1  Robert A. Bleicher (Bar No. 111334)
   HOLLAND & KNIGHT LLP
2  50 California Street, 28th Floor
   San Francisco, California 94111
3  Telephone: (415) 743-6900
   Facsimile: (415) 743-6910
4
   Shelley G. Hurwitz (SBN 217566)
5  HOLLAND & KNIGHT LLP
   633 W. Fifth Street, 21st Floor
6  Los Angeles, California 90071
   Telephone: (213) 896-2400
7  Facsimile: (213) 896-2450

8  Attorneys for Defendant
   Anthony Rothschild
9

10

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14 | CORCEPT THERAPEUTICS, INC., | Case No.: C 07-03795 JW
   | Corporation, JOSEPH K. BELANOFF, an |
15 | individual, ALAN F. SCHATZBERG, an | **MEMORANDUM OF POINTS AND**
   | individual | **AUTHORITIES IN SUPPORT OF**
16 | | **DEFENDANT DR. ANTHONY**
   |         Plaintiffs, | **ROTHSCHILD'S SPECIAL MOTION TO**
17 | | **STRIKE PURSUANT TO CALIFORNIA'S**
   |         vs. | **STRATEGIC LAWSUIT AGAINST**
18 | | **PUBLIC PARTICIPATION (ANTI-**
   | ANTHONY ROTHSCHILD, DOE 1, an | **SLAPP) STATUTE**
19 | individual, DOE 2, an individual, and DOES 3 |
   | through 20, inclusive, | **Date:** October 22, 2007
20 | | **Time:** 9:00 am
   |         Defendants. | **Courtroom:** 8
21 | | **Judge:** Hon. James Ware

22 | |  [Filed concurrently with Notice of Motion,
   | | Declarations of Dr. Anthony Rothschild and
23 | | Shelley Hurwitz, and Non-Federal Authorities]

24

25

26

27

28

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................... 2

    A.    The Parties. ...................................................................................... 2

        1.    Plaintiffs ................................................................................ 2

        2.    Defendant Dr. Rothschild. .................................................... 3

    B.    Facts Giving Rise To This Action. ................................................... 3

    C.    CORLUX And The Financial Interests Of Schatzberg And Belanoff Have Been A Matter Of Widespread Public Debate For Many Years............................ 4

III.  THE ANTI-SLAPP STATUTE PROTECTS ACTS IN FURTHERANCE OF FREE SPEECH. ................................................................................ 7

IV.   THE FIRST AMENDED COMPLAINT ARISES FROM ACTS IN FURTHERANCE OF FREE SPEECH..................................................... 8

    A.    The Four Yahoo Postings Constitute Statements Made In A Public Forum .......... 8

    B.    The Efficacy Of CORLUX And The Related Conduct Of Its Insiders Constitutes An Issue of Public Interest..................... 8

        1.    CORLUX Is Touted As A Drug To Treat A Serious Disorder Suffered By Millions Of People. ....................... 9

        2.    Corcept's Corporate Activities Are An Issue Of Public Interest. ............. 10

V.    PLAINTIFFS CANNOT DEMONSTRATE A PROBABILITY OF PREVAILING ON THE MERITS OF THEIR CLAIMS. ........................... 11

    A.    Plaintiffs Can Still Not Establish That Dr. Rothschild Posted The Allegedly Defamatory Comments. ..................... 12

        1.    The October 17, 2005 Posting ................................................. 13

        2.    November 4, 2005 Posting....................................................... 14

    B.    Plaintiffs' Claims Are Based On Statements That Are Either Protected Expressions Of Subjective Opinion Or Substantially True. ................... 14

        1.    Legal Standards. ..................................................................... 14

            a.    Expressions of Opinion Are Not Actionable. ............... 14

            b.    Statements Whose "Gist" and "Sting" Are Substantially True Are Not Actionable. ......................... 15

        2.    All Of The Postings Explicitly State That They Are Opinion. ............. 16

        3.    The March 17, 2005 Posting. ................................................. 16

        4.    The August 23, 2005 Posting.................................................. 19

        5.    The October 17, 2005 Posting ................................................ 20

        6.    The October 28, 2005 Posting ................................................ 21

    C.    Plaintiffs Cannot Establish Actual Malice And Therefore Cannot Maintain Their Defamation Claims.................... 21

Defendant Anthony Rothschild's                                     Case No.: C 07-03795 JW
Special Motion To Strike

1.      Plaintiffs Are Public Figures...................................................................... 22

2.      Plaintiffs Cannot Establish Actual Malice .............................................. 24

D.     Plaintiffs' Interference With Prospective Advantage And Intentional Infliction Of Emotional Distress Causes Of Action Must Also Be Stricken......... 24

VI.    CONCLUSION............................................................................................. 25

Defendant Anthony Rothschild's
Special Motion To Strike

Case No.: C 07-03795 JW

1

# TABLE OF AUTHORITIES

2

## FEDERAL CASES

3

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...............................................................................12

4

*California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,*
5          818 F.2d 1466 (9th Cir. 1987) ........................................................11

6

*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ............................................................17

7

*Cormier v. Pennzoil Exploration & Prod. Co.,*
8          969 F.2d 1559 (5th Cir. 1992) ........................................................12

9

*Global Telemedia v. Doe 1,*
    132 F. Supp. 2d 1261 (C.D. Cal. 2001) ............................................10

10

*Masson v. New Yorker Magazine,*
11          501 U.S. 496 (1991).............................................................15, 18

12

*Metabolife Intern., Inc. v. Wornick,*
    264 F.3d 832 (9th Cir. 2001) ................................................................8

13

*Partington v. Bugliosi,*
14          56 F.3d 1147 (9th Cir.1995) ..........................................................17

15

*Ruffin v. County of Los Angeles,*
    607 F.2d 1276 (9th Cir. 1979) ............................................................12

16

*Thomas v. Fry's Electronics, Inc.,*
17          400 F.3d 1206 (9th Cir. 2005) ..........................................................7

18

*Thomas v. Los Angeles Times Communications, LLC,*
    189 F. Supp. 2d 1005 (C.D. Cal. 2002) ............................................15

19

*Thomas v. Los Angeles Times Communications LLC,*
20          45 Fed.Appx. 801 (9th Cir. 2002)......................................................7

21

*Troy Group v. Tilson,*
    364 F. Supp. 2d 1149 (C.D. Cal. 2005) ............................................10

22

23

## STATE CASES

24

*Ampex Corp. v. Cargle,*
    128 Cal. App. 4th 1569 (2005) ...........................8, 10, 12, 16, 22, 23, 24

25

*Annette F. v. Sharon S.,*
26          119 Cal. App. 4th 1146 (2004) ........................................................21

27

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,*
    47 Cal. App. 4th 464 (1996) ................................................................25

28

Defendant Anthony Rothschild's                                    Case No.: C 07-03795 JW
Special Motion To Strike

*Baker v. L.A. Herald Examiner*,
    42 Cal. 3d 254 (1986) ................................................................14

*Botos v. Los Angeles County Bar Assn*,
    151 Cal. App. 3d 1083 (1984) .....................................................19

*Braun v. Chronicle Publ'g Co.*,
    52 Cal. App. 4th 1036 (1997) ......................................................12

*Christian Research Inst. v. Alnor*,
    148 Cal. App. 4th 71 (2007) .....................................................7, 25

*Colt v. Freedom Commc'ns, Inc.*,
    109 Cal. App. 4th 1551 (2003) ....................................................22

*ComputerXpress, Inc. v. Jackson*,
    93 Cal. App. 4th 993 (2001) ..................................................7, 8, 10

*Conroy v. Spitzer*,
    70 Cal. App. 4th 1446 (1999) ......................................................22

*DuPont Merck Pharmaceutical Co. v. Superior Court*,
    78 Cal. App. 4th 562 (2000) .....................................................9, 10

*Fellows v. National Inquirer, Inc.*,
    42 Cal. 3d 234 (1986) ................................................................24

*Ferlauto v. Hamsher*,
    74 Cal. App. 4th 1394 (1999) ......................................................16

*Flores v. Emerich & Fike*,
    2007 WL. 963282 (E.D. Cal. 2007) ..............................................11

*Franklin v. Dynamic Details, Inc.*,
    116 Cal. App. 4th 375 (2004) ..................................................14, 17

*Ghafur v. Bernstein*,
    131 Cal. App. 4th 1230 (2005) ....................................................15

*Gilbert v. Sykes*,
    147 Cal. App. 4th 13 (2007) ...............................4, 11, 19, 22, 23, 24, 25

*HMS Capital v. Lawyers Title Co.*,
    118 Cal. App. 4th 204 (2004) .......................................................8

*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*,
    129 Cal. App. 4th 1228 (2005) ......................................................8

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) .............................................................25

*Live Oak Publishing Co. v. Cohagan*,
    234 Cal. App. 3d 1277 (1991) ..................................................22, 23

*Miller v. Nestande*,
    192 Cal. App. 3d 191 (1987) .......................................................15

-iv-

*Mosesian v. McClatchy Newspapers,*
  233 Cal. App. 3d 1685 (1991) ...........................................................24

*Moyer v. Amador Valley J. Union High Sch. Dist.,*
  225 Cal. App. 3d 720 (1990) .........................................................15, 19

*Overstock.com, Inc. v. Gradient Analytics, Inc.,*
  151 Cal. App. 4th 688 (2007) ...........................................................15

*Rosenaur v. Scherer,*
  88 Cal. App. 4th 260 (2001) .............................................................22

*Sipple v. Foundation For National Progress,*
  71 Cal. App. 4th 226 (1999) .............................................................22

*Stolz v. KSFM 102 FM,*
  30 Cal. App. 4th 195 (1994) .................................................15, 21, 23

*Varian Med. Sys., Inc. v. Delfino,*
  35 Cal. 4th 180 (2005) .......................................................................7

*Vogel v. Felice,*
  127 Cal. App. 4th 1006 (2005) .........................................................22

*Wilbanks v. Wolk,*
  121 Cal. App. 4th 883 (2004) ..........................................................8, 9

*Wilcox v. Superior Court,*
  27 Cal. App. 4th 809 (1994) .............................................................11

*Wilson v. Parker, Covert & Chidester,*
  28 Cal. 4th 811 (2002) .....................................................................11

## STATUTES

C.C.P.
  § 425.16(a) ................................................................1, 7, 8, 11, 12
  § 425.16(b)(1) ...................................................................................7
  § 425.16(e) .......................................................................................7
  § 425.16(e)(3) .................................................................................11


FRCP
  Rule 56(c) ..................................................................................11, 12
  Rule 10b5-1 ....................................................................................18

# 4715904_v3

Defendant Anthony Rothschild's                              Case No.: C 07-03795 JW
Special Motion To Strike

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs Alan Schatzberg, Joseph Belanoff, and their publicly traded company, Corcept Therapeutics, Inc. ("Corcept") are powerful public figures attempting to sue their critics into silence. What makes this litigation even more egregious than most speech-chilling SLAPP ("Strategic Lawsuit Against Public Participation") lawsuits is that the four Yahoo postings that plaintiffs erroneously attribute to defendant Dr. Anthony Rothschild are mere trifles in the vast and heated public debate and criticism of plaintiffs and the drug they have developed, CORLUX. For years, there has been vigorous debate on the internet, in the press, in medical journals, and in financial publications regarding the efficacy of CORLUX and the financial ties and conflicts of interest of Corcept's insiders, Dr. Belanoff (its CEO) and Dr. Schatzberg (developer of the CORLUX patent, a major Corcept shareholder, and the Chairman of Corcept's Board of Scientific Advisors). Yet, plaintiffs have inexplicably chosen to target Dr. Rothschild, making the baseless allegation that he made four internet postings on a Yahoo message board and that those postings, amid a sea of public controversy, have caused them grave injury. The California Legislature had this type of lawsuit precisely in mind when it enacted the special motion to strike procedure permitting the award of defense expenses in cases asserting frivolous defamation and other speech-chilling claims, noting "the disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech [.]" C.C.P. § 425.16(a).

Significantly, unlike the typical anti-SLAPP motion that proceeds before discovery, plaintiffs already have conducted years of exhaustive discovery and *still* cannot present evidence that it was Dr. Rothschild who posted the allegedly defamatory comments on the free, publicly accessible Yahoo message board. In any event, whoever posted the messages, the "gist" and "sting" of the postings are either substantially true or constitute nonactionable opinion absolutely protected by law. Therefore, and because plaintiffs cannot establish the predicate "actual malice," plaintiffs cannot demonstrate a probability of success on the merits of their claims. The First Amended Complaint must be stricken pursuant to California's anti-SLAPP statute.

1    II.    **STATEMENT OF FACTS**

2       A.    **The Parties.**

3          1.    **Plaintiffs**

4    Corcept is a publicly traded pharmaceutical company that develops drugs for the

5    treatment of severe psychiatric and metabolic diseases.  First Amended Complaint ("FAC")

6    ¶¶1&2.  Plaintiffs Joseph K. Belanoff ("Belanoff") and Alan F. Schatzberg ("Schatzberg") are

7    co-founders of Corcept, with Belanoff as Corcept's CEO.  FAC, ¶1, Exh. 1[1].  Dr. Belanoff owns

8    or controls approximately 2.8 million shares of Corcept (8.1%), while Dr. Schatzberg owns or

9    controls about 2.7 million shares (7.9%).  Exh. 28.  Corcept's lead product is CORLUX, a drug

10   targeted for the treatment of the psychotic features of Psychotic Major Depression.  ("PMD").

11   FAC, ¶9.  CORLUX is a brand name for mifepristone, commonly known as RU-486 or the

12   "abortion pill," a potent antagonist of the body's cortisol and progesterone receptors.  Declaration

13   of Anthony Rothschild ("Rothschild Decl."), ¶6.  In addition to their prominent roles at Corcept,

14   Dr. Belanoff is a clinical faculty member in the Department of Psychiatry at Stanford University

15   and Dr. Schatzberg is the Chair of the Department of Psychiatry at Stanford.  Rothschild Decl.

16   ¶7.  Dr. Schatzberg developed the patent for CORLUX; he assigned that patent to Stanford

17   University.  Id. at ¶7.

18   Corcept has conducted several clinical trials of CORLUX.   According to Corcept's press

19   releases and widely disseminated reports in the medical and financial literature, these clinical

20   trials have all failed to provide sufficient scientific support for the use of CORLUX in treating

21   PMD.  See e.g., Corcept Press Release, August 10, 2006 ("Corcept Therapeutics Announces

22   Negative Results From The First of Three Phase 3 Studies Evaluating Corlux . . . "); Corcept

23   Press Release, September 29, 2006 (Corcept "today announced that the second of its three Phase

24   3 trials evaluating CORLUX for treating the psychotic features of PMD was negative."); Corcept

25   Press Release, March 19, 2007 (Corcept "today announced that Study 06, the last of three Phase

26

27   _____

[1] Unless otherwise noted, all exhibits cited herein are attached to the declaration of Shelley

28   Hurwitz, filed herewith.

-2-

1    3 trials evaluating CORLUX for treating the psychotic features of PMD, did not achieve

2    statistical significance with respect to its primary endpoint.") Exh. 2.[2]

3            **2.    Defendant Dr. Rothschild.**

4            Defendant Dr. Rothschild is a Professor and Vice Chair for Research in the Department

5    of Psychiatry at the University of Massachusetts Medical School. Rothschild Decl., ¶2. Dr.

6    Rothschild also maintains a clinical practice in Massachusetts where he treats severely ill

7    inpatient and outpatient psychiatric patients. Rothschild Decl., ¶2. In the 1980s, while they were

8    both researchers at McLean Hospital, Schatzberg and Dr. Rothschild formed a theory regarding

9    the underlying cause of PMD: that high cortisol levels might play a key role in PMD. Rothschild

10   Decl., ¶8. While Schatzberg and Dr. Rothschild hypothesized that RU-486 might effectively

11   treat PMD, restrictions on the "abortion pill" prevented any research. Rothschild Decl., ¶8.

12   After the drug became available under President Clinton, Schatzberg and Belanoff, then at

13   Stanford, began to test mifepristone on severely depressed patients. Exh. 6. A patent dispute

14   then ensued between Stanford and McLean Hospital – Stanford ultimately prevailed. Rothschild

15   Decl., ¶8

16           **B.    Facts Giving Rise To This Action.**

17           Plaintiffs allege that someone utilizing the internet screen names "corceptisafraud" and

18   "stanfordinsider" posted statements on a Yahoo internet message board regarding the efficacy of

19   Corcept's drug, CORLUX, specifically that there is no scientific evidence that it is effective for

20   psychotic depression, that Corcept knew that it was ineffective, that Belanoff and Schatzberg and

21   other insiders were selling their Corcept stock, and that there were four cardiac related deaths

22   during clinical trials of the drug. FAC, ¶¶16&23. Plaintiffs contend that these statements are

23   false and defamatory. FAC, ¶¶17&24.

---

24   [2] See also medical journal articles such as Nihalani & Schwartz, <u>Drug evaluation: Mifepristone, a</u>
25   <u>glucocorticoid antagonist for the potential treatment of psychotic major depression,</u> Current
     Opinion in Investigational Drugs, 8(7):563-569 (2007)("As the evidence is currently mixed,
26   there is not enough definitive data to support widespread use of mifepristone for PMD.") Exh. 3,
     and Carroll & Rubin, <u>Is Mifepristone Useful in Psychotic Depression?</u>
27   Neuropsychopharmacology, 31, 2793-2794 (2006), Exh. 4. See also analysts reports such as
     PiperJaffray, Company Note, June 1, 2004 ("Efficacy data from the two Phase III trial were
28   mixed, with one trial failing to demonstrate efficacy . . ..") Exh. 5.

1    The First Amended Complaint contends that "corceptisafraud" posted four messages to

2    the Yahoo message board, and that "stanfordinsider" posted three messages. FAC, ¶¶16&23.

3    Plaintiffs also contend that "standfordinsider" posted a message on November 4, 2005.

4    However, plaintiffs allege that only *four* of these messages are defamatory – *March 17, 2005,*

5    *August 23, 2005, October 17, 2005 and October 28, 2005.* FAC, ¶¶16&23.[3]

6    While the original complaint was filed almost two years ago, plaintiffs inexplicably now

7    allege that Dr. Rothschild is the person who posted the allegedly defamatory statements. FAC,

8    ¶¶16&23.

9    In their Third Cause of Action for Intentional Infliction of Emotional Distress, plaintiffs

10    allege that Dr. Rothschild "pursued a calculated strategy to inflict emotional distress on Belanoff

11    and Schatzberg" by, essentially, making prank telephone calls. FAC, ¶30. Again, the First

12    Amended Complaint does not contain any allegations indicating why plaintiffs attribute these

13    alleged prank calls to Dr. Rothschild.

14    The First Amended Complaint also contains a Cause of Action for Interference with

15    Prospective Economic Relations, alleging that Dr. Rothschild interfered with Corcept's

16    prospective relationships with potential shareholders, universities and professional societies by

17    engaging in the conduct alleged above. FAC, ¶¶37-39.

18    **C.    CORLUX And The Financial Interests Of Schatzberg And Belanoff Have**

19    **Been A Matter Of Widespread Public Debate For Many Years.**

20    The efficacy of CORLUX and the conflicts of interest presented by the business and

21    academic interests of Schatzberg and Belanoff have been matters of widespread public debate for

22    many years. While plaintiffs had long publicly touted the promise of CORLUX for the treatment

23    of PMD[4], the debate regarding its efficacy and the conflicts of Corcept's principals who authored

24    [3] Gilbert v. Sykes, 147 Cal. App. 4th 13, 26 (2007)("The general rule is that the words

25    constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.")

26    [4] For example, on May 1, 2004, Belanoff presented the results of a clinical study of CORLUX at

27    the Biological Psychiatry Conference in New York City. Exh. 7. On October 11, 2004, Schatzberg made a presentation at the European College of Neuropsychopharmacology (ECNP)

28    Annual Meeting in Stockholm, Sweden entitled "Cortisol receptor antagonists in the treatment of depression". Id. On December 8, 2004, Corcept made a presentation regarding its clinical and

-4-

1    "academic studies" came to a head in December 2004 when Dr. Bernard Carroll and Dr. Robert

2    Rubin unveiled a presentation at the American College of Neuropsychopharmocology

3    Conference entitled "Mifepristone (RU 486) in the Treatment of Psychotic Depression: Re-

4    Evaluation of Published Data."  Rothschild Decl., ¶9; Exh. 1 thereto and Exh. 9 to Hurwitz Decl..

5    Drs. Carroll and Rubin criticized the conclusions reached by the three published studies of RU-

6    486 (CORLUX) for depression, and their presentation juxtaposed positive statements by

7    Belanoff and Schatzberg in their role as academic scientists at Stanford regarding the efficacy of

8    RU-486 against their financial interests in Corcept.  Id.

9        Since then, there has been additional vigorous debate on the internet, in the press, in

10    medical journals, and in financial publications regarding CORLUX and the financial ties of

11    Belanoff and Schatzberg.  Indeed, the subject postings were only a few of the *283* messages

12    posted by internet users in that message board string alone.  Exh. 10.  Other Yahoo postings

13    critical of Corcept and CORLUX, lead with such heated titles as: "Corcept being run by crooks,"

14    "CORLUX makes u gain weight," "Insiders r itching to sell on this", "[Corcept] = a scam

15    operation," "CEO insider selling like crazy ripoff i sell also", and "All this insider selling really

16    bothers me."  Exh. 11.

17        The CORLUX debate continues on other internet sites besides Yahoo.  See e.g., "Clinical

18    Psychology and Psychiatry: A Closer Look," April 5, 2007, ("Although [Corcept] has tried to

19    spin negative findings as actually being positive, its hard to see how a series of studies showing

20    poor efficacy will lead to helping patients in any meaningful fashion . . some have questioned

21    whether [Schatzberg's] financial stake in the company has skewed his judgment on the topic.)"

22    Exh. 12; "Health Care Renewal," November 20, 2006 ("These failure did not stop the Corcept

23    team from talking up the drug's potential in review articles, book chapters, Continuing Medical

24    Education programs, news reports, and press releases. . . All in all, Corcept is a case study in bad

25

26    corporate progress at Harris Nesbitt "Focus on Healthcare" Investor Conference. Id.  In October
     2004, The Wall Street Transcript published an interview of Belanoff and Corcept's CFO Fred
27    Kurland, wherein Belanoff is quoted as stating that "[a]t this point in time, what we are working
     on is demonstrating the efficacy and safety of CORLUX for psychotic depression." Exh. 8. See
28    Exhibit 7 for a list of other presentations that plaintiffs have given regarding CORLUX.

-5-

1   outcomes for academic entrepreneurs and their backers.") Exh. 13; "SiliconBeat," July 11, 2006,

2   ("Yet peers are saying [Schatzberg's] research is shoddy, and that he hasn't provided any

3   convincing statistical analysis.") Exh. 14.

4        CORLUX has also been the topic of many articles published in scientific journals,

5   including articles written by plaintiffs, in which they disclose their positions at Stanford but are

6   silent about their direct financial stake and role in CORLUX and Corcept.[5]  Plaintiffs' journal

7   articles have been criticized on the internet and elsewhere for this omission by among others,

8   Drs. Rubin and Carroll.  See Exh. 18 & Exh. 12 (Nov. 10, 2006 posting).

9        Confirming the public's interest in CORLUX, Corcept, and its insiders, The San Jose

10  Mercury News published a lengthy article on July 10, 2006 entitled "Science critics make issue

11  of financial ties" recounting the controversy surrounding CORLUX, the lack of evidence that it

12  works for PMD, the criticisms of Drs. Rubin and Carroll, and the financial conflicts of

13  Schatzberg and other insiders.  Exh. 6.  The Article discussed the Rubin and Carroll presentation

14  and recounted Dr. Schatzberg's effort to intimidate and silence his critics: "Even now, Schatzberg

15  can hardly contain his anger, 'Those that are critical', he said, 'ought to be careful about

16  impugning others.'"  Id.

17       As a publicly traded company, Corcept and its chief product, CORLUX, have also been

18  the topic of many analyst reports.  See e.g., PiperJaffray, Company Note, June 1, 2004 ("Efficacy

19  data from the two Phase III trial were mixed, with one trial failing to demonstrate efficacy . . ..")

20  Exh. 5; Legg Mason, Company Analysis, June 2, 2004 ("[W]e believe that the lack of near-term

21  milestones makes it difficult to justify purchasing shares at this time.") Exh. 5.

22  [5] See e.g., Debattista & Belanoff, The use of mifepristone in the treatment of neuropsychiatric
    disorders, Trends in Endocrinology and Metabolism, Vol. 17, No. 3 April 2006, Exh. 15;
23  Debattista & Belanoff, Response to Rubin and Carroll, Trends in Endocrinology and
    Metabolism, Vol. 17, No. 10, October 31, 2006, Exh. 29; Carroll & Rubin, Is Mifepristone
24  Useful in Psychotic Depression, Neuropsychopharmacology, Issue 31, p.2793-2794 (2006), Exh.
    4; Rothschild, Challenges in the Treatment of Depression with Psychotic Features, Biological
25  Psychiatry, 53:680-690 (accepted September 17, 2002), Exh. 16; Smith, Burke, et. al., Psychosis
    in Major Depression, 2007, Exh. 17; Nemeroff & Neigh, Response to Rubin and Carroll and Van
26  Den Eede et al., Trends in Endocrinology and Metabolism, Vol. 17, No. 10, October 30, 2006,
    Exh. 30; Schatzberg, New Approaches to Managing Psychotic Depression, J Clin Psychiatry
27  2003; 64, Exh. 32; Belanoff, et. al, Cortisol Activity and Cognitive Changes in Psychotic Major
    Depression, Am J. Psychiatry 2001; 158:1612-1616, Exh. 33.

28

-6-

1    Plaintiffs have apparently, and without justification, chosen to "set an example" for their

2    critics by targeting Dr. Rothschild, due to his stature in the field.

3    **III.    THE ANTI-SLAPP STATUTE PROTECTS ACTS IN FURTHERANCE OF FREE**

4    **SPEECH.**

5    The anti-SLAPP statute (C.C.P. § 425.16), through a "special motion to strike," provides

6    citizens "a right not to be dragged through the courts because [he] exercised [his] constitutional

7    rights." Varian Med. Sys., Inc. v. Delfino, 35 Cal. 4th 180, 193 (2005). The statute arose from

8    the Legislature's recognition that SLAPP suit plaintiffs are not seeking to succeed on the merits,

9    but to use the legal system to the chill the defendant's First Amendment right of free speech.

10   Christian Research Inst. v. Alnor, 148 Cal. App. 4th 71 (2007).

11   The anti-SLAPP special motion to strike is available to defendants who have removed to

12   Federal Court. Thomas v. Los Angeles Times Communications LLC, 45 Fed.Appx. 801 (9th

13   Cir. 2002)("We have previously held that the special motion to strike provided for by the anti-

14   SLAPP statute may be made in cases removed from the California courts"); Thomas v. Fry's

15   Electronics, Inc., 400 F.3d 1206 (9th Cir. 2005).

16   C.C.P. § 425.16, which must be construed broadly, applies where "the defendant has

17   made a threshold showing that the challenged action is one arising from protected activity"

18   enumerated in the statute, specifically an "act in furtherance of a person's right of petition or free

19   speech under the United States or California Constitution in connection with a public issue." See

20   § 425.16(e). Claims based on these acts are subject to a special motion to strike unless the court

21   determines that the plaintiff has established that there is a probability of prevailing on the merits.

22   § 425.16(b)(1).

23   Thus, the anti-SLAPP statute invites a two-part analysis: First, did the challenged cause

24   of action arise from activity protected under the statute? The moving defendant bears this

25   threshold burden. Second, if the defendant makes the threshold showing, the burden shifts to the

26   plaintiff to make a prima facie showing of facts which, if credited by the trier of fact, would

27   sustain a favorable judgment. ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 999

28   (2001). In opposing an anti-SLAPP motion, the plaintiff cannot rely on allegations in the

-7-

1  complaint, but must bring forth sufficient evidence that would be admissible at trial. Metabolife

2  Intern., Inc. v. Wornick, 264 F.3d 832, 840 (9th Cir. 2001); HMS Capital v. Lawyers Title Co.,

3  118 Cal. App. 4th 204, 212 (2004).

4  **IV.    THE FIRST AMENDED COMPLAINT ARISES FROM ACTS IN**

5          **FURTHERANCE OF FREE SPEECH.**

6          Despite years of investigation and discovery, plaintiffs still have no grounds to contend

7  that Dr. Rothschild authored the allegedly defamatory postings. Rothschild Decl., ¶5. Plaintiffs

8  have simply sued the wrong person. In any event, the First Amended Complaint is a perfect

9  paradigm of the type of lawsuit that the Legislature acted to prevent in enacting C.C.P. §

10 425.16(a). The anti-SLAPP statute explicitly protects as an "act in furtherance of . . . free speech

11 . . . Any written or oral statement or writing made in a place open to the public or a public forum

12 in connection with an issue of public interest." C.C.P. § 425.16(e)(3). Here, the four Yahoo

13 postings undoubtedly meet that definition.

14     **A.    The Four Yahoo Postings Constitute Statements Made In A Public Forum**

15         Messages posted on the Yahoo message board constitute statements made in a public

16 forum for the purposes of the anti-SLAPP statute. Indeed, in Ampex Corp. v. Cargle, 128 Cal.

17 App. 4th 1569, 1576 (2005), the Court expressly held that a Yahoo message board, such as the

18 one in this case, constitutes a public forum for the purposes of the anti-SLAPP statute. See also

19 Wilbanks v. Wolk, 121 Cal. App. 4th 883, 895 (2004); ComputerXpress, Inc. v. Jackson, 93 Cal.

20 App. 4th 993, 1007 (2001)(holding that disparaging remarks made on websites were made in a

21 public forum where the websites were accessible free of charge to any member of the public and

22 persons who chose to do so could post their own opinions there.)

23     **B.    The Efficacy Of CORLUX And The Related Conduct Of Its Insiders**

24          **Constitutes An Issue of Public Interest**

25         A statement or other conduct is "in connection with an issue of public interest" (C.C.P.

26 §425.16(e)(3)) if the statement or conduct concerns a topic of widespread public interest and

27 contributes in some manner to a public discussion of the topic. Wilbanks v. Wolk, 121 Cal. App.

28 4th 883, 898 (2004); Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA,

-8-

1    <u>Inc.,</u> 129 Cal. App. 4th 1228, 1246 (2005).  Again, the alleged postings easily satisfy this

2    standard.

3    **1.    CORLUX Is Touted As A Drug To Treat A Serious Disorder Suffered**

4    **By Millions Of People.**

5    The alleged Yahoo message board postings regarding CORLUX and the actions of its

6    insiders constitute an "issue of public interest".  Consumer information affecting a large number

7    of persons, such as a consumer's statements about the quality of a seller's products, is information

8    concerning a matter of public interest.  <u>See Wilbanks v. Wolk</u>, 121 Cal. App. 4th 883, 898

9    (2004) (Alleged statements made by industry consumer watchdog on her website to effect that

10   viatical settlements brokerage was under investigation by Department of Insurance, subject to

11   judgment against it, a provider of incompetent advice, and unethical concerned issue of public

12   interest).  When the product is a prescription drug indicated to treat a widespread, serious

13   medical condition, there is an even more compelling basis to classify statements concerning that

14   product as a matter of public interest.

15   In <u>DuPont Merck Pharmaceutical Co. v. Superior Court</u>, 78 Cal. App. 4th 562 (2000), the

16   plaintiffs alleged that the defendant pharmaceutical company made false and omissive statements

17   about Coumadin, a prescription blood thinner.  In holding that the statements concerned an issue

18   of public interest under the anti-SLAPP statute, the Court explained: "We find the answer to this

19   question in the first amended complaint.  Plaintiffs allege: 'More than 1.8 million Americans

20   have purchased Coumadin, an anti-coagulant medication, for the prevention and treatment of

21   blood clots that can lead to life-threatening conditions such as stroke and pulmonary embolism.'

22   Both the number of persons allegedly affected and the seriousness of the conditions treated

23   establish the issue as one of public interest."  <u>Id.</u> at 567.

24   Here, CORLUX is targeted for the treatment of psychotic features of PMD.  FAC, ¶9.

25   Plaintiffs contend that CORLUX was granted "fast track status" by the FDA, a status granted to

26   certain drugs intended for the treatment of life-threatening conditions,  "because of the severity

27   of the illness and because no other drugs have been approved for it." FAC, ¶9; Exh. 27, Corcept

28   Website.  Indeed, Corcept reports that:

Defendant Anthony Rothschild's                                    Case No.: C 07-03795 JW
Special Motion To Strike

1
2
3
4
5

> The course of PMD is such that patients with it often require hospitalization . . . In addition, psychotically depressed individuals are at increased risk for suicide. Almost 15 percent of those suffering from severe depression ultimately commit suicide . . . Individuals with PMD are at least 70 times more likely to commit suicide in their lifetime than the general population. In fact, individuals with PMD appear to be five times more likely to commit suicide than those suffering from major depression without psychotic features.

6    Exh. 19, Corcept Website.

7    Corcept further reports that about 3 million people have PMD. Id. Thus, like Coumadin

8    in the DuPont case, Corlux is indicated to treat a serious condition affecting millions of people.

9    As such, the alleged postings regarding CORLUX's effectiveness are a matter of public interest

10    for the purposes of the anti-SLAPP statute. DuPont, supra, at 567. Plainly, moreover, the

11    anonymous postings "contribute in some manner to a public discussion of the topic" as they are

12    freely accessible to anyone in the world, and invite discussion from fellow Yahoo message board

13    users.

14              2.    **Corcept's Corporate Activities Are An Issue Of Public Interest.**

15    In the same vein, internet postings concerning the corporate activities of Corcept's

16    insiders are matters of public interest. In determining whether internet postings about corporate

17    activity constitute issues of public interest, courts consider the following pertinent factors: (1)

18    whether the company is publicly traded, (2) the number of investors, and (3) whether the

19    company has promoted itself by means of numerous press releases. Ampex Corp. v. Cargle,

20    supra, 128 Cal. App. 4th at 1576; Global Telemedia v. Doe 1, 132 F. Supp. 2d 1261 (C.D. Cal.

21    2001)(statements made in internet chatroom criticizing the management of a publicly traded

22    company who issued numerous press releases and had thousands of investors involved "matters

23    of public significance"); ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 999

24    (2001)(disparaging comments by business owners about a publicly-traded company, as posted on

25    Internet sites, were made in connection with issues of public interest; company had from 12

26    million to 20 million outstanding shares, and issued press releases); Troy Group v. Tilson, 364 F.

27    Supp. 2d 1149 (C.D. Cal. 2005).

28

-10-

1    Corcept has issued at least 55 press releases regarding CORLUX and Corcept's corporate

2    activities, with 24 of those press releases issued before the alleged Yahoo postings.  Exh. 2.

3    Moreover, on the dates of the alleged postings, Corcept had between 22 million and 23 million

4    shares of common stock outstanding, with 34,741,766 shares outstanding as of April 30, 2007.

5    Exh. 20.  Internet postings about these corporate activities confirms that they relate to a matter of

6    public interest.

7        Therefore, this action clearly arises out of statements made in a public forum and "in

8    furtherance of the constitutional right of free speech in connection with an issue of public

9    interest."  § 425.16(e)(3).

10   **V.    PLAINTIFFS CANNOT DEMONSTRATE A PROBABILITY OF PREVAILING**

11   **ON THE MERITS OF THEIR CLAIMS.**

12       Once a defendant makes a prima facie showing that the anti-SLAPP statute applies, the

13   burden shifts to plaintiffs to establish a probability of success on the merits. C.C.P.

14   §425.16(b)(1); Wilcox v. Superior Court, 27 Cal. App. 4th 809, 824 (1994).  To meet this

15   burden, Plaintiffs must "state and substantiate a legally sufficient claim."  Wilson v. Parker,

16   Covert & Chidester, 28 Cal. 4th 811, 821 (2002).  In assessing the probability of prevailing, a

17   court looks to the evidence that would be presented at trial, similar to reviewing a motion for

18   summary judgment; a plaintiff cannot simply rely on its pleadings, but must adduce, competent,

19   admissible evidence.  Gilbert v. Sykes, 147 Cal. App. 4th 13, 26 (2007).

20       The Federal standard on a motion for summary judgment should be applied.  See Flores

21   v. Emerich & Fike, 2007 WL 963282 *5 (E.D. Cal. 2007)(". . . where an Anti-SLAPP motion to

22   strike is based on a plaintiff's alleged failure of proof, the motion must be treated as a motion for

23   summary judgment under the Federal Rule of Civil Procedure 56 . . .").  The Ninth Circuit has

24   made it clear that, "no longer can it be argued that any disagreement about a material issue of

25   fact precludes the use of summary judgment."  California Architectural Bldg. Prods., Inc. v.

26   Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).  Under Rule 56, where the

27   moving party meets its initial burden of demonstrating the absence of any genuine issue of

28   material fact, the nonmoving party must then produce "specific facts showing that there

-11-

1   remain[s] a genuine factual issue for trial" and that the evidence is "significantly probative" as to

2   any material fact claimed by the nonmoving party to be in dispute.  Ruffin v. County of Los

3   Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  Evidence that is "merely colorable," or raises

4   some "metaphysical doubt," or is otherwise conclusory or speculative is wholly insufficient to

5   raise genuine issues of fact and defeat a motion for summary judgment.  Anderson v. Liberty

6   Lobby, Inc., 477 U.S. 242, 249-50 (1986).

7        Thus, declarations that lack foundation or personal knowledge, or that are argumentative,

8   speculative, impermissible opinion, hearsay or conclusory are to be disregarded.  See FRCP

9   56(c); Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992).

10  Absent a sufficient showing, the court must strike the Complaint and award defendant his

11  attorney's fees and costs. C.C.P. §425.16(c); Braun v. Chronicle Publ'g Co., 52 Cal. App. 4th

12  1036, 1052-1053 (1997).  Here, plaintiffs cannot meet their burden because, as demonstrated

13  below, they do not have a probability of prevailing on the merits of their claims.  Indeed, unlike

14  the typical anti-SLAPP motion that proceeds prior to discovery, plaintiffs have conducted years

15  of exhaustive discovery and investigation and are *still* unable to present evidence sufficient to

16  establish a probability of prevailing on the merits. Rothschild Decl., ¶5.  In addition, for the

17  same reasons that the statements at issue are not actionable by plaintiffs Belanoff and

18  Schatzberg, they are not actionable by Corcept.  See Ampex Corporation v. Cargle, 128 Cal.

19  App. 4th 1569 (2005).

20        A.    **Plaintiffs Can Still Not Establish That Dr. Rothschild Posted The Allegedly**

21              **Defamatory Comments.**

22        As a predicate, plaintiffs must establish that Dr. Rothschild is the person who posted the

23  four allegedly defamatory statements on March 17, August 23, October 17, and October 28, 2005

24  under the names "corceptisafraud" and "stanfordinsider."  They cannot because Dr. Rothschild

25  has never registered or used the internet screen names "corceptisafraud" or "standfordinsider."

26  Rothschild Decl., ¶3.  Plaintiffs searched Dr. Rothschild's work computer, his laptop computer,

27  his telephone records at work; they hired technology experts to examine his cell phone and

28  pager, subpoenaed documents from Yahoo and other internet providers, subpoenaed documents

-12-

1    from hotels, subpoenaed records from the American Psychiatric Association; they took his

2    deposition for a full day.  Still they have no evidence, let alone significantly probative evidence,

3    to connect Dr. Rothschild with these names and, hence, these postings.

4        At best, plaintiffs may point to subpoenaed documents produced by Yahoo indicating that

5    someone who identified himself as "standfordinsider" made postings at a large professional

6    association meeting in Arlington, Virginia on October 17, 2005 and at another such meeting in

7    Pittsburgh on November 4, 2005.  Dr. Rothschild (not surprisingly) happened to be in attendance

8    at both.  This "evidence," of course, completely fails to uncloak the poster of "corceptisafraud."

9    As to the identity of "stanfordinsider" it creates, at best, a "metaphysical" possibility that the

10   poster was Dr. Rothschild.  As explained below, however, this speculative possibility is, in

11   reality, pure conjecture.  Plaintiffs "evidence" that Dr. Rothschild is the targeted poster is far

12   short of the substantially probative evidence plaintiffs need to avoid this Motion to Strike.

13               **1.    The October 17, 2005 Posting**

14        Allegedly, a person using "standfordinsider" logged on to the Yahoo message board on

15   multiple occasions from the Hyatt Regency in Arlington, Virginia, and from a floor of a building

16   in Arlington that houses both One Voice Communications and the offices of the APA.

17   Declaration of Christine Watson, ¶4, Exh. 21.  At the time, Dr. Rothschild was indeed in

18   Arlington at a meeting for the APA.  Rothschild Decl., ¶10.  However, the APA has 35,000

19   members, all of whom specialize in psychiatry and are potentially interested in and

20   knowledgeable about CORLUX.  Exh. 22, APA Website.  There is no reason to single out Dr.

21   Rothschild as a person more or less likely to have posted the messages, especially given that he

22   does not have access to APA computers.  Rothschild Decl., ¶10.  Indeed, "stanfordinsider"

23   discusses his or her position at Stanford in the postings.  Exh. 10.  However, Dr. Rothschild is

24   not now, and has never been employed by Stanford.  Rothschild Decl., ¶3.  Dr. Rothschild's

25   presence at an APA meeting on the same date of one of the alleged postings, is simply

26   coincidence, not evidence that he is "stanfordinsider."

27

28

Defendant Anthony Rothschild's                                Case No.: C 07-03795 JW
Special Motion To Strike

1

   **2.**  **November 4, 2005 Posting**

2    Preliminarily, plaintiffs do *not* contend that any posting on November 4, 2005 by

3 "stanfordinsider" is defamatory.  Turning then to whether the November 4 posting is "evidence"

4 that Dr. Rothschild is "stanfordinsider," Yahoo's information indicates that the ISP address used

5 to post the November 4, 2005 message originated from the Holiday Inn in Pittsburgh.  However,

6 the Holiday Inn's network is wireless and allows free access to anyone.  Exh. 23.  No record was

7 made or kept of the user who accessed the Holiday Inn wireless network.  Id.  While Dr.

8 Rothschild was indeed in Pittsburgh on November 4, 2005, he was there along with hundreds of

9 other psychiatrists who attended the 5th Annual Meeting of the International College of Geriatric

10 Psychoneuropharmacology.  Rothschild Decl., ¶11.  There is no reason to single out Dr.

11 Rothschild as a person more likely to have posted the messages than one of the other hundreds of

12 psychiatrists who also clearly have both the knowledge and interest in psychotropic drugs that

13 plaintiffs attribute to Dr. Rothschild.  Indeed, given that Dr. Rothschild neither stayed at the

14 Holiday Inn, nor brought his laptop with him to Pittsburgh, it is apparent that plaintiffs'

15 erroneous speculation is simply not evidence that he is "stanfordinsider".  Id. at ¶11.

16    Despite their years of discovery, plaintiffs still have no basis to even presumptively

17 conclude that Dr. Rothschild utilized the screen names "stanfordinsider" and "corceptisafraud."

18 In the same vein, there is no reason to believe that "stanfordinsider" and "corceptisafraud" are the

19 same person.  Dr. Rothschild's unsurprising presence at professional gatherings has no probative

20 value, either.  Plaintiffs have simply sued the wrong person, and cannot produce any admissible

21 evidence demonstrating otherwise.

22   **B.**  **Plaintiffs' Claims Are Based On Statements That Are Either Protected**

23     **Expressions Of Subjective Opinion Or Substantially True.**

24    **1.**  **Legal Standards**

25     **a.**  **Expressions of Opinion Are Not Actionable.**

26    The expressions contained in the four Yahoo postings at issue reflect the opinions of the

27 speakers (whoever they may be) and therefore are absolutely protected by law.  Baker v. L.A.

28 Herald Examiner, 42 Cal. 3d 254 (1986).  California looks to its judges to serve as the

-14-

1    gatekeepers of free speech, leaving it to them to determine, in the first instance, if a statement

2    reflects an opinion and therefore is protected by law. <u>Id.</u> at 260-61; <u>Franklin v. Dynamic Details,</u>

3    <u>Inc.,</u> 116 Cal. App. 4th 375 (2004)("Whether a statement declares or implies a provably false

4    assertion of fact is a question of law for the court to decide"). In determining this, "[t]he

5    dispositive question . . . is whether a reasonable fact finder could conclude that the published

6    statements imply a provably false factual assertion." <u>Moyer v. Amador Valley J. Union High</u>

7    <u>Sch. Dist.,</u> 225 Cal. App. 3d 720, 724 (1990). Statements that are "an expression of subjective

8    judgment by the speaker" or an "exaggerated expression containing the speaker's viewpoint," or

9    that contain words used in a "loose, figurative sense," are not actionable. <u>Id.</u> at 275.

10    To determine whether an article implies a provable factual assertion, California courts

11    use a totality of the circumstances test. <u>Overstock.com, Inc. v. Gradient Analytics, Inc.,</u> 151 Cal.

12    App. 4th 688 (2007). This entails examining the language of the statement. <u>Id.</u> Next, the

13    context in which the statement was made must be considered. <u>Id.</u> The contextual analysis

14    requires that courts examine the nature and full content of the particular communication, as well

15    as the knowledge and understanding of the audience targeted by the publication. <u>Id.</u>; <u>Thomas v.</u>

16    <u>Los Angeles Times Communications, LLC,</u> 189 F.Supp.2d 1005, 1015 (C.D. Cal. 2002)(the

17    court must "look at the statement in its broad context, which includes the general tenor of the

18    entire work, the subject of the statements, the setting, and the format of the work.").

19    California courts have found that even crass expressions of opinion are essential to the

20    "profound national commitment" to uninhibited debate and "may well include vehement, caustic,

21    and sometimes unpleasantly sharp attacks." <u>Ghafur v. Bernstein</u>, 131 Cal. App. 4th 1230, 1236-

22    37 (2005) (affirming grant of defendant's anti-SLAPP motion)(internal quotation omitted).

23            **b.**      <u>**Statements Whose "Gist" and "Sting" Are Substantially True**</u>

24                   <u>**Are Not Actionable.**</u>

25    Any plaintiff – and especially public figures like plaintiffs – who brings an action on

26    allegations concerning matters of public interest bears the burden of proving falsity. <u>Miller v.</u>

27    <u>Nestande</u>, 192 Cal. App. 3d 191, 198 (1987); <u>Stolz v. KSFM 102 FM</u>, 30 Cal. App. 4th 195, 202

28    (1994). In order to be nonactionable, it is not necessary that the allegedly libelous accusation be

-15-

1   literally true in every detail, so long as the imputation is substantially true and therefore justifies

2   the "gist" or "sting" of the remark.  Masson v. New Yorker Magazine, 501 U.S. 496, 517 (1991)

3   (a statement is not actionable "as long as the substance, the gist, the sting, of the libelous charge

4   can be justified") (internal citations omitted); see also Ferlauto v. Hamsher, 74 Cal. App. 4th

5   1394, 1404 (1999).

6        **2.**     **All Of The Postings Explicitly State That They Are Opinion.**

7        All of the postings contain the following explicit disclaimer:

8        **Reminder:** . . . These messages are only the opinion of the poster, are no

9        substitute for your own research, and should not be relied upon for trading
    or any other purpose.  (Exh. 10).

10       The context and setting of the Yahoo postings could not be clearer – each viewer is

11  explicitly informed that the postings constitute *"only the opinion of the poster"* (emphasis

12  added).  A Yahoo message board is generally understood to be a forum for the opinions of

13  anyone who chooses to post a comment.[6]  Here, the audience was expressly informed that the

14  postings are merely the opinions of the author.  As such, all of the statements at issue are

15  absolutely protected by law.

16       **3.**     **The March 17, 2005 Posting.**

17       Neither plaintiffs, nor anyone else for that matter, are in possession of a copy of the

18  alleged March 17, 2005 posting.  Indeed, it appears that the posting, if it indeed ever existed, has

19  been destroyed and is not recoverable.  The only purported evidence that plaintiffs have of the

20  content of the alleged posting is a letter from Belanoff to Yahoo in which he claims to quote the

21  content of the message.  Exh. 24.  In any event, when considering the entire posting's general

22  tenor, its exaggerated and figurative language makes clear that the posting reflects the opinion of

23  the author, and does not assert a verifiable statement of fact.  For example, the posting states:

24       •   "I feel sorry for all you people who bought Corcept."

25       •   "Big Pharma will never touch a company like this."

26

27  [6] See Ampex Corporation v. Cargle, 128 Cal. App. 4th 1569, 1574 (2005)("We take judicial
    notice that Yahoo! offers financial message boards on the Internet for publicly traded companies

28  where any user can post comments").

-16-

1      • "People who bought stock in Corcept should get a good lawyer and file a class

2          action suit for what appears to be a massive case of fraud."

3    Exh. 10.

4         The posting is clearly not intended to be, nor is it, an objective account of the efficacy of

5    Corcept's drug. Rather, it is obviously an opinion-laden editorial that conveys the author's

6    subjective views and biases. The username itself -- coreceptisafraud – candidly alerts any

7    reasonable reader that the speaker is not objective. Plaintiffs ignore the general tenor and setting

8    of the entire posting, and focus instead on a few specific statements. Regardless, a consideration

9    of those statements indicate that they constitute nothing more than the opinion of the poster.

10        Plaintiffs complain about the poster's statement that "there is no scientific evidence that

11   [Corcept's] drug, RU-486, works for psychotic depression or anything else for that matter."

12   FAC, ¶16. The author explains that this opinion is based upon Dr. Rubin's re-analysis of

13   Corcept's data and report that "RU-486 does not separate from placebo." Exh. 10. The posting

14   also explains that Dr. Rubin's conclusions were presented at the American College of

15   Neuropsychopharmacology Annual Meeting in December 2004. Exh. 10.

16        A defendant cannot be liable for defamation if he or she gives an opinion and fully

17   discloses the facts upon which that opinion is based, without implying the existence of other

18   facts so long as those underlying disclosed facts are provably true. Franklin v. Dynamic Details,

19   Inc., 116 Cal. App. 4th 375, 384-390 (2004); Partington v. Bugliosi, 56 F.3d 1147, 1156-1157

20   (9th Cir.1995). Here, the author of the posting disclosed the facts upon which his or her

21   statement was based, which facts are irrefutably true – Drs. Rubin and Caroll made a

22   presentation at the American College of Neuropsychopharmacology Annual Meeting in

23   December 2004, in which they concluded that Corcept's drug was ineffective, and no different

24   from placebo. Exhs. 9&10. Therefore, the posting's statement that Corcept's drug is ineffective

25   is protected opinion. Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir.

26   1993)("Because the bases for the ... conclusion are fully disclosed, no reasonable reader would

27   consider the term anything but the opinion of the author drawn from the circumstances related").

28

-17-

1    Scientists and commentators have long debated whether certain drugs are effective, and

2    whether specific methodologies and studies prove the efficacy of those drugs. The author's

3    opinion that "scientific evidence" did not exist as of March 17, 2005 is just that – the author's

4    view that the studies conducted as of that date did not establish that CORLUX is effective for

5    PMD. Solidifying that opinion is the fact that prior to March 17, 2005, analysts reports

6    discussing the various clinical trials concurred with the posting, reporting that "[e]fficacy data

7    from two . . . trials were mixed," " . . it is difficult to draw any conclusions of Corlux's efficacy,"

8    "[Corcept] attributes the negative outcome . . .", and "we view this analysis as difficult to

9    interpret." Exh. 5, PiperJaffray June 1, 2004. As discussed above, public debate about

10   CORLUX continues today in the aftermath of its latest round of failed clinical trials.

11   Plaintiffs also single out the phrase "Corcept knows all of this" in the March 17, 2005

12   posting as allegedly defamatory. FAC, ¶16(b). However, the immediately preceding sentences

13   describe the fact that Dr. Rubin made a presentation in December 2004 regarding the efficacy of

14   CORLUX, and that in his opinion, scientific evidence does not support the efficacy of

15   CORLUX. Plaintiffs were undeniably aware of Dr. Rubin's presentation and contentions. As

16   such, the "gist" and "sting" of the posting's statement that "Corcept knows all of this" is

17   substantially true and not actionable. Masson v. New Yorker Magazine, 501 U.S. 496, 517

18   (1991). Moreover, even if the statement is construed to suggest that Corcept is aware that

19   scientific evidence supporting the efficacy of CORLUX does not exist, that too is merely the

20   opinion of the author.

21   Finally, Corcept identifies the posting's statement that Belanoff and Schatzberg were

22   selling their Corcept stock, despite the stock selling at record lows. FAC, ¶16(c). The "gist" and

23   "sting" of this statement is true. On March 17, 2005, Corcept stock was selling at $4.79 a share,

24   compared to the $5 to $7 price it commanded in the past. Exh. 25. Moreover, the Form 4's filed

25   by Belanoff with the SEC during this time period demonstrate that he was indeed selling Corcept

26   stock. Exh. 26. While these sales may have been triggered by a Rule 10b5-1 automatic trading

27   plan (a technical SEC procedure, knowledge of which can hardly be attributed to Dr.

28

-18-

1    Rothschild), the fact is that the shares were sold by Belanoff during this time period. Thus, the

2    "gist" and "sting" of this statement is true, and absolutely protected by law.

3         Therefore, because the March 17, 2005 posting is not actionable, plaintiffs cannot

4    establish a probability of succeeding on the merits of their first cause of action for defamation.

5                          **4.    The August 23, 2005 Posting**

6         The August 23, 2005 posting begins with the statement "I agree with Shockman" and

7    ends with the statement "[i]t strikes me as fraudulent." Exh. 10. When examining this posting's

8    nature and context – as evidenced by its opening and closing remarks – it is clear that the

9    August 23, 2005 posting reflects the opinions of the poster and does not purport to be a factual

10   assertion. Indeed, the speaker makes clear that the posting reflects his opinion that "Shockman's"

11   opinion is valid ("I agree with"), and his opinion that something is fraudulent ("[i]t strikes me").

12   The poster's "impression" is classic protected opinion (See Botos v. Los Angeles County Bar

13   Assn, 151 Cal. App. 3d 1083, 1088-1090 (1984)) and thus plaintiffs have no claim regarding the

14   August 23, 2005 posting as a matter of law.

15        Examining the statements makes it clear that the August 23, 2005 posting is not

16   actionable. That Belanoff, Corcept's CEO, "has been selling the shares as fast as he can," is

17   precisely the type of loose, figurative exaggerated expression protected as opinion. Moyer v.

18   Amador Valley J. Union High Sch. Dist., 225 Cal. App. 3d 720, 724 (1990). Moreover, the

19   "gist" and "sting" of the statement that Belanoff was selling his shares is true, since the Form 4's

20   filed by Belanoff with the SEC during this time period demonstrate that he was indeed selling

21   Corcept stock. Exh. 26. Gilbert v. Sykes, *supra*, 147 Cal. App. 4th at 29 (2007)(statements on

22   plaintiff's website that surgeon "quickly" suggested she have procedures performed did not alter

23   substantial truth that surgeon suggested she have procedures performed, even though he

24   presented evidence that he only did so after the patient informed him of her concerns).

25        The statement that the "CEO and the company create press releases to raise the price of

26   the stock and then sell on the news. It strikes me as fraudulent" is likewise not actionable. First,

27   the statement is so vague that it is unclear whether it is even susceptible of defamatory meaning

28   – does the author intend to opine that Corcept sells its stock on the television news? Does the

-19-

1    author intend to opine that the company sells stock at a higher price because of the press release?

2    Does the author intend to opine that the press releases are published on the news?  It is far from

3    clear.  Second, the loose, figurative language about a company "creat[ing] press releases," and

4    "rais[ing] the price of stock" is protected opinion.  When viewed in its totality as required by

5    California law – the obvious book ended commentary, the disclaimer, its presence on a Yahoo

6    message board, its vagueness – it is apparent that the August 23, 2005 posting is not actionable.

7    **5.    The October 17, 2005 Posting**

8        The October 17, 2005 posting is perhaps the most glaring proof that plaintiffs have

9    intentionally targeted the wrong person.  Exh. 10.  The author describes his position at Stanford,

10   internal rumors at Stanford, and that he is concerned about his position at Stanford.  Dr.

11   Rothschild has never been employed at Stanford – not now, not in 2005.  Rothschild Decl., ¶3.

12   In any event, while plaintiffs choose to focus on certain portions of the posting, even a cursory

13   review demonstrates that the entire piece is the opinion of the author.  The author states:

14       • "I worry about my position at Stanford. . ."

15       • ". . . it is becoming clear to me . . ."

16       • "The word here . . ."

17       • "My guess is that . . ."  (Exh. 10).

18       Plaintiffs contend that the October 17, 2005 posting is defamatory because, according to

19   plaintiffs, "[a]n outside expert panel was not hired *specifically* to review Schatzberg's use of his

20   Psychiatry Chair position to promote Corcept's drug." FAC, ¶24(e)(emphasis added).  First,

21   plaintiff's have taken a portion of a sentence completely out of context.  The entire sentence

22   reads: "The word here at Stanford is that the Dean of the medical school has hired an outside

23   expert panel to review Schatzberg's use of his Psychiatry Chair position to promote Corcept's

24   drug." Exh. 10.  Clearly, the author is relaying that a rumor was circulating among the Stanford

25   community – "the word here at Stanford" -- not making a factual statement.  Plaintiffs have also

26   very carefully worded their accusations, stating that an outside panel was not hired "specifically"

27   to review Dr. Schatzberg. FAC, ¶24(e).  Plaintiffs' word parsing reveals that a panel did indeed

28   review Dr. Schatzberg, but the panel may have had other duties, as well.  The reasonable

-20-

inferences from Plaintiffs' effort to craftily word their allegations all but concede that the "gist" and "sting" of this statement are substantially true. Finally, for the same reasons discussed above, the posting's opinions regarding the efficacy of CORLUX are not actionable.

### 6.    The October 28, 2005 Posting

Finally, plaintiffs allege that the October 28, 2005 posting's statement that there were "4 cardiac related deaths in trial" is false. FAC, ¶24(g). However, the "gist" and "sting" of this statement is certainly true. It was reported in the press that four patients died during one of the CORLUX trials. Indeed, Belanoff was cited in The San Jose Mercury News, confirming the truth of this statement:

> In one of those trials, four patients died, said Corcept CEO Belanoff, but three of those were in the comparison group, which was not given RU-486. The deaths, he said, were reported to the FDA, which allowed the trials to proceed. (Exh). 6.[7]

That three of the four patients who died in the study were in the comparison group does not change the posting's substantial truth that there were "4 cardiac related deaths in trial."

Therefore, because plaintiffs cannot show that any of the subject postings are actionable, and thus cannot demonstrate a probability of success on the merits of their claims, the First Amended Complaint should be stricken and Dr. Rothschild awarded his attorneys fees pursuant to the anti-SLAPP statute.

### C.    Plaintiffs Cannot Establish Actual Malice And Therefore Cannot Maintain Their Defamation Claims.

As public figures,[8] plaintiffs must demonstrate that Dr. Rothschild made the alleged postings (which he did not make) with actual malice. To survive an anti-SLAPP motion, a public figure must establish actual malice by clear and convincing evidence. Annette F. v. Sharon S., 119 Cal. App. 4th 1146, 1162 (2004). To meet the clear and convincing standard, the

---

[7] See also in article published in the The New York Times on October 22, 2002 entitled Abortion Pill May Help Treat Severe Form of Depression, Exh. 31("Dr. Belanoff confirmed that one patient in the first clinical trial, a 49-year-old man, had died during the study.")

[8] Whether a plaintiff is a public figure is a question to be determined by the court. Stolz v. KSFM 102 FM, 30 Cal. App. 4th 195, 203 (1994).

Defendant Anthony Rothschild's                    Case No.: C 07-03795 JW
Special Motion To Strike

1    evidence must be such "as to command the unhesitating assent of every reasonable mind." Id. at

2    1579. Plaintiffs have no evidence to carry this heavy burden.

3        Plaintiffs cannot demonstrate actual malice, which is "subjective in nature," unless they

4    demonstrate by clear and convincing evidence that Dr. Rothschild "realized that his statement

5    was false," he "subjectively entertained serious doubt as to the truth," or that he made the

6    postings with a "high degree of awareness of . . . probable falsity." No other evidence – not even

7    a "departure from reasonably prudent conduct, including the failure to investigate before

8    publishing" will satisfy the rigorous First Amendment test for actual malice. See Live Oak

9    Publishing Co. v. Cohagan, 234 Cal. App. 3d 1277, 1290 (1991). The test is focused on the

10   defendant's attitude toward the veracity of the published material, as opposed to his attitude

11   toward the plaintiff. Ampex Corporation v. Cargle, 128 Cal. App. 4th 1569, 1579 (2005).

12       California courts have applied the actual malice standard in a number of anti-SLAPP

13   cases, rejecting meritless lawsuits like this one and approving awards of defense expenses. See

14   Rosenaur v. Scherer, 88 Cal. App. 4th 260, 273 (2001); Conroy v. Spitzer, 70 Cal. App. 4th

15   1446, 1451-54 (1999); Vogel v. Felice, 127 Cal. App. 4th 1006 (2005); Colt v. Freedom

16   Commc'ns, Inc., 109 Cal. App. 4th 1551 (2003); Sipple v. Foundation For National Progress, 71

17   Cal. App. 4th 226 (1999).

18           **1.    Plaintiffs Are Public Figures.**

19       A plaintiff becomes a limited purpose public figure by interjecting himself or itself into

20   the public debate about a topic that concerns a substantial number of people. Gilbert v. Sykes,

21   supra, 47 Cal. App. 4th at 25. First, there must be a public controversy, which means the issue

22   was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Id.

23   at 24. Second, the plaintiff must have undertaken some voluntary act through which he or she

24   sought to influence resolution of the public issue. Id. In this regard it is sufficient that the

25   plaintiff attempts to thrust himself into the public eye. Id. And finally, the alleged defamation

26   must be germane to the plaintiff's participation in the controversy. Id.

27       In Ampex Corporation v. Cargle, 128 Cal. App. 4th 1569 (2005), a publicly traded

28   corporation and its chairman brought a defamation action against a former employee who posted

-22-

1   messages critical of them on a Yahoo message board.  In holding that the corporation and its

2   chairman were limited public figures for the purposes of the imposition of the actual malice

3   standard, the Court relied on the following facts: (1) prior to defendant's posting, there were a

4   number of postings on the Yahoo message board criticizing the management of the corporation

5   and its chairman, (2) the Yahoo message board itself was a public forum, (3) the content of

6   defendant's messages posted over a three day period indicated that each message responded to

7   another poster's message, with over 40 postings occurring in between, and (4) with 59,000

8   shares outstanding, the causes and consequences of discontinuing Ampex's venture into the

9   Internet television business had foreseeable and substantial ramifications for nonparticipants. Id.

10  at 1578. The Court further found that the plaintiffs inserted themselves into the controversy by

11  way of press releases and letters posted on their website. Id. at 1578.

12          As in the Ampex case, principals active in the public eye are generally held to be limited

13  purpose public figures upon a finding that their corporate affiliate is a limited purpose public

14  figure. See Live Oak Publishing Co. v. Cohagan, 234 Cal. App. 3d 1277, 1290 (1991)(managers

15  of publishing company are public figures because they are intimately involved in public political

16  debate in their community and the community has a legitimate and substantial interest in their

17  conduct regarding the operation of the newspaper); Stolz II v. KSFM 102 FM, 30 Cal. App. 4th

18  195 (1995)(for same reasons that his station was all-purpose public figure, owner, operator and

19  general manager of statement was limited-purpose public figure for purposes of defamation

20  claim premised on on-air comments made by competitor about station).

21          Moreover, individuals who thrust themselves into the public debate by publishing

22  articles, are generally considered limited purpose public figures. See e.g., Gilbert v. Sykes,

23  supra, 147 Cal. App. 4th at 25 (surgeon thrust himself into the public debate by appearing on

24  local television shows, writing numerous articles in medical journals and beauty magazines,

25  touting the virtues of cosmetic surgery and reconstructive surgery).

26          Without question, the viability of CORLUX as a PMD medication and the conflicts of

27  Corcept's insiders is and has been a matter of public debate.  Here, as in the Ampex case, the

28  alleged postings are only a few of many internet postings criticizing Corcept and its

-23-

1  management, the Yahoo message board is a public forum, the Yahoo postings are responses to

2  messages posted by other Yahoo users (e.g., "I agree with Shockman"), and with millions of

3  shares outstanding, the efficacy of CORLUX has substantial financial ramifications for others.

4  Ampex, 128 Cal. App. 4th at 1578.  Moreover, as discussed above, both Schatzberg and Belanoff

5  have published articles, given interviews, and made presentations regarding CORLUX.  As such,

6  the individual plaintiffs have also thrust themselves into the public debate regarding CORLUX,

7  and are limited purpose public figures and therefore must establish actual malice.

8        Finally, plaintiffs status as limited purpose public figures is confirmed by the fact that

9  plaintiffs are seeking, and indeed have been vocal about their efforts to seek, FDA approval of

10  CORLUX.  FAC, ¶9; Exh. 27.  See Mosesian v. McClatchy Newspapers, 233 Cal. App. 3d 1685

11  (1991)(applicant for horse racing license became limited public figure when he became deeply

12  embroiled by his own efforts in public controversy over application).

13        **2.    Plaintiffs Cannot Establish Actual Malice**

14        Plaintiffs cannot establish that Dr. Rothschild posted the Yahoo messages with "actual

15  malice" because plaintiffs cannot establish that the Dr. Rothschild authored the postings.

16  Clearly, since plaintiffs cannot establish that Dr. Rothschild made the alleged postings, they

17  cannot establish that he did so with the requisite subjective mindset.

18        In any event, as the gist of the postings are substantially true or protected opinion,

19  plaintiffs cannot establish that Dr. Rothschild knew the postings were false, entertained doubts as

20  to their truth, or wrote them with a high degree of awareness of probable falsity.  Because

21  plaintiffs cannot establish actual malice by clear and convincing evidence, they have no chance

22  of succeeding on their defamation claims.

23        **D.    Plaintiffs' Interference With Prospective Advantage And Intentional**

24                 **Infliction Of Emotional Distress Causes Of Action Must Also Be Stricken.**

25        The anti-SLAPP statute applies to "all claims whose gravamen is the alleged injurious

26  falsehood of a statement."  Gilbert v. Sykes, 147 Cal. App. 4th 13, 34 (2007).  "[T]o allow an

27  independent cause of action for the intentional infliction of emotional distress, based on the same

28  acts that would not support a defamation action, would allow plaintiffs to do indirectly what they

1    could not do directly.  It would also render meaningless any defense of truth or privilege."

2    Fellows v. National Inquirer, Inc., 42 Cal.3d 234, 245 (1986)(internal quotation omitted).

3         Plaintiffs' causes of action for Intentional Infliction of Emotional Distress and

4    Interference with Prospective Economic Advantage are based upon the alleged Yahoo postings,

5    which, because they cannot sustain a claim for defamation, cannot sustain these independent

6    torts.  Gilbert v. Sykes, *supra,* 147 Cal. App. 4th at 34.  Plaintiffs have also alleged that Dr.

7    Rothschild made prank telephone calls, mostly cancelling their hotel reservations.  FAC, ¶30.

8    Obviously, Dr. Rothschild, a well respected professor and clinician, did not make these prank

9    calls.  Rothschild Decl.,¶4.  Putting aside the absurdity of these allegations, it is apparent that

10   they too are designed to chill Dr. Rothschild's free speech and are thus further misuse of the

11   legal system; ills that the anti-SLAPP statute was specifically designed to eradicate.  Christian

12   Research Institute v. Alnor, 148 Cal. App. 4th 71 (2007).

13        Finally, to sustain a claim for interference with prospective relations, the plaintiff must

14   plead and prove that that the defendant's conduct was independently wrongful, beyond the fact

15   of interference itself.  Arntz Contracting v. St. Paul Fire & Marine, 47 Cal. App. 4th 464, 475

16   (1996).  An act is independently wrongful if it is unlawful (proscribed by some constitutional,

17   statutory, regulatory, common law, or other determinable legal standard).  Korea Supply Co. v.

18   Lockheed Martin, 29 Cal.4th 1134 (2003).  Plaintiffs endeavor to fulfill this requirement by

19   asserting that Dr. Rothschild committed the tort of defamation. However, because plaintiffs do

20   not have a probability of establishing that defendant is liable for defamation, they also

21   necessarily cannot establish this requisite element of their interference claim.

22   **VI.    CONCLUSION**

23        For the reasons stated above, Dr. Rothschild respectfully requests that the Court grant the

24   instant motion, striking the First Amended Complaint, and award him his fees and costs.

25   Dated:  August 23, 2007                           HOLLAND & KNIGHT LLP

26

27                                                    Robert A. Bleicher
                                                     Shelley G. Hurwitz
28                                                   Attorneys for Defendant
                                                     ANTHONY ROTHSCHILD
                                                            -25-