# EXHIBIT 5
## To Appendix to California State Authorities

52 Cal.App.4th 1036                                                                 Page 1

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

▷

ODELIA S. BRAUN, Plaintiff and Appellant,
v.
CHRONICLE PUBLISHING COMPANY et al.,
Defendants and Respondents.
**No. A073121.**

Court of Appeal, First District, Division 4, California.

Feb. 18, 1997.

SUMMARY

The medical director of a research and training center at a state university sued a publishing company, a reporter, and others for defamation and other torts, following publication of news articles stemming from allegations of illegal and improper management of the center. The publishing company and reporter moved to strike plaintiff's claims under the anti-SLAPP (strategic lawsuit against public participation) statute ( Code Civ. Proc., § 425.16), and the trial court granted defendants' motion. (Superior Court of the City and County of San Francisco, No. 970990, David A. Garcia, Judge.)

The Court of Appeal affirmed. The court held that defendants were acting in furtherance of their free speech rights within the meaning of  Code Civ. Proc., § 425.16, subd. (e). The articles fell squarely within clause two of  Code Civ. Proc., § 425.16, subd. (e), as "writing[s] made in connection with an issue under consideration or review by ... any other official proceeding authorized by law"-namely, a state investigatory audit. The court also held that the articles reported on matters "in connection with a public issue" for purposes of defendants' motion under the anti-SLAPP statute. Although the investigative audit that was reported on was confidential, clause two of  Code Civ. Proc., § 425.16, subd. (e), defines an act in furtherance of free speech rights "in connection with a public issue" as "any" writing made "in connection with an issue under consideration or review by" any official proceeding authorized by law. The audit, conducted by the State Aud-

itor, was an authorized official proceeding ( Gov. Code, § 8547 et seq.), and the articles were "in connection with" this proceeding. The court further held that plaintiff could not establish a probability that she would prevail on her claim ( Code Civ. Proc., § 425.16, subd. (b)). Plaintiff asserted she would prevail because she could defeat application of  Civ. Code, § 47, subd. (d) (privilege for publication of fair and true report in public journal, of judicial, legislative, or other public official proceeding), thereby destroying defendants' privilege. The privilege applied, however, notwithstanding that the investigative audit that was reported on was confidential. The articles constituted a history of the audit conducted by the State Auditor; the activities **\*1037** were newsworthy and the public was entitled to information about them. The court also held that the trial court did not abuse its discretion in denying plaintiff's request for discovery ( Code Civ. Proc., § 425.16, subd. (g)), or in awarding attorney fees and costs ( Code Civ. Proc., § 425.16, subd. (c)). (Opinion by Poché, J., with Anderson, P. J., and Hanlon, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 93--Motion to Strike Pleading as a Whole--SLAPP Suits-- Defendant's Prima Facie Showing.
A defendant pursuing an anti-SLAPP (strategic lawsuit against public participation) statute motion ( Code Civ. Proc., § 425.16) must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech. A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in  Code Civ. Proc., § 425.16, subd. (e) (any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; such a statement or writing made in connection with an issue under consideration or review by a legislative,

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv. 1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

executive, or judicial body, or any other official proceeding authorized by law; or such a statement or writing made in a place open to the public or a public forum in connection with an issue of public interest).

(2a, 2b) Pleading § 93--Motion to Strike Pleading as a Whole--SLAPP Suits--News Articles Covering State Investigatory Audit--Acting in Furtherance of Free Speech Rights.
In an action by the medical director of a research and training center at a state university against a publishing company and a reporter for defamation and other torts, following publication of news articles stemming from allegations of illegal and improper management of the center, defendants were acting in furtherance of their free speech rights within the meaning of Code Civ. Proc., § 425.16, subd. (e), for purposes of their motion to strike plaintiff's claims under the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16). The articles fell squarely within clause two of Code Civ. Proc., § 425.16, subd. (e), as "writing[s] made in connection with an issue under consideration or review by ... any other official proceeding authorized by law"-namely, a state investigatory audit. Code Civ. Proc., § 425.16, subd. (e), protects free speech activities that are unrelated to petitioning *1038 efforts. Also, at least as to acts covered by clauses one and two of Code Civ. Proc., § 425.16, subd. (e), the statute requires simply "any" writing or statement made in, or in connection with an issue under consideration or review by, the specified proceeding or body. To harmonize the concept of a public issue with the legislative purpose to encourage continued participation in "matters of public significance" (Code Civ. Proc., subd. (a)), the term "significance" should be read as simply the meaning or import of a particular matter.

[See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962 et seq.]

(3) Statutes § 51--Construction--Codes--Conflicting Provisions.
Courts must construe a statute or provision thereof with reference to the entire scheme to which it belongs so that all parts may be harmonized and have effect. Moreover, where there are conflicting provisions, the one susceptible to only one meaning will control the one that is susceptible of two meanings, if the statute can thereby be made harmonious.

(4) Pleading § 93--Motion to Strike Pleading as a Whole--SLAPP Suits--News Articles Covering State Investigatory Audit--Matters in Connection With a Public Issue.
In an action by the medical director of a research and training center at a state university against a publishing company and a reporter for defamation and other torts, following publication of news articles stemming from allegations of illegal and improper management of the center, the articles reported on matters "in connection with a public issue" for purposes of defendants' motion to strike plaintiff's claims under the anti-SLAPP (strate gic lawsuit against public participation) statute (Code Civ. Proc., § 425.16). Although the investigative audit that was reported on was confidential, clause two of Code Civ. Proc., § 425.16, subd. (e), defines an act in furtherance of free speech rights "in connection with a public issue" as "any" writing made "in connection with an issue under consideration or review by" any official proceeding authorized by law. The audit, conducted by the State Auditor, was an authorized official proceeding (Gov. Code, § 8547 et seq.), and the articles were "in connection with" this proceeding. Nor did the confidentiality of the audit transmute it into an unofficial or nonpublic activity; it was a public proceeding that was government-sponsored and provided for by statute. The articles were also made in connection with a public issue "under consideration or review" by an official proceeding, even though the powers of the State Auditor were investigatory only.

(5) Pleading § 93--Motion to Strike Pleading as a Whole--SLAPP Suits--News Articles Covering State Investigatory Audit--Probability That Plaintiff Would Prevail on Claim.
In an action by the *1039 medical director of a research and training center at a state university against a publishing company and a reporter for de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv. 1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

famation and other torts, following publication of news articles stemming from allegations of illegal and improper management of the center, plaintiff, upon defendants' filing of a motion to strike plaintiff's claims under the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16), could not establish a probability that she would prevail on her claim (Code Civ. Proc., § 425.16, subd. (b)). Plaintiff asserted she would prevail because she could defeat application of Civ. Code, § 47, subd. (d) (privilege for publication of fair and true report in public journal, of judicial, legislative, or other public official proceeding), thereby destroying defendants' privilege. The privilege applied, however, notwithstanding that the investigative audit that was reported on was confidential. The articles constituted a history of the audit conducted by the State Auditor; the activities were newsworthy and the public was entitled to information about them. The articles came squarely within the Civ. Code, § 47, subd. (d), privilege for reports of "public official proceedings." Although the investigation was closed to the public, courts have extended Civ. Code, § 47, subd. (d), protection to confidential proceedings.

(6) Pleading § 93--Motion to Strike Pleading as a Whole--SLAPP Suits-- Discovery--Attorney Fees and Costs.
In an action by the medical director of a research and training center at a state university against a publishing company and a reporter for defamation and other torts, following publication of news articles stemming from allegations of illegal and improper management of the center, the trial court, upon the filing of a motion to strike plaintiff's claims under the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16), did not abuse its discretion in denying plaintiff's request for discovery (Code Civ. Proc., § 425.16, subd. (g)). Although plaintiff orally requested discovery at the hearing on the publishing company's Code Civ. Proc., § 425.16, motion, the request was not a timely and properly noticed motion for discovery, supported by a showing of good cause, as required by Code Civ. Proc., § 425.16, subd. (g). Nor did the court abuse its discretion in

awarding attorney fees and costs to the publishing company. Code Civ. Proc., § 425.16, subd. (c), provides that the prevailing defendant is entitled to attorney fees and costs. Although plaintiff asserted that in the instant case, particularly where the publishing company was a media defendant, the losing plaintiff should not be forced to pay, the statute was to the contrary. Nor did plaintiff present any evidence that the award was based on unnecessary work or any other improper basis. *1040

COUNSEL

Lawless, Horowitz & Lawless, Barbara A. Lawless and Carol Belcher for Plaintiff and Appellant.

Landels, Ripley & Diamond, Neil L. Shapiro and Mark D. Johnson for Defendants and Respondents.

POCHÉ, J.

This appeal concerns the scope of two, sometimes interrelated, statutes: the anti-SLAPP [FN1] statute, Code of Civil Procedure section 425.16 (section 425.16), and the reporter's privilege found at Civil Code section 47, subdivision (d). The triggering event in this litigation was the publication of five news reports stemming from allegations of illegal and improper management of the Center for Pre-Hospital Research and Training (CPRT) at the University of California at San Francisco (UCSF). In particular, the news reports described an investigative audit carried out by the State Auditor, as well as a background audit and "whistle-blower letter" that disclosed various levels of malfunctioning and malfeasance in the CPRT program.

> FN1 SLAPP is an acronym for strategic lawsuit against public participation. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co. (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46].)*

Odelia Braun, M.D., sued the Chronicle Publishing Company (Chronicle), reporter Ben Wildavsky (respondents) and others for defamation and a multitude of other torts. Respondents Chronicle and Wildavsky successfully employed section 425.16 to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

strike the claims against them. On appeal Braun urges that the statute does not apply to the stricken claims and even if it did, the court erred in striking them because she demonstrated a probability of prevailing on the merits. We disagree with Braun and, accordingly, affirm the judgment.

### I. Facts

The CPRT was founded in 1987 as an activity within the UCSF Department of Medicine to support emergency medical services in the community. Dr. Braun served as medical director of the center from inception until closure in December 1994.

Following receipt of complaints of mismanagement of CPRT, Floyd Rector, M.D., chair of the department of medicine, retained Maybruck Associates to review CPRT's contracts and operations. Maybruck released a *1041 report in October 1992 which detailed numerous irregularities in CPRT's operations. However, Dr. Rector did not make the report public, nor did he disseminate it within university channels, e.g., to the audit committee of the Board of Regents, office of the president, university auditor, UCSF internal audit staff or the university external auditors.

Then in February 1993 an instructor for the San Francisco Fire Department (SFFD) Medical Training Program, which contracts its medical training to CPRT, sent a "whistle-blower" letter to Dr. Rector confirming their conversation about various business practices within CPRT that were of concern to her. These included misuse of SFFD training contract funds and billing SFFD for work not performed.

That August, Braun sued two of her colleagues at UCSF for slander, infliction of emotional distress and interference with business relations. At the heart of her complaint were allegations that the defendants made false statements to various persons charging her with seriously mismanaging the finances of CPRT, misappropriating CPRT funds and encouraging CPRT personnel to misappropriate funds. Braun also alleged that defendants hired an outside auditor to review and scrutinize CPRT.

Eventually employees of UCSF lodged allegations with the Bureau of State Audits (State Auditor) pursuant to the Reporting of Improper Governmental Activities Act [FN2] to the effect that: (1) CPRT was improperly spending state and donor-generated funds; (2) the center was paying for expenses out of a secret, unauthorized checking account; and (3) there were improprieties in the contracts with the SFFD.

> FN2 Government Code section 8547 et seq.

In early 1994 the State Auditor commenced its investigative audit of CPRT. That July, the State Auditor requested that counsel for the Board of Regents obtain the assistance of UCSF to access CPRT computer files containing payroll information related to falsification of hours. After counsel refused assistance, an investigator for the State Auditor sought and obtained a search warrant, which resulted in seizure of various records. The State Auditor issued his report on November 22. Thereafter the university terminated Braun and closed the CPRT, due to "lack of funds."

Meanwhile, the Chronicle published five articles in 1994, about the State Auditor's probe of CPRT and events leading up to that investigation. [FN3] Four of the five articles were penned by Ben Wildavsky. *1042

> FN3 They were as follows: (1) August 15, reporting that the State Auditor was investigating whistle-blowing allegations of fraud and misuse of state funds at CPRT, and delving back to the 1992 Maybruck audit and UCSF's inaction in the face of its revelations; (2) August 16, relating the Board of Regent's reactions to the failure of UCSF staff to circulate the Maybruck audit to high level officials; (3) August 20, reporting on execution of the search warrant and seizure of time sheets and computers; indicating that the San Francisco District Attorney had opened a criminal investigation of the center; and describing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv. 1119, 97 Daily Journal D.A.R. 1642

**(Cite as: 52 Cal.App.4th 1036)**

the focal areas of the State Auditor's investigation; (4) August 26, relating 1993 whistle-blower charges of payroll padding and recapping aspects of the search warrant and resulting seizures; and (5) November 23, summarizing the findings of the State Auditor's report.

In addition to respondents, Braun has prosecuted the present lawsuit against UCSF, the Board of Regents, Maybruck Associates, and a host of former professional colleagues. She has alleged 10 causes of action, ranging from sex discrimination and breach of contract and of the covenant of good faith to defamation and intentional and negligent infliction of emotional distress. This appeal followed the granting of respondents' motion to strike under section 425.16.

## II. Discussion
### A. Background

The anti-SLAPP statute is designed to nip SLAPP litigation in the bud by striking offending causes of actions which "chill the valid exercise of the constitutional rights of freedom of speech and petition ...." (§ 425.16, subd. (a).) Finding a "disturbing increase" in such lawsuits, the Legislature has declared it in the public interest "to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (*Ibid.*)

Thus, where a cause of action arises "from any act" of a person "in furtherance of the person's right of petition or free speech ... in connection with a public issue," that cause is subject to a motion to strike, unless the plaintiff establishes a probability of prevailing on the claim. (§ 425.16, subd. (b).) Acts "in furtherance of a person's right of petition or free speech ... in connection with a public issue" are defined as including: "[(1)] any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; [(2)] *any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other offi-*

*cial proceeding authorized by law;* or [(3)] any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (*Id.*, subd. (e), italics added.)

(1) The defendant pursuing an anti-SLAPP motion must make an initial prima facie showing that plaintiff's suit arises from an act in furtherance of **\*1043** defendant's right of petition or free speech. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 820 [33 Cal.Rptr.2d 446].) A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) (quoted above). (27 Cal.App.4th at p. 820.)

Braun first urges that her claims are outside the ambit of section 425.16 because respondents' underlying actions did not further either the exercise of their petition rights or their free speech rights in a public forum. Next, she is adamant that the reported matters did not amount to a "public" issue. Finally, Braun insists that even if respondents could make out a prima facie case under section 425.16, she would be able to counter that case with her own showing of facts establishing a probability of prevailing at trial. These contentions are not compelling.

### B. Analysis
### (1) *The Chronicle and Its Reporter Were Acting in Furtherance of Their Free Speech Rights Within the Meaning of Section 425.16, Subdivision (e).*

(2a) Throughout this litigation, the Chronicle and its reporter have maintained that their published reports constitute acts in furtherance of their free speech rights within the meaning of section 425.16, subdivision (e). In particular they reason that these reports fall squarely within the second clause of subdivision (e) as "writing[s] made in connection with an issue under consideration or review by ... any other official proceeding authorized by law"-namely, the state investigatory audit. We agree.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036                                                                                Page 6
52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

Under the plain terms of section 425.16, the motion to strike remedy can be employed only where the plaintiff has launched litigation stemming from "any act ... in furtherance of the [defendant's] right of petition or free speech ... in connection with a public issue." (§ 425.16, subd. (b.).) Subdivision (e), in turn, gives definitional contour to the entire "act in furtherance" phrase.

Under the first clause of section 425.16, subdivision (e), the qualifying act is *any* statement or writing made before a legislative, executive or judicial proceeding. For the second clause, all that is needed is that the statement or writing be made "in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other official proceeding authorized by law." To fit under the third clause, the statement or writing must be made in a public forum or place, and must relate to an issue of "public interest." *1044

These statutory requirements are straightforward and unambiguous. The confusion has come with case law that misreads and then needlessly misinterprets the statute. Braun relies on two cases: (1) *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628 [49 Cal.Rptr.2d 620] (*Wollersheim*); and (2) *Zhao v. Wong* (1996) 48 Cal.App.4th 1114 [55 Cal.Rptr.2d 909] (*Zhao*).

(a). *Wollersheim*
In *Wollersheim*, the act fueling the plaintiff's SLAPP suit was the defendant's exercise of petition rights, in particular his successful prosecution of tort claims against his former church, the Church of Scientology. Throughout the underlying litigation, the church engaged in a pattern of conduct designed to frustrate the litigation. Then, after pursuing various appellate remedies, the church sought to set aside the judgment on grounds of judicial bias during trial. Defendant parried with a motion to strike pursuant to section 425.16.

Among other points, the court in *Wollersheim* posed the question whether a tort action against a private party was a matter of public interest that would qualify for statutory protection under section

425.16, subdivision (e). The court had this to say: "Subdivision (e), describing protected activity, refers to three categories; only the category of activity referred to as the 'exercise of free speech rights' is subject to the limitation that it be 'made in a place open to the public or a public forum in connection with an issue of public interest.' [FN4] The first two categories parallel the description of privileged communications in Civil Code section 47, subdivision (b) and include judicial proceedings without any limitation as to subject matter." (*Wollersheim, supra,* 42 Cal.App.4th at p. 650, fn. omitted.)

> FN4 We agree with the observation that the final clause of subdivision (e) of section 425.16 is the only category of activity with the public place-forum/public interest limitation. However, the clause does *not* single out free speech rights. One could also petition for redress of grievances in a public place, and in such instance the petitioning effort would also have to pass the public interest test.

Seizing on this passage, Braun asserts that *Wollersheim* stands for the proposition that the first two categories in section 425.16, subdivision (e) are restricted to petition clause activities. Therefore, she reasons, these clauses provide no shelter for respondents in their free speech activity in publishing the five news reports. If and to the extent *Wollersheim* stands for this proposition, it is wrong. First, there is nothing in the statute to imply that the first and second clauses-concerning writings or statements made (1) *before* the defined official proceedings, or (2) *in connection with* matters under review or consideration by the defined body or proceeding-embrace only *1045 petitioning activity, to the exclusion of free speech. In fact, the plain wording of the statute specifically includes both. Second, *Wollersheim* is a petition case. It did not raise any issue as to whether the second clause of subdivision (e) could also pertain to free speech and thus *Wollersheim* is dicta on this issue.

The opinion in *Lafayette Morehouse, Inc.* v. *Chron-*

52 Cal.App.4th 1036                                                                 Page 7
52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

*icle Publishing Co., supra,* 37 Cal.App.4th 855 correctly resolves this question in the affirmative. The newspaper articles at issue in *Morehouse* reported on a dispute between an alternative university and its neighbors over the school's decision to open its property to the homeless, and on related hearings before the county board of supervisors, the county's enforcement action and the school's responsive federal suit. These reports were "clearly united by dependence on or relation to" the official actions they described, and therefore comprised protected writings " 'made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law....' " (*Id.* at p. 863.)

More to the point, the court held that news reporting activity is "free speech" and section 425.16 motions can apply to media defendants in libel actions. (*Morehouse, supra,* 37 Cal.App.4th at p. 864.) Thus, the court in *Morehouse* correctly avoided limiting section 425.16, subdivision (e), clause two to petitioning activity.

### (b). *Zhao*

Braun also argues that the recent opinion in *Zhao* correctly confines protected free speech activities to those "intended to further the focus on petition-clause related activities." The defendant in *Zhao* allegedly made certain remarks to a newspaper reporter suggesting that the plaintiff killed the defendant's brother and forged the brother's will. After the newspaper published an article on the brother's mysterious death and ensuing coroner's investigation, plaintiff served defendant with a complaint alleging slander. Moving to strike the complaint under section 425.16, defendant sought to elevate his remarks to the reporter to a public issue by linking the press interview with the pending will contest-to which he was not a party-and with the coroner's investigation. The trial court agreed, but not the Court of Appeal. (*Zhao, supra,* 48 Cal.App.4th at p. 1133.)

The Court of Appeal first took pains to point out that media coverage, by itself, cannot "create an issue of public interest within the statutory meaning."

(*Zhao, supra,* 48 Cal.App.4th at pp. 1121-1122, 1131.) It found that term to be reserved for matters "occupying 'the highest rung of the hierarchy *1046 [sic] of First Amendment values,' that is, to speech pertaining to the exercise of democratic self-government." (*Id.* at p. 1122.) The court gave the same treatment to the term "public issue": "The existence of a public issue depends ... on whether the statements possessed the sort of relevance to self-government that places them in a specially protected category of First Amendment values ...." (*Id.* at p. 1132.)

Summing up what it found to be the legislative history of section 425.16, the appellate court concluded it "emphasizes the legislative intent to safeguard activities protected by the petition clause with a particularly clear focus on expressive conduct for which the right of freedom of speech offers an alternative protection. The statute represents a clear recognition of the need to provide maximum protection of a citizen's right to exercise free speech and petition where such rights are exercised in relation to issues of public concern." (*Zhao, supra,* 48 Cal.App.4th at p. 1125.)

Then, turning its attention to the second clause of section 425.16, subdivision (e)-i.e., statements or writings made "in connection with an issue under consideration or review" by any official proceeding-the court remarked that this statutory language was difficult to construe in the context of the statute's express legislative purpose. It held that the clause's application was limited "to the narrow sphere of activity, described in the statement of legislative purpose, involving the exercise of a citizen's rights under the petition clause and related areas protected by the right of freedom of speech." (*Zhao, supra,* 48 Cal.App.4th at p. 1127.)

Braun argues on the basis of the above quoted excerpts that because the Chronicle was not engaged in petition-related activity on its own behalf or in free speech efforts furthering petition-related activity, the five news reports do not qualify for anti-SLAPP protection. We disagree with Braun for two reasons.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036                                                                                         Page 8

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

First, we part ways with the *Zhao* determination that section 425.16, subdivision (e), clause two does not protect free speech activities which are unrelated to petitioning efforts. We agree with *Morehouse* that within the scope of this clause are news reports made in connection with an issue under consideration or review by an authorized official proceeding which reports are published by media defendants. Further, news reporting activity *is* free speech. Nothing in any portion of subdivision (e), which is unambiguous on its face, confines free speech to speech which furthers the exercise of petition rights.

Second, *Zhao* is incorrect in its assertion that the only activities qualifying for statutory protection are those which meet the lofty standard of pertaining *1047 to the heart of self-government. [FN5] At least as to acts covered by clauses one and two of section 425.16, subdivision (e), the statute requires simply *any* writing or statement made in, or in connection with an issue under consideration or review by the specified proceeding or body. Thus these clauses safeguard free speech and petition conduct aimed at advancing self government, as well as conduct aimed at more mundane pursuits. Under the plain terms of the statute it is the context or setting itself that makes the issue a public issue: all that matters is that the First Amendment activity take place in an official proceeding or be made in connection with an issue being reviewed by an official proceeding.

> FN5 For the record, we take issue with Braun's portrayal of the press coverage. While the Chronicle was not exerting its *own* petition rights, it *was* advancing the "highest rung" of First Amendment values. As the Chronicle points out, Braun ignores the crucial role of the press in *informing* the citizenry, so that it can responsibly engage in self-governance. "The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences

....'" (*Estes v. State of Texas* (1965) 381 U.S. 532, 539 [85 S.Ct. 1628, 1631, 14 L.Ed.2d 543].)

It bears noting that none of the complained of events and allegations would have come about had it not been for whistle-blowing employees complaining first to their department head and then to the State Auditor that all was not well within CPRT. The center was a recognized branch of a large, publicly funded university medical school and performed a public training function. Without question its financial well-being and integrity were legitimate matters of public concern, especially when called into question by the people most closely affected-its employees. Along the way, important public officials within the university system were left out of the loop until matters reached the level of an investigation by the State Auditor. Surely all these people were acting within their petition rights to uncover and correct a situation of alleged extreme mismanagement or even criminal wrongdoing.

In this regard we point out that the Reporting of Improper Governmental Activities Act, pursuant to which the allegations in this case were lodged with the State Auditor, is a statutory vehicle by which state employees can exercise their petition rights. The purpose of the act is to permit state employees to disclose improper governmental activities to the State Auditor. (Gov. Code, §§ 8547.1, 8547.5.) The State Auditor, in turn, has authority to conduct an investigative audit into the matter; report the nature and details of improper activities to the appropriate agency and, where appropriate, to the Attorney General; issue reports on substantiated investigations; and release findings resulting from investigations as is deemed necessary to serve the interests of the state. (Gov. Code, § 8547.7.)

The answer to *Zhao's* concern over how to harmon-

52 Cal.App.4th 1036                                                                                     Page 9
52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
(Cite as: 52 Cal.App.4th 1036)

ize the language of <u>section 425.16</u>, subdivision (e), clause two with the statement of legislative intent contained in subdivision (a) is now apparent: The Legislature when crafting the clause two definition clearly and unambiguously resorted to an easily understandable concept of what constitutes a public issue. Specifically, it *equated* a public issue with the authorized official proceeding to which it connects. How do we then match this concept of a public issue with the declaration of legislative purpose to "encourage continued participation in *matters of public significance* . ..."? (<u>§ 425.16</u>, subd. (a), italics added.) **1048**

The term "significance" supports multiple meanings. It can mean "[t]he meaning or import *of* something." (15 Oxford English Dict. (2d ed. 1989) p. 458.) It can also mean "[i]mportance, consequence." (*Ibid.*) (<u>3</u>, <u>2b</u>) Our rules of statutory construction teach us that we must construe a statute or provision thereof with reference to the entire scheme to which it belongs so that all parts may be harmonized and have effect. (*<u>Stafford v. Realty Bond Service Corp.</u>* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]; see also *<u>DuBois v. Workers' Comp. Appeals Bd.</u>* (1993) 5 Cal.4th 382, 388 [20 Cal.Rptr.2d 523, 853 P.2d 978].) Moreover, " 'where there are conflicting provisions, the one susceptible to only one meaning will control the one that is susceptible of two meanings, if the statute can thereby be made harmonious.' " (*<u>Wheeler v. Board of Administration</u>* (1979) 25 Cal.3d 600, 606 [159 Cal.Rptr. 336, 601 P.2d 568].)

With these principles in mind, it is apparent that legislative intent is not gleaned solely from the preamble of a statute; it is gleaned from the statute as a whole, which includes the particular directives. This being the case, the meaning ascribed to the concept of "public significance" in the preamble must accommodate the singular, clearly defined protected activities set forth in each clause of <u>section 425.16</u> subdivision (e). To harmonize the two provisions, the term "significance" should be read as simply the meaning or import of a particular matter. Thus a matter has *public* meaning or significance within the language of <u>section 425.16</u>, sub-

division (a) because and solely because (1) it occurs within the context of the proceedings delineated in clause one (i.e. "any statement or writing made before ...."); or (2) it occurs in connection with an issue under consideration or review by one of the bodies or proceedings delineated in clause two; or (3) it is an issue of public interest that is aired to the public or in a public forum.

*(2) The Articles Reported on "Public" Issues*
(4) Next, Braun argues that the Chronicle was not reporting on matters that were "in connection with a public issue" because the actual audit was confidential. In her opinion, the Chronicle instead was reporting on the results of its *own* investigation into her employment situation and related *internal* matters at UCSF.

Braun misses the point. To reiterate, clause two of <u>section 425.16</u>, subdivision (e) defines an act in furtherance of free speech rights "in connection with a [public] issue" as "*any*" writing made "in connection with an issue under consideration or review by" any official proceeding authorized by law. (Italics added.) The investigative audit, conducted by the State Auditor, is an authorized official proceeding. (<u>Gov. Code, § 8547</u> et seq.) The Chronicle **1049** articles were made "in connection with" this proceeding: They reported that the investigation was being conducted, its subject matter, the documents gathered and relied on by the investigators, as well as the execution of the search warrant. While the investigative audit itself is confidential (<u>Gov. Code, § 8547.7</u>, subd. (c)), these topics and events are not.

Nor does the confidentiality of the audit transmute it into an unofficial or nonpublic activity. True, the investigation itself is closed to the public, but it is an authorized, public proceeding because it is government-sponsored and provided for by statute.

Braun also contends that the articles could not have been made in connection with a public issue "under consideration or review" by an official proceeding because the powers of the State Auditor are investigatory only, there being no additional power to re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036                                                                 Page 10

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
**(Cite as: 52 Cal.App.4th 1036)**

view or consider issues. She emphasizes that the State Auditor has no enforcement powers (Gov. Code, § 8547.7, subd. (b)) and no statutory authorization to conduct hearings or make binding findings of fact. This being the case, to Braun it is "axiomatic" that a matter under investigation by the State Auditor is not "under consideration or review" within the meaning of section 425.16, subdivision (e) and, hence, cannot rise to the level of a public issue encompassed by the anti-SLAPP statute.

The phrase "under consideration or review" is not so confining as to exclude an investigative audit, carried out by a funded and independent state bureau, with subpoena authority and authority to seek assistance from other state agencies and to report on substantiated findings. (Gov. Code, §§ 8543, 8544.5, 8545.4, 8546, 8547.6, 8547.7.) To the contrary, a matter under consideration is one kept "before the mind", given "attentive thought, reflection, meditation." (3 Oxford English Dict., *supra*, p. 769.) A matter under review is one subject to "an inspection, examination." (13 Oxford English Dict., *supra*, p. 830.) Against these definitions, surely the alleged governmental impropriety is "under consideration or review" by the Bureau of State Audits when subjected to an investigative audit.

*(3) Braun Cannot Prevail on Her Claims*

(5) Braun also insists that she will probably prevail on her claims against the Chronicle and its reporter because she can defeat application of Civil Code section 47, thereby destroying their privilege. Once the privilege is gone, Braun contends she can make out a prima facie case of liability against the Chronicle and escape the anti-SLAPP provisions. However, as we explain, Civil Code section 47 *does* apply to defeat Braun's claim. **\*1050**

This statute establishes a news media privilege for publications made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof ...." (Civ. Code, § 47, subd. (d).)

Braun's quarrels with Civil Code section 47 largely

repeat her quarrels with section 425.16. First, she asserts that the Chronicle did not and could not report on the actual investigative audit because that investigation was confidential. Therefore, she concludes the privilege is not available.

Again, it is immaterial that the audit itself was confidential. [FN6] In the context of judicial proceedings, case law is clear that reports which comprise a *history* of the proceeding come within the privilege, as do statements made outside the courtroom and invoking no function of the court, e.g., representations and theories expressed by criminal justice personnel in relation to pretrial events such as pursuit and arrest of the defendant. (*Hayward v. Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255, 259-260 [71 Cal.Rptr. 295].) We see no reason why the breathing room afforded the press for explaining the basis and background of a judicial proceeding should not be equally available for exposing the basis and background of a "public official proceeding." Nothing in the language of the statute provides a basis to distinguish between the two on this point. **\*1051**

> FN6 Braun makes much of the fact that the search warrant, affidavit and documents produced in response to the warrant were sealed until 10 days after the State Auditor issued his report. Hence, she argues, the Chronicle's assertion of privilege could not rest on reports of matters contained therein. Braun is barking up the wrong tree. When and how the Chronicle learned that a search warrant was sought, issued and executed, and that certain fruits were forthcoming, are not in issue. What does matter is whether the Chronicle published a "fair and true" account of these events and whether they related to a "public official proceeding." They did and they do.
> Braun also quibbles with the Chronicle's report that the *district attorney* opened a criminal probe of the CPRT, pointing out that the *State Auditor* requested the warrant, not the district attorney, and only the district attorney can open a criminal in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036                                                    Page 11
52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642
(Cite as: 52 Cal.App.4th 1036)

vestigation. So what? If Braun's point is that the article was not a true and fair report, she is wrong. The test is whether the report "captures the substance, the 'gist' or 'sting' of the subject proceedings." (*Kilgore v. Younger* (1982) 30 Cal.3d 770, 777 [180 Cal.Rptr. 657, 640 P.2d 793].) This test measures the publication by its " 'natural and probable effect' " " 'on the mind of the average reader.' " (*Ibid.*) The article would pass this test. Whether or not the district attorney "opened" a criminal investigation, the truth is that the State Auditor was investigating alleged criminal wrongdoing and the affiant for the search warrant declared he had disclosed all material information, favorable or unfavorable, to the district attorney. Additionally, the affiant expressed his own opinion that there was probable cause to believe that felony violations had occurred. Finally, Braun does not dispute that representatives of the district attorney's office were present during the search. What would strike the average reader is the "sting" that public officials were probing government wrongdoing, and had to resort to a search warrant to secure certain documents.

The articles in question detail the fact that the State Auditor was conducting an investigation of CPRT; the conduct of that investigation and statements made by various persons affected by or concerned with the subject of the audit; the substance of the background reports and charges leading up to the investigation; and a summary of the findings that ultimately issued. These reports constitute a history of the investigative audit conducted by the State Auditor; the reported activities were newsworthy and the public was entitled to information about them. The articles come squarely within the Civil Code section 47, subdivision (d), privilege for reports of "public official proceedings."

Second, Braun insists that an investigative audit pursuant to the Reporting of Improper Governmental Activities Act is not an "official proceeding" for

purposes of Civil Code section 47, subdivision (d). She relies on *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367], a case involving the definition of "official proceeding[s]" in Civil Code section 47, subdivision (b) (publications/broadcasts made in legislative, judicial or "any other official proceeding") in which the majority refused to apply the privilege to an allegedly false report of crime to the police. In the majority's view, the embrace of " 'official proceeding[s]' " does not reach beyond proceedings which resemble judicial and legislative proceedings. (*Fenelon v. Superior Court*, *supra*, at p. 1480.)

Since the act does not provide for enforcement powers or the conduct of evidentiary hearings, it lacks the necessary *Fenelon* hallmarks. However, as the dissent in *Fenelon* points out, the majority's definition is "unduly narrow" and is also inconsistent with relevant case law. (*Fenelon v. Superior Court*, *supra*, 223 Cal.App.3d at pp. 1484-1487.) We have found no reported cases which have followed *Fenelon*; to the contrary it has been criticized regularly. (*Hunsucker v. Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502-1503 [28 Cal.Rptr.2d 722]; *Passman v. Torkan* (1995) 34 Cal.App.4th 607, 618-619 [40 Cal.Rptr.2d 291].)

Third, Braun is unshakable in her view that the investigation cannot fit the bill of a "public official proceeding" because it was closed to the public. However, courts *have* extended Civil Code section 47, subdivision (d) protection to confidential proceedings. For example, in *Reeves v. American Broadcasting Companies, Inc.* (2d Cir. 1983) 719 F.2d 602, the reviewing court held that the privilege for press coverage of "judicial proceedings" encompasses press accounts of secret proceedings, in that case a grand jury inquiry. (*Id.* at p. 606.)

Even closer to home, in *Crane v. The Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1518, the Ninth Circuit concluded that a closed investigation by *1052 a congressional committee qualified for protection irrespective of whether it was denominated a "legislative" or "public official" proceeding. Reviewing the pertinent case law and applying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52 Cal.App.4th 1036, 61 Cal.Rptr.2d 58, 115 Ed. Law Rep. 989, 25 Media L. Rep. 1594, 97 Cal. Daily Op. Serv.
1119, 97 Daily Journal D.A.R. 1642

**(Cite as: 52 Cal.App.4th 1036)**

principles of statutory construction, the court concluded that an interpretation of "public official proceeding[s]" that would cabin the privilege to meetings and proceedings that were "open to the public" would go against the spirit animating Civil Code section 47, subdivision (d). (*Crane, supra,* at pp. 1518-1519.) "Citizens cannot monitor their government when it conducts business behind closed doors. As [case law has] interpreted the phrase, 'public' would appear to mean ' governmental' as opposed to private actions. 'Official' apparently signifies formal, as opposed to informal, governmental proceedings. This definition reconciles the [pertinent] cases with the statutory language in a manner that most generously accommodates the public's right to know about the inner-workings of its government." (*Id.* at p. 1518.)

For these reasons we conclude that the investigation qualified as an "official public proceeding" within the meaning of Civil Code section 47, subdivision (d).

### (4) The Trial Court Did Not Abuse Its Discretion in Denying Discovery and Awarding Attorney Fees

(6) The filing of a motion to strike under the anti-SLAPP statute suspends discovery. (§ 425.16, subd. (g).) However, on noticed motion and for good cause, the court "may order that specified discovery be conducted." (*Ibid.*)

Braun orally requested discovery at the hearing on the Chronicle's section 425.16 motion. She now complains the court unfairly denied this request. But hers was not a timely and properly noticed motion for discovery, supported by a showing of good cause. Braun's failure to comply with subdivision (g) dooms the discovery request. (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1499 [45 Cal.Rptr.2d 624]; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 357 [42 Cal.Rptr.2d 464].)

Section 425.16 also provides that the prevailing defendant is entitled to attorney fees and costs. (*Id.,* subd. (c).) The court awarded the Chronicle $17,879 in fees and $599 in costs. Braun's parting

argument is that under the facts of the case, particularly where the defendant is "a media defendant," the losing plaintiff should not be forced to pay. She cites no authority for this proposition, and the statute clearly is to the contrary. Nor has she presented **\*1053** any evidence that the award was based on unnecessary or duplicative work or any other improper basis. The award will stand. (*Wollersheim, supra,* 42 Cal.App.4th at pp. 658-659.)

We affirm the judgment.

Anderson, P. J., and Hanlon, J., concurred.

A petition for a rehearing was denied March 18, 1997, and appellant's petition for review by the Supreme Court was denied June 11, 1997. Chin, J., was of the opinion that the petition should be granted.

Cal.App.1.Dist.,1997.

Braun v. Chronicle Pub. Co.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6
## To Appendix to California State Authorities

Westlaw.

151 Cal.App.3d 1083
151 Cal.App.3d 1083, 199 Cal.Rptr. 236
**(Cite as: 151 Cal.App.3d 1083)**

C

BELA BOTOS, Plaintiff and Appellant,
v.
LOS ANGELES COUNTY BAR ASSOCIATION,
Defendant and Respondent.
**Civ. No. 69703.**

Court of Appeal, Second District, Division 3, California.

Feb 16, 1984.

SUMMARY

In an action for defamation against a local bar association by an unsuccessful candidate for elective judicial office, based on the association's publication of an evaluation which concluded the candidate was not qualified to perform the duties of the office sought, the trial court sustained the association's demurrer to the complaint and dismissed the action. (Superior Court of Los Angeles County, No. C 429207, Billy G. Mills, Judge.)

The Court of Appeal affirmed, holding that the association's published opinion that the candidate was 'not qualified' to sit as a superior court judge was not libelous as a matter of law, that the association had a right to express its views on who was or was not qualified for judicial office, and that by entering the arena of public elections the candidate subjected himself to evaluative comment. (Opinion by Arabian, J., with Klein, P. J., and Lui, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b) Libel and Slander § 10--Actionable Words--As to Public Officers and Candidates--Judicial Candidate--Evaluation by Local Bar Association.
A local bar association's published evaluation of an attorney as not qualified to perform the duties of a superior court judge for which office he was a candidate was nonlibelous as a matter of law. The bar association, like everyone else, had the right to ex-

press its views on who was or was not qualified for judicial office. By entering the arena of public elections, the candidate subjected himself to **\*1084** evaluative comment, not only from the bar association, but also from any and all interested persons.

[See Cal.Jur.3d, Assault and Other Wilful Torts, § 164; Am.Jur.2d, Libel and Slander, § 14.]

(2) Libel and Slander § 2--Definitions and Distinctions--Libel.
A libel is a false and unprivileged written publication which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. (Civ. Code, § 485.)

(3) Libel and Slander § 3--Elements of Defamation--Libel.
An essential element of libel is that the publication in question must contain a false statement of fact, which requirement is constitutionally based. Courts carefully distinguish between statements of opinion and fact, treating the one as constitutionally protected and imposing on the other civil liability for its abuse. The critical determination of whether the alleged defamatory statement contains fact or opinion is a question of law.

(4) Libel and Slander § 10--Actionable Words--As to Public Officers and Candidates--Opinion.
Mere expression of opinion or severe criticism is not libelous even if it adversely reflects on the fitness of an individual for public office.

(5) Appellate Review § 160--Determination and Disposition of Cause-- Affirmance--Order on Demurrer.
An order sustaining a demurrer will be upheld on appeal where the complaint fails to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).)

COUNSEL

Bela Botos, in pro. per., for Plaintiff and Appellant.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lewis, D'Amato, Brisbois & Bisgaard and David B. Parker for Defendant and Respondent. **1085**

ARABIAN, J.

### Introduction

In a case of first impression we are called upon to determine whether an action for defamation may be maintained against a local bar association by an unsuccessful candidate for elective judicial office, following the association's publication of an evaluation which concluded the candidate was 'not qualified' to perform the duties of the office sought.

We conclude the action may not be maintained.

### Statement of Facts

The complaint, which was couched in a single cause of action for defamation, was filed by appellant, Bela Botos (Botos) against respondent, the Los Angeles County Bar Association (LACBA) and several of its officers and members. [FN1] Botos is seeking special, compensatory and exemplary damages. He alleges the following facts in his complaint and the several exhibits incorporated therein by reference:

> FN1 The individual defendants were not served.

Botos is a practicing attorney and has been a member of the California Bar for the past 18 years, enjoying a good name and reputation, both personally and professionally.

On February 10, 1982, he declared himself a candidate for the office of Judge of the Superior Court of Los Angeles County, office no. 2.

After his official registration, on or about March 1, 1982, LACBA wrote to Botos (and all other candidates for local judicial office) and requested that he complete and return a biographical questionnaire for use by the judicial evaluation committee of LACBA in connection with their preparation of evaluation ratings. Botos failed to respond.

On or about March 15, 1982, LACBA again requested the same information. On March 20, 1982, Bo-

tos responded by letter, refused to provide the requested information and challenged the right of LACBA to evaluate candidates for judicial office. His position was that LACBA's 'only right is to vote for or against the candidate.' Botos refused to give LACBA permission to evaluate him and directed LACBA's attention to the provisions **1086** of Elections Code section 29630, which pertains to criminal intimidation of the electorate. [FN2]

> FN2 Elections Code section 29630 states: 'Every person who makes use of or threatens to make use of any force, violence, or tactic of coercion or intimidation, to induce or compel any other person to vote or refrain from voting at any election or to vote or refrain from voting for any particular person or measure at any election, or because any person voted or refrained from voting at any election or voted or refrained from voting for any particular person or measure at any election is punishable by imprisonment in the state prison for 16 months or two or three years.'

In a letter dated April 30, 1982, LACBA advised Botos that he had been given a 'tentative evaluation' of 'not qualified.' Botos was offered an option to discuss his rating with the judicial evaluation committee.

On May 6, 1982, Botos again responded by letter, objected to the evaluation and charged that LACBA was acting 'against the law' and that the tentative rating was 'defamatory and injurious.' He warned that any release of the evaluation would cause him to seek 'all proper legal remedies.'

LACBA continued its review and investigation of Botos and by letter of May 21, 1982, advised him that after due deliberation and consideration, the judicial evaluation committee had evaluated him as 'not qualified' for the judicial office for which he sought election. On or about May 25, 1982, the report of LACBA was released and published. [FN3] Newspapers in Los Angeles County reported the following statements:

FN3 In addition to the evaluation, LACBA's public report explained the composition and structure of its judicial evaluation committee and outlined its procedures. It stated that the standards used 'necessarily involve and contemplate a *qualitative evaluation* and are, therefore, very different from the mere eligibility provisions of the California Constitution ....' (Italics added.) There was an explanation that a 'not qualified' evaluation meant the candidate lacked 'some or all of the qualities of professional ability, experience, competence, integrity and temperament indicative of fitness to perform the judicial function satisfactorily.' The report indicated the scope of the evaluations were limited: 'The Committee firmly emphasizes that it has limited its evaluations only to a determination of the candidate's present qualifications for judicial office and it does not purport in any way to reflect upon any candidate's capabilities for any other office or as a practicing attorney or in any other endeavor. *The following final evaluations of the Judicial Evaluation Committee are limited to the Committee's considered opinion as to the candidate's present ability to serve as a judge for the court to which he or she seeks election ....*' (Italics added.)

Superior Court 'Office #2: ... Attorney Bela Botos, not qualified.'

'Attorney Bela Botos, 'has not demonstrated the [necessary] experience and competence.''

Botos' complaint alleged the falsity of LACBA's publication, malice, special damages, and the other technical requirements of a cause of action for libel. *1087

LACBA demurred to the complaint on two separate grounds: LACBA's published comment that Botos is 'not qualified' to serve as a superior court judge (1) is not susceptible to a defamatory meaning un-

der Civil Code section 45 [FN4] and (2) is an expression of opinion which is protected speech under the First Amendment of the United States Constitution and the California Constitution.

FN4 Civil Code section 45 provides: 'Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'

The demurrer was sustained on the grounds urged without leave to amend and this appeal followed the subsequent dismissal of the action.

Discussion

'Good name in man and woman, dear my Lord, Is the immediate jewel of their souls: Who steals my purse steals trash; 'tis something, nothing; Twas mine, ' tis his and has been slave to thousands; But he that filches from me my good name Robs me of that which not enriches him And makes me poor indeed.' [FN5]

FN5 William Shakespeare, Othello, Act III, scene 3, line 155.

(1a)Not unlike Iago's lament, Botos' complaint is that he was defamed when LACBA published their evaluation of him as not qualified to perform the duties of a superior court judge. The utterance having appeared in print, the question is whether it is libelous. (See Civ. Code, § 44.) [FN6] *1088

FN6 'The modern tort of defamation developed from two sources. The action for written defamation, called libel, grew out of a criminal action in the Star Chamber, while the action for spoken defamation, called slander, arose in the ecclesiastical courts. When the common-law courts took jurisdiction over slander, they allowed recovery only where pecuniary loss was proved, or where the slanderous accusation was one of a few which were considered so

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

serious as to create a great probability that such loss would be suffered. In the Star Chamber, however, only reputational harm was necessary for the crime of libel. When, upon the abolition of that tribunal, libel became the basis for a tort action in the common-law courts, this basis of liability was retained. Thus the outcome of many actions became dependent upon the form in which the defamation was published; courts might allow recovery for a written defamatory statement read by few persons but not for an identical statement made in a speech before a large audience. The difference has been justified on the ground that since libel is in a more permanent form and will be taken more seriously, pecuniary harm is so probable that it can be presumed.' (*Developments in the Law-Defamation* (1956) 69 Harv.L.Rev. 875, 887, fns. omitted.)

This is the first time the California courts have addressed the question whether the publication by a local bar association of an opinion regarding the qualifications of a candidate for judicial office may subject the association to an action for libel. [FN7]

> FN7 A similar issue was addressed by the Illinois courts in *Anagnost v. Chicago Bar Ass'n* (1980) 83 Ill.App.3d 466 [38 Ill.Rec. 902, 404 N.E.2d 326]. On appeal, the conclusion of the trial court that the comments of the Chicago Bar Association were not libelous was affirmed.

(2)In California a libel is a 'false and unprivileged' written publication which 'exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.' (Civ. Code, § 45.)

(3)'An essential element of libel ... is that the publication in question must contain a false statement of *fact.* ... This requirement ... is constitutionally based. The reason for the rule, well stated by the

high court, is that 'Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges or juries but on the competition of other ideas.' ( *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997], fn. omitted ....) In this context courts apply the Constitution by carefully distinguishing between statements of opinion and fact, treating the one as constitutionally protected and imposing on the other civil liability for its abuse. [¶] The critical determination of whether the alleged defamatory statement constitutes fact or opinion is a question of law.' ( *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425]; see *Okun v. Superior Court* (1981) 29 Cal.3d 442, 450-451 [175 Cal.Rptr. 157, 629 P.2d 1369], cert. den. 454 U.S. 1099 [70 L.Ed.2d 641, 102 S.Ct. 673].)

(4)It is well settled law that 'mere expression of *opinion* or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office.' ( *Yorty v. Chandler* (1970) 13 Cal.App.3d 467, 472-473 [91 Cal.Rptr. 709], italics added; see *Sierra Breeze v. Superior Court* (1978) 86 Cal.App.3d 102, 106 [149 Cal.Rptr. 914], *Miller v. Bakersfield News-Bulletin, Inc.* (1975) 44 Cal.App.3d 899, 903 [119 Cal.Rptr. 92], *Scott v. McDonnel Douglas Corp., supra.*, 37 Cal.App.3d at pp. 289, 290.)

Although Botos was burdened with the committee's evaluation of him as 'not qualified' to serve on the superior court bench, it was only their *1089 collective *opinion* of him, based on a majority or greater vote. [FN8] As a collective judgment of his qualifications, it may have ranged from being well founded to utterly wrong. (1b)However, LACBA, like everyone else, has a right to express its views on who is or is not qualified for judicial office. (See *Yorty v. Chandler, supra.*, 13 Cal.App.3d at p. 473.)

> FN8 The special committee on judicial evaluations was appointed by the president of LACBA during the administration year

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1981-1982. Its composition represented a cross-section of the legal community, as it included minorities, women and men, public and private sector lawyers, sole practitioners and members of small, medium and large law firms. The preponderance of the membership was said to possess broad litigation experience and knowledge concerning those characteristics and attributes required for judicial office.

By entering the arena of public elections, Botos subjected himself to evaluative comment, not only from the local bar association, but also from any and all interested persons. ( *Eva v. Smith* (1928) 89 Cal.App. 324, 328 [264 P. 803]; see *Yorty v. Chandler, supra.*, 13 Cal.App.3d at p. 473.) There is 'good authority for believing that grapes do not grow on thorns nor figs on thistles.' ( *Coleman v. MacLennan* (1908) 78 Kan. 711, 739 [98 P. 281, 291].)

The comments of the court in *Eva v. Smith, supra.*, 89 Cal.App. 324, are particularly apt: 'An individual who seeks or accepts public office invites and challenges public criticism so far as it may relate to his fitness and qualifications, ... It is, therefore, justifiable ... to communicate ... to the constituency any matter respecting a candidate material to the election. Having offered profert of himself for public investigation a candidate must expect some criticism of his personal fitness .... [*T*]emperament and qualifications are mere matters of opinion of which the electors are the only good judges .... The right of criticism rests upon public policy and those who seek office should not be supersensitive or too thin-skinned concerning criticism of their qualifications .... 'It would be absurd to hold as libelous to say of a candidate for public office that he was utterly unworthy of public confidence....'" ( *Id.*, at pp. 328-329; italics added.)

In *Desert Sun Publishing Co. v. Superior Court* (1979) 97 Cal.App.3d 49 [158 Cal.Rptr. 519], the court pointed out that '[o]ur political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those in or seeking public office.

Washington was called a murderer, Jefferson a blackguard, a knave and insane (Mad Tom), Henry Clay a pimp, Andrew Jackson a murderer and an adulterer, and Andrew Johnson and Ulysses Grant drunkards. Lincoln was called a half-witted usurper, a baboon, a gorilla, a ghoul. Theodore Roosevelt was castigated as a traitor to his class, and Franklin Delano Roosevelt as a traitor to his country. Dwight D. Eisenhower was charged with being a conscious agent of the Communist Conspiracy.' *1090* ( *Id.*, at p. 51; see *Grillo v. Smith* (1983) 144 Cal.App.3d 868, 872 [193 Cal.Rptr. 414].)

While there is general agreement that a good reputation is one of man's choicest treasures and that its uncompensated loss through false charges should be required only where it is clear the public good requires this sacrifice (Noel, *Defamation of Public Offices and Candidates* (1949) 49 Colum.L.Rev. 875, 891), clearly the public is well served by public comment of bar associations and others concerning the qualifications of candidates for judicial office. Further, a local bar association has a vested interest in aiding the public to form sound judgments concerning the quality of judicial candidates.

An unfavorable evaluation by such an association is not akin to the ringing of a leper's bell nor a drumming out of the corps. The vast majority of candidates simply accept the ultimate results of the election and carry on unencumbered by residual memory. Some even win the subject seat and have the last laugh. Moreover, we are reminded of the wise words credited to President Harry S. Truman: 'If you can't stand the [evaluative] heat, get out of the [electoral] kitchen.' (See *Desert Sun Publishing Co. v. Superior Court, supra.*, 97 Cal.App.3d at p. 52.)

We hold, therefore, that LACBA's published *opinion* that Botos is 'not qualified' to sit as a superior court judge is nonlibelous as a matter of law. (See *Yorty v. Chandler, supra.*, 13 Cal.App.3d 467; and see *Miller v. Bakersfield News-Bulletin, Inc., supra.*, 44 Cal.App.3d at p. 902.) [FN9] In so holding, we are not unmindful of Botos' concern that his reputation has been injured by the unflattering

151 Cal.App.3d 1083                                                                                  Page 6
151 Cal.App.3d 1083, 199 Cal.Rptr. 236
(Cite as: 151 Cal.App.3d 1083)

LACBA evaluation of his fitness for judicial office. However, there exists no protective mantle from fair, open and honest comment when one seeks a place of public trust and service. The hallowed hall of justice is not a sheltering inn for members of the bar who may not possess the attributes of courage, character, habit, industry, mentality and morality required of those who would sit in the seat of judgment.

> FN9 Since an essential element of libel is that the publication in question contain a false statement of *fact*, we need not review the trial court's determination that LACBA's statement is not susceptible to a defamatory meaning. (See *Okun v. Superior Court, supra.,* 29 Cal.3d at p. 450.)

### Conclusion

(5)An order sustaining a demurrer will be upheld on appeal where, as here, the complaint fails to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) *1091

The judgment is affirmed.

Klein, P. J., and Lui, J., concurred. *1092

Cal.App.2.Dist.,1984.

Botos v. Los Angeles County Bar Ass'n

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7
## To Appendix to California State Authorities

55 Cal.Rptr.3d 600                                                                                          Page 1
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)

C

Court of Appeal, Fourth District, Division 3, California.
CHRISTIAN RESEARCH INSTITUTE et al.,
Plaintiffs and Respondents,
v.
William ALNOR, Defendant and Appellant.
No. G036587.

Feb. 28, 2007.

**Background:** In response to defamation action by plaintiffs, after defendant reported on a web site that plaintiffs were the subject of a mail fraud investigation, defendant filed motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute. The Superior Court, Orange County, No. 05CC04546, Robert J. Moss, J., denied the motion, and defendant appealed.

**Holdings:** The Court of Appeal, Aronson, J., held that:

(1) plaintiffs showed by a preponderance of the evidence that defendant's statement was false, but

(2) plaintiffs failed to demonstrate a probability of prevailing on the merits by clear and convincing evidence that defendant made the challenged statement with actual malice.

Order reversed with directions.

Rylaarsdam, Acting P.J., filed a dissenting opinion.

West Headnotes

**[1] Appeal and Error** ⟜103
30k103 Most Cited Cases
An order denying an anti-SLAPP (strategic lawsuit against public participation) special motion to strike is appealable. West's Ann.Cal.C.C.P. §§ 425.16(i), 904.1.

**[2] Appeal and Error** ⟜893(1)
30k893(1) Most Cited Cases
The appellate court reviews the trial court's order denying an anti-SLAPP (strategic lawsuit against public participation) special motion to strike de novo.

**[3] Pleading** ⟜358
302k358 Most Cited Cases
To prevail on an anti-SLAPP (strategic lawsuit against public participation) special motion to strike, the movant must first make a threshold showing that the challenged cause of action arises from an act in furtherance of the right of petition or free speech in connection with a public issue; if once the movant meets this burden, the plaintiff must demonstrate a probability of prevailing on the claim, or the trial court will strike the cause of action. West's Ann.Cal.C.C.P. § 425.16.

**[4] Pleading** ⟜358
302k358 Most Cited Cases

**[4] Pleading** ⟜360
302k360 Most Cited Cases
To establish a probability of prevailing on a claim challenged under the anti-SLAPP (strategic lawsuit against public participation) statute, plaintiff must demonstrate that complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. West's Ann.Cal.C.C.P. § 425.16.

**[5] Pleading** ⟜360
302k360 Most Cited Cases
In determining whether plaintiff established probability of prevailing on cause of action challenged under anti-SLAPP (strategic lawsuit against public participation) statute, trial court considers pleadings and evidentiary submissions of both plaintiff and defendant; although court does not weigh credibility or comparative probative strength of competing evidence, it should grant motion if, as a matter of law, defendant's evidence supporting motion defeats plaintiff's attempt to establish evidentiary support for claim. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading** ⟜360
302k360 Most Cited Cases
To establish probability of prevailing on cause of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW     Document 37     Filed 08/23/2007     Page 23 of 40

55 Cal.Rptr.3d 600                                                        Page 2
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)

action challenged under anti-SLAPP (strategic law-suit against public participation) statute, plaintiff cannot rely on allegations of complaint, but must produce evidence that would be admissible at trial. West's Ann.Cal.C.C.P. § 425.16.

**[7] Libel and Slander** ☜30
237k30 Most Cited Cases

**[7] Libel and Slander** ☜51(5)
237k51(5) Most Cited Cases
A public figure plaintiff in a libel action has the burden of proving both that the challenged statement is false, and that defendant acted with actual malice.

**[8] Libel and Slander** ☜51(1)
237k51(1) Most Cited Cases
In the context of a libel action, a defendant acts with actual malice when publishing a knowingly false statement or where he or she entertained serious doubts as to its truth.

**[9] Libel and Slander** ☜112(2)
237k112(2) Most Cited Cases
A public figure plaintiff in a libel action must prove actual malice by clear and convincing evidence.

**[10] Pleading** ☜360
302k360 Most Cited Cases
In response to special motion to strike defamation action under anti-SLAPP (strategic lawsuit against public participation) statute, plaintiffs, in establishing a probability of prevailing on the merits of their claim, were required to prove falsity by a preponderance of the evidence rather than by clear and convincing evidence. West's Ann.Cal.C.C.P. § 425.16.

**[11] Trial** ☜228(1)
388k228(1) Most Cited Cases
Pattern jury instructions, while designed to accurately reflect the law, are not the law itself.

**[12] Evidence** ☜378(1)
157k378(1) Most Cited Cases
Freedom of Information Act (FOIA) letters were admissible evidence under the official record ex-

ception to the hearsay rule, in support of defamation plaintiffs' showing that defendant's challenged statement was false; the FOIA letters were authenticated by declaration of attorney for plaintiffs, and the FOIA letters each stated that they were prepared in response to a FOIA request, and they identified the time period searched. West's Ann.Cal.Evid.Code § 1280.

**[13] Evidence** ☜333(1)
157k333(1) Most Cited Cases
Office of the Inspector General (OIG) report was not admissible evidence under the official record exception to the hearsay rule, in support of defamation plaintiffs' showing that defendant's challenged statement was false; there was insufficient evidence to indicate the trustworthiness of the report, inasmuch as the report contained information that was not directly observable by the investigator who prepared the report, and the investigator identified no independent sources. West's Ann.Cal.Evid.Code § 1280.

**[14] Pleading** ☜360
302k360 Most Cited Cases
Freedom of Information Act (FOIA) letters were sufficient to meet defamation plaintiffs' burden to prove falsity of defendant's statement, for purposes of establishing a probability of prevailing on the merits in response to defendant's special motion to strike the defamation action under anti-SLAPP (strategic lawsuit against public participation) statute; FOIA letters provided sufficient evidence that the postal service did not investigate alleged wrongdoing by plaintiffs, contrary to defendant's claim. West's Ann.Cal.C.C.P. § 425.16.

**[15] Pleading** ☜360
302k360 Most Cited Cases
Any inference that defendant in defamation action fabricated his conversation with employee from postal service, before publishing the statement on web site that plaintiffs were the subject of a mail fraud investigation, was not sufficiently strong to meet the clear and convincing evidence standard to establish actual malice, in order for plaintiffs to establish a probability of prevailing on the merits of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their claim in response to defendant's special motion to strike defamation action under anti-SLAPP (strategic lawsuit against public participation) statute; although postal service's response to Freedom of Information Act (FOIA) request indicated that it could not locate any documents regarding an investigation centering on plaintiffs, the postal service's response did not purport to foreclose the possibility that documents pertaining to the investigation might exist, but were kept in a location other than those searched. West's Ann.Cal.C.C.P. § 425.16.

**[16] Evidence 596(1)**
157k596(1) Most Cited Cases
The burden of proof by clear and convincing evidence requires a finding of high probability; the evidence must be so clear as to leave no substantial doubt, and it must be sufficiently strong to command the unhesitating assent of every reasonable mind.

**[17] Libel and Slander 51(1)**
237k51(1) Most Cited Cases
To show actual malice in the context of a defamation action, the plaintiff must demonstrate that the defendant either knew the statement was false or subjectively entertained serious doubt that the statement was truthful; publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

**[18] Libel and Slander 51(1)**
237k51(1) Most Cited Cases

**[18] Libel and Slander 112(2)**
237k112(2) Most Cited Cases
A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice; a failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff may, in an appropriate case, indicate that the publisher had serious doubts regarding the truth of the publication.

**[19] Libel and Slander 51(1)**
237k51(1) Most Cited Cases

The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice in the context of a defamation action, nor even necessarily raise a triable issue of fact on that controversy.

**[20] Appeal and Error 1010.1(6)**
30k1010.1(6) Most Cited Cases
Reviewing courts must reject challenges to the sufficiency of the evidence if substantial evidence supports the judgment.

**[21] Appeal and Error 840(3)**
30k840(3) Most Cited Cases
Normal principles of substantial evidence review do not apply to the appellate court's independent review of an actual malice determination in a First Amendment libel case; the question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact, and judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice. U.S.C.A. Const.Amend. 1.

**[22] Libel and Slander 51(1)**
237k51(1) Most Cited Cases
Gross or even extreme negligence will not suffice to establish actual malice in the context of a defamation action; the defendant must have made the statement with knowledge that the statement was false or with actual doubt concerning the truth of the publication.

**[23] Libel and Slander 51(5)**
237k51(5) Most Cited Cases

**[23] Pleading 358**
302k358 Most Cited Cases

**[23] Pleading 360**
302k360 Most Cited Cases
The fact that defendant in defamation action may have reported a story on web site in a biased man-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                                Page 4
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

ner regarding plaintiffs did not establish clear and convincing evidence of actual malice, in order for plaintiffs to establish a probability of prevailing on the merits of their claim in response to defendant's special motion to strike defamation action under anti-SLAPP (strategic lawsuit against public participation) statute; although defendant reported that plaintiffs were the targets of a federal mail fraud investigation, while postal service employee had purportedly stated only that her office had initiated an investigation of plaintiffs on the basis of mail fraud, any divergence between the two accounts was at most negligence. West's Ann.Cal.C.C.P. § 425.16.

**[24]** Libel and Slander ☞51(5)
237k51(5) Most Cited Cases

**[24]** Pleading ☞358
302k358 Most Cited Cases

**[24]** Pleading ☞360
302k360 Most Cited Cases
The fact that defendant in defamation action filed a mail fraud complaint against plaintiffs, while reporting on a web site that plaintiffs were the subject of a mail fraud investigation, did not establish clear and convincing evidence of actual malice, in order for plaintiffs to establish a probability of prevailing on the merits of their claim in response to defendant's special motion to strike defamation action under anti-SLAPP (strategic lawsuit against public participation) statute; although a plausible inference from defendant's filing of the complaint was that there was no existing investigation, it was equally reasonable to infer that defendant filed the report to bolster an existing investigation by providing additional information. West's Ann.Cal.C.C.P. § 425.16.

**[25]** Libel and Slander ☞51(5)
237k51(5) Most Cited Cases

**[25]** Pleading ☞358
302k358 Most Cited Cases

**[25]** Pleading ☞360
302k360 Most Cited Cases
The purported inadequate investigation by defendant in defamation action, prior to reporting on a

web site that plaintiffs were the subject of a mail fraud investigation, did not establish clear and convincing evidence of actual malice, in order for plaintiffs to establish a probability of prevailing on the merits of their claim in response to defendant's special motion to strike defamation action under anti-SLAPP (strategic lawsuit against public participation) statute; plaintiffs asserted that defendant should have known that it was unlikely that postal service would have had an investigation underway on the same day that defendant spoke to postal service employee about the possible mail fraud, but there was no evidentiary basis to presume that defendant would have been the only catalyst for a post office investigation. West's Ann.Cal.C.C.P. § 425.16.

**[26]** Libel and Slander ☞51(1)
237k51(1) Most Cited Cases
The mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient to demonstrate actual malice in the context of a defamation action; to support a finding of actual malice, the failure to investigate must fairly be characterized as the purposeful avoidance of the truth or the product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of the subject charges.

**[27]** Libel and Slander ☞51(5)
237k51(5) Most Cited Cases

**[27]** Pleading ☞358
302k358 Most Cited Cases

**[27]** Pleading ☞360
302k360 Most Cited Cases
The purported unreliability of defendant's sources that he relied on prior to reporting on a web site that plaintiffs were the subject of a mail fraud investigation did not establish clear and convincing evidence of actual malice, in order for plaintiffs to establish a probability of prevailing on the merits of their claim in response to defendant's special motion to strike defamation action under anti-SLAPP (strategic lawsuit against public participation) stat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                                                                                            Page 5
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

ute; although defendant did not obtain a postal ser-
vice employee's title or last name when he spoke to
her, nothing in the record indicated that defendant
was suspicious of her veracity or doubted her
knowledge of the investigation. West's
Ann.Cal.C.C.P. § 425.16.
*See 5 Witkin, Cal. Procedure (4th ed. 1997) Plead-
ing, § 962 et seq.; Cal. Jur. 3d, Pleading, § 295 et
seq.; Weil & Brown, Cal. Practice Guide: Civil
Practice Before Trial (The Rutter Group 2006) ¶
7:207 et seq (CACIVP Ch. 7- C).*

**[28] Libel and Slander ⬢⟿51(5)**
237k51(5) Most Cited Cases

**[28] Pleading ⬢⟿358**
302k358 Most Cited Cases
The purported ill will that defendant in defamation
action harbored toward plaintiffs, which assertedly
led to defendant's reporting on a web site that
plaintiffs were the subject of a mail fraud investiga-
tion, did not establish clear and convincing evid-
ence of actual malice, in order for plaintiffs to es-
tablish a probability of prevailing on the merits of
their claim in response to defendant's special mo-
tion to strike defamation action under anti-SLAPP
(strategic lawsuit against public participation) stat-
ute; even if defendant had been angry about his pur-
ported termination from plaintiff's organization,
plaintiffs failed to demonstrate any connection
between defendant's alleged ill will and defendant's
belief about the truth of his publication. West's
Ann.Cal.C.C.P. § 425.16.

**[29] Libel and Slander ⬢⟿51(1)**
237k51(1) Most Cited Cases
A court may consider a defendant's anger or hostil-
ity toward a plaintiff in determining the presence of
malice in a defamation action only to the extent it
impacts the defendant's actual belief concerning the
truthfulness of the publication; the focus is thus on
the defendant's attitude toward the truth or falsity of
the material published and not the defendant's atti-
tude toward the plaintiff.
**605 Ross, Dixon & Bell, Kevin F. Kieffer, Becki
F. Kieffer, Jenece D. Solomon, Irvine; ACLU
Foundation of Southern California and Peter J. Eli-
asberg, Los Angeles, for Defendant and Appellant.

Tom S. Chun, Irvine, for Plaintiffs and Respond-
ents.

*76 OPINION
ARONSON, J.

Defendant William Alnor appeals the trial court's
denial of his special motion to strike brought under
the anti-SLAPP statute. [FN1] (Code Civ. Proc., §
425.16.) [FN2] Alnor contends plaintiffs Hank
Hanegraaff and Christian Research Institute (CRI)
failed to meet their burden of demonstrating a like-
lihood of success on their defamation complaint be-
cause they failed to show by clear and convincing
evidence Alnor's statement about plaintiffs was
false or that Alnor acted with malice.

> FN1. SLAPP is an acronym for strategic
> lawsuit against public participation, first
> coined by two University of Denver pro-
> fessors. (See Comment, *Strategic Lawsuits
> Against Public Participation: An Analysis
> of the Solutions* (1990/1991) 27 Cal. West-
> ern L.Rev. 399.)

> FN2. Unless otherwise indicated, all fur-
> ther statutory references are to the Code of
> Civil Procedure.

We conclude the law does not require a defamation
plaintiff to prove falsity by clear and convincing
evidence and that plaintiffs have shown by a pre-
ponderance of the evidence that Alnor's statements
were false. Plaintiffs, however, have failed to
demonstrate a probability of prevailing by clear and
convincing evidence that Alnor made the chal-
lenged statement with "actual malice." We there-
fore reverse the trial court's order denying Alnor's
special motion to strike, and direct the trial court to
enter a new order granting the motion and striking
the complaint.

I
FACTUAL AND PROCEDURAL BACK-
GROUND
*A. The Defamation Lawsuit*

55 Cal.Rptr.3d 600                                                                                     Page 6
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

Hanegraaff is president of CRI, a nonprofit organization that disseminates religious information. Defendant William Alnor is a former CRI employee who maintains the Christian Sentinel, a web site reporting on the fundraising and spending practices of various Christian organizations.

Hanegraaff posted an "urgent" letter on CRI's web site stating that the post office branch in Rancho Santa Margarita had misdirected some of CRI's mail to the **606 wrong address, and that the recipient had discarded some of it. The letter explained that although the local post office branch "has accepted full responsibility for this error and has fixed the problem," the mishap caused *77 CRI to lose a substantial amount of money, "perhaps in the hundreds of thousands of dollars." The letter requested readers to "send a sacrificial gift" to CRI to cover the loss. Suspicious of CRI's claims, Alnor called several post office branches to verify the incident. Based on his findings, Alnor published a Christian Sentinel edition disputing CRI's claim that a substantial amount of CRI's mail had been diverted, and questioning the fundraising tactics of Hanegraaff and CRI. Under the heading of "BREAKING NEWS," the edition bore the headline: "Federal Criminal Mail Fraud Investigation Launched Against CRI and Leader Hank Hanegraaff." Under a picture of Hanegraaff, the story began: "Christian Research Institute (CRI) President Hank Hanegraaff has become the focus of a federal criminal mail fraud investigation sparked last week by an unusual 'urgent memo' fundraising appeal letter he released on Friday on CRI's website."

Plaintiffs filed a defamation complaint against Alnor based on his statement that CRI and Hanegraaff were under a federal criminal investigation. Alnor responded with a special motion to strike under the anti-SLAPP statute. In support of the motion, Alnor submitted a declaration outlining his investigation into the CRI memo.

### B. *Alnor's Evidence*

According to his declaration, Alnor called the Ran-

cho Santa Margarita office of the United States Postal Service (USPS) and asked to speak to the postmaster. A person who identified himself as " 'Gus,' the 'acting postmaster' " told Alnor he was unaware of the mail diversion discussed in the CRI letter. After providing Gus a copy of the CRI memo, Alnor again called the branch and learned from an unidentified person that the CRI letter had been posted at the facility for the employees to view. This person told Alnor that no one at the facility knew anything about the allegations made in the CRI memo, and that the issue had become a matter of internal investigation. The person also advised Alnor to contact the postal inspector's office in Pasadena, California, so they could start an investigation.

Alnor then called the USPS Pasadena postal inspector's office and spoke to "Debra," who advised Alnor that she was aware of the claims in CRI's memo, and her office was " 'investigating' it on the basis of 'mail fraud.' " Debra asked Alnor to fax her a copy of the CRI memo, and referred him to a web site where he could file a mail fraud report. Debra explained that all complaints regarding suspected mail fraud were filed with the USPS's national postal inspector's office in Chicago, Illinois. Alnor then printed off, completed, and sent a mail fraud report to both the Rancho Santa Margarita branch and the Chicago postal inspector's office. Alnor subsequently called the Chicago postal inspector's office to ask about the status of his mail fraud *78 report, and was referred to someone who did not return his call. Shortly after Alnor published the allegedly defamatory article, he received a letter from the Chicago postal inspector's office informing him " '[t]he information you provided will be reviewed to determine if this matter constitutes any violation of the Mail Fraud or False Representation Statutes.' "

Alnor spoke on two more occasions with Gus, who said he had received Alnor's mail fraud report and that the postal inspector's office was investigating the situation. Gus said CRI had never complained about diverted **607 mail, and that " '[n]o apologies were ever made to CRI.' " Gus opined the mail

Case 5:07-cv-03795-JW    Document 37    Filed 08/23/2007    Page 28 of 40

55 Cal.Rptr.3d 600                                                Page 7
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

diversion outlined in the CRI letter appeared fabricated. Gus told Alnor, " 'It never happened. There were no diversions of mail.' " On another call to the Rancho Santa Margarita Post Office, Alnor spoke with an unidentified woman who told him the employees of the office were annoyed over the allegations in the CRI letter and claimed " '[CRI] never came in to talk to us at all.' " She also confirmed that CRI had not filed a complaint regarding the allegedly diverted mail. Alnor also contacted the San Juan Capistrano USPS branch, whose postmaster told Alnor he had never heard of the matters claimed by Hanegraaff in the CRI memo. Alnor attempted to speak with CRI about the matter on several occasions, but the organization would not provide any information.

In addition to his own declaration, Alnor submitted the declaration of Jay Howard, another person who monitors religious organizations. Howard stated that shortly after Alnor published the allegedly defamatory article, he confirmed with someone named "Mildred" that the post office had initiated a mail fraud investigation based on the CRI letter. Alnor also introduced evidence, including a Los Angeles Times article, to demonstrate plaintiffs' public figure status.

### C. *Plaintiffs' Evidence*

In opposing the special motion to strike, plaintiffs submitted Hanegraaff's declaration. Hanegraaff stated that in the last quarter of 2004, he became aware there had been a noticeable drop in mail volume and the amount of donations received compared with the same period in prior years. In December 2004, CRI received a call from a company named On-Target Marketing (On-Target), a direct mail marketing company which deals with large volumes of mail daily. The On-Target employee claimed the company had retrieved from its dumpster mail belonging to CRI. Hanegraaff dispatched Paul Young, CRI's chief operating officer, who returned with a full tray of CRI mail from On-Target. Young then met with a USPS official to discuss the situation. CRI decided not to file a formal complaint with the USPS because it did not wish to

seek compensation, but only to correct the problem. *79 Believing the drop in donations occurred because the post office diverted their mail, Hanegraaff prepared and published the CRI letter.

Hanegraaff's declaration states that Alnor had made numerous personal attacks against Hanegraaff, including claims of plagiarism and financial improprieties, since CRI terminated Alnor's employment in 1992. Hanegraaff stated he was aware of only one postal service investigation relating to the CRI memo, which was commenced over a month after Alnor's article. The investigation did not concern any wrongdoing on the part of CRI or Hanegraaff, but focused only on the post office's alleged mishandling of CRI's mail. Plaintiffs included a copy of the post office's investigative report, which confirmed plaintiffs were not targeted.

Plaintiffs also introduced copies of letters received from the Office of Inspector General of the USPS, Federal Trade Commission, and the Federal Bureau of Investigation, in response to CRI's Freedom of Information Act document request; each of the letters stated the agency had no investigative records concerning CRI or Hank Hanegraaff during the preceding two-year period.

## II
### STANDARD OF REVIEW

[1][2] An order denying an anti-SLAPP special motion to strike is appealable under **608 sections 425.16, subdivision (i), and 904.1. We review the trial court's order de novo. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999, 113 Cal.Rptr.2d 625.)

## III
### DISCUSSION
#### A. *Applicable Anti-SLAPP and Libel Principles*

The anti-SLAPP statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has es-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 37    Filed 08/23/2007    Page 29 of 40

55 Cal.Rptr.3d 600                                                                    Page 8
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)

tablished that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) An act in furtherance of the right of free speech includes "conduct in furtherance of the exercise of the constitutional right of petition *80 or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

[3] "The anti-SLAPP statute arose from the Legislature's recognition that SLAPP suit plaintiffs are not seeking to succeed on the merits, but to use the legal system to chill the defendant's first amendment right of free speech." (_Integrated Healthcare Holdings, Inc. v. Fitzgibbons_ (2006) 140 Cal.App.4th 515, 522, 44 Cal.Rptr.3d 517 (_Integrated Healthcare_ ).) "To prevail on an anti-SLAPP motion, the movant must first make ' "a threshold showing that the challenged cause of action" arises from an act in furtherance of the right of petition or free speech in connection with a public issue.' [Citation.] Once the movant meets this burden, the plaintiff must demonstrate ' "a probability of prevailing on the claim." ' [Citation.] If the plaintiff cannot meet this burden, the trial court must strike the cause of action. [Citation.]" (_Ibid._)

Plaintiffs concede Alnor's statement arose from constitutionally protected activity, and that the statute's first prong has been met. Thus, the only issue here is whether plaintiffs have demonstrated a probability of success on the merits.

[4][5][6] "To establish a probability of prevailing, the plaintiff ' "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.] In doing so, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant. [Citation.] Although 'the court does not _weigh_ the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'

[Citation.] Moreover, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial. [Citation.]" (_Integrated Healthcare, supra,_ 140 Cal.App.4th at p. 527, 44 Cal.Rptr.3d 517.)

Plaintiffs' sole cause of action against Alnor is libel. Civil Code section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." There is no question the phrase "Federal Criminal Mail Fraud Investigation Launched Against CRI and Leader Hank Hanegraaff" exposes plaintiffs **609 to "hatred, contempt, ridicule, or obloquy," would cause them to be "shunned or avoided," and has a tendency to injure Hanegraaff in his occupation.

[7][8][9] *81 Plaintiffs do not dispute they are public figures. [FN3] As such, they have the burden of proving both that the challenged statement is false, and that Alnor acted with " 'actual malice.' " (See _New York Times Co. v. Sullivan_ (1964) 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (_Sullivan_ ); _Curtis Publishing Co. v. Butts_ (1967) 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (plur. opn. of Harlan, J.) [applying _Sullivan_ actual malice standard to public figures that are not public officials].) In this context, a defendant acts with " 'actual malice' " when publishing a knowingly false statement or where he "entertained serious doubts as to [its] truth." (_Reader's Digest Assn. v. Superior Court_ (1984) 37 Cal.3d 244, 256, 208 Cal.Rptr. 137, 690 P.2d 610 (_Reader's Digest_ ).) A public figure plaintiff must prove actual malice by clear and convincing evidence. (_Gertz v. Robert Welch, Inc._ (1974) 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (_Gertz_ ).)

> FN3. As Alnor points out, CRI bills itself as the "largest, most effective apologetics ministry in the world," receiving over $7 million a year in donations. Plaintiffs also produce "Bible Answer Man," a nationally

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                              Page 9
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

syndicated daily radio program reaching millions of listeners every week.

*B. Plaintiffs Have Met Their Burden to Show Falsity*

1. Plaintiffs Are Required to Demonstrate Falsity by a Preponderance of the Evidence

[10] Alnor contends plaintiffs must not only prove malice by clear and convincing evidence, but must also prove falsity by the same standard. In support, Alnor cites *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1170, 15 Cal.Rptr.3d 100 *(Annette F.).* Plaintiffs, citing CACI No. 1700, contend they are required to prove falsity only by a preponderance of the evidence. We conclude plaintiffs are correct.

In *Annette F.,* the court reversed an order denying an anti-SLAPP motion in part on the plaintiff's failure to prove the falsity of the challenged statement by clear and convincing evidence. (119 Cal.App.4th at p. 1171, 15 Cal.Rptr.3d 100.) *Annette F.* relied solely on the California Supreme Court's decision in *Blatty v. New York Times* (1986) 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 728 P.2d 1177 *(Blatty* ). According to *Annette F., Blatty* held the "plaintiff in [a] case governed by ... *Sullivan, supra,* 376 U.S. 254, 84 S.Ct. 710 ... bears [the] burden of proving falsehood by clear and convincing evidence." *(Annette F.,* at p. 1170, 15 Cal.Rptr.3d 100.). *Blatty,* however, never applied the clear and convincing standard for falsity, nor did it even discuss the issue. Based on the *82 pinpoint citation provided, it appears the *Annette F.* court simply misread *Blatty's* discussion regarding the burdens of proof in defamation actions involving public figures. [FN4]

FN4. The portion of the *Blatty* opinion cited by *Annette F.* on burden of proof reads as follows: "At the threshold, in defamation actions--in which, of course, the alleged injurious falsehood of a statement is the gravamen of the plaintiff's claim--the amendment has abrogated the common law of strict liability. *(Gertz v. Robert Welch,*

*Inc.* (1973) 418 U.S. [323,] 347[, 94 S.Ct. 2997, 41 L.Ed.2d 789]....) For constitutional purposes it is not enough that the traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood. (*Id.* at pp. 339-348[, 94 S.Ct. 2997] ...; ... *Sullivan, supra,* 376 U.S. at pp. 278-280[, 84 S.Ct. 710] ...; see, e.g., *Bose Corp. v. Consumers Union of U.S., Inc.* [ (1984) ] 466 U.S. [485], 511, fn. 30[, 104 S.Ct. 1949, 80 L.Ed.2d 502] ... [holding that when the plaintiff is a public official or public figure, in order to carry his burden he must prove 'actual malice'--i.e., he must 'demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement']; *Gertz .... supra,* [418 U.S.] at p. 347[, 94 S.Ct. 2997] ... [effectively holding that when the plaintiff is a private individual, he must prove that the defendant made the falsehood with at least negligence) )." *(Blatty, supra,* 42 Cal.3d at p. 1042, 232 Cal.Rptr. 542, 728 P.2d 1177.)

[11] As plaintiffs correctly note, CACI No. 1700 requires falsity to be proved by a **610 preponderance of the evidence. Pattern jury instructions, however, while designed to accurately reflect the law, are not the law itself. *(People v. Alvarez* (1996) 14 Cal.4th 155, 217, 58 Cal.Rptr.2d 385, 926 P.2d 365.) Some courts have interpreted United States Supreme Court precedent to require proof of falsity by clear and convincing evidence (see, e.g., *Kapiloff v. Dunn* (1975) 27 Md.App. 514, 530-531, 343 A.2d 251), but the Supreme Court itself has never done so. Indeed, in *Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 661 fn. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562, the court noted: "There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. [Citations.] We express no view on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 37    Filed 08/23/2007    Page 31 of 40

55 Cal.Rptr.3d 600                                                                    Page 10
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)

this issue."

The requirement that a public figure plaintiff prove malice by clear and convincing evidence arises from First Amendment concerns that freedom of expression be provided "the 'breathing space' that [it] 'need[s] ... to survive....' " (*Sullivan, supra,* 376 U.S. at p. 272, 84 S.Ct. 710.) Although citing *Annette F.,* Alnor provides no argument why the element of falsity requires a clear and convincing evidence standard to protect freedom of expression. Neither the California Supreme Court nor the United States Supreme Court has expressly mandated this requirement, and we perceive no reason to do so now. Where the law specifies no higher burden of proof, the preponderance of the evidence standard applies. (Evid.Code, § 115.)

*83 2. The Plaintiffs Submitted Admissible Evidence Demonstrating Falsity

[12] To meet their burden of proving the challenged statement was false, plaintiffs cite to (1) the letters received from federal agencies in response to plaintiffs' Freedom of Information Act request (FOIA letters); (2) the report from the Office of Inspector General (OIG report); and (3) a Los Angeles Times article submitted by Alnor. Alnor raised hearsay objections to challenge the admissibility of these items.

Plaintiffs contend the FOIA letters and the OIG report fall within the official records exception to the hearsay rule. Evidence Code section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

The FOIA letters are authenticated by the declaration of Tom S. Chun, an attorney representing plaintiffs. Chun declares he received the FOIA letters after submitting a written request under the Freedom **611 of Information Act for "any and all investigative records pertaining to either CRI or Hanegraaff." The FOIA letters each state they were prepared in response to the FOIA request, and identify the time period searched. Each of the letters is dated shortly after the requests were made, and identify the position of the sender. We conclude the official record exception to the hearsay rule has been met.

[13] The OIG report is more problematic. The report contains information which was not directly observable by the investigator who prepared the report, and the investigator identifies no independent sources. Indeed, some of the information on the report appears to have come directly from CRI. For example, the report states: "Beginning in October 2004, CRI began to notice a marked decline in the volume of mail they were receiving. Donations received in October and November of 2004 were down 36.730% compared to donations received in October and November of 2003." Because there is insufficient information to indicate the trustworthiness of the OIG report, we decline to consider it here.

We also conclude the Los Angeles Times newspaper article is hearsay and therefore decline to consider it for its truth. Because Alnor introduced the article, plaintiffs contend he cannot now dispute its accuracy. The record demonstrates, however, Alnor specifically sought judicial notice of "[t]he fact that the Los Angeles Times published the article," and not the truth of its *84 contents. Because neither Alnor nor plaintiffs sought to introduce the contents of the article for its truth, Alnor did not waive his hearsay objection to the article.

[14] Thus, we are left with the question whether the FOIA letters are sufficient to " ' "sustain a favorable judgment if the evidence ... is credited." ' " (*Integrated Healthcare, supra,* 140 Cal.App.4th at p. 527, 44 Cal.Rptr.3d 517.) Alnor contends the letters are unreliable because they did not disclose the investigation of CRI and Hanegraaff prompted by Alnor's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint. We reject this contention. As noted above, a court may not weigh competing evidence in an anti-SLAPP motion. If the defendant's evidence does not demonstrate that plaintiff cannot prevail as a matter of law, we consider only whether evidence favoring the plaintiff, standing alone, would sustain a judgment in his or her favor. Here, plaintiffs have met their burden to prove falsity because the FOIA letters provide sufficient evidence the USPS did not investigate the plaintiffs, contrary to Alnor's claim.

C. *Plaintiffs Have Not Shown Actual Malice by Clear and Convincing Evidence*

[15][16] Unlike the falsity requirement, plaintiffs must demonstrate "actual malice" by clear and convincing evidence. This requirement presents " 'a heavy burden, far in excess of the preponderance sufficient for most civil litigation.' " (*Hoffman v. Capital Cities/ABC, Inc.* (9th Cir.2001) 255 F.3d 1180, 1186-1187.) "The burden of proof by clear and convincing evidence 'requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 846, 52 Cal.Rptr.2d 831 (*Copp* ).)

[17] To show actual malice, plaintiffs must demonstrate Alnor either knew his statement was false or subjectively entertained serious doubt his statement was truthful. (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (*Bose* ).) The **612 question is not " 'whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' " (*Reader's Digest, supra,* 37 Cal.3d at pp. 256-257, 208 Cal.Rptr. 137, 690 P.2d 610.)

[18][19] A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show

actual malice. (*Reader's Digest, supra,* 37 Cal.3d at pp. 257-258, 208 Cal.Rptr. 137, 690 P.2d 610.) "A failure to investigate [fn. omitted] [citation], anger and *85 hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations]--such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Id.* at p. 258, 208 Cal.Rptr. 137, 690 P.2d 610.) Thus, malice may be inferred where, for example, "a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." (*St. Amant v. Thompson* (1968) 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (*St.Amant* ).) Similarly, an inference of malice may be drawn "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] ... [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [fn. omitted.]" (*Ibid.*) Conversely, "[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]" (*Reader's Digest, supra,* 37 Cal.3d at p. 258, 208 Cal.Rptr. 137, 690 P.2d 610.)

Alnor asserts he believed his challenged statement about plaintiffs to be true at the time he made it. To demonstrate this, Alnor relies on his declaration which describes a telephone conversation he allegedly had with "Debra" at the postal inspector's office in Pasadena: "Debra advised me that she was aware of the claims in Hanegraaff's fundraising letter and that her office was 'investigating' it on the basis of 'mail fraud.' " Our analysis of whether plaintiffs have demonstrated actual malice by clear and convincing evidence focuses largely on Alnor's purported conversation with Debra.

1. Fabrication

As we have noted, malice is shown where "a story

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is fabricated by the defendant, [or] is the product of his imagination...." (*St. Amant, supra,* 390 U.S. at p. 732, 88 S.Ct. 1323.) In the present case, plaintiffs have provided no direct evidence that Alnor fabricated his conversation with Debra. An inference of fabrication can be drawn, however, from the FOIA responses. Specifically, one may reasonably infer from the USPS's inability to locate records of an investigation centering on either of the plaintiffs that no investigation had been launched. From that, one may reasonably infer that Debra in the Pasadena postal inspector's office would not have told Alnor an investigation had been launched, giving rise to the further inference that Alnor either never spoke with anyone named Debra, or that he simply attributed statements to Debra which he knew she never made. Although an inference of malice arises, the question arises whether this inference is " 'sufficiently **613 strong to command the unhesitating assent of every reasonable mind.' " (*Copp, supra,* 45 Cal.App.4th at p. 846, 52 Cal.Rptr.2d 831.) We conclude it is not.

[20] *86 To demonstrate a probability of prevailing under the anti-SLAPP statute's second prong, the plaintiff must make " 'a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733.) Thus, in considering whether plaintiffs have met their burden of demonstrating a probability of prevailing on the actual malice issue here, we must determine whether, if credited, their evidence is sufficient to sustain a judgment rendered in their favor by the trier of fact. Reviewing courts must reject challenges to the sufficiency of the evidence if substantial evidence supports the judgment. (See *McMahon v. Albany Unified School Dist.* (2002) 104 Cal.App.4th 1275, 1282, 129 Cal.Rptr.2d 184.) The requirement that a public figure plaintiff demonstrate actual malice, however, calls for a different analysis.

[21] "Normal principles of substantial evidence review do not apply to the appellate court's independent review of an actual malice determination in a

First Amendment libel case. [fn. omitted.]" (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 846, 231 Cal.Rptr. 518, 727 P.2d 711.) "The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by *clear and convincing* proof of 'actual malice.' " (*Bose, supra,* 466 U.S. at p. 511, 104 S.Ct. 1949, italics added.) Accordingly, a reviewing "court *is not bound to consider the evidence of actual malice in the light most favorable to respondents or to draw all permissible inferences in favor of respondents.* To do so would compromise the independence of our inquiry. '[T]he constitutional responsibility of independent review encompasses far more than [an] exercise in ritualistic inference granting.' " (*McCoy,* at p. 846, 231 Cal.Rptr. 518, 727 P.2d 711, italics added.) Independent review is applied with equal force in considering whether a plaintiff has established a probability of demonstrating malice by clear and convincing evidence in opposing an anti-SLAPP motion. (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 357-358, 42 Cal.Rptr.2d 464; see also *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 950, 52 Cal.Rptr.2d 357 (*Beilenson* ).)

*Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172, 264 Cal.Rptr. 699 (*Fletcher* ) applied independent review where the evidence supported an inference the defendant fabricated a libelous statement. There, the plaintiff was a city council member and former member of an agency that helped low income persons save money on energy. In a series of published articles, the defendant newspaper and reporter accused the plaintiff of having been involved with Weathermaster, a company attempting to contract with the agency at the same time the plaintiff sat on the agency's board. Recognizing *87 that plaintiff had resigned from the agency's board on March 9, defendants ran an article that quoted, in bold and oversize type, a former

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                                                    Page 13
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)

Weathermaster salesperson as stating: " ' "There's absolutely no doubt in my mind that [the plaintiff] was involved in Weathermaster before March 1." ' " (*Id.* at p. 181, 264 Cal.Rptr. 699.) At trial, however, **614 the former salesperson testified that "he had 'doubt in my mind' " on whether the plaintiff had been involved with Weathermaster at the time. (*Id.* at p. 188, 264 Cal.Rptr. 699.) This testimony coincided with the reporter's handwritten notes of the salesperson's interview, which quoted the salesman as stating: " ' "There is no, absolutely"--I have "doubt in my mind that [the plaintiff] was involved in Weathermaster before March 1." ' " (*Ibid.*) The reporter, however, testified he accurately quoted the salesperson but inadvertently omitted the word "no" in the second clause of the sentence in his notes. (*Ibid.*) Following a jury verdict awarding damages to the plaintiff, the trial court granted the defendants' motion for judgment notwithstanding the verdict.

On appeal, the plaintiff in *Fletcher* argued the evidence supported the finding of actual malice because the jury could reasonably infer that defendant fabricated the story because of the discrepancy between the published article and the reporter's notes. The Court of Appeal rejected this argument: "Although the conflict between [the reporter's] notes and what [the reporter] wrote is troubling, we do not think it demonstrates with convincing clarity that [the reporter] believed the allegations against [the plaintiff] were unfounded." (*Fletcher, supra,* 216 Cal.App.3d at p. 188, 264 Cal.Rptr. 699.) The court found it improbable the reporter would have fabricated the quote to support his story because he had obtained information regarding the plaintiff's purportedly improper activities from other sources. (*Id.* at p. 189, 264 Cal.Rptr. 699.) In its independent review of the record, the court acknowledged evidence demonstrating the reporter did not like the plaintiff, and specifically noted that the challenged articles "were less than objective" and "[c]learly" contained factual errors. (*Ibid.*) Nonetheless, the court concluded the plaintiff had failed to provide clear and convincing evidence of malice.

As we noted above, the USPS FOIA response gives

rise to an inference Alnor fabricated his conversation with Debra at the Pasadena postal inspector's office. This inference, however, lacks sufficient strength to meet the clear and convincing standard.

For example, the USPS FOIA response does not unequivocally state the USPS has no documents concerning an investigation of either of the plaintiffs, but only that the responder "could not locate any records" of any investigation in her search of the "USPS OIG, Investigations Office and the *88 Hotline complaint desk...." [FN5] Thus, the response does not purport to foreclose the possibility that documents pertaining to the investigation Debra mentioned may exist, but are kept in a location other than those searched.

> FN5. Presumably, "Investigations Office" referred to USPS's national investigation office in Chicago, not their Pasadena office.

[22] The USPS FOIA response also does not negate the possibility that Alnor simply misunderstood Debra. Specifically, Debra's statement that "she was aware of the claims in Hanegraaff's fundraising letter and that her office was 'investigating' it on the basis of 'mail fraud,' " was ambiguous. One could reasonably interpret the statement to mean either that her office was investigating whether the purported misdirection of mail described in the CRI fundraising letter constituted mail fraud, or was investigating whether the letter itself constituted mail fraud. Plaintiffs do not contend, and have cited no evidence suggesting, Alnor considered Debra's **615 statement to be the former. Alnor might have carelessly interpreted Debra's statement, but this would not establish malice. "Gross or even extreme negligence will not suffice to establish actual malice; the defendant must have made the statement with knowledge that the statement was false or with 'actual doubt concerning the truth of the publication.' " (*Annette F., supra,* 119 Cal.App.4th at p. 1167, 15 Cal.Rptr.3d 100.)

We conclude any inference from the USPS FOIA response that Alnor fabricated his conversation

Case 5:07-cv-03795-JW    Document 37    Filed 08/23/2007    Page 35 of 40

55 Cal.Rptr.3d 600                                                    Page 14
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

with Debra is not sufficiently strong to meet the clear and convincing evidence standard.

### 2. Slanted Reporting

[23] We note Debra's representation that her office had initiated an investigation of the CRI letter "on the basis of mail fraud" differs from Alnor's report that plaintiffs were the targets of a "federal mail fraud investigation." We conclude this discrepancy does not demonstrate actual malice.

The term "mail fraud" is typically used as short-hand for a violation of the federal mail fraud stat-ute, title 18 United States Code section 1341. (See, e.g., *In re Utz* (1989) 48 Cal.3d 468, 473, 256 Cal.Rptr. 561, 769 P.2d 417.) Because plaintiffs originated the letter, they naturally would fall with-in the scope of any mail fraud investigation. True, Alnor may have deliberately characterized Debra's comments in a light most unflattering to plaintiffs. Slanted reporting, however, does not by itself con-stitute malice. "Fair and objective reporting may be a worthy ideal, but there is also room, within the protection of the First Amendment, for writing which seeks to expose wrongdoing and arouse righteous anger; clearly such writing is typically less than objective in its presentation." *89(Read-er's Digest, supra,* 37 Cal.3d at p. 259, 208 Cal.Rptr. 137, 690 P.2d 610.) Thus, " [a] publisher is 'not required to provide an objective picture [citation] or an accurate one [citation]' [citation]. So long as he has no serious doubts concerning its truth, he can present but one side of the story." (*Id.* at p. 259, 208 Cal.Rptr. 137, 690 P.2d 610.)

The present situation is similar to *Annette F.* There, the defendant had published a statement that the plaintiff was a " 'convicted perpetrator of domestic violence.' " (*Annette F., supra,* 119 Cal.App.4th at p. 1167, 15 Cal.Rptr.3d 100.) The defendant based her statement on an earlier superior court ruling that issued a restraining order and found that the plaintiff had "perpetrated domestic violence" against the defendant. (*Id.* at p. 1156, 15 Cal.Rptr.3d 100.) The Court of Appeal in *Annette F.* acknowledged that a restraining order was not

technically a "conviction." Nonetheless, the court recognized that a lay person might not understand the distinction between a restraining order and a criminal conviction. Consequently, the court con-cluded that even when considered with such addi-tional factors as evidence of hostility, an alleged motive to discredit the plaintiff, and a lack of in-vestigation, the challenged publication "was not so far from the truth as to permit an inference of actual malice by clear and convincing evidence...." (*Id.* at p. 1170, 15 Cal.Rptr.3d 100.) The court observed: "At the most, these additional factors raised a spec-ulative possibility that Sharon might have known or suspected that her use of the word 'convicted' was technically incorrect. 'Such a speculative possibility falls short of clear and convincing evidence.' " (*Ibid.*) Accordingly, *Annette F.* reversed the trial court's order denying the defendant's anti-SLAPP motion.

Similarly, any divergence between what Debra told Alnor and what Alnor published **616 demon-strates at most negligence, and therefore it is mere speculation to surmise Alnor knew his statement was false.

### 3. Alnor's Mail Fraud Report

[24] Plaintiffs assert Alnor either knew no criminal investigation of plaintiffs existed or harbored doubts that such an investigation existed because he filed a mail fraud report with the Office of Inspect-or General. Specifically, plaintiffs argue: "Alnor would not have filed [a mail fraud] complaint if he believed that there already was a criminal investig-ation pending against Respondents. The fact that Alnor tried to start an investigation is strong evid-ence of Alnor's subjective belief that one did not exist at that time." Although this is a plausible in-ference, we are not persuaded it is as compelling as plaintiffs contend. An equally reasonable inference is that Alnor filed the report to bolster the existing investigation by providing additional information based on his own research. Absent additional evid-ence supporting plaintiffs' position, the inference that Alnor's filing of a mail fraud report indicated doubts in his mind about an existing investigation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273

**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

amounts to little more than a speculative possibility.

*90 4. Inadequate Investigation

[25] Plaintiffs argue Alnor failed to conduct a thorough investigation because Alnor's declaration demonstrates he focused chiefly on whether CRI's mail had been misdelivered, not on the post office's purported investigation of CRI's fundraising letter. Plaintiffs contend Alnor's failure to focus his investigation on the post office's mail fraud investigation concerning CRI demonstrated actual malice. We disagree.

[26] Actual malice " 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' [Citation.] Lack of due care is not the measure of liability, nor is gross or even extreme negligence." (_McCoy, supra,_ 42 Cal.3d at p. 860, 231 Cal.Rptr. 518, 727 P.2d 711.) Thus "mere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient" to demonstrate actual malice. (_Annette F., supra,_ 119 Cal.App.4th at p. 1169, 15 Cal.Rptr.3d 100.)

For example, in _Beilenson, supra,_ 44 Cal.App.4th 944, 52 Cal.Rptr.2d 357, an unsuccessful candidate for a congressional seat sued his opponent for libel based on a campaign mailer accusing the plaintiff of unethical behavior for maintaining a private law practice while employed by the state. (_Id._ at p. 947, 52 Cal.Rptr.2d 357.) The plaintiff argued the defendant "recklessly failed to take any steps to discover" if the plaintiff had violated any law, and demonstrated that a reasonable investigation would have revealed no law had been violated. (_Ibid._) Nonetheless, the court reversed the trial court's order denying the defendant's anti-SLAPP motion because the plaintiff failed to demonstrate the defendant knew his statement was false, or harbored doubts as to its truth. (_Id._ at pp. 952-953, 52 Cal.Rptr.2d 357.)

"To support a finding of actual malice, the failure to investigate must fairly be characterized as ' "the purposeful avoidance of the truth" ' or the ' "product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges." ' " (_Rosenaur v. Scherer_ (2001) 88 Cal.App.4th 260, 277, 105 Cal.Rptr.2d 674.) In _Antonovich v. Superior Court_ (1991) 234 Cal.App.3d 1041, 1052-1053, 285 **617Cal.Rptr. 863, the defendant charged his political opponent with destroying files. The defendant had no proof of this charge, and failed to investigate after his opponent had offered contrary proof. The court determined that a reasonable trier of fact could conclude the defendant's failure to investigate " 'was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges,' " amounting to a " 'purposeful avoidance of the truth' " sufficient to support a malice finding. (_Id._ at p. 1053, 285 Cal.Rptr. 863.) Similarly, in *91_Khawar v. Globe Internat., Inc._ (1998) 19 Cal.4th 254, 79 Cal.Rptr.2d 178, 965 P.2d 696, the defendant republished information suggesting that the plaintiff had killed Robert Kennedy. The court determined the plaintiff had demonstrated sufficient evidence of malice because the Kennedy assassination "had been painstakingly and exhaustively investigated by both the FBI and state prosecutorial agencies," the only person charged in the shooting was Sirhan Bishara Sirhan, and that "[a]t Sirhan's trial, 'it was undisputed that [Sirhan] fired the shot that killed Senator Kennedy'...." (_Id._ at p. 276, 79 Cal.Rptr.2d 178, 965 P.2d 696.) The court concluded, based on these facts, that there were " ' "obvious reasons" ' " for the defendant to have doubted the accuracy of the information. (_Ibid._)

Plaintiffs argue Alnor had an obvious reason to doubt the accuracy of the information he received, asserting "[i]t was highly implausible that a criminal investigation would have been launched as of the time [Alnor] had the alleged discussions with the USPS employees." Plaintiffs assert Alnor's suspicions should have been aroused because Debra informed him an investigation was underway on the same day he discovered the fundraising letter. This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                                                                          Page 16
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

argument is specious. Plaintiffs presume that any post office investigation would have been launched solely as a result of Alnor's complaints. But the fundraising letter was widely distributed to donors at some unspecified point before Alnor began his inquiry. Thus, there is no evidentiary basis to presume Alnor would have been the only catalyst for a post office investigation.

5. Biased Sources

[27] Plaintiffs contend Alnor based his statement on biased and unreliable sources because (a) there is no indication that the employees Alnor spoke with held appropriately responsible positions to comment on a mail fraud investigation; (b) Alnor received no indication the employees had any familiarity with the subject; and (c) "it was obvious that any response from the employees would be biased when asked in essence whether they lost CRI's mail." None of these factors is sufficient to demonstrate Alnor doubted the reliability of his sources.

For example, Alnor reached "Debra" by calling the regional postal inspector's office. Her comments demonstrated knowledge of the issue, and she acknowledged her office had launched an investigation into the matter. Although Alnor apparently did not obtain Debra's title or even her last name, there is nothing in the record to indicate Alnor was suspicious of her veracity or doubted her knowledge of the investigation. Moreover, any purported bias by postal employees due to allegations they mishandled CRI's mail would not extend to Debra, whose office apparently had nothing to do with the delivery of CRI's mail. The mere fact that Alnor could have done more to investigate the reliability of his informants is not indicative of malice.

*92 6. Ill Will

[28] Plaintiffs introduced evidence that Alnor harbored ill will toward them, arising **618 in part from Alnor's purported termination from CRI. Plaintiffs assert that "Alnor's mind was so infected with ill-will, he only saw the worst and the opportunity to spin the situation and create negative publicity for CRI." That Alnor's objectivity and judg-

ment may have been impaired by hostility toward plaintiffs does not by itself demonstrate malice.

[29] A court may consider a defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent it impacts the defendant's *actual belief* concerning the truthfulness of the publication. (*Reader's Digest, supra,* 37 Cal.3d at p. 258, 208 Cal.Rptr. 137, 690 P.2d 610.) The focus is thus on the " 'defendant's attitude toward the truth or falsity of the material published ... [not] the defendant's attitude toward the plaintiff.' " (*Id.* at p. 257, 208 Cal.Rptr. 137, 690 P.2d 610.) Plaintiffs have not demonstrated any connection between Alnor's alleged ill will toward them and Alnor's belief about the truth of his publication.

We conclude that plaintiffs have not demonstrated Alnor acted with actual malice by clear and convincing evidence. We recognize the actual malice requirement places a substantial barrier to defamation claims brought by a public figure, particularly at this early stage of the proceeding. This barrier, however, was erected in recognition that "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " (*Sullivan, supra,* 376 U.S. at p. 271-272, 84 S.Ct. 710.) Our nation's highest court has recognized: "This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures." (*Gertz, supra,* 418 U.S. at pp. 342-343, 94 S.Ct. 2997.)

The actual malice requirement has been imposed on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                                                                Page 17
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

public officials and public figures in part because such persons "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *(Gertz, supra,* 418 U.S. at p. 344, 94 S.Ct. 2997.) Plaintiffs' ability to correct the inadvertent errors of a critic, even one as purportedly tenacious as Alnor, is manifest. CRI bills itself as the "largest, most effective apologetics ministry in the world." Plaintiffs produce the nationally syndicated "Bible *93 Answer Man" radio program reaching millions of people every week, and Hanegraaff has written books and made numerous television appearances. Although uttered in a different context, Justice Brandeis's observation in *Whitney v. California* (1927) 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (conc. opn. of Brandeis, J.) applies here as well: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."

This is not to say one may slander a public figure with impunity. The actual malice barrier, although formidable, is not insurmountable. We note that plaintiffs might have met their burden, for example, **619 by submitting a declaration from an official at the Pasadena postal inspector's office that no one named Debra worked there during the time in question, or a declaration from Debra stating she spoke with Alnor but did not tell him her office was investigating the CRI letter. (See *St. Amant, supra,* 390 U.S. at p. 732, 88 S.Ct. 1323 [malice shown where "a story is fabricated by the defendant [or] is the product of his imagination"].) If evidence from which actual malice may be proven is not readily available, the nonmoving party may, on noticed motion and for good cause, request discovery. (§ 425.16, subd. (g).)

### IV
### DISPOSITION

The order denying Alnor's special motion to strike is reversed, and the trial court is directed to enter a new order granting the motion and striking the complaint. Alnor is to recover his costs on this ap-

peal.

FYBEL, J., concurs.

RYLAARSDAM, Acting P.J., Dissenting.

I respectfully dissent.

I wholly agree with my colleagues' legal analysis. But I differ with their application of the law to the facts in this case. My disagreement goes only to the issue of whether plaintiffs have "established a probability that [they] will prevail on the claim...." (Code Civ. Proc., § 425.16, subd. (b)(3); the entire statute will be referred to as the anti-SLAPP statute and all further statutory references are to the Code of Civil Procedure.)

Once it is established that the defendant's conduct is protected under the anti-SLAPP statute, the plaintiff is charged with the burden "to make a prima facie showing, by admissible evidence, of facts that would merit a favorable *94 judgment on those claims.... [Citations.] This burden is somewhat akin to that required to resist a nonsuit [citation], or to move for summary judgment. [Citation.]" *(1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584, 132 Cal.Rptr.2d 789, fn. omitted.) "A plaintiff is not required 'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim. [Citation.]" *(Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 105, 15 Cal.Rptr.3d 215.)

The fact that the test for a "prima facie showing" is identical to the test for summary judgment was reiterated by our Supreme Court in *Taus v. Loftus* (2007) 40 Cal.4th 683, 54 Cal.Rptr.3d 775, 151 P.3d 1185. The court stated, "past cases interpreting [the anti-SLAPP statute] establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than not that plaintiff will prevail on the claim, but rather intended to establish a summary-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 Cal.Rptr.3d 600                                                    Page 18
148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273
(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)

judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities."

Thus, as would be the case if this were a motion for summary judgment, it is our task to determine whether plaintiffs presented sufficient evidence, contradicted or not, to demonstrate the existence of a prima facie case. There is only one element of plaintiffs' cause of action where my colleagues concluded plaintiffs were unable to supply such a demonstration: clear and convincing evidence of actual malice. And this is the only point on which our paths diverge.

**620 Since the same standard applies, I approach my analysis of this case as if defendant had moved for summary judgment under section 437c and we, on de novo review, would determine whether the trial court erred in denying such a motion. Under section 437c, subdivision (p)(2), once defendant had met his initial burden, the burden would have shifted to plaintiffs to demonstrate the existence of evidence raising triable issues of fact. But the court may not grant summary judgment "based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (§ 437c, subd. (c).) Also, the court may deny summary judgment "where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact ...." (§ 437c, subd. (e).) And in making our determination, we may consider all evidence, regardless of which party presented it. (§ 437c, subd. (c).)

Now let us examine the evidence relating to the malice element of plaintiffs' claim. I can hardly disagree with my colleagues that we "must **95 independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 511 [104 S.Ct. 1949, 80 L.Ed.2d 502].) Although we are required to engage

in de novo review on this issue, we need not draw all inferences favorable to defendant and ignore reasonable inferences favoring plaintiffs. And, in my opinion, when we consider all of the evidence, regardless of who produced it, and draw the possible inferences therefrom, they support the conclusion that defendant acted with actual malice.

Putting plaintiffs' best case forward and drawing the inferences in their favor, here is what happened: Plaintiffs truthfully advertised the need for additional funds after their mail had been lost due to misdirection. Defendant, motivated by his anger at having been fired by plaintiffs, attempted to embarrass them by asking the post office to conduct a criminal investigation, based on his claim that plaintiffs' advertisement was untruthful and that no mail had been misdirected. The post office failed or refused to do so. Nevertheless, defendant placed notices on his web site accusing plaintiffs of falsely advertising the loss of mail and asserting that plaintiffs were the subject of a mail fraud investigation.

I stress that I am not here deciding that this is what really happened. But the evidence could support such a conclusion. And such a conclusion would support a finding of malice based on clear and convincing evidence.

As noted by my colleagues, one of the leading cases dealing with the tension between the First Amendment and the law of defamation is *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 208 Cal.Rptr. 137, 690 P.2d 610. In discussing the de novo standard by which we are to review whether summary judgment should be granted (and the same standard applies here), the court stated: "We recognize a potential chilling effect from protracted litigation as well as a public interest in resolving defamation cases promptly. *That does not mean, however, that a court should grant summary judgment when there is a triable issue of fact as to actual malice.* Instead, courts may give effect to these concerns regarding a potential chilling effect by finding no triable issues *unless it appears that actual malice may be proved at trial by clear and*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273

**(Cite as: 148 Cal.App.4th 71, 55 Cal.Rptr.3d 600)**

*convincing* **621** *evidence*--i.e., evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that the resulting judgment ' "does not constitute a forbidden intrusion on the field of free expression" ' [citation]." (*Id.* at p. 252, 208 Cal.Rptr. 137, 690 P.2d 610, italics added.)

**\*96** Based on the evidence before us and reasonable inferences that may be drawn therefrom, I am of the opinion that there is "evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that" (*Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 252, 208 Cal.Rptr. 137, 690 P.2d 610), if plaintiff prevails, the "judgment ' "does not constitute a forbidden intrusion on the field of free expression" ' [citation]." (*Ibid.*)

148 Cal.App.4th 71, 55 Cal.Rptr.3d 600, 07 Cal. Daily Op. Serv. 2273

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.