# EXHIBIT 11
## To Appendix to California State Authorities

78 Cal.App.4th 562                                                                 Page 1
78 Cal.App.4th 562, 92 Cal.Rptr.2d 755, 00 Cal. Daily Op. Serv. 1422, 2000 Daily Journal D.A.R. 1967
(Cite as: 78 Cal.App.4th 562)

▷

DuPONT MERCK PHARMACEUTICAL COMPANY, Petitioner,
v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent; MARC NEWMAN et al.,
Real
Parties in Interest.
**No. G024013.**

Court of Appeal, Fourth District, Division 3, California.

Jan. 25, 2000.

SUMMARY

Individuals representing the purchasers of a prescription drug used to thin blood brought a class action suit against the manufacturer of the drug, alleging that defendant made false statements before regulatory bodies, the medical profession, and to the public in connection with the drug. The trial court entered an order denying defendant's motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc. § 425.16). (Superior Court of Orange County, No. 788358, William F. McDonald, Judge.)

The Court of Appeal ordered issuance of a writ of mandate ordering the trial court to vacate its order denying defendant's motion to strike the complaint under Code Civ. Proc. § 425.16, to receive additional evidence and to conduct a further hearing or hearings to determine whether plaintiffs could establish that there was a probability they would prevail on their claims, and thereafter, to enter a new order granting or denying the motion to strike. The court held that the allegations of the complaint constituted claims described under the first prong of the two-part SLAPP analysis ( Code Civ. Proc., § 425.16, subd. (b)(1)), that is, the complaint alleged acts in furtherance of defendant's right of petition or free speech in connection with a public issue. The court further held that, since the trial court er-

roneously concluded that the first prong of the anti-SLAPP statute had not been met, remand was necessary to give the trial court an opportunity to consider the second prong, i.e., whether there was a probability that plaintiffs would prevail. (Opinion by Rylaarsdam, J., with Crosby, Acting P. J., and Bedsworth, J., concurring.) *563

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 93--Motion to Strike Pleading as a Whole--Statutory Remedy Against SLAPP Suits--Required Prima Facie Showing--Two-part Analysis.
In a class action suit against the manufacturer of a prescription drug brought on behalf of the purchasers of the drug, in which plaintiffs alleged that defendant made false statements before regulatory bodies, the medical profession, and to the public in connection with the drug, the trial court erred in denying defendant's motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute ( Code Civ. Proc. § 425.16). The allegations constituted claims described under the first prong of the two-part SLAPP analysis ( Code Civ. Proc., § 425.16, subd. (b)(1)), that is, the complaint alleged acts in furtherance of defendant's right of petition or free speech in connection with a public issue. The alleged acts fell into two categories: (1) lobbying and other activities seeking to influence the decisions of regulatory and legislative bodies, and (2) advertising, marketing, and public relations activities directed at the medical profession and the general public. The anti-SLAPP statute covers any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law. There is no separate requirement that statements involve a public issue. Further, since the trial court erroneously concluded that the first prong of the anti-SLAPP statute had not been met, the court was required to consider the second prong, i.e., whether there was a probability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 Cal.App.4th 562                                                                                 Page 2
78 Cal.App.4th 562, 92 Cal.Rptr.2d 755, 00 Cal. Daily Op. Serv. 1422, 2000 Daily Journal D.A.R. 1967
(Cite as: 78 Cal.App.4th 562)

that plaintiffs would prevail.

[See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962 et seq.]

COUNSEL

Crowell & Moring, Randall L. Erickson, Donald E. Bradley, Deborah E. Colaner; Gray, Cary, Ware & Freidenrich, Shirli F. Weiss, Mary A. Lehman and Sharon B. Spivak for Petitioner.

No appearance for Respondent.

Kolodny & Pressman, Joel M. Pressman, Terry J. Hellenkamp, Ronald J. Mix; Zwerling, Schachter & Zwerling, Susan Salvetti, Joseph S. Tusa, Dan Drachler and Marvin Nachlis for Real Parties in Interest. *564

**RYLAARSDAM, J.**

The complaint in this class action suit alleges defendant made false statements before regulatory bodies, the medical profession, and to the public in connection with one of its pharmaceutical products. The trial court denied a motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16; all further statutory references are to this code, unless otherwise indicated.) The court's decision was based on a determination that the allegations of the complaint did not fit the requirement of the statute that the causes of action arose from acts of defendant "in furtherance of [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)

Since we conclude the acts with which the complaint charges defendant qualify under the first step of the SLAPP analysis, we remand the case to the trial court to make a determination whether plaintiffs can establish a probability they will prevail. This latter determination cannot be based on allegations but must be based on evidence, and if it results in a judgment striking the complaint, should be supported by a statement of decision.

Facts

Plaintiffs' purported class action seeks damages on behalf of the purchasers of the drug Coumadin (generically, warfarin sodium), a prescription drug used to thin blood. The complaint alleges defendant, the manufacturer of Coumadin, artificially inflated the price of the drug by "disseminating false and omissive information concerning the use and effectiveness" of an equivalent generic product. The first amended complaint asserts causes of action under the California Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and the California Unfair Practices Act. (Bus. & Prof. Code, § 17500.)

The acts attributed to defendant upon which these causes of action are based consist of allegations defendant: (1) "took measures to prevent and/or delay Food and Drug Administration ('FDA') approval of warfarin sodium in a generic form, [(2)] published and disseminated false and misleading information to the public regarding the generic form of warfarin sodium, and [(3)] undertook aggressive lobbying and public relations efforts, involving the dissemination of false and misleading information, and increased its marketing efforts about Coumadin directed to doctors and other medical professionals." Plaintiffs further allege defendant: (4) "published and disseminated false and misleading information in, inter alia press releases, *565 Internet bulletins and public statements ... and [(5)] initiated an effort to delay the introduction of a generic version of Coumadin by [filing] a petition with the FDA for the change in [the bioequivalence] standard." Plaintiffs further complain defendant (6) "sought legislation in at least 20 states that would increase the requirements for substitution of [the] generic version of warfarin sodium for Coumadin." Finally, they allege that defendant (7) "instituted an initiative to entrench doctor's prescribing habits ... through the dissemination of false and misleading information about the proposed generic version of Coumadin."

Defendant demurred to the first amended complaint and, at the same time, filed a motion to strike under the anti-SLAPP suit statute. (§ 425.16.) The trial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 Cal.App.4th 562                                          Page 3

78 Cal.App.4th 562, 92 Cal.Rptr.2d 755, 00 Cal. Daily Op. Serv. 1422, 2000 Daily Journal D.A.R. 1967

**(Cite as: 78 Cal.App.4th 562)**

court overruled the demurrer and denied the motion.

Defendant then petitioned this court for a writ of mandate compelling the trial court to grant its motion to strike. Because section 425.16, subdivision (f) requires a motion under the statute to be filed within 60 days of serving the complaint, absent special permission by the court, and because the record supplied to us failed to demonstrate permission was sought or obtained, we denied the petition summarily. Defendant then petitioned the California Supreme Court for review. That court granted review and transferred the matter to this court with directions to vacate the order denying mandate, to issue an alternative writ, and to consider this matter in light of *Briggs v. Eden Council for Hope and Opportunity* (1999) 19 Cal.4th 1106 [81 Cal.Rptr.2d 471, 969 P.2d 564]. We interpreted the order of the Supreme Court to require us to consider the matter on the merits. We thereupon issued an alternative writ and established a further briefing schedule.

Discussion
*Acts in Furtherance of Right of Petition or Free Speech?*
(1) Section 425.16, subdivision (b)(1) provides for a motion to strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue ... unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." We must therefore first consider whether the complaint alleges acts in furtherance of defendant's right of petition or free speech in connection with a public issue.

The seven acts or groups of acts alleged in the amended complaint which we list above may be summarized as falling into two categories: (1) lobbying **\*566** and other activities seeking to influence the decisions of regulatory and legislative bodies and (2) advertising, marketing, and public relations activities directed at the medical profession and the general public. The anti-SLAPP statute provides

that the phrase " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(1).) Defendant's lobbying and other activities seeking to influence the decisions of regulatory and legislative bodies fall within this definition. By failing to argue the contrary, plaintiffs concede this issue.

Plaintiffs argue the alleged advertising, marketing, and public relations activities do not fall within the protections of the First Amendment's right to freedom of speech. The first amended complaint alleges defendant's statements were false and misleading. Citing *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626, 637-638 [105 S.Ct. 2265, 2274-2275, 85 L.Ed.2d 652], and *Bill Johnson's Restaurants, Inc. v. NLRB* (1983) 461 U.S. 731, 743 [103 S.Ct. 2161, 2170, 76 L.Ed.2d 277], plaintiffs *contend that false, deceptive, and misleading statements are not protected by the right of free speech. This may be true, at least as far as false advertising is concerned. However, in making this argument, plaintiffs are placing the cart before the horse. The allegation in the unverified complaint that the statements were false may or may not be true. Whether or not they were true should be considered in the second part of the analysis; whether there is a probability plaintiffs will prevail. In determining whether the alleged conduct is constitutionally protected it is sufficient to determine the conduct constituted speech protected by the First Amendment.*

*Acts in Connection With a Public Issue?*
*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th 1106 teaches there is no separate requirement that statements made in legislative, judicial, and similar fora or statements made in connection with issues pending before such fora involve a "public issue." The *Briggs* court stated: "Clauses (3) and (4) of section 425.16, subdivision (e), concerning statements made in public fora and 'other conduct' implicating speech or petition rights,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 Cal.App.4th 562                                                                                                    Page 4
78 Cal.App.4th 562, 92 Cal.Rptr.2d 755, 00 Cal. Daily Op. Serv. 1422, 2000 Daily Journal D.A.R. 1967
**(Cite as: 78 Cal.App.4th 562)**

include an express 'issue of public interest' limitation; clauses (1) and (2), concerning statements made before or in connection with issues under review by official proceedings, contain no such limitation." (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1117.)

Therefore, to the extent the acts attributed to defendant constitute exercises of its right to petition under section 425.16, subdivision (e)(1), we need *567 not inquire whether the issue was "a public issue or an issue of public interest." Likewise, to the extent the statements attributed to defendant were made "in connection with an issue under consideration or review by a legislative [or similar] body" under section 425.16, subdivision (e)(2), no such inquiry is necessary.

On the other hand, to the extent the statements attributed to defendant were not made "in connection with an issue under consideration or review by a legislative [or similar] body" and may thus only be covered under section 425.16, subdivision (e)(3) and (4), an inquiry must be made whether the issue of the equivalence of Coumadin and its generic counterpart pertains to "a public issue or an issue of public interest." We find the answer to this question in the first amended complaint. Plaintiffs allege: "More than 1.8 million Americans have purchased Coumadin, an anti-coagulant medication, for the prevention and treatment of blood clots that can lead to life-threatening conditions such as stroke and pulmonary embolism." Both the number of persons allegedly affected and the seriousness of the conditions treated establish the issue as one of public interest.

We therefore conclude that the first prong of the anti-SLAPP statute has been satisfied. The causes of action are of the type described in section 425.16, subdivision (b)(1): "[C]ause[s] of action ... arising from [acts] in furtherance of [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue."

*A Probability Plaintiffs Would Prevail?*

Having determined the first prong of an analysis under the anti-SLAPP statute has been met, we next turn to the second prong: Did plaintiffs establish that there is a probability they will prevail on their claims? Plaintiffs' return makes two arguments with respect to this issue: (1) "Plaintiffs' *claims* are legally sufficient." (Italics added.) (2) Judges in three similar cases pending in other jurisdictions denied motions to dismiss or for summary judgment.

We deal with the second of these arguments first. Since plaintiffs have provided us with only a partial record of these out-of-state trial court decisions, and did not request we take judicial notice of them, we will not do so on our own motion. Furthermore, there is nothing in the record that permits us to accept plaintiffs' allegation these "lawsuits [were] brought on the same core of facts at issue in this matter." Finally, denial of motions to dismiss or motions for summary judgment under procedures which were not explained to us and which undoubtedly differ from the California Code of *568 Civil Procedure, hardly establish that plaintiffs will probably prevail in this case. We likewise decline plaintiffs' invitation to decide this case based on the decision of a Los Angeles Superior Court commissioner in another action, which according to plaintiffs, is "related" to the one before us.

Thus, we return to plaintiffs' contention that they established a probability of success by demonstrating their *claims* were legally sufficient. Plaintiffs' claims are contained in an unverified amended complaint. This amended complaint survived a demurrer; thus, plaintiffs' argument goes, they established a probability of success. In arguing they established such a probability, plaintiffs rely entirely on the allegations of their complaint. They claim *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th 1106, "re-affirmed established precedent holding that plaintiffs who successfully defend the legal sufficiency of their claims in a proceeding such as a demurrer, have made the requisite showing under CCP § 425.16(b)(1) sufficient to defeat a special motion to strike." *Briggs* says no such thing. The case quotes from *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th

78 Cal.App.4th 562                                                                                         Page 5
78 Cal.App.4th 562, 92 Cal.Rptr.2d 755, 00 Cal. Daily Op. Serv. 1422, 2000 Daily Journal D.A.R. 1967
(Cite as: 78 Cal.App.4th 562)

394, 412 [58 Cal.Rptr.2d 875, 926 P.2d 1061], to the effect the trial court must " 'determine only if the plaintiff has stated *and substantiated* a legally sufficient claim.' " (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1123, italics added.)

In overruling the demurrer, the trial court determined plaintiffs had stated a legally sufficient claim, an issue we are not here reviewing. However, in order to satisfy its burden under the second prong of the anti-SLAPP statute, it is not sufficient that plaintiffs' complaint survive a demurrer. Plaintiffs must also substantiate the legal sufficiency of their claim. It would defeat the obvious purposes of the anti-SLAPP statute if mere allegations in an unverified complaint would be sufficient to avoid an order to strike the complaint. Substantiation requires something more than that. Once the court determines the first prong of the statute has been met, a plaintiff must provide the court with sufficient evidence to permit the court to determine whether "there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Since the trial court erroneously concluded the first prong of the anti-SLAPP statute had not been met, it never had an opportunity to consider whether there was a probability plaintiffs would prevail. We will therefore remand the case to the trial court to determine this issue.

### Disposition

We hold the allegations of the amended complaint constitute claims described in section 425.16, subdivision (b)(1). We remand the matter to the **\*569** trial court to determine whether plaintiffs can establish there is a probability they will prevail on their claims. Let a writ of mandate issue ordering the trial court to vacate its order denying defendant's motion to strike the complaint under section 425.16, to receive additional evidence and conduct a further hearing or hearings to determine whether plaintiffs can establish there is a probability they will prevail on their claims and, thereafter, enter a new order granting or denying the motion to strike. Our stay order is vacated and the alternative writ is dis-

charged. Each party shall bear its own costs incurred in connection with this writ proceeding.

Crosby, Acting P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied February 14, 2000, and the opinion was modified to read as printed above. Petitioner's application for review by the Supreme Court was denied April 12, 2000. **\*570**

Cal.App.4.Dist.,2000.

DuPONT MERCK PHARMACEUTICAL COMPANY, Petitioner, v. THE SUPERIOR COURT OF ORANGE COUNTY, Respondent; MARC NEWMAN et al., Real Parties in Interest.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12
**To Appendix to California State Authorities**

Westlaw.

42 Cal.3d 234                                                                    Page 1

42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305

**(Cite as: 42 Cal.3d 234)**

ARTHUR FELLOWS, Plaintiff and Appellant,

v.

NATIONAL ENQUIRER, INC., Defendant and Respondent

**L.A. No. 32082.**

Supreme Court of California

Jul 31, 1986.

SUMMARY

A movie producer brought an action for false light invasion of privacy against a newspaper that had published an article about an actress that stated the actress was dating the producer and that he was the new man in her life, on the grounds that the article was false as he and the actress were not dating and he had been married to his wife for many years. The newspaper demurred on the grounds that the article was not defamatory on its face so that Civ. Code, § 45a, required the producer to plead special damages as defined in Civ. Code, § 48a. Plaintiff conceded he had not suffered any special damages and the trial court sustained the demurrer without leave to amend. (Superior Court of Los Angeles County, No. C 426493, John L. Cole, Judge.) The Court of Appeal, Second Dist., Div. One, reversed (No. B004319).

The Supreme Court reversed the Court of Appeal, holding that when a false light action is based on a publication that is defamatory within the meaning of Civ. Code, § 45a, pleading and proof of special damages are required. (Opinion by Broussard, J., with Bird, C. J., Mosk, Reynoso, Grodin, Lucas and Panelli, JJ., concurring. Separate concurring opinion by Bird, C. J.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Privacy § 8--Actions--Pleading--Action for False Light Invasion of Privacy Based on Defamat-

ory Statements--Necessity of Pleading and Proving Special Damages.
In an action for false light invasion of privacy by a movie producer against a newspaper that had published an article about an actress stating that she was dating the producer and that he was the new man in her life, on the basis that the article was false, as he and the actress were not dating and he had been married *235 to his wife for many years, the newspaper's demurrer to the complaint was properly sustained, where the producer conceded he had not suffered any special damages, since Civ. Code, § 45a, requires that such damages must be pleaded and proved in a false light action based on statements that are not defamatory on their face. That section manifests a legislative determination that liability imposed for a publication which affords no warning of its defamatory nature and does not cause actual pecuniary injury would place too great a burden on the editorial process and would hamper the free dissemination of the news. That policy is equally applicable in false light actions based on defamatory publications, since virtually every published defamation would support such action. Exempting such actions from the requirement of proving special damages would render the statute a nullity.

[See Cal.Jur.3d, Assault and Other Wilful Torts, § 127; Am.Jur.2d, Privacy, § 44.]

COUNSEL

Marvin Gross, James M. Simon and Grayson & Gross for Plaintiff and Appellant.

John G. Kester, Richard S. Hoffman, Williams & Connolly, Richard H. Borow, Jon W. Davidson and Irell & Manella for Defendant and Respondent.

**BROUSSARD, J.**

Under Civil Code section 45a, language that is defamatory only by reference to extrinsic facts is not actionable unless the plaintiff can prove special damages. [FN1] Special damages are defined in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                                              Page 2
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
**(Cite as: 42 Cal.3d 234)**

Civil Code section 48a as damages to property, business or occupation. [FN2] In this case *236 we must decide whether the special damages rule of section 45a applies when a defamatory publication gives rise to an action for false light invasion of privacy rather than libel. We conclude that when a false light action is based on a publication that is defamatory within the meaning of the statute, pleading and proof of special damages are required.

> FN1 Section 45a provides: "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code."

> FN2 Section 48a defines general and special damages for purposes of defamation actions as follows: "(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings; [¶] (b) 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other."

## I.

The August 17, 1982, edition of the National Enquirer carried a photograph of plaintiff Arthur Fellows and actress Angie Dickinson over the caption, "Angie Dickinson [¶] Dating a producer." The accompanying two-sentence article stated: "Georgeous Angie Dickinson's all smiles about the new man in her life - TV producer Arthur Fellows. Angie's steady-dating Fellows all over TinselTown, and happily posed for photographers with him as they exited the swanky Spago restaurant in Beverly

Hills."

Shortly after publication, Fellows' attorney wrote a letter to defendant National Enquirer, Inc. (hereafter the Enquirer) asserting that the article was false and demanding a correction. The Enquirer's attorney wrote back expressing confusion about the nature of the alleged falsity. Fellows' attorney then wrote a second letter, which stated: "The article is false because Mr. Fellows has never dated Miss Dickinson, is not 'the new man in her life,' and has been married to Phyllis Fellows for the last 18 years." [FN3] The Enquirer subsequently rejected the retraction request and Fellows filed the present action.

> FN3 Statements made by plaintiff's counsel in the trial court suggest that the Enquirer photograph had been taken as plaintiff and Ms. Dickinson left a restaurant after dining with Mrs. Fellows and one or two other people.

Plaintiff's initial complaint alleged libel, false light invasion of privacy, intentional and negligent infliction of emotional distress and "conscious disregard" (Mrs. Fellows was added as a plaintiff in the latter three causes of action). The libel count alleged defamation based on facts extrinsic to the article: "Said article is defamatory in that said article was understood by those who read it or heard it [*sic*] and who have knowledge of plaintiff's marital status to mean that plaintiff was engaged in improper and immoral conduct." The privacy cause of action was based on the same factual allegations and asserted that the Enquirer's article had placed Fellows before the public in a false light as "steady-dating" Ms. Dickinson and as the "new man in her life," and also had cast him in a false light in the eyes of those who knew of his marital status by suggesting that he was engaged in improper or immoral conduct. Both the libel and false light causes of action alleged that the Enquirer had published the article with knowledge of its *237 falsity or with reckless disregard for whether it was false. Both causes of action also sought general damages for plaintiff's loss of reputation, shame, mortifica-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                 Page 3
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
(Cite as: 42 Cal.3d 234)

tion and hurt feelings. It also was alleged, on information and belief, that plaintiff had suffered special damages to his business as a film producer by a "decline in the amount of new work normally to be expected" and by damage to his "business relationships with members of the film industry." The complaint included a demand for $5 million in punitive and exemplary damages.

The Enquirer demurred generally to the complaint. It attacked both the libel and false light claims on the ground that special damages had not been pleaded with sufficient specificity. The Enquirer further argued that the false light claim was duplicative of the defamation claim and should be dismissed as superfluous. The demurrer also challenged the remaining causes of action on grounds not relevant here.

The trial court overruled the demurrer to the libel count, although it expressed skepticism that plaintiff would be able to prove special damages and indicated that defendant would be free to renew its special damages challenge to the amended complaint. The court also overruled the demurrer with regard to the intentional infliction of emotional distress claim, again noting that its ruling was "without prejudice" to further challenges by defendant. The court sustained the demurrer to the false light claim on the ground that it was "redundant" of the libel claim, but granted leave to amend. The demurrer also was sustained to the remaining causes of action.

Plaintiff filed a first amended complaint that restated the original libel cause of action, expanded the allegations of the invasion of privacy claim, and again included counts for intentional and negligent infliction of emotional distress. In the amended complaint, the false light claim alleged only general damages and did not include any allegations of injury to business. The Enquirer again demurred to the entire pleading on grounds similar to those previously asserted, with emphasis upon the alleged inadequacy of the special damages allegation. At the hearing on this demurrer, plaintiff's counsel conceded that no special damages had been

suffered, and acknowledged that it would be "highly improbable [plaintiff] will have special damages." Counsel maintained, however, that such damages were not a prerequisite to a cause of action for invasion of privacy. The court this time sustained the demurrer to all causes of action except that for negligent infliction of emotional distress, again granting leave to amend. The court expressly stated that it had sustained the demurrer to the libel and false light claims because of the absence or insufficiency of the special damages pleading.

Plaintiff then filed his second amended complaint. In view of his concession that he had not suffered any special damages, plaintiff did not reassert a *238 cause of action for libel, but continued to allege a cause of action for false light invasion of privacy. In this complaint, however, he deleted loss of reputation from his request for general damages and sought damages only for shame, mortification and hurt feelings. The causes of action for infliction of emotional distress were once again included.

Defendant again demurred to all causes of action. The Enquirer argued that plaintiff's failure to plead special damages barred a cause of action for false light invasion of privacy as well as an action for libel. The trial court agreed, and sustained the demurrer without leave to amend. The court based its ruling expressly on this court's decision in *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 35, footnote 16 [81 Cal.Rptr. 360, 459 P.2d 912]. The court also sustained the demurrer to the causes of action for infliction of emotional distress. [FN4] It then entered an order of dismissal.

> FN4 The Court of Appeal stated that plaintiff had "abandoned his causes of action for intentional and negligent infliction of emotional distress and seeks reversal only to reinstate his cause of action for invasion of privacy."

On appeal, plaintiff argued that the special damages requirement in libel *per quod* actions should not apply to an action for false light invasion of privacy, which plaintiff asserted is an independent tort de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                                                      Page 4
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
**(Cite as: 42 Cal.3d 234)**

signed to redress injuries to interests separate and distinct from the interests at issue in a defamation action. Defendant answered by arguing that plaintiff's view would defeat the legislative policy underlying the special damages requirement since virtually all libel actions could be brought on the alternative theory. The Court of Appeal agreed with plaintiff and reversed the dismissal order. We granted review.

### Discussion

An invasion of privacy by publicity that places the plaintiff in a false light in the public eye was first identified as a distinct tort in the late Dean Prosser's well-known 1960 law review article, *Privacy* (1960) 48 Cal.L.Rev. 383. Prosser considered over 300 cases decided in the 70 years since Warren and Brandeis [FN5] had originated the concept of a legal right of privacy, and determined that the decisions revealed a complex of four independent torts. In addition to false light invasion of privacy, this now definitive formulation included intrusion upon one's solitude or seclusion, public disclosure of private facts and appropriation.

> FN5 Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193.

In order to be actionable, the false light in which the plaintiff is placed must be highly offensive to a reasonable person. (Rest.2d Torts, § *239652E, p. 394.) Although it is not necessary that the plaintiff be defamed, publicity placing one in a highly offensive false light will in most cases be defamatory as well. The substantial overlap between the two torts raised from the outset the question of the extent to which the restrictions and limitations on defamation actions would be applicable to actions for false light invasion of privacy.

With the same pen he used to christen the false light tort, Dean Prosser expressed his concern about its future evolution in words that precisely describe the issue we confront over 25 years later. "The question may well be raised, and apparently still is unanswered, whether this branch of the tort is not capable of swallowing up and engulfing the whole

law of public defamation; and whether there is any false libel printed, for example, in a newspaper, which cannot be redressed upon the alternative ground. If that turns out to be the case, it may well be asked, what of the numerous restrictions and limitations which have hedged defamation about for many years, in the interest of freedom of the press and the discouragement of trivial and extortionate claims? Are they of so little consequence that they may be circumvented in so casual and cavalier a fashion?" (Prosser, *supra*, 48 Cal.L.Rev. 401.)

The first answers to Dean Prosser's question were not long in coming. In its landmark decision in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the United States Supreme Court held that a defamatory statement concerning a public official was protected by the First Amendment except when made with "'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].) The *New York Times* doctrine was later expanded to include public figures. (*Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975].) In *Time, Inc. v. Hill* (1967) 385 U.S. 374, 387-388 [17 L.Ed.2d 456, 466-467, 87 S.Ct. 534], the United States Supreme Court for the first time considered the conflicting demands of the First Amendment and the right of privacy. In a case involving the false light tort, the court applied the actual malice standard of liability and thus balanced the competing interests in exactly the same manner as it had when reputation and speech competed in *New York Times*. [FN6] *240

> FN6 It remains an open question whether *greater* constitutional protections exist in privacy cases. In *Time, Inc.*, the court looked to the newsworthiness of the report rather than the status of the plaintiff. After that decision, however, the court decided *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], holding that the actual malice standard was not constitutionally required where the plaintiff was a private person, even though

42 Cal.3d 234                                                    Page 5
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
(Cite as: 42 Cal.3d 234)

the subject matter of the publication could be considered newsworthy. The court later observed that the question of whether a lesser standard could be applied to a private plaintiff in a false light action remained unanswered: "No objection was made by any of the parties to this knowing-or-reckless-falsehood instruction. Consequently, this case presents no occasion to consider whether a State may constitutionally apply a more relaxed standard of liability for a publisher or broadcaster of false statements injurious to a private individual under a false-light theory of invasion of privacy, or whether the constitutional standard ... in *Time, Inc.* v. *Hill* applies to all false-light cases. Cf. *Gertz v. Robert Welch Inc.,* 418 U.S. 323." (*Cantrell v. Forest City Publishing Co.* (1974) 419 U.S. 245, 250- 251 [42 L.Ed.2d 419, 425-426, 95 S.Ct. 465].)

In *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 265 [208 Cal.Rptr. 137, 690 P.2d 610], this court recently held that plaintiff's failure to show a triable issue of fact as to actual malice barred not only his defamation claim, but also his claim for false light invasion of privacy and intentional infliction of emotional distress. We observed that the United States Supreme Court had "defined a zone of constitutional protection within which one could publish concerning a public figure without fear of liability. That constitutional protection does not depend on the label given the stated cause of action. ... [L]iability cannot be imposed on any theory for what has been determined to be a constitutionally protected publication." (*Ibid.*)

In addition to the restricted liability compelled by the First Amendment, further protection is afforded defamatory speech by certain statutorily imposed limitations on defamation actions. In deciding whether such statutory provisions are applicable to a particular cause of action, the courts of this state have traditionally looked behind the label affixed to the complaint and examined the gravamen of the claim. Where the complaint is based on an offens-

ive statement that is defamatory, plaintiffs have not been allowed to circumvent the statutory limitation by proceeding on a theory other than defamation.

A leading decision in this area is *Werner v. Times-Mirror Co.* (1961) 193 Cal.App.2d 111 [14 Cal.Rptr. 208]. Werner sued for invasion of privacy based on a 1958 Los Angeles Times story suggesting that he and his first wife had been involved in political scandals and criminal wrongdoing during his tenure as Los Angeles City Attorney 30 years earlier. Werner claimed that the article's allegations were false or misleading, and had caused him "deep humiliation, emotional distress, anxiety and embarrassment." The trial court dismissed the action because of plaintiff's failure to post the bond then required in libel actions (former Code Civ. Proc., § 830).

Without discussing the bond issue, the Court of Appeal observed that under Civil Code section 48a a plaintiff suing for libel may recover only special damages unless he has demanded a retraction of the offending **\*241** statements and the demand has been refused. [FN7] Since Werner's complaint sought only general damages and did not allege that he had demanded a retraction, the statute would have clearly barred a libel action. In order to determine whether the statute also barred an action for invasion of privacy, the court looked to the policies underlying the retraction rule as described by Justice Traynor in *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121 [216 P.2d 825]. In the earlier *Werner* decision, this court rejected a constitutional attack on the retraction statute, finding "at least two bases on which the Legislature could reasonably conclude that the retraction provisions of section 48a provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news." (*Werner, supra,* at p. 126.)

FN7 Section 48a provides in pertinent part: "1. In any action for damages for the publication of a libel in a newspaper, or of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                                                Page 6
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
**(Cite as: 42 Cal.3d 234)**

slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous."

After quoting extensively from the *Werner* court's discussion of the public policy rationale underlying section 48a, the Court of Appeal observed: "To extend the tort of invasion of privacy to the extent necessary to reach a determination that the appellant's amended complaint states a cause of action would be to ignore such declaration of public policy and to dilute the effect of such legislation. This court is not free to do so." (193 Cal.App.2d at p. 123.) Implicit in this observation is a determination that privacy suits threaten the freedoms of speech and press in the same manner as defamation suits. The court refused to "sanction an evasion" of the statutory protections. (*Id.*, at p. 122.)

This court adopted the *Werner* holding in *Kapellas v. Kofman, supra,* 1 Cal.3d 20. Kapellas was a candidate for the Alameda City Council and the mother of six children. A front-page editorial in the *Alameda Times Star* concluded that Kapellas would not be a suitable member of the city council since her obligations, in the opinion of the editorial writer, "'would seem to be more to her home and family, than to the city she adopted as home some years ago.'" (1 Cal.3d at p. 27, fn. 2.) In support of its thesis, the editorial cited numerous complaints and arrests involving the Kapellas children allegedly drawn from the local "police blotter." (*Ibid.*)

Kapellas filed a complaint alleging libel on behalf of herself, with separate counts alleging libel and invasion of privacy on behalf of her children. *242

Defendant demurred to the libel counts on the ground that the publication was privileged in that it related to the qualifications of a candidate for public office, and upon the additional ground that plaintiffs had not made a sufficient demand for retraction. Defendant also demurred to the invasion of privacy count on the ground that the editorial concerned matters of public interest. The trial court sustained the demurrer without leave to amend and dismissed the action.

This court reversed the trial court's order with respect to the two libel counts, finding plaintiff's allegation of malice sufficient to overcome the qualified privilege granted by Civil Code section 47, subdivision 3, and finding plaintiff's demand for retraction sufficient to comply with the requirements of section 48a. Turning next to plaintiff's privacy claim, the court found the complaint insufficient to state a cause of action as either false light invasion of privacy or public disclosure of private facts. The court carefully distinguished between the two theories, observing that false light rested on the inaccuracy of the publication, whereas public disclosure of private facts by definition involved the publication of true facts. Because the latter theory is not concerned with falsity, the court found section 48a inapposite since a party would gain no relief from a subsequent retraction of the article. [FN8] (1 Cal.3d at p. 35.)

> FN8 Nevertheless, the court found the editorial to be newsworthy and therefore privileged. (1 Cal.3d at pp. 35-39.)

The court reached a different conclusion with respect to the potential false light claim: "Insofar as the instant plaintiff's right to privacy action is of the 'false light in the public eye' variety, *resting on the allegedly false nature of the editorial statements,* we find the action is in substance equivalent to the children's libel claim, and should meet the same requirements of the libel claim *on all aspects of the case,* including proof of malice ... and fulfillment of the requirements of section 48a. ... Since the complaint contains a specific cause of action for libel, the privacy count, if intended in this light, is super-

Case 5:07-cv-03795-JW    Document 39    Filed 08/23/2007    Page 14 of 30

42 Cal.3d 234                                                                  Page 7
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
(Cite as: 42 Cal.3d 234)

fluous and should be dismissed." (1 Cal.3d at p. 35, fn. 16, italics added.)

The *Kapellas* holding was unanimously reaffirmed in *Briscoe v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529 [93 Cal.Rptr. 866, 483 P.2d 34]. In that case, defendant published an article that correctly identified Briscoe as the perpetrator of a crime, but did not indicate that the crime had occurred 11 years earlier and that Briscoe had since led "an exemplary, virtuous and honorable life." ( *Id.*, at p. 532.) Briscoe brought an action *243 for invasion of privacy based upon theories of public disclosure of private facts and false light. The bulk of the opinion addressed Briscoe's public disclosure claim and concluded that his identification as the perpetrator of an 11-year-old crime stated a prima facie claim of invasion of privacy.

Plaintiff's false light claim was based on the suggestion of the article that his criminal activity was of recent vintage. The court quoted from *Kapellas* to observe that "a 'false light' cause of action 'is in substance equivalent to ... [a] libel claim, and should meet the same requirements of the libel claim. ...'" (4 Cal.3d at p. 543.) It concluded that the allegations of the complaint were insufficient to support a false light claim since plaintiff had neither made a retraction request nor alleged special damages. "Plaintiff here alleged malice, but at no time complied with the requirements of section 48a. It would therefore be possible for him to amend his complaint to state a cause of action based on a 'false light' theory *only if he alleged special damages*." (*Ibid.*, italics added.)

In addition to section 48a, other statutory and common law restrictions on libel and slander actions have been applied to nondefamation claims when such claims were based on defamatory language. In *Grimes v. Carter* (1966) 241 Cal.App.2d 694 [50 Cal.Rptr. 808], plaintiff brought an action for invasion of privacy and intentional infliction of emotional distress alleging that defendant had stated to a large number of people that she had engaged in sexual intercourse with several men. The trial court dismissed the complaint because of plaintiff's fail-

ure to post the bond formerly required in defamation actions.

The Court of Appeal observed that the case required that it decide whether "a plaintiff who essentially bases her cause of action upon facts which constitute defamation ... can bypass the requirement of section 830 of the Code of Civil Procedure that an undertaking be filed for the protection of the defendant." (241 Cal.App.2d at p. 700.) Finding section 830 to be the "considered public policy of the state," the court concluded that "[i]t would not be proper for a court to permit a plaintiff to evade this public policy by announcing, as the plaintiff did in this instance, that she does not ask for damages for loss of reputation but only for the humiliation and emotional distress resulting to herself personally from the tort." On this basis the court affirmed dismissal of the emotional distress claim. [FN9] (*Ibid.*; see also *Huffaker v. McVey* (1917) 35 Cal.App. 302 [169 P. 704] [plaintiff required to post *244 bond where defamation was basis of claim even though labeled as malicious prosecution].) [FN10]

> FN9 The court affirmed dismissal of the privacy claim for reasons unrelated to the bond requirement.

> FN10 The court below relied heavily on *Kerby v. Hal Roach Studios* (1942) 53 Cal.App.2d 207 [127 P.2d 577], where an invasion of privacy action based on defamatory statements was permitted without the filing of a bond. After concluding that plaintiff had made out a claim for invasion of privacy, the *Kerby* court noted that although the claim was similar to libel, the plaintiff had not intended to allege libel and, in any event, had not posted the bond required for such actions. (53 Cal.App.2d at p. 214.) We find little significance in this decision. The *Kerby* case arose very early in the development of the privacy tort, long before false light publicity had been identified as an independent action, or the overlap of privacy and defamation had been recognized as an issue of con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW     Document 39     Filed 08/23/2007     Page 15 of 30

42 Cal.3d 234                                                              Page 8
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
**(Cite as: 42 Cal.3d 234)**

cern. The court did not consider the applicability of the bond requirement to a privacy claim, nor did it consider the possibility that such a claim might be used to evade the statutory provision.

Civil Code section 47 defines privileged publications and broadcasts and was originally limited in application to defamation actions. In *Albertson v. Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405], this court for the first time extended the privilege outside of the defamation context and held that section 47 barred an action for disparagement of title arising out of a notice of lis pendens. A Court of Appeal recently noted that the cases decided after *Albertson* "have applied the privilege to defeat tort actions which, however labeled and whatever the theory of liability, are predicated upon the publication in protected proceedings of an injurious falsehood." (*Block v. Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 390-391, fns. omitted 182 Cal.App.3d 438].) *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573 [131 Cal.Rptr. 592], is typical of the post-*Albertson* decisions: "To allow appellant to proceed with this cause of action would substantially defeat the purpose of the privilege enunciated in section 47. It would exalt a judicially derived cause of action ... above clear legislative intention and operate as a severe deterrent to communications otherwise protected. Therefore, no such cause of action, based upon the defamatory nature of a communication which is itself privileged under the defamation laws, can be permitted." (60 Cal.App.3d at p. 579.) [FN11]

> FN11 The protections of section 47 have been applied to a variety of nondefamation causes of action, including, abuse of process (*Thornton v. Rhoden* (1966) 245 Cal.App.2d 80 [53 Cal.Rptr. 706, 23 A.L.R.3d 1152]; *Twyford v. Twyford* (1976) 63 Cal.App.3d 916 [134 Cal.Rptr. 145]; *Younger v. Solomon* (1974) 38 Cal.App.3d 289 [113 Cal.Rptr. 113]; *Umansky v. Urquhart* (1978) 84 Cal.App.3d 368 [148 Cal.Rptr. 547]); in-

tentional infliction of mental distress (*Kachig v. Boothe* (1971) 22 Cal.App.3d 626 [99 Cal.Rptr. 393]; *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573 [131 Cal.Rptr. 592]; *Pettitt v. Levy* (1972) 28 Cal.App.3d 484 [104 Cal.Rptr. 650]; *Scott v. McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277 [112 Cal.Rptr. 609]); inducing breach of contracts (*Agostini v. Strycula* (1965) 231 Cal.App.2d 804 [42 Cal.Rptr. 314]; *Scott v. McDonnell Douglas Corp., supra*); interference with prospective economic advantage (*Brody v. Montalbano* (1978) 87 Cal.App.3d 725 [151 Cal.Rptr. 206]); fraud and negligence ( *Pettitt v. Levy, supra*).

In *Flynn v. Higham* (1983) 149 Cal.App.3d 677 [197 Cal.Rptr. 145], the same Court of Appeal that decided the instant case considered whether a **\*245** false publication concerning a deceased person, barred if brought as a libel action, would support a claim for intentional infliction of emotional distress. The court held that "to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly. It would also render meaningless any defense of truth or privilege." (149 Cal.App.3d at p. 682.)

The overwhelming majority of decisions in other jurisdictions enforce defamation restrictions in actions for false light invasion of privacy when such actions are based on a defamatory publication. (*Cibenko v. Worth Publishers, Inc.* (D.N.J. 1981) 510 F.Supp. 761, 766 ["An action for defamation and a claim for false light invasion of privacy ... are closely allied, and the same considerations apply to each." Libel defense of opinion applied to false light.]; *Rinsley v. Brandt* (10th Cir. 1983) 700 F.2d 1304, 1307 ["[I]n a false light privacy action, as in a defamation action, truth is an absolute defense. Similarly, the defense available in a defamation action that the allegedly defamatory statements are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234

42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305

**(Cite as: 42 Cal.3d 234)**

opinions, not assertions of fact, is also available in a false light privacy action."]; *Brown v. Boney* (N.C.App. 1979) 255 S.E.2d 784, 791 ["In a libel action, the defamatory statements must be false in order to be actionable, and an admission of the truth of the statement is a complete defense. ... Likewise, with regard to invasion of privacy of the false light variety, it is essential that the matter published concerning the plaintiff is not true. ..."]; *Gruschus v. Curtis Publishing Company* (10th Cir. 1965) 342 F.2d 775, 776 ["The general rule, frequently analogized to defamation, is that the action does not survive the death of the party whose privacy was invaded. ..."]; *Michigan United Conservation Clubs v. CBS News* (W.D.Mich. 1980) 485 F.Supp. 893, 904 ["Each tort is directed toward a particular individual, and in the area of defamation this has given rise to the rule that a publication is not actionable unless it is 'of and concerning' the individual plaintiff. ... This court can find no reason why a similar rule should not be extended to claims of false light."]; *Koussevitzky v. Allen, Towne & Heath* (Supreme Ct. 1947) 188 Misc. 479 [68 N.Y.S.2d 779, 785] [The doctrine that equity will not enjoin publication of a libel also precludes an injunction sought on a theory of false light invasion of privacy]; *Fouts v. Fawcett Publications* (D.Conn. 1953) 116 F.Supp. 535, 537 ["[T]he only reasonable conclusion is that any State which adopts the single publication rule for purposes of the tort of libel, would also adopt it and apply it, with the same test as to the date of accrual, in cases of wrongful violations of the right of privacy."]; *Smith v. Esquire, Inc.* (D.Md. 1980) 494 F.Supp. 967, 970 ["[W]here the basis of the cause of action is the false nature of the publication, *i.e.* a defamation, the action should be governed by the various limitations placed on an action for defamation. To hold otherwise would allow a plaintiff, in any defamation *246 action where there has been a general publication, to avoid the otherwise applicable one-year statute merely by phrasing the cause of action in terms of invasion of privacy."]; *McDonald v. Time* (D.N.J. 1981) 7 Med.L.Rptr. 1981, 1983 ["The court finds that the gist of these causes of action is defamation, and as such, they too are time-barred. ... [¶] New Jersey courts look beyond

the label affixed to the cause of action. ..."]; but cf. *Wood v. Hustler Magazine, Inc.* (5th Cir. 1984) 736 F.2d 1085, 1088-1089 and *Rinsley v. Brandt* (D.Kan. 1977) 446 F.Supp. 850, 858 [libel statute of limitations not applied to false light invasion of privacy].)

It is also noteworthy that the American Law Institute has adopted the position that the restrictions on defamation actions should be applied to actions for false light invasion of privacy where supported by the policy behind the particular restrictive rule: "[A]nother important question is that of the extent to which common law and statutory restrictions and limitations that have grown up around the action for defamation are equally applicable when the action is one for invasion of privacy by publicity given to falsehoods concerning the plaintiff. These restrictions include, for example, the requirement that special damages be pleaded and proved by the plaintiff in any case in which the defamatory words are not actionable per se. ... [¶] When the false publicity is also defamatory so that either action can be maintained by the plaintiff, it is arguable that limitations of long standing that have been found desirable for the action for defamation should not be successfully evaded by proceeding upon a different theory of later origin, in the development of which the attention of the courts has not been directed to the limitations." (Rest.2d Torts, § 652E, subd. (e), p. 399.)

Defendant has cited only one case that specifically considers the applicability of a special damages requirement to a false light cause of action. We have found only one other case on point, a later decision by the same court. In *Fogel v. Forbes, Inc.* (E.D.Penn. 1980) 500 F.Supp. 1081, the plaintiff brought actions for defamation and false light invasion of privacy, as well as other privacy claims, based on the publication of a single photograph. The court granted defendant's motion for summary judgment as to both the defamation and false light claims based on plaintiffs' failure to allege special damages. "Since the requirement of special damage is likewise applicable to invasion of privacy based upon 'Publicity placing person in false light,' and

since plaintiffs in their depositions stated that they were unable to prove special damage, the plaintiffs are unable to establish an essential element for such a claim." (500 F.Supp. at p. 1088.) The court reached the same conclusion in *McCabe* v. *Village Voice, Inc.* (E.D.Penn. 1982) 550 F.Supp. 525, 529, footnote 9: "I note again plaintiffs' failure to plead special damages. The policies which support the imposition of the *247 special damages requirement in actions for defamations also support a similar requirement in actions for false light."

(1) The applicability of the special damages requirement to a false light claim presents a question of first impression in this state. The court below held that even though plaintiffs' complaint was based on language not defamatory on its face within the meaning of section 45a, proof of special damages was not required since the complaint alleged only a cause of action for false light invasion of privacy and did not allege a cause of action for libel. As we have seen, this holding is contrary to the overwhelming weight of authority in this state and in other jurisdictions, which holds that the limitations on liability for defamatory speech should be enforced irrespective of the theory of liability.

The court's holding rests on a superficially logical syllogism. Its initial premise is that the interests protected by false light invasion of privacy and defamation are entirely separate and distinct. "Reputation ... is not the interest affected, protected, or compensated in invasion of privacy cases. ... [T]he wrong inflicted by an invasion of privacy is a direct injury to the plaintiff's feelings and peace of mind, and compensation is awarded for that injury, not for loss of standing in the eye of others."

The court's second premise is that section 45a is concerned only with the "protection of the plaintiff's *reputation* ... [and] neither recognizes nor addresses the different, non-reputational interests protected, and injuries redressed, in invasion of privacy actions." (Original italics.) Based on these conclusions, the court found the special damage rule "wholly inapposite" to a cause of action for false light invasion of privacy.

Most of the court's lengthy opinion is devoted to establishing its initial premise that invasion of privacy and defamation are concerned with different interests. [FN12] Even assuming this premise to be true, however, where a *248 complaint is based on a defamatory publication, this conceptual difference in the two torts does not justify making actionable an otherwise protected statement.

> FN12 The relationship between false light invasion of privacy and defamation has been the subject of much debate, disagreement and confusion. This disagreement has centered primarily on the extent to which the false light tort is intended to protect interests different from those interests protected by defamation actions. In *Kapellas* and *Briscoe* this court viewed false light and defamation as in essence equivalent. This view is consistent with Dean Prosser's assertion that "[t]he interest protected [by the false light action] is clearly that of reputation, with the same overtones of mental distress as in defamation." (Prosser, *supra*, 48 Cal.L.Rev. 400.) This was also the position taken by the United States Supreme Court in its most recent discussion of the false light tort. (*Zacchini* v. *Scripps-Howard Broadcasting Co.* (1976) 433 U.S. 562, 573 [53 L.Ed.2d 965, 974-975, 97 S.Ct. 2849].) Some commentators have gone so far as to argue that false light invasion of privacy does not protect any interest independent of defamation that is worthy of protection. (Kalven, *Privacy in Tort Law - Were Warren and Brandeis Wrong?* (1966) 31 Law & Contemp. Probs. 326; Gerety, *Redefining Privacy* (1977) 12 Harv. C.R.- C.L.L.Rev. 233.) The North Carolina Supreme Court recently accepted this argument in a decision announcing that the false light tort would not be recognized in that state. (*Renwick* v. *News and Observer Pub. Co.* (1984) 310 N.C. 312 [312 S.E.2d 405].) Most writers recognize the conceptual differences in the torts, but find at least a substantial overlap in the in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

terests protected. (See Wade, *Defamation and the Right of Privacy* (1962) 15 Vand. L.Rev. 1093, 1094-1095.) The Court of Appeal's analysis is misleading in part because it defines the interest protected by a right of privacy in general without distinguishing among the different interests safeguarded by the variegated tort. It may be true that one's sensibilities and peace of mind are primarily at issue in the pure privacy torts of intrusion and public disclosure of private facts; however, these interests are much less relevant in the appropriation tort, which is essentially concerned with protecting a proprietary interest, and in the false light tort, which is primarily intended to protect the integrity of one's public identity. (Gerety, *supra*, 12 Harv. C.R.-C.L.L.Rev. 255-261.)

The restrictions and limitations on liability for defamatory speech have evolved over many years as courts and legislatures have attempted to balance the interest in reputation against the interest in speech. The existing balance protects some defamatory statements in recognition that a certain amount of "'breathing space'" is necessary to maintain the vitality of the freedoms of speech and press. ( *New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 271-272 [11 L.Ed.2d at p. 701].) The modern law of defamation has been primarily concerned with determining the point at which potential liability for defamatory speech intolerably "dampens the vigor and limits the variety of public debate." ( *Id., at p. 279 [11 L.Ed.2d at p. 706].)*

The fact that a defamatory statement may injure "feelings and peace of mind" as well as reputation does not lessen the importance of "uninhibited, robust, and wide-open" public discourse, nor should the protections afforded defamatory statements in the interests of providing a generous zone of lawful speech be abrogated merely because the statement contains a privacy-invading element. ( *Id., at p. 270 [11 L.Ed.2d at pp. 700-701].)* Courts should proceed very cautiously before upsetting the delicate balance that has developed in the law of defamation

between the protection of an individual's interest in redressing injury from published falsehoods, and the protection of society's interest in vigorous debate and free dissemination of the news.

In most cases where defamation restrictions have been extended to false light claims the courts have acknowledged the theoretical differences in the interests protected, but have recognized as well that the different interests may be implicated by the same conduct. The *Werner* court expressly discussed this issue: "It is, of course, true that the tort of invasion of the right of privacy accords protection to a fundamentally different interest than that safeguarded by the law of defamation. But each of such interests conceivably *249 could be invaded by the same publication in a particular case. ... However, while the appellant in the present case has disclaimed any reliance on the law of libel, it is clear that he could not, in any event, recover under the theory of the tort of libel in the absence of a demand for a retraction and a failure to comply therewith ... unless he could establish special damages. ... Yet, assuming some of the statements of which the appellant complains in his amended complaint to be libelous in nature, to permit him to recover general damages in this case under the theory of the invasion of his right of privacy is to sanction an evasion of the provision of section 48a of the Civil Code." ( *Werner, supra, 193 Cal.App.2d at pp. 120-122,* fns. omitted.)

We also disagree with the Court of Appeal's narrow interpretation of the policy embodied in section 45a. Justice Traynor explained the objectives of the statute in *McLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 550 [343 P.2d 36]:* "The purpose of the rule requiring proof of special damages when the defamatory meaning does not appear on the face of the language used is to protect publishers who make statements innocent in themselves that are defamatory only because of extrinsic facts known to the reader. For example, a newspaper might erroneously report that 'Mrs. *A* gave birth to a child last night.' Mrs. *A* has been married only a month. The language used will take on a defamatory meaning only to those who know when Mrs. *A*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                                    Page 12
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
(Cite as: 42 Cal.3d 234)

was married, and many of them will also know that the paper made a mistake. In such a case, general damages for loss of reputation may be trivial, and the paper's mistake may have been innocent, for the content of the report would not alert it to the possibility of defamation. It is not unreasonable therefore to require proof of special damages to establish a cause of action."

In *Werner v. Southern Cal. etc. Newspapers, supra, 35 Cal.2d 121,* this court considered the related rule of section 48a, which limits plaintiffs to recovery for special damages and substitutes a printed retraction for general damages. The court's discussion of the basis for a rule limiting recovery to special damages is applicable here: "In view of the complex and far-flung activities of the news services upon which newspapers and radio stations must largely rely and the necessity of publishing news while it is new, newspapers and radio stations may in good faith publicize items that are untrue but whose falsity they have neither the time nor the opportunity to ascertain. The Legislature may reasonably conclude that the public interest in the dissemination of news outweighs the possible injury to a plaintiff from the publication of a libel, and may properly encourage and protect news dissemination by relieving newspapers and radio stations from all but special damages resulting from defamation, upon the publication of a retraction." (35 Cal.2d at p. 128.) *250

The United States Supreme Court recognized the same danger in *Time, Inc.*: "We create a grave risk of serious impairment of the indispensable service of a free press in a free society if we saddle the press with the impossible burden of verifying to a certainty the facts associated in news articles with a person's name, picture or portrait, particularly as related to non-defamatory matter. Even negligence would be a most elusive standard, especially when the content of the speech itself affords no warning of the prospective harm to another through falsity. ... [¶] In this context, sanctions against either innocent or negligent misstatement would present a grave hazard of discouraging the press from exercising the constitutional guarantees." (385 U.S. at p.

389 [17 L.Ed.2d at pp. 467-468].)

Section 45a manifests a legislative determination that liability imposed for a publication which affords no warning of its defamatory nature, and has not caused actual pecuniary injury, would place too great a burden on the editorial process and would hamper the free dissemination of the news. The fact that plaintiff has deleted injury to reputation from his prayer and is seeking to recover only for injury to his sensibilities, does not alter the legislative judgment that such injuries alone are inadequate to outweigh the burden on a free press. The policy concerns identified in *McCleod* and *Werner* are not dependent on the type of general damages alleged.

The court below agreed with plaintiff's argument that adequate protection was afforded innocent publishers by the constitutional requirement of malicious publication. This argument challenges the merits of the special damages requirement itself, suggesting that the rule is unnecessary in defamation as well as false light cases. Indeed, the same argument could be made with regard to virtually all restrictions and limitations imposed on defamation actions that are not constitutionally compelled.

In *Werner v. Southern Cal. etc. Newspapers, supra, 35 Cal.2d 126,* this court addressed an identical argument regarding section 48a: "Although [the statute] extends its protection to those who may deliberately and maliciously disseminate libels, the Legislature could reasonably conclude that it was necessary to go so far effectively to protect those who in good faith and without malice inadvertently publish defamatory statements. ... 'It may be urged, of course, that a false statement, known to be untrue, and dictated by malice, should always be the subject of a civil remedy. But this bald method of stating the question assumes both the untruth and the malice. If by any process of demonstration, free from the defects of human judgment, the untruth and malice could be set above and beyond all question of doubt, there might be ground for contending that the law should give damages to an injured person. But this is not the state of things under which this question of law has to be determined. Whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                    Page 13
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
**(Cite as: 42 Cal.3d 234)**

statements were in fact untrue, and *251 whether they were dictated by malice, are, and always will be, open questions, upon which opinions may differ, and which can only be resolved by the exercise of human judgment. And the real question is whether it is proper on grounds of public policy to remit such questions to the judgment of a jury. The reasons against doing so are simple and obvious. A participant in judicial proceedings may be utterly free from malice, and yet in the eyes of a jury be open to that imputation; or he may be cleared by the jury of the imputation, and may yet have to encounter the expense and distress of a harassing litigation. With such possibilities hanging over his head, he cannot be expected to speak with that free and open mind which the administration of justice demands.'" (35 Cal.2d at pp. 134-136, quoting from Veeder, *Absolute Immunity in Defamation* (1909) 9 Colum.L.Rev. 463, 469-470.)

This view is consistent with the position taken by Justices Black, Douglas and Goldberg in the *New York Times* decision. The concurring justices did not agree with the majority that an actual malice standard was sufficient to protect First Amendment values and did not concur in the adoption of that standard. A substantial majority of states have also found it desirable to extend additional protections to publishers through a special damages requirement. The fact that our Legislature has elected to do the same may not be second-guessed by this court.

We find the public policy embodied in section 45a equally applicable to an action for false light invasion of privacy based upon a defamatory publication. Since virtually every published defamation would support an action for false light invasion of privacy, exempting such actions from the requirement of proving special damages would render the statute a nullity. Permitting a plaintiff to circumvent the statutory requirement by labeling the action as one for false light invasion of privacy would defeat the legislative purpose of providing a zone of protection for the operation of a free press. The *Werner, Kapellas* and *Briscoe* courts would not allow such an evasion of legislative purpose, nor shall we. We hold that whenever a claim for false light invasion of privacy is based on language that is defamatory within the meaning of section 45a, pleading and proof of special damages are required. [FN13] *252

> FN13 Our holding would not apply to false light publicity that would be actionable as a public disclosure of private facts had the representations made in the publication been true. The public disclosure branch of the privacy tort involves the publication by defendant of non-newsworthy intimate details of plaintiff's private life. In the public disclosure of private facts context, the policies of section 45a are inapposite, since the injurious nature of the report should have been apparent on its face and the question of innocent mistake does not arise. Those false light cases based on publications which, if true, would be actionable as public disclosure of private facts, are conceptually indistinguishable from the latter category, and should not be subject to the special damages requirement of section 45a.

Although we recognize that a free press does not always mean a responsible press, the architects of the First Amendment anticipated that it would be necessary to tolerate some abuse in order to maintain the vitality of the guarantee. James Madison said: "Some degree of abuse is inseparable from the proper use of every thing, and in no instance is this more true than in that of the press. [¶] It has accordingly been decided ... that it is better to leave a few of its noxious branches to their luxuriant growth, than by pruning them away, to injure the vigor of those yielding the proper fruits." (4 Elliott's Debates on the Federal Constitution (1876 ed.) p. 571.)

The judgment of the Court of Appeal is reversed.

Bird, C. J., Mosk, J., Reynoso, J., Grodin, J., Lucas, J., and Panelli, J., concurred.

**BIRD, C. J.**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Cal.3d 234                                                                 Page 14
42 Cal.3d 234, 721 P.2d 97, 228 Cal.Rptr. 215, 57 A.L.R.4th 223, 13 Media L. Rep. 1305
**(Cite as: 42 Cal.3d 234)**

I concur. I write separately because I think it is imperative at this time in our history that we give serious thought to the minority view expressed by Justices Goldberg and Douglas in _New York Times Co. v. Sullivan_ (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710].

In my opinion, "sunlight is the most powerful of all disinfectants ...." (See Freund, The Supreme Court of the United States (1961) p. 61.) That "sunlight" in a democracy is provided in large part by the press.

For all its momentary power, the press as an institution is quite fragile. Although those who from time to time have suffered its slings and arrows may dispute that fact, it is a reality. To be truly free, the press must feel free - free to be wise and free to be foolish; free to be constructive and free to be destructive; free to be impartial and free to be unfair. That can only be accomplished if it knows that it has an "absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses." ( _New York Times Co. v. Sullivan, supra_, 376 U.S. at p. 298 [11 L.Ed.2d at p. 719] (conc. opn. of Goldberg, J.).) The press will never feel free if it is chilled by codification.

"The prized American right 'to speak one's mind,' cf. _Bridges v. California_ [1941] 314 U.S. 252, 270, about public officials and affairs needs ' breathing space to survive,' (_N.A.A.C.P. v. Button_ [1963] 371 U.S. 415, 433.) The right should not depend upon a probing by the jury of the motivation of the citizen or press. The theory of our Constitution is that every citizen may speak his mind and every newspaper express its view on matters of public concern and may not be barred from speaking or publishing because those in control of government think that what is said or written is unwise, unfair, false, or malicious. In a democratic society, one who **\*253** assumes to act for the citizens in an executive, legislative, or judicial capacity must expect that his official acts will be commented upon and criticized. Such criticism cannot, in my opinion, be muzzled or deterred by the courts at the instance of public officials under the label of libel." _New York Times_

_Co. v. Sullivan, supra_, 376 U.S. at pp. 298-299 [11 L.Ed.2d at p. 719] (conc. opn. of Goldberg, J.).)
**\*254**

Cal.,1986.

Fellows v. National Enquirer, Inc.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13
## To Appendix to California State Authorities

Westlaw.

74 Cal.App.4th 1394                                                            Page 1
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
(Cite as: 74 Cal.App.4th 1394)

▷

THOMAS M. FERLAUTO, Plaintiff and Appel-
lant,
v.
JANE HAMSHER et al., Defendants and Respond-
ents.
No. B125980.

Court of Appeal, Second District, Division 2, Cali-
fornia.

Sep 20, 1999.

SUMMARY

The trial court sustained without leave to amend a
demurrer to a complaint by an attorney alleging that
he was defamed in a book defendant wrote concern-
ing her production of a movie and a lawsuit against
her in connection with it, in which plaintiff repres-
ented the other party. The statements impugned
plaintiff's ability as an attorney in a colorful and
crude manner. (Superior Court of Los Angeles
County, No. BC178368, Marvin Lager, Judge.)

The Court of Appeal affirmed. The court held that
the complaint failed to state a cause of action, since
the complained-of statements were of opinions, not
facts. It was apparent from the totality of the cir-
cumstances that defendant applied spicy prose in
describing the making of a controversial film and
describing her thoughts on everyone associated
with it. In this context, and especially with her
views born out of litigation to which she was ad-
verse to plaintiff, the average reader would deem
her comments about plaintiff as subjective expres-
sions of opinion devoid of factual matter. The court
also held that plaintiff failed to show that defendant
waived her U.S. Const., 1st Amend., rights by a
confidentiality agreement entered into when the
lawsuit was settled. (Opinion by Boren, P. J., with
Zebrowski, J., and Mallano, J., [FN*] concurring.)

FN* Judge of the Los Angeles Superior
Court, assigned by the Chief Justice pursu-
ant to article VI, section 6 of the California

Constitution .

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b) Libel and Slander § 11--Actionable Words-
-As to Occupation or Business--Attorney--By Ad-
verse Party in Lawsuit--Fact *1395 or Opinion.
A complaint by an attorney alleging that he was de-
famed in a book defendant wrote concerning her
production of a movie and a lawsuit against her in
connection with it, in which plaintiff represented
the other party, failed to state a cause of action,
since the complained-of statements were of opin-
ions, not facts. The statements included, inter alia,
(1) "I [defendant] screamed, ' If some whore's son
is filing a motion just to make me pay to defend it,
even though it's preposterous, he should be forced
to pay if he's found full of shit!' " (2) "Kmart John-
nie Cochran"; (3) "loser wannabe lawyer"; (4)
"creepazoid attorney"; and (5) "meanest, greediest,
low-blowing motherfuckers." It was apparent from
the totality of the circumstances that defendant ap-
plied spicy prose in describing the making of a con-
troversial film and describing her thoughts on
everyone associated with it. In this context, and es-
pecially with her views born out of litigation to
which she was adverse to plaintiff, the average
reader would deem her comments about plaintiff as
subjective expressions of opinion devoid of factual
matter.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988)
Torts, § 486.]

(2a, 2b) Libel and Slander § 7--Actionable Words-
-Waiver of First Amendment Rights--Confidential
Settlement Agreement.
In an action by an attorney alleging that he was de-
famed in a book defendant wrote concerning her
production of a movie and a lawsuit against her in
connection with it, in which plaintiff represented
the other party, plaintiff failed to show that defend-
ant waived her U.S. Const., 1st Amend., rights by a
confidentiality agreement entered into when the

74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal D.A.R. 9903

**(Cite as: 74 Cal.App.4th 1394)**

lawsuit was settled. The agreement bound the parties to confidentiality as to the nature of the claims asserted in the lawsuit or any other matter, and an understanding not to use or disclose any document, tape recording, or other matter of any description whatsoever occasioned by, or arising out of the lawsuit. The confidentiality clause did not by its terms specifically prohibit characterizations of the legal abilities or the personality of plaintiff. Indicative of the absence of any intent to shield plaintiff from anyone's First Amendment speech, the complaint did not assert plaintiff was a party to the confidentiality agreement or even mentioned in the terms of the agreement. It would be unusual for the typical confidential settlement agreement to protect *1396 counsel, rather than the litigants and the terms of their agreement. Moreover, the phrase was so imprecise and overbroad as to fall short of being a clear and compelling waiver of specific First Amendment rights regarding any comments about plaintiff.

(3) Constitutional Law § 55--First Amendment Rights--Freedom of Speech-- Waiver.
U.S. Const., 1st Amend., safeguards freedom of speech, which is the matrix, the indispensable condition, of nearly every other form of freedom. Thus, where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, courts are unwilling to find waiver in circumstances that fall short of being clear and compelling. Courts closely scrutinize waivers of constitutional rights, and indulge every reasonable presumption against a waiver.

(4) Libel and Slander § 7--Actionable Words--Fact or Opinion.
To state a libel claim a plaintiff must allege a statement that is provably false. Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot reasonably be interpreted as stating actual facts about an individual. Thus, rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt, and language used in a loose, figurative sense have all been accorded constitutional protection. The critical determination of

whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court and therefore suitable for resolution by demurrer. If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. In drawing the distinction between opinion and fact, California courts apply the totality of the circumstances test to determine whether an allegedly defamatory statement is actionable.

(5) Libel and Slander § 7--Actionable Words--Fact or Opinion--Test.
In applying the totality of the circumstances test to determine whether an allegedly libelous statement is one of fact or opinion, editorial context is regarded by the courts as a powerful element in construing as opinion what might otherwise be deemed fact. In evaluating whether language used is defamatory, courts look not so much to the allegedly libelous statement's effect when subjected to the critical analysis of a mind trained in the law, but to the natural and probable *1397 effect upon the mind of the average reader. Part of the totality of the circumstances used in evaluating the language in question is whether the statements were made by participants in an adversarial setting. Where potentially defamatory statements are published in a setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.

COUNSEL

Thomas M. Ferlauto, in pro. per., for Plaintiff and Appellant.

Sidley & Austin, Stephen G. Contopulos and Bradley H. Ellis for Defendants and Respondents.

**BOREN, P. J.**

Appellant, Attorney Thomas M. Ferlauto, sued respondents, Jane Hamsher, Don Murphy, Jane and Don Productions, Inc., and Broadway Books, for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 Cal.App.4th 1394                                                    Page 3
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
**(Cite as: 74 Cal.App.4th 1394)**

defamation and intentional and negligent infliction of emotional distress. The trial court sustained without leave to amend the demurrer to Ferlauto's second amended complaint. We affirm.

Factual and Procedural History

Ferlauto sued because of unflattering comments impliedly referring to him in Hamsher's book entitled Killer Instinct: How Two Young Producers Took on Hollywood and Made the Most Controversial Film of the Decade (1997) (hereinafter, the book). [FN1] The book concerned the making of the movie Natural Born Killers (1994), which was produced by Hamsher and Murphy, "written by" Quentin Tarantino, and directed by Oliver Stone. The book discussed, in part, litigation that resulted when Rand Vossler, briefly slotted to be the director of the movie, sued Hamsher and Murphy for fraud after they asked him to step aside. Vossler was represented by Attorney Ferlauto, and a confidential settlement agreement was ultimately reached. In her book, Hamsher made critical remarks about the litigation and about the attorney for Vossler, though the name of the attorney was never mentioned. **\*1398**

> FN1 Pursuant to respondents' request, we have taken judicial notice of the book, copies of which have been lodged with this court.

Hamsher's book is laden with flip, earthy and colorful language, and written in an exaggerated, irreverent and attention-grabbing style. The jacket of the book advises the reader that it is "[a] shockingly candid, hilarious account" of the producer's "two-year roller-coaster ride through the ruthless world of studio pitbulls, idiotic film crew leeches, and unprecedented butt-kissing and back-stabbing." Book reviews quoted on the book jacket characterize the book as "lean, mean, scabrously honest," and as "[f]ast, funny and horrifically honest .... Hamsher delivers the most mercilessly incisive portrait of our prepsychotic film industry in years."

Nothing in the book specifically states that Ferlauto in his legal representation of Vossler was incompet-

ent or unethical, but Ferlauto alleged in his complaint that those were reasonable implications from various statements culled from the book. The statements complained of concerned negative remarks about the Vossler lawsuit and several imaginative and vigorous insults.

(1a) The comments, taken out of context and listed seriatim much as Ferlauto did in his complaint, were as follows: (1) "I [Hamsher] screamed, 'If some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous, he should be forced to pay if he's found full of shit!' "; [FN2] (2) filing the motion was "stupid"; (3) the judge "laughed at their motion"; (4) "the judge thought their motion was a joke"; (5) "the judge had laughed his case out of court during the summary judgment"; (6) " 'a judge threw out their summary motion as spurious' "; (7) " 'It's clearly a frivolous lawsuit' "; (8) " 'Rand's lawsuit is spurious' "; (9) "not an ethical one"; (10) "Kmart Johnnie Cochran"; (11) "loser wannabe lawyer"; (12) " 'creepazoid attorney' "; (13) "little fucker"; and (14) "meanest, greediest, low-blowing motherfuckers." Ferlauto alleged in the complaint that such statements implied that he is an unethical attorney who abuses legal procedures to vex, harass and annoy his opponents, and that such statements were defamatory on their face and actionable per se in that they tended to injure him in his profession without the necessity of considering the surrounding circumstances.

> FN2 Appellant's motion for a preliminary injunction had been denied because he had not pled a cause of action requesting injunctive relief.

Ferlauto's second amended complaint also alleged that litigation in which he had represented Vossler was resolved with a confidential settlement agreement. According to the terms of the agreement, Hamsher, Murphy and their production company each agreed "to maintain the confidentiality of ... the nature of the claims asserted in the [Vossler] Lawsuit or any other matter," and further agreed "not to use or disclose any document, tape **\*1399**

74 Cal.App.4th 1394                                                    Page 4
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
(Cite as: 74 Cal.App.4th 1394)

recording, or other matter of any description what-
soever occasioned by, or arising out of [the
Vossler] Lawsuit...." [FN3] Ferlauto urges that by
entering into this agreement, respondents "waived
their Constitutional right of free speech guaranteed
by the First Amendment with respect to all commu-
nications concerning the [Vossler] Lawsuit." [FN4]

>     FN3 Pursuant to respondents' request, we
>     have also taken judicial notice of the mutu-
>     al limited release among the parties, dated
>     May 28, 1998, which establishes that Fer-
>     lauto may not amend his complaint to state
>     a cause of action against respondents for
>     breach of contract as to the Vossler confid-
>     ential settlement agreement.

>     FN4 We note that respondent Broadway
>     Books was not a party to this settlement
>     agreement.

The trial court sustained the demurrer to Ferlauto's
second amended complaint without leave to amend.
The court held that the First Amendment barred the
libel cause of action because "the alleged defamat-
ory statements would not imply to a reasonable
fact-finder provable false factual assertions," and
that likewise the claims for emotional distress could
not be sustained.

### Discussion

I. *No waiver of the First Amendment as a defense*
Ferlauto contends that respondents cannot assert the
First Amendment as a defense to his claims because
they knowingly and voluntarily waived those rights
by entering into a confidentiality agreement in the
Vossler litigation. According to Ferlauto, without
the protection of the First Amendment, this court
should apply the common law of defamation as it
existed prior to *New York Times Co. v. Sullivan*
(1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686,
95 A.L.R.2d 1412], and that by applying the law of
defamation without the protections of the First
Amendment all of the statements alleged in the
second amended complaint are actionable. (See
*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1,
12-21 [110 S.Ct. 2695, 2702-2707, 111 L.Ed.2d

[describing the history of First Amendment protec-
tions restricting the state law of defamation].)

(2a) Apart from Ferlauto's analysis of defamation
law unencumbered by the First Amendment, his un-
derlying premise is flawed. There was no waiver of
the First Amendment by the terms of the confiden-
tiality agreement at issue here.

(3) The First Amendment "safeguards a freedom
which is the 'matrix, the indispensable condition, of
nearly every other form of freedom.' [Citation.]
Where the ultimate effect of sustaining a claim of
waiver might be an imposition on that valued free-
dom, we are unwilling to find waiver in *1400 cir-
cumstances which fall short of being clear and
compelling." (*Curtis Publishing Co. v. Butts* (1967)
388 U.S. 130, 145 [87 S.Ct. 1975, 1986, 18 L.Ed.2d
1094].) " '[I]t is well established that courts closely
scrutinize waivers of constitutional rights, and "in-
dulge every reasonable presumption against a
waiver." ' " (*City of Glendale v. George* (1989) 208
Cal.App.3d 1394, 1398 [256 Cal.Rptr. 742] [record
fails to establish understanding waiver of First
Amendment rights by a consent judgment].)

(2b) The agreement here alleged to result in a
waiver of fundamental First Amendment rights
binds the parties to confidentiality as to "the nature
of the claims asserted in the [Vossler] Lawsuit or
any other matter," and an understanding "not to use
or disclose any document, tape recording, or other
matter of any description whatsoever occasioned
by, or arising out of [the Vossler] Lawsuit." [FN5]
The confidentiality clause does not by its terms spe-
cifically prohibit characterizations of the legal abil-
ities or the personality of Attorney Ferlauto. Indic-
ative of the absence of any intent to shield Ferlauto
from anyone's First Amendment speech, the second
amended complaint does not assert Ferlauto was a
party to the confidentiality agreement or even men-
tioned in the terms of the agreement. Indeed, it
would be unusual for the typical confidential settle-
ment agreement to protect counsel, rather than the
litigants and the terms of their agreement.

>     FN5 Ferlauto has not alleged that respond-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 Cal.App.4th 1394                                                                                    Page 5
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
**(Cite as: 74 Cal.App.4th 1394)**

ents used or disclosed any document, tape recording, or specific physical item.

Moreover, the phrase "the nature of the claims asserted ... or any other matter," is so imprecise and overbroad as to "fall short of being [a] clear and compelling" (*Curtis Publishing Co. v. Butts, supra, 388 U.S. at p. 145 [87 S.Ct. at p. 1986]*) waiver of specific First Amendment rights regarding any comments about Ferlauto. It is uncertain whether the phrase "nature of the claims asserted" applies only to preclude revelation of the causes of action in the complaint, or is intended to prohibit any general discussion of the claims. And, the vague phrase "any other matter," without any point of reference, is hopelessly imprecise and overbroad. Such language is an inadequate basis for a knowing and intelligent waiver of the constitutional right to freedom of speech. (See *National Polymer Products v. Borg-Warner Corp.* (6th Cir. 1981) *641 F.2d 418, 423-424* [terms of a protective order to preserve confidentiality of discovery material were deemed ambiguous and not a waiver of First Amendment rights].)

Accordingly, respondents have not waived the right to rely on the First Amendment in defense of appellant's claims. *1401

*II. Appellant cannot state a libel claim because none of the statements cited from the book convey a provably false factual assertion*

(4) To state a libel claim which is not defeated by the freedom of speech protections of the First Amendment, Ferlauto must allege a statement that is provably false. (*Milkovich v. Lorain Journal Co., supra, 497 U.S. at p. 20 [110 S.Ct. at p. 2706].*) Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." (*Ibid.*, citing *Hustler Magazine v. Falwell* (1988) *485 U.S. 46, 50 [108 S.Ct. 876, 879, 99 L.Ed.2d 41].*) Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of ... contempt," and language used "in a loose, figurat-

ive sense" have all been accorded constitutional protection. (*Greenbelt Pub. Assn. v. Bresler* (1970) *398 U.S. 6, 14 [90 S.Ct. 1537, 1542, 26 L.Ed.2d 6];* *Letter Carriers v. Austin* (1974) *418 U.S. 264, 284, 286 [94 S.Ct. 2770, 2781, 2782, 41 L.Ed.2d 745].*)

"The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court [citations] and therefore suitable for resolution by demurrer. [Citation.] If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. (*Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) *22 Cal.3d 672, 680 ....*)" (*Campanelli v. Regents of University of California* (1996) *44 Cal.App.4th 572, 578 [51 Cal.Rptr.2d 891].*) In drawing the distinction between opinion and fact, California courts apply the totality of the circumstances test to determine whether an allegedly defamatory statement is actionable. (*Baker v. Los Angeles Herald Examiner* (1986) *42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].*)

(5) In applying the totality of the circumstances test, " 'editorial context is regarded by the courts as a powerful element in construing as opinion what might otherwise be deemed fact.' " (*Morningstar, Inc. v. Superior Court* (1994) *23 Cal.App.4th 676, 693 [29 Cal.Rptr.2d 547].*) In evaluating whether language used is defamatory, courts look " 'not so much [to the allegedly libelous statement's] effect when subjected to the critical analysis of a mind trained in the law, but [to] the natural and probable effect upon the mind of the average reader.' " (*Id.* at p. 688.)

Part of the totality of the circumstances used in evaluating the language in question is whether the statements were made by participants in an adversarial setting. "[W]here potentially defamatory statements are published in a ... setting in which the audience may anticipate efforts by the parties to *1402 persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 Cal.App.4th 1394                                                                                      Page 6
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
(Cite as: 74 Cal.App.4th 1394)

of opinion." (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425] [statements in a bulletin attacking the motives of union officers in a labor dispute].) " '[S]ince such [labor] disputes, realistically considered, normally involve considerable differences of opinion and vehement adherence to one side or the other, a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of the controversy.' " (*Id.* at p. 602; see also *Information Control v. Genesis One Computer Corp.* (9th Cir. 1980) 611 F.2d 781, 784 [disparaging comments by business litigants generally understood not as statements of fact but as predictable opinion of the other side's motives].)

In *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, the court discussed critical comments made in Attorney Vincent Bugliosi's book about another attorney's unsuccessful representation of a defendant in a murder case, in which Bugliosi had obtained an acquittal for the codefendant in a separate trial. With personal accounts by a commentator who was a participant involved in the litigation, "a reader would be likely to recognize that the critiques of the judges, witnesses, and other participants in the [litigation]- and particularly of the other counsel-generally represent the highly subjective opinions of the author rather than assertions of verifiable, objective facts." (*Id.* at p. 1154.) Although Bugliosi had clearly implied that Attorney Partington had inadequately represented his client (*id.* at p. 1157), "[c]ritiques of a lawyer's performance in a particular case generally cannot be proved true or false and, consequently, cannot ordinarily serve as the basis of a defamation claim. ... [¶] ... [¶] ... [C]ourts should be reluctant to hold comments concerning the professional abilities of an individual actionable." (*Id.* at pp. 1158-1159; see also *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 7-8, 14-15 [20 Cal.Rptr.2d 890] [statements that an attorney used " 'sleazy tactic[s]' " and engaged in a " ' "fishing expedition, " ' " and supposition that the judge had a " 'dim view of the defense tactics' " qualify as opinion].)

(1b) In the present case, the comments about Fer-

lauto all related to Hamsher's discussion of the lawsuit against her, an event she took very personally. As Hamsher explained in the book: "If you've never been sued before, let me tell you, nothing can quite match the wild disbelief that courses through your whole body when you realize someone's going to take you to court." With that introduction, already having experienced over 60 pages of Hamsher's hyperbolic rhetoric, knowing that the movie was a major item in Hamsher's fledgling career, and knowing the headaches Vossler had *1403 already caused her, no reader would expect Hamsher to suddenly change her tone in the book. Hamsher would not be expected to describe Vossler's legal attack with an arid, dispassionate, desiccated recital of bare facts. A reasonable reader would expect exactly what Hamsher provided-her highly partisan opinions of the lawsuit and her opponents, including Attorney Ferlauto.

Turning to the particular language alleged to be defamatory, the numerous descriptions of the lawsuit and the motion as "stupid," "laughed at," "a joke," "spurious," and "frivolous," are common characterizations which are nothing more than "the predictable opinion" of one side to the lawsuit. (*Information Control v. Genesis One Computer Corp., supra,* 611 F.2d at p. 784.) Use of such descriptive terms does not improperly attack appellant's competence or ethics and cannot be the basis for a defamation claim.

Nor is it of any significance that one of the above deprecating descriptions is from Hamsher's attorney. (*Information Control v. Genesis One Computer Corp., supra,* 611 F.2d at p. 784 [holding that statement of defendant's counsel that plaintiff corporation acted to avoid paying its obligations was nonactionable opinion].) Also contrary to Ferlauto's assertion, the mere passage of time between the events described and the publication of the book is not determinative. Regardless whether Hamsher is retelling what occurred five years ago or five days ago, the overall context of the book, the subject matter, and the author's literary style alert readers that they are reading the subjective views of a partisan participant to the events described. The pub-

74 Cal.App.4th 1394                                                                                    Page 7
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
**(Cite as: 74 Cal.App.4th 1394)**

lication date of the book would not affect the reader's view of the statements.

Caricature, imaginative expression, and rhetorical hyperbole, as used here, are often subject to the threat of a defamation action, but generally constitute a legitimate exercise of literary style. (*Milkovich v. Lorain Journal Co., supra,* 497 U.S. at p. 20 [110 S.Ct. at p. 2706]; *Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 263-264.) For example, the statements in the book that the judge in the Vossler litigation "laughed at their motion" and "thought their motion was a joke" are merely colorful descriptions of the incontestable fact that the court indeed denied Vossler's motion. Although the judge may not have literally laughed, authors are not limited to a sterile narrative of facts.

Hamsher's imaginative phrase "Kmart Johnnie Cochran" is also not actionable. Ferlauto asserts the phrase means that his legal services were of low quality and that he is unethical. The phrase is a lusty and creative expression of contempt, too loose and figurative to be susceptible of being proved true or false. (See *1404Hustler Magazine v. Falwell, supra,* 485 U.S. at pp. 53- 55 [108 S.Ct. at pp. 880-882]; *James v. San Jose Mercury News, Inc., supra,* 17 Cal.App.4th at p. 15.)

Similarly, the phrases "creepazoid attorney" and "loser wannabe lawyer" are classic rhetorical hyperbole which "cannot 'reasonably [be] interpreted as stating actual facts.' " (*Milkovich v. Lorain Journal Co., supra,* 497 U.S. at p. 20 [110 S.Ct. at p. 2706].) Hamsher's use of curse words, although not in good taste, are of course not to be taken literally. Her expressive phrases are merely name-calling of the "sticks and stones will break my bones" variety. They are epithets and subjective expressions of disapproval, devoid of any factual content, reflecting Hamsher's "vague expressions of low esteem" for Ferlauto. (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 838 [52 Cal.Rptr.2d 831] [use of the metaphoric expressions "keep him honest," "booby," and "baying in the ocean breezes" are subjective expressions of negative opinion with no disprovable factual content].) Hamsher's book recounts in detail the

circumstances leading up to the Vossler lawsuit, and the bases for her colorful expressions of opinion are thoroughly disclosed with no fact of any significance falsely stated.

Hamsher's only factual error was in mistakenly labeling a motion for summary judgment one which was actually a motion for preliminary injunction. The error in identifying the type of motion filed was here of no consequence. Libel law "overlooks minor inaccuracies and concentrates on substantial truth." (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 516 [111 S.Ct. 2419, 2432, 115 L.Ed.2d 447].) What is critical in assessing whether a statement is capable of defamatory meaning is " 'the substance, the gist, the sting, of the libelous charge.' " (*Id.* at p. 517 [111 S.Ct. at p. 2433].) Moreover, when analyzing the statements in question, courts do so from the perspective of the average reader, not a person trained in the technicalities of the law. (*Morningstar, Inc. v. Superior Court, supra,* 23 Cal.App.4th at p. 688.) Whether it was a summary judgment motion or a preliminary injunction motion, is a minor inaccuracy which would have no effect on how the average reader would interpret the statements made. (See, e.g., *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1050, fn. 6 [61 Cal.Rptr.2d 58] [misstating that a criminal investigation was started by the district attorney rather than by the state auditor did not change the gist or sting of the alleged libel].)

Moreover, several of the statements complained of actually do not concern Ferlauto. He cannot constitutionally establish liability unless he proves that the contested statements are " 'of and concerning,' " him either by name or by "clear implication." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042-1044 [232 Cal.Rptr. 542, 728 P.2d 1177].) Ferlauto, for example, *1405 grossly distorts the text of the book by emphasizing the phrase "not an ethical one" from the following passage: "Well, we were already well aware that Rand [Vossler] had us over a barrel, but it was a time barrel, not an ethical one; had we had all the time in the world to take the thing to court, we knew we

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

74 Cal.App.4th 1394                                                                                          Page 8
74 Cal.App.4th 1394, 88 Cal.Rptr.2d 843, 27 Media L. Rep. 2364, 99 Cal. Daily Op. Serv. 7829, 1999 Daily Journal
D.A.R. 9903
(Cite as: 74 Cal.App.4th 1394)

would've won. But we didn't." In other words, Hamsher felt no ethical barriers in proceeding with the film without Vossler, but realized that his lawsuit presented a logistical obstacle. The sentence simply does not imply that Ferlauto (who was never referred to by name in the book) was unethical; the phrase "not an ethical one" was not of and concerning him at all.

Similarly, the most natural reading of the remarks made by Hamsher and her attorney wherein they surmise the motive behind Vossler's filing the motion and the denial of her request for attorney fees (i.e., "some whore's son is filing a motion just to make me pay to defend it, even though it's preposterous," etc.) is that they were remarks about Vossler, not his unnamed attorney. And, the most natural reading of the phrase "the meanest, greediest, low-blowing motherfuckers in Hollywood" is that it pertained not to Ferlauto, but rather to Vossler and to Tarantino, who at that stage did not want the film produced and thus was siding with Vossler. Moreover, the passage in which Hamsher's partner Murphy speculates before the fact that Vossler will "find some loser wannabe lawyer" to represent him only reflects Murphy's hypothetical expectations, rather than a specific allegation concerning the individual eventually hired. It is thus apparent that in addition to nonactionable, feisty expressions of permissible opinion, some of the statements complained of were not even directed at Ferlauto.

The totality of the circumstances test must be used (*Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 260) in assessing the context of phrases from an evaluation of the entire book. (*Scott v. McDonnell Douglas Corp. (1974) 37 Cal.App.3d 277, 291, fn. 11 [112 Cal.Rptr. 609].*) The statements complained of may not be ripped out of context or, as Ferlauto seeks to do, defined from language in a review on the book's jacket asserting the "horrifically honest" nature of the book. It is apparent from the totality of the circumstances that Hamsher applies spicy prose in describing the making of a controversial film and describing her thoughts on everyone associated with it. In this context, and especially with her views born out of litigation to which she was adverse to Ferlauto, the average reader would deem her comments about Ferlauto as subjective expressions of opinion devoid of factual matter. (*Copp v. Paxton, supra,* 45 Cal.App.4th at p. 838.)

Since Ferlauto was not entitled to legal relief under any possible theory and there was no reasonable possibility the pleading could be cured (see **\*1406** *Platt v. Coldwater Banker Residential Real Estate Services (1990) 217 Cal.App.3d 1439, 1444 [266 Cal.Rptr. 601]*), the trial court did not abuse its discretion in dismissing his second amended complaint without leave to amend. (*Hendy v. Losse (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].*)

Disposition

The judgment is affirmed. Costs on appeal to respondents.

Zebrowski, J., and Mallano, J., [FN\*] concurred.
**\*1407**

FN\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Cal.App.2.Dist.,1999.

THOMAS M. FERLAUTO, Plaintiff and Appellant, v. JANE HAMSHER et al., Defendants and Respondents.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.