# EXHIBIT 14

## To Appendix to California State Authorities

Westlaw.

10 Cal.Rptr.3d 429                                                    Page 1
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

C

Court of Appeal, Fourth District, Division 3, Cali-
fornia.
Bryan FRANKLIN et al., Plaintiffs and Appellants,
v.
DYNAMIC DETAILS, INC., et al., Defendants and
Respondents.
**No. G031625.**

March 2, 2004.

**Background:** Sales representative for vendors of
electronic products sued electronic products design-
er, alleging libel per se, trade libel, and interference
with contractual and prospective economic relation-
ships, arising from e-mails published by designer
stating that sales representative stole copyrighted
materials. The Superior Court, Orange County, No.
01CC16382, William M. Monroe, J., entered sum-
mary judgment for designer. Sales representative
appealed.

**Holdings:** The Court of Appeal, Fybel, J., held
that:
(1) e-mails contained opinions based upon fully dis-
closed, provably true facts, and thus were not ac-
tionable as libel, and
(2) e-mails were not cause of sales representative's
loss of business.
Affirmed.

West Headnotes

**[1] Libel and Slander** 130
237k130 Most Cited Cases

**[1] Libel and Slander** 136
237k136 Most Cited Cases
The relevant law is the same as to libel and trade li-
bel, and the same conditional privileges apply to
both causes of action. West's Ann.Cal.Civ.Code  §
45.
See 5 Witkin, Summary of Cal. Law (9th ed. 1988)
Torts, § 576.

**[2] Libel and Slander** 130

237k130 Most Cited Cases
"Trade libel" is the publication of matter dispar-
aging the quality of another's property, which the
publisher should recognize is likely to cause pecu-
niary loss to the owner.

**[3] Libel and Slander** 30
237k30 Most Cited Cases
The sine qua non of recovery for defamation is the
existence of falsehood.

**[4] Libel and Slander** 6(1)
237k6(1) Most Cited Cases
For purposes of libel, statements of opinion that im-
ply a false assertion of fact are actionable. West's
Ann.Cal.Civ.Code  § 45.

**[5] Libel and Slander** 6(1)
237k6(1) Most Cited Cases
For purposes of libel, the question is not strictly
whether the published statement is fact or opinion;
rather, the dispositive question is whether a reason-
able fact finder could conclude the published state-
ment declares or implies a provably false assertion
of fact. West's Ann.Cal.Civ.Code  § 45.

**[6] Constitutional Law** 2161
92k2161 Most Cited Cases
    (Formerly 92k90.1(5))
Satirical, hyperbolic, imaginative, or figurative
statements are protected by First Amendment, and
not actionable as libel, because the context and ten-
or of the statements negate the impression that the
author seriously is maintaining an assertion of actu-
al fact. U.S.C.A. Const.Amend. 1; West's
Ann.Cal.Civ.Code  § 45.

**[7] Libel and Slander** 123(2)
237k123(2) Most Cited Cases
In libel action, whether a statement declares or im-
plies a provably false assertion of fact is a question
of law for the court to decide, unless the statement
is susceptible of both an innocent and a libelous
meaning, in which case the jury must decide how
the statement was understood. West's
Ann.Cal.Civ.Code  § 45.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                Page 2
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

**[8] Libel and Slander** ⬅➡19
237k19 Most Cited Cases

**[8] Libel and Slander** ⬅➡22
237k22 Most Cited Cases
In a libel action, under the totality of the circumstances test, which is used to determine whether the statement communicates or implies a provably false statement of fact, the language of the statement is examined first, and then the context in which the statement was made must be considered. West's Ann.Cal.Civ.Code § 45.

**[9] Libel and Slander** ⬅➡7(13)
237k7(13) Most Cited Cases

**[9] Libel and Slander** ⬅➡133
237k133 Most Cited Cases
E-mails published by electronics products designer, which stated that sales representative for vendors of electronic products had stolen copyrighted materials, contained opinions based upon fully disclosed, provably true facts, and thus were protected by First Amendment and not actionable as libel per se or trade libel; e-mails directed reader to sales representative's website, which framed another web site through a link, and so supporting facts were disclosed and accessible to reader, who could form own opinion based on facts,
and designer's statements appeared in context as rhetorical hyperbole. U.S.C.A. Const.Amend. 1; West's Ann.Cal.Civ.Code § 45.
*See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 549A; Cal. Civil Practice (Thomson/West 2003) Torts, § 21:27; Annot., Libel and Slander: Actionability of Defamatory Statements as to Business Conduct, Relating to a Single Transaction or Occurrence (1973) 51 A.L.R.3d 1300.*

**[10] Libel and Slander** ⬅➡6(1)
237k6(1) Most Cited Cases
A statement of opinion based on fully disclosed facts is actionable as libel only if the stated facts are themselves false and demeaning, because, when the supporting facts are fully disclosed, readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.

West's Ann.Cal.Civ.Code § 45.
**[11] Libel and Slander** ⬅➡7(1)
237k7(1) Most Cited Cases
Accusations of criminal activity, like other statements, are not actionable as libel if the underlying facts are disclosed. West's Ann.Cal.Civ.Code § 45.

**[12] Torts** ⬅➡219
379k219 Most Cited Cases
    (Formerly 379k15)
A cause of action for interference with contractual relations and a cause of action for interference with prospective economic relations both require the plaintiff to prove causation.

**[13] Torts** ⬅➡241
379k241 Most Cited Cases
    (Formerly 379k15, 379k12, 379k10(3))

**[13] Torts** ⬅➡242
379k242 Most Cited Cases
    (Formerly 379k12)
E-mails published by electronic products designer, which stated that sales representative for vendors of electronic products had stolen copyrighted materials, did not cause any damage to sales representative's business relationships, and thus were not actionable as interference with contractual and prospective economic relationships; even though sales representative experienced loss of business with its primary vendor after e-mails were sent, e-mails were not cause of that loss of business.
**430 *377 Roxborough, Pomerance & Nye, Nicholas P. Roxborough, Karin R. Leavitt and Lorne Lilienthal for Plaintiffs and Appellants.

Payne & Fears, Daniel M. Livingston and Donald P. Breese, Irvine, for Defendants and Respondents.

*378 **OPINION**
FYBEL, J.

## INTRODUCTION

Bryan Franklin and Franklin-Choi Corporation (FCC) sued Dynamic Details, Inc. (DDi), and Jim Axton, contending three e-mail messages that Axton prepared and sent to companies with which Franklin and FCC did business were defamatory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                                      Page 3
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

and caused interference with contractual and pro-
spective economic relationships. The **431 trial
court concluded the e-mails contained statements
that were defamatory on their face, but granted
summary judgment in favor of DDi and Axton on
the ground the e-mails were privileged communica-
tions under Civil Code section 47, subdivision (c).

We affirm. With respect to the causes of action for
libel and trade libel, the dispositive issue is not
whether the e-mails were privileged under Civil
Code section 47, subdivision (c). Rather, the dis-
positive issue is whether the e-mails were action-
able as libel; more specifically, whether the e-mails
contained opinions based upon fully disclosed,
provably true facts. (See Milkovich v. Lorain Journ-
al Co. (1990) 497 U.S. 1, 19, 110 S.Ct. 2695, 111
L.Ed.2d 1 (Milkovich ); Standing Committee v. Yag-
man (9th Cir.1995) 55 F.3d 1430, 1438-1439
(Standing Committee ).) In compliance with Code
of Civil Procedure section 437c, subdivision
(m)(2), at oral argument we invited the parties to
submit supplemental briefs on that issue. We com-
mend the parties on the excellent letter briefs they
submitted.

We hold two of Axton's e-mails were not actionable
as libel or trade libel because they expressed Ax-
ton's opinions and fully disclosed provably true
facts on which the opinions were based. Axton's e-
mails contained statements that would be defamat-
ory per se if actionable. The statements in Axton's
e-mails expressed Axton's opinions because they
purported to apply copyright and contract law to
facts to reach the conclusion Franklin and FCC
were acting unlawfully. The e-mails disclosed the
facts upon which the opinions were based by direct-
ing the reader to the FCC Web site and (via a Web
link on the FCC Web site) to another company's
Web site. The Web sites were provably true be-
cause their existence, content, and layout were not
in dispute in any material way. A reader of the e-
mails could view those Web sites and was free to
accept or reject Axton's opinions based on his or
her own independent evaluation. Our conclusion is
the result of an application of the principles of
Milkovich and Standing Committee and, in our

view, strikes the proper balance between constitu-
tional guarantees of free speech and the interest in
preventing attacks on reputation. The third e-mail
was not actionable because the statements were true
or vague.

With respect to the causes of action for interference
with contractual relationships and interference with
prospective economic advantage, we *379 con-
clude, as the trial court did, Franklin and FCC
failed to meet their burden of submitting evidence
showing a triable issue of fact exists as to whether
the e-mails caused them damage.

                                FACTS
Franklin formed FCC in 1995 and has been its sole
shareholder since late 1998. FCC serves as a sales
representative for vendors of electronic testing
products and equipment, including USA Micro-
Craft, Inc. (MicroCraft), and Test-X Fixture
Products (Test-X). FCC was MicroCraft's exclusive
sales representative in the western United States,
and MicroCraft was FCC's largest source of busi-
ness.

DDi provides design and manufacturing services to
the electronics manufacturing industry. Axton is
DDi's corporate director of test. MicroCraft sold
DDi several moving contact probers for high speed
precise testing of printed circuit boards. Franklin
testified in his deposition this was an "important"
relationship and both DDi and MicroCraft "needed
each other."

On May 7, 2001, Franklin sent an advisory e-mail
to all of his electronic sales contacts, including Ax-
ton, stating: "Test-X has made its' [sic ] site more
interactive. Now you can get a decent picture of a
part before you order it. [¶] Go here: ht-
tp://4FCC.com/return.cfm?**432         re-
mote=http://www.test-x.com. [¶] Please reply with
REMOVE to be deleted from our list."

The Internet address in Franklin's May 7 e-mail led
the viewer to FCC's Web site; from there, the Test-
X Web site could be accessed by a Web link. The
FCC Web site displayed logos of FCC's principal
vendors. When the Web user clicked on a logo with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                      Page 4
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

the browser, the Web user would be led to that vendor's Web site via a Web link. The FCC Web site acted as the host or frame for Web sites accessed via the Web link. "Framing refers to the process whereby one Web site can be visited while remaining in a previous Web site." *(Digital Equipment Corp. v. AltaVista Technology, Inc. (D.Mass.1997) 960 F.Supp. 456, 461, fn. 12.)*

After receiving Franklin's May 7 e-mail, Axton visited the Test-X Web site by first visiting the FCC Web site and clicking on the Test-X logo. At the Test-X Web site, Axton viewed a catalog of Test-X products. He noticed part of the catalog included parts and part number schemes he believed had been copied from two other companies, Giese International (Giese) and Test Connections, Inc. (TCI). He saw the Giese logo in the catalog on the Test X-Web site.

On May 7, 2001, Axton contacted Ed Shea, TCI's general manager, concerning the FCC Web site. Shea told Axton that "Franklin and Test-X did **\*380** not have permission to copy TCI's materials onto their website." Shea also told Axton that Franklin initially had refused to sign a domestic representative agreement with TCI because the agreement included a trade secret clause, and that Franklin had told Shea he " 'didn't believe there were such things as trade secrets.' " Shea visited FCC's Web site and concluded FCC was representing products for Test-X that competed with TCI, in violation of the written contract between FCC and TCI. TCI terminated FCC as its sales representative. An attorney for TCI contacted Test-X's president and demanded Test-X cease posting TCI "proprietary materials."

Axton spoke with Larry Cannedy of Giese. When Cannedy told Axton that Test-X did not represent Giese, Axton responded, "[t]hen I think it is in your best interests to go to this web site and take a look at this." Axton forwarded Franklin's May 7 e-mail to Cannedy. Soon thereafter, FCC received a letter from an attorney representing Giese stating, "Giese International is extremely unhappy about the test-x.com site carrying unauthorized copies of its product pages without ever having obtained or even

requested permission to do so." The letter continued, "[e]ach page is an original work of Giese International with content which is new, original, and well exceeds the content threshold necessary for copyright protection."

After viewing the Test-X Web site via the FCC Web site, Axton sent the three e-mails forming the basis for this lawsuit.

*The first e-mail.* Axton's first e-mail was sent to Yorio Hidehira, MicroCraft's chief executive officer, on May 15, 2001, and read: "I thought you might find this e-mail from Brian [*sic* ] Franklin very disturbing. Please follow the path. [ ] FCC & Test-X stole copyrighted materials from Giese International & Test Connections and placed this data on their websites as their own. Please review the music wire 2.50 inch crimped prints. [T]hey still have Giese's title block on the documents. [¶] It's bad enough that FCC & Test-X violated U.S. copyright laws when they took this data and tried to make it look like their own. [ ] FCC took Test Connections['] copyrighted materials and plagiarized the data. [ ] FCC had a legal contract with Test Connections (TCI) and pretended to act as sales agent. [¶] Unfortunately, **\*433** FCC represents USA MicroCraft in the U.S. market. What makes you believe that he would honor your intellectual properties? DDI has non-disclosure agreements on file with Giese, TCI, MicroCraft, and FCC. [ ] We take our customers['] and vendors['] intellectual properties very seriously. Now, DDI has been compromised by MicroCraft's U.S. sales agent. DDI does not condone this type of unlawful practices and as such FCC will not be able to participate in any DDI business activity. I am concerned as we are giving MicroCraft, our customer data ... and FCC has access to this data. Also when this incident becomes public in **\*381** the next few days, MicroCraft's relationship with FCC could be misconstrued by DDI's customers and vendors. This is not good and FCC is not a [*sic* ] honorable company."

Axton's e-mail prompted an exchange of e-mails between Axton and Hidehira. Hidehira responded to Axton's first e-mail with an e-mail thanking Ax-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                 Page 5

116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731

**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

ton for the information and stating in part: "We take intellectual properties rights very seriously. However currently, I do not know or understand what Bryan Franklin is doing on the website. [¶] Please understand that FCC does represent Micro-Craft in the West Coast, however not for DDI account.... I will make sure that we keep all information between MicroCraft and DDI."

*The second e-mail.* On May 16, 2001, Axton responded to Hidehira's e-mail by sending him the second e-mail, which read: "Apparently, you misunderstand my intent. [ ] [¶] a. DDi's customers (and competitors) are being led to believe that FCC has an active role in the DDi/MicroCraft relationship. FCC's profound lack of respect for intellectual properties will reflect poorly on MicroCraft & DDi. [¶] b. FCC is clearly involved in this Test-X web site and this constitutes a breach of the DDi/FCC non-discl[o]sure agreement. DDI will not be conducting business with FCC & Test-X. Mr. Franklin has made comments to myself and others as to his belief that trade secrets are bogus. [ ] His words. [¶] We respect your position in regards to this issue. Please understand our situation, FCC has seriously undermined DDI's ability to protect our (& our clients['] and vendors['] ) intellectual property. Therefore, we will not be forwarding any data to Micro-Craft and any ongoing evaluations of MicroCraft products and/or services will be immediately discontinued."

Hidehira responded with an e-mail to Axton announcing, in essence, MicroCraft would end its relationship with FCC. The e-mail stated, in part: "[W]e don't have enough time to investigate all issues, contracts with FCC and legal issues. However I can issue this immediate letter to FCC. [¶] 1. As of May 12, 2001 FCC will stop all communications, interactions, and sales activities between DDI and MicroCraft regarding MicroCraft issues. [¶] 2. As of May 12, 2001 FCC will not receive any compensation with any sales on MicroCraft Products. [¶] 3. FCC will remove the MicroCraft Link from its website immediately. [¶] 4. FCC will not communicate, ask questions, or inquire any information from any MicroCraft employee. [¶] I am prepared

to write a letter like this to Bryan Franklin of FCC. This will insure that all DDI customers' information will be safe with MicroCraft." The record contains no evidence such a letter was ever prepared or sent.

*The third e-mail.* On June 4, 2001, Axton received an e-mail from Dave Runyon of FastFixtures, one of FCC's principal vendors, requesting that DDi *382 consider purchasing a new technology that FastFixtures had developed. In response, Axton sent Runyon the third e-mail stating, in part: "Unfortunately, your **434 product has not been evaluated at this time due to your relationship with FCC. [¶] FCC is not in good standing with DDI due to their intolerance of intellectual properties, copyrights, and trade secrets." Runyon responded with an e-mail to Axton stating, in part: "I do not understand your situation with FCC and neither myself, nor my product should be disqualified on that basis. [¶] I will indeed refrain from any further references to DDI. In fact, I request that you withdraw my product from consideration in any of your facilities.[¶] Your hostile response to my harmless letter has left me with no desire to develop[ ] a relationship."

Axton did not seek legal advice before sending any of the e-mails. Axton contends that before he sent the first e-mail he called Franklin and left a message saying, "Bryan, you need to call me. I am very concerned about this link." Franklin denied ever receiving this message or any communication from Axton.

After June 11, 2001, Franklin made no effort to sell MicroCraft products, having placed the relationship between MicroCraft and FCC "on hold," despite a request by Adelino Sousa, MicroCraft's president, that Franklin continue sales efforts. Sousa expressed concern that Franklin intended to sue DDi, a MicroCraft customer. On July 8, 2001, Franklin sent an e-mail to Sousa stating: "Please begin your search for a Rep in So. Cal. This is not a resignation however, I may resign due to circumstances." Sousa responded with an e-mail to Franklin stating, in part: "I can no longer keep waiting for FCC's response. I am requesting th[at] you send me a Form-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                    Page 6
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)

al Resignation by Tomorrow Afternoon (6[*sic* ]/17/2001). It is not our intent to look for a new rep at this time. MicroCraft will wait approximately 90 days and then review our sales strategy. We can then discuss a new contract if you wish." Franklin responded to Sousa's e-mail with an e-mail of July 16, 2001, stating: "You know the exact date that I put FCC and MicroCraft on hold. I suggest you wait until DDI responds before you or I decide what we do. The choice is yours.... If you choose not to wait and terminate please be my guest."

Franklin resigned from his position as sales representative for MicroCraft, stating in an e-mail dated July 17, 2001, "[t]he relationship that we've had for the last 8+ years has been severed and I find I can no longer work under the current environment/condition."

### PROCEDURAL HISTORY

Franklin and FCC sued DDi and Axton, asserting causes of action for (1) libel per se, (2) trade libel, (3) intentional interference with contractual *383 relationships, (4) intentional interference with prospective economic relationships, and (5) violations of Business and Professions Code section 17200 et seq. Franklin and FCC alleged Axton's e-mails were defamatory per se and disrupted or interfered with Franklin and FCC's business relationships with MicroCraft and several other companies in the electronics testing industry.

DDi and Axton moved for summary judgment and, alternatively, for summary adjudication of causes of action. The trial court granted summary judgment. The trial court, in its tentative decision, concluded: "The e-mails are libel as they have a 'tendency to injure him in his occupation.' Here, the e-mails state that plaintiff 'plagiarized[,]' engaged in 'unlawful practices', 'FCC is not an honorable company' and 'FCC is not in good standing with DDI due to [its] intolerance of intellectual properties....' There is no innuendo, defendant clearly believes plaintiff is engaging in unlawful activity. The communications herein are libel on their face."

**435 The trial court also concluded, however, the

three e-mails were privileged under Civil Code section 47, subdivision (c) because "[i]n making the comments about plaintiff, defendant was attempting to protect Ddi's product," "MicroCraft would be interested in plaintiff's disrespect for intellectual property because it had plaintiff on payroll and a reputation to maintain," and "Fast Fixtures would be interested in that information as it was attempting to sell defendant its product." The court concluded "plaintiff has not demonstrated any actual malice pursuant [to] Lundquist [v. Reusser (1994) 7 Cal.4th 1193], [31 Cal.Rptr.2d 776, 875 P.2d 1279]" and "[t]he content of the communications were [*sic* ]based on what defendant Axton thought to be the truth." The court also concluded "[p]laintiff failed to carry the burden as to the 3rd and 4th causes of action."

Following a hearing, the trial court entered a minute order adopting its tentative ruling as the final ruling and granting summary judgment. Judgment was entered in favor of DDi and Axton. Franklin and FCC timely appealed. We review summary judgment de novo. (Johnson v. City of Loma Linda (2000) 24 Cal.4th 61, 65, 67-68, 99 Cal.Rptr.2d 316, 5 P.3d 874; Village Nurseries v. Greenbaum (2002) 101 Cal.App.4th 26, 35, 123 Cal.Rptr.2d 555.)

### DISCUSSION

I. *Libel Per Se and Trade Libel Causes of Action*
[1] In the first cause of action, Franklin and FCC alleged Axton's three e-mails were libelous on their face. In the second cause of action, Franklin and FCC alleged Axton's three e-mails disparaged Franklin and FCC's services. *384 The relevant law is the same as to libel and trade libel, and the same conditional privileges apply to both causes of action. (ComputerXpress, Inc. v. Jackson (2001) 93 Cal.App.4th 993, 1010-1011, 113 Cal.Rptr.2d 625; 5 Witkin, Summary of Cal. Law (9th ed.1988) Torts, § 576, p. 671.)

[2][3] "Libel is a false and unprivileged publication by writing ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                Page 7
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

to injure him in his occupation." *(Civ.Code, § 45.)* "Trade libel is the publication of matter disparaging the quality of another's property, which the publisher should recognize is likely to cause pecuniary loss to the owner." *(ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at p. 1010, 113 Cal.Rptr.2d 625.) "The sine qua non of recovery for defamation ... is the existence of falsehood." *(Letter Carriers v. Austin* (1974) 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745.) A statement is libel on its face if it "is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." *(Civ.Code, § 45a.)*

Franklin and FCC contend the three e-mails were actionable as libel and/or trade libel because they contained false statements of fact. DDi and Axton do not deny the three e-mails, if untrue, were libelous on their face, as the trial court concluded. They contend, however, the e-mails were not actionable because the messages merely expressed Axton's opinions and disclosed all the facts supporting those opinions. Franklin and FCC counter that the average reader would not understand the e-mails to disclose the factual bases for Axton's statements.

Our analysis starts with *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260, 228 Cal.Rptr. 206, 721 P.2d 87, in which the California Supreme Court strictly **436 distinguished between statements of fact and statements of opinion for purposes of defamation liability. In *Baker,* the court concluded statements of fact may be actionable as libel; statements of opinion are constitutionally protected. *(Ibid.)* However, "[t]his categorical exemption of opinions from the reach of defamation law rested on a passage from *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340, 94 S.Ct. 2997, 41 L.Ed.2d 789," and "[t]he viability of this categorical 'opinion rule' was considered in *Milkovich* [,supra, 497 U.S. 1, 18-19, [110 S.Ct. 2695]]." *(Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1606, 284 Cal.Rptr. 244.)

[4] In *Milkovich, supra,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1, the United States Supreme Court rejected the contention that statements of opinion enjoy blanket constitutional protection. The Supreme Court reasoned that "[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications" *(id.* at p. 19, 110 S.Ct. 2695) because a speaker may still imply "a knowledge of facts which lead **\*385** to the [defamatory] conclusion" *(id.* at p. 18, 110 S.Ct. 2695). The court explained that expressions of opinion may imply an assertion of objective fact. For example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. *(Id.* at pp. 18-19, 110 S.Ct. 2695.) Statements of opinion that imply a false assertion of fact are actionable. *(Id.* at p. 19, 110 S.Ct. 2695.)

[5][6] Thus, after *Milkovich,* the question is not strictly whether the published statement is fact or opinion. Rather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. *(Milkovich, supra,* 497 U.S. at p. 19, 110 S.Ct. 2695; see also *Standing Committee, supra,* 55 F.3d 1430, 1438-1439; *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1383, 88 Cal.Rptr.2d 802; *Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1607, 284 Cal.Rptr. 244; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724, 275 Cal.Rptr. 494.) *Milkovich* did not change the rule that satirical, hyperbolic, imaginative, or figurative statements are protected because "the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact." *(Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1000-1001, 283 Cal.Rptr. 644.)

[7] Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide *(Eisenberg v. Alameda Newspa-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 40    Filed 08/23/2007    Page 9 of 41

10 Cal.Rptr.3d 429                                                    Page 8
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)

*pers. Inc., supra,* 74 Cal.App.4th at p. 1382, 88 Cal.Rptr.2d 802; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837, 52 Cal.Rptr.2d 831), unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood *(Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1608, 284 Cal.Rptr. 244; *Weller v. American Broadcasting Companies, Inc., supra,* 232 Cal.App.3d at p. 1001, fn. 8, 283 Cal.Rptr. 644).

[8] In determining whether a statement is actionable fact or nonactionable opinion, *Baker* instructed courts to use a " 'totality of the circumstances' " test. *(Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 260, 228 Cal.Rptr. 206, 721 P.2d 87.) After *Milkovich,* the **437 same totality of the circumstances test is used to determine whether the statement in question communicates or implies a provably false statement of fact. *(Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1608, 284 Cal.Rptr. 244.) Under the totality of the circumstances test, "[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense.... [¶] Next, the context in which the statement was made must be considered." *386(Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260-261, 228 Cal.Rptr. 206, 721 P.2d 87.) "*Milkovich* did not substantially change these principles." *(Moyer v. Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d at p. 724, 275 Cal.Rptr. 494.)

[9] Applying the totality of the circumstances test, we conclude Axton's first and second e-mails are best characterized as Axton's protected opinions that Franklin and FCC stole copyrighted material, plagiarized data, breached a nondisclosure agreement with DDi, compromised DDi, and were dishonorable. In reaching this conclusion, we are persuaded by the analysis of *Coastal Abstract Service, Inc. v. First American Title Ins. Co.* (9th Cir.1999) 173 F.3d 725 *(Coastal Abstract )* and *Standing Committee, supra,* 55 F.3d 1430.

In *Coastal Abstract, supra,* 173 F.3d 725, 729, an officer of the defendant title insurance company

stated the plaintiff, an escrow company, "was not licensed in California" to engage in the escrow business. The Ninth Circuit Court of Appeals held that statement was not actionable as a matter of law because it expressed an opinion based upon fact. "Thus the statement that Coastal was operating illegally without a California license might present a triable claim if in fact Coastal had a California license. There is no dispute, however, that Coastal had no California license (and was not affiliated with a California licensee) at the time First American made the statement. The only claim of falsity concerns the statement or suggestion that California's statute applied to the activities of Coastal, which was (and apparently still is) a matter of opinion." *(Id.* at p. 732.)

In *Standing Committee, supra,* 55 F.3d 1430, an opinion authored by Judge Kozinski, the Ninth Circuit Court of Appeals considered the propriety of the district court's disciplinary action against Attorney Stephen Yagman for making several statements about District Judge Keller. In one statement, Yagman said Judge Keller " 'has a penchant for sanctioning Jewish lawyers: me, David Kenner and Hugh Manes. I find this to be evidence of anti-semitism.' " *(Id.* at p. 1438.) The Ninth Circuit concluded the first part of the statement was fact, and was true--Kenner, Manes, and Yagman were all Jewish attorneys, and Judge Keller sanctioned them. *(Ibid.)* The Ninth Circuit characterized the statement " 'I find this to be evidence of anti-semitism' " as opinion because it conveyed Yagman's personal belief that Judge Keller is anti-semitic. *(Ibid.)* Because part of the statement was opinion, "it may be the basis for sanctions only if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false." *(Id.* at pp. 1438-1439.)

The Ninth Circuit, using examples from section 566 of the Restatement Second of Torts, contrasted opinion statements based upon expressly stated facts with opinion statements based on implied, undisclosed facts. *387(Standing Committee, supra,* 55 F.3d at p. 1439.) "The statement, 'I think Jones is an alcoholic,' for example, is an expression of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                                              Page 9
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)

opinion based on implied facts, [citation], because the statement 'gives rise to the inference that there are **438 undisclosed facts that justify the forming of the opinion,' [citation]. Readers of this statement will reasonably understand the author to be implying he knows facts supporting his view--*e.g.*, that Jones stops at a bar every night after work and has three martinis. If the speaker has no such factual basis for his assertion, the statement is actionable, even though phrased in terms of the author's personal belief." *(Ibid.)*

[10] The Ninth Circuit provided this example from section 566 of the Restatement Second of Torts of an opinion based on expressly stated facts: " '[Jones] moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair ... with a drink in his hand. I think he must be an alcoholic.' [Citation.]" *(Standing Committee, supra, 55 F.3d at p. 1439.)* This opinion disclosed all the facts on which it was based and did not imply there are other, unstated facts supporting the belief Jones is an alcoholic. The opinion that Jones ' 'must be an alcoholic' " is actionable only if the disclosed facts are false and defamatory. "A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *(Ibid.)* The rationale for this rule is that "[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *(Ibid.)* When the facts supporting an opinion are disclosed, "readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts." *(Ibid.;* see also *Partington v. Bugliosi* (9th Cir.1995) 56 F.3d 1147, 1156-1157 ["when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment"]; *Chapin v. Knight-Ridder, Inc.* (4th Cir.1993) 993 F.2d 1087, 1093["[b]ecause the bases

for the ... conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related"]; *Phantom Touring, Inc. v. Affiliated Publications* (1st Cir.1992) 953 F.2d 724, 730 [if author discloses basis for statement, it can only be read as the author's "personal conclusion about the information presented, not as a statement of fact"].)

[11] Axton's statements in the first and second e-mails that FCC stole copyrighted material and plagiarized data are similar to the comment in *Coastal Abstract, supra,* 173 F.3d 725 that Coastal was operating illegally without a license. Axton's statements purported to interpret copyright law and contract law and apply that law to fully disclosed facts--the FCC Web site and its link *388 to the Test-X Web site--to conclude Franklin and FCC engaged in unlawful conduct. Axton's comments similarly are opinion even if construed as accusing Franklin of criminal activity. "Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed." *(Nicosia v. De Rooy* (N.D.Cal.1999) 72 F.Supp.2d 1093, 1103.)

The first and second e-mails disclosed the facts on which Axton's opinions were based and did not imply the existence of any other facts on which the opinions were based. The first e-mail enclosed Franklin's e-mail and invited the reader to "follow the path" leading to the FCC and Test-X Web sites. The first e-mail then invited the reader to "review the music **439 wire 2.50 inch crimped prints" and described the prints as having Giese's "title block" on them. The first e-mail thus disclosed Franklin's e-mail, the FCC Web site, the Test-X Web site, and the prints found on the Test-X Web site as the bases for the opinions stated.

Franklin and FCC argue in their reply letter brief the average reader of the first e-mail would not understand the e-mail fully disclosed the basis for Axton's opinions. A reasonable reader, Franklin and FCC argue, "would not be able to discern that the link [from] the FCC website to the Test-X website was the basis for the defamatory statements in Ax-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                Page 10
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)

ton's e-mails to MicroCraft." We disagree. The first e-mail identified the link to the FCC Web site and the link to the Test-X Web site and neither the first e-mail nor the second e-mail expressed or implied any other factual basis for the opinions. Although the process of accessing the factual bases for the opinions involved clicking onto each Web site, the dispositive point is those factual bases were disclosed and were accessible to the reader.

The facts upon which Axton's opinions were based were provably true because the existence, content, and layout of the Web sites were not in dispute in any material way. Because we are not determining the truth or reasonableness of Axton's opinions, the issue in determining whether the Web sites were provably true is not whether the Web sites made truthful assertions of fact, but whether the Web sites in fact existed and made the assertions claimed. Franklin's e-mail, the FCC Web site, and the Test-X Web site existed, and the parties agree on their layout and content. Although the parties dispute the type size of the Giese logo on the Test-X Web site, they do not in any other respect dispute the layout or content of the Web sites or of Franklin's e-mail. It is undeniable the FCC Web site frames the Test-X Web site when the Web site links are used.

The first two e-mails expressed Axton's opinions about the Web sites. The reader, Hidehira, was invited to view the Web sites. He was "free to accept or reject the author's opinion based on [his] own independent evaluation of the *389 facts" (_Standing Committee, supra,_ 55 F.3d at p. 1439) and " 'free to form another, perhaps contradictory opinion from the same facts' " (_id._ at p. 1440). Finally, the statement in the first e-mail that FCC is not an "honorable company" and the statement in the second e-mail that FCC displayed a "profound lack of respect for intellectual properties" are classic assertions of subjective judgment.

In determining whether the first two e-mails implied a provably false factual assertion, we must also consider the context in which the e-mails were made. (_Baker v. Los Angeles Herald Examiner,_ _supra,_ 42 Cal.3d at pp. 260-261, 228 Cal.Rptr. 206, 721 P.2d 87; _Moyer v. Amador Valley J. Union High School Dist., supra,_ 225 Cal.App.3d at pp. 724-725, 275 Cal.Rptr. 494.) "This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." (_Baker v. Los Angeles Herald Examiner, supra,_ 42 Cal.3d at p. 261, 228 Cal.Rptr. 206, 721 P.2d 87.) The circumstances in which the e-mails were prepared, sent, and understood support our conclusion the e-mails contained protected statements. Axton received Franklin's e-mail, reviewed the FCC Web site, and formed the opinions expressed in the e-mails. These circumstances support the conclusion Axton's opinions in the first and second e-mails were based only upon the Web sites.

Axton is not, and did not purport to be, an attorney. The average reader therefore **440 would not have assumed the statements in the first and second e-mails had the weight of a legal opinion. Although Axton did not temper his opinions with words of transparency, neither did he present his opinions as legal truths framed in legal verbiage. Indeed, his statements that Franklin "stole" copyrighted material, "compromised" DDi, and "plagiarized" data appear in context as rhetorical hyperbole. (_Moyer v. Amador Valley J. Union High School Dist., supra,_ 225 Cal.App.3d at p. 726, 275 Cal.Rptr. 494; see also _Letter Carriers v. Austin, supra,_ 418 U.S. at p. 283, 94 S.Ct. 2770 [" 'traitor[s]' " understood to mean that plaintiffs' actions were reprehensible, not that plaintiffs had committed treason]; _Greenbelt Coop. Pub. Assn. v. Bresler_ (1970) 398 U.S. 6, 13-14, 90 S.Ct. 1537, 26 L.Ed.2d 6 [" 'blackmail' " a vigorous epithet used to describe unreasonable negotiations]; _Rosenaur v. Scherer_ (2001) 88 Cal.App.4th 260, 278-279, 105 Cal.Rptr.2d 674 [calling plaintiff "thief" and "liar" during political campaign was hyperbole]; _Morningstar, Inc. v. Superior Court_ (1994) 23 Cal.App.4th 676, 687-694, 29 Cal.Rptr.2d 547 [title stating " 'Lies, Damn Lies, and Fund Advertisements' " held not to imply money management fund actually lied].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 40    Filed 08/23/2007    Page 12 of 41

10 Cal.Rptr.3d 429                                                                                    Page 11
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)

As Franklin and FCC point out, Hidehira was a Japanese national and professed to a lack of understanding of American law, but those facts do not **\*390** suggest the first two e-mails implied a provably false factual assertion. [FN1] The specific understanding of Hidehira--the only and therefore "average reader" of the two e-mails to MicroCraft--supports the conclusion the e-mails adequately disclosed the factual basis for the opinions expressed. Hidehira, given his position, understood Internet matters, including such concepts as framing and Web links, and could navigate the path to the FCC Web site and the Test-X Web site.

> FN1. Axton and DDi argue Hidehira's nationality and lack of understanding of American law should not be considered because the test for whether a statement is fact or opinion is an objective test. *(Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1404, 88 Cal.Rptr.2d 843 ["when analyzing the statements in question, courts do so from the perspective of the average reader, not a person trained in the technicalities of the law"].) But in analyzing the context in which the statements were made, courts must look to "the knowledge and understanding of the audience to whom the publication was directed" *(Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 261, 228 Cal.Rptr. 206, 721 P.2d 87) and measure the effect of a publication by its " 'natural and probable effect upon the mind of the average *reader* ' " *(Morningstar, Inc. v. Superior Court, supra,* 23 Cal.App.4th at p. 688, 29 Cal.Rptr.2d 547, italics added). Here, the audience to whom the first two e-mails were directed was Hidehira.

The third e-mail, to Dave Runyon of FastFixtures, is an easier call. The e-mail was not actionable. Axton's statements "your product has not been evaluated at this time due to your relationship with FCC" and "FCC is not in good standing with DDI" were true. Axton's statement that FCC was "intoleran [t] of intellectual properties, copyrights, and trade

secrets" was too vague to be actionable. *(Moyer v. Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d at pp. 725-726, 275 Cal.Rptr. 494; see also *Chapin v. Knight-Ridder, Inc., supra,* 993 F.2d at p. 1093 [" 'Hefty' is just too subjective a word to be proved false"].)

Our conclusion that Axton's e-mails conveyed protected statements properly balances, we believe, the First Amendment guarantee of free speech and society's " 'pervasive and strong interest in preventing and redressing attacks upon reputation.' " *(Milkovich, supra,* 497 U.S. at p. 22, 110 S.Ct. 2695.)* Franklin's natural and **\*\*441** compensable interest in his and FCC's reputation was protected because the first and second e-mails disclosed the factual basis for Axton's opinions. The reader could access the FCC Web site and link to the Test-X Web site, and based upon those Web sites could decide whether to accept or reject Axton's opinions.

Because we conclude the three e-mails sent by Axton were not actionable as libel or trade libel, we do not reach the issue whether the e-mails were privileged under Civil Code section 47, subdivision (c).

**\*391** *II. Interference with Contractual Relations and Interference with Prospective Economic Relationships Causes of Action*

In the third and fourth causes of action, Franklin and FCC alleged Axton's e-mails interfered with Franklin and FCC's existing contracts and future economic relationships with MicroCraft and several other companies. We conclude Franklin and FCC failed to show a triable issue regarding causation.

[12] A cause of action for interference with contractual relations and a cause of action for interference with prospective economic relations both require the plaintiff to prove causation. *(Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 [interference with contract]; *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 595, 52 Cal.Rptr.2d 877 [interference with prospective economic relations].) "A cause of injury,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                                                    Page 12
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm." (BAJI No. 3.76; see also *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052-1053, 1 Cal.Rptr.2d 913, 819 P.2d 872.)

[13] First, we address Franklin and FCC's allegation Axton's e-mails interfered with contracts and economic relationships other than those with MicroCraft. In support of the motion for summary judgment, DDi and Axton presented declarations showing FCC lost no business with companies other than MicroCraft as a result of Axton's e-mails. Franklin and FCC produced no evidence in opposition. Franklin and FCC conceded this point in their separate statement, stating: "While Plaintiffs[ ] may not have written evidence of Defendants' interference with any companies other than MicroCraft and Fast Fixtures, these e-mails indicate that Defendants did, in fact, interfere with Plaintiffs' relationships." However, Axton's e-mails alone do not raise an inference of causation sufficient to defeat summary judgment. Franklin and FCC produced no evidence of interference with their relationship with FastFixtures. The exchange of e-mails between Axton and Runyon actually showed Axton's e-mails disrupted or destroyed *DDi's* relationship with Fast-Fixtures. Franklin and FCC do not contend otherwise on appeal, but argue only that they produced evidence creating a triable issue of fact as to interference with their relationship with MicroCraft.

Second, with respect to Franklin and FCC's relationship with MicroCraft, DDi and Axton submitted in support of the motion for summary judgment the declaration of Adelino Sousa, who stated: "Nothing that DDI or Jim Axton did had anything to do with the end of Mr. Franklin's role as a Microcraft sales representative. Mr. Franklin failed to perform his responsibilities as a Microcraft sales representative and was damaging Microcraft's relationship *392 with DDI with his threat to initiate litigation against DDI. Mr. Axton and DDI did not interfere with the relationship between FCC and Franklin on the one hand, and MicroCraft on the other. **442 Nothing Mr. Axton or DDI has said or done has in any way affected my opinion of Mr. Franklin or FCC." Ac-

cording to Sousa, MicroCraft has made no commissionable sales to DDi since July 2001, when Franklin ceased being a MicroCraft sales representative. Sousa testified in his deposition that Axton's e-mails did not influence MicroCraft's relationship with FCC. Sousa was concerned when Franklin threatened to sue DDi because "[a]s a vendor, if customers fear that you are going to sue them, they are not going to want to do business with you."

DDi also submitted portions of Franklin's deposition transcript in support of the motion for summary judgment. Franklin testified Sousa asked him to continue to sell MicroCraft products after June 11, 2001, but Franklin placed the relationship "on hold."

This evidence was sufficient to meet DDi's initial burden of production to make a prima facie showing that there was not a triable issue of material fact on the issues of interference and of causation of damages. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 107 Cal.Rptr.2d 841, 24 P.3d 493.) The burden shifted to Franklin and FCC to show the existence of a triable issue regarding whether Axton's e-mails were a substantial factor in bringing about injury or damage. Franklin and FCC, in their separate statement in opposition to the summary judgment motion, identified the July 2001 exchange of e-mails between Franklin and Sousa as creating a triable issue as to causation. FCC and Franklin also relied upon Hidehira's May 16, 2001 e-mail to Axton and Franklin's declaration as creating a triable issue. [FN2] We analyze this evidence.

> FN2. Franklin and FCC do not contend Axton's e-mails to Hidehira create a triable issue as to causation. Indeed, while Axton's e-mails constitute evidence of acts intended to induce a breach or disruption of a contractual relationship, Axton's e-mails alone do not support a reasonable inference of causation of damages.

First, the exchange of e-mails between Sousa and Franklin did not create a triable issue of fact regard-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Cal.Rptr.3d 429                                                                Page 13
116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)

ing causation. On July 8, 2001, Franklin sent an e-mail to Sousa stating: "Please begin your search for a Rep in So. Cal. This is not a resignation however, I may resign due to circumstances." Sousa responded with an e-mail to Franklin stating, in part: "I can no longer keep waiting for FCC's response. I am requesting th[at] you send me a Formal Resignation by Tomorrow Afternoon (6[*sic* ]/17/2001). It is not our intent to look for a new rep at this time. MicroCraft will wait approximately 90 days and then review our sales strategy. We can then discuss a new contract if you *393 wish." Franklin responded to Sousa's e-mail with an e-mail of July 16, 2001, stating: "You know the exact date that I put FCC and MicroCraft on hold. I suggest you wait until DDI responds before you or I decide what we do. The choice is yours.... If you choose not to wait and terminate please be my guest."

We construe these e-mails favorably to Franklin and FCC as establishing MicroCraft did ask for Franklin to resign as a sales representative. Nonetheless, the e-mails do not reveal a causal nexus between Axton's e-mails and MicroCraft's request for Franklin's resignation. The e-mails do not contradict Sousa's declaration that Axton's e-mails had nothing to do with the end of Franklin's role as a Microcraft sales representative. The e-mails do not, therefore, tend to show Axton's e-mails were a substantial factor in bringing about MicroCraft's request for Franklin's resignation.

Second, Hidehira, in his May 16, 2001 e-mail to Axton, stated he was prepared to send Franklin a letter announcing MicroCraft **443 would cease all communications and business activities with FCC. The record contains no evidence, however, that such a letter was ever sent. To the contrary, Franklin testified that in June 2001 Sousa encouraged him to continue selling MicroCraft products and Franklin placed the relationship between Micro-Craft and FCC on hold.

Finally, Franklin's declaration failed to create a triable issue of fact regarding causation. Franklin declared: "Prior to the e-mails that form the basis of the instant action, FCC had always been a profit-able company making in excess of $100,000 every year it was in business, a large portion of which was derived from MicroCraft sales. [¶] ... [¶] ... Almost immediately upon receipt of Defendant Axton's e-mails, MicroCraft severely limited its relationship with Plaintiffs and subsequently specifically requested that Plaintiffs cease doing business with MicroCraft[.] [¶] ... Immediately following the libelous e-mails from Defendants, Plaintiffs' sales dropped dramatically and, therefore, so did the commission payments Plaintiffs were entitled to. In addition, subsequent to the e-mails at issue, Plaintiffs lost many of their principals and clients."

Franklin's declaration does not set forth a causal nexus between Axton's e-mails and FCC's loss of business. Rather, the declaration attempts to establish causation through a temporal sequence: Because the e-mails preceded FCC's loss of Micro-Craft's business, the e-mails caused the loss. A *394 cause and effect relationship based upon such a temporal sequence is a classic example of the logical fallacy of post hoc, ergo propter hoc (literally, "after this, therefore because of this"). (See *Bland v. Southern Pac. R. Co.* (1884) 65 Cal. 626, 628, 4 P. 672; *People v. Abraham* (1986) 185 Cal.App.3d 1221, 1231, 230 Cal.Rptr. 325 (conc. opn. of Poché, J.); *Huskey v. City of San Jose* (9th Cir.2000) 204 F.3d 893, 899; *Choe v. I.N.S.* (9th Cir.1993) 11 F.3d 925, 938 (conc. & dis. opn. of Alarcon, J.).) With respect to causation, "[m]ore than *post hoc, ergo propter hoc* must be demonstrated." *(Motorola Communication & Electronics, Inc. v. Department of General Services* (1997) 55 Cal.App.4th 1340, 1345, 64 Cal.Rptr.2d 477; see also *Hardt v. Heidweyer* (1894) 152 U.S. 547, 558, 14 S.Ct. 671, 38 L.Ed. 548.) Thus, "it is a false generalization to suppose that because a sinking follows a collision thirty-nine days later, the sinking necessarily was an effect of the collision." *(Dreijer v. Girod Motor Co.* (5th Cir.1961) 294 F.2d 549, 555.)

Similarly, it is a false generalization to infer that because FCC lost MicroCraft's business after Axton's e-mails, the loss of business necessarily was an effect of the e-mails. Put another way, a trier of

116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731
**(Cite as: 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429)**

fact could not draw a reasonable inference that Axton's e-mails to Hidehira were a substantial factor in bringing about FCC's lost business merely because the e-mails preceded the loss. Franklin's declaration, as the other evidence Franklin and FCC relied upon to show causation, failed to present a causal nexus between Axton's e-mails and Franklin and FCC's loss of business from MicroCraft sufficient to create a triable issue of fact.

Franklin and FCC failed to meet their burden of producing evidence showing the existence of a triable issue of fact as to causation of damages; therefore, we affirm summary adjudication of the causes of action for interference with contractual relations and interference with prospective economic relations.

### III. *Cause of Action Under Business and Professions Code Section 17200*

Franklin and FCC concede the fifth cause of action for violations of **\*\*444**Business and Professions Code section 17200 is dependent upon the other causes of action. Because the first four causes of action were properly adjudicated against Franklin and FCC, the fifth cause of action was properly adjudicated against them as well.

### \*395 Disposition

The judgment is affirmed. Respondents to recover costs incurred on appeal.

WE CONCUR: MOORE, Acting P.J., and IKOLA, J.

116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 04 Cal. Daily Op. Serv. 1850, 2004 Daily Journal D.A.R. 2731

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 15
## To Appendix to California State Authorities

Westlaw.

32 Cal.Rptr.3d 626                                                                                      Page 1
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731
**(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)**

**C**

Court of Appeal, First District, Division 4, California.
Khadija A. GHAFUR, Plaintiff and Appellant,
v.
Jonathan BERNSTEIN et al., Defendants and Respondents.
**No. A104918.**

Aug. 11, 2005.
Certified for Partial Publication. [FN*]
FN* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II-C.

**Background:** Former superintendent of system of public charter schools sued organization and its officers for libel, arising from statements made to former state Superintendent of Public Instruction, and posting of such statements on organization's website, urging investigation of plaintiff's alleged ties to terrorist group. The Superior Court, City and County of San Francisco, No. CGC-03-416294, Donald S. Mitchell, J., granted defendant's special motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute. Plaintiff appealed.

**Holding:** The Court of Appeal, Kay, P.J., held that alleged libel pertained to plaintiff's role as a public official, and thus plaintiff was required to show actual malice in order to prevail.
Affirmed.

West Headnotes

**[1] Pleading** ☞360
302k360 Most Cited Cases
In ruling on a special motion to strike a complaint under the anti-SLAPP (strategic lawsuit against public participation) statute, the court must first decide whether the defendant has shown that the challenged cause of action arises out of activity protected under the anti-SLAPP law; if that showing is made, the court must then determine whether the

plaintiff has demonstrated a probability of prevailing on the claim. West's Ann.Cal.C.C.P. § 425.16.

**[2] Libel and Slander** ☞36
237k36 Most Cited Cases
A communication to an official agency which is designed to prompt action is deemed part of an official proceeding for purposes of statutory litigation privilege. West's Ann.Cal.Civ.Code § 47(b).

**[3] Libel and Slander** ☞51(5)
237k51(5) Most Cited Cases
Libel suit which was brought by former superintendent of system of public charter schools pertained to plaintiff's role as a "public official," and thus plaintiff was required to show actual malice in order to prevail; plaintiff, who sued organization and its officers for libel, arising from statements made to former state Superintendent of Public Instruction urging investigation of plaintiff's alleged ties to terrorist group and posting of such statements on organization's website, was superintendent of, and primary spokesperson for, fasting growing charter school system in state, and thus there was manifestly strong public interest in open discussion of her job performance and fitness.
See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 535; Annot., Who is "Public Official" for Purposes of Defamation Action (1996) 44 A.L.R.5th 193.

**[4] Libel and Slander** ☞51(5)
237k51(5) Most Cited Cases
To recover for defamation relating to their official conduct, "public officials" must show that the statements were made with malice, that is, knowledge of their falsity or reckless disregard for their truth.

**[5] Libel and Slander** ☞48(2)
237k48(2) Most Cited Cases
For purposes of libel claim, "public official"s are held to a different rule than private individuals because they assume a greater risk of public scrutiny by seeking public office, and generally have greater access to channels of effective communication to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 Cal.Rptr.3d 626                                                    Page 2
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731
**(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)**

rebut false charges.

**[6] Libel and Slander** &#x2290;48(2)
237k48(2) Most Cited Cases
Whether someone is a "public official" for purposes of libel claim is determined according to federal standards, according to which the public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

**[7] Libel and Slander** &#x2290;48(2)
237k48(2) Most Cited Cases
The strong public interest in ensuring open discussion of their job performance warrants the conclusion that school board members are "public officials" for purposes of a libel claim.

**627 Brian Beckwith, Palo Alto, CA, Attorney for Appellant.

Susan H. Handelman, Terry Anastassiou, Ropers, Majeski, Kohn & Bentley, Redwood City, CA, Attorneys for Respondents.

KAY, P.J.

*1232 Plaintiff and appellant Khadija A. Ghafur sued defendants and respondents the Anti-Defamation League of B'nai B'rith (ADL), ADL's Regional Director, Jonathan Bernstein, and ADL's Regional Board Chair, Gil Serota, for libel for statements in a letter from Bernstein and Serota on behalf of the ADL to former State Superintendent of Public Instruction Delaine Eastin urging an investigation into plaintiff's links to an Islamic terrorist organization, and a suspension of public funding for the charter school system plaintiff managed. This is an appeal from an order granting defendants' motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) law (Code Civ. Proc., § 425.16) and from the resulting judgment against plaintiff.

*1233 In the published portion of the opinion, we hold that the alleged libel pertained to plaintiff's role as a public official, and we explain why that conclusion, and the one we draw in the unpublished

portion of the opinion--that there is no clear and convincing evidence defendants acted with actual malice in making the challenged statements--are dispositive in defendants' **628 favor. We affirm the order and judgment.

**I. BACKGROUND**

Prior to January 16, 2002, plaintiff was the superintendent of the Gateway Academy public charter schools (Gateway) chartered by the Fresno Unified School District (FUSD). According to December 20, 2001, and January 2, 2002, articles in the Fresno Bee, Gateway opened three sites in September 2000 and thereafter became the fastest growing network of charter schools in California, which at its peak operated 14 schools for about 1,000 students from the Bay Area to Southern California.

A December 17, 2001, article in the San Francisco Chronicle reported that students at the Gateway school in Sunnyvale were paying tuition, studying Islam in class, and praying with their teachers. Plaintiff denied being aware of the situation at the Sunnyvale school, and severed Gateway's ties with the school the day after she was contacted by the Chronicle.

The January 2, 2002, Fresno Bee article said that Gateway was being investigated by law enforcement agencies and might soon lose its charter. The investigations were apparently focused on Gateway's spending, school sites, and parent corporation, which was founded by plaintiff. State Superintendent of Public Instruction Delaine Eastin was threatening to cut off Gateway's funding if allegations about teaching religion at certain of its sites and charging tuition were not answered. Although Gateway received about $1.1 million in state funds in the preceding academic year, and $672,900 in state funds along with a private loan of $630,000 in the 2002 academic year, it was reporting an indebtedness of $1.3 million. The FUSD had asked Gateway to submit an itemized account of its spending and explain its $1.3 million debt. The article said that if adequate information was not provided by the following Friday, Marilyn Shepard, head of FUSD's charter school department, would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 Cal.Rptr.3d 626                                                                                    Page 3
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731
(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)

ask the FUSD board to terminate Gateway's charter. Plaintiff thought that Gateway was in the spotlight because of "fears and rumors about Muslims" following the September 11, 2001, terrorist attacks, but FUSD officials said that their concerns were legitimate and that Gateway "wasn't being treated unfairly because some members are Muslim."

On January 10, 2002, the ADL under defendants Bernstein's and Serota's signatures sent the letter to Delaine Eastin that is the subject of this lawsuit. *1234 The letter called for an immediate suspension of Gateway's funding, and urged an investigation of religious instruction in religious schools, and of Gateway's link to an Islamic terrorist organization called Al-Fuqra. The letter referred accurately to news reports stating that plaintiff was an officer of "Muslims of the Americas," that Muslims of the Americas was a corporate front for Al-Fuqra, and that members of Al-Fuqra had committed murders and bombings in the United States. The letter described Muslims of the Americas as "a virulently anti-Semitic, Islamic extremist group."

Gateway's charter was terminated by the FUSD on January 16, 2002, because of fiscal mismanagement, failure to obtain fire marshal approval for facilities, and failure to obtain criminal background clearances for employees. According to the declaration of FUSD official Shepard, the ADL's January 10, 2002, letter to Eastin was not presented to or considered by the FUSD in connection with the charter revocation. She had recommended revocation of the charter, and a vote on the revocation had been scheduled, before the letter was sent. [FN1] At some point after **629 Gateway's charter was revoked, the ADL posted the letter on its website.

> FN1. Plaintiff does not contend that the letter played any role in the charter's revocation.

Plaintiff's complaint for libel alleged that the Eastin letter was maliciously false and defamatory in stating that plaintiff was an officer of a virulently anti-Semitic Islamic extremist group, and in linking plaintiff, Gateway, and the Muslims of the Amer-

icas to a terrorist organization.

In support of their motion to strike, defendants submitted the above-referenced news articles, and many others detailed below in our discussion of the malice issue, that documented the activities of Al-Fuqra, and the link between Al-Fuqra and Muslims of the Americas. Defendants also submitted Nevada Secretary of State records showing plaintiff as the secretary of a corporation called "Muslims of America, Inc."

Plaintiff submitted a declaration in opposition to the motion stating that she had been a practicing Muslim since 1971, and that she was not anti-Semitic. To her knowledge, Muslims of the Americas, Inc. had never sponsored or supported violence or terror. She had worked with women's groups in conjunction with Muslims of the Americas, Inc. on "refugee outreach, educational programs and social service activities," but had never been an officer or employee of that corporation. She had been secretary of a "wholly different and unrelated Nevada non-profit corporation, Muslims *of* America, Inc," which never conducted any business or served as a front for any individual or entity. She believed that defendants were aware of the difference between the two corporations, and knew in January 2002 that she was not an *1235 officer of Muslims of the Americas, Inc. because they had been tracking that organization since the 1980s.

In its statement of decision on the granting of the motion to strike, the court found that plaintiff's libel claim was subject to the anti-SLAPP law because the transmission of the January 10, 2002, letter to Superintendent Eastin, and the posting of the letter on ADL's website, were "protected First Amendment conduct." The court concluded that plaintiff could not demonstrate a probability of prevailing on her claim because sending the letter to Eastin was privileged under Civil Code section 47 (hereafter section 47), subdivision (b), and posting the letter on the website was privileged under section 47, subdivision (d). Alternatively, the court found that plaintiff had no probability of prevailing because she was a limited purpose public figure, and "may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 Cal.Rptr.3d 626                                                                                      Page 4
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731
**(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)**

[also] be considered" a public official, with respect to the statements at issue, and there was insufficient evidence that the allegedly false statements in the letter were made with actual malice.

## II. DISCUSSION

A. *Arguments Raised*

[1] In ruling on a motion to strike, the court must first decide whether the defendant has shown that the challenged cause of action arises out of activity protected under the anti-SLAPP law; if that showing is made, the court must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685.) It is not disputed that plaintiff's libel claim arises out of acts "in furtherance of [defendants'] right of petition or free speech under the United States or California Constitution in connection with a public issue" (Code Civ. Proc. § 425.16, subd. (b)(1)), and thus satisfies the first prong of the anti-SLAPP test. The issue is whether plaintiff has established a probability of prevailing on the claim.

**\*\*630** [2] It is conceded that the letter in question was privileged insofar as it was communicated to Superintendent Eastin. The letter sought a suspension of funding for Gateway, and asked for an investigation of ADL's allegations against Gateway and plaintiff. "A communication to an official agency which is designed to prompt action" (*Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1439, 114 Cal.Rptr.2d 69) is deemed part of an official proceeding for purposes of section 47, subdivision (b), which provides that a publication made in any "official proceeding authorized by law" is privileged. (See *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 362-364, 7 Cal.Rptr.3d 803, 81 P.3d 244 [citing and discussing numerous cases applying this privilege "to complaints to governmental agencies requesting that the agency investigate or remedy wrongdoing"].)

[3] **\*1236** Plaintiff contends that she can nevertheless prevail on her libel claim based on the posting

of the letter on ADL's website. She submits that this public broadcast of the letter, unlike the original letter itself, was not privileged. (See *King v. Borges* (1972) 28 Cal.App.3d 27, 34, 104 Cal.Rptr. 414 [absolute privilege covering letter to Division of Real Estate alleging realtor's malfeasance did not extend to copies of letter distributed to persons outside the state agency].) Defendants maintain that the website posting was privileged under section 47, subdivision (d)(1)(C) and (D), which protects fair and true reports in a "public journal" of anything said in the course of a public official proceeding. Defendants argue that ADL's website, like a newspaper, magazine, or television broadcast (see *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1558, 1 Cal.Rptr.3d 245; *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 246, 83 Cal.Rptr.2d 677; *Green v. Cortez* (1984) 151 Cal.App.3d 1068, 1073, 199 Cal.Rptr. 221), qualifies as a "public journal" because the ADL has been judicially recognized as an entity that engages in journalistic activity (see *Anti-Defamation League of B'nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1092-1093, 79 Cal.Rptr.2d 597 [noting also, however, that many of ADL's activities "are unrelated to conventional journalism"] ).

Alternatively, defendants argue that plaintiff cannot establish a probability of prevailing because she was either a limited purpose public figure, or a public official, in connection with the alleged libel, and there is no clear and convincing evidence that the challenged statements were made with actual malice, as required by the *New York Times* (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686) rule. We conclude that plaintiff was a public official, and that she has not established the requisite malice to prevail on her libel cause of action. In view of these conclusions, we need not decide whether plaintiff was a limited purpose public figure, and we need not address defendants' claim of privilege under section 47, subdivision (d).

B. *Whether Plaintiff was a Public Official*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 Cal.Rptr.3d 626                                                                                    Page 5
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731
(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)

[4][5] To recover for defamation relating to their official conduct, public officials must show that the statements were made with knowledge of their falsity or reckless disregard for their truth. *(New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279-280, 84 S.Ct. 710.) This rule extends to "anything which might touch on an official's fitness for office." *(Garrison v. Louisiana* (1964) 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125.) The rule reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and **631 wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *(New York Times Co. v. Sullivan, supra,* 376 U.S. at p. 270, 84 S.Ct. 710.) Public *1237 officials are held to a different rule than private individuals because they assume a greater risk of public scrutiny by seeking public office, and generally have greater access to channels of effective communication to rebut false charges. *(Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789.)

[6] Whether someone is a "public official" for this purpose is determined according to federal standards. *(Rosenblatt v. Baer* (1966) 383 U.S. 75, 84, 86 S.Ct. 669, 15 L.Ed.2d 597; *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1610, 284 Cal.Rptr. 244.) Under those standards, "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *(Rosenblatt v. Baer, supra,* 383 U.S. at p. 85, 86 S.Ct. 669.) The designation applies where the individual's "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all governmental employees...." *(Id.* at p. 86, 86 S.Ct. 669.) "The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *(Id.* at p. 86-87, fn. 13, 86

S.Ct. 669.)

Who qualifies as a "public official" has been litigated in many cases throughout the country (see Annot. (1996) 44 A.L.R.5th 193 [collecting decisions]), and the issue has arisen a number of times in California. Under our precedents, a child welfare worker *(Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1613, 284 Cal.Rptr. 244), a police officer *(Gomes v. Fried* (1982) 136 Cal.App.3d 924, 934, 186 Cal.Rptr. 605), and a former city attorney and lawyer for a city redevelopment agency *(Weingarten v. Block* (1980) 102 Cal.App.3d 129, 139, 162 Cal.Rptr. 701) have been found to be public officials. A public school teacher *(Franklin v. Benevolent Etc. Order of Elks* (1979) 97 Cal.App.3d 915, 924-925, 159 Cal.Rptr. 131), and a shareholder and director of the parent company of an association licensed to conduct horse racing at a county fairgrounds *(Mosesian v. McClatchy Newspapers* (1988) 205 Cal.App.3d 597, 611, 252 Cal.Rptr. 586) have been held not to be public officials. There is a split of authority as to whether a deputy public defender should be regarded as a public official. (Compare *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 10-11, 20 Cal.Rptr.2d 890, and *Tague v. Citizens for Law & Order, Inc.* (1977) 142 Cal.Rptr. 689, 75 Cal.App.3d Supp. 16, 24.)

Consistent with the federal nature of the applicable standards, precedents from other jurisdictions have been cited as persuasive authority in the *1238 California cases. (E.g., *Kahn v. Bower, supra,* 232 Cal.App.3d at pp. 1612-1613, 284 Cal.Rptr. 244; *Gomes v. Fried, supra,* 136 Cal.App.3d at pp. 933-934, 186 Cal.Rptr. 605; *Weingarten v. Block, supra,* 102 Cal.App.3d at p. 140, 162 Cal.Rptr. 701.) There is disagreement among jurisdictions as to whether public school principals and teachers are to be considered public officials. (See Annot., *supra,* 44 A.L.R.5th at pp. 318-332 and cases cited; see also **632*Franklin v. Benevolent Etc. Order of Elks, supra,* 97 Cal.App.3d at pp. 924-925, 159 Cal.Rptr. 131.) However, there is apparently universal agreement that public school superintendents and board members merit that designation. (*Garcia

32 Cal.Rptr.3d 626                                                                                   Page 6
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731
**(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)**

*v. Bd. of Ed. of Socorro Consol. Sch. Dist. (10th Cir.1985) 777 F.2d 1403, 1408* [school board members are public officials]; *Strong v. Oklahoma Pub. (Okla.Civ.App.1995) 899 P.2d 1185, 1188* [school board vice president is public official]; *Scott v. News-Herald (1986) 25 Ohio St.3d 243, 496 N.E.2d 699, 702-703* [superintendent of municipal public school system]; *State v. Defley (La.1981) 395 So.2d 759, 761* [school superintendent and "school supervisor"]; *Palm Beach Newspapers, Inc. v. Early (Fla.Dist.Ct.App.1976) 334 So.2d 50, 51* [county superintendent of public instruction].)

[7] Whether public school board members and superintendents qualify for public official status has not been considered a close question. "Clearly, the governance of a public school system is of the utmost importance to a community, and school board policies are often carefully scrutinized by residents. Members of the local school board, who are elected to make decisions regarding local education, clearly 'have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.' *Rosenblatt [v. Baer, supra, 383 U.S. at p. 85, 86 S.Ct. 669].* The strong public interest in ensuring open discussion of their job performance warrants the conclusion that school board members are public officials." (*Garcia v. Bd. of Ed. of Socorro Consol. Sch. Dist., supra, 777 F.2d at p. 1408;* see also *Strong v. Oklahoma Pub., supra, 899 P.2d at p. 1189* [school board vice-president "clearly" meets the test for public official status].) The same reasoning applies equally to an unelected public school superintendent: "Clearly, the head of a city school district has substantial responsibilities in the operation of the system. Moreover, the [city's] public has a substantial interest in the qualifications and performance of the person appointed as its superintendent. [¶] ... Controversial actions of a public school superintendent constitute major news in the local paper. A contrary finding [to that of public official status] would stifle public debate about important local issues." (*Scott v. News-Herald, supra, 496 N.E.2d at pp. 702-703.*)

The reasoning of these cases is persuasive here. Plaintiff was the superintendent of what was de-

scribed at the time as the fastest growing charter school system in the state. At their peak, the Gateway charter schools were educating 1,000 students. They had received over a $1 million in public funds for their operation, and stood to receive millions of dollars more. Insofar as it *1239 appears from the record, plaintiff was the primary, if not sole, spokesperson for these schools, and the one in charge of their management. In that capacity she had "substantial responsibility for or control over the conduct of governmental affairs," and her position was one of sufficient importance to "invite public scrutiny and discussion ... entirely apart from the ... particular charges in controversy." (*Rosenblatt v. Baer, supra,* 383 U.S. at pp. 85-87, fn. 13, 86 S.Ct. 669.) "[E]ducation is perhaps the most important function of state and local governments." (*Brown v. Board of Education* (1954) 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873.) Public schools are "the Nation's most important institution 'in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests.'" (*Lorain Journal Co. Et Al. v. Milkovich* (1985) 474 U.S. 953, 958, 106 S.Ct. 322, 88 L.Ed.2d 305, cert. den. (dis. opn. of Brennan, J.).) Thus, there was manifestly a strong public interest in open discussion of **633 plaintiff's job performance and fitness for the position.

Plaintiff contends that she cannot be considered a public official under *New York Times* because as a superintendent of charter schools, she was not a governmental employee. This argument is based on *Mosesian v. McClatchy Newspapers, supra,* 205 Cal.App.3d 597, 252 Cal.Rptr. 586, the case that considered whether a man with an interest in an association licensed to manage horse races was a public official. In concluding that he was not, the court first found that he could not be a public official because he was not a government employee. (*Id.* at p. 609, 252 Cal.Rptr. 586.) Although the court said it did not believe that public official status could be based merely on the performance of a public or governmental function (*id.* at p. 607, 252 Cal.Rptr. 586), it then went on to note that horseracing is not a government business in California (*id.* at p. 610, 252 Cal.Rptr. 586). Despite the reasoning of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 Cal.Rptr.3d 626                                                                                                   Page 7
131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9713
(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)

decision, we do not consider government employment a dispositive factor in resolving the issue of public official status here.

Charter schools have been broadly described as "statutorily created schools run by private parties" (Note, *Exploring 'Unchartered' Territory: An Analysis of Charter Schools and the Applicability of the U.S. Constitution* (1998) 7 So.Cal. Interdisc. L.J. 133), and as entities that may in some respects blur the distinction between public and private institutions for constitutional law purposes (*id.* at pp. 150-165 [discussing whether charter schools can be considered government agencies]; see also Wren, *Charter Schools: Public or Private? An Application of the Fourteenth Amendment's State Action Doctrine to These Innovative Schools* (2000) 19 Rev. Litig. 135). However, it is clear that California charter schools are part of this state's public school system. This was one of our holdings in *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1136, 89 Cal.Rptr.2d 745, where we rejected state constitutional challenges to California's charter school laws, and the argument that charter schools are private, not public schools (*id.* at p. 1139, 89 Cal.Rptr.2d 745). We also rejected the contention that charter officials were not **\*1240** officers of the public schools. We held to the contrary that, under the laws of this state, "charter school officials are officers of public schools to the same extent as members of other boards of education of public school districts." (*Id.* at p. 1141, 89 Cal.Rptr.2d 745.)

We likewise conclude here that plaintiff, as the superintendent of a charter school system, was, like other public school superintendents and board members, a public official under *New York Times,* whether or not she was strictly speaking a governmental employee in that capacity. A contrary conclusion would exalt form over substance, overlook "the intent of the Legislature that charter schools are and should become an integral part of the California educational system" (Ed.Code, § 47605, subd. (b)), and derogate the First Amendment protection of open discussion of the performance and qualifications of those with "substantial responsibil-

ity for or control over the conduct of governmental affairs" (*Rosenblatt v. Baer, supra,* 383 U.S. at p. 85, 86 S.Ct. 669).

This result is consistent with the only case we have found where a First Amendment issue has arisen in the context of a charter school. In *Nampa Charter School, Inc. v. DeLaPaz* (2004) 140 Idaho 23, 89 P.3d 863, a defamation action by a charter school against a bookkeeper it had fired, the school alleged that the bookkeeper was intentionally making false statements to induce the school district to **\*\*634** revoke the school's charter. The school argued that, as a nonprofit corporation, it had the same powers as any individual to sue or be sued. The court concluded, however, based on the state laws governing the charter school, that the school "should be treated similarly to a school district" (*id.* at p. 868), and thus as "a governmental entity, at least within the context of this case" (*ibid.*). Since *New York Times* and *Rosenblatt v. Baer, supra,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597, "held that a generalized criticism of government policy cannot be punished," the charter school was barred from suing for defamation. (*Nampa Charter School, Inc. v. DeLaPaz, supra,* at p. 867.) Moreover, the school could not obtain an injunction preventing the teacher from making unfounded false statements about the school's administrators because such relief would be "an impermissible prior restraint on speech that is critical of *public officials.*" (*Ibid.;* italics added.)

Accordingly, plaintiff was a public official for purposes of the *New York Times* rule.

C. *Whether Defendants Acted With Actual Malice* [FN\*\*]

FN\*\* See footnote *, ante.*

**\*1241** III. DISPOSITION
The order granting the motion to strike, and the judgment for defendants, are affirmed.

We concur: REARDON and RIVERA, JJ.

131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 Cal.Rptr.3d 626                                                                Page 8

131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626, 200 Ed. Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005 Daily Journal D.A.R. 9731

**(Cite as: 131 Cal.App.4th 1230, 32 Cal.Rptr.3d 626)**

Law Rep. 842, 05 Cal. Daily Op. Serv. 7161, 2005
Daily Journal D.A.R. 9731

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16
**To Appendix to California State Authorities**

Westlaw.

53 Cal.Rptr.3d 752                                                              Page 1
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

C

Court of Appeal, Third District, California.
Georgette GILBERT, Plaintiff, Cross-defendant
and Appellant,
v.
Jonathan SYKES, Defendant, Cross-complainant
and Respondent.
**No. C050766.**

Jan. 26, 2007.

**Background:** Patient brought medical malpractice action against plastic surgeon who had performed facial cosmetic procedures on her, and surgeon cross-complained for defamation and other torts, claiming loss of business as result of alleged false and misleading statements appearing on patient's Web site created to relate her experience with surgeon. Patient moved to strike cross-complaint under anti-SLAPP (strategic lawsuit against public participation) statute. The Superior Court, Sacramento County, No. 04AS02094, Thomas M. Cecil, J., denied motion. Patient appealed.

**Holdings:** The Court of Appeal, Butz, J., held that:
(1) patient's Web site concerned "matter of public interest" within meaning of anti-SLAPP statute;
(2) surgeon was "limited purpose public figure" required to show patient's actual malice to prevail on his defamation claim;
(3) surgeon did not show likelihood of success on his defamation claim; and
(4) surgeon did not show likelihood of success on his other tort claims.
Reversed and remanded with directions.

West Headnotes

**[1] Pleading** 358
302k358 Most Cited Cases
Anti-SLAPP (strategic lawsuit against public participation) statute was enacted to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. U.S.C.A. Const.Amend. 1; West's

Ann.Cal. Const. Art. 1, § 2(a); West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading** 358
302k358 Most Cited Cases
**[2] Pleading** 360
302k360 Most Cited Cases
SLAPP suits (strategic lawsuit against public participation) are subject to a special motion to strike, unless the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail. West's Ann.Cal.C.C.P. § 425.16.

**[3] Pleading** 360
302k360 Most Cited Cases
If defendant moving to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute establishes prima facie case that claim arose from protected conducted, burden shifts to plaintiff to establish probability that plaintiff will prevail on claim, i.e., make prima facie showing of facts which would, if proved at trial, support judgment in plaintiff's favor. West's Ann.Cal.C.C.P. § 425.16.

**[4] Appeal and Error** 893(1)
30k893(1) Most Cited Cases
The trial court's ruling on a motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute is reviewed de novo. West's Ann.Cal.C.C.P. § 425.16.

**[5] Appeal and Error** 842(7)
30k842(7) Most Cited Cases
On appeal from ruling on motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute, reviewing court exercises its independent judgment to determine not only whether anti-SLAPP statute applies, but whether complainant has established reasonable probability of prevailing on merits. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading** 358
302k358 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752                                              Page 2
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)

**[6] Torts ☞437**
379k437 Most Cited Cases
Plastic surgery patient's Web site created to relate her bad experience with well known surgeon concerned "matter of public interest" within meaning of anti-SLAPP (strategic lawsuit against public participation) statute; assertions of "nightmare" results requiring extensive revision surgery contributed to discussion about benefits and risks of plastic surgery, and Web site also contained advice and contact information for others to share their experiences. West's Ann.Cal.C.C.P. § 425.16.
*See* 5 Witkin, Cal. Procedure (4th ed. 1997) Pleadings, § 962A; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 7:229 et seq. (CACIVP Ch. 7-C); Cal. Jur. 3d, Pleading, § 299 et seq.; Cal. Civil Practice (Thomson/West 2003) Civil Rights Litigation, § 14:5 et seq.

**[7] Pleading ☞358**
302k358 Most Cited Cases
A lawsuit qualifies for a special motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute if it arises from an act in furtherance of the person's right of petition or free speech under the United States or California Constitution. U.S.C.A. Const.Amend. 1; West's Ann.Cal. Const. Art. 1, § 2(a); West's Ann.Cal.C.C.P. § 425.16.

**[8] Pleading ☞358**
302k358 Most Cited Cases
The "public interest" requirement of anti-SLAPP (strategic lawsuit against public participation) statute must be construed broadly so as to encourage participation by all segments of society in vigorous public debate related to issues of public interest. West's Ann.Cal.C.C.P. § 425.16(e)(3).

**[9] Libel and Slander ☞48(1)**
237k48(1) Most Cited Cases
Prominent plastic surgeon who claimed patient defamed him on her Web site was "limited purpose public figure" or "vortex public figure" required to show patient's actual malice to prevail on his defamation claim; relative merits of plastic surgery were focus of widespread public interest, and surgeon thrust himself into controversy by advertising, appearing on television, and writing articles in favor of cosmetic surgery.

**[10] Libel and Slander ☞48(1)**
237k48(1) Most Cited Cases
To characterize plaintiff claiming defamation as limited purpose public figure, first, there must be public controversy, second, plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of public issue, i.e., attempted to thrust himself or herself into public eye, and third, alleged defamation must be germane to plaintiff's participation in controversy.

**[11] Libel and Slander ☞48(1)**
237k48(1) Most Cited Cases
To show that a defamation plaintiff is a limited purpose public figure, it is not necessary to show that plaintiff actually achieved prominence in public debate; it is sufficient that he attempted to thrust himself into the public eye or to influence a public decision.

**[12] Libel and Slander ☞48(1)**
237k48(1) Most Cited Cases
To show that prominent plastic surgeon who claimed patient defamed him on her Web site was "limited purpose public figure" it was required only to show that surgeon had injected himself into public debate about topic that concerned substantial number of people; there was no requirement of preexisting public controversy regarding procedures surgeon performed on this patient.

**[13] Pleading ☞360**
302k360 Most Cited Cases
To meet burden to establish likelihood of prevailing on claim, so as to overcome motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, plaintiff must demonstrate that complaint is legally sufficient and supported by sufficient prima facie showing of facts to sustain favorable judgment if evidence submitted by plaintiff is credited. West's Ann.Cal.C.C.P. § 425.16.

**[14] Pleading ☞360**
302k360 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752

147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972

(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)

Page 3

Plaintiff's burden to establish likelihood of prevailing on claim, so as to overcome motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, is similar to standard used in determining motions for nonsuit, directed verdict, or summary judgment; showing must be made through competent and admissible evidence, and declarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are disregarded. West's Ann.Cal.C.C.P. § 425.16.

**[15] Pleading** ⛥360
302k360 Most Cited Cases
In deciding question of potential merit of plaintiff's claim, when ruling on defendant's motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, trial court does not weigh credibility or comparative probative strength of competing evidence, and it should grant motion if, as matter of law, defendant's evidence supporting motion defeats plaintiff's attempt to establish evidentiary support for claim. West's Ann.Cal.C.C.P. § 425.16.

**[16] Libel and Slander** ⛥1
237k1 Most Cited Cases
Defamation is an invasion of the interest in reputation.

**[17] Libel and Slander** ⛥1
237k1 Most Cited Cases
The tort of defamation involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage.

**[18] Libel and Slander** ⛥30
237k30 Most Cited Cases
There can be no recovery for defamation without a falsehood.

**[19] Constitutional Law** ⛥2161
92k2161 Most Cited Cases
    (Formerly 92k90.1(5))
To state a defamation claim that survives a First Amendment challenge, plaintiff must present evidence of a statement of fact that is provably false.

U.S.C.A. Const.Amend. 1.

**[20] Libel and Slander** ⛥6(1)
237k6(1) Most Cited Cases
Statements cannot form the basis of a defamation action if they cannot reasonably be interpreted as stating actual facts about an individual.

**[21] Libel and Slander** ⛥54
237k54 Most Cited Cases
Plastic surgery patient established truth of "before and after" pictures on her Web site created to relate her experience with surgeon, so as to provide complete defense to surgeon's defamation claim based on allegation that "after" pictures were taken after surgery performed by other surgeons, by presenting uncontradicted declaration that pictures were taken before any other surgery.

**[22] Libel and Slander** ⛥54
237k54 Most Cited Cases
In all cases of alleged defamation, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose.

**[23] Libel and Slander** ⛥52
237k52 Most Cited Cases
A defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified, and if the gist of the charge is established by the evidence the defendant has made his case.

**[24] Libel and Slander** ⛥55
237k55 Most Cited Cases
A slight inaccuracy in the details of an alleged defamatory statement will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader differently.

**[25] Libel and Slander** ⛥9(2)
237k9(2) Most Cited Cases
Plastic surgery patient's Web site, created to relate her experience with surgeon, did not falsely indicate that surgeon "quickly" recommended and per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752                                                          Page 4
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

formed procedures that patient did not "want" or "need" as alleged by surgeon in his defamation claim; surgeon did not deny making suggestions and their timing had no impact on his reputation, patient never stated or implied she "needed" surgeries, and patient's claims that she thought results would be "subtle" was supported by surgeon's deposition testimony.

**[26] Libel and Slander ☞80**
237k80 Most Cited Cases
Plastic surgeon's allegation that patient's Web site, created to relate her experience with surgeon, misstated the content of communications between patient and surgeon relating to the procedures performed by surgeon, was far too vague and amorphous to support a cause of action for defamation.

**[27] Pleading ☞358**
302k358 Most Cited Cases

**[27] Pleading ☞360**
302k360 Most Cited Cases
In order to successfully resist a special motion to strike, a plaintiff must state and substantiate a legally sufficient claim, i.e., the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. West's Ann.Cal.C.C.P. § 425.16.

**[28] Pleading ☞358**
302k358 Most Cited Cases
If the plaintiff's pleadings are not adequate to support a cause of action, the plaintiff has failed to carry his burden in resisting a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute. West's Ann.Cal.C.C.P. § 425.16.

**[29] Libel and Slander ☞85**
237k85 Most Cited Cases
The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.

**[30] Libel and Slander ☞9(2)**

237k9(2) Most Cited Cases
Warning on plastic surgery patient's Web site, created to relate her bad experience with surgeon, to avoid doctor who asked for payment "under the table" did not falsely suggest that this surgeon was compensated for procedures he performed for patient "under the table" and thus could not form basis of defamation claim.

**[31] Libel and Slander ☞123(2)**
237k123(2) Most Cited Cases
Whether a statement is reasonably susceptible of a defamatory interpretation is a question of law for the court.

**[32] Libel and Slander ☞100(7)**
237k100(7) Most Cited Cases
Where the words or other matters which are the subject of a defamation action are of ambiguous meaning, or innocent on their face and defamatory only in the light of extrinsic circumstances, the plaintiff must plead and prove that as used, the words had a particular meaning, or innuendo, which makes them defamatory.

**[33] Constitutional Law ☞1620**
92k1620 Most Cited Cases
 (Formerly 92k90.1(5))
The First Amendment privilege applicable to defamation claims applies not merely to defamation but to all claims whose gravamen is the alleged injurious falsehood of a statement. U.S.C.A. Const.Amend. 1.

**[34] Damages ☞57.25(4)**
115k57.25(4) Most Cited Cases

**[34] Torts ☞211**
379k211 Most Cited Cases
Once plastic surgeon failed to show likelihood that he would prevail on his defamation claim against patient who created Web site to relate her experience with surgeon, so as to defeat patient's motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, surgeon's other claims for intentional and negligent interference with economic advantage and intentional infliction of emotional distress that allegedly arose from same

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752

147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972

**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

Page 5

publication necessarily failed. West's Ann.Cal.C.C.P. § 425.16.

**[35] Libel and Slander ☞6(1)**
237k6(1) Most Cited Cases
Nonactionable communications do not expose the speaker to liability for defamation merely because the speaker uses means making them more likely to reach a greater number of recipients.

**\*\*756** DLA Piper Rudnick Gray Cary US, Kathryn E. Karcher, Megan Whyman Olesek, Jerold L. Hersh, East Palo Alto, and **\*\*757** Gregory J. Lundell; Sheppard Mullin Richter & Hampton, Guylyn R. Cummins and James M. Chadwick, San Francisco; Nolen, Saul & Brelsford and Rudy Nolen; Nolen & Associates and Rudy Nolen, for Plaintiff, Cross-defendant and Appellant.

Wilke, Fleury, Hoffelt, Gould & Birney, Philip R. Birney, Danielle M. Guard and Daniel L. Baxter, Sacramento, for Defendant, Cross-complainant and Respondent.

BUTZ, J.

**\*17** In our youth and celebrity worshipping culture, the benefits and risks of plastic surgery are a hot topic. The number of people, especially women, who have had minimally invasive cosmetic surgery has grown exponentially in the past several years.

Jonathan Sykes, M.D., is a prominent professor and practitioner of plastic and reconstructive surgery at the University of California, Davis Medical Center (UCD Medical Center) in Sacramento. Sykes performed a series of facial cosmetic procedures on Georgette Gilbert in February 2003. Gilbert **\*18** was appalled at the results. She not only sued Sykes for medical malpractice, but created a Web site relating her experiences with Dr. Sykes (including *before* and *after* photos), as well as information and advice for those considering plastic surgery.

Sykes filed a multi-tort cross-complaint in the malpractice action, alleging he was defamed and suffered loss of business as a result of false and misleading statements appearing on Gilbert's Web site. Gilbert responded with a special motion to

strike the cross-complaint. (Code Civ. Proc., § 425.16.) [FN1] The trial court denied the motion, finding that Sykes had established a probability of prevailing on his cross-complaint.

> FN1. Undesignated statutory references are to the Code of Civil Procedure.

Exercising our power of independent review, we shall reverse. While we agree with the trial court's finding that the cross-complaint qualified for SLAPP [FN2] treatment under the statute, we conclude, contrary to the trial court's finding, that Sykes was a limited purpose public figure and therefore had the burden of making a prima facie showing that the statements in the Web site were both false and published with actual malice. Because we find that Sykes failed to carry that burden, we shall vacate the order with directions to grant Gilbert's motion.

> FN2. "SLAPP stands for 'Strategic Lawsuit Against Public Participation.' " (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 835, fn. 1, 111 Cal.Rptr.2d 582.) For clarity, we refer to a "SLAPP" or "anti-SLAPP" motion as a "special motion to strike"--the language used in the statute (§ 425.16, subd. (b)(1)).

## FACTUAL BACKGROUND
### The Surgery

Dr. Sykes is the Director of Facial Plastic and Reconstructive Surgery at UCD Medical Center in Sacramento. Sykes was profiled in a 2003 article in Sacramento magazine entitled *Top Doctors,* which lauds him as "a nationally recognized educator and leader in minimally invasive esthetic and laser surgery [,] [who] has performed over 10,000 surgical procedures, is board-certified in otolaryngology and facial plastic surgery, and has published three books and over 90 articles on facial plastic surgery."

Gilbert became interested in plastic surgery after another doctor recommended that she might benefit from a brow lift. She approached Sykes because she was acquainted with him and thought of him as a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752                                                                Page 6
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

friend. After consulting with Sykes, Gilbert **758 agreed to undergo five separate plastic surgical procedures to her face. Sykes told her that the goal was to make her look *19 natural after the surgery and that "we didn't want to make too much change." The surgery was performed in February 2003.

During an April 2003 post-surgical visit, Sykes told Gilbert the results were "very good and improving." Gilbert did not agree. She was extremely unhappy with the results, asserting that she could not fully close her eyes, her eyebrows were higher than she expected, one eyebrow was higher than the other and she had a permanently "surprised" look on her face. Beginning in late June 2003 Gilbert underwent four revision surgeries, performed by other doctors, to correct her problems.

In May 2004, Gilbert brought a malpractice suit against Dr. Sykes and the Regents of the University of California (the Regents) in connection with the surgery performed by Sykes.

*Gilbert's Web site* [FN3]

> FN3. We use the preferred spelling of "Web site" throughout this opinion.

In late February or early March 2005, Gilbert established a Web site (with the address <http://www.mysurgerynightmare.com> [currently accessible as of 1/26/07] ) (hereafter Web site). The Web site contains five hyperlinks (or link(s) that take the reader to an additional page of information), which we discuss below:

At the *Home Page* of the Web site, Gilbert explains: "I started this Web site so I can share my experience with plastic surgery. My hopes are to inform and educate because when I originally looked into cosmetic surgery on the Internet there was very little information from a patients [*sic* ] perspective, but a lot of information coming from the doctor's perspective. [¶] I will share my experience with plastic surgery and show my original (untouched) *before* and *after* photos. If you still wish to pursue plastic surgery after reading my story, I hope you learn from the information I provide so you can

make the best educated decision possible before going under the knife. I will give you information and links on how to check what your doctor is certified in, any past lawsuits, information on what to ask during your consult, and give you my take on what red flags to look out for." The *Home Page* also lists several malpractice lawsuits that have been filed or are pending against Dr. Sykes.

The *Before and After Photos* link takes the viewer to two pairs of photographs taken before and after the surgery performed by Sykes--one full view of Gilbert's face and another of just her eyes. Both *after* pictures are captioned "Approximately [five] months after surgery." The *after* photographs *20 show Gilbert with a surprised, eyes-wide-open look. Above the eye photographs, Gilbert inserted the following caption: "I was told by my doctor that this was a good result--that I looked better after his surgery--what do you think?"

At the *Selecting a Doctor* link, a page of "useful information" features tips on selecting a plastic surgeon, advice which Gilbert states is "MY own opinion after consulting with revision doctors all over the United States, having multiple revisional surgeries, and just researching as much as possible."

At the *Red Flags* link, Gilbert discusses "Things to look out for" with disclaimers describing certain traits under the heading, "Doctors I would be cautious of."

The *Final Thoughts/Contact Me* link recounts Gilbert's experience with Sykes. **759 She said that Sykes told her she would look natural after the surgery and she was under the impression the change would be subtle. Instead, she wrote, the "surgery was the biggest regret of my life. I didn't need [five] procedures and I had no idea what I was getting myself into. What I thought was going to be subtle turned into a nightmare. I've spent over two years of my life meeting with doctors all over the United States and having revision surgeries in hopes to get back to how I once looked or at the very least look normal again."

*Litigation*

When Gilbert did not submit to Sykes's request to close down her Web site, Sykes and the Regents filed a cross-complaint for damages and injunctive relief [FN4] based on publications appearing in the Web site that were allegedly defamatory and caused Sykes emotional distress and loss of business. The crucial charging accusations of the cross-complaint appear in paragraph 7, which states:

> FN4. Sykes abandoned his attempt to force Gilbert to shut down her Web site after the trial court denied his ex parte application for a temporary restraining order.

"In late February or early March 2005, ... [Gilbert] established a Web site at www.mysurgerynightmare.com (Web site). In this Web site, [Gilbert] (after identifying Dr. Sykes as the 'director of facial plastic and reconstructive surgery at [UCD] Medical Center') presents, inter alia, misleading 'before *21 and after' facial photographs in connection with the procedures performed by Dr. Sykes (photos that were taken after additional and significant cosmetic surgery procedures not performed by Dr. Sykes), falsely indicates that Dr. Sykes recommended and performed procedures that [Gilbert] did not need/want, misstates the content of communications between [Gilbert] and Dr. Sykes relating to the procedures performed by Dr. Sykes, and falsely suggests that Dr. Sykes was compensated for the procedures 'under the table.' "

Sykes also alleged that Gilbert obtained from Google TM or possibly other search engines a "sponsored link," such that a search for "Jonathan Sykes" would bring up a link to Gilbert's Web site.

Gilbert responded by filing a special motion to strike the cross-complaint (see fn. 2, *ante* ). Her moving papers claimed that the Web site's publications were protected by the First Amendment, and that neither Sykes nor the Regents could establish an actionable claim for defamation or any other tort.

Evidence was submitted by both sides and the trial court held a hearing on the matter. The court ultimately issued an order granting the special motion

as to the Regents but denying it as to Sykes. While finding that section 425.16 applied to the cross-complaint, the court also ruled that Sykes was not a limited purpose public figure, which would have required a showing that Gilbert's statements were uttered with actual malice. Stated the court: "The fact he has published articles and books on plastic surgery and appeared on television shows does not mean there is a public controversy relating to Ms. Gilbert's plastic surgery." Finding that Sykes had made the requisite prima facie showing that Gilbert defamed him with respect to the *before* and *after* photos as well as statements appearing in the Web site, the court denied the special motion to strike.

The Regents have not appealed from the order dismissing them as cross-complainants. Gilbert appeals from the order denying her special motion to strike as to Sykes.

**760 DISCUSSION
I. General Principles

[1][2] "Code of Civil Procedure section 425.16 was enacted in 1992 to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. [Citation.] These meritless suits, referred to under the acronym SLAPP, ... are subject to a special motion to strike unless *22 the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail." (*Sipple v. Foundation for Nat. Progress (1999) 71 Cal.App.4th 226, 235, 83 Cal.Rptr.2d 677 (Sipple* ), fn. omitted, citing *Lafayette Morehouse, Inc. v. Chronicle Publishing Co. (1995) 37 Cal.App.4th 855, 858, 44 Cal.Rptr.2d 46* and § 425.16, subd. (b)(1).) "Claims based on these acts are subject to a special motion to strike unless the court determines that the plaintiff has established that there is a probability of prevailing on the merits." (*Ampex Corp. v. Cargle (2005) 128 Cal.App.4th 1569, 1575-1576, 27 Cal.Rptr.3d 863 (Ampex* ).)

[3] " 'If the defendant establishes a prima facie case, then the burden shifts to the plaintiff to establish " 'a probability that the plaintiff will prevail on

the claim,' " i.e., "make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor." ' " *(Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1417, 103 Cal.Rptr.2d 174 *(Dowling* ).)

[4][5] The trial court's ruling on a section 425.16 motion is reviewed de novo. *(Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1544, 33 Cal.Rptr.3d 145 *(Terry* ).) We exercise our independent judgment to determine not only whether the anti-SLAPP statute applies, but whether the complainant has established a reasonable probability of prevailing on the merits. *(Ibid.)*

### II. Whether Section 425.16 Applies

[6] Before reaching the merits of the order, we must address Sykes's initial contention that, contrary to the trial court's ruling, section 425.16 did not even apply to the cross-complaint. [FN5]

> FN5. Although he did not file a cross-appeal, Sykes has standing to make this argument for the purpose of demonstrating that the trial court errors of which Gilbert complains caused her no prejudice. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2005) ¶ 8:196, p. 8-124; see Code Civ. Proc., § 906.)

[7] A lawsuit qualifies as a special motion to strike under section 425.16 if it arises from an act " 'in furtherance of the person's right of petition or free speech under the United States or California Constitution.' " *(Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 892, 17 Cal.Rptr.3d 497 *(Wilbanks* ), quoting § 425.16, subd. (b)(1).) The statute defines acts in furtherance of free speech or petition as including statements that are made (1) in a public forum and (2) in connection with an issue of public interest. *(Wilbanks, at p. 892, 17 Cal.Rptr.3d 497, citing § 425.16, subd. (e).)*

*23 While not contesting that the Internet is a public forum, Sykes maintains that the Web site does not concern a matter of public interest. He points out that "it is not enough that the statement refer to

a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *(Wilbanks, supra,* 121 Cal.App.4th at p. 898, 17 Cal.Rptr.3d 497.) Sykes asserts that statements on the Web site do not contribute to the public debate because they only concern **761 Gilbert's interactions with *him.* He is wrong.

[8] The public interest requirement of section 425.16, subdivision (e)(3) must be " 'construed broadly' so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest." *(Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808, 119 Cal.Rptr.2d 108 *(Seelig* ).) The Legislature inserted the "broad construction" provision out of concern that judicial decisions were construing that element of the statute too narrowly. *(Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120, 81 Cal.Rptr.2d 471, 969 P.2d 564 *(Briggs* ), citing Stats.1997, ch. 271, § 1.)

Sykes does not dispute that plastic surgery is a subject of widespread public interest and discussion. Indeed, a Google TM search (at <http://www.google. com/> [as of 1/26/07] ) using the words "pros" "cons" "cosmetic" and "surgery" returns a virtual deluge of articles and Web sites devoted to the well-known controversy surrounding plastic surgery. Elective cosmetic surgery was the subject of the popular television series *Extreme Makeover,* in which it is portrayed as a positive, life-transforming event. Yet the widespread and indiscriminate use of plastic surgery by celebrities and the public has also generated a firestorm of negative publicity and comment. (See, e.g., *Awful Plastic Surgery--the good, bad, and ugly of celebrity plastic surgery* <http:// www.awfulplasticsurgery.com> [as of 1/26/07]; Kuczynski, Beauty Junkies-- Inside Our $15 Billion Obsession With Cosmetic Surgery (2006).)

Sykes is a widely known plastic surgeon, practicing at a prestigious medical institution, who has written numerous articles on plastic surgery, appeared in local television shows on the subject and advertised in the Sacramento media market.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Gilbert's Web site contributed toward the public debate about plastic surgery in at least two ways: First, assertions that a prominent and well-respected plastic surgeon produced "nightmare" results that necessitated extensive revision surgery contributes toward public discussion about the benefits and risks of plastic surgery in general, and particularly among persons contemplating plastic surgery as a means of looking younger or improving their appearance. (See *24*Terry, supra,* 131 Cal.App.4th at p. 1547, 33 Cal.Rptr.3d 145 [allegations that a church leader engaged in an inappropriate relationship with a teenage minor in his congregation constituted a matter of public interest because it implicated "society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe"]; *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1161, 15 Cal.Rptr.3d 100 *(Annette F.)* [charges of domestic abuse by a lesbian partner in a couple that had achieved national prominence through adoption litigation was an issue of public interest because it "potentially affected a large number of children and adoptive parents beyond the direct participants"]; *Sipple, supra,* 71 Cal.App.4th at p. 238, 83 Cal.Rptr.2d 677 [wife-beating allegations against prominent political consultant raised issue of public interest, where he "was able to capitalize on domestic violence issues in order to further his career"].)

Second, a review of the entire Web site shows that it is not limited to Gilbert's interactions with Sykes. The Web site contains advice, information and a contact page where readers can share their own experiences. At the *Selecting a Doctor* link, a page on "Useful Information" has tips on choosing a plastic surgeon, including references to other Web sites and resources. A *Red Flags* link lists "Things to **762 look out for" or warning signs to look for when selecting a doctor to perform the surgery. A *Final Thoughts/Contact Me* link gives Gilbert's ruminations about plastic surgery in general, not all of it negative. Clearly, the Web site was not limited to attacking Sykes, but contributed to the general debate over the pros and cons of undergoing cosmetic surgery.

For the foregoing reasons, we agree with the trial court's finding that Gilbert's Web site concerned a matter of public interest within the meaning of *section 425.16.*

### III. Limited Purpose Public Figure

[9][10] The most important question we face is whether Sykes was a limited purpose public figure for purposes of his defamation claims. "*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846[, 52 Cal.Rptr.2d 831] [ *(Copp)* ] sets forth the elements that must be present in order to characterize a plaintiff as a limited purpose public figure. First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." *(Ampex, supra,* 128 Cal.App.4th at p. 1577, 27 Cal.Rptr.3d 863.)

*25 Contrary to the trial court's ruling, Sykes stands out as an archetypical example of a "limited purpose" or "vortex" public figure. *(Annette F., supra,* 119 Cal.App.4th at p. 1163, 15 Cal.Rptr.3d 100.) As we have explained, the relative merits of plastic surgery is a subject that has garnered national attention and is the focus of widespread public interest. Gilbert produced evidence showing that Sykes has thrust himself into that debate by appearing on local television shows as well as writing numerous articles in medical journals and beauty magazines, touting the virtues of cosmetic and reconstructive surgery. Sykes has also testified as an expert witness on the subject and advertised his services in the local media.

[11] These facts provide compelling proof that Sykes "undertook 'some *voluntary* act through which he seeks to influence the resolution of the public issues involved,' " and took " 'affirmative actions' " to thrust himself into the " 'forefront of [a]

53 Cal.Rptr.3d 752　　　　　　　　　　　　　　　　　　　　　　　Page 10
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

particular public controvers[y].' " (*Copp, supra, 45 Cal.App.4th at p. 845, 52 Cal.Rptr.2d 831,* quoting *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254-255, 208 Cal.Rptr. 137, 690 P.2d 610.) It is not even necessary to show that Sykes actually achieved prominence in the public debate. It is sufficient that he " 'attempt[ed] to thrust himself into the public eye' [citation] or to influence a public decision." (*Copp, supra,* at pp. 845-846, 52 Cal.Rptr.2d 831.)

[12] Sykes attempts to avoid this conclusion by playing fast and loose with the definitions. Sykes argues he was not a limited purpose public figure because there was no preexisting public " 'controversy' *regarding the procedures performed by Dr. Sykes on Ms. Gilbert.*" (Italics added.) This claim is at war with the concept of a limited purpose public figure.

A person *becomes* a limited public figure by injecting himself into the public debate about a topic that concerns a substantial number of people. Once he places himself in the spotlight on a topic of public interest, his private words and conduct relating to that topic become fair game. Sykes would turn this formulation on its head. **763 He would require that the plaintiff generate a broad public controversy through private words or conduct before he could be deemed a public figure, an atrophic definition that would virtually eliminate all vortex public figure candidates.

If a complainant's private conduct had to generate a public controversy before he could be deemed a public figure, those who exposed his controversial behavior in the first place would face defamation liability for inaccurate statements made in good faith, while those who joined in the discussion afterward would be immune from such claims unless it was shown that their statements were uttered with malice. That is not the law. Indeed, defamation decisions finding the complainants to be vortex public figures have typically *26 involved persons who claimed they were defamed for private conduct *after* they injected themselves into matters of general public discussion or controversy. (See, e.g.,

*Terry, supra,* 131 Cal.App.4th at pp. 1547-1548, 33 Cal.Rptr.3d 145; *Sipple, supra,* 71 Cal.App.4th at p. 238, 83 Cal.Rptr.2d 677; *Copp, supra,* 45 Cal.App.4th at pp. 846-847, 52 Cal.Rptr.2d 831.)

Here, Sykes's sought-after prominence as an expert in and advocate for plastic surgery as a means of personal enhancement transformed him into a limited purpose public figure. As such, statements alleging that his surgical procedures resulted in disfigurement or required expensive multiple corrective surgeries are entitled to constitutional protection.

We conclude that Sykes was a vortex public figure who invited public attention and comments regarding his surgical practice. Thus, to prevail on a defamation claim, he was required to prove by clear and convincing evidence not only that Gilbert's claims were false, but that they were uttered with actual malice. (*Annette F., supra,* 119 Cal.App.4th at p. 1166, 15 Cal.Rptr.3d 100.)

Having resolved these preliminary but important issues, we turn to the specific allegations of the cross-complaint and whether Sykes met his burden of producing prima facie evidence to support his defamation claims.

### IV. Probability of Success

[13][14] Since Gilbert established that she was sued after exercising her First Amendment right to free speech in a public forum in connection with an issue of public interest, the burden shifted to Sykes to establish that there is a probability he will prevail on his claims. (§ 425.16, subd. (b)(1); *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1496, 45 Cal.Rptr.2d 624.) To meet this burden, Sykes must " 'demonstrate the [cross-]complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citation.] 'The burden on the plaintiff is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment.' " (*Seelig, supra,* 97 Cal.App.4th at p. 809, 119 Cal.Rptr.2d 108.) The showing must be made

through "competent and admissible evidence." *(Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236, 132 Cal.Rptr.2d 57 *(Tuchscher* ); see also *Evans, supra,* 38 Cal.App.4th at pp. 1497-1498, 45 Cal.Rptr.2d 624.) Thus, declarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded. (See *Tuchscher, supra,* at pp. 1238, 1240, 132 Cal.Rptr.2d 57.)

[15] "In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of **764 both the plaintiff and the defendant *27 (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." *(Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733 *(Wilson* ).)

[16][17][18][19][20] "Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *(Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1179, 96 Cal.Rptr.2d 136 *(Ringler.)* "There can be no recovery for defamation without a falsehood. [Citation.] Thus, to state a defamation claim that survives a First Amendment challenge, plaintiff must present evidence of a statement of fact that is *provably false. (Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20[, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1, 18].) 'Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." [Citations.] Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of ... contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection.

[Citations.]' ... The dispositive question after the *Milkovich* case is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion." *(Seelig, supra,* 97 Cal.App.4th at p. 809, 119 Cal.Rptr.2d 108, italics added).)

Sykes alleges that Gilbert's Web site defamed him in four different ways: (1) presenting misleading *before* and *after* facial photographs in that the *after* photos were taken after "additional and significant cosmetic surgery" performed by others; (2) falsely indicating that Sykes recommended and performed procedures that Gilbert did not need or want; (3) misstating "the content of communications" relating to the procedures he performed; and (4) falsely suggesting that Sykes was compensated for procedures "under the table."

For the reasons that follow, we conclude that Sykes has failed to carry his burden of demonstrating the probable merit of a defamation claim based on any of these allegations.

### A. *Before* and *After* Photographs

[21] Gilbert posted two sets of *before* and *after* photographs on her Web site with captions "Approximately one month *before* surgery" and "Approximately two weeks *before* surgery," each paired with a photo captioned *28 " Approximately [five] months *after* surgery." (Italics added.) Sykes's cross-complaint alleged that the photographs were misleading in that the *after* photo was taken after Gilbert had additional revision surgical procedures performed by other plastic surgeons. Gilbert, however, debunked this accusation in an uncontradicted declaration, wherein she stated that the *after* photograph was taken after Sykes's procedures and *before* any revision surgery was done on her face. Gilbert added that her facial muscles were at rest and her face in repose when the photographs were taken, thereby laying to rest any speculation that she tried to distort her natural appearance in order to cast the results of the surgery in a bad light.

[22] " 'In all cases of alleged defamation, ... the truth of the offensive statements **765 or commu-

53 Cal.Rptr.3d 752
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

nication is a complete defense against civil liability, regardless of bad faith or malicious purpose.' " *(Ringler, supra,* 80 Cal.App.4th at p. 1180, 96 Cal.Rptr.2d 136.) Because Gilbert submitted uncontradicted evidence the photographs were indeed what they purported to be, truth as a defense was established.

Sykes responds by focusing on minute details that do not detract from the essential accuracy of the photographs. He seizes on Gilbert's admission in her deposition that her first revision surgery was performed on June 24, 2003 (about four and one-half months after her February 5 surgery), and notes that at one time, Gilbert's Web site claimed the *after* photo was taken *five and one-half* months after the surgery.

[23][24] The slight discrepancy in time frame does not provide Sykes with an escape hatch from the truth defense. " 'It is well settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified, and if the gist of the charge be established by the evidence the defendant has made his case.' [Citation.] ' "[A] slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently...." ' " *(Sipple, supra,* 71 Cal.App.4th at p. 244, 83 Cal.Rptr.2d 677, quoting *Kurata v. Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224, 227, 40 P.2d 520.) Whether the photograph was taken five or even five and one-half months after the surgery rather than four and one-half is of little significance. The crucial point is that the photograph was taken *after* Sykes's surgery but *before* other doctors performed their revision surgeries. Because it was, the "gist" and "sting" of the allegedly libelous charge was shown to be true, and Sykes cannot base a defamation claim upon it. *(Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936, 19 Cal.Rptr.3d 247.)

Sykes also points to the declaration of Julie Hamilton, which he submitted in opposition to the special motion to strike. In it, Hamilton declared she took *29 screen snapshots of the photos on Gilbert's Web site with her Apple computer, aligned the two images, and then created a split-screen view. Based on these statements, Sykes argues that Gilbert's photos were taken from different angles and on a different scale.

Again, Sykes seeks to turn the court's attention away from the forest by focusing on the trees, or perhaps more accurately, a branch of one tree. Hamilton's declaration establishes, at most, that Gilbert did not compose her photographs with scientific precision. But the average reader cares little about geometrical accuracy--what is important is that the photographs were substantially accurate depictions of what Gilbert's face looked like before and after Sykes's surgery. Because Hamilton's declaration did not negate this fact, it did not help prove a prima facie case of defamation.

Since the *before* and *after* photographs were substantially accurate representations of what took place with respect to Sykes's surgery, they were not defamatory as a matter of law.

### B. Procedures that Gilbert Did Not Need/Want
[25] Sykes next alleges that the Web site falsely indicated that Sykes recommended and performed procedures that Gilbert did not "need" or "want." Sykes finds support for this charge from two sources:

**766 First, a passage that appeared on an earlier version of the Web site (since removed), which stated: "I met with [Dr. Sykes], the director of facial plastic and reconstructive surgery at [UCD] Medical Center. I knew him for a few years from my ex-boyfriend and had a lot of trust in him based on knowing and seeing him over the years and his impressive sounding title. I really wasn't sure what to expect when I met with him. He quickly suggested I would benefit from having *five* procedures to my face. I was told that if I did the suggested procedures, I would maintain my looks longer and age better into my late thirties and forties. He said I could be back to work in two weeks and that it

53 Cal.Rptr.3d 752
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)

Page 13

would be *subtle.* Wow, he made it sound simple and easy--sign me up!"

Second, Sykes points to Gilbert's "final thoughts" at her *Final Thoughts/Contact Me* link: "For me surgery was the biggest regret of my life. I didn't *need* [*five* ] procedures and I had no idea what I was really getting myself into. What I thought was going to be subtle turned into a nightmare." (Italics added.)

Weaving these two passages together, Sykes claims they are libelous because (1) he did not "quickly" suggest having the procedures, but only did **30** so after Gilbert informed him of her concerns; (2) he never told her she "needed" five procedures or any procedure for that matter; and (3) he did not state the changes would be subtle; in fact Gilbert told him to be "aggressive." His arguments are unpersuasive for several reasons:

First, Sykes does not deny that he *suggested* a variety of procedures and indeed, his deposition testimony admits as much. The *timing* of the suggestion during his conference with Gilbert is of no consequence because it has no impact on Sykes's reputation in the community. (Civ.Code, § 46.) No plastic surgeon can claim he lost business because his suggestions were too "quick."

Second, nowhere in the Web site does Gilbert state or imply that Sykes told her she "needed" the surgeries. Indeed, her use of the word "suggested" connotes just the opposite. Gilbert's wistful closing remark that she did not "need" the procedures, read in the proper context, simply indicates her regret at her eagerness to go ahead with the surgery without becoming fully informed, and her sorrow at the unfortunate consequences that ensued. No injurious falsehood can be extracted from Gilbert's statement that she did not "need" five procedures.

Third, Gilbert's statement that she thought the changes would be "subtle" is not very different from Sykes's own deposition testimony on the subject--"I told her that my goal was to make it so that at the end of her healing process, which could take several months, that she *look natural* after surgery

and that *we didn't want to make too much change.*" (Italics added.) These statements could be reasonably interpreted by a prospective patient as an assurance that the changes effected by the surgical procedures would be subtle.

The "gist" and "sting" of Gilbert's assertion that Sykes assured her the changes would be "subtle" was substantially true, regardless of whether Sykes ever used the word. [FN6] Thus, the imputation was protected by the truth defense. *(Ringler, supra,* 80 Cal.App.4th at p. 1181, 96 Cal.Rptr.2d 136, citing *Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581-582, 51 Cal.Rptr.2d 891.)

> FN6. Gilbert testified at her deposition that Sykes did indeed use the word "subtle" to describe the intended result of his procedures.

**767** Fourth and finally, Gilbert's alleged failure to disclose her direction to Sykes to "be aggressive" with the surgery does not leave her open to a charge of defamation. While she may have told him to be aggressive, she certainly did not intend for him to make her *look* aggressive, which was the asserted unhappy result of the surgery.

### *31 C. Misstating "the Content of Communications" Between Gilbert and Sykes

[26] The third major charge of the cross-complaint is that Gilbert's Web site "misstates the content of communications between [Gilbert] and Dr. Sykes relating to the procedures performed by Dr. Sykes." This allegation is far too vague and amorphous to support a cause of action for defamation.

[27][28] In order to successfully resist a special motion to strike, a plaintiff must " ' "state[ ] and substantiate[ ] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is *both legally sufficient* and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " *(Wilson, supra,* 28 Cal.4th at p. 821, 123 Cal.Rptr.2d 19, 50 P.3d 733, italics added.) If the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752                                                    Page 14

147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972

**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

pleadings are not adequate to support a cause of action, the plaintiff has failed to carry his burden in resisting the motion. (See *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1018-1019, 26 Cal.Rptr.3d 350 (*Vogel* ); [FN7] *Drum v. Bleau, Fox & Associates* (2003) 107 Cal.App.4th 1009, 1018-1019, 132 Cal.Rptr.2d 602 ["[S]pecial motions to strike pursuant to section 425.16 'operate "like a demurrer or motion for summary judgment in 'reverse.' " ' (*Briggs, supra,* 19 Cal.4th at p. 1123, 81 Cal.Rptr.2d 471, 969 P.2d 564, citing *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 718-719, 34 Cal.Rptr.2d 898, 882 P.2d 894 [plaintiff opposing Code Civ. Proc., § 425.13, subd. (a) motion, must demonstrate existence of legally sufficient claim that is supported by competent, admissible evidence]"], *Drum* was disapproved on another ground in *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055, 1065, 39 Cal.Rptr.3d 516, 128 P.3d 713; see also *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073-1074, 112 Cal.Rptr.2d 397 [granting cross-complainant leave to amend pleadings in resisting a special motion to strike incompatible with statute's quick dismissal remedy].))

> FN7. In *Vogel,* the appellate court held a plaintiff's failure to *plead* a legally sufficient claim for defamation was fatal to his opposition to the special motion to strike, but reached the evidentiary issues because the defect in pleadings was never raised in the trial court. (*Vogel, supra,* 127 Cal.App.4th at p. 1019, 26 Cal.Rptr.3d 350.) Here, by contrast, Gilbert repeatedly objected in the trial court that Sykes's allegations lacked specificity and/or were inadequate to support a claim for defamation.

[29] " 'The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.' " (*Vogel, supra,* 127 Cal.App.4th at p. 1017, 26 Cal.Rptr.3d 350, quoting *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1612, fn. 5, 284 Cal.Rptr. 244.)

Sykes's allegation that Gilbert misstated the content of unspecified communications between him and Gilbert relating to unspecified procedures that he **\*32** performed is a paradigm of vagueness, and does not even come close to the specificity required to state an actionable libel claim. (See *Dowling, supra,* 85 Cal.App.4th at p. 1421, 103 Cal.Rptr.2d 174.) The charge contains no averment of a "provably false factual assertion," which is indispensable to any **\*\*768** claim for defamation. (*Seelig, supra,* 97 Cal.App.4th at p. 809, 119 Cal.Rptr.2d 108.)

Although we could well stop here, we also note that Sykes's evidentiary showing was also deficient. The gist of Sykes's charge is that Gilbert captioned the *after* photo with the question, "I was told by my doctor that this was a good result--that I looked better after his surgery--what do you think?" To prove the insinuation was defamatory, Sykes averred that he saw Gilbert only two and one-half, not five months after the surgery, and that he did not tell her it was a "good result," only that she was "healing well."

But Gilbert produced deposition testimony from Sykes that he told her on April 21 the results were "good and improving." Sykes may not impeach his own sworn testimony with contrary self-serving averments. (*Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522, 27 Cal.Rptr.3d 826.) The fact there was a two and one-half month discrepancy between the date of the photo and the date of Sykes's assurance that the results were "good" did not detract from the essential truth of the charge. Even if the representation with regard to the time frame was inaccurate, Sykes utterly failed to show, by clear and convincing evidence, that it was made with actual malice, i.e., "knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706; see *Vogel, supra,* 127 Cal.App.4th at pp. 1017- 1018, 26 Cal.Rptr.3d 350.)

For all of the above reasons, the "communication misstatements" allegation did not carry Sykes's bur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752                                                    Page 15
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)

den of showing a probability of prevailing on the merits.

### D. "Under-the-table" Compensation

[30] The last operative defamation allegation is that Gilbert's Web site "falsely suggests that Dr. Sykes was compensated for the procedures 'under the table.' " As the source for this charge, Sykes points to the *Red Flags* link with a page captioned "Things to look out for" with the sub-caption: "Doctors I would be cautious of." Therein, Gilbert includes a list of 10 warning signs to watch for when choosing a plastic surgeon, including: "If they seem preoccupied or distracted," "If they recommend more procedures than what you are seeking!" and "If a doctor downplays the risks or does not explain the risks of the procedure in detail." The seventh item on the list says: "*RUN if a doctor asks you to pay cash under the table* for any part of the surgery. This **\*33** says a lot about their ethics." Sykes claims it is a *question of fact* whether this statement was susceptible of an interpretation that Gilbert was referring to him. We disagree.

[31][32] Whether a statement is reasonably susceptible of a defamatory interpretation is a question of law for the court. *(Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 647, 85 Cal.Rptr.2d 397.) "Where the words or other matters which are the subject of a defamation action are of ambiguous meaning, or innocent on their face and defamatory only in the light of extrinsic circumstances, the plaintiff must *plead* and *prove* that as used, the words had a particular meaning, or 'innuendo,' which makes them defamatory." (*Id.* at p. 645, 85 Cal.Rptr.2d 397, italics added.) Sykes failed to carry his burden in either respect.

Nowhere on the Web site does Gilbert ever state or imply that Sykes accepted cash under the table. The cross-complaint contains no explanation how a statement made about doctors generally suggests **\*769** that *Sykes* engaged in such unethical behavior.

Sykes's name is not mentioned once on the entire *Red Flags* link or its "Things to look out

for"--"Doctors I would be cautious of" page. The "under the table" statement is couched as one of the 10 warning signs to look out for when choosing a doctor. More importantly, the entire section carries a significant preface not mentioned by Sykes that dispels any notion Gilbert is referring specifically to him: "[T]his is based on my own experience and is solely of MY own opinion *after consulting with revision doctors all over the United States,* having multiple revisional surgeries, and *just researching as much as possible.*" (Italics added.) No reasonable reader of the *Red Flags* list who also read its preface would conclude that Gilbert was charging Sykes with each unscrupulous practice mentioned therein. Yet that is exactly the notion Sykes seeks to advance by claiming that one item on the list defamed him.

There is another, more compelling, reason why the under-the-table warning cannot give rise to a cause of action. Even if it could be understood to refer to Sykes, he offered no evidence that it was *false.* Conspicuously absent from Sykes's declaration in opposition to the motion is any denial that he accepted "cash under the table."

By failing to deny the charge of under-the-table payments, Sykes has tacitly admitted that the challenged statement was substantially true. *(Vogel, supra,* 127 Cal.App.4th at pp. 1021-1022, 26 Cal.Rptr.3d 350.) Sykes has totally failed to carry his burden of showing, by "clear and convincing evidence," that the **\*34** imputation of under-the-table payments was false. *(Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 728 P.2d 1177 *(Blatty* ).)

### V. Other Torts

[33][34] The constitutional privilege applies not merely to defamation but to "all claims whose gravamen is the alleged injurious falsehood of a statement." *(Blatty, supra,* 42 Cal.3d at p. 1042, 232 Cal.Rptr. 542, 728 P.2d 1177). Thus, the collapse of Sykes's defamation claim spells the demise of all other causes of action in the cross-complaint such as intentional and negligent interference with economic advantage and intentional infliction of emo-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Cal.Rptr.3d 752
147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972
**(Cite as: 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752)**

Page 16

tional distress, all of which allegedly arise from the same publications on Gilbert's Web site. (See *Seelig, supra,* 97 Cal.App.4th at p. 812, 119 Cal.Rptr.2d 108.) As the state Supreme Court observed, " 'to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly. It would also render meaningless any defense of truth or privilege.' " (*Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 245, 228 Cal.Rptr. 215, 721 P.2d 97, quoting *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 682, 197 Cal.Rptr. 145.)

Sykes maintains, however, that his claims for infliction of emotional distress and interference with economic advantage must be allowed to proceed because they are not based on the allegedly defamatory communications, but on Gilbert's use of a Google TM *Sponsored Links* function, which "constitutes a discrete item of misconduct." Not so.

According to Sykes's 2005 cross-complaint and declaration, a Google TM search of the words "Jonathan Sykes plastic surgery" would bring up Gilbert's Web site as a prominent result under the *Sponsored Links* portion of the "Results" page.

[35] The only effect of the *Sponsored Links* function is to draw more attention to Gilbert's Web site than it otherwise **770 might attract. But the statements on Gilbert's Web site either give rise to defamation claims or they do not. Nonactionable communications do not expose the speaker to liability merely because they are likely to reach a greater number of recipients.

The *Sponsored Links* allegation does not save the cross-complaint from dismissal under section 425.16.

### *35 DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to grant Gilbert's special motion to strike and to conduct further proceedings in accordance with section 425.16. Gilbert shall recover her costs on appeal. (Cal. Rules of

Court, rule 8.276(a)(2).)

ROBIE, Acting P.J., and CANTIL-SAKAUYE, J., concur.

147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 07 Cal. Daily Op. Serv. 972

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.