# EXHIBIT 17
## To Appendix to California State Authorities



12 Cal.Rptr.3d 786                                                      Page 1
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)

▷

Court of Appeal, Second District, Division 3, California.

HMS CAPITAL, INC., etc., Plaintiff and Respondent,

v.

LAWYERS TITLE COMPANY, etc., Defendant and Appellant.

**No. B158008.**

April 30, 2004.

**Background:** In underlying litigation, title company sued mortgage broker based on the allegation that mortgage broker breached contract by failing to pay cancellation fees. After litigation terminated in favor of mortgage broker, mortgage broker brought present action against title company for malicious prosecution. Title company filed a motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute, and the Superior Court, Los Angeles County, No. BC264096, Emilie Elias, J., denied the motion. Title company appealed.

**Holdings:** The Court of Appeal, Aldrich, J., held that

(1) title company met its burden of showing that the challenged activity arose from protected activity, but

(2) mortgage broker met its burden of establishing a probability of prevailing on the merits of its malicious prosecution claim.

Affirmed.

West Headnotes

**[1] Pleading ☞360**
302k360 Most Cited Cases
The anti-SLAPP (strategic lawsuit against public participation) statute requires the court to engage in a two-step process when ruling on a defendant's anti-SLAPP motion to strike a complaint: first, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, and, if

the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading ☞360**
302k360 Most Cited Cases
In opposing an anti-SLAPP (strategic lawsuit against public participation) motion, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial. West's Ann.Cal.C.C.P. § 425.16.

**[3] Pleading ☞360**
302k360 Most Cited Cases
In ruling on an anti-SLAPP (strategic lawsuit against public participation) motion, the trial court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence; rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law. West's Ann.Cal.C.C.P. § 425.16.

**[4] Pleading ☞360**
302k360 Most Cited Cases
In adjudicating an anti-SLAPP (strategic lawsuit against public participation) motion, the issue of whether the plaintiff has established a prima facie case is a question of law. West's Ann.Cal.C.C.P. § 425.16.

**[5] Appeal and Error ☞893(1)**
30k893(1) Most Cited Cases
The appellate court reviews the trial court's rulings on an anti-SLAPP (strategic lawsuit against public participation) motion de novo, conducting an independent review of the entire record. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading ☞358**
302k358 Most Cited Cases
Title company that was sued for malicious prosecution by mortgage broker met its burden of showing,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                        Page 2
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
**(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)**

for purposes of title company's anti-SLAPP (strategic lawsuit against public participation) motion, that the challenged activity arose from protected activity; malicious prosecution action arose from the right to petition in the underlying lawsuit. West's Ann.Cal.C.C.P. § 425.16.

**[7] Pleading** &⟶358
302k358 Most Cited Cases
After title company filed anti-SLAPP (strategic lawsuit against public participation) motion against mortgage broker in response to mortgage broker's malicious prosecution action against title company, mortgage broker met its burden of establishing a probability of prevailing on the merits; mortgage broker was able to establish each element of its malicious prosecution action, showing that title company commenced underlying action without probable cause, that litigation terminated in mortgage broker's favor, and that underlying litigation was initiated with malice. West's Ann.Cal.C.C.P. § 425.16.
See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962 et seq.; Cal. Jur. 3d, Pleading, § 295 et seq.

**[8] Pleading** &⟶358
302k358 Most Cited Cases
In order for a plaintiff, in response to an anti-SLAPP (strategic lawsuit against public participation) motion, to establish a probability of prevailing in the litigation, the plaintiff must state and substantiate a legally sufficient claim. West's Ann.Cal.C.C.P. § 425.16.

**[9] Malicious Prosecution** &⟶0.5
249k0.5 Most Cited Cases
    (Formerly 249k16)
In an action for malicious prosecution, the plaintiff must establish that the prior underlying action (1) was commenced by or at the direction of the defendant, or the defendant continued to prosecute it after discovering it lacked probable cause, and it was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice.

**[10] Malicious Prosecution** &⟶37

249k37 Most Cited Cases
Mortgage broker, as plaintiff in malicious prosecution action against title company, made a prima facie showing that it had obtained a favorable termination of the underlying action; after a trial on the merits, the title company was awarded nothing on its complaint while mortgage broker was awarded $7,125 on its cross-complaint.

**[11] Malicious Prosecution** &⟶35(1)
249k35(1) Most Cited Cases
For purposes of establishing, in a malicious prosecution case, that the plaintiff obtained a favorable termination of the underlying action when prior proceedings were terminated by means other than a trial, the termination must reflect on the merits of the case and the malicious prosecution plaintiff's innocence of the misconduct alleged in the underlying lawsuit.

**[12] Malicious Prosecution** &⟶35(2)
249k35(2) Most Cited Cases
Mortgage broker, as plaintiff in malicious prosecution action against title company, made a prima facie showing that it had obtained a favorable termination of the underlying action, notwithstanding that, after it was awarded damages on its cross-complaint and title company was awarded nothing, the parties entered into a compromise and stipulation about the amount of costs; the settlement and the resulting stipulation did not relate to the merits of the parties' underlying dispute.

**[13] Malicious Prosecution** &⟶25(1)
249k25(1) Most Cited Cases
Mortgage broker, as plaintiff in malicious prosecution action against title company, made a prima facie showing that there was a lack of probable cause to commence the underlying action; title company's underlying lawsuit was based on the claim that mortgage broker breached contract by failing to pay cancellation fees, but escrow instructions used by the parties specifically stated that mortgage broker would not be paying any cancellation fees.

**[14] Malicious Prosecution** &⟶31

12 Cal.Rptr.3d 786                                                              Page 3
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
**(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)**

249k31 Most Cited Cases
Mortgage broker, as plaintiff in malicious prosecu-
tion action against title company, made a sufficient
prima facie showing of malice; title company's un-
derlying lawsuit was based on the claim that mort-
gage broker breached contract by failing to pay
cancellation fees, but escrow instructions used by
the parties specifically stated that mortgage broker
would not be paying any cancellation fees, title
company did not discuss cancellation fees with
mortgage broker, and title company undertook only
limited discovery, allowing for the inference that it
was simply trying to force a settlement from the
mortgage broker on a baseless case.

[15] Malicious Prosecution ☞30
249k30 Most Cited Cases
The malice element of the malicious prosecution
tort goes to the defendant's subjective intent; it is
not limited to actual hostility or ill will toward the
plaintiff.

[16] Malicious Prosecution ☞32
249k32 Most Cited Cases
In malicious prosecution actions, a lack of probable
cause in bringing the underlying action is a factor
that may be considered in determining if the claim
was prosecuted with malice, but the lack of prob-
able cause must be supplemented by other, addi-
tional evidence.

[17] Malicious Prosecution ☞64(2)
249k64(2) Most Cited Cases
In malicious prosecution actions, malice is usually
proven by circumstantial evidence and inferences
drawn from the evidence, since parties rarely admit
an improper motive.
**788 *207 Richard D. Marks Professional Corpor-
ation and Richard D. Marks for Defendant and Ap-
pellant.

Kester & Isenberg and Charles F. Kester for
Plaintiff and Respondent.

ALDRICH, J.

The issue on appeal is whether the trial court erred
in denying an anti-SLAPP motion. [FN1] The mo-
tion contended that a malicious prosecution lawsuit

should be stricken. We affirm the order denying the
motion in part because the party bringing the mali-
cious lawsuit received a *208 favorable termination
on the merits of the underlying lawsuit, irrespective
of the voluntary settlement of costs.

> FN1. "SLAPP is an acronym for 'strategic
> lawsuit against public participation.' "
> (Jarrow Formulas, Inc. v. LaMarche
> (2003) 31 Cal.4th 728, 732, fn. 1, 3
> Cal.Rptr.3d 636, 74 P.3d 737 (Jarrow For-
> mulas, Inc.).)

**789 FACTUAL AND PROCEDURAL BACK-
GROUND
1. Introductory facts.

Plaintiff and respondent HMS Capital Inc., a Cali-
fornia corporation, (HMS) is a residential mortgage
broker specializing in arranging refinancing of
home mortgages in California with no points and
no-cost loans. Defendant and appellant Lawyers
Title Company, a corporation, (Lawyers Title) is in
the business of providing title and escrow services
for real estate transactions.

In May 1998, HMS and Lawyers Title entered into
an oral contract, under which Lawyers Title was to
provide title insurance and escrow services to
HMS. A few months later, the parties ended their
business relationship.

2. The underlying litigation.

On April 9, 1999, Lawyers Title filed suit against
HMS (LASC No. BC 208521), (hereafter LASC
No. BC 208521). In its complaint and first amended
complaint, Lawyers Title alleged it was owed ap-
proximately $40,000 for cancellation fees from
various title services.

In an amended cross-complaint, HMS sought
$13,578 for breach of contract, unjust enrichment,
conversion, and interference with prospective eco-
nomic advantage.

A court trial was held. The trial court ruled that
Lawyers Title was to take nothing on its complaint,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                                                                Page 4
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
**(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)**

and HMS was awarded $7,185.27 (for the amount that had been held in escrow), plus prejudgment interest and costs on the cross-complaint. In rendering its opinion, the trial court issued a May 17, 2001, statement of decision in which it made a number of factual findings. The judgment entered on May 17, 2001, left open a space for the amount of costs to be awarded to HMS, which was to be determined later.

On May 24, 2001, HMS filed a memorandum of costs requesting $9,053.87 in costs.

On June 11, 2001, the trial court accepted and filed a stipulation between the parties regarding the amount of costs to be awarded to HMS. In the stipulation, the parties agreed that the total costs awarded to HMS was to be *209 $7,906.36. [FN2] On June 11, 2001, the trial court amended the judgment by interlineation to include a $7,906.36 costs award. The June 11, 2001, order of the court read: "Good cause appearing, HMS is to be awarded $7,906.36 in costs in accordance with the [parties'] Stipulation, and such costs are to be included in the Judgment." Lawyers Title asserts that it paid the judgment and a full satisfaction of judgment was filed. Lawyers Title did not appeal.

> FN2. The stipulation read in part: "On May 24, 2001, HMS filed its Memorandum of Costs wherein HMS sought $9,053.87 in costs to be paid by [Lawyers Title]. [¶][ ] Rather than litigate over certain disputed costs, the Parties have agreed to reduce the amount of costs sought by $1,147.51. [¶][ ] Thus, the total amount of costs to be awarded to HMS in this action--and to be paid by [Lawyers Title]--should be $7,906.36."

3. *The present proceedings.*

On December 20, 2001, HMS filed a malicious prosecution case against Lawyers Title.

Lawyers Title responded with a motion to strike, pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute. Lawyers Title attached to its motion the declaration of its attorney, Richard

D. Marks, a copy of Code of Civil Procedure section 425.16, a copy of an appellate court case discussing the application of anti-SLAPP motions to malicious prosecution actions, and the June 11, 2001, stipulation regarding costs. [FN3]

> FN3. In its motion to strike, Lawyers Title conceded that the underlying case had been resolved in favor of HMS. In a subsequent pleading, Lawyers Title deleted this concession.

**790 HMS opposed the motion. HMS attached to its opposition the following: a declaration from its counsel; the May 17, 2001, judgment; the statement of decision in LASC No. BC 208521; and a communication that had been sent from HMS's attorney to Lawyers Title's counsel during the pendency of LASC No. BC 208521. This communication stated in part, "[g]iven [the] clear language [of the escrow instructions we used] we believe [Lawyers Title's] claims to be frivolous." This communication had attached a copy of the escrow instructions the parties had used. The escrow instructions stated in part, "HMS Capital will not be paying any cancellation fees whatsoever to Lawyers Title...." In his declaration, HMS's counsel declared that on numerous occasions he had told Lawyers Title that its case was unfounded, but Lawyers Title's counsel insisted on a payment of $25,000 to resolve the case. HMS's counsel further declared that in case LASC No. BC 208521, Lawyers Title had taken no depositions and had promulgated only one set of form interrogatories.

HMS contended in its opposition that it had a probability of prevailing on its malicious prosecution case because: (1) LASC No. BC 208521 had been *210 terminated in its favor; (2) the findings in the statement of decision in LASC No. BC 208521 demonstrated that Lawyers Title's breach of contract claims lacked probable cause; and (3) LASC No. BC 208521 was initiated with malice as demonstrated by (a) the trial court's findings in that case; (b) the minimal discovery conducted by Lawyers Title in that case; and (c) the fact that HMS had informed Lawyers Title's counsel that its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                                                    Page 5
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
**(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)**

breach of contract claims were baseless.

In its reply brief, Lawyers Title contended: (1) LASC No. BC 208521 had not been terminated favorably to HMS because the judgment was entered upon stipulation; (2) the claims in LASC No. BC 208521 were legally tenable and the trial court's statement of decision in that case contained no explicit finding that there was no probable cause to initiate the case; (3) the amount of discovery conducted in LASC No. BC 208521 was not relevant with regard to malice; and (4) settlement discussions were inadmissible and not an indicia of lack of probable cause or malice. Lawyers Title submitted an additional declaration from its counsel; the May 17, 2001, judgment, as modified on June 11, 2001; the June 11, 2001, minute order in which the trial court directed the May 17, 2001, judgment be modified; and the pleadings from LASC No. BC 208521.

On April 8, 2002, the trial court denied Lawyers Title's anti-SLAPP motion. Lawyers Title appealed from the denial of the motion. [FN4]

> FN4. An order denying a special motion to strike is appealable. (Code Civ. Proc., §§ 425.16, subd. (i), 904.1.)

## DISCUSSION

### 1. *The remedy of a special motion to strike under Code of Civil Procedure section 425.16.*

The purpose underlying the anti-SLAPP statute, Code of Civil Procedure section 425.16 (hereinafter section 425.16), is set forth therein. It states: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public **791 significance, and that this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).)

To meet this concern, section 425.16 provides that

a "cause of action against a person arising from any act of that person in furtherance of the *211 person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

The determination that the plaintiff will prevail or the claim is made on the basis of the pleadings, as well as "supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) If it is determined that there is a probability the plaintiff will prevail, that determination is inadmissible at any later stage of the case and does not affect the applicable burden or degree of proof. (§ 425.16, subd. (b)(3).)

### 2. *Burdens of proof.*

[1] We "summarize a court's task in ruling on an anti-SLAPP motion to strike as follows. Section 425.16, subdivision (b)(1) requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685.)

In other words, "the moving defendant's burden is to show the challenged cause of action 'arises' from protected activity. [Citations.] Once [but only if] it is demonstrated the cause of action *arises* from the exercise of the defendant's free expression or peti-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                                                      Page 6
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)

tion rights, then the burden shifts to the plaintiff to show a probability of prevailing in the litigation." (*Shekhter v. Financial Indemnity Co.* (2001) 89 Cal.App.4th 141, 151, 106 Cal.Rptr.2d 843.)

"[S]ection 425.16 is analogous to other statutes requiring the plaintiff to make a threshold showing, which are aimed at eliminating meritless litigation at an early stage. [Citation.]" (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 355, 42 Cal.Rptr.2d 464.) A plaintiff opposing an anti-SLAPP motion bears the burden to make a prima facie showing of facts that would support a judgment in plaintiff's favor. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907, 84 Cal.Rptr.2d 303; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 613-614, 129 Cal.Rptr.2d 546.) *212 Anti-SLAPP motions must be supported (and opposed) by declarations stating facts upon which the liability or defense is based. (§ 425.16, subd. (b).)

[2] In opposing an anti-SLAPP motion, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial. (*Roberts v. Los Angeles County Bar Assn., supra,* 105 Cal.App.4th at pp. 613-614, 129 Cal.Rptr.2d 546.) Thus, declarations may not be based upon "information and belief" (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497-1498, 45 Cal.Rptr.2d 624) and documents submitted without the proper **792 foundation are not to be considered. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1238, 132 Cal.Rptr.2d 57.)

[3] The court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff (*Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 45-46, 134 Cal.Rptr.2d 420) and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906, 120 Cal.Rptr.2d 576; *Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 768, 131 Cal.Rptr.2d

201.) The trial court merely determines whether a prima facie showing has been made that would warrant the claim going forward. (*Robertson v. Rodriguez, supra,* 36 Cal.App.4th at p. 356, fn. 3, 42 Cal.Rptr.2d 464.)

[4] "Whether plaintiffs have established a prima facie case is a question of law. [Citation.]" (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965, 12 Cal.Rptr.3d 54, 87 P.3d 802.)

[5] We review the trial court's rulings on an anti-SLAPP motion de novo, conducting an independent review of the entire record. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999, 113 Cal.Rptr.2d 625; *Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees* (1999) 69 Cal.App.4th 1057, 1064, 82 Cal.Rptr.2d 10.)

*3. The moving defendant in this malicious prosecution case, Lawyers Title, met its burden of showing the challenged cause of action arose from protected activity.*

[6] As indicated, the threshold issue requires the defendant to show that the challenged cause of action arises from protected activity. (*Jarrow Formulas, Inc., supra,* 31 Cal.4th at p. 736, 3 Cal.Rptr.3d 636, 74 P.3d 737; *Shekhter v. Financial Indemnity Co., supra,* 89 Cal.App.4th at pp. 150-151, 106 Cal.Rptr.2d 843.) The recent case of *213 Jarrow Formulas, Inc.* establishes that a cause of action for malicious prosecution is subject to anti-SLAPP scrutiny under section 425.16. [FN5] As stated in *Jarrow Formulas, Inc.,* a malicious prosecution cause of action arises from the right to petition as it "arises from an underlying lawsuit, or petition to the judicial branch. By definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit. [Citation.]" (*Jarrow Formulas, Inc., supra,* at pp. 734-735, 3 Cal.Rptr.3d 636, 74 P.3d 737.)

FN5. On October 28, 2002, we took the instant appeal off calendar, on our own motion, pending the resolution of *Jarrow Formulas, Inc., supra,* 31 Cal.4th 728, 3 Cal.Rptr.3d 636, 74 P.3d 737. The Su-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                                      Page 7
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
**(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)**

preme Court issued its opinion on August 18, 2003. Thereafter, we provided the parties with an opportunity to file supplemental briefs and placed the case on calendar.

*4. HMS, the malicious prosecution plaintiff and the party opposing the anti-SLAPP motion, met its burden of establishing a probability of prevailing.*

[7][8] Because the initial burden of showing that the malicious prosecution claim was subject to scrutiny under section 425.16 was met, the burden shifted to HMS. HMS, as the plaintiff in this case, had to establish a probability of prevailing in the litigation. **793*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67, 124 Cal.Rptr.2d 507, 52 P.3d 685.) "To satisfy this prong, the plaintiff must 'state[ ] and substantiate[ ] a legally sufficient claim.' [Citation.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]" *(Jarrow Formulas, Inc., supra,* 31 Cal.4th at p. 741, 3 Cal.Rptr.3d 636, 74 P.3d 737.)

As discussed below, when analyzed in this manner, the trial court's ruling denying the anti-SLAPP motion was correct.

*a. Elements of malicious prosecution.*

[9] In an action for malicious prosecution, the plaintiff must establish that the prior underlying action (1) was commenced by or at the direction of the defendant, or the defendant continued to prosecute it after discovering it lacked probable cause, and it was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice. *(Crowley v. Katleman* (1994) 8 Cal.4th 666, 676, 34 Cal.Rptr.2d 386, 881 P.2d 1083; *Zamos v. Stroud, supra,* 32 Cal.4th at p. ----, 12 Cal.Rptr.3d 54, 87 P.3d 802 [2004 WL 829006*8].)

*214* **b. HMS met its burden.**

*(1) HMS made a prima facie showing that it had obtained a favorable termination of the underlying action, LASC No. BC 208521.*

[10][11] The first element of a malicious prosecution cause of action is that the underlying case must have been terminated in favor of the malicious prosecution plaintiff. The basis of the favorable termination element is that the resolution of the underlying case must have tended to indicate the malicious prosecution plaintiff's innocence. *(Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341, 9 Cal.Rptr.3d 97, 83 P.3d 497; *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750, 159 Cal.Rptr. 693, 602 P.2d 393.) When prior proceedings are terminated by means other than a trial, the termination must reflect on the merits of the case and the malicious prosecution plaintiff's innocence of the misconduct alleged in the underlying lawsuit. *(Casa Herrera, Inc. v. Beydoun, supra,* at pp. 341-342, 9 Cal.Rptr.3d 97, 83 P.3d 497; *Pender v. Radin* (1994) 23 Cal.App.4th 1807, 1814, 29 Cal.Rptr.2d 36; see cases discussed in *Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827, 145 Cal.Rptr. 829 [the following reflect on the merits as there is assumption that one does not abandon meritorious actions once instituted: dismissal of criminal action sought by district attorney after preliminary hearing, dismissal of prosecution of a criminal action for lack of evidence, and dismissal for failure to prosecute]; e.g., *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1191, 121 Cal.Rptr.2d 794 [summary judgment granted and sanctions issued because claim meritless].)

Here, after a trial on the merits, LASC No. BC 208521 ended with Lawyers Title being awarded nothing on its complaint and HMS being awarded $7,125.27 on its cross-complaint against Lawyers Title. These facts present a prima facie showing that the underlying case was terminated in HMS's favor.

[12] Lawyers Title contends, however, that LASC No. BC 208521 was *not* resolved in HMS's favor because after the trial on the merits, the parties entered into a compromise and stipulation as to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                      Page 8
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)

amount of costs, and the judgment was modified to reflect this agreement. To support this contention, Lawyers Title **794 cites *Ferreira v. Gray, Cary, Ware & Freidenrich* (2001) 87 Cal.App.4th 409, 104 Cal.Rptr.2d 683. *Ferreira,* follows the general rule that a case concluded as a result of settlement does not result in a favorable termination because such a result is ambiguous and does not reflect on the merits, but leaves open the question of the parties' guilt or innocence. *(Pender v. Radin, supra,* 23 Cal.App.4th at p. 1814, 29 Cal.Rptr.2d 36; *Dalany v. American Pacific Holding Corp.* (1996) 42 Cal.App.4th 822, 827, 50 Cal.Rptr.2d 13.)

*215 *Ferreira* does contain some broad language that might assist Lawyers Title. (E.g., *Ferreira v. Gray, Cary, Ware & Freidenrich, supra,* 87 Cal.App.4th at p. 413, 104 Cal.Rptr.2d 683 ["where both sides give up anything of value in order to end the litigation, a party cannot later claim he received a favorable termination. [Citations.]" And, "Where the underlying litigation ends by way of a negotiated settlement, there is no favorable termination for the purposes of pursuing a malicious prosecution action."].) However, *Ferreira* must be analyzed according to its facts, which are not analogous to the present case. In *Ferreira,* a verdict was returned by a jury. One party "believed there were strong grounds to challenge the verdict through posttrial motions and on appeal." *(Id.* at p. 412, 104 Cal.Rptr.2d 683.) Thereafter, the parties discussed settling the merits of the litigation. While settlement discussions were underway, a judgment on the verdict was entered. *(Ibid.)* Shortly thereafter, the parties settled the case, including an agreement by one side not to appeal and an agreement by the other side to accept $3.00 as full satisfaction of his $75,982 damages award. As a result of the settlement agreement, an amended judgment was entered. *(Ibid.) Ferreira* concluded that there was no favorable termination because the settlement ended the litigation.

In contrast, here, the settlement and the resulting stipulation did not relate to the merits of the parties' dispute. They dealt only with the ancillary issue of the amount of costs. Instead of HMS receiving

$9,053.87 in costs, the parties agreed to reduce the sum owed by $1,147.51 so that HMS would received $7,906.36. (See *ante,* fn. 2.) Unlike *Ferreira,* this case does not involve a situation where the parties forgo a trial and settle the dispute, nor as in *Ferreira,* where the parties resolve all issues by settlement after a trial. [FN6] (Compare with **795*Dalany v. American Pacific Holding Corp.,* *216*supra,* 42 Cal.App.4th 822, 50 Cal.Rptr.2d 13 [no favorable termination where motion for summary adjudication granted in part and thereafter lengthy settlement negotiations result in stipulated judgment being filed prior to trial on merits].) Here, the settlement was entered into by HMS and Lawyers Title after a full trial on the merits in which HMS was victorious. HMS's agreement to reduce its cost request by $1,000 did not reflect on the merits of the case.

> FN6. Neither party cites *Pender v. Radin,* *supra,* 23 Cal.App.4th 1807, 29 Cal.Rptr.2d 36, a case that concluded a waiver of costs and attorney fees did *not* result in a favorable termination. However, the facts of *Pender* make it distinguishable from the case before us. In *Pender v. Radin,* three family members were sued by Irene Radin on a remodeling contract. To settle the case, one defendant (Herbert Pender IV, the contractor) paid Radin $25,000; to assist Herbert, the two other defendants (Gisele and Francine Pender) forgave a debt Herbert owed them; and all three family members agreed to waive costs and attorney fees. *(Id.* at pp. 1812, 1814, 29 Cal.Rptr.2d 36.) After the breach of contract case was dismissed, Gisele and Francine brought a malicious prosecution case against Radin. In the malicious prosecution case, a summary judgment in favor of Radin was affirmed on appeal. The appellate court noted that the settlement of the breach of contract case was negotiated by one attorney on behalf of all three family members. *(Id.* at p. 1814, 29 Cal.Rptr.2d 36.) Further, in the resolution of the breach of contract case, Gisele and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                    Page 9
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)

Francine had given up something of value by waiving fees and costs. (*Ibid.*) Notwithstanding that Gisele and Francine had not paid Radin to resolve the breach of contract lawsuit, Gisele and Francine had been parties to a global settlement, in which the waiver of costs and fees was a necessary part. (*Id.* at pp. 1814-1815, 29 Cal.Rptr.2d 36; *Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 45 Cal.Rptr.2d 848 [favorable termination discussion involved whether settlement necessarily included all parties].)

HMS made a prima facie showing that LASC No. BC 208521 was terminated in its favor.

*(2) HMS made a sufficient prima facie showing that there was a lack of probable cause to commence the underlying action, LASC No. BC 208521.*

[13] To meet its burden in opposing the anti-SLAPP motion, HMS had to present a prima facie case addressing the second element of malicious prosecution, i.e., that the underling lawsuit (i.e., LASC No. BC 208521) was brought without probable cause.

The parties agree that Lawyers Title's lawsuit was premised upon a claim that HMS breached the contract by failing to pay cancellation fees. According to the statement of decision, it was undisputed that at no time did Lawyers Title ever advise HMS that cancellation fees would be charged. According to the statement of decision, it was undisputed that there were no discussions about cancellation fees during negotiations of the contract and it was undisputed that at no time thereafter were such discussions held. The statement of decision reflected that in the trial, it was undisputed that cancellation fees were not standard in the industry and that Lawyers Title did not charge such fees ordinarily. [FN7] Lastly, a copy of the escrow instructions *217 used by the parties specifically stated that "HMS Capital will not be paying any cancellation fees whatsoever to Lawyers Title...."

FN7. The statement of decision in LASC

No. BC 208521 was submitted to the trial court by HMS in opposition to Lawyers Title's anti-SLAPP motion. On appeal, Lawyers Title contends that the findings and statements of the trial court as articulated in the statement of decision cannot be considered by us to determine if HMS met its burden to prove a probability of prevailing in this malicious prosecution lawsuit. However, Lawyers Title never objected in the trial court on these grounds. Rather, Lawyers Title's objection was narrowly drawn. Lawyers Title cited Code of Civil Procedure section 1858 [in constructing a statute or instrument, judges may not insert what was omitted] to argue that the statement of decision did not include an *express* finding on the issue of probable cause and thus, it was improper for such an express finding to be interlineated into that document. Because Lawyers Title did not argue in the trial court that the statements and findings of fact contained in the statement of decision constituted inadmissible evidence, Lawyers Title is precluded from doing so on appeal. (Evid.Code, § 353, subd. (a); *Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1226-1227, fn. 13, 83 Cal.Rptr.2d 235 [evidentiary objections waived if not made in trial court].) Also, Lawyers Title did not argue in the trial court that it was improper to judicially notice the facts as determined in the statement of decision. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1563, 8 Cal.Rptr.2d 552 [may take judicial notice that trial court made findings, but judicial notice not properly taken of the truth of the factual findings of the trial judge].) Thus, Lawyers Title is foreclosed from doing so on appeal. (*Doers v. Golden Gate Bridge Etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1, 151 Cal.Rptr. 837, 588 P.2d 1261.)

These facts could demonstrate that there was no evidence upon which Lawyers Title could claim it was owed cancellation fees. These facts support a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                Page 10
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)

prima facie showing that Lawyers Title lacked **796 probable cause to bring the underlying case as it was not legally tenable. *(Mabie v. Hyatt (1998) 61 Cal.App.4th 581, 596-597, 71 Cal.Rptr.2d 657* [unreasonable to prosecute a case where there is a complete absence of supporting evidence]; *Sangster v. Paetkau (1998) 68 Cal.App.4th 151, 164-165, 80 Cal.Rptr.2d 66* [to avoid malicious prosecution, claim must be legally and factually tenable]; *Jarrow Formulas, Inc., supra, 31 Cal.4th at p. 742, 3 Cal.Rptr.3d 636, 74 P.3d 737* [probable cause measured objectively]; *Zamos v. Stroud, supra, 32 Cal.4th at p. ----, 12 Cal.Rptr.3d 54, 87 P.3d 802 [2004 WL 829006, *8].)*

Lawyers Title points to *Jarrow Formulas, Inc., supra, 31 Cal.4th 728, 3 Cal.Rptr.3d 636, 74 P.3d 737,* to argue that HMS did not meet its burden with regard to the lack of probable cause element. In *Jarrow Formulas, Inc.* the malicious prosecution case was based upon the granting of a summary judgment motion on a cross-complaint alleging slander of title and interference with economic advantage. *(Id. at p. 732, 3 Cal.Rptr.3d 636, 74 P.3d 737.)* In opposing the anti-SLAPP motion, the malicious prosecution plaintiff relied exclusively on the summary judgment. The minute order granting summary judgment stated that " 'no competent evidence' of harmful activity by Jarrow or damages to LaMarche's business had been presented." *(Id. at p. 742, 3 Cal.Rptr.3d 636, 74 P.3d 737,* fn. omitted.) In defending the anti-SLAPP motion, Jarrow argued that the summary judgment in its favor on the underlying cross-complaint established, as a matter of law, that it had a probability of prevailing on the malicious prosecution case. *(Ibid.) Jarrow Formulas, Inc.,* concluded that this finding did not refute, as a matter of law, the argument that the underlying lawsuit was objectively reasonable, or legally tenable, when filed. *(Id. at p. 743, 3 Cal.Rptr.3d 636, 74 P.3d 737.)* This conclusion partially was based upon the fact that parties have a right to present arguably correct issues, even if they subsequently lose. *(Id. at p. 742.) Jarrow Formulas, Inc.,* further stated that a summary judgment does not necessarily establish malice. *(Id. at p. 743, 3 Cal.Rptr.3d 636, 74 P.3d 737.)*

Unlike *Jarrow Formulas, Inc.,* we are not dealing with a summary judgment motion and the evidence presented here demonstrated that Lawyers Title had no probable cause to file its case.

HMS made a sufficient prima facie showing that Lawyers Title lacked probable cause to bring the underlying action.

**\*218 (3) *HMS made a sufficient prima facie showing of malice.***

[14] The remaining issue is whether HMS made an adequate showing that Lawyers Title acted with malice in commencing LASC No. BC 208521.

[15][16][17] "The malice element of the malicious prosecution tort goes to the defendant's subjective intent.... It is not limited to actual hostility or ill will toward the plaintiff." *(Sierra Club Foundation v. Graham (1999) 72 Cal.App.4th 1135, 1156-1157, 85 Cal.Rptr.2d 726.)* It can exist, for example, where the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim. A lack of probable cause is a factor that may be considered in determining if the claim was prosecuted with malice *(Downey Venture v. LMI Ins. Co. (1998) 66 Cal.App.4th 478, 498, fn. 29, 78 Cal.Rptr.2d 142),* but the lack of probable cause must be supplemented by other, additional evidence. *(Id. at p. 498, 78 Cal.Rptr.2d 142.)* Since parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence. **797*(Padres L.P. v. Henderson (2003) 114 Cal.App.4th 495, 522, 8 Cal.Rptr.3d 584.)*

As this court explained in *Downey Venture v. LMI Ins. Co.,* "[m]erely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [citation], *without more,* would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind. In other words, the presence of malice must be established by other, additional evidence. [¶] ... [T]hat evidence must include

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12 Cal.Rptr.3d 786                                                                                    Page 11
118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243
(Cite as: 118 Cal.App.4th 204, 12 Cal.Rptr.3d 786)

proof of either actual hostility or ill will on the part of the defendant or a subjective intent to deliberately misuse the legal system for personal gain or satisfaction at the expense of the wrongfully sued defendant. [Citation.]" *(Downey Venture v. LMI Ins. Co., supra,* 66 Cal.App.4th at pp. 498-499, 78 Cal.Rptr.2d 142, fn. omitted, original italics.)

Here, with respect to the issue of malice, according to the statement of decision, at no time did Lawyers Title discuss cancellation fees with HMS. Lawyers Title was informed by HMS's attorney that the escrow instructions used by the parties specifically stated that such fees would not be charged. Given this language and the lack of any discussion between the parties about such fees, it could be concluded that Lawyers Title's claims in LASC No. BC 208521 were frivolous. It was also undisputed that Lawyers Title took no depositions, promulgated only one set of form interrogatories, and refused to dismiss LASC No. BC 208521 unless HMS paid $25,000. These facts could support a conclusion that Lawyers Title was simply trying to squeeze a settlement from HMS on a baseless case, and hence evidence of malice.

*219 Lawyers Title argues we cannot consider that it had requested a specified sum from HMS to settle the case, as evidence of settlement discussions are not admissible. (Evid.Code, §§ 1152, 1154 [statutes prohibiting use of settlement negotiations to show liability or invalidity of a claim].) Lawyers Title has waived this evidentiary objection because it did not obtain a ruling on it in the trial court. (Cf. *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1, 25 Cal.Rptr.2d 137, 863 P.2d 207.) Further, malice can be shown by initiating litigation for an improper purpose. Lawyers Title cites no case holding that settlement discussions are inadmissible to show that a case was litigated for an improper purpose. (C.f. *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 915, 93 Cal.Rptr.2d 364 [unreasonably low offer admissible to show bad faith].) Thus, the fact that Lawyers Title's counsel insisted on a payment of $25,000 to dismiss the case, irrespective of the facts, would be admiss-

ible.

We concur in the trial court's conclusion that HMS made a sufficient prima facie showing that Lawyers Title acted with the subjective intent to deliberately misuse the legal system for personal gain or satisfaction at HMS's expense.

In opposing the anti-SLAPP motion, HMS met its burden of establishing a probability of prevailing on its malicious prosecution lawsuit. [FN8]

> FN8. By our conclusion, we express no opinion as to the merits of HMS's malicious prosecution claim. We simply hold that HMS has met its burden of showing its action has the sufficient merit required to survive an anti-SLAPP motion. (§ 425.16, subd. (b)(3).)

DISPOSITION

The order denying the motion by Lawyers Title to strike HMS's complaint is **798 affirmed. HMS shall recover costs on appeal.

We concur: KLEIN, P.J., and CROSKEY, J.

118 Cal.App.4th 204, 12 Cal.Rptr.3d 786, 04 Cal. Daily Op. Serv. 3741, 2004 Daily Journal D.A.R. 5243

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 18
## To Appendix to California State Authorities

Westlaw.

29 Cal.Rptr.3d 521                                                                                              Page 1
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

▷

Court of Appeal, Fourth District, Division 1, California.
HUNTINGDON LIFE SCIENCES, INC., et al.,
Plaintiffs and Respondents,
v.
STOP HUNTINGDON ANIMAL CRUELTY USA,
INC., et al., Defendants and Appellants.
No. D042950.

June 1, 2005.

**Background:** Animal testing laboratory and its employee sued organization and individuals protesting laboratory's activities, alleging trespass, harassment, and related causes of action arising from incidents that occurred at the home of employee. The Superior Court, San Diego County, No. GIC812248, J. Richard Haden, J., denied defendants' special motion to strike the complaint under anti-SLAPP (strategic lawsuit against public participation) statute. Defendants appealed.

**Holdings:** The Court of Appeal, McConnell, P.J., held that:
(1) trial court's granting preliminary injunction to plaintiffs did not conclusively establish plaintiffs' probability of success on the merits;
(2) plaintiffs showed probability of prevailing on their harassment cause of action;
(3) employee showed probability of prevailing on causes of action for intentional infliction of emotional distress and invasion of privacy;
(4) employee showed probability of prevailing on cause of action for unfair competition;
(5) employee showed probability of prevailing on cause of action for violating city's municipal code, which made it unlawful for any person to engage in picketing a residence; and
(6) plaintiffs failed to show probability of prevailing on their causes of
action for trespass or negligent infliction of emotional distress.
Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Pleading ⟳360**
302k360 Most Cited Cases
In deciding an anti-SLAPP (strategic lawsuit against public participation) motion, the trial court must engage in a two-step process: first, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity; if the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading ⟳358**
302k358 Most Cited Cases
For purposes of anti-SLAPP (strategic lawsuit against public participation) statute, a defendant may meet his or her burden by showing the act underlying the plaintiff's cause of action fits one of the categories enumerated in the statute, which include acts in furtherance of the defendant's right of petition or free speech. West's Ann.Cal.C.C.P. § 425.16.

**[3] Pleading ⟳358**
302k358 Most Cited Cases
Statutory phrase "cause of action ... arising from," within meaning of anti-SLAPP (strategic lawsuit against public participation) statute authorizing a motion to strike a complaint as a SLAPP suit, means simply that the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech; in the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech. West's Ann.Cal.C.C.P. § 425.16.

**[4] Pleading ⟳358**
302k358 Most Cited Cases
The anti-SLAPP (strategic lawsuit against public participation) statute's definitional focus is not the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                           Page 2
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

form of the plaintiff's cause of action but, rather, the defendant's activity that gives rise to his or her asserted liability, and whether that activity constitutes protected speech or petitioning. West's Ann.Cal.C.C.P. § 425.16.

**[5] Pleading** ☞360
302k360 Most Cited Cases
To establish a probability of prevailing on the claim, a plaintiff responding to an anti-SLAPP (strategic lawsuit against public participation) motion must state and substantiate a legally sufficient claim; that is, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading** ☞360
302k360 Most Cited Cases
In deciding the question of potential merit of the plaintiff's claim, after the defendant has filed a motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant; though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. West's Ann.Cal.C.C.P. § 425.16.

**[7] Appeal and Error** ☞842(7)
30k842(7) Most Cited Cases
The court's ruling on a special motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute is subject to the appellate court's independent review. West's Ann.Cal.C.C.P. § 425.16.

**[8] Courts** ☞89
106k89 Most Cited Cases
Pending a decision by the California Supreme Court on whether a motion to strike a complaint un-

der the anti-SLAPP (strategic lawsuit against public participation) statute applied to mixed causes of action involving both constitutionally protected conduct involving the exercise of free speech rights and unprotected conduct, the Court of Appeal would following existing appellate precedent that applied the anti-SLAPP statute to mixed causes of action. West's Ann.Cal.C.C.P. § 425.16.

**[9] Pleading** ☞358
302k358 Most Cited Cases
Complaint by an animal testing laboratory and its employee against organization and individuals protesting the laboratory's activities arose from defendants' protected speech rights, for purposes of defendants' motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute; animal testing was an area of widespread public concern and controversy, and defendants' speech took place in a public forum, which included a public street and a Web site. West's Ann.Cal.C.C.P. § 425.16.

**[10] Pleading** ☞358
302k358 Most Cited Cases
When a cause of action arises from constitutionally protected speech, the anti-SLAPP (strategic lawsuit against public participation) statute applies and the question of whether the speech is not protected must be examined when plaintiff demonstrates a probability of success on the merits. West's Ann.Cal.C.C.P. § 425.16.

**[11] Pleading** ☞358
302k358 Most Cited Cases
In the context of a defendant's motion to strike a complaint under the anti-SLAPP (strategic lawsuit against public participation) statute, if the defendant concedes or the evidence conclusively establishes that the conduct complained of was illegal, as a matter of law the defendant cannot make a prima facie showing the action arises from protected activity within the meaning of the statute. West's Ann.Cal.C.C.P. § 425.16.

**[12] Pleading** ☞358
302k358 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                    Page 3
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

The "public interest" component of the anti-SLAPP (strategic lawsuit against public participation) statute is met when the statement or activity precipitating the claim involved a topic of widespread public interest, and the statement in some manner itself contributes to the public debate. West's Ann.Cal.C.C.P. § 425.16.

**[13] Judgment ⬥644**
228k644 Most Cited Cases

**[13] Pleading ⬥358**
302k358 Most Cited Cases
Trial court's granting of preliminary injunction to animal testing laboratory and its employee, against organization and individuals protesting the laboratory's activities, did not conclusively establish plaintiffs' probability of success on the merits, under the collateral estoppel aspect of the res judicata doctrine, for purposes of defendants' motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute; the preliminary injunction did not affect all defendants, trial court did not address many of the complaint's causes of action in issuing the injunction, and the finality requirement of collateral estoppel was not met. West's Ann.Cal.C.C.P. § 425.16.
*See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962 et seq.; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2004) ¶ 7:207 et seq (CACIVP Ch. 7-C).*

**[14] Judgment ⬥540**
228k540 Most Cited Cases

**[14] Judgment ⬥584**
228k584 Most Cited Cases
The doctrine of res judicata gives certain conclusive effect to a former judgment in subsequent litigation involving the same controversy; it seeks to curtail multiple litigation causing vexation and expense to the parties and wasted effort and expense in judicial administration.

**[15] Judgment ⬥634**
228k634 Most Cited Cases
Under the collateral estoppel aspect of res judicata, relitigation of an issue previously adjudicated is generally precluded if the following criteria are met: first, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; second, this issue must have been actually litigated in the former proceeding; third, it must have been necessarily decided in the former proceeding; fourth, the decision in the former proceeding must be final and on the merits; and finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

**[16] Judgment ⬥956(1)**
228k956(1) Most Cited Cases
The party asserting collateral estoppel has the burden of establishing its threshold requirements.

**[17] Constitutional Law ⬥1490**
92k1490 Most Cited Cases
    (Formerly 92k90(1))
The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people, and it attempts to secure the widest possible dissemination of information from diverse and antagonistic sources. U.S.C.A. Const.Amend. 1.

**[18] Constitutional Law ⬥1517**
92k1517 Most Cited Cases
    (Formerly 92k90(3))

**[18] Constitutional Law ⬥1562**
92k1562 Most Cited Cases
    (Formerly 92k90(3))

**[18] Constitutional Law ⬥1801**
92k1801 Most Cited Cases
    (Formerly 92k90(3))

**[18] Constitutional Law ⬥1545**
92k1545 Most Cited Cases
    (Formerly 92k90.1(1))

**[18] Constitutional Law ⬥2161**
92k2161 Most Cited Cases
    (Formerly 92k90.1(5))

**[18] Constitutional Law ⬥2190**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                                          Page 4
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

92k2190 Most Cited Cases
(Formerly 92k90.4(1))

**[18] Constitutional Law** ⬡⟝2246
92k2246 Most Cited Cases
(Formerly 92k90.4(1))
The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality; these categories include defamatory speech, fighting words, incitement to riot or imminent lawless action, obscenity, child pornography, and true threats. U.S.C.A. Const.Amend. 1.

**[19] Constitutional Law** ⬡⟝1831
92k1831 Most Cited Cases
(Formerly 92k90.1(1))
True threats, which are not protected by the First Amendment, encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. U.S.C.A. Const.Amend. 1.

**[20] Constitutional Law** ⬡⟝1558
92k1558 Most Cited Cases
(Formerly 92k90.1(1))

**[20] Constitutional Law** ⬡⟝1830
92k1830 Most Cited Cases
(Formerly 92k90.1(1))
Violence and threats of violence fall outside the protection of the First Amendment because they coerce by unlawful conduct, rather than persuade by expression, and thus play no part in the marketplace of ideas. U.S.C.A. Const.Amend. 1.

**[21] Breach of the Peace** ⬡⟝17
62k17 Most Cited Cases

**[21] Constitutional Law** ⬡⟝1827
92k1827 Most Cited Cases
(Formerly 92k90.1(1))
In California, speech that constitutes "harassment" is not constitutionally protected, and the victim of the harassment may obtain injunctive relief.

U.S.C.A. Const.Amend. 1; West's Ann.Cal.C.C.P. § 527.6.

**[22] Breach of the Peace** ⬡⟝15.1
62k15.1 Most Cited Cases
Statute prohibiting harassment is intended to protect the individual's right to pursue safety, happiness, and privacy as guaranteed by the California Constitution. West's Ann.Cal. Const. Art. 1, § 1; West's Ann.Cal.C.C.P. § 527.6.

**[23] Pleading** ⬡⟝358
302k358 Most Cited Cases
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory and its employee against organization and individuals protesting laboratory's activities, plaintiffs showed a probability of prevailing on their harassment cause of action against organization and its president; given the background of violent attacks by organization's supporters on laboratory employees in the past, trial court could reasonably determine that organization's Web site entries specifically targeting employee and giving her home address would put a reasonable person in fear for her safety or the safety of her family. West's Ann.Cal.C.C.P. §§ 425.16, 527.6, 527.8.

**[24] Constitutional Law** ⬡⟝1831
92k1831 Most Cited Cases
(Formerly 92k90.1(1))
The only intent requirement for a true threat, which is not protected speech under the First Amendment, is that the defendant intentionally or knowingly communicate the threat; it is not necessary that the defendant intend to, or be able to, carry out the threat. U.S.C.A. Const.Amend. 1.

**[25] Breach of the Peace** ⬡⟝15.1
62k15.1 Most Cited Cases

**[25] Breach of the Peace** ⬡⟝18
62k18 Most Cited Cases
Animal testing laboratory could not maintain cause of action under harassment statute against organization and individuals protesting laboratory's activities, inasmuch as statute applied only to natural per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

Page 5

sons; however, laboratory could maintain action under alternative provision allowing an employer to seek injunctive relief on behalf of its employees. West's Ann.Cal.C.C.P. §§ 425.16, 527.6, 527.8.

**[26] Breach of the Peace ⟜17**
62k17 Most Cited Cases
Animal testing laboratory and its employee could not maintain cause of action under harassment statute against individual who protested against laboratory's activities, where evidence merely showed that individual demonstrated in front of employee's house by holding a candle in silence. West's Ann.Cal.C.C.P. §§ 425.16, 527.6, 527.8.

**[27] Damages ⟜57.20**
115k57.20 Most Cited Cases
Peace of mind is recognized as a legally protected interest, the intentional invasion of which is an independent wrong, giving rise to liability without the necessity of showing the elements of any of the traditional torts.

**[28] Damages ⟜57.21**
115k57.21 Most Cited Cases
To state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

**[29] Damages ⟜57.22**
115k57.22 Most Cited Cases
Conduct, to be "outrageous" for purposes of proving a cause of action for intentional infliction of emotional distress, must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.

**[30] Constitutional Law ⟜1218**
92k1218 Most Cited Cases
    (Formerly 92k82(7))
California Constitution protects Californians against invasions of privacy by nongovernmental as

well as governmental parties. West's Ann.Cal. Const. Art. 1, § 1.

**[31] Torts ⟜340**
379k340 Most Cited Cases
Action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person.

**[32] Torts ⟜340**
379k340 Most Cited Cases
To satisfy the first element of a cause of action for intrusion, that is, intrusion into a private place, conversation, or matter, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about the plaintiff, and the tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source.

**[33] Torts ⟜340**
379k340 Most Cited Cases
To prove actionable intrusion, the expectation of privacy need not be complete or absolute privacy; rather, privacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder and the nature of the intrusion.

**[34] Torts ⟜340**
379k340 Most Cited Cases
Determining offensiveness in the context of a claim alleging actionable intrusion requires consideration of all the circumstances of the intrusion, including its degree and setting and the intruder's motives and objectives.

**[35] Pleading ⟜358**
302k358 Most Cited Cases
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory's employee against organization and individuals protesting laboratory's activities, employee showed a probability of prevailing on her causes of action for intentional infliction of emotional distress and invasion of privacy; trial court could have reasonably found in favor of employee based on organization's web

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                          Page 6
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

site entries targeting her for illegal activity such as "civil disobedience" and threatening her safety. West's Ann.Cal.C.C.P. § 425.16.

**[36] Damages** ☜**57.25(1)**
115k57.25(1) Most Cited Cases

**[36] Torts** ☜**345**
379k345 Most Cited Cases
As a business entity, animal testing laboratory lacked standing to pursue causes of action for intentional infliction of emotional distress and invasion of privacy against organization and individuals who had been protesting against laboratory's activities.

**[37] Pleading** ☜**358**
302k358 Most Cited Cases
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory's employee against and individual protesting laboratory's activities, employee could not show a probability of prevailing on her causes of action for intentional infliction of emotional distress and invasion of privacy against individual; individual picketed peacefully in front of employee's home, and such conduct did not cause employee actionable emotional distress.

**[38] Antitrust and Trade Regulation** ☜**135(2)**
29Tk135(2) Most Cited Cases
    (Formerly 92Hk3 Consumer Protection)
The Legislature intended the sweeping language of the unfair competition statute to include anything that can properly be called a business practice and that at the same time is forbidden by law. West's Ann.Cal.Bus. & Prof.Code § 17200 et seq.

**[39] Action** ☜**3**
13k3 Most Cited Cases
    (Formerly 92Hk32 Consumer Protection)

**[39] Antitrust and Trade Regulation** ☜**290**
29Tk290 Most Cited Cases
    (Formerly 92Hk32 Consumer Protection)
The unfair competition law creates an independent action when a business practice violates some other law. West's Ann.Cal.Bus. & Prof.Code § 17200.

**[40] Antitrust and Trade Regulation** ☜**130**

29Tk130 Most Cited Cases
    (Formerly 92Hk2.1 Consumer Protection)
Voter proposition that amended unfair competition cause of action, by requiring that a private party meet specified standing requirements, applied to cases filed before the proposition's effective date, in which no final judgment had been entered at the time the proposition became effective; unfair competition law was a statutory remedy rather than a common law remedy, and, therefore, actions under that law did not vest until final judgment. West's Ann.Cal.Bus. & Prof.Code § 17200 et seq.

**[41] Statutes** ☜**278.2**
361k278.2 Most Cited Cases
    (Formerly 92k188)
A retrospective law is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute.

**[42] Statutes** ☜**278.2**
361k278.2 Most Cited Cases
    (Formerly 92k188)
A statute has retrospective effect when it substantially changes the legal consequences of past events.

**[43] Statutes** ☜**278.6**
361k278.6 Most Cited Cases
    (Formerly 361k263)
A new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise.

**[44] Statutes** ☜**278.22(1)**
361k278.22(1) Most Cited Cases
    (Formerly 361k276(1))
The unconditional repeal of a special remedial statute without a saving clause stops all pending actions where the repeal finds them, and if final relief has not been granted before the repeal goes into effect it cannot be granted afterwards, even if a judgment has been entered and the cause is pending on appeal; the reviewing court must dispose of the case under the law in force when its decision is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

rendered.

**[45] Action ⇐⇒34**
13k34 Most Cited Cases
Because a statutory remedy is a creature of statute, such a right of action exists only so far and in favor of such person as the legislative or initiative power may declare; unlike a common law right, a statutory remedy does not vest until final judgment.

**[46] Pleading ⇐⇒358**
302k358 Most Cited Cases
  (Formerly 92Hk38 Consumer Protection)
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory's employee against organization and individuals protesting laboratory's activities, employee showed a probability of prevailing on her cause of action for unfair competition; employee alleged that she sustained damage to real property and personal property, and thus, she had standing to proceed individually, and since she showed a probability of prevailing on her causes of action for harassment, invasion of privacy, and intentional infliction of emotional distress, it was also probable that she would prevail on her unfair competition claim. West's Ann.Cal.Bus. & Prof.Code § 17200 et seq.; West's Ann.Cal.C.C.P. § 425.16.

**[47] Pleading ⇐⇒358**
302k358 Most Cited Cases
  (Formerly 92Hk38 Consumer Protection)
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory against organization and individuals protesting laboratory's activities, laboratory failed to show a probability of prevailing on the merits of its unfair competition cause of action; although laboratory alleged that defendants' actions had caused employees to quit and companies to cease doing business with laboratory, it failed to provide evidence that any employee or company had actually severed ties with the laboratory. West's Ann.Cal.Bus. & Prof.Code § 17200 et seq.; West's Ann.Cal.C.C.P. § 425.16.

**[48] Pleading ⇐⇒358**

302k358 Most Cited Cases
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by employee of animal testing laboratory against individual protesting laboratory's activities, employee showed a probability of prevailing on the merits on her cause of action for violating city's municipal code, which made it unlawful for any person to engage in picketing a residence; violation of city ordinance could be redressed by civil action, and individual admitted that he had participated in a protest in front of employee's home. West's Ann.Cal.C.C.P. § 425.16; West's Ann.Cal.Gov.Code § 36900(a).

**[49] Trespass ⇐⇒12**
386k12 Most Cited Cases
The essence of the cause of action for trespass is an unauthorized entry onto the land of another.

**[50] Pleading ⇐⇒360**
302k360 Most Cited Cases
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory and its employee against organization and individuals protesting laboratory's activities, plaintiffs failed to show a probability of prevailing on their cause of action for trespass; plaintiffs produced no evidence that individuals associated with organization trespassed on employee's property, or that they directed or authorized the conduct of other apparent trespassers. West's Ann.Cal.C.C.P. § 425.16.

**[51] Pleading ⇐⇒358**
302k358 Most Cited Cases
In response to motion under anti-SLAPP (strategic lawsuit against public participation) statute to strike complaint by animal testing laboratory and its employee against organization and individuals protesting laboratory's activities, plaintiffs failed to show a probability of prevailing on their cause of action for negligent infliction of emotional distress; there was no special relationship between plaintiffs and defendants that imposed a duty on defendants not to cause the employee emotional distress. West's Ann.Cal.C.C.P. § 425.16.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                      Page 8
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

**[52] Damages** ☞57.14
115k57.14 Most Cited Cases
The negligent causing of emotional distress is not
an independent tort, but the tort of negligence, in-
volving the usual duty and causation issues.

**[53] Damages** ☞57.14
115k57.14 Most Cited Cases
There is no duty to avoid negligently causing emo-
tional distress to another, and damages for emotion-
al distress are recoverable only if the defendant has
breached some other duty to the plaintiff.

**[54] Pleading** ☞360
302k360 Most Cited Cases
In response to motion under anti-SLAPP (strategic
lawsuit against public participation) statute to strike
complaint by animal testing laboratory and its em-
ployee against organization and individuals protest-
ing laboratory's activities, plaintiffs failed to show a
probability of prevailing on their cause of action for
intentional and negligent interference with pro-
spective economic advantage; plaintiffs failed to
provide any evidence that defendants disrupted any
relationship between the laboratory and its employ-
ees or prospective clients.

**[55] Torts** ☞213
379k213 Most Cited Cases
The tort of intentional interference with prospective
economic advantage imposes liability for improper
methods of disrupting or diverting the business re-
lationship of another, with elements that include ac-
tual disruption of the relationship and economic
harm to the plaintiff proximately caused by the acts
of the defendant.

**[56] Appeal and Error** ☞760(1)
30k760(1) Most Cited Cases
The reviewing court is not required to make an in-
dependent, unassisted study of the record in search
of error or grounds to support the judgment; it is
entitled to the assistance of counsel.

**[57] Breach of the Peace** ☞16
62k16 Most Cited Cases
Preliminary injunction against organization and in-
dividuals protesting animal testing laboratory's

activities was overbroad, insofar as it precluded de-
fendants from coming within 100 feet of any person
known or believed to be a laboratory employee or
family member, friend or business associate of any
laboratory employee; evidence against defendants
was limited to postings on organization's Web site,
and while the injunction could be properly tailored
to preclude any Web site threats, there was no
ground to include in the injunction the prohibitions
of coming near laboratory employees. West's
Ann.Cal.C.C.P. §§ 526, 527.6.

**[58] Appeal and Error** ☞1024.2
30k1024.2 Most Cited Cases
In reviewing the scope of a preliminary injunction,
the appellate court applies a substantial evidence
test, resolving all factual conflicts and questions of
credibility in favor of plaintiffs as the prevailing
parties. West's Ann.Cal.C.C.P. § 526 et seq.

**[59] Constitutional Law** ☞1554
92k1554 Most Cited Cases
    (Formerly 92k90.1(1))
An injunction curtailing protected expression will
be upheld only if the challenged provisions of the
injunction burden no more speech than necessary to
serve a significant government interest. U.S.C.A.
Const.Amend. 1; West's Ann.Cal.C.C.P. § 526 et
seq.

**[60] Constitutional Law** ☞1780
92k1780 Most Cited Cases
    (Formerly 92k90.1(1))
If a home is involved in an injunction curtailing
protected expression, the state interest in preserving
residential privacy is exceptionally potent. West's
Ann.Cal.C.C.P. § 526 et seq.

**[61] Injunction** ☞22
212k22 Most Cited Cases
The purpose of a prohibitory injunction is to pre-
vent future harm to the applicant by ordering the
defendant to refrain from doing a particular act;
consequently, injunctive relief lies only to prevent
threatened injury and has no application to wrongs
that have been completed, and it should neither
serve as punishment for past acts, nor be exercised

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                    Page 9
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future. West's Ann.Cal.C.C.P. § 526 et seq.

**[62]** Costs ☞194.25
102k194.25 Most Cited Cases
A "prevailing defendant" within the meaning of the attorney fees provision of the anti-SLAPP (strategic lawsuit against public participation) statute includes a defendant whose anti-SLAPP motion was granted as to some causes of action but not others. West's Ann.Cal.C.C.P. § 425.16(c).

**[63]** Costs ☞252
102k252 Most Cited Cases
A "prevailing defendant" within the meaning of the attorney fees provision of the anti-SLAPP (strategic lawsuit against public participation) statute is also entitled to attorney fees incurred on appeal. West's Ann.Cal.C.C.P. § 425.16(c).

**[64]** Costs ☞264
102k264 Most Cited Cases
Although the appellate court has the power to fix attorney fees on appeal, for purposes of the attorney fees provision of the anti-SLAPP (strategic lawsuit against public participation) statute, the better practice is to have the trial court determine such fees. West's Ann.Cal.C.C.P. § 425.16(c).
**\*\*529** Shannon Keith and Orly Degani for Defendants and Appellants.

**\*\*530** Laturno & Graves and David W. Graves, Escondido, for Plaintiffs and Respondents.

McCONNELL, P.J.

**\*1239** This is an action for trespass, harassment under Code of Civil Procedure [FN1] sections 527.6 and 527.8 and related causes of action arising from incidents at the home of plaintiff Claire Macdonald, an employee of plaintiff Huntingdon Life Sciences, Inc. (HLS), an animal testing laboratory. Defendants Stop Huntingdon Animal Cruelty USA, Inc. (SHAC USA), Kevin Kjonaas and David Agranoff appeal an order denying their special motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) stat-

ute. (§ 425.16.)

> FN1. Statutory references are to the Code of Civil Procedure unless otherwise specified.

Contrary to plaintiffs' contention, we conclude the complaint arises from protected speech within the meaning of section 425.16. As to SHAC USA and Kjonaas, we affirm the order as to plaintiffs' cause of action for harassment, as they showed a probability of prevailing thereon. Considering the factual context and all the circumstances, certain entries SHAC USA published on its Internet Web site constituted a " 'credible threat of violence' " within the meaning of sections 527.6, subdivision (b)(2) and 527.8, subdivision (b)(2).

We also affirm the order as to Macdonald's causes of action against SHAC USA and Kjonaas for intentional infliction of emotional distress and invasion of privacy, as she showed a probability of prevailing on those claims. As to Macdonald's unfair competition cause of action (Bus. & Prof.Code, § 17200 et seq.) against those defendants, we affirm the order insofar as it concerns her individual claim, as she showed a probability of prevailing thereon. We direct the court to grant defendants judgment on the pleadings insofar as the representative portion of the cause of action is concerned, as it is precluded by Proposition 64's amendments to the unfair competition law (as approved by voters, Gen. Elec. (Nov. 2, 2004)). We reverse the order insofar as it concerns the remaining causes of action against SHAC USA and Kjonaas, and HLS's unfair competition cause of action against them based on Proposition 64.

As to Agranoff, who admittedly picketed at Macdonald's home, we affirm the order as to her cause of action against him for violation of San Diego Municipal Code section 52.2003. We reverse the order insofar as it concerns the remaining causes of action against him and HLS's claim against him under the Municipal Code.

Further, we reverse the preliminary injunction in part for overbreadth, and direct the court on remand

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                        Page 10
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

to reconsider provisions related to SHAC USA's Internet Web site. Additionally, we direct the court to consider defendants' request for attorney fees.

### *1240 FACTUAL AND PROCEDURAL BACK-GROUND

HLS is a British company with United States headquarters in New Jersey. HLS provides research services to pharmaceutical and chemical companies, and in doing so it conducts testing on various types of animals, including mice, rats, dogs, monkeys and rabbits.

In 1999 the entity Stop Huntingdon Animal Cruelty was launched in England with, according to HLS, the stated purpose of forcing HLS's closure. Kjonaas, SHAC USA's president, formed that entity in 2000 with the shared goal of forcing HLS's closure.

**531 SHAC USA's Web site "advocates protest against HLS, its shareholders, employees, clients and supporters, [and] lists the names, addresses and telephone numbers of some of these entities and individuals." SHAC USA "makes no secret that it supports illegal acts of civil disobedience, including those that involve property damage, so long as no human or animal is harmed." For instance, "SHAC USA openly approves of and supports the activities of the Animal Liberation Front (ALF)," a radical animal rights organization whose members engage in illegal acts such as trespassing and the destruction of property.

Macdonald is an HLS employee who lives in San Diego. SHAC USA and Kjonaas do not deny SHAC USA's Web site specifically targeted her for protest activity. In the early morning of March 28, 2003, red paint was dumped on the driveway of her home and on her husband's car, three of the car's tires were punctured and "HLS SCUM" was painted on the garage in blue spray paint. Afterward, Macdonald took precautionary measures, such as having motion lights and cameras installed at her home to provide 24-hour surveillance.

In the early morning of May 3, 2003, three persons dressed in dark clothing with their faces covered rang Macdonald's doorbell and set off a siren. The persons then stood at the end of her driveway and shouted through megaphones, " 'Claire Macdonald is a murderer.' " The persons had departed by the time police arrived.

The following day SHAC USA published on its Web site a report of the May 3 incident, which included Macdonald's home address. The entry, which said it was "[r]eceived anonymously from CA [California] activists," (italics omitted) read: " 'Activists paid a late night visit to the home of Claire Mac[d]onald, employee of HLS. Using multiple megaphones, we reminded Claire [that] 500 animals die each day because of her wicked ways. We informed all her neighbors that a puppy killer lives at [street address].' " The *1241 entry included the following message: " 'To [Macdonald's] neighbors: We are sorry you live near such a scumbag. We know she is an embarrassment to the neighborhood. We certainly understand if you would like to join us in encouraging [her] to move. Puppy killer leave town!' "

The evening of May 25, 2003, three persons wearing dark clothing with their faces covered approached the front of Macdonald's home and one of them rang her doorbell continuously for several seconds. Those persons then joined about 15 to 20 other persons lined up on the sidewalk adjacent to her home. Many of the persons were holding candles, but others were holding posters that read " 'puppy killers' " and "contained graphic pictures." Several other persons "were canvassing the neighborhood putting flyers in mailboxes and on car windshields."

SHAC USA published a report of the May 25 incident, again attributed to California activists, on its Web site. The report read:

" '20 black-clad activists wearing balaclavas descended upon the home of Claire Mac[d]onald, located at [street address]. Claire is an HLS employee who is able to pay for her gigantic house by promoting the torture and murder of animals at HLS.

" 'So the activists showed their disgust for Claire and sympathy for the animals by silently standing

29 Cal.Rptr.3d 521                                                                    Page 11

129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301

**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

in a straight line in front of her house with tall, red candles. Some neighbors came out to ask why Claire keeps getting visitors, and one threw a beer bottle at her house! Activists were entertained by the commotion, but remained silent and focused on the **532 animals dying for Claire's extravagance. We weren't sure if she was home because all the lights were out, but when the cops finally came (it took these jokers over 20 minutes to get there!) she opened up the door, reassuring us that she was home and watching us through the peephole.

" 'A message for Claire: tonight 250 flyers were distributed in your neighborhood alerting your neighbors that you're a vicious animal abuser. You've already been hit by the ALF [ FN2]], you've already gotten early morning wake-up calls, you have masked activsts [*sic*] protesting in front of your home, your censor [*sic*] lights are a joke, the cops are too slow to get there within a reasonable time, and thousands of activists know where you live. What's it going to take for you to quit HLS?' "

> FN2. Plaintiffs produced evidence that the day after the March 28, 2003 vandalism at Mac[d]onald's home, the Web site "www.directaction.info," which gives the name "Bite Back" and an address in West Palm Beach, Florida, published an account of the vandalism, which it reportedly received anonymously from *"US activists."* The message was signed " 'A. L. F.' "

*1242 In June 2003 Macdonald and HLS sued SHAC USA, Kjonaas, ALF and Agranoff for trespass, harassment under section 527.6, [FN3] intentional and negligent infliction of emotional distress, invasion of privacy, intentional and negligent interference with prospective economic advantage, violation of California's unfair competition law (Bus. & Prof.Code, § 17200 et seq.) and violation of San Diego Municipal Code section 52.2003. Plaintiffs sought injunctive relief, attorney fees and costs.

> FN3. The complaint does not cite section 527.8, but as discussed later, it is fairly

construed to include a cause of action under that statute by HLS.

Plaintiffs moved ex parte for a temporary restraining order. They submitted the entries SHAC USA published on its Web site regarding the May 3 and 25 incidents at Macdonald's home among other evidence. Regarding Agranoff, plaintiffs submitted a document entitled "San Diego Regional Officer's Report Narrative," which stated an officer stopped Agranoff's car as he was driving away from the area of Macdonald's home after the May 25 demonstration because a brake light was out. Three passengers in Agranoff's car wore ski masks.

In opposition to the request for injunctive relief, Kjonaas submitted a declaration that stated SHAC USA displays the following disclaimer on every page of its Web site: "The SHAC USA website, its designers, and contributors are not responsible for actions on the part of any individual which proves defamatory, injurious, or prejudicial to the individuals or entities named herein, their families, or acquaintances. This website is provided for informational purposes only, and is not intended to incite any criminal action on the part of its viewers.' "

The declaration also stated Kjonaas had not visited San Diego for more than 10 years, and he had never contacted Macdonald or any other HLS employee residing in California by phone, e-mail, fax, or letter. Further, the declaration stated Kjonaas "never had access to or knowledge of any information about ... Mac[d]onald besides what has been posted on the SHAC USA news website."

The court issued a temporary restraining order against all defendants. Shortly thereafter, they brought a special motion to strike the complaint under the anti-SLAPP statute. (§ 425.16.) Defendants submitted declarations of Kjonaas, and a **533 declaration of Agranoff, in which he denied any association with ALF and stated he was "near" Macdonald's home on May 25, 2003, and he "held a candle in silence for about an hour."

*1243 The court issued a preliminary injunction against HLS and Kjonaas. The injunction did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                          Page 12
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

include ALF and Agranoff because the court found no evidence they were served with the summons and complaint or the temporary restraining order and order to show cause. [FN4] The court found good cause to believe SHAC USA and Kjonaas "have engaged in, are engaging in, and are about to engage in acts, practices, and conduct that constitutes violations of plaintiff's right to privacy and which constitutes trespass, infliction of emotional distress, and violations of San Diego Municipal Code [section] 52.2003."

> FN4. We have reviewed the superior court file (see Cal. Rules of Court, rule 12(a)(1)(A)) and note that service of the summons and complaint on ALF was achieved through publication, and in July 2004 a default was entered against it. ALF is not involved in this appeal.

The preliminary injunction prohibits SHAC USA and Kjonaas from coming within 100 feet of any real property of any HLS employee; coming within 100 feet of any HLS employee or his or her family member, friend or business associate; placing or maintaining on any Web site any information regarding any HLS employee, family, friend or business associate; telephoning any HLS employee; e-mailing HLS or any HLS employee; attempting to block the Web site, e-mail, facsimile lines or telephone lines of HLS or any HLS employee; trespassing on or vandalizing the property of Macdonald or any other HLS employee; harassing or stalking Macdonald or any other HLS employee; engaging in picketing at a residence owned or in the possession of Macdonald or any other HLS employee, and violating San Diego Municipal Code section 52.2003.

The court later denied defendants' special motion to strike, explaining that even assuming the complaint arises from their protected speech, plaintiffs "have obtained injunctive relief which necessarily included a determination [plaintiffs] had shown a likelihood of prevailing on the merits of their claims." This appeal of the order on the anti-SLAPP motion ensued.

## DISCUSSION

### I

### *The Anti-SLAPP Statute*

In 1992 the Legislature enacted section 425.16, known as the anti-SLAPP statute, to allow a court to dismiss certain types of unmeritorious claims at an early stage in the litigation. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1159, 15 Cal.Rptr.3d 100.) Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of *1244 the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

[1] In deciding an anti-SLAPP motion, the trial court must "engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.... If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685.)

**534 [2] A defendant may meet his or her burden by showing the act underlying the plaintiff's cause of action fits one of the categories enumerated in section 425.16, subdivision (e). (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78, 124 Cal.Rptr.2d 519, 52 P.3d 695.) As used in that provision, a protected act includes "... (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of ... free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

[3][4] "[T]he statutory phrase 'cause of action ... arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                      Page 13
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78, 124 Cal.Rptr.2d 519, 52 P.3d 695.) "The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability--and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92, 124 Cal.Rptr.2d 530, 52 P.3d 703.)

[5][6] "[T]o establish a probability of prevailing on the claim [citation], a plaintiff responding to an anti-SLAPP motion must ' "state[ ] and substantiate [ ] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; *1245 though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733.) The "plaintiff 'cannot simply rely on the allegations in the complaint.' " (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010, 113 Cal.Rptr.2d 625 (*ComputerXpress* ).)

[7] The court's ruling on a special motion under section 425.16 is subject to our independent review. (*Annette F. v. Sharon S., supra,* 119 Cal.App.4th at p. 1159, 15 Cal.Rptr.3d 100.)

## II
### *The Complaint Arises from Protected Speech*

## A

Each of the causes of action here includes the allegation that on March 28, 2003, defendants vandalized Macdonald's home and her husband's car. Vandalism, of course, is not a legitimate exercise of free speech rights, and if the complaint arose only from such conduct it would not be subject to an anti-SLAPP motion. Each cause of action, however, also alleges protected activity such as SHAC USA's encouragement of demonstrations against animal testing and support of "those who choose to operate outside the confines of the legal system." Indeed, the gravamen of the action against defendants here is **535 based on their exercise of First Amendment rights.

[8] "Published appellate court cases have concluded that where a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 426.16 unless the protected conduct is 'merely incidental' to the unprotected conduct." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103, 15 Cal.Rptr.3d 215.) The California Supreme Court is currently reviewing this issue (*Kids Against Pollution v. California Dental Association,* review granted Sept. 17, 2003, S117156), but pending its decision we follow the existing appellate precedent that the anti-SLAPP statute applies to a mixed cause of action. (*Mann v. Quality Old Time Service, Inc., supra,* at p. 103, 15 Cal.Rptr.3d 215.)

## B

[9][10] Plaintiffs contend this is not a SLAPP suit because they merely seek to enjoin illegal activity such as trespass. Mere allegations that defendants *1246 acted illegally, however, do not render the anti-SLAPP statute inapplicable. For instance, the First Amendment does not protect defamation, yet defamation suits are a prime target of anti-SLAPP motions. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305, 106 Cal.Rptr.2d 906.) "The Legislature did not intend that ... to invoke the special motion to strike the defendant must first establish her [or his] actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                    Page 14
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

the inquiry as to whether the plaintiff has estab-
lished a probability of success would be superflu-
ous." (Ibid.) "When a cause of action arises from
constitutionally protected speech, section 425.16
applies and the question of whether the speech is
[not protected] must be examined when plaintiff
demonstrates a probability of success on the mer-
its." (Scott v. Metabolife Internat., Inc. (2004) 115
Cal.App.4th 404, 420, 9 Cal.Rptr.3d 242.)

[11] If the defendant concedes or the evidence con-
clusively establishes the conduct complained of was
illegal, as a matter of law the defendant cannot
make a prima facie showing the action arises from
protected activity within the meaning of section
425.16. (Paul for Council v. Hanyecz (2001) 85
Cal.App.4th 1356, 1367, 102 Cal.Rptr.2d 864, dis-
approved on another ground in Equilon Enterprises
v. Consumer Cause, Inc., supra, 29 Cal.4th at p. 68,
fn. 5, 124 Cal.Rptr.2d 507, 52 P.3d 685; Governor
Gray Davis Com. v. American Taxpayers Alliance
(2002) 102 Cal.App.4th 449, 459, 125 Cal.Rptr.2d
534.) Defendants, however, have not conceded they
committed any illegal acts, and we conclude that
with a minor exception the evidence does not show
illegality as a matter of law. [FN5]

FN5. As discussed below, the evidence
shows Agranoff violated San Diego Muni-
cipal Code section 52.2003, which pre-
cludes picketing targeted at a specific res-
idence. Because Macdonald met her bur-
den of showing a probability of succeeding
on that cause of action, we need not ad-
dress her contention the evidence showed
Agranoff's violation of that ordinance as a
matter of law.

[12] The "public interest" component of section
425.16, subdivision (e)(3) and (4) is met when "the
statement or activity precipitating the claim in-
volved a topic of widespread public interest," and
"the statement ... in some manner itself contrib-
ute[s] to the public debate." (Wilbanks v. Wolk
(2004) 121 Cal.App.4th 883, 898, 17 Cal.Rptr.3d
497.) "Commenting on a matter of public concern is
a classic form of speech that lies at the heart of the

**536 First Amendment." (Annette F. v. Sharon S.,
supra, 119 Cal.App.4th at p. 1162, 15 Cal.Rptr.3d
100, citing Schenck v. Pro-Choice Network (1997)
519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1.)
Animal testing is an area of widespread public con-
cern and controversy, and the viewpoint of animal
rights activists contributes to the public debate.
(See McGill v. Parker (1992) 179 A.D.2d 98, 106,
582 N.Y.S.2d 91, 96.)

*1247 Moreover, defendants' speech took place in a
public forum. "Cases construing the term 'public
forum' as used in section 425.16 have noted that the
term 'is traditionally defined as a place that is open
to the public where information is freely ex-
changed.' [Citation.] 'Under its plain meaning, a
public forum is not limited to a physical setting, but
also includes other forms of public communication.'
" (ComputerXpress, supra, 93 Cal.App.4th 993,
1006, 113 Cal.Rptr.2d 625.) Statements on SHAC
USA's Web site are accessible to anyone who
chooses to visit the site, and thus they "hardly could
be more public." (Wilbanks v. Wolk, supra, 121
Cal.App.4th at p. 895, 17 Cal.Rptr.3d 497; Com-
puterXpress, at p. 1007, 113 Cal.Rptr.2d 625.) As
to Agranoff, a public street is a "traditional public
forum" even when it runs through a residential
neighborhood. (Frisby v. Schultz (1988) 487 U.S.
474, 480-481, 108 S.Ct. 2495, 101 L.Ed.2d 420.)
Plaintiffs do not assert that either the public interest
or public forum criterion is unsatisfied.

III
Collateral Estoppel Is Inapplicable
[13] Because defendants met their threshold burden
under section 425.16, the burden shifted to
plaintiffs to demonstrate a probability of success on
the merits of each of their causes of action.
Plaintiffs contend that under the collateral estoppel
aspect of the res judicata doctrine, the trial court's
granting of a preliminary injunction conclusively
establishes their probability of succeeding on the
merits of each of their claims for purposes of the
section 425.16 analysis. Plaintiffs suggest that be-
cause defendants do not challenge the court's find-
ings on the preliminary injunction, the second
prong of the section 425.16 analysis is not subject

29 Cal.Rptr.3d 521                                                                                Page 15
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

to review on appeal. We conclude collateral estop-pel is inapplicable.

[14][15][16] "The doctrine of *res judicata* gives certain *conclusive effect* to a *former judgment* in subsequent litigation involving the same contro-versy. It seeks to curtail multiple litigation causing vexation and expense to the *parties* and wasted ef-fort and expense in *judicial administration*." (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 290, p. 820.) Under the collateral estoppel aspect of res judicata, relitigation of an issue previously adju-dicated is generally precluded if certain criteria are met. "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido v. Superi-or Court* (1990) 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 795 P.2d 1223.) The party asserting collateral estoppel has the burden of establishing *1248 these threshold requirements. (*Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346, 1364, 104 Cal.Rptr.2d 183.)

In *Lam v. Ngo* (2001) 91 Cal.App.4th 832, 111 Cal.Rptr.2d 582, the court rejected the notion that a preliminary injunction **537 had an issue preclus-ive effect on an anti-SLAPP motion. There, the "tri-al court did not consider the merits of [the defend-ant's] motion because it viewed the motion as noth-ing more than a rerun of the preliminary injunction question." (*Id.* at p. 843, 111 Cal.Rptr.2d 582.) The appellate court concluded collateral estoppel was inapplicable because the *issues* on preliminary in-junction and an anti-SLAPP suit are not identical. (*Ibid.*)

The court explained: "In deciding whether to grant a preliminary injunction, the trial court not only as-sesses 'the likelihood that the plaintiff will prevail at trial,' but 'the interim harm that the plaintiff will likely sustain if the injunction were denied.' [Citation.] Trial courts must balance the respective equities, and in any event the decision is tested un-der an abuse of discretion standard. [Citation.] [¶] By contrast, in passing on anti-SLAPP suit motions, the trial court faces a much more binary task, more akin to a summary judgment motion: Has the plaintiff made a prima facie showing of facts which, if proved at trial, support a favorable judg-ment?" (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 843, 111 Cal.Rptr.2d 582.) "Additionally, a key dif-ference between preliminary injunctions and special motions to strike is the role of the individual cause of action. A single cause of action can sustain a preliminary injunction. [Citation.] By contrast, an anti-SLAPP suit motion involves examination of each of the causes of action attacked, because the purpose is to weed out meritless 'claims' at any early stage." (*Id.* at p. 844, 111 Cal.Rptr.2d 582.)

We agree with the *Lam v. Ngo* court's analysis. This case also "illustrates how the plaintiff's ability to obtain a preliminary injunction cannot be equated with a 'probability' the plaintiff will prevail on the claim." (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 843, 111 Cal.Rptr.2d 582.) The preliminary injunc-tion here does not even affect Agranoff, the only defendant who was actually involved in one of the protests at Macdonald's home, and in issuing the in-junction the court did not address many of the com-plaint's causes of action.

Further, the finality requirement of collateral estop-pel is unmet. A preliminary injunction is a *provi-sional* remedy, and the trial court "possesses the in-herent power to modify its preliminary injunction which is of a continuing or executory nature." (*City of San Marcos v. Coast Waste Management, Inc.* (1996) 47 Cal.App.4th 320, 328, 54 Cal.Rptr.2d 588; Code Civ. Proc., § 532; 6 Witkin, Cal. Proced-ure (4th ed. 1997) Provisional Remedies, § 396, pp. 322-323.) "There is no inflexible rule as to the ef-fect of the granting or denial of a preliminary in-junction on subsequent litigation, but *1249 unless it appears that the court intended a final adjudica-tion of the issue involved, a decision on an applica-tion for a preliminary injunction does not amount to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                                    Page 16
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

a decision on the ultimate rights in controversy." (*Bomberger v. McKelvey* (1950) 35 Cal.2d 607, 612, 220 P.2d 729.) The record reveals no such intention as to SHAC USA and Kjonaas, and Agranoff is not subject to the preliminary injunction.

## IV

### *Plaintiffs Showed a Probability of Prevailing on Their Harassment Cause of Action Against SHAC USA and Kjonaas*

#### A

[17] The First Amendment to the United States Constitution and the California Constitution (art. I, § 2, subd. (a)) prohibit the enactment of laws abridging the freedom of speech. The First Amendment "was fashioned to assure unfettered **538 interchange of ideas for the bringing about of political and social changes desired by the people" (*Roth v. United States* (1957) 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498), and it "attempt[s] to secure the 'widest possible dissemination of information from diverse and antagonistic sources.' " (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686.) Speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." (*Terminiello v. City of Chicago* (1949) 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131.)

[18] The right of free speech, however, is not unlimited. (*Near v. Minnesota* (1931) 283 U.S. 697, 708, 51 S.Ct. 625, 75 L.Ed. 1357; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 142-145, 87 Cal.Rptr.2d 132, 980 P.2d 846.) "The First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." ' " (*Virginia v. Black* (2003) 538 U.S. 343, 358-359, 123 S.Ct. 1536, 155 L.Ed.2d 535.) These categories include defamatory speech, fighting words, incitement to riot or imminent law-

less action, obscenity and child pornography. (*Bose Corporation v. Consumers Union of United States, Inc.* (1984) 466 U.S. 485, 504, 104 S.Ct. 1949, 80 L.Ed.2d 502.)

[19][20] *1250 "[T]he First Amendment also permits a State to ban a 'true threat.' [Citations.] [¶] 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.]" (*Virginia v. Black, supra,* 538 U.S. at p. 359, 123 S.Ct. 1536.) "Violence and threats of violence ... fall outside the protection of the First Amendment because they coerce by unlawful *conduct,* rather than persuade by expression, and thus play no part in the 'marketplace of ideas.' As such, they are punishable because of the state's interest in *protecting individuals from the fear of violence,* the disruption fear engenders and the possibility the threatened violence will occur." (*In re M.S.* (1995) 10 Cal.4th 698, 714, 42 Cal.Rptr.2d 355, 896 P.2d 1365, second italics added.)

[21] In California, speech that constitutes "harassment" within the meaning of section 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief. "Harassment" is defined as "unlawful violence, *a credible threat of violence,* or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff." (§ 527.6, subd. (b), italics added.) " 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

[22] "Section 527.6 is intended 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.'

" **539(*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 403, 5 Cal.Rptr.3d 137; Cal. Const. art. I, § 1.) The statute " ' "establish [es] an expedited procedure for enjoining acts of 'harassment' as defined." ' " (*Russell v. Douvan*, at p. 403, 5 Cal.Rptr.3d 137.)

"Context is everything in threat jurisprudence." (*United States v. Bell* (9th Cir.2002) 303 F.3d 1187, 1192, citing *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists* (9th Cir.2002) 290 F.3d 1058, 1071 (*Planned Parenthood* )). "Indeed, context is critical in a true threats case and history can give meaning to the medium." (*Planned Parenthood*, at p. 1078; see also *In re George T.* (2004) 33 Cal.4th 620, 635, 16 Cal.Rptr.3d 61, 93 P.3d 1007 [under Penal Code section 422 a "communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning"].)

*1251 In *Planned Parenthood*, the court held that in analyzing whether a "threat of force" was made within the meaning of the Freedom of Access to Clinic Entrances Act (FACE), title 18 of United States Code section 248, [FN6] the alleged threat must be analyzed in light of "the entire context and under all the circumstances," including prior violence by third parties. (*Planned Parenthood, supra*, 290 F.3d at p. 1077.) There, physicians and health care clinics that provided women's health care services, including abortions, brought suit under FACE, claiming the American Coalition of Life Activists (ACLA) targeted them with threats. A "Deadly Dozen 'GUILTY' " poster identified three plaintiff physicians among 10 others; a " 'GUILTY' " poster contained a plaintiff physician's name, address and photograph; and the " 'Nuremburg Files' " was "a compilation about those whom the ACLA anticipated one day might be put on trial for crimes against humanity. The 'GUILTY' posters identifying specific physicians were circulated in the wake of a series of 'WANTED' and 'unWANTED' posters that had identified other doctors who performed abortions before they were murdered." (*Id.* at p. 1062.)

FN6. "FACE gives aggrieved persons a right of action against whoever by 'threat of force ... intentionally ... intimidates ... any person because that person is or has been ... providing reproductive health services.' " (*Planned Parenthood, supra*, 290 F.3d at p. 1062, citing 18 U.S.C. § 248(a)(1) and (c)(1)(A).)

Under FACE, whether ACLA made threats of force was a jury question. (*Planned Parenthood, supra*, 290 F.3d at pp. 1063, 1070.) The court held that although the posters contained no express threats themselves, the jury's finding in favor of the plaintiffs was supported by substantial evidence, explaining: "ACLA was aware that a 'wanted'-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of 'WANTED' posters identifying a specific physician followed by that physician's murder. The same is true of the posting about these physicians on that part of the 'Nuremberg Files' where lines were drawn through the names of doctors who provided abortion services and who had been killed or wounded." (*Id.* at p. 1063.) The court rejected the notion the surrounding evidence may not include "a context of violence that includes the independent action of others." (*Id.* at pp. 1071.)

ACLA also argued the First Amendment required reversal because liability was premised on political speech that constituted neither an incitement to imminent lawless action or a true threat, and since the posters contained no express threat **540 the case was "really an incitement case in disguise." (*Planned Parenthood, supra*, 290 F.3d at p. 1072.) The court noted that under the United States Supreme Court's opinion in *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (*Brandenburg*), "the First *1252 Amendment protects speech that advocates violence, so long as the speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action." (*Planned Parenthood, supra*, at p. 1071.) The *Planned Par-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                Page 18
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

*enthood* court, however, essentially concluded imminent lawless action is not an element of a true threat. It explained that "[i]f ACLA had merely endorsed or encouraged the violent actions of others, its speech would be protected. [¶] However, while advocating violence is protected, threatening a person with violence is not. In *Watts v. United States* [ (1969) ] 394 U.S. 705, [707] [89 S.Ct. 1399, 22 L.Ed.2d 664] ..., the Court explicitly distinguished between political hyperbole, which is protected, and true threats, which are not." *(Planned Parenthood, supra,* 290 F.3d at p. 1072.)

## B

[23] This case is analogous to *Planned Parenthood,* and considering the entire factual context, the trial court could reasonably conclude SHAC USA's Web site contained credible threats of violence toward Macdonald by SHAC USA and Kjonaas within the meaning of section 527.6.

In October 2002 Kjonaas was deposed in another case against SHAC USA. He conceded that SHAC USA "targets" specific HLS employees in its campaign against HLS. Further, SHAC USA wrote in a Web site entry that it "has identified, and is targeting, any and every pillar of support that HLS has. This includes ... individual employees." The entry contained a "Click *here* " prompt to learn the identities, and presumably home addresses and other identifying information, of the "current targets" of the campaign. Additionally, a SHAC USA newsletter stated: "The SHAC campaign employs a variety of tactics, aimed at hitting HLS' [s] every vulnerability. *Campaign targets can expect* regular phone and email *blockades,* black faxes, demonstrations and *disruptions inside and outside their offices, civil disobedience, home demonstrations of executives,* and publicity stunts .... Quarterly newsletters keep our supporters informed of latest victories, *new targets,* inspirational stories and general activist info." (Italics added.) SHAC USA and Kjonaas do not deny they specifically targeted Macdonald for this type of treatment.

Further, Kjonaas knew that in England animal rights activists had physically attacked HLS em-

ployees. He testified in the 2002 deposition that he was familiar with the SHAC organization in England and had worked for it as a volunteer. SHAC USA published on its Web site an article it attributed to the Associated Press, titled "U.S. activists using British ecoterror tactics." SHAC USA quoted the article as stating, " 'In England last summer, activists beat a Huntingdon managing director and sprayed a caustic liquid in the face of *1253 another Huntingdon employee.' " The Web site article quoted Kjonaas as saying, " 'inducing human terror "pales by comparison to what ... animals feel" during research.' "

Also, SHAC USA's Web site published "tactics" animal rights activists have used against HLS employees, including physical violence and threats of violence. In March 2001 the Web site contained an entry titled "From the Research Defense Society of the UK." The entry listed "tactics [that] have been used by animal rights extremists campaigning against HLS and similar companies in the last three years." The **541 entry noted that "[r]epeated use of several tactics against one individual is not unusual." The list contained such tactics as "[d]emonstrations at your home or place of work, including verbal abuse using a loudhailer," "[c]haining gates shut or blocking gates with old cars to trap staff on site," "[p]hysical assaults on yourself and your partner, including spraying cleaning fluid into your eyes," "[s]mashing all the windows in your home when your family is home," "[s]ledgehammer attack on your car--while you are still inside it," "[f]irebombing your car in your drive, firebombing sheds and garages," "[b]omb hoaxes requiring evacuation of premises," "[t]hreatening telephone calls and letters (threats to kill or injure you, your partner and children)," and "[a]rranging for the undertaker to call to collect your body." At the bottom of this entry, SHAC USA wrote: "*Editors' Note: Now don't get any funny ideas, folks.*" SHAC USA's Web site contained essentially the same entry in 2002. [FN7]

> FN7. SHAC USA and Kjonaas contend this was merely a republication of an article by a proanimal testing entity regarding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                                   Page 19
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

activities of animal rights activists, and as such it is constitutionally protected speech. Even if the article itself is protected, however, the court may consider it as part of the context in which other Web site postings were made.

Additionally, the evidence shows that after SHAC USA previously targeted another HLS employee, animal rights activists trespassed on and vandalized his residential property in New York. In a declaration, Mark Bibi, legal counsel for HLS, stated SHAC USA and Kjonaas "started to target me in July 2002, when SHAC [USA] announced in its summer 2002 newsletter a new focus of its campaign, and new targets, including me." In August 2002 Bibi began getting harassing telephone calls at home. "[O]n one occasion the caller exclaimed 'murderer, how can you live with yourself?' " In October 2002 activists protested at Bibi's home in New York. SHAC USA's Web site published a report of the protest, attributed to "the ADL--Long Island." The report contained Bibi's home address and concluded with, " 'That's right Mark, we will be back, and with more people.' "

Bibi's declaration also stated: "Sometime during the night of November 6, 2002, ... [persons] unlawfully entered upon my property, and severely vandalized my home and my automobile which was parked in my driveway. **\*1254** These vandals smashed the windshield of my car with a large rock and, with red paint, painted the term [']ALF,' ... and other graffiti, all over my car. My house was also severely vandalized and damaged; using the same red paint, the vandals prominently painted upon all four ... sides of my house numerous slogans, such as 'PUP KILLER,' '9,000,000 DEAD CUS [*sic* ] OF YOU MARK,' [']CLOSE HLS,' 'QUIT NOW,' and 'STOP HELPIN [*sic* ] BAKER [Chief Executive Officer of HLS].' "

SHAC USA's Web site published a report of the vandalism, which was "[f]orwarded by N.Y. activists" and attributed to ALF. It stated: " 'Tonight 11/6/02 we stopped by the home of Mark Bibi, [street address] and made a bloody mess of the place. The house was covered with red paint and sprayed slogans denouncing his work for HLS, leaving the home almost as bloody as his palms! We tinkered with his daughter's car, painted that up too, and finished the masterpiece with a boulder through the windshield! [¶] Welcome to the post-electoral democracy Mark! We are damn tired of pulling the pant legs of politicians begging for adjustments in the way animals and the earth are treated[.] [W]e are taking the future into our own hands and you and your dying business **\*\*542** are not part of it!' " The claimed tinkering with the car caused Bibi to have it towed to a service station for evaluation.

After a December 2002 protest at Bibi's home, SHAC USA's Web site contained a report of it, again attributed to "NY activists." The report concluded with, " 'Until all life is freed from the confines of HLS, every cage is smashed, and the building leveled--Mark Bibi, ... and HLS can expect [an] escalating campaigning against them. [¶] Make No Mistake, We Will Win!' " [FN8]

> **FN8.** According to the complaint here, "HLS and ... Bibi were successful in obtaining a temporary restraining order and preliminary injunction against SHAC, SHAC USA, and several other affiliated animal rights organizations in New York."

In May 2003, the same month as the incidents at Macdonald's home, SHAC USA wrote on its Web site: "The SHAC campaign has over the last year hit HLS in a multi[-]pronged attack on the workers, shareholders, and clients resulting in all-time low worker morale, a rock bottom share price, and a loss of customer confidence. [¶] Workers: Everyday [*sic* ] of the week a crowd of protesters assemble [*sic* ] outside the gates of HLS'[s] main lab site in Huntingdon. All day long as workers of HLS come go [*sic* ] they are greeted with screaming protesters who let them know just how much their [*sic* ] worth. Every eight weeks SHAC holds national demonstrations wherein over a thousand protestors show up to the lab, the town center, or a company affiliated with HLS in the area and lay siege to 'em.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                    Page 20
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

[L]arge demonstrations are always followed up with several *home demonstrations of the employees. These tactics combined with the ALF's series of car bombings of workers (at \*1255 11 now) and numerous attacks on their homes has ... a tremendous effect.* There is a high turnover rate, and according to court documents *several workers are having a hard time even finishing a days [sic] work, or sleeping at night.*" (Italics added.)

In her declaration, Macdonald stated she was "aware of numerous acts of violence ... against HLS employees including car bombings and beatings in England." Macdonald did not state when she learned the information, but presumably as an HLS executive she was aware of those incidents and the incidents at Bibi's home before SHAC USA targeted her. Macdonald wrote that as a result of the Web site entries and incidents at her home, "I am now constantly looking over my shoulder to see if I am being followed or observed by anyone. I do not enter my property without making sure my car doors are locked and when I return home I do not exit my car until I enter the garage and the garage door is closed completely." She also explained, "I am extremely concerned about injury to myself, my husband and my property."

Given the background of violent attacks on HLS employees in England, and the trespass and vandalism at Bibi's home in New York *after being specifically targeted in SHAC USA's campaign,* the court could reasonably determine SHAC USA's Web site entries specifically targeting Macdonald and reporting the May 3 and 25, 2003 incidents at her home and giving her home address would put a reasonable person in fear for her safety, or the safety of her family (§ 527.6, subd. (b)(2)). The entry regarding the May 3 incident called on her neighbors to pressure her to move out of the neighborhood, and the entry regarding the May 25 incident warned Macdonald, "your censor [sic ] lights are a joke, the cops are too slow to get there within a reasonable time, and thousands of activists know where you live.' "

\*\*543 Further, the evidence supports a finding that

although the postings regarding the May 3 and 25 incidents were attributed to anonymous third parties, those postings, in conjunction with being targeted by SHAC USA, would intimidate Macdonald and cause her to fear Kjonaas and other persons affiliated with SHAC USA, as well as other animal rights activists, and indeed Kjonaas knew as much and that was the desired result. SHAC USA's Web site acknowledged that HLS employees targeted in its campaign against HLS could expect home visits and civil disobedience, just as Bibi experienced. To qualify as a true threat, a communication need not specify who would carry out the threat. *(Planned Parenthood, supra,* 290 F.3d at pp. 1077, 1078.) " ' "The fact that a threat is subtle does not make it less of a threat." ' " *(Id.* at p. 1075.) Surely, the postings singling out and threatening Macdonald are the type of harassment the Legislature intended to proscribe in section 527.6.

[24] \*1256 The disclaimer SHAC USA posts on its Web site is relevant context evidence, but it is not dispositive. "It is not necessary that the defendant intend to, or be able to carry out his threat; the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat." *(Planned Parenthood, supra,* 290 F.3d at p. 1075; *United States v. Orozco-Santillan* (9th Cir.1990) 903 F.2d 1262, 1265, fn. 3.) "[W]hether or not the maker of the threat has an actual intention to carry it out, 'an apparently serious threat may cause the mischief or evil toward which the statute was in part directed.' " *(Planned Parenthood, supra,* at p. 1076.) Even if Macdonald knew of the disclaimer, the court could reasonably find she perceived entries on SHAC USA's Web site as threats.

C

SHAC USA and Kjonaas rely on *Brandenburg, supra,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430, in which the Supreme Court reversed the conviction of a Ku Klux Klan leader under a "Criminal Syndicalism Act" that punished persons who " 'advocate or teach the duty, necessity, or propriety' of violence 'as a means of accomplishing industrial or political reform'; or who publish or circulate or dis-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                                    Page 21
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

play any book or paper containing such advocacy.' " (*Id.* at p. 448.) The Klansman threatened "revengeance" if "our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race." (*Id.* at p. 446.) The court relied on "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is *directed to inciting or producing imminent lawless action and is likely to incite or produce such action.* ... '[T]he mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' " (*Id.* at pp. 447-448, italics added.)

Additionally, SHAC USA and Kjonaas rely on *NAACP v. Claiborne Hardware Company* (1982) 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (*Claiborne Hardware* ). *Claiborne Hardware* arose from the boycott by Black persons of White merchants in Claiborne County, Mississippi, "to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice." (*Id.* at p. 907, 102 S.Ct. 3409.) The merchants sued the NAACP and its field secretary, Charles Evers, among others, seeking injunctive relief and damages.

**544 The court rejected the plaintiffs' contention Evers could be held liable because he " 'threatened violence on a number of occasions against boycott breakers.' " (*Id.* at p. 898, 102 S.Ct. 3409.) During a speech at an NAACP meeting, " 'Evers told his audience that they would be *1257 and that blacks who traded with white merchants would be *answerable to him.* ... [Further], Evers told the assembled black people that any "uncle toms" who broke the boycott would "have their necks broken" by their own people.' " (*Id.* at p. 900, fn. 28, 102 S.Ct. 3409.) In another speech at a church, Evers told the group "that boycott violators would be 'disciplined' by their own people and warned that the Sheriff could not sleep with boycott violators at night." (*Id.* at p. 902, 102 S.Ct. 3409.) On another occasion, Evers told a crowd of several hundred

people, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck.' " (*Ibid.*)

The court concluded Evers's speeches "predominantly contained highly charged political rhetoric lying at the core of the First Amendment," and the speeches "did not transcend the bounds of protected speech set forth in *Brandenburg.*" (*Claiborne Hardware, supra,* 458 U.S. at pp. 926-927, 928, 102 S.Ct. 3409.) The court explained that when "spontaneous and emotional appeals for unity and action in a common cause ... do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the 'profound national commitment' that 'debate on public issues should be uninhibited, robust and wide-open.' " (*Id.* at p. 928, 102 S.Ct. 3409.) The court noted that Evers's speeches were not closely followed by violence, and rather acts of violence by third parties occurred weeks or months later. (*Ibid.*)

In *Claiborne Hardware,* the court also held that "[c]ivil liability may not be imposed merely because an individual belonged to a group [there the NAACP], some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." (*Claiborne Hardware, supra,* 458 U.S. at p. 920, 102 S.Ct. 3409.) "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." (*Id.* at p. 908, 102 S.Ct. 3409.) "To impose liability without a finding that the NAACP authorized ... or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment." (*Id.* at p. 931, 102 S.Ct. 3409.)

Neither *Brandenburg* nor *Claiborne Hardware,* however, arose under a statute proscribing threats of violence or in the context of a threat against a *specific* named individual. Moreover, immediacy or the prospect of imminent lawless action is not an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

element of a claim for violation of a threats statute. (State v. E.J.Y. (2002) 113 Wash.App. 940, 55 P.3d 673, 678; see also Planned Parenthood, supra, 290 F.3d at p. 1071 (lead opn. of Rymer, J.); id. at pp. 1106-1107 (dis. opn. of Berzon, J.).) Further, we are not concerned here with defendants' association with ALF or other animal rights activists. *1258 We base their potential liability on their own credible threats of violence, and their lack of intent to actually carry out the threats is immaterial. [FN9]

FN9. In supplemental briefing Kjonaas and SHAC USA assert the publications on SHAC USA's Web site are privileged under title 47 of United States Code section 230(c)(1), a provision of the Communications Decency Act, which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The statute "created a federal immunity to any cause of action that would make interactive service providers liable for information originating with a third party user of the service." (Gentry v. eBay, Inc. (2002) 99 Cal.App.4th 816, 828, 121 Cal.Rptr.2d 703, citing Zeran v. America Online, Inc. (4th Cir.1997) 129 F.3d 327, 330.) " 'Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions--such as deciding whether to publish, withdraw, postpone or alter content--are barred.' " (Gentry v. eBay, Inc., supra, at pp. 828-829, 121 Cal.Rptr.2d 703.) To any extent title 47 of United States Code section 230(c)(1) arguably applies in the context of a threats statute, defendants have abandoned the issue by not raising it in their opening brief. (California Recreation Industries v. Kierstead (1988) 199 Cal.App.3d 203, 205, fn. 1, 244 Cal.Rptr. 632.) Moreover, there is no evidence that SHAC USA's Web site is an "interactive computer service," which the statute defines as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." (47 U.S.C., § 230(f)(2), italics added.) Further, as discussed, given the entire context, including targeting Macdonald for harassment, the court could reasonably find that SHAC USA and Kjonaas made credible threats of violence toward her on SHAC USA's Web site.

**545 D

[25] HLS does not have a cause of action under section 527.6, because the statute applies only to natural persons. (Scripps Health v. Marin (1999) 72 Cal.App.4th 324, 333, 85 Cal.Rptr.2d 86; Diamond View Limited v. Herz (1986) 180 Cal.App.3d 612, 618-619, 225 Cal.Rptr. 651.) Section 527.8, however, allows an employer to seek injunctive relief on behalf of its employees under the same criteria set forth in section 527.6. "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction on behalf of the employee prohibiting further unlawful violence or threats of violence by that individual." (§ 527.8, subd. (a).) "[T]he Legislature intended to provide employers with the remedy of injunctive relief to protect their employees by preventing unlawful violence where it is reasonably likely such unlawful violence may occur in the future." (Scripps Health v. Marin, supra, 72 Cal.App.4th at p. 335, 85 Cal.Rptr.2d 86.)

Although the complaint does not specifically cite section 527.8, it does allege facts giving rise to a cause of action by HLS under that statute, and *1259 defendants do not contend otherwise. For reasons discussed above, we conclude HLS also showed a probability of prevailing on the merits of its harassment claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 41    Filed 08/23/2007    Page 36 of 42

29 Cal.Rptr.3d 521                                                          Page 23
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

[26] Plaintiffs' evidence against Agranoff merely shows he demonstrated in front of Macdonald's home by holding a candle in silence. Thus, his conduct is not proscribed by section 527.6.

## V

*Macdonald Showed a Probability of Prevailing on Her Causes of Action Against SHAC USA and Kjonaas for Intentional Infliction of Emotional Distress, Invasion of Privacy and Unfair Competition*

### A

[27][28][29] "Peace of mind is now recognized as a legally protected interest, the **546 intentional invasion of which is an independent wrong, giving rise to liability without the necessity of showing the elements of any of the traditional torts." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 403, p. 483.) "[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Trerice v. Blue Cross of California* (1989) 209 Cal.App.3d 878, 883, 257 Cal.Rptr. 338.) "Conduct, to be ' "outrageous" ' must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." (*Ibid.*)

[30][31][32][33][34] "[A]rticle I, section 1 of the California Constitution protects Californians against invasions of privacy by nongovernmental as well as governmental parties." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 227, 74 Cal.Rptr.2d 843, 955 P.2d 469.) "[T]he action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Id.* at p. 231, 74 Cal.Rptr.2d 843, 955 P.2d 469.) To satisfy the first element, "the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable

expectation of seclusion or solitude in the place, conversation or data source." (*Id.* at p. 232, 74 Cal.Rptr.2d 843, 955 P.2d 469.) The expectation of privacy need not be complete or absolute privacy. Rather, "[p]rivacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder and the nature *1260 of the intrusion." (*Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 915, 918, 85 Cal.Rptr.2d 909, 978 P.2d 67.) "[D]etermining offensiveness requires consideration of all the circumstances of the intrusion, including its degree and setting and the intruder's 'motives and objectives.' " (*Shulman v. Group W Productions, Inc.* at p. 236, 74 Cal.Rptr.2d 843, 955 P.2d 469.)

[35] SHAC USA and Kjonaas contend Macdonald cannot recover for these torts because their speech is constitutionally protected. We have held to the contrary, however, and we conclude the trial court could reasonably find in favor of Macdonald on these causes of action based on SHAC USA's Web site entries targeting her for illegal activity such as "civil disobedience" and threatening her safety. [FN10] Indeed, in enacting section 527.6 the Legislature intended to supplement existing causes of action for emotional distress and invasion of privacy available to a victim of harassment. (*Diamond View Limited v. Herz, supra,* 180 Cal.App.3d at p. 619, 225 Cal.Rptr. 651.)

> FN10. These causes of action are not subject to a jury trial because plaintiffs seek only injunctive relief, attorney fees and costs.

[36][37] As a business entity, however, HLS lacks standing to pursue these torts. (*Tenants Assn. of Park Santa Anita v. Southers* (1990) 222 Cal.App.3d 1293, 1304, 272 Cal.Rptr. 361 [emotional distress]; *Coulter v. Bank of America* (1994) 28 Cal.App.4th 923, 930, 33 Cal.Rptr.2d 766 [invasion of privacy].) Further, Agranoff's conduct did not cause Macdonald actionable emotional distress, and he did not invade **547 her privacy by picketing peacefully in front of her home. Agranoff was on a public sidewalk and a trier of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521
Page 24
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

fact could not reasonably find his conduct was highly offensive.

## B

### 1

[38][39] As to the unfair competition cause of action, Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." "The Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545, quoting *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111, 113, 101 Cal.Rptr. 745, 496 P.2d 817.) "The unfair competition law thus creates an independent action when a business practice violates some other law." (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1170, 121 Cal.Rptr.2d 79.)

[40] When this lawsuit commenced, section 17204 provided that "any person acting for the interests of itself, its members or the general public" *1261 could bring an unfair competition cause of action. (Former § 17204.) On November 2, 2004, the voters approved Proposition 64; it became effective the following day. (Cal. Const., art. II, § 10, subd. (a).) Proposition 64 amended Business and Professions Code section 17204 to state an unfair competition cause of action may be prosecuted "by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." Further, Proposition 64 amended Business and Professions Code section 17203 to require that a private party may bring a representative action only if he or she meets the standing requirement of section 17204 and complies with class certification requirements set forth in Code of Civil Procedure section 382.

[41][42][43] The question is whether Proposition 64 applies to cases pending on appeal. [FN11] " 'A retrospective law is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the stat-

ute.' " (*Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 391, 182 P.2d 159.) A statute has retrospective effect when it substantially changes the legal consequences of past events. (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 7, 255 Cal.Rptr. 412, 767 P.2d 679.) "It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287, 279 Cal.Rptr. 592, 807 P.2d 434.)

> FN11. We asked the parties to submit supplemental briefing on Proposition 64, and we have taken their responses into consideration.

[44] "The repeal of a statutory right or remedy, however, presents entirely distinct issues from that of the prospective or retroactive application of a statute. A well-established line of authority holds: ' " 'The unconditional repeal of a special remedial statute without a saving clause stops all pending actions where the repeal finds them. If final relief has not been granted before the repeal goes into effect it cannot be granted afterwards, even if a judgment has been entered and the cause is pending on appeal. The reviewing court must dispose of the case under the law in **548 force when its decision is rendered.' " [Citations.]' [Citations.]" (*Physicians Com. for Responsible Medicine v. Tyson Foods* (2004) 119 Cal.App.4th 120, 125-126, 13 Cal.Rptr.3d 926 (italics omitted).)

[45] "The justification for this rule is that all statutory remedies are pursued with full realization that the legislature may abolish the right to recover at any time." (*Callet v. Alioto* (1930) 210 Cal. 65, 68-69, 290 P. 438; Gov.Code, § 9606 ["Any statute may be repealed at any time, except when vested rights would be impaired. Persons acting under any statute act in contemplation of this power of repeal."].) "Because it is a *1262 creature of statute, the right of action exists only so far and in favor of such person as the legislative [or initiative] power may declare." (*Graczyk v. Workers' Comp. Appeals*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 41    Filed 08/23/2007    Page 38 of 42

29 Cal.Rptr.3d 521                                                              Page 25
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

*Bd.* (1986) 184 Cal.App.3d 997, 1007, 229 Cal.Rptr. 494.) Unlike a common law right, a " 'statutory remedy does not vest *until final judgment.*' " *(County of San Bernardino v. Ranger Ins. Co.* (1995) 34 Cal.App.4th 1140, 1149, 41 Cal.Rptr.2d 57.)

Based on these principles, we conclude Proposition 64 applies to this case and others filed before its effective date of November 3, 2004. The unfair competition law (Bus. & Prof.Code, § 17200 et seq.) is a statutory remedy, not a common law remedy. In *Bank of the West v. Superior Court, supra,* 2 Cal.4th at page 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545, the court explained the common law of unfair competition required a showing of competitive injury to one's business. The court noted such a showing is not required for a statutory prohibiting unfair competition: "[S]tatutory 'unfair competition' extends to all unfair and deceptive business practices. For this reason, the statutory definition of 'unfair competition' 'cannot be equated with the common law definition....' " *(Ibid.)* Moreover, Proposition 64 contained no saving clause.

### 2

[46] The complaint alleges Macdonald sustained damage to real property and personal property, and thus she has standing to proceed individually on the unfair competition cause of action. Because Macdonald showed a probability of prevailing on her causes of action for harassment, invasion of privacy and intentional infliction of emotional distress, it is also probable she will prevail on her unfair competition cause of action.

The complaint also alleges Macdonald purports to represent the general public, and under amended Business and Professions Code sections 17203 and 17204 she may not do so without complying with the class action certification procedures of Code of Civil Procedure section 382. We direct the trial court to grant defendants judgment on the pleadings on the unfair competition cause of action insofar as the representative portion is concerned. (See Code of Civ. Proc. § 438, subd. (c)(3)(B)(ii) [providing the trial court may grant a motion for judgment on

the pleadings when the complaint does not state facts sufficient to constitute a cause of action against that defendant].) Although leave to amend should be granted if it appears the plaintiff may attempt to seek class certification (see *Virginia G. v. ABC Unified School Dist.* (1993) 15 Cal.App.4th 1848, 1852, 19 Cal.Rptr.2d 671), Macdonald asserts no desire to do so.

[47] HLS submits Proposition 64 does not preclude its unfair competition cause of action because defendants' "actions have caused employees to quit and *1263 companies to cease doing business with HLS, all intentional acts to interfere with HLS'[s] economic advantage." HLS cites the declarations of Michael Caulfield, **549 HLS's general manager in the United States, and Bibi, whose home was vandalized after SHAC USA's Web site targeted him. Neither declaration, however, states that any HLS employee or company doing business with it severed ties with HLS. Accordingly, HLS may not maintain an unfair competition claim. [FN12]

> FN12. HLS does not assert Code of Civil Procedure section 527.8 gives rise to an employer's unfair competition claim under Business and Professions Code sections 17203 and 17204, as amended by Proposition 64, based on its employee's actual injury, and thus we do not reach that issue.

### VI
*Macdonald Showed a Probability of Prevailing on Her Cause of Action*
*Against Agranoff for Municipal Code Violation*
[48] Section 52.2003 of the San Diego Municipal Code provides: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in The City of San Diego." In enacting the ordinance, the city council relied on *Frisby v. Schultz, supra,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420, in which the court held the government may ban "focused picketing taking place solely in front of a particular residence." *(Id.* at p. 483, 108 S.Ct. 2495.) The court explained the "First Amendment permits the government to prohibit offensive speech as intrusive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 41    Filed 08/23/2007    Page 39 of 42

29 Cal.Rptr.3d 521                                                    Page 26
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

when the 'captive' audience cannot avoid the objectionable speech," and a resident whose home is picketed "is figuratively, and perhaps literally, trapped within the home ... [and] is left with no ready means of avoiding the unwanted speech." (*Id.* at p. 487, 108 S.Ct. 2495.) The court noted the ordinance at issue there was constitutional because it did not prohibit "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." (*Id.* at p. 483, 108 S.Ct. 2495.)

Agranoff's declaration states that on "May 25, 2003, I was present at a peaceful protest near the home of HLS employee, Claire Mac[d]onald," and "[t]his was the first and only time I have ever been to ... Mac[d]onald's home." On appeal he admits "that on one occasion [he] participated along with fifteen to twenty other people in a peaceful protest *in front of Mac[d]onald's home.*" (Italics added.) Agranoff does not contend his conduct did not violate San Diego Municipal Code section 52.2003. Rather, he asserts that since the provision appears in an article of the Municipal Code titled "Police--Police Regulations--Offenses Against Government," there is no private right of action. Government Code section 36900, subdivision (a), however, **1264 expressly provides that a violation of a city ordinance may be redressed by civil action. (See also *Riley v. Hilton Hotels Corp.* (2002) 100 Cal.App.4th 599, 607, 123 Cal.Rptr.2d 157.) We conclude Macdonald showed a probability of prevailing against Agranoff on this cause of action.

There is no evidence Kjonaas or anyone affiliated with SHAC USA picketed at Macdonald's home, and thus this cause of action cannot proceed against them. Further, this is not a viable cause of action for HLS.

## VII

### *Plaintiffs Did Not Establish a Probability of Prevailing on the Remaining Causes of Action*

[49][50] " 'The essence of the cause of action for trespass is an "unauthorized entry" onto the land of another.' " **550(*Miller v. National Broadcasting*

*Co.* (1986) 187 Cal.App.3d 1463, 1480, 232 Cal.Rptr. 668.) Plaintiffs produced no evidence Kjonaas, any SHAC activist or Agranoff trespassed on Macdonald's property. Defendants assert Agranoff is liable for trespass because "he provided transportation to the apparent trespassers." Even assuming the persons Agranoff transported after the incident had trespassed on Macdonald's property, his conduct did not direct or authorize their conduct. Further, there is no evidence of a principal and agent relationship to support a ratification theory. (*Claiborne Hardware, supra,* 458 U.S. at p. 927, 102 S.Ct. 3409.)

[51][52][53] Further, as to the negligent infliction of emotional distress cause of action, there is no special relationship between Macdonald and SHAC USA, Kjonaas or Agranoff that would impose a duty on them to not cause her emotional distress. The "*negligent* causing of emotional distress is not an independent tort but the tort of *negligence,* involving the usual duty and causation issues." (6 Witkin, Summary of Cal. Law (9th ed.1988), Torts, § 838, p. 195.) "[T]here is no duty to avoid negligently causing emotional distress to another, and ... damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984, 25 Cal.Rptr.2d 550, 863 P.2d 795.) Plaintiffs contend defendants, and SHAC activists, had a duty to not trespass on or vandalize property. Plaintiffs, however, adduced no evidence showing the defendants engaged in such conduct.

[54][55][56] Additionally, plaintiffs' causes of action for intentional and negligent interference with prospective economic advantage lack merit because they point to no evidence SHAC USA, Kjonaas or Agranoff disrupted any relationship between HLS and Macdonald or its other employees or prospective clients. " ' "The tort of intentional ... interference with prospective *1265 economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another.... [Citation.]" [Citation.]' " (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301

**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

Cal.App.4th 1249, 1255-1256, 116 Cal.Rptr.2d 358.) Elements of the tort are actual disruption of the relationship and economic harm to plaintiff proximately caused by the acts of the defendant. (*Id.* at p. 1256, 116 Cal.Rptr.2d 358.) [FN13]

> FN13. Plaintiffs assert the evidence establishes "disruption of the relationships," but they cite no supporting evidence. "The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.)

VIII

*Scope of Injunction*

[57][58] SHAC USA and Kjonaas contend the preliminary injunction is overbroad insofar as it precludes them from coming within 100 feet of any real property known or believed to be lawfully in the possession of any HLS employee; coming within 100 feet of any person known or believed to be an HLS employee or family member, friend or business associate of any HLS employee; and posting or maintaining on any Web site any information regarding any person known or believed to be an HLS employee or family member, friend or business associate of any HLS employee. We apply a substantial evidence test, resolving all factual conflicts and questions of credibility in favor of plaintiffs as the prevailing parties. **\*\*551**(*USS- Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 444, 4 Cal.Rptr.3d 54.)

[59][60] "An injunction curtailing protected expression will be upheld only if the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (*Planned Parenthood Assn. v. Operation Rescue* (1996) 50 Cal.App.4th 290, 299, 57 Cal.Rptr.2d 736, citing *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593.) "[I]f a home is involved the state interest in preserving residential privacy is exceptionally potent." (*Planned Parenthood Assn.*

*v. Operation Rescue, supra,* at p. 299, 57 Cal.Rptr.2d 736.)

[61] Plaintiffs sought a preliminary injunction under sections 526 and 527.6. Under section 526, the court may grant an injunction when "it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce ... great or irreparable injury [ ] to a party to the action." (§ 526, subd. (a)(2).) Under section 527.6, the court may grant an injunction when there is a threat of harm because of harassment, as defined in the statute. (§ 527.6, subds. (a), (b); see also § 527.8, subds. (a), **\*1266** b).) The "purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act. [Citations.] Consequently, injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed. [Citation.] It should neither serve as punishment for past acts, *nor be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future.*" (*Scripps Health v. Marin, supra,* 72 Cal.App.4th at p. 332, 85 Cal.Rptr.2d 86, italics added.)

Plaintiffs presented no evidence that Kjonaas or anyone else associated with SHAC USA picketed at Macdonald's home or was involved in any trespass or vandalism at her home, or the home of any other HLS employee. Rather, the evidence against SHAC USA and Kjonaas was limited to the postings on SHAC USA's Web site. Accordingly, the court's finding that SHAC USA and Kjonaas trespassed on Macdonald's property and violated San Diego Municipal Code section 52.2003 is without merit. Because the case against SHAC USA and Kjonaas is based on the future risk of continuing threats of violence posted on the Web site, the injunction must be tailored to preclude such threats. (*USS-Posco Industries v. Edwards, supra,* 111 Cal.App.4th at p. 442, 4 Cal.Rptr.3d 54.) There is no ground to include in the injunction the prohibitions of coming within 100 feet of any real property known or believed to be lawfully in the possession of any HLS employee, or coming within 100 feet of any person

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521                                                                                      Page 28
129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301
(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)

known or believed to be an HLS employee, or his or her family member, friend or business associate.

As to SHAC USA's Web site, the injunction may not be broader than necessary to assure SHAC USA and Kjonaas will not again make a credible threat of violence against Macdonald or any other HLS employee, or family members residing with them. (See *Planned Parenthood, supra,* 290 F.3d at p. 1087; §§ 527.6, subd. (c); 527.8, subd. (d).) Thus, SHAC USA and Kjonaas may be enjoined from targeting Macdonald or any other HLS employee, or family members residing with them, and from publishing their names, addresses or other identifying information, as well as reports of trespasses, vandalism or other illegal activity at their homes. (See *Planned Parenthood, supra,* at pp. 1087- 1088.) As SHAC USA and Kjonaas point out, they should not be prohibited from **552 publishing an entry "that a particular HLS employee has been convicted of animal cruelty," should that ever be the case, and as the injunction now stands, it improperly "requires removal of all references of any kind [to HLS employees] including purely public references" such as "deleting names from articles published in ... newspapers ... which are merely republished" on SHAC USA's Web site. We order the court on remand to delete the references concerning picketing and approaching HLS employees (subcategories "a" and "b"), and more narrowly tailor the injunction insofar as the Web site is concerned (subcategory "c").

## *1267 IX

### *Defendants' Request for Attorney Fees*
[62] A "prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." (§ 425.16, subd. (c).) "This section authorizes the court to make an award of reasonable attorney fees to a prevailing defendant, which will adequately compensate the defendant for the expense of responding to a baseless lawsuit." *(Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785, 54 Cal.Rptr.2d 830.) A "prevailing defendant" within the meaning of section 425.16, subdivision (c), includes a defendant whose anti-SLAPP motion was granted as

to some causes of action but not others. *(ComputerXpress, supra,* 93 Cal.App.4th at p. 1020, 113 Cal.Rptr.2d 625.)

[63][64] A prevailing defendant is also entitled to attorney fees incurred on appeal. *(ComputerXpress, supra,* 93 Cal.App.4th at p. 1020, 113 Cal.Rptr.2d 625.) "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees." *(Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498, 191 Cal.Rptr. 134.) On remand, the trial court is to consider whether under the circumstances of this case the defendants are entitled to fees and, if so, the amount.

### DISPOSITION
We affirm the order on the special motion to strike under section 425.16 as to Macdonald's and HLS's cause of action against SHAC USA and Kjonaas for harassment under sections 527.6 and 527.8, and as to Macdonald's causes of action against them for intentional infliction of emotional distress and invasion of privacy [FN14], and as to her individual claim against them under Business and Professions Code section 17200.

> FN14. The sixth cause of action, for "Intrusion into Private Affairs," duplicates the fifth cause of action.

We reverse the order as to the following causes of action against SHAC USA and Kjonaas: trespass, negligent infliction of emotional distress, intentional and negligent interference with prospective economic advantage and violation of San Diego Municipal Code section 52.2003. We also reverse the order as to the following causes of action as to HLS only: intentional infliction of emotional distress, invasion of privacy and violation of Business and Professions Code section 17200.

As to Agranoff, we affirm the order as to Macdonald's cause of action against him for violation of San Diego Municipal Code section 52.2003. We reverse the order as to all other causes of action against Agranoff.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Cal.Rptr.3d 521

129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301

**(Cite as: 129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521)**

**\*1268** We direct the court on remand to grant SHAC USA and Kjonaas judgment on the pleadings on HLS's unfair competition **\*\*553** cause of action, and on Macdonald's unfair competition cause of action insofar as it purports to be a representative action; modify the injunction in accordance with part VIII of this opinion; and consider defendants' request for attorney fees.

The parties are to bear their own costs on appeal.

WE CONCUR: <u>BENKE</u> and <u>McINTYRE</u>, JJ.

129 Cal.App.4th 1228, 29 Cal.Rptr.3d 521, 05 Cal. Daily Op. Serv. 4607, 2005 Daily Journal D.A.R. 6301

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.