# EXHIBIT 20

## To Appendix to California State Authorities

Westlaw.

234 Cal.App.3d 1277                                                                 Page 1
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

c

LIVE OAK PUBLISHING COMPANY, INC., et
al., Plaintiffs and Appellants,
v.
GLADYS COHAGAN, Defendant and Respondent.
**No. C008798.**

Court of Appeal, Third District, California.

Oct 1, 1991.

SUMMARY

In a defamation action by a newspaper for state-
ments attacking it which it published as a paid ad-
vertisement by a candidate's supporter during a
political campaign, the trial court sustained defend-
ant's demurrer without leave to amend as to the li-
bel cause of action, and granted summary judgment
for defendant as to a cause of action for slander.
(Superior Court of San Joaquin County, No.
208523, Stephen G. Demetras, Judge.)

The Court of Appeal affirmed. The court held that
the trial court properly sustained defendant's de-
murrer without leave to amend on the libel cause of
action, since the newspaper published the defamat-
ory statement itself and could not bring itself within
the exception applicable to coerced republication.
The fact defendant "demanded" that the letter be
published was insufficient as a matter of law to
show coercion, as was the fact the newspaper may
have acted reasonably in publishing the letter. It
also held that the trial court properly granted de-
fendant summary judgment, since plaintiff failed to
prove by clear and convincing evidence the state-
ments were made with malice. Both the newspaper
and its managerial employees were public-figure
plaintiffs who had to prove actual malice by clear
and convincing evidence, and they did not intro-
duce such evidence in opposition to the summary
judgment motion. The only direct evidence on the
issue of malice was the candidate's deposition testi-
mony which established that defendant bore anim-
osity toward the newspaper, but ill will is not "actu-
al malice," and defendant failed to establish any

link between defendant's hostility to the paper and
her awareness of the probable falsity of her state-
ments. The candidate's deposition testimony did not
contain clear and convincing evidence on the issue
of defendant's state of mind to show that she enter-
tained serious doubts as to the truth of her state-
ments or that they were so inherently improbable
that only a reckless person would have put them in
circulation. (Opinion by Carr, Acting P. J., with
Davis and Nicholson, JJ., concurring.)  *1278

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 22--Demurrer to Complaint-
-Demurrer as Admission.
A general demurrer admits the truth of all material
facts alleged in the complaint. If there is a reason-
able possibility the defect can be cured plaintiff
should be given leave to amend. If there can be no
liability as a matter of law the demurrer should be
sustained without leave to amend.

(2) Libel and Slander § 34--Who May Be Libeled.
An entity other than a natural person may be
libeled.

(3) Libel and Slander § 7--Actionable Words-
-Advertisement.
An advertisement may be held libelous.

(4) Libel and Slander § 3--Elements of Defamation-
-Publication-- Republication--Coercion Exception.
A libelous statement is not actionable until it has
been published to a third person. A plaintiff cannot
manufacture a defamation cause of action by pub-
lishing the statements to third persons; the publica-
tion must be done by the defendant. An exception
exists where it is foreseeable that a defendant's act
would result in publication to a third person, based
on the principle that the act of disclosure arises
from necessity. Necessity is not predicated exclus-
ively on conditions which are physical, but may be
superinduced by a fear which is akin to duress. The
"coercion" aspect of the exception applies where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277                                           Page 2
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person after he has read it or been informed of its contents. The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. To determine if the "coercion" exception is applicable, the test is whether, because of some necessity he was under to communicate the matter to others, it was reasonably to be anticipated that the person defamed would do so.

[See 5 **Witkin**, Summary of Cal. Law (9th ed. 1988) Torts, § 478b.]

(5) Libel and Slander § 3--Elements of Defamation--Defamation of Publisher of Statement--Coercion.
In a defamation action by a newspaper for statements attacking it that it published as a paid advertisement during a political campaign, the trial court properly sustained *1279 defendant's demurrer to the complaint without leave to amend, on the ground it published the defamatory statement itself and could not bring itself within the exception applicable to coerced republication. The fact defendant "demanded" that the letter be published was insufficient as a matter of law, as was the fact the newspaper may have acted reasonably in publishing the letter.

(6a, 6b, 6c) Libel and Slander § 54--Summary Judgment--First Amendment Defamation--Proof of Malice.
In an action for slander by a newspaper publisher and certain of its employees against the financial backer of a political candidate, for oral statements that the newspaper intentionally sabotaged and crucified the candidate in the context of a garbled article about her, lying to defendant about the mistakes being unintentional, the trial court properly granted defendant summary judgment. Plaintiff failed to prove by clear and convincing evidence the statements were made with malice. Both the newspaper and its managerial employees were pub-

lic-figure plaintiffs who had to prove actual malice by clear and convincing evidence, and they did not introduce such evidence in opposition to the summary judgment motion. The only direct evidence on the issue of malice was the candidate's deposition testimony which established that defendant bore animosity toward the newspaper, but ill will is not "actual malice," although it may be circumstantial evidence of it. However, defendant failed to establish any link between defendant's hostility to the paper and her awareness of the probable falsity of her statements. The candidate's deposition testimony did not contain clear and convincing evidence on the issue of defendant's state of mind to show that she entertained serious doubts as to the truth of her statements or that they were so inherently improbable that only a reckless person would have put them in circulation.

[See **Cal.Jur.3d (Rev)**, Assault and Other Willful Torts, § 147.]

(7) Summary Judgment § 26--Appellate Review--Scope.
A defendant who moves for summary judgment must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial. The normal scope of appellate review of a summary judgment motion involves the same three-step analysis required of the trial court: (1) identification of the issues framed by the pleadings since it is those allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading; (2) *1280 determination whether the moving party's showing has established facts that negate the opponent's claim and justify a judgment in the movant's favor; (3) determination whether the opposition demonstrates the existence of a triable, material factual issue.

(8) Libel and Slander § 54--Actions--Trial, Judgment, New Trial, and Appeal--Judgment--Summary Judgment--First Amendment Defamation Action-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277                                               Page 3
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

-Review.
The standard of review of First Amendment (U.S. Const., 1st Amend.) defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a First Amendment defamation case can only be supported when actual malice is shown by clear and convincing evidence, rather by a preponderance of evidence as in most cases, the evidence and all the inferences that can reasonably be drawn from it must meet the higher standard. If there is insufficient evidence to sustain a finding of malice a trial is not warranted. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubt shows reckless disregard for truth or falsity and demonstrates actual malice.

(9a, 9b) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Public Figures--Who Are Public Figures--Newspaper Managerial Employees.
In a defamation action brought by a newspaper and its managerial employees, the managerial employees, along with the newspaper, were public figures required to prove actual, or constitutional, malice. The managerial employees operated the newspaper and were intimately involved in public political debate in their community, and the community had a legitimate and substantial interest in their conduct regarding the operation of the paper.

(10) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Public Figures--Who Are Public Figures.
In the law of defamation, public officials and figures can be said to have voluntarily exposed themselves to public scrutiny and must accept the consequences. A person is not a public figure merely because he happens to be involved in a controversy that is newsworthy; instead, he must have undertaken some voluntary act through which he sought

to influence the resolution of the public issues involved. When called on to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported "public figures" have thrust themselves into the forefront of particular public **\*1281** controversies. Generally, authors are considered to have participated sufficiently in public controversies or otherwise involved themselves in matters of public concern as to be public figures.

(11) Libel and Slander § 23--Privileged Communications--Qualified Privilege--Effect of Malice--Actual (Constitutional) Malice.
Under First Amendment (U.S. Const., 1st Amend.) defamation law, constitutional "actual" malice is subjective in nature, provable only by evidence that the defendant realized that his statement was false or that he subjectively entertained a serious doubt as to the truth of his statement. Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing. Only the existence of sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity will suffice to meet the subjective test.

COUNSEL

Meyer & Mitchell, Daniel L. Mitchell, Jack Leavitt, Damrell, Nelson & Schrimp, Roger M. Schrimp and Debra A. Hayes for Plaintiffs and Appellants.

Brown, Hall, Spatola, Clair & McKinley, Charles R. Spatola and Steven A. Clair for Defendant and Respondent.

**CARR, Acting P. J.**

In this man-bites-dog story, plaintiff newspaper sued an individual for libel and slander. The trial court sustained a demurrer without leave to amend as to the libel cause of action and granted summary judgment as to the slander cause of action. We shall affirm.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

Page 4

Factual and Procedural Background

On May 25, 1988, the Escalon Times, a small-town newspaper, published articles about each candidate for a local election. The article about candidate Victoria Royster was obviously garbled. Gladys Cohagan (Cohagan), a *1282 Royster supporter, wrote a letter to the newspaper accusing it of intentionally garbling the article, presumably to influence the outcome of the election. Cohagan included a check to cover the cost of printing her letter as a full-page advertisement. The paper kept her money and printed her letter as an advertisement. Plaintiffs Live Oak Publishing Company, Inc., a California corporation doing business as the Escalon Times, Stanley L. Cook, owner and publisher, Williams P. Camp, general manager, Richard Myers, editor, and Tom Mauldin, managing editor (collectively Live Oak) sued Cohagan for libel. The paper also sued for slander, based on statements Cohagan made to employees of the paper. The court sustained Cohagan's demurrer without leave to amend as to the libel cause of action on the ground Live Oak itself published the libel. Live Oak was given leave to amend the slander cause of action.

Live Oak filed a first amended complaint against Cohagan, realleging both causes of action. Cohagan again demurred and the court overruled the demurrer. Apparently recognizing the impropriety of restating the libel cause of action (Code Civ. Proc., § 436), Live Oak declined to pursue this as a viable cause of action and appeals from the dismissal entered as to the cause of action after the sustaining of the demurrer. [FN1]

> FN1 Live Oak filed a notice of appeal from the order granting summary judgment. We dismissed the appeal as a nonappealable order. (See Foremost Ins. Co. v. Wilks (1988) 206 Cal.App.3d 251, 255, fn. 2 [253 Cal.Rptr. 596].) Eventually Cohagan had a judgment entered and Live Oak filed a proper notice of appeal.

Cohagan moved for summary judgment on the slander cause of action on the ground the statements were protected opinion statements and that

there had been no publication of the statements to third parties. Supplemental papers urged Live Oak was a public figure and there was no evidence of actual malice. The motion was granted on this latter ground. Reconsideration was denied.

Live Oak's briefs present issues in a confusing order which we do not attempt to follow. [FN2] We shall first review the order sustaining the demurrer to the libel cause of action, then we shall review the order granting summary judgment as to slander. *1283

> FN2 Live Oak's reference to a matter not reflected in the record which occurred after the filing of the notice of appeal, a television program about this suit, is improper and we disregard it. (Cal. Rules of Court, rules 13, 18.) We also disregard Cohagan's reference to a possible malicious prosecution suit for the alleged SLAPP, or Strategic Lawsuit Against Public Participation.

## I. The Libel Cause of Action.
### A. *The Standard of Review.*

(1) A general demurrer admits the truth of all material facts alleged in the complaint. If there is a reasonable possibility the defect can be cured the plaintiffs should be given leave to amend. (Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn. (1986) 42 Cal.3d 929, 936 [231 Cal.Rptr. 748, 727 P.2d 1029].) If there can be no liability as a matter of law the demurrer should be sustained without leave to amend. (Lawrence v. Bank of America (1985) 163 Cal.App.3d 431, 436-437 [209 Cal.Rptr. 541].) As Live Oak was given no leave to amend the libel cause of action in the original complaint, the adequacy of that cause of action may be tested here. (Seidner v. 1551 Greenfield Owners Assn. (1980) 108 Cal.App.3d 895, 901 [166 Cal.Rptr. 803].)

### B. *Discussion.*

The trial court ruled Live Oak could not sue for libel as *it* had published the allegedly defamatory statement. The demurrer also raised the question of whether the statements were statements of opinion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277                                                                                              Page 5
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
(Cite as: 234 Cal.App.3d 1277)

protected under the First Amendment, an issue we do not reach because of our ruling on the publication issue. (But see *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, ___ [111 L.Ed.2d 1, 19, 110 S.Ct. 2695] [no separate privilege for statements of opinion under First Amendment].)

"Libel is a false and unprivileged publication by writing, ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) (2) An entity other than a natural person may be libeled. (*Di Giorgio Fruit Corp. v. AFL- CIO* (1963) 215 Cal.App.2d 560, 570- 571 [30 Cal.Rptr. 350].)

Typically it is the newspaper which seeks protection from liability for printing a letter to the editor. (E.g., Annot. (1980) 99 A.L.R.3d 573.) But this is not the first time a newspaper or its agents have brought suit for defamation. (E.g., *Earl v. Times-Mirror Co.* (1921) 185 Cal. 165 [196 P. 57] [publisher and owner], see Gatley on Libel and Slander (7th ed. 1974) § 64, p. 34 and fn. 17, § 73, pp. 39-40; Odgers, A Digest of the Law of Libel and Slander (5th ed. 1911) pp. 30-31 [journalists, newspaper proprietors]; Wittenberg, Dangerous Words (1947) p. 296 [listing adjudicated libels of editors]; pp. 301-302, 303 [publishing company].)

(3) An advertisement may be held libelous. (*Farr v. Bramblett* (1955) 132 Cal.App.2d 36, 43 [281 P.2d 372] [advertisement alleging communism *1284 subject to retraction provisions of Civ. Code, § 48a]. See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R.2d 1412] [political advertisement held protected absent actual malice].)

(4) However, a libelous statement is not actionable until it has been published to a third person. (Prosser on Torts (5th ed. 1984) Defamation, § 113, pp. 797-799.) A plaintiff cannot manufacture a defamation cause of action by publishing the statements to third persons; the publication must be done by the defendant. (*Shoemaker v. Friedberg*

(1947) 80 Cal.App.2d 911, 916 [183 P.2d 318] [plaintiff repeated statement, no publication]. Cf. *Hellar v. Bianco* (1952) 111 Cal.App.2d 424 [244 P.2d 757, 28 A.L.R.2d 1451] [defendant allowed statement to remain on the men's room wall, publication].)

There is an exception to this rule. When it was foreseeable that a defendant's act would result in publication to a third person, the plaintiff may maintain a libel action. (*Schneider v. United Airlines, Inc.* (1989) 208 Cal.App.3d 71, 75 [256 Cal.Rptr. 71] [defendant liable for foreseeable republication by third party]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 478b, p. 562.) In the leading case of *Hedgpeth v. Coleman* (1922) 183 N.C. 309 [111 S.E. 517], a young boy received a letter accusing him of theft. The court held the sender of the letter must have foreseen the boy would show it to his family. "The sending of libelous matter to a person known by the sender to be blind, or having sight, to be unable to read, and therefore obliged to have it read by another, is when read, a publication by the sender, because such exposure of the subject-matter is the proximate result of the writing and sending of the communication. [Citations.] These exceptions are based upon the principle that the act of disclosure arises from necessity. But necessity is not predicated exclusively on conditions which are physical. Necessity may be superinduced by a fear which is akin to duress. A threat may operate so powerfully upon the mind of an immature boy as to amount to coercion; and when an act is done through coercion it is not voluntary." (*Id.* at pp. 313-314 [111 S.E. at 520]; see also *Bretz v. Mayer* (1963) 1 Ohio Misc. 59 [203 N.E.2d 665, 670-671] [letter to clergyman threatening existence of new schismatic church].)

The "coercion" aspect of the exception applies "where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person *after* he has read it or been informed of its contents. [Citations.]" (*McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787, 796 [168 Cal.Rptr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277                                                                      Page 6
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

891.) *1285

"The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed." (*McKinney, supra,* 110 Cal.App.3d at pp. 797-798, cited in *Mitchell v. Superior Court (1984)* 37 Cal.3d 268, 281 [208 Cal.Rptr. 152, 690 P.2d 625].)

This exception has been limited to a narrow class of cases, usually where a plaintiff is compelled to republish the statements in aid of disproving them. Thus, where a derogatory statement is placed in a personnel file, the employee must explain the statement to subsequent employers, who will surely learn of it if they investigate his or her past employment. (*McKinney, supra,* 110 Cal.App.3d at p. 795; *Churchey v. Adolph Coors Co.* (Colo. 1988) 759 P.2d 1336, 1344-1345 [adopting *McKinney* rule]; *Lewis v. Equitable Life Assur. Soc.* (Minn. 1986) 389 N.W.2d 876, 886-888 [62 A.L.R.4th 581] [collecting cases]; *Colonial Stores v. Barrett (1946)* 73 Ga.App. 839 [38 S.E.2d 306, 307-308] [under wartime regulations worker was required to present his certificate of separation to prospective employers; thus former employer knew defamatory statements placed on the certificate would be republished]. See also Prosser, *supra,* § 113, p. 802; Annot. (1988) 62 A.L.R.4th 616.) Similarly, when an unfavorable statement is placed in a person's credit report the person must explain the statement in order to obtain credit. (Cf. *Belcher v. Little* (Iowa 1982) 315 N.W.2d 734 [adopts *McKinney* rule, question of fact whether plaintiffs were compelled to publish defendant's claim of interest in their property].)

To determine if the "coercion" exception is applic-

able, the test, as prescribed by Prosser is whether "because of some necessity he was under to communicate the matter to others, it was reasonably to be anticipated that he would do so[.]" (Prosser, *supra,* § 113, p. 802.) Cohagan foresaw the publication of the statement, as she demanded it be published and paid almost $600 to ensure Live Oak would publish it. The question then is whether Live Oak was under some "necessity" to publish; whether Live Oak was compelled to publish the statement.

(5) Live Oak makes no claim it was required by law to publish the advertisement. The issue is whether, as a practical matter, Live Oak was under a compulsion to publish the article which was so strong that it could not reasonably have refused. *1286

The only fact from the original complaint relating to compulsion is that Cohagan "demanded" that the letter be published. This was insufficient as a matter of law, and the real question is whether the complaint could have been amended to state facts establishing the requisite compulsion.

Code of Civil Procedure section 472c permits an appellant to propose an amendment to a complaint on appeal, even if such amendment was not proffered to the trial court when a demurrer was sustained without leave. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 951, pp. 384-385.) Live Oak has set out the factual amendments to the original complaint it would make if given leave:

"c. In Cohagan's view, the *Escalon Times* would refuse to print the facts about the garbled Royster interview if the newspaper had any choice in the matter;

"d. By exerting pressure on the newspaper and by insisting that her letter run, unedited, as a paid advertisement, Cohagan placed the newspaper in an untenable position;

"e. If the *Escalon Times* published the Cohagan letter, unedited, its readership would be presented with supposed facts about its purportedly deliberate acts of sabotage;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277    Page 7
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

"f. If the *Escalon Times* refused to run the letter, unedited, the newspaper's actions would prove its deliberate culpability, in the minds of Cohagan and her supporters, and would establish the newspaper as untrustworthy;

"g. Under the circumstances, the *Escalon Times* felt compelled to publish the Cohagan letter since publication of the defamatory material prevented Cohagan from spreading other, potentially more serious defamatory statements about the newspaper's editorial policies;

"h. Cohagan foresaw that the *Escalon Times* would feel compelled to disclose her defamatory statements and created the circumstances which made the compulsion irresistible for all practical purposes;

"i. The *Escalon Times* published the defamatory material reluctantly, yielding only because of the compulsion which Cohagan had created[.]"

The totality of these "facts" amounts to an argument that Live Oak acted reasonably in publishing the letter. It does not establish why it was compelled to publish the letter. Assuming "the minds of Cohagan and her *1287 supporters" were important to Live Oak it could simply have printed an article explaining Cohagan's views and Live Oak's response and returned the advertisement and the money to Cohagan.

This is not a situation in which the statement would go unrebutted if Live Oak refused to publish the defamatory statement. Live Oak could print an article contesting the accuracy of Cohagan's assertions if she made them from another forum. In stark contrast is the sort of situation presented by *McKinney, supra,* wherein a job seeker must tell a prospective employer what is in his personnel file in order to explain away a negative job reference. In that situation there is no alternative but for the plaintiff to republish the defamation.

These "facts" do not bring Live Oak within the coerced republication rule. Since Live Oak published the defamatory statements itself, it cannot state a

cause of action against Cohagan for libel. It is self-axiomatic that a person cannot sue himself or herself. (*Lodi v. Lodi* (1985) 173 Cal.App.3d 628, 631 [219 Cal.Rptr. 116].) The court properly sustained the demurrer.

II. The Slander Cause of Action

The first amended complaint alleged Cohagan made the following oral statements: "... that Plaintiff intentionally sabotaged Victoria Royster, that Plaintiffs intentionally crucified Victoria Royster, and that Plaintiffs were lying to Defendant Gladys Cohagan."

(6a) The motion for summary judgment as to slander was granted because (1) the statements were opinion statements and (2) Live Oak was a public figure, and therefore had to show the statements were made with malice, which had to be proven by clear and convincing evidence. We need only address the latter ruling, as that is dispositive. (*Charpentier v. Von Geldern* (1987) 191 Cal.App.3d 101, 107 [236 Cal.Rptr. 233].)

(7) A defendant who moves for summary judgment "must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

The normal scope of appellate review of a summary judgment motion involves the same three-step analysis required of the trial court:

"First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete *1288 defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.]

"Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
**(Cite as: 234 Cal.App.3d 1277)**

"[T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 2031.)

(8) However, when the plaintiff in a defamation case is a public figure he or she must show actual malice, and the standard of review of a summary judgment motion is modified: "It is pointless to declare in the abstract that summary judgment is a favored or disfavored remedy. A more subtle analysis is required-one that explains how a motion for summary judgment should be decided in a defamation case under the *New York Times* test. ... '[T]he standard of review of First Amendment defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, [citation], the evidence and all the inferences which can reasonably be drawn from it must meet the higher standard." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610]. See *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 256-257 [91 L.Ed.2d 202, 216-217, 106 S.Ct. 2505]; *Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; *Miller v. Nestande* (1987) 192 Cal.App.3d 191, 196 [237 Cal.Rptr. 359, 62 A.L.R.4th 301]; *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 634-635 [188 Cal.Rptr. 216].) If there is insufficient evidence to sustain a finding of malice a trial is not warranted.

" 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' " (*Reader's Digest, supra*, 37 Cal.3d at pp. 256-257, quoting *St. Amant v. Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323]; see *Planned Protective Services, Inc. v. Gorton* (1988) 200 Cal.App.3d 1, 8-9 [245 Cal.Rptr. 790].) **\*1289**

(9a) The first question to be determined is whether Live Oak is a public figure.

### A.

(10) "As a general rule, public officials and figures can be said to have voluntarily exposed themselves to public scrutiny and must accept the consequences. ... [¶] ... A person is not a public figure merely because he happens to be involved in a controversy that is newsworthy. [Citation.] '[A] ' public figure' plaintiff must have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved. As such, the mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action. [¶] In sum, when called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported "public figures" have thrust themselves into the forefront of particular public controversies.' " (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 744 [257 Cal.Rptr. 708, 771 P.2d 406]. See *Kaufman v. Fidelity Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 913, 920 [189 Cal.Rptr. 818].)

Generally, authors are considered to have "participated sufficiently in public controversies or ... otherwise involved themselves in matters of public concern as to be public figures ...." (Annot. (1977) 75 A.L.R.3d 616, 628 [collecting cases].) In *Hoffman v. Washington Post Co.* (D.D.C. 1977) 433 F.Supp. 600 (affd. without opn. (1978) 578 F.2d 442), the plaintiff was held to be a public figure partly because he "achieved his admitted prominence in the field of protein supplements by serving as editor and publisher of *Strength and Health* magazine since 1932 and by writing at least 67 books ...." (*Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at p. 604.) The plaintiff "voluntarily injected himself into this public controversy [regarding protein supplements]." (*Ibid.*) In *Warner v. Kansas City Star Co.* (Mo.Ct.App. 1987) 726 S.W.2d 384, it was held (at p. 385) that the former editor of a newspaper's outdoor section was a limited purpose public figure. He wrote many articles and was well known to the newspaper's readers. (*Ibid.*) In the *Liberty Lobby* case, one way in which the district court found that Liberty Lobby participated in public affairs was that it "publishes a newspaper, and broadcasts its radio commentary and television news show." (*Liberty Lobby, Inc. v. Anderson* (1983) 562 F.Supp. 201, 208. See *Anderson v. Liberty Lobby Inc., supra,* 477 U.S. at p. 246, fn. 3 [91 L.Ed.2d at p. 2101.)

The basis for these rulings is that an author, and especially a newspaper, often acts with the purpose of fostering public debate. " 'The Constitution **\*1290** specifically selected the press ... to play an important role in the discussion of public affairs. Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve.' " (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 859 [231 Cal.Rptr. 518, 727 P.2d 711], quoting *Mills v. Alabama* (1966) 384 U.S. 214, 219 [16 L.Ed.2d 484, 488, 86 S.Ct. 1434].) A newspaper is uniquely possessed of 'sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements. [Citation.]" (*Curtis Publishing v. Butts* (1976) 388 U.S. 130, 155, see *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344 [41 L.Ed.2d 789, 808, 94 S.Ct. 2997].)

(9b) On appeal Live Oak appears to concede Live Oak Publishing Company is a public figure, but seeks separate treatment for the individual plaintiffs, the managerial employees of the company. Live Oak cites *Vegod Corp. v. American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], page 769, wherein the court stated: "Merely doing business

with parties to a public controversy does not elevate one to public figure status." But these managerial individuals did not "do business" with the newspaper, as Live Oak urges; they operated the newspaper. The owner and publisher, general manager and editors of the Escalon Times are intimately involved in public political debate in their community and the community has a legitimate and substantial interest in their conduct regarding the operation of the newspaper. (See *Milkovich, supra,* 111 L.Ed.2d at p. 15.) We do not believe these plaintiffs were "more vulnerable to injury," justifying any special protection. (Cf. *Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1016 [271 Cal.Rptr. 30].) They, too, are public figures.

B.

(6b) The next question to be determined is whether Live Oak can produce clear and convincing evidence of actual malice at trial. (11) Constitutional "actual" malice is "subjective in nature, provable only by evidence that the defendant 'realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.' [Citations.] Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing. Only the existence of 'sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of ... probable falsity" ' will suffice to meet the subjective test." (*Newton v. National Broadcasting Co., Inc.* (9th Cir. 1990) 930 F.2d 662, 668- 669.) **\*1291**

(6c) Since this appeal is from a grant of summary judgment, the initial issue is whether Cohagan established her "lack of any serious doubt as to the truthfulness" of her statements. (*Miller v. Nestande, supra,* 192 Cal.App.3d at p. 197.)

The pleadings are in disarray. Since the major thrust of the motion was to establish that no slanderous statements were ever made, Cohagan's statement of undisputed facts does not establish Live Oak's inability to prove malice. However, Cohagan

did file a declaration stating she was active in the Royster campaign and had donated and loaned the campaign over $6,000. She declared the reason she contacted the Escalon Times "was because the article [about Royster] was extremely garbled with many misspelled words and many words which were out of context. [¶] It was my opinion that article showed Victoria Royster in a very poor light as compared to the articles which accompanied this garbled article .... [¶] Because of the time that I expended in the campaign and the monies I have expended in both contributions and a loan to the campaign, I was very disturbed by the extremely poor quality of the text of the interview with Victoria Royster." She urged Live Oak could not show malice.

This declaration is minimally sufficient. It establishes that, assuming the verbal statements attributed to Cohagan were made, they were made because Cohagan believed them. This means Live Oak could not prove actual malice, and Cohagan, as the movant, established her prima facie case for summary judgment. Live Oak suggests that since the best proof of malice is the defendant's state of mind, "her untested proclamation of innocence cries out for cross-examination." Live Oak misses the point of a summary judgment motion in a defamation case. If Live Oak is a public figure, the issue is whether Live Oak can produce clear and convincing evidence of actual malice at trial, not whether actual malice existed.

We look to Live Oak's opposition to discover any conflicting evidence of malice. There is no such evidence.

Throughout Live Oak's brief are references to Live Oak's inability to complete discovery prior to the hearing on the summary judgment motion. As no claim of error is predicated on this point as evidenced by the failure to separately head an argument on it as required by California Rules of Court, rule 15, we disregard these references. (*Utz v. Aureguy* (1952) 109 Cal.App.2d 803, 807 [241 P.2d 639].)

The only direct evidence on the issue of malice produced below was Royster's deposition testimony. At best this testimony established that Cohagan bore animosity towards the Escalon Times. But ill will toward the **\*1292** plaintiff is not "actual malice." (*McCoy v. Hearst, supra*, 42 Cal.3d at p. 872.) It is true that evidence of ill will may be circumstantial evidence of actual malice. (*Reader's Digest, supra*, 37 Cal.3d at pp. 257-258.) But, as in the very authority cited by Live Oak, the defendants failed to establish any link between Cohagan's hostility to the paper and her awareness of the probable falsity of her statements. (*Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172, 186 [264 Cal.Rptr. 699].)

Further, Royster testified in deposition that she herself thought some of her statements were misstated by the paper, not merely typographically misprinted, and she mentioned this to Cohagan. When Royster saw the article she thought the paper had acted intentionally. Royster also testified that a citizen accosted her on the street to say "that the Escalon Times must think we're stupid, the readers are stupid." Two other persons told Royster the paper had acted intentionally. This suggests Cohagan was not the only person in the community who entertained an honest belief that the newspaper intentionally misprinted the article. Cohagan was "quite upset about the whole situation." As Royster put it, "in a campaign I think you get to a point where you feel a lot is intentional and you take things very personal, no matter who you are, whether a candidate or a supporter."

Citing *Reader's Digest, supra*, Live Oak urges there was circumstantial evidence that Cohagan did not believe her statements. "*Reader's Digest* (at pp. 257-258) points out actual malice can be proven by circumstantial evidence such as failure to investigate, anger and hostility toward the defendant [*sic*] or reliance on sources known to be unreliable or biased against the plaintiff." (*Planned Protective Services, supra*, 200 Cal.App.3d at p. 10.) Live Oak points to two pieces of evidence. The first is that Cohagan disregarded the explanation for the misprints given to her by the newspaper. The second is that she disregarded Royster's suggestion that she

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

234 Cal.App.3d 1277
234 Cal.App.3d 1277, 286 Cal.Rptr. 198
(Cite as: 234 Cal.App.3d 1277)

phrase her statements in opinion form.

However, "such evidence is relevant only to the extent that it reflects on the subjective attitude of the publisher. [Citations.] The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]" (*Reader's Digest, supra,* 37 Cal.3d at p. 258.)

The pieces of evidence noted by Live Oak, singly or in combination, prove nothing about Cohagan's malice. Indeed, it could be urged plausibly that each demonstrates the sincerity of her belief that the newspaper was dishonest: If she believed this, she would not have believed the explanation **\*1293** she was given for the misprints, and she would believe it was not necessary to express her belief in the form of an opinion. In fact, Royster's deposition testimony reflects that after Royster suggested that Cohagan word the letter in the form of an opinion, Cohagan's response was "that the letter was her feelings." It further reflects that after the paper informed Royster the article would be corrected and reprinted, she informed the paper that "after the way things have happened, I would have to see it to believe it." Thus even Royster rejected the newspaper's explanation.

We do not believe this speculation by Live Oak raises a triable issue of fact. Royster's deposition testimony, when read in its entirety, does not contain clear and convincing evidence on the issue of Cohagan's state of mind to show that she "entertained serious doubts as to the truth" of her statements or that they were "so inherently improbable that only a reckless [person] would have put them in circulation." (*Reader's Digest, supra,* 37 Cal.3d at pp. 256, 257.)

## Conclusion

The demurrer on the libel cause of action was properly sustained because Live Oak voluntarily published the allegedly defamatory statements. Live Oak and its managerial employees are public-figure plaintiffs and thus must prove actual malice by clear and convincing evidence. Live Oak did not introduce such evidence in opposition to the summary judgment motion. As Cohagan presented a prima facie case for summary judgment, Live Oak's failure to produce opposing evidence is fatal to its cause of action for slander.

## Disposition

The judgment is affirmed.

Davis, J., and Nicholson, J., concurred.

Cal.App.3.Dist.,1991.

Live Oak Pub. Co. v. Cohagan

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 21
## To Appendix to California State Authorities

Westlaw.

192 Cal.App.3d 191                                                                                Page 1
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

▷

EDISON W. MILLER, Plaintiff and Appellant,

v.

BRUCE NESTANDE et al., Defendants and Respondents

**No. D004129.**

Court of Appeal, Fourth District, Division 1, California.

May 28, 1987.

SUMMARY

In an action by an incumbent candidate for public office against his opponent and several former prisoners of war (POW) for defamation, emotional distress, and negligence, arising out of the opponent's dissemination of a pamphlet, to registered voters, accusing the incumbent of cooperating with the enemy while a POW, the trial court granted summary judgment to defendants. The court found that the record failed to clearly and convincingly show that there was a triable issue of fact as to the whether the opponent or the former POW's made the publication with actual malice, that is, knowing the communicated material was false or entertaining serious doubts that it was true. (Superior Court of Orange County, No. 335522, Judith M. Ryan, Judge.)

The Court of Appeal affirmed. It held that the trial court properly granted summary judgment to defendants on the defamation cause of action, since plaintiff's status as an incumbent candidate for public office required him to prove that the pamphlet was published with actual malice, even though defendants did not claim news media status, and even though the pamphlet did not relate to the incumbent's conduct while in office. It further held that the incumbent could not prove that defendants had acted with actual malice, in light of numerous published descriptions of his conduct while a POW, his censure by the Navy, and defendants' own observations and information obtained while POW's. It also held that the causes of action for emotional distress and negligence were properly dismissed, since they

were predicated on the same facts as the defamation cause of action. (Opinion by Work, J., with Kremer, P. J., and Butler, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Libel and Slander § 44--Evidence--Summary Judgment--Public Figure-- Actual Malice.
Summary judgment is appropriate in a defamation *192 action, upon a properly supported motion, unless a public-figure plaintiff affirmatively establishes by clear and convincing evidence that a genuine issue of fact exists as to whether actual malice can be established at trial.

(2) Summary Judgment § 6--Motion--Showing--Rebuttal Evidence.
Although a party seeking summary judgment bears the initial burden of supporting its motion with admissible evidence showing that there is no triable issue of material fact, once that showing has been made, the opposing party can only avoid summary adjudication by submitting competent rebuttal evidence from which the court can infer that material facts are genuinely disputed.

(3a, 3b, 3c, 3d) Libel and Slander § 26--Qualified Privilege-- Candidates, Public Officers, and Public Figures--Nonmedia Defendants.
In a defamation action by an incumbent candidate for public office, against his opponent and several former prisoners of war (POW), for the dissemination of a pamphlet accusing the incumbent of cooperating with the enemy while a POW, the trial court properly granted summary judgment to defendants. Plaintiff, as an incumbent candidate for public office, was required to prove that the statements were published with actual malice, even though defendants were not members of the news media, and even though the statements did not relate to his conduct in office. However, he could not prove actual malice, in light of numerous published descriptions of his conduct while a POW, his censure by the Navy, and defendants' own observations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 44    Filed 08/23/2007    Page 15 of 35

192 Cal.App.3d 191                                                                Page 2
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

and information while POW's. Thus, the record revealed no triable issue as to actual malice. (Disapproving _Schomer v. Smidt (1980) 113 Cal.App.3d 828 [170 Cal.Rptr. 662]_ to the extent it may be construed as suggesting the constitutional standard does not apply to nonmedia defendants.)

[See **Cal.Jur.3d, Assault and Other Wilful Torts, §
202** et seq.; **Am.Jur.2d, Libel and Slander, § 192** et
seq.]

(4) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Public Figures.
For purposes of a plaintiff's burden of proving actual malice in a defamation action, public figures are individuals who have achieved such public notoriety or fame as to have achieved special prominence in the resolution of public questions.

(5a, 5b) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Candidates, Public Officers, and Public Figures--Actual Malice.
To avoid summary judgment in a defamation action, plaintiffs who are "public figures" are required to establish that they have the ability at trial to clearly and convincingly prove actual malice, that *193 is, the defendant's allegedly defamatory statements were published with knowledge they were false or with reckless disregard of whether they were false or not. This evidentiary burden is not limited to public officials defamed on a falsehood relating to their official conduct but applies, as well, to private figures defamed with statements that are of public concern. The actual malice test applies to statements involving criticisms of public officials whether published by the media or disseminated by private individuals. Further, the test applies to comments about a political candidate's private life insofar as it reflects on fitness for public office.

COUNSEL

Richard V. McMillan and Dorie A. Rogers for Plaintiff and Appellant.

Parker, Stanbury, McGee, Babcock & Combs, George H. Babcock, Robert A. Walker, Selvin &

Weiner, Paul P. Selvin and James S. Tyre for Defendants and Respondents.

**WORK, J.**

Former prisoner of war, Edison W. Miller, colonel, United States Marine Corps, retired, appeals a summary judgment entered in favor of Bruce Nestande and several former prisoners of the North Vietnamese on Miller's causes of action for defamation, intentional infliction of emotional distress and negligence. This litigation arose from Nestande's mailing defamatory pamphlets to more than 100,000 registered voters within the Third Supervisorial District of Orange County during his successful campaign to unseat Miller in the 1980 election for county supervisor. The political flyer, authorized by Nestande and signed by more than 200 former prisoners of the North Vietnamese, essentially alleged Miller had cooperated with the enemy after his capture to the detriment of his fellow American prisoners.

Although Miller posits his contentions somewhat differently, the principal issue on appeal is whether the trial court was correct in applying the holdings of _New York Times Co. v. Sullivan (1964) 376 U.S. 254[11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]_ and _Reader's Digest Assn. v. Superior Court (1984) 37 Cal.3d 244 [208 Cal.Rptr. 137, 690 P.2d 610]_, when it determined the record fails to clearly and convincingly show there is a triable issue of *194 fact as to whether Nestande or the former prisoners made the publication with actual malice, i.e., knowing the communicated material was false or entertaining serious doubts that it was true. (_New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706]; St. Amant v. Thompson (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].)_ We conclude Miller's status as an incumbent candidate for public office requires application of the narrow definition of actual malice expressed in federal decisions even though the defendants do not claim media status. Further, an examination of the record reveals no triable issue of fact as to Miller's inability to prove the defendants acted with actual malice. Accordingly,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

192 Cal.App.3d 191                                                                                   Page 3
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

we affirm the judgment.

#### Factual and Procedural Background

Miller, a highly decorated United States Marine Corps fighter pilot, was shot down on October 13, 1967, while leading a mission over North Vietnam. He was captured and held prisoner by the North Vietnamese for five and one-half years. During this time, he and fellow prisoners suffered extreme abuse from their captors. Unlike most of his fellow prisoners, after several years of captivity he voluntarily made antiwar communications at the behest of the North Vietnamese.

After his release, Miller was charged with violating the Uniform Code of Military Justice, and issued an administrative letter of censure by the Secretary of the Navy stating his conduct while a prisoner did not meet the high standard required of military officers and was severely detrimental to the welfare and the morale of his fellow prisoners. [FN1]

> FN1 In 1985, Miller obtained a federal "order" removing the letter of censure from his military file because he had not been given a hearing and an opportunity to be heard. (*Miller v. Lehman* (D.D.C. Jan. 28, 1985) Dock. No. 84-2417.)

On July 9, 1979, Miller was appointed to the Orange County Board of Supervisors. Miller's appointment created a media furor in light of his activities while a prisoner. Both before and after his appointment, Miller was the subject of numerous news articles recounting his conduct while imprisoned. Many articles contained statements from fellow prisoners, most of whom scathingly denounced Miller's lack of patriotism. An in-depth history of the commissioned officers held captive in North Vietnam was published in 1976. [FN2] This detailed treatise along with many published articles, was submitted as an exhibit in support of the motions for summary judgment and contrasts Miller's conduct with that of the many prisoners who suffered severe torture without succumbing to these pressures by voluntarily broadcasting or otherwise aiding their captors. **\*195**

> FN2 Hubbell, POW (Reader's Digest Press (1976)).

The June 1980 election race between Miller and Nestande for the supervisorial seat was hotly contested. Approximately one week before the election, Nestande mailed the offending political flyer to more than 100,000 registered voters. The pamphlet stated:

"Dear Fellow American:

"(1) Each and every one of us is a former American Prisoner of War. We were held for periods ranging from a few months to over 8 years in Communist North Vietnamese prisons.

"(2) Each and every one of us was aware that Edison W. Miller was also held with us as a Prisoner of War in Communist North Vietnam.

"(3) Each and every one of us urges you to vote against Edison W. Miller in his campaign for County Supervisor, or any other public office Edison W. Miller might seek.

"(4) Do you know that Edison W. Miller cooperated with the enemy to the detriment of his fellow American Prisoners of War?

"(5) Do you know that Edison W. Miller wrote articles for the Communist North Vietnamese that were against the interests of his government and against the interests of his fellow POW's?

"(6) Do you know that Edison W. Miller willingly made a tape recording that was broadcast over Radio Hanoi that supported the Communist North Vietnamese?

"(7) We, who were there, know. We also know that in doing these things, Edison W. Miller violated his oath as a Military Officer, and disobeyed the lawful orders of his superiors.

"(8) It is clear to each of us that Edison W. Miller does not have the dedication to duty, to his country, or to a sense of service which would qualify him for *any* public office.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 44    Filed 08/23/2007    Page 17 of 35

192 Cal.App.3d 191                                                    Page 4
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

"(9) We are not politically active as a group. We now live all across this great nation. However, on the issue of Edison W. Miller, we all have one thing in common: We cannot believe any patriotic group of Americans would select a person like Edison W. Miller for any position of public trust. **\*196**

"(10) Please, in the interest of integrity in public office, we urge you to reject Edison W. Miller." **\*196**

Nestande and the ex-prisoner of war (POW) filed their respective motions for summary judgment in March 1985, alleging there existed no triable issue of fact because Miller could not prove by clear and convincing evidence they had acted with malice. In granting the motions, the trial court state: "... I have no evidence that shows to the court that Mr. Miller has clear and convincing evidence of actual malice such that this case should go to the jury."

We stress the only ground raised in the motion for summary judgment was that there was no triable issue of fact as to whether Nestande or the POW's had acted with actual malice. Although each raised an affirmative defense of truth by answer there was no attempt to establish the truth of the allegedly defamatory material at summary judgment. Instead, the evidence submitted in support of the motions consisted solely of self-serving declarations to the effect that each defendant had a good faith belief those allegations were true, accompanied by a compilation of published materials purporting to describe Miller's objectionable conduct while imprisoned.

The defendants do not contend the distributed statements are not defamatory or that they were not intentionally disseminated in an effort to prevent Miller from retaining public office. Further, there is no dispute but that the allegations were represented as statements of fact, not expressions of opinion. Therefore, for the purpose of the appeal, we assume there has been publication of false information which is libelous per se. [FN3]

> FN3 Because the pamphlet directly accuses Miller of cooperating with an enemy of the United States during a period of hostilities

in violation of his oath as an officer on active duty, it disseminates material which is defamatory on its face. (Civ. Code, §§ 45, 45a.)

I

(1) The latest judicial dune in the shifting decisional sands underlying the law of defamation regarding public figures was sculptured by _Anderson v. Liberty Lobby, Inc._ (1986) 477 U.S. 242 [91 L.Ed. 2d 202, 106 S.Ct. 2505] when the United States Supreme Court held that summary judgment is appropriate upon a properly supported motion unless a public-figure plaintiff affirmatively establishes by clear and convincing evidence a genuine issue of fact exists as to whether actual malice can be established at trial. ( _Id._ at p. 257 [91 L.Ed.2d at p. 217].) Relying on language in _Rebozo v. Washington Post Co._ (5th Cir. 1981) 637 F.2d 375, 381, the California Supreme Court had earlier adopted the same standard in _Reader's Digest Assn. v. Superior Court, supra,_ 37 Cal.3d at page 252. Thus, the trial court correctly evaluated the evidence to determine whether Miller could produce clear and convincing evidence of actual malice at trial. **\*197**

(2) Although the parties seeking summary judgment bear the initial burden to support their motions with admissible evidence showing there is no triable issue of material fact, once that showing has been made the opposing party can only avoid summary adjudication by submitting competent rebuttal evidence from which the court can infer these material facts are genuinely disputed. (Code Civ. Proc., § 437c; _Brejcha v. Wilson Machinery, Inc._ (1984) 160 Cal.App.3d 630, 640 [206 Cal.Rptr. 688].) In support of their contention there was no factual issue as to their lack of any serious doubt as to the truthfulness of their statements, Nestande and the other defendants submitted numerous newspaper articles and the historical treatise, POW. Most articles were published in Orange County and neighboring Los Angeles County, criticizing Miller's conduct while a prisoner, decrying his lack of patriotism and accusing him of openly aiding the enemy to the detriment of his fellow prisoners. These allegations were attributed to Miller's fellow captives, some of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 44    Filed 08/23/2007    Page 18 of 35

192 Cal.App.3d 191                                                                                      Page 5
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

whom signed the offending pamphlet. Miller produced no affirmative evidence of actual malice in opposition to summary judgment. Whatever opposing proof there is must be gleaned from among the vitriol engrossed on the defendants' flyers and self-serving declarations.

## II

(3a), (4)(See fn. 4.), (5a) Miller argues *Anderson's* heavy burden to avoid summary judgment in defamation cases is not shifted to a plaintiff except where it is necessary to protect the *news media* when it criticizes conduct of public *officials* in their *official capacity*. However, the plaintiffs to whom that burden was affixed in *Anderson* and *Reader's Digest* were not public officials, but only "public figures." [FN4] (*Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at p. 244 [91 L.Ed.2d at p. 209]; *Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 256.) In each of those cases, the court required the plaintiffs to establish they had the ability at trial to clearly and convincingly prove the statements were published with knowledge they were false or with reckless disregard of whether they were false or not. This is the classic standard from *New York Times Co. v. Sullivan, supra,* 376 U.S. at pages 279-280 [11 L.Ed.2d at p. 706], where the Supreme Court "fundamentally altered judicial treatment of defamation actions by placing [this] significant constitutional limitation on the ability of a public official to recover damages for a defamatory falsehood." (*Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 252.) It applies not only to "public figures" (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at pp. 335- 336, 342-343 [41 L.Ed.2d 789, 803, 807]; *198Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 154-155 [18 L.Ed.2d 1094, 1111, 87 S.Ct. 1975]; *Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 253), but also to private figures defamed with statements which are of public concern (*Philadelphia Newspapers, Inc. v. Hepps* (1986) 475 U.S. 767, 775 [89 L.Ed.2d 783, 792, 106 S.Ct. 1558]).

FN4 In this context, public figures are individuals who have achieved such public

notoriety or fame as to have achieved special prominence in the resolution of public questions. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 811-812, 94 S.Ct. 2997].)

## III

(3b) Even so, Miller claims neither the *Anderson* evidentiary burden nor the *New York Times* actual malice test protects *nonmedia* defendants like Nestande and the pamphleteering ex-prisoners. Although the United States Supreme Court has yet to directly address whether a public or private figure libeled by allegations relating to matters of public concern must prove those statements to be false or reckless when made by nonmedia defamers (*Philadelphia Newspapers, Inc. v. Hepps, supra,* 475 U.S. at p. 779, fn. 4 [89 L.Ed.2d at p. 794]; *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 753-754 [86 L.Ed.2d 593, 598-599, 105 S.Ct. 2939, 2942]), at least two Justices (Brennan and Blackmun) (*Philadelphia Newspapers, Inc. v. Hepps, supra,* 475 U.S. at pp. 779-780 [89 L.Ed.2d at p. 795] (conc. opn. of Brennan, J.)) and maybe more (*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 U.S. at p. 781 [86 L.Ed.2d at p. 617, 105 S.Ct. at pp. 2957-2959] (dis. opn. of Brennan, J.)); Comment, *Dun & Bradstreet v. Greenmoss: Cutting Away the Protective Mantle of Gertz* (1986) 37 Hastings L.J. 1171, 1192) would make no distinction. Such rationale is based on the perception that First Amendment publications are rooted in the inherent worth of informing the public, not on the identity of the source. (*Philadelphia Newspapers, Inc. v. Hepps, supra,* 475 U.S. at pp. 779-780 [89 L.Ed.2d at p. 795] (conc. opn. of Brennan, J.); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 U.S. at p. 781 [86 L.Ed.2d at p. 617, 105 S.Ct. at p. 2957] (dis. opn. of Brennan, J.).) [FN5] *199

FN5 Justice Brennan further explained: "Such a distinction is irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 44    Filed 08/23/2007    Page 19 of 35

192 Cal.App.3d 191                                          Page 6
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

its source, whether corporation, association, union, or individual.' [Citation.]

"First Amendment difficulties lurk in the definitional questions such an approach would generate. And the distinction would likely be born an anachronism. Perhaps most importantly, the argument that *Gertz* should be limited to the media misapprehends our cases. We protect the press to ensure the vitality of First Amendment guarantees. This solicitude implies no endorsement of the principle that speakers other than the press deserve lesser First Amendment protection. 'In the realm of protected speech, the legislature is constitutionally disqualified from dictating ... the speakers who may address a public issue.' [Citations.]

"The free speech guarantee gives each citizen an equal right to self-expression and to participation in self-government. [Citations.] This guarantee also protects the rights of listeners to 'the widest possible dissemination of information from diverse and antagonistic sources.' [Citation.] Accordingly, at least six Members of this Court (the four who join this opinion and Justice White and The Chief Justice) agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities. [Citation.]" (*Id.* at pp. 782-784 [86 L.Ed.2d at pp. 617-619, 105 S.Ct. at pp. 2957-2959], fns. omitted.)

In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 U.S. at page 759 [86 L.Ed.2d at page 602, 105 S.Ct. at pages 2945-2946], the Supreme Court emphasized the special protection adhering to communications concerning public affairs which it characterized as occupying the highest rung of the hierarchy of First Amendment values. Although such a distinction has been criticized for impliedly providing too little protection for speech involving only private matters (see Comment, *Dun*

*& Bradstreet v. Greenmoss: Cutting Away the Protective Mantle of Gertz, supra,* 37 Hastings L.J. at p. 1172), the emphasis on the public concern content of the defamatory communication is central to our resolution of this case. In an era of an increased awareness of the need for personal integrity in those to whom the public entrusts its governance, knowledge of the personal qualifications of candidates for public office is the lifeblood of an informed electorate. Such communication is indeed "more than self-expression. ..." (*Garrison v. Louisiana* (1964) 379 U.S. 64, 75 [13 L.Ed.2d 125, 133, 85 S.Ct. 209].)

Here, Miller first pointedly interjected his military record and his North Vietnamese imprisonment into his campaign in a mailer portraying a Marine Corps insignia and a POW bracelet with his rank, name and date of capture. This fund solicitation begins:

"Dear Fellow Americans:

"For 5-1/2 years I was a POW in North Vietnam.

"I know you remember me because you were one of the people who wore a POW bracelet with my name on it or wrote to me and my family. ...

"

. . . . . . . . . .

"... Now that I have left the military, I want to continue serving my country in government. I want to bring to elected office the same strong feelings you and I shared in the past: patriotism, honesty, decency, and concern for our fellow man."

Miller's flyer heavily emphasizes his status as, and impliedly his conduct while, a prisoner. Whatever privacy expectations he might have had regarding his activities during that time became irrelevant when he directly injected this factor into his campaign. [FN6] Nestande's rebuttal mailer describing *200 Miller's conduct in captivity as distinctly unpatriotic and detrimental to the welfare of his fellow prisoners, is "that type of speech indispensable to decision making in a democracy." (*First National Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 777 [55 L.Ed.2d 707, 718, 98 S.Ct. 1407].) Wheth-

Case 5:07-cv-03795-JW    Document 44    Filed 08/23/2007    Page 20 of 35

192 Cal.App.3d 191                                                                 Page 7
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
(Cite as: 192 Cal.App.3d 191)

er criticism of public officials is published by the media or disseminated by individuals, we hold it is protected by the constitutional standard expressed in *New York Times*. [FN7]

FN6 His military record otherwise had been highly publicized and was outstanding. His rapid rise to Marine Lieutenant Colonel and squadron leader was based in part on his capacity for hard work and his exhibited bravery. When shot down after leading 70 missions over Vietnam, he suffered 2 cracked vertebrae and a broken ankle. During a six-week forced march on the broken ankle he lost eighty pounds and was severely beaten.

FN7 To the extent that language in this court's earlier decision, *Schomer v. Smidt* (1980) 113 Cal.App.3d 828, 834 [170 Cal.Rptr. 662], may be construed as suggesting the constitutional standard does not apply to nonmedia defendants (see Comment, *Actual Malice* (1986) 16 Sw.U.L.Rev. 577, 604-606), it is disapproved.

IV

(5b), (3c) Miller argues the *New York Times* standard applies only to statements criticizing his conduct in the performance of his official duties. He cites the passage "[t]he constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his *official conduct* unless he proves that the statement was made with 'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." ( *New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706], italics added.) Miller cites no cases which expressly restrict the scope to "official conduct." The very application of the actual malice protection to public figures, who do not hold public office, shows the fallacy in Miller's narrow interpretation. (See *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at pp. 335-336, 342-343 [41 L.Ed.2d at pp. 803, 807];

*Curtis Publishing Co. v. Butts, supra,* 388 U.S. at pp. 154-155 [18 L.Ed.2d at p. 1111]; *Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 253; *Widener v. Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 432 [142 Cal.Rptr. 304], disapproved on other grounds in *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 847, fn. 9 [231 Cal.Rptr. 518, 727 P.2d 711].) Further, numerous decisions have applied the *New York Times* standard to published allegations defaming public figures in regards other than their conduct in public office. For instance, in *Noonan v. Rousselot* (1966) 239 Cal.App.2d 447 [48 Cal.Rptr. 817], the defamed plaintiff was a nonincumbent candidate for public office "smeared" when an opposing Republican primary candidate alleged he was the lackey of left-wing Democrats. This political character assassination attempt was deemed subject to the *New York Times* test. ( *Id.* at p. 451.) Further, the alleged libels in *Anderson v. Liberty Lobby, Inc., supra,* 472 U.S. 242 [91 L.Ed.2d 202], were an investigative reporter's depiction of a self-described "citizens lobby" and its founder as neo-nazi, antisemitic, racist and fascist. These epithetic characterizations were held to require summary judgment review according to the *New York Times* standard. *201

More so than the facts addressed in *Noonan* and *Liberty Lobby,* the exposition of Miller's POW activities as perceived by fellow prisoners relates to facets of Miller's behavior which he himself stressed as showing his fitness to be retained in public office. Expressions of opinion on these matters to the voters in Miller's supervisorial district is manifestly speech subject to the constitutional protection addressed by *New York Times.* It is this seemingly self-evident proposition which led the United States Supreme Court to reformulate the "official conduct" rule to encompass a candidate's private life insofar as it reflects on fitness for public office. (*Monitor Patriot Co. v. Roy* (1971) 401 U.S. 265, 274-275 [28 L.Ed.2d 35, 42, 91 S.Ct. 621].) In *New York Times Co. v. Sullivan, supra,* 376 U.S. at page 281 [11 L.Ed.2d at page 707], the court quoted approvingly from *Coleman v. MacLennan* (1908) 78 Kan. 711 [98 P. 281, 286], as follows: "[I]t is of the utmost consequence that the people

Case 5:07-cv-03795-JW    Document 44    Filed 08/23/2007    Page 21 of 35

192 Cal.App.3d 191                                                          Page 8
192 Cal.App.3d 191, 237 Cal.Rptr. 359, 62 A.L.R.4th 301, 14 Media L. Rep. 1233
**(Cite as: 192 Cal.App.3d 191)**

should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. ..."

Although both the *Coleman* and *New York Times* cases involved alleged libels pertaining to in-office conduct of public officials, the reference to the need to protect a free flow of information regarding qualifications of persons applying for, as well as already holding, public office compels the application of an actual malice standard to candidates for office.

V

(3d) The trial court correctly found no triable issue of fact as to actual malice. Whatever inferences could otherwise have been drawn from the pamphlet itself, in light of the defendants' declarations supported by the numerous newspaper articles, transcripts of media broadcasts and compilation of statements from Miller's fellow prisoners in Hubbell's treatise, POW, there is no evidence suggesting any defendant believed the allegations were false. Nor is there any evident possibility that Miller can show any defendant entertained a serious doubt that the consistent, numerous published descriptions of Miller's conduct and his censure by the Secretary of the Navy accurately characterized his role in activities detrimental to the welfare of his fellow prisoners and to this country's military position. Nestande personally verified the accuracy of these widely disseminated reports from more than 200 persons who were held prisoner at the same time as Miller, who were privy to first-hand reports and/or claimed to be personally aware of the facts related. These ex-prisoners are the remaining defendants who rely, in large part, on contemporaneous reports transmitted through a complex clandestine *202 prisoner communication network and their personal observations. (See generally Hubbell, POW.)

Miller attacks the judgment as based on Nestande's reliance on "hearsay and rumor" which does not satisfy the requirements of admissible evidence under Evidence Code section 1201. However, Nestande's diligence in attempting to corroborate the accuracy of published reports of Miller's conduct by personally contacting the fellow prisoners of war more than meets the investigative burden to show good faith. For instance, in *Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at page 259, the court considered a similar argument, finding a failure to conduct an objective investigation relatively inconsequential where one relies on sources considered to be reliable. The defendants in *Reader's Digest* considered their sources to be of "unsullied" reputation. (*Ibid.*) Here, Nestande relied on reports from persons whose bias is evident, but whose integrity and reliability is not otherwise questioned. These sources relied on their own observations and the general information known to each other by virtue of their common experiences as prisoners of war.

In sum, we hold this case is subject to the *New York Times* test of actual malice and there is no triable issue of fact regarding whether any defendant communicated these allegations knowing them to be untrue or having a serious doubt of their truth. Finally, because Miller's additional causes of action for intentional infliction of emotional distress and negligence are predicated upon the same facts as the defamation action, they also fail to survive the motion for summary judgment. ( *Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 265.)

Judgment affirmed.

Kremer, P. J., and Butler, J., concurred. *203

Cal.App.4.Dist.,1987.

Miller v. Nestande

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 22
## To Appendix to California State Authorities

Westlaw.

233 Cal.App.3d 1685                                                    Page 1
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

▷

PAUL S. MOSESIAN, Plaintiff and Appellant,
v.
McCLATCHY NEWSPAPERS et al., Defendants
and Respondents.
**No. F013144.**

Court of Appeal, Fifth District, California.

Sep 13, 1991.

SUMMARY

Plaintiff, a shareholder, officer, and director of a
corporation that competed with another entity to
obtain a license to conduct a racing meet, brought a
defamation action against a newspaper and its em-
ployees based on news articles about plaintiff's per-
sonal qualifications to be involved in horse racing.
The licensing matter had become controversial
when the contract was granted to plaintiff's corpor-
ation, the contract was then taken away and granted
instead to the competing entity that included a local
supervisor, and the matter was reopened following
plaintiff's lawsuit and public accusations about the
politics of the decision process. The trial court ini-
tially found that plaintiff was a public official and
thus precluded from recovering damages absent a
finding of actual malice on the part of defendants.
The appellate court reversed and remanded, holding
that plaintiff was not a public official, and that no
reasonable jury could find actual malice. On re-
mand, the court determined that plaintiff was a lim-
ited public figure for the purpose of the controversy
surrounding the racing license, and thus still re-
quired to show actual malice. It therefore dismissed
the case by reason of the appellate court's ruling re-
garding actual malice. (Superior Court of Fresno
County, No. 274889-5, John Fitch, Judge.)

The Court of Appeal affirmed. It held that, under
the totality of the circumstances, by publicly an-
nouncing his intention to apply for the horse racing
license, a matter of great public concern, plaintiff
placed his qualification to be licensed in the public
eye and foreclosed his return to private figure status

at least until the licensing procedures were com-
pleted. (Opinion by Franson J., [FN*] with Martin,
Acting P. J., and Vartabedian, J., concurring.)
**\*1686**

FN* Retired Presiding Justice of the Court
of Appeal, Fifth District, sitting under as-
signment by the Chairperson of the Judi-
cial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1) Libel and Slander § 26--Privileged Communica-
tions--Qualified    Privilege--Matters    Concerning
Candidates, Public Officers, Official Acts, and Pub-
lic Figures--Categories of Public Figures.
If a defamation action is brought by a public figure,
the plaintiff must demonstrate actual malice on the
part of the defendant to recover damages. There are
two types of public figures for analysis under U.S.
Const., 1st Amend. The first category is the "all
purpose" public figure who has achieved such per-
vasive fame or notoriety that he or she becomes a
public figure for all purposes and in all contexts.
The second category is the "limited purpose" or
"vortex" public figure, an individual who volunta-
ily injects himself or herself or is drawn into a par-
ticular public controversy and thereby becomes a
public figure for a limited range of issues.

(2) Libel and Slander § 26--Privileged Communica-
tions--Qualified    Privilege--Matters    Concerning
Candidates, Public Officers, Official Acts, and Pub-
lic Figures--Requirement That Public Figure
Plaintiff Show Actual Malice.
Speech on matters of public concern is at the heart
of U.S. Const., 1st Amend. Freedom of expression
upon public questions should be uninhibited even
though it may well include sharp attacks on govern-
ment and public officials. The press must be free to
canvass the merits and measures of public individu-
als. For this reason, in order to recover damages for
a defamatory falsehood relating to his official con-
duct, a public official must prove the statement was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

made with the knowledge that it was false or with reckless disregard whether it was true or false. Erroneous statement is inevitable in free debate, yet it must be protected if freedom of expression is to survive. Speech on purely private matters is of less First Amendment concern; therefore a private plaintiff is not required to prove actual malice. Whether speech involves a matter of public concern depends upon its content, form, and context as revealed by the whole record. Nevertheless, even when speech involves a matter of public concern, defamation plaintiffs who are private individuals need not prove actual malice, since they have not exposed themselves to an increased risk of injury from defamatory statements and generally lack effective means of rebutting such statements.

(3) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Candidates, Public Officers, Official Acts, and Public Figures--Determination Who Is Public Figure--As Matter of Law.

Three types of defamation plaintiffs must *1687 prove actual malice when defamatory speech relates to a matter of public concern: the public official, the general purpose public figure, and the limited purpose public figure. Whether a plaintiff is a public official or public figure is in the first instance a question of law for the courts to decide.

(4a, 4b, 4c, 4d) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Candidates, Public Officers, Official Acts, and Public Figures--Limited Public Figure--Horse Racing Association Director.

In a defamation action, the trial court did not err in determining plaintiff was a limited public figure and therefore was required to prove actual malice in order to recover damages. Plaintiff was a shareholder, officer, and director of a corporation that was involved in a highly publicized competition with another entity to obtain a license to conduct a racing meet. The matter became controversial when the contract was granted to plaintiff's corporation, the contract was taken away, the contract was then granted instead to the competing entity that included a local supervisor, and the matter was re-

opened following plaintiff's lawsuit and public accusations about the politics of the decision process. He brought the defamation action against a newspaper and its employees based on news articles about plaintiff's personal qualifications to be involved in horse racing. Under the totality of the circumstances, by publicly announcing his intention to a apply for the horse racing license, a matter of great public concern, plaintiff placed his qualification to be licensed in the public eye and foreclosed his return to private figure status at least until the licensing procedures were completed.

[Libel and slander: Who is a public figure or otherwise within the federal constitutional rule requiring public officials to show actual malice, note, 19 A.L.R.3d 1361. See also Cal.Jur.3d (Rev), Assault and Other Wilful Torts, § 230; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 536.]

(5) Gaming and Prize Contests § 5--Regulation and Offenses--Horse Racing-- Public Concern Regarding Applicants.

Horse racing and gambling are controversial subjects and are deserving of serious public concern. Thus, the California regulatory scheme for licensing and oversight is detailed and replete with rules designed to protect the public from criminal elements who might be attracted to the horse races. It is for these reasons that the personal qualifications of one applying for a racing license are subject to public scrutiny and comment in every case.

(6) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Candidates, Public Officers, *1688 Official Acts, and Public Figures--Becoming Public Figure by Responding to Defamatory Statements.

A defamation defendant cannot create a defense by creating a controversy from the content of defamatory statements, and a plaintiff does not become a public figure simply by responding to defamatory statements.

(7) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Candidates, Public Officers, Official Acts, and Pub-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685                                                                    Page 3
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

lic Figures--Continuous Status.
Public figure status, once achieved, does not end
spontaneously with the stopping of pertinent publi-
city. Rather, the public figure status continues as
long as the specific issue for which the public status
was achieved continues.

COUNSEL

Paul S. Mosesian, in pro. per., Nuttall & Berman,
Roger T. Nuttall and James F. Tritt for Plaintiff and
Appellant.

Gibson, Dunn & Crutcher, Rex S. Heinke, Kelli L.
Sager, Karen N. Frederiksen and Thomas E. Koto-
ske for Defendants and Respondents.

**FRANSON, J.** [FN*]

>      FN* Retired Presiding Justice of the Court
>      of Appeal, Fifth District, sitting under as-
>      signment by the Chairperson of the Judi-
>      cial Council.

Statement of the Case
This is the second appeal from a summary judg-
ment in plaintiff Paul S. Mosesian's defamation ac-
tion against defendants McClatchy Newspapers,
Frank McCulloch, Denny Walsh, Jerry Bier and
James McClung. [FN1] In *Mosesian v. McClatchy
Newspapers (1988) 205 Cal.App.3d 597 [252
Cal.Rptr. 586] (Mosesian I)* this court addressed the
question of whether plaintiff was a "public official"
as a matter of law and would therefore have to
prove actual malice to recover damages from de-
fendant. We held plaintiff was not a public official
as a matter of law; however, we did not resolve the
question whether plaintiff was a "public figure,"
which also requires proof of actual *1689 malice as
a predicate for damages. This question was left for
further proceedings upon remand. (*Id.* at p. 611.)
*Mosesian I* also held no reasonable jury could find
actual malice. Thus, if it were to be determined in
further proceedings plaintiff was a public figure, he
would be unable to recover damages for defama-
tion, and defendants would be entitled to judgment.

>      FN1 All defendants will be referred to

herein collectively as "defendant" or "the
Bee."

(1) The United States Supreme Court has defined
two categories of public figures for First Amend-
ment analysis. First, the "all purpose" public figure
who has "achiev[ed] such pervasive fame or notori-
ety that he becomes a public figure for all purposes
and in all contexts." The second category is the "lim-
ited purpose" or "vortex" public figure, an individu-
al who "voluntarily injects himself or is drawn into
a particular public controversy and thereby be-
comes a public figure for a limited range of issues."
(*Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323,
351 [41 L.Ed.2d 789, 812, 94 S.Ct. 2997].*)

The trial court on remand ruled there were triable
issues of fact on the question whether plaintiff was
a public figure for "all purposes"; however, it con-
cluded as a matter of law plaintiff was a public fig-
ure for the limited purpose of the public contro-
versy which had arisen over plaintiff's qualifica-
tions to be licensed, through Calfax Racing Associ-
ation (Calfax), for horse racing in Fresno.

Because plaintiff would be unable to prove actual
malice on the defendant's part in publishing the al-
legedly defamatory articles, the libel action had to
be dismissed.

For the reasons to be explained, we hold the trial
court properly found plaintiff to be a limited pur-
pose public figure; hence, the judgment will be af-
firmed.

Discussion
A. *The Public Controversy*
The following description of the public controversy
which preceded the publication of the defendant's
allegedly defamatory articles about plaintiff is
taken from photocopies of 31 newspaper articles
published in the Fresno Bee between August 1979
and November 1980. The articles are attached as
exhibits to defendant's motion for summary judg-
ment and are part of the record before us. Many of
the articles, appearing under bold headlines and
prominently displayed, presumably were read by
many people in the Fresno community, and also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685
Page 4

233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815

**(Cite as: 233 Cal.App.3d 1685)**

presumably were the basis of numerous radio and **\*1690** television news commentaries throughout the San Joaquin Valley. We are not concerned with the truth or falsity of the hearsay contents of the articles but only their relevance to the question of whether plaintiff attained the position of a "public figure" in connection with the disputes involving the licensing of his company, Calfax, to conduct horse racing.

In 1976 Governor Edmund G. Brown, Jr., vetoed a bill to authorize spring horse racing in Fresno due to a lack of community support. Two years later the bill was reintroduced by then Assemblyman Ken Maddy, an avid horse racing fan, and the Governor signed the bill into law. Thus, the stage was set for Fresno to embark on the first spring horse racing meet in its history.

Plaintiff was the president, one of three corporate directors and one of three shareholders in Equestra Corporation which owned Calfax. Plaintiff also was the legal representative and the principal spokesperson for Calfax during the licensing process hereinafter described. He also became the general manager of the 1980 spring race meet.

The first spring meet was scheduled to be held at the Fresno Fairgrounds in 1980. Mosesian's company, Calfax, was one of two bidders for a contract to lease the Fresno Fairgrounds, a prerequisite to obtaining a license from the California Horse Racing Board (the CHRB) to conduct the meet. The other bid was submitted by the Fresno Horse Racing Association (the FHRA), whose president was Fresno County Supervisor Harry Huey. Because Calfax submitted a bid higher than FHRA, Calfax was selected by the fair board directors to receive the contract, subject to licensing by the CHRB.

Supervisor Huey publicly protested on behalf of his group that Calfax was ineligible to bid on the lease because it was not incorporated as required by contract specifications. As a result of this dispute, the fair board directors suspended the contract with Calfax and sent both the Calfax and FHRA bids to the California Attorney General's office for an eval-

uation of their legality. Mosesian protested publicly, claiming the fair board "had the right to waive irregularities, defects and informalities and in effect did waive those things by their ... vote" in selecting Calfax. Mosesian also claimed in the press that Vern Higdon, secretary-manager of the 21st District Agricultural Association, told him Calfax did not need to be incorporated until it was awarded the contract. Higdon publicly denied Mosesian's contention.

Responding to questions from the press, fair board director Besley Lewis, Jr., characterized the dispute as to who would receive the contract as a **\*1691** "political ball game," and noted the fair board had received "a lot of phone calls from a lot of legislators" after Calfax was selected.

Two weeks later, on the advice of the California Department of Food and Agriculture, the fair board directors took the contract away from Calfax and awarded it to FHRA on the ground that Calfax was not been legally incorporated at the time its bid was submitted.

Mosesian, who had made an appearance before the fair board directors at their public meeting, criticized the decision and accused them of "collusion." As the Bee reported the next day under a headline entitled, "Spring horse racing switch: Huey group gets it," "Over angry accusations of 'collusion,' " Fresno lawyer Paul Mosesian stated, " 'It seems to me that I'm fighting a shadow, ... I'm fighting this big, black shadow and I don't know what it is.' "

On September 20, 1979, two days after the fair board's decision, Mosesian and Calfax filed a lawsuit in the Fresno superior court against the fair board directors, FHRA, the California Department of Food and Agriculture Department, and other state and county officials, seeking a temporary restraining order to prevent the fair board from awarding the contract to FHRA. Mosesian's suit contended the defendants had "entered into a conspiracy" to break the Calfax contract award.

Mosesian and Huey then made public appearances before the CHRB to argue their respective posi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tions. CHRB members were apparently unaware they were defendants in Mosesian's lawsuit because, at the meeting, FHRA Attorney Klein reportedly "drew chuckles from board members" when he mentioned Mosesian had charged them with conspiracy.

On October 14, 1979, the fair board directors decided to set aside all prior proposals submitted for the spring meet and to reopen the bidding process under sealed bids. Calfax's bid again was the highest, and Calfax again was awarded the lease for the 1980 spring meet, subject to a license from the CHRB. Supervisor Huey was quoted in the Bee as conceding the lease award to Calfax, which he characterized as "preordained."

In January 1980, two articles were published in the Bee which described Calfax's application to the CHRB for a license to conduct the spring meet, and which also discussed Calfax's plans for the meet. Mosesian, who was interviewed in one of the articles, claimed he was confident the CHRB would approve of Calfax, and asserted there was a good chance his request for the race dates of May 3 to 31 would be granted. One of Mosesian's proposals was to hold horse racing on Sundays, which had never been done *1692 in Fresno. However, in the interview, Mosesian stated it had yet to be decided whether there would be Sunday racing.

The CHRB, which oversees all pari-mutuel racing in the state, held a public meeting in January 1980 to decide whether to approve Calfax's license application. At the meeting, the CHRB appeared reluctant to approve the application until Mosesian told the three CHRB members that his group's "credibility would be hurt" in Fresno if no action was taken. The members questioned Calfax's financial statement, lack of named personnel in its application, and the makeup of the proposed race cards. A final hearing on Calfax's application was scheduled for February 15, 1980.

The following week a new group, the Valley Racing Association, announced it would compete with Calfax for the license before the CHRB. Mosesian,

in an interview after the announcement by the rival group, said he was confident Calfax would still be awarded the license. Less than two weeks before the final license hearing was held, Mosesian called a press conference in his law office to introduce Calfax's top management personnel who were to operate the meet. When the license hearing was convened on February 15, no action could be taken because the CHRB lacked a quorum. However, this public meeting became a heated discussion when two other groups said they would vie for the license, and two horsemen's groups-the Pacific Coast Quarterhorse Racing Association and the California Arabian Horse Board-objected to Calfax's license application.

Plaintiff addressed these problems at a public meeting of the fair board directors in Fresno a few weeks later. He said Calfax had reached an "oral understanding" with the mixed-breed horsemen's association that might want to participate in the meet. He said Calfax was working out "labor problems" with various labor organizations which were to staff the meet.

On March 1, 1980, the CHRB awarded Calfax a license to conduct spring horse racing in Fresno. The article covering the announcement stated that necessary accords had been reached with labor organizations and horsemen's associations. Plaintiff was interviewed for the article. He was quoted as stating that he was "in an unusual position [of being] the first person in the state" to conduct such a meet and that he was under a great deal of pressure. He also stated that a survey reflected an "overwhelming number of people in Fresno favor Sunday racing." In his opinion, "Sunday will be a big day for racing in Fresno, maybe even bigger than Saturday."

A press article on April 24, 1980, stated that Calfax had denied the local 4-H Club the use of the fairground facilities for its annual fair during the 21-day horse racing event because the lease allowed Calfax exclusive use of *1693 the facilities. An article the following day reflected an agreement had been reached and the 4-H Club would be allowed to use the grounds for its event.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685                                                                    Page 6
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

A commentary published in the Bee May 1, 1980, discussed the fact that the First Armenian Presbyterian Church had cancelled its plans to use the fairgrounds for its annual picnic because the church opposed Sunday racing. Plaintiff was chided in the article for making a bad public relations move in conducting Sunday racing.

The plaintiff made various attendance and wagering predictions for the meet which were widely reported in the press. He later admitted his predictions were overly optimistic and part of his promotion "hype."

The Bee provided daily coverage of the spring horse racing event. Although it was initially reported that attendance at the event was disappointing, by the end of the meet, after lowering ticket prices, reports indicated the meet was quite successful. Immediately after the meet, plaintiff announced Calfax would seek to renew its license for the following year.

Thereafter, for approximately five and one-half months, the press was silent about Mosesian, Calfax, or spring horse racing in Fresno. However, on November 14, 1980, the Bee published the first of several allegedly defamatory articles about Mosesian and his personal qualifications to be involved in horse racing. The article reported an investigation by the CHRB into irregularities in the handling of funds in connection with the 1980 spring horse racing meet and a further investigation of plaintiff's background. According to the article, the new investigation was based upon information provided by Bee reporters which reflected the initial investigation was not thorough. It also was reported that state files indicated plaintiff may have been involved in illegal gambling and may have associated with known bookmakers, prostitutes and organized crime figures.

That same afternoon, plaintiff held a press conference to respond to the article. He denied the allegations and announced that he would seek criminal sanctions for "malicious slander" against the Bee and the reporters responsible for the article. His statements were included in an article in the Bee the next day.

B. *Constitutional Framework for Analysis*
(2) Speech on matters of public concern is at the heart of the First Amendment. (*First National Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 776 [55 L.Ed.2d 707, 717, 98 S.Ct. 1407].) Freedom of expression upon public questions and debate upon public issues should be "uninhibited, *1694 robust, and wide-open" even though "it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 270 [11 L.Ed.2d 686, 701, 84 S.Ct. 710, 95 A.L.R.2d 1412].) It is a fundamental constitutional principle that the press be free to " '... canvass[ ] the merits and measures of public men, of every description, ...' " (*Id.* at p. 275 [11 L.Ed.2d at p. 703].) For this reason, in order to recover damages for a defamatory falsehood relating to his official conduct, a public official must prove the statement was made with knowledge that it was false or with reckless disregard of whether it was true or false. (*Id.* at p. 280 [11 L.Ed.2d at p. 706].) "[E]rroneous statement is inevitable in free debate, ... [yet] it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive,' ..." (*Id.* at pp. 271-272 [11 L.Ed.2d at p. 701].)

Speech on matters of purely private concern is of less First Amendment concern. (*Connick v. Myers* (1983) 461 U.S. 138, 146-147 [75 L.Ed.2d 708, 719-720, 103 S.Ct. 1684].) When the libelous statement relates to a matter which is not of public concern, the plaintiff is not required to prove actual malice. (*Dun & Bradstreet, Inc. v. Greenmoss Builders* (1985) 472 U.S. 749, 761 [86 L.Ed.2d 593, 603- 604, 105 S.Ct. 2939].) Whether speech addresses a matter of public concern depends upon its content, form and context as revealed by the whole record. (*Connick v. Myers, supra,* at pp. 147-148 [75 L.Ed.2d at p. 720].)

Nevertheless, even when speech involves a matter of public concern, defamation plaintiffs who are

233 Cal.App.3d 1685                                                                                      Page 7
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
(Cite as: 233 Cal.App.3d 1685)

private individuals need not prove actual malice. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at pp. 344-345 [41 L.Ed.2d at p. 808].) Unlike public officials or public figures, private individuals have not voluntarily exposed themselves to an increased risk of injury from defamatory statements and generally lack effective opportunities for rebutting such statements. (*Ibid.*)

(3) Three types of defamation plaintiffs have been identified who must prove actual malice when defamatory speech relates to a matter of public concern-the public official, the general purpose public figure and the limited purpose public figure. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) Whether a plaintiff is a public official or public figure is in the first instance a question of law for the trial court to decide. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610].)

### C. Limited Purpose Public Figure
In companion cases, *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker,* the Supreme Court first discussed the public figure concept. (**1695***Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975].) Butts, the athletic director of the University of Georgia, was accused in a publication of conspiring to fix a football game between the University of Georgia and the University of Alabama. Walker, a retired military man, was accused in a publication of instigating a riot on the campus of the University of Mississippi when federal agents attempted to enforce an order allowing a Black student to attend the university.

The question before the court was whether the rule announced in *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, requiring a public official to prove actual malice on the part of a publisher in order to recover damages for a defamation, should be extended to plaintiffs such as Butts and Walker.

"[I]n formulating the standards for determining the degree of care to be expected in the circumstances, courts have consistently given much attention to the

importance of defendants' activities. [Citation.] The courts have also, especially in libel cases, investigated the plaintiff's position to determine whether he has a legitimate call upon the court for protection in light of his prior activities and means of self-defense. [Citations.] We note that the public interest in the circulation of the materials here involved, and the publisher's interest in circulating them, is not less than that involved in *New York Times.* And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary tort rules. [Citation.] Butts may have attained that status by position alone and Walker by *his purposeful activity amounting to a thrusting of his personality into the ' vortex' of an important public controversy,* but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements. [Citation.]" (*Curtis Publishing Co. v. Butts, supra,* 388 U.S. at pp. 154-155 [18 L.Ed.2d at pp. 1110- 1111], italics added.)

The rule of *New York Times* requiring proof of malice in order to recover damages for defamation was thereby extended to public figure plaintiffs.

Thereafter, in *Rosenbloom v. Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811], a plurality opinion extended the First Amendment privilege requiring proof of malice to speech on all matters of public concern. The question of whether malice was required, according to *Rosenbloom,* depended upon "whether the utterance involved concern[ed] an issue of public or general concern, ..." (*Id.* at p. 44 [29 L.Ed.2d at p. 312].) *Rosenbloom* left to future cases to delineate the reach of the term **1696** "issue of public or general concern." (*Id.* at pp. 44-45 [29 L.Ed.2d at p. 312].)

The court subsequently rejected the reasoning of the *Rosenbloom* plurality in *Gertz v. Robert Welch, Inc., supra,* 418 U.S. 323. The *Gertz* court refused to accept that the actual malice standard applied to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685                                                                                      Page 8
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

cases concerning all discussion and communication involving matters of public or general concern regardless of whether the plaintiff was a private individual or public individual. (*Id.* at pp. 334, 344-346 [41 L.Ed.2d at pp. 807-809].)

Gertz was a prominent Chicago attorney who represented the family of a young man who was shot by a policeman in a civil action against the policeman for damages. In a John Birch Society publication, Gertz was accused of participating in a communist conspiracy to discredit law enforcement. The civil suit against the policeman accused of shooting the young man was claimed in the article to be a part of the conspiracy. Gertz sued for libel, and the defendant invoked the privilege of *New York Times v. Sullivan.*

*Gertz* characterized the holding in *Curtis Publishing Co v. Butts, supra,* 388 U.S. 130, as extending the *New York Times* rule to "protect defamatory criticism of nonpublic persons who 'are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' " (418 U.S. at p. 337 [41 L.Ed.2d at p. 803], quoting conc. opn. of Warren, C. J., in *Curtis* and *Walker* cases, 388 U.S. at p. 164 [18 L.Ed.2d at p. 1116].) The *Gertz* court recognized the tension between "the need for a vigorous and uninhibited press" and "the legitimate interest" in the " '... protection of private personality ....' " (418 U.S. at pp. 341-342 [41 L.Ed.2d at p. 806].) The *Rosenbloom* plurality approached the task of defining a proper balance between these competing interests in terms of the matters about which the allegedly libelous remarks were concerned-i.e., whether they addressed issues of general or public interest. The *Gertz* court rejected that approach and instead focused upon the individual plaintiff's identity and status-i.e., whether the plaintiff was a public official/figure or a private individual. (418 U.S. at pp. 344-346 [41 L.Ed.2d at pp. 807-809].)

The rationale for the distinction between a public official and private person was that the public official had more access to the media for self- help in

order to correct the error or to contradict the lie. Additionally, those who seek governmental office are deemed to have accepted the risk of closer public scrutiny. The court stated a similar rationale for the public figure plaintiff. *1697

"Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have *thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.* In either event, they invite attention and comment." (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 345 [18 L.Ed.2d at p. 808], italics added.)

A private individual, on the other hand, cannot be deemed to have assumed the same risk.

"Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and *public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an 'influential role in ordering society.'* Curtis Publishing Co. v. Butts, 388 U.S., at 164 (Warren, C. J., concurring in result). He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery." (418 U.S. at p. 345 [18 L.Ed.2d at p. 808], italics added.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685                                                                Page 9
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

The court rejected offhand the claim that Gertz was a public official because he had served briefly on housing committees as a result of appointment by the mayor or because he attended the coroner's inquest into the death of the young man whose family Gertz was representing in a civil action.

It likewise rejected the claim that Gertz was a general purpose public figure.

His status as a "limited purpose public figure" was then assessed:

"It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. **\*1698**

"In this context it is plain that petitioner was not a public figure. He played a minimal role at the coroner's inquest, and his participation related solely to his representation of a private client. He took no part in the criminal prosecution of Officer Nuccio. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome. We are persuaded that the trial court did not err in refusing to characterize petitioner as a public figure for the purpose of this litigation." (418 U.S. at p. 352 [41 L.Ed.2d at p. 812].)

In _Wolston v. Reader's Digest Assn., Inc._ (1979) 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701], an article published in 1974 identified the plaintiff as a Soviet agent. The defendant claimed the plaintiff was a public figure as a result of his 1958 conviction for contempt of court for failing to respond to a subpoena from a grand jury investigating his involvement in Soviet espionage. According to defendant, plaintiff was a public figure for the limited purpose of comment on his connection with, or involvement in, Soviet espionage during the 1940's and 1950's.

In applying the _Gertz_ test, the court concluded that

Wolston did not voluntarily thrust or inject himself into the forefront of the public controversy surrounding the investigation. He was "dragged unwillingly into the controversy." (443 U.S. at p. 166 [61 L.Ed.2d at p. 460].) His voluntary response to the subpoena and subsequent citation for contempt resulting in media attention did not transform him into a public figure.

The court also concluded there was no evidence that Wolston's failure to respond to the subpoena "was intended to have, or did in fact have, any effect on any issue of public concern." (443 U.S. at p. 168 [61 L.Ed.2d at p. 461].) "In short, we find no basis whatsoever for concluding that [Wolston] relinquished, to any degree, his interest in the protection of his own name." (_Ibid._)

The California Supreme Court addressed the limited purpose public figure question in _Reader's Digest Assn. v. Superior Court, supra_, 37 Cal.3d 244. In that case Synanon and its founder, Dederich, sued Reader's Digest for libel arising out of an article in the magazine. The court found that Synanon was, at the very least, a "limited purpose" public figure for the purposes of the general controversy surrounding its operation, and that Dederich was a public figure to the extent his involvement in directing the activities of Synanon was at issue.

"The cases decided since _New York Times_ and _Gertz_ make it clear that a person or group should not be considered a 'public figure' solely because **\*1699** that person or group is a criminal defendant (_Wolston v. Reader's Digest Assn., Inc., supra_, 443 U.S. 157); has sought certain relief through the courts (_Time, Inc. v. Firestone_ (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958]); or merely happens to be involved in a controversy that is newsworthy (_Time, Inc. v. Firestone, supra_). Rather, as this court recognized in _Vegod Corp. v. American Broadcasting Companies, Inc._ (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], a 'public figure' plaintiff must have undertaken some _voluntary_ act through which he seeks to influence the resolution of the public issues involved. As such, the mere involvement of a person in a matter which the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685                                                                     Page 10
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
(Cite as: 233 Cal.App.3d 1685)

media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action." (37 Cal.3d at p. 254, fn. omitted.)

In *Weingarten v. Block* (1980) 102 Cal.App.3d 129 [162 Cal.Rptr. 701], limited purpose public figure status was extended to a former city attorney and counsel for local redevelopment agency. The attorney had initiated a recall of city council members who had voted to discharge him from his position as city attorney. The local newspaper published an unfavorable editorial about him, and he sued for libel.

"The facts as found by the trial court here indicate that Weingarten thrust himself to the forefront of the public controversy that arose around his termination and was actively involved in influencing its resolution by his involvement in the recall and his continuing representation of the Redevelopment Agency as its chief local counsel. By such voluntary and active participation, he relinquished his interest in the protection of his own name. Further here, since Weingarten earned substantial amounts from his public assignments, there was sufficient concern about specific public expenditures to make him a public figure." (102 Cal.App.3d at p. 142, fns. omitted.)

The same result was reached in *Kaufman v. Fidelity Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 913 [189 Cal.Rptr. 818]. In *Kaufman*, plaintiff, chairman of the board of Arrowhead Savings and Loan Association, objected to a zoning change sought by defendant, Fidelity Federal Savings and Loan Association, and participated in numerous public hearings in order to block defendant's efforts. The political battle between the two received coverage by local media and was a subject of public debate in the small community. Defendant sent a letter to local residents claiming that plaintiff was attempting to influence the board of supervisors in an effort to monopolize savings and loan business in the area. Plaintiff sued for libel based upon the letter.

The court concluded Kaufman was a public figure because he voluntarily injected himself into the zoning dispute and because the letter "directed the **\*1700** attention of the recipients of the letter to the matter in controversy and to the role plaintiff played therein as defendant saw it." (140 Cal.App.3d at p. 921.) The court reasoned Kaufman "must accept the necessary consequences of that involvement in public affairs." (*Ibid.*)

In *Hofmann Co. v. E. I. Du Pont De Nemours & Co.* (1988) 202 Cal.App.3d 390 [248 Cal.Rptr. 384], plaintiff, a land developer, sued the owner of a chemical plant located next to property on which plaintiff sought to build a housing project because of comments made by employees of the chemical plant regarding the hazards of the plant that would affect those living adjacent thereto. The court held the developer was a limited purpose public figure and therefore was required to prove actual malice on the part of the employees.

"Though nominally a private-figure plaintiff, for present purposes appellant possesses the attributes of a public figure. It is undisputed that, as described in the Chronicle article, appellant has actively and openly sought to influence public officials and in that manner affect the public decision process for determining the uses to which land in Contra Costa County may be put." (202 Cal.App.3d at p. 404.)

(4a) Applying the principles recited above to the instant case, it is clear that from the summer of 1979 to the beginning of the spring meet in May 1980 there was a substantial and almost continuous public debate and controversy over, first, who would receive the license for the 1980 spring meet and, second, what policies would be followed in conducting the meet. The first issue as to who would receive the license impacted the public's consciousness dramatically when it was learned the initial contest would be between, on the one side, the plaintiff, a prominent Fresno lawyer and businessman, and on the other side Fresno County Supervisor Harry Huey, a prominent, elected public official. This fact alone whetted the public's appetite for controversy and created a wide interest in the

233 Cal.App.3d 1685                                                      Page 11
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

outcome, apart from the question whether Calfax or FHRA should receive the license on their respective merits.

When the fair directors canceled the initial award of the contract to plaintiff's organization, plaintiff immediately entered the fray to influence its outcome, i.e., by "thrusting of his personality into the 'vortex' of [the] ... controversy, ..." (*Curtis Publishing Co v. Butts, supra,* 388 U.S. at p. 155 [18 L.Ed.2d at p. 1111].) Plaintiff first publicly accused everyone involved of conspiring to take the contract away from Calfax, when the reason for losing the contract was plaintiff's failure to follow the rules for obtaining the contract. This hyperbole, followed by fair director Lewis's comment to the media that the dispute had become a "political ball game," and that the fair **\*1701** board had received "a lot of phone calls from a lot of legislators," only sharpened the public's interest in the dispute.

Plaintiff's lawsuit accusing state and local officials of collusion after the contract had been awarded to FHRA was another effort by plaintiff to dominate the dispute as to who should get the contract by exerting pressure on the directors to change their minds and award the contract to Calfax. [FN2]

> FN2 Another controversy permeated plaintiff's efforts to conduct the 1980 spring meet from the outset-whether racing should be held on Sundays. This question naturally evokes strong feelings on the part of certain religious groups and individuals opposed to gambling on their Sabbath. Plaintiff met the problem by first announcing that he did not want to offend the community and that he had spoken with several religious leaders about the subject. Plaintiff then used every media opportunity to convince the public that most people favored Sunday racing; that Sunday racing would be more popular than Saturday racing; and that he would start the Sunday races at 1 p.m. rather than 12 noon so as not to interfere with church attendance. While these efforts may have been com-

mendable in their directness, they could not have lessened to any substantial degree the deeply felt concern of a segment of the Fresno community opposed to Sunday gambling.

Plaintiff, by his own voluntary and at times bombastic efforts in the latter part of 1979 and the first part of 1980, can be said to have placed himself and Calfax in a situation similar to the land developer in *Hofmann Co. v. E. I. Du Pont De Nemours & Co., supra,* 202 Cal.App.3d 390, where it was held that a person "who seeks necessary public approval for a ... project ... enters the public arena, invites public judgment, and is, for First Amendment purposes, similar to one who seeks government office. He '... runs the risk of closer public scrutiny than might otherwise be the case.' " (*Id.* at pp. 404-405, quoting from *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) Because plaintiff enjoyed "access to the channels of effective communication" regarding his dispute and thus had a "realistic opportunity to counteract false statements" (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 344 [41 L.Ed.2d at p. 808]), he became a public figure.

We do not suggest that every applicant for a horse racing license ipso facto becomes a public figure. But when an applicant for such a license becomes deeply embroiled by his own efforts in a public controversy over his application and at every opportunity thrusts himself into the center of the dispute to influence the decision makers as to the merits of the application, as in the present case, the applicant steps from a cloak of privacy into public view for the purpose of his qualifications to be licensed.

(5) Horse racing and gambling are controversial subjects and are deserving of serious public concern. (See *Morrison v. California Horse Racing Bd.* (1988) 205 Cal.App.3d 211, 218 [252 Cal.Rptr. 293]; **\*1702***Flores v. Los Angeles Turf Club* (1961) 55 Cal.2d 736, 744-745 [13 Cal.Rptr. 201, 361 P.2d 921]; *In re Goddard* (1937) 24 Cal.App.2d 132, 140-141 [74 P.2d 818].) Thus, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685                                                                      Page 12
233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815
**(Cite as: 233 Cal.App.3d 1685)**

California regulatory scheme for licensing and oversight is detailed and replete with rules designed to protect the public from criminal elements who might be attracted to the horse races. (Bus. & Prof. Code, §§ 19480, 19572; Cal. Code Regs., tit. 4, § 1400 et seq.; Pen. Code, § 337a.) It is for these reasons that an applicant's personal qualifications to be licensed are subject to public scrutiny and comment in every case.

(4b) Plaintiff argues strenuously that even assuming he attained public figure status for the 1980 spring meet, his public status ended after the meet was held and before the publication of the defamatory article. Plaintiff points out correctly that for a period of five and one-half months there was no press comment about either him or Calfax concerning their horse racing activities during the 1980 meet or their qualifications to conduct the coming 1981 spring meet. It was only the publication by the Bee of the allegedly defamatory article of November 14, 1980, that created a new public controversy concerning plaintiff's qualifications to be relicensed for the 1981 meet. (6) Since a defamation defendant cannot create a defense by creating a controversy from the content of defamatory statements (*Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135 [61 L.Ed.2d 411, 431, 99 S.Ct. 2675]), and since a plaintiff does not become a public figure simply by responding to defamatory statements (*Time, Inc. v. Firestone* (1976) 424 U.S. 448, 454-455, fn. 3 [47 L.Ed.2d 154, 163, 96 S.Ct. 958]), plaintiff contends he was merely a private businessman and lawyer at the time he was allegedly defamed.

(4c) While plaintiff's argument has a superficial appeal, it nonetheless must be rejected. As we have explained, horse racing is a matter of serious public concern because it involves gambling on a large-scale basis. Gambling attracts criminal elements who will engage in illegal wagering, bookmaking and other unlawful acts. For this reason, the personal qualifications, background, and honesty of the license applicant, his organization and his associates are subject to public scrutiny. It is also for this reason that the CHRB issues a license for one year only; the regulations require relicensing each year.

Thus, when plaintiff announced at the end of the 1980 meet that Calfax would apply for a license to operate the 1981 spring meet, plaintiff's status as a public figure continued for the limited purpose of his qualifications to obtain a license for that meet. The fact that plaintiff had not formally applied for the 1981 license when defendant's allegedly defamatory article appeared is of no moment. Public statements issued by plaintiff leading up to and during Calfax's operation of the 1980 spring horse racing meet, including his announcement that Calfax would seek relicensing for the 1981 season, constituted a purposeful reinjection of plaintiff's personality *1703 into the continuing public controversy over the operation of spring horse racing in Fresno. Hence, the issue of plaintiff's qualifications to be licensed was before the public, and under the First Amendment the Bee was entitled to publish the information it had received regarding plaintiff's qualifications.

(7) Public figure status, once achieved, does not end spontaneously with the stopping of the publicity. Rather, the public figure status continues as long as the specific issue for which the public status was achieved continues. (Cf. *Street v. National Broadcasting Co.* (6th Cir. 1981) 645 F.2d 1227, 1235, holding that once a person becomes a public figure in connection with a particular controversy, the person remains a public figure thereafter for purposes of later commentary on that controversy; see also, *Brewer v. Memphis Pub. Co., Inc.* (5th Cir. 1980) 626 F.2d 1238, 1257; *Time, Inc. v. Johnston* (4th Cir. 1971) 448 F.2d 378, 380-382.)

(4d) Under the totality of the unique circumstances of this case, by publicly announcing his intention to apply for a license for the 1981 spring horse racing meet, plaintiff placed his qualification to be licensed in the public eye and foreclosed his return to private figure status at least until the 1981 licensing procedures were completed.

Disposition

The judgment is affirmed.

Martin, Acting P. J., and Vartabedian, J., con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

233 Cal.App.3d 1685

Page 13

233 Cal.App.3d 1685, 285 Cal.Rptr. 430, 19 Media L. Rep. 1815

**(Cite as: 233 Cal.App.3d 1685)**

curred.

A petition for a rehearing was denied October 9, 1991, and appellant's petition for review by the Supreme Court was denied December 12, 1991. Baxter, J., did not participate therein. **\*1704**

Cal.App.5.Dist.,1991.

Mosesian v. McClatchy Newspapers

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.