# EXHIBIT 23
## To Appendix to California State Authorities

225 Cal.App.3d 720    Page 1
225 Cal.App.3d 720, 275 Cal.Rptr. 494, 64 Ed. Law Rep. 205, 18 Media L. Rep. 1602
**(Cite as: 225 Cal.App.3d 720)**

C

LARRY L. MOYER, Plaintiff and Appellant,
v.
AMADOR VALLEY JOINT UNION HIGH
SCHOOL DISTRICT et al., Defendants and
Appellants.
**Nos. A046084, A047591.**

Court of Appeal, First District, Division 1, California.

Nov. 27, 1990.

**[Opinion certified for partial publication. [FN*]]**
FN* Part II of this opinion is not certified
for publication. (See Cal. Rules of Court,
rules 976(b) and 976.1.)

SUMMARY

A high school teacher filed a defamation action
against a high school and others arising from the
publication of a story in a high school student
newspaper. The alleged defamatory statements
were: "Students terrorize teacher," in the headline,
and "teacher is a babbler ..." and "he is the worst
teacher at [the school]." The trial court sustained
defendants' demurrer without leave to amend and
dismissed. (Superior Court of Alameda County, No.
H-137925-3, Richard A. Hodge, Judge.)

The Court of Appeal affirmed, holding the state-
ments could not reasonably be understood to state
actual facts about plaintiff and were thus not action-
able, considering the nature and meaning of the lan-
guage used, including the verifiability of the state-
ments, and the context in which the statements ap-
peared. (Opinion by Racanelli, P. J., with Newsom
and Stein, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b) Libel and Slander § 14--Actionable words-
-Construction of Language--Opinion and Fact.
There is no wholesale defamation exception under
U.S. Const., 1st Amend, for anything that might be
labeled "opinion." A false assertion of fact may be
libelous even *721 though couched in terms of
opinion. However, statements that cannot be reas-
onably interpreted as stating actual facts are entitled
to constitutional protection. In defamation cases
raising First Amendment issues, a reviewing court
must make an independent examination of the
whole record to insure that there is no infringement
of free expression. The dispositive question for the
court is whether a reasonable fact finder could con-
clude that the published statements imply a prov-
ably false factual assertion. The answer to that
question is determined by applying the "totality of
circumstances" test-a review of the meaning of the
language in context and its susceptibility to being
proved true or false.

[See **Cal.Jur.3d (Rev)**, Assault and Other Willful
Torts, § 147; 5 **Witkin**, Summary of Cal. Law (9th
ed. 1988) Torts, § 471.]

(2) Libel and Slander § 26--Qualified Privilege-
-Matters Concerning Candidates, Public Officers,
Official Acts, and Public Figures--Defense.
The common law rule that truth is a defense to al-
leged defamation with the burden of proof on the
defendant is superseded by a constitutional rule
when the plaintiff is a public official or public fig-
ure, or when the statements are matters of public
concern published by a media defendant. In those
cases, the burden is on the plaintiff to prove falsity.

(3) Libel and Slander § 14--Actionable Words-
-Construction of Language-- Opinion and Fact-
-Student Newspaper.
In a libel action against a high school by a teacher
alleging he was defamed by the publication of a
story in the school newspaper by the headline "Stu-
dents terrorize [teacher]," and in the story
"[teacher] is a babbler ...," and "he is the worst
teacher at [the school]," the trial court properly sus-
tained defendants' demurrer without leave to amend
and dismissed. These statements could not reason-
ably be understood to state actual facts about

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

225 Cal.App.3d 720                                                                Page 2
225 Cal.App.3d 720, 275 Cal.Rptr. 494, 64 Ed. Law Rep. 205, 18 Media L. Rep. 1602
(Cite as: 225 Cal.App.3d 720)

plaintiff, and thus were not actionable, considering the nature and meaning of the language used, including the verifiability of the statements and the context in which the statements appeared. The "worst teacher" statement was not a factual assertion capable of being proved true or false, but was the expression of subjective judgment by the speaker, while the "babbler" statement conveyed the speaker's disapproval of plaintiff's teaching or speaking style and could not be understood to state actual facts about plaintiff. The "terrorize" statement in the headline fell within the protectable category of rhetorical hyperbole. *722

COUNSEL

McCray, Rowland & Donovan and Rita Rowland for Plaintiff and Appellant.

Stubbs, Stubbs, Hittig & Stubbs, Stubbs, Hittig & Leone, Louis A. Leone, Barry R. Gross, Anthony L. Head, Dobbs, Berger, Molinari, Vanelli, Nadel & Links and Robert D. Links for Defendants and Appellants.

**RACANELLI, P. J.**

Plaintiff Larry L. Moyer, a teacher by profession, filed a 12-count complaint seeking damages on theories of defamation and infliction of emotional distress arising from the publication of a story in a high school student newspaper. Plaintiff now appeals from an order dismissing his complaint following the sustaining of general demurrers without leave to amend. The appeal is presented against the following factual and procedural background.

On March 11, 1988, an article appeared in In Flight, a student publication of Foothill High School, reporting that a smoke bomb had gone off in plaintiff's classroom. The headline stated: "Students terrorize Moyer." The article quoted the bomb-throwing student who merely "wanted to play a joke" as well as "The Shadow," the student who supplied the smoke bomb because "Mr. Moyer is a babbler, and babblers are annoying to me .... [¶] Also he pissed me off, he is the worst teacher at FHS."

The complaint named as party defendants the school district, school principal, student newspaper adviser, the students who made and reported the comments, including another student who reported plaintiff's filing of a governmental tort (libel) claim and republished the "babbler" and "worst teacher" remarks. The opposing arguments below centered on whether the challenged remarks constituted non-actionable expressions of opinion or arguably triable factual issues.

While sustaining the general demurrers, the trial court denied the school district's motion for costs, including attorney fees, under the authority of Code of Civil Procedure section 1038. The district has filed a separate appeal from that order which we have consolidated herein. *723

Discussion

I. *Defamation*

Prior to the filing of briefs herein, the courts perceived a fundamental distinction between statements of fact and statements of opinion. Statements of opinion were held to be protected by the First Amendment and thus not actionable. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259- 260 [228 Cal.Rptr. 206, 721 P.2d 87], cert. den. 479 U.S. 1032 [93 L.Ed.2d 834, 107 S.Ct. 880]; *Okun v. Superior Court* (1981) 29 Cal.3d 442, 450-451 [175 Cal.Rptr. 157, 629 P.2d 1369], cert. den. *sub nom. Maple Properties v. Superior Court* (1981) 454 U.S. 1099 [70 L.Ed.2d 641, 102 S.Ct. 673]; *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-604 [131 Cal.Rptr. 641, 552 P.2d 425]; *Hofmann Co. v. E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 407-408 [248 Cal.Rptr. 384]; *Scott v. McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 290-291 [112 Cal.Rptr. 609].) This prevailing rule was grounded primarily on dictum contained in *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 45    Filed 08/23/2007    Page 4 of 30

225 Cal.App.3d 720    Page 3
225 Cal.App.3d 720, 275 Cal.Rptr. 494, 64 Ed. Law Rep. 205, 18 Media L. Rep. 1602
**(Cite as: 225 Cal.App.3d 720)**

statements of fact."

On June 21, 1990, while this appeal was pending, our highest court filed its opinion in *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. ___ [111 L.Ed.2d 1, 110 S.Ct. 2695], in which it reexamined the law of defamation within the context of the First Amendment and rejected what it called "the creation of an artificial dichotomy between 'opinion' and fact." (*Id.* at p. ___ [111 L.Ed.2d at p. 18].) (1a) The court explained that the language in *Gertz* had been interpreted too broadly and was *not* intended to create "a wholesale defamation exemption for anything that might be labeled 'opinion.' " (*Id.* at p. ___ [111 L.Ed.2d at p. 17].) Instead, the court made clear that a false assertion of fact could be libelous even though couched in terms of opinion. [FN1] *724

> FN1 We note that the two dissenting justices in *Milkovich* agreed with the majority's legal analysis but disagreed as to the application of the announced principles to the statements at issue. (497 U.S. at pp. ___, ___ [111 L.Ed.2d at pp. 21-23].) Indeed, the notion that a statement may be understood as a factual assertion though phrased as an opinion has long been recognized in California. (See *Okun v. Superior Court, supra,* 29 Cal.3d at p. 450; *Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 682 [150 Cal.Rptr. 258, 586 P.2d 572], cert. den. (1979) 441 U.S. 961 [60 L.Ed.2d 1066, 99 S.Ct. 2406]; *Rest.2d Torts.* § 566.)

Although the *Milkovich* court held that there is no *separate* First Amendment privilege for statements of opinion, the court recognized that existing constitutional doctrine remained operative to protect free expression of ideas. That is, statements that cannot be "reasonably interpreted as stating actual facts" are still entitled to constitutional protection. (497 U.S. at p. ___ [111 L.Ed.2d at p. 19]; e.g., *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 50, 57 [99 L.Ed.2d 41, 48, 53, 108 S.Ct. 876]

[parody]; *Letter Carriers v. Austin* (1974) 418 U.S. 264, 284-286 [41 L.Ed. 745, 761-763, 94 S.Ct. 2770] [hyperbole and imaginative expression]; *Greenbelt Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 13-14 [26 L.Ed.2d 6, 14-15, 90 S.Ct. 1537] [same].)

Before *Milkovich*, the California courts had employed a "totality of the circumstances" test to differentiate between fact and opinion: "First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense .... [¶] Next, the context in which the statement was made must be considered. ... [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." (*Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260-261.) The crucial determination whether the statement was fact or opinion was held to be a question of law for the court. (*Id.* at p. 260; see generally *Letter Carriers v. Austin, supra,* 418 U.S. 264; *Greenbelt Pub. Assn. v. Bresler, supra,* 398 U.S. 6; see also *Okun v. Superior Court, supra,* 29 Cal.3d at p. 450; *Gregory v. McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 601.) The federal courts employed a similar test. (*Ollman v. Evans* (D.C. Cir. 1984) 750 F.2d 970, 979 [242 App.D.C. 301], cert. den. (1985) 471 U.S. 1127 [86 L.Ed.2d 278, 105 S.Ct. 2662].)

*Milkovich* did not substantially change these principles; it underscored that in cases such as this, raising First Amendment issues, a reviewing court must make an independent examination of the whole record in order to ensure that there is no infringement of free expression. (497 U.S. at p. ___ [111 L.Ed.2d at p.17]; *Bose Corp. v. Consumers Union of U. S., Inc.* (1984) 466 U.S. 485, 499 [80 L.Ed.2d 502, 515-516, 104 S.Ct. 1949].) (2) (1b) The dispositive question for the court is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion. (497 U.S. at p. ___ [111 L.Ed.2d at p. 19].) [FN2] *725 The answer to that question is determined by applying the "totality of circumstances" test-a review of the meaning of the language in con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

text and its susceptibility to being proved true or false. (*Ibid*; see also 497 U.S. at p. ___ [111 L.Ed.2d at p. 20] (dis. opn. of Brennan, J.).)

> FN2 The common law rule that truth is a *defense* to alleged defamation with the burden of proof on the defendant (*Lipman v. Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 233 [11 Cal.Rptr. 97, 359 P.2d 465]) is superseded by a constitutional rule when the plaintiff is a public official or public figure, or when the statements are matters of public concern published by a media defendant. In those cases, the burden is on the *plaintiff* to prove falsity. (*Philadelphia Newspapers, Inc. v. Hepps* (1986) 475 U.S. 767, 775-777 [89 L.Ed.2d 783, 791-793, 106 S.Ct. 1558]; see *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 753, fn. 37 [257 Cal.Rptr. 708, 771 P.2d 406].)

The U.S. Supreme Court has yet to decide the applicable standard when the defendant is not a media defendant. (*Philadelphia Newspapers, Inc. v. Hepps, supra,* 475 U.S. at p. 779, fn. 4 [89 L.Ed.2d at p. 794]; see *Milkovich v. Lorain Journal Co., supra,* 497 U.S. at p. ___, fn. 6 [111 L.Ed.2d at p. 18]; *Hutchinson v. Proxmire* (1979) 443 U.S. 111, 133, fn. 16 [61 L.Ed.2d 411, 430, 99 S.Ct. 2675]; but see *Miller v. Nestande* (1987) 192 Cal.App.3d 191, 197-200 [237 Cal.Rptr. 359, 62 A.L.R.4th 301].) In the present case, plaintiff asserted at oral argument that In Flight is not a media defendant; thus, the common law presumption of falsity should apply. Plaintiff misapprehends the pivotal question raised in this appeal. The issue is not whether the statements were *actually* true or false, a question of fact for trial. Rather, in this challenge to the sustaining of the demurrers, the question is one of law: whether the statements contain *provably* false factual assertions and thus fall outside the protection of the First Amendment.

(3) Turning to the relevant circumstances herein, plaintiff essentially asserts the publication contained three factual statements: (1) the headline, "Students terrorize Moyer"; (2) "Mr. Moyer is a babbler ...."; and (3) "he is the worst teacher at FHS." Thus, the narrow issue before this court is whether these statements can reasonably be understood to state actual facts about plaintiff. In determining that issue, we consider the nature and meaning of the language used, including the verifiability of the statements, and the context in which the statements appeared. Viewed through that analytical prism, we are impelled to conclude that the statements are not actionable.

As to the third or "worst teacher" statement, there is no factual assertion capable of being proved true or false. Clearly, the statement is an expression of subjective judgment by the speaker. The full text of the sentence confirms that the statement was simply an expression of anger or disgust on the student-speaker's part. The statement contains no verifiable facts and is clearly protected under the First Amendment. (See, e.g., *Botos v. Los Angeles County Bar Assn.* (1984) 151 Cal.App.3d 1083, 1088-1090 [199 Cal.Rptr. 236] [rating judge "not qualified" by local bar association was a collective judgment of the judge's qualifications and not an actionable statement of fact].)

Nor does the second or "babbler" statement fall within the legal framework of actionable speech. A commonly accepted definition of "babbler" is *726 one who utters meaningless or unintelligible sounds, who talks foolishly or incessantly. (See Webster's New Collegiate Dict. (1977) p. 81.) Obviously, the readers of the article would have understood that the word was not used literally but as a form of exaggerated expression conveying the student-speaker's disapproval of plaintiff's teaching or speaking style. The statement could not reasonably have been understood to be stating actual facts about plaintiff. (E.g., *Letter Carriers v. Austin, supra,* 418 U.S. at pp. 284-286 [41 L.Ed.2d at pp. 761-763] ["traitor" understood to mean that plaintiffs' actions were reprehensible, not that plaintiffs had committed treason]; *Greenbelt Pub.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

225 Cal.App.3d 720                                                                 Page 5
225 Cal.App.3d 720, 275 Cal.Rptr. 494, 64 Ed. Law Rep. 205, 18 Media L. Rep. 1602
**(Cite as: 225 Cal.App.3d 720)**

*Assn. v. Bresler, supra,* 398 U.S. at pp. 13-14 [26 L.Ed.2d at p. 15] ["blackmail" merely a vigorous epithet used to describe unreasonable negotiating position]; *Buckley v. Littell* (2d Cir. 1976) 539 F.2d 882, 893, cert. den. (1977) 429 U.S. 1062 [50 L.Ed.2d 777, 97 S.Ct. 785] [the term "fascist" subject to a variety of interpretations and cannot be regarded as a statement of fact]; *Rinaldi v. Holt, Rinehart & Winston, Inc.* (1977) 42 N.Y.2d 369 [397 N.Y.S.2d 943, 950-951, 366 N.E.2d 1299], cert. den. (1977) 434 U.S. 969 [54 L.Ed.2d 456, 98 S.Ct. 514] [accusing judge of being "corrupt" actionable, but calling him "incompetent" too vague to constitute a statement of fact]; *Cole v. Westinghouse Broadcasting Co., Inc.* (Mass. 1982) 386 Mass. 303 [435 N.E.2d 1021], cert. den. (1982) 459 U.S. 1037 [74 L.Ed.2d 603, 103 S.Ct. 449] [statement that reporter engaged in "sloppy and irresponsible reporting" too imprecise to be a false statement of fact].)

Finally, as to the first statement, we agree with plaintiff that by its nature a headline over a news story arguably implies a factual assertion. [FN3] But even if the descriptive term "terrorize" is an exaggeration of the actual event, it nonetheless falls within the protectible category of rhetorical hyperbole-a word used in a loose, figurative sense. Moreover, the article read in full context accurately reported that one student supplied another student with a smoke bomb that was set off during plaintiff's class. [FN4]

> FN3 We assume only for purposes of discussion that the statement is defamatory. In all candor, however, we have great difficulty seeing anything false or defamatory in the assertion that plaintiff was "terrorized."

> FN4 The subsequent story reporting plaintiff's filing of a libel claim eventually republished the substance of the original In Flight story.

In summary, we conclude that the statements are not actionable, that no fact finder could reasonably interpret the statements as stating actual facts about plaintiff, and, consequently, that the demurrers were properly sustained. *727

II. *District's Appeal* [FN*]
FN* See footnote, *ante, page 720.*

. . . . . . . . . .

The judgment or orders appealed from, and each of them, are affirmed. The parties shall bear their respective cost on appeal.

Newsom, J., and Stein, J., concurred. *728

Cal.App.1.Dist.,1990.

Moyer v. Amador Valley Joint Union High School Dist.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 24
## To Appendix to California State Authorities

Westlaw.

61 Cal.Rptr.3d 29                                                                Page 1
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

**H**

Court of Appeal, First District, Division 4, California.

OVERSTOCK.COM, INC., et al., Plaintiffs and
Respondents,

v.

GRADIENT ANALYTICS, INC., et al., Defendants and Appellants.

No. A113397.

May 30, 2007.

**Background:** Publicly traded online retailer brought action for defamation and other torts against publisher of analytic reports on publicly traded companies and against principals of hedge funds and other institutional investors, alleging defendants collaborated to produce custom negative reports on retailer. The Superior Court, Marin County, No. CV053693, Vernon F. Smith, J., denied defendants' motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute. Defendants appealed.

**Holdings:** The Court of Appeal, Reardon, J., held that:

(1) allegedly false publications about retailer could be understood as implying defamatory statements;

(2) retailer showed likelihood of prevailing in defamation action against publisher;

(3) retailer established prima facie case of malice;

(4) retailer established prima facie case that investors played responsible part in publications of reports; and

(5) retailer had standing under unfair competition law (UCL).

Affirmed.

West Headnotes

**[1] Appeal and Error** ⟊919
30k919 Most Cited Cases
On appeal from an order denying a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the reviewing court does not weigh the evidence but accepts as true all evidence favorable to the plaintiff. West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading** ⟊358
302k358 Most Cited Cases
Resolving the merits of a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute involves a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if it does, proceeding secondly to whether the plaintiff can establish a probability of prevailing on the merits. West's Ann.Cal.C.C.P. § 425.16.

**[3] Appeal and Error** ⟊893(1)
30k893(1) Most Cited Cases
The appellate court reviews de novo the trial court's ruling on a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute. West's Ann.Cal.C.C.P. § 425.16.

**[4] Pleading** ⟊360
302k360 Most Cited Cases
Although the filing of a notice of motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute generally will stay all discovery in the action, a plaintiff opposing an anti-SLAPP motion cannot rely on allegations in the complaint, but must set forth evidence that would be admissible at trial. West's Ann.Cal.C.C.P. § 425.16.

**[5] Pleading** ⟊360
302k360 Most Cited Cases
Because the anti-SLAPP (strategic lawsuit against public participation) statute (1) permits early intervention in lawsuits alleging unmeritorious causes of action that implicate free speech concerns, and (2) limits opportunity to conduct discovery, the plaintiff's burden of establishing a
probability of prevailing, so as to overcome the motion, is not high. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading** ⟊360
302k360 Most Cited Cases

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

In ruling on a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the court does not weigh credibility or evaluate the weight of the evidence; instead, it accepts as true all evidence favorable to the plaintiff and assesses the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law. West's Ann.Cal.C.C.P. § 425.16.

**[7] Libel and Slander ⟲51(5)**
237k51(5) Most Cited Cases

**[7] Libel and Slander ⟲112(2)**
237k112(2) Most Cited Cases
Where the plaintiff claiming defamation is a limited public figure, he or she must prove by clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity. West's Ann.Cal.Civ.Code § 44 et seq.

**[8] Pleading ⟲358**
302k358 Most Cited Cases

**[8] Pleading ⟲360**
302k360 Most Cited Cases
In the context of opposing a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, a limited public figure who sues for defamation must establish a probability that he or she can produce clear and convincing evidence that allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity. West's Ann.Cal.C.C.P. § 425.16; West's Ann.Cal.Civ.Code § 44 et seq.

**[9] Libel and Slander ⟲6(1)**
237k6(1) Most Cited Cases

**[9] Libel and Slander ⟲22**
237k22 Most Cited Cases
A false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable. West's Ann.Cal.Civ.Code § 44 et seq.

**[10] Libel and Slander ⟲6(1)**
237k6(1) Most Cited Cases
In determining whether a false statement is action-

able, the key is not parsing whether a published statement is fact or opinion, but whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. West's Ann.Cal.Civ.Code § 44 et seq.

**[11] Libel and Slander ⟲19**
237k19 Most Cited Cases
When deciding whether a statement communicates or implies a provably false assertion of fact, and is thus actionable, courts use a totality of the circumstances test, which entails examining the language of the statement and the context in which the statement was made, including the nature and full content of the particular communication and the knowledge and understanding of the audience targeted by the publication. West's Ann.Cal.Civ.Code § 44 et seq.

**[12] Libel and Slander ⟲9(7)**
237k9(7) Most Cited Cases
Allegedly false publications about online retailer's accounting irregularities contained in publisher's analytic reports on retailer could be understood as implying defamatory statements, so as to support retailer's defamation action against publisher, even though statements were framed as being opinion; flurry of negative reports and stylistic emphasis on key phrases by publisher, which held itself out as having specialized knowledge, strengthened implication in reports that retailer was manipulating accounting procedures to boost price of its stock. West's Ann.Cal.Civ.Code § 44 et seq.
See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 617 et seq.; Cal. Jur. 3d, Assault and Other Wilful Torts, § 163; Cal. Civil Practice (Thomson/West 2003) Torts, § 21:53 et seq.

**[13] Libel and Slander ⟲6(1)**
237k6(1) Most Cited Cases
Merely couching an assertion of a defamatory fact in cautionary language such as "apparently" or "some sources say" or even putting it in the form of a question, does not necessarily defuse the impression that the speaker is communicating an actual fact. West's Ann.Cal.Civ.Code § 44 et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

**[14] Libel and Slander** ⟲6(1)
237k6(1) Most Cited Cases
The use of interrogative language, rather than assertive language, does not alone entitle statements to constitutional protection where they otherwise can be understood as implying defamatory fact. West's Ann.Cal.Civ.Code § 44 et seq.

**[15] Libel and Slander** ⟲22
237k22 Most Cited Cases
Even where the speaker states facts upon which he or she bases an opinion, if the facts are incorrect or incomplete, or if the speaker's assessment of them is erroneous, the statement can still imply an actionable defamatory statement. West's Ann.Cal.Civ.Code § 44 et seq.

**[16] Pleading** ⟲360
302k360 Most Cited Cases
Online retailer established prima facie case of falsity of publisher's statements about retailer's accounting irregularities contained in analytic reports on retailer, so as to overcome publisher's motion to strike retailer's defamation complaint under anti-SLAPP (strategic lawsuit against public participation) statute, by introducing declaration of its senior vice-president of finance, stating that retailer's revenue-recognition accounting was dictated by generally accepted accounting principles (GAAP), approved by outside auditors, reflected substantial inventory risk, and was not driven by any effort to increase company's reported revenues. West's Ann.Cal.C.C.P. § 425.16; West's Ann.Cal.Civ.Code § 44 et seq.

**[17] Libel and Slander** ⟲112(2)
237k112(2) Most Cited Cases
For defamation actions, actual malice may be proved by circumstantial or direct evidence. West's Ann.Cal.Civ.Code § 44 et seq.

**[18] Libel and Slander** ⟲101(4)
237k101(4) Most Cited Cases
In defamation actions requiring a showing of actual malice, courts will not infer actual malice solely from evidence of ill will, personal spite, or bad motive. West's Ann.Cal.Civ.Code § 44 et seq.

**[19] Libel and Slander** ⟲112(2)
237k112(2) Most Cited Cases
In defamation actions, evidence of negligence, of motive, and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity of the publication. West's Ann.Cal.Civ.Code § 44 et seq.

**[20] Libel and Slander** ⟲51(1)
237k51(1) Most Cited Cases
In defamation actions, factors such as defendant's failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable or known to be biased against the plaintiff may, in an appropriate case, indicate that the defendant himself had serious doubts regarding the truth of his publication. West's Ann.Cal.Civ.Code § 44 et seq.

**[21] Libel and Slander** ⟲51(5)
237k51(5) Most Cited Cases
Online retailer, a limited public figure, established prima facie case that publisher of analytic reports on publicly traded companies published reports on retailer in reckless disregard of the truth for malice element of its defamation action; evidence showed that publisher frequently altered reports to meet customers' expectations, and that particular customer desired negative report on retailer to drive down value of retailer's stock. West's Ann.Cal.Civ.Code § 44 et seq.

**[22] Pleading** ⟲360
302k360 Most Cited Cases
Evidence that subscribers to analytic reports on publicly traded companies initiated negative campaign against online retailer and was in regular contact with publisher of reports that contained allegedly false statements about retailer established prima facie case that subscribers played responsible part in publications of reports, so as to allow retailer to overcome subscribers'
motion to strike retailer's defamation complaint under anti-SLAPP (strategic lawsuit against public participation) statute. West's Ann.Cal.Civ.Code § 44 et seq.; West's Ann.Cal.C.C.P. § 425.16.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW    Document 45    Filed 08/23/2007    Page 11 of 30

61 Cal.Rptr.3d 29                                                                Page 4
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

**[23] Libel and Slander ☞74**
237k74 Most Cited Cases
One who takes a responsible part in a publication of defamatory material may be held liable for the publication. West's Ann.Cal.Civ.Code § 44 et seq.

**[24] Libel and Slander ☞74**
237k74 Most Cited Cases
Participating in publication of a defamatory article as editor can subject a person to liability. West's Ann.Cal.Civ.Code § 44 et seq.

**[25] Torts ☞213**
379k213 Most Cited Cases
To establish prima facie case of intentional interference with prospective economic advantage, plaintiff must demonstrate (1) economic relationship between plaintiff and third party, with probability of future economic benefit to plaintiff, (2) defendant's knowledge of this relationship, (3) intentional and wrongful conduct on the part of defendant designed to interfere with or disrupt relationship, (4) actual disruption or interference, and (5) economic harm to plaintiff as proximate result of defendant's wrongful conduct.

**[26] Torts ☞215**
379k215 Most Cited Cases

**[26] Torts ☞218**
379k218 Most Cited Cases

**[26] Torts ☞415**
379k415 Most Cited Cases
A plaintiff's burden in an action for intentional interference with prospective economic advantage includes pleading and proving that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.

**[27] Torts ☞218**
379k218 Most Cited Cases
For intentional interference with prospective economic advantage, the defendant's act is "independently wrongful" if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.

**[28] Antitrust and Trade Regulation ☞219**
29Tk219 Most Cited Cases
Transactions relating to the securities market are not beyond the reach of the unfair competition law (UCL). West's Ann.Cal.Bus. & Prof.Code §§ 17200 et seq., 17500 et seq.

**[29] Antitrust and Trade Regulation ☞290**
29Tk290 Most Cited Cases
Publicly traded online retailer, which claimed that scheme of publisher and its subscribers to prepare false negative analytic reports on retailer resulted in diminution in value of its assets and decline in its market capitalization and other vested interests, had standing to bring action under unfair competition law (UCL). West's Ann.Cal.Bus. & Prof.Code §§ 17204, 17535.

**[30] Pleading ☞360**
302k360 Most Cited Cases
Publicly traded online retailer's prima facie evidence that subscribers of analytic reports on publicly traded companies willfully participated in wrongful scheme to depress price of retailer's stock by, among other things, participating in development and publication of false statements concerning retailer, was sufficient to overcome subscribers' motion to strike, under anti-SLAPP (strategic lawsuit against public participation) statute, retailer's complaint alleging statutory violations. West's Ann.Cal.C.C.P. § 425.16; West's Ann.Cal.Corp.Code § 25400.

**33 Keker & Van Nest, LLP, John W. Keker, Susan J. Harriman, Steven A. Hirsch, San Francisco, DLA Piper Rudnick Gray Cary US LLP, Perrie M. Weiner, Edward D. Totino, Los Angeles, for Gradient Appellants.

Lowenstein Sandler PC, Gavin J. Rooney, Roseland, NJ, Michael J. Hahn, Sherman Oaks, Paul, Hastings, Janofsky & Walker LLP, Grace A. Carter, Hilton S. Williams, San Francisco, for Rocker Appellants.

Hunton & Williams LLP, Colleen Heisey, John Jay Range, Washington, DC, M. Christine Klein, Rich-

61 Cal.Rptr.3d 29                                                                                                Page 5
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

mond, VA, William P. McKeithan, Davis Wright Tremaine LLP, Thomas R. Burke, San Francisco, Lucy A. Dalglish, Gregg P. Leslie, Casey P. Murray, for Amici Curiae on Behalf of Appellants.

Stein & Lubin LLP, Theodore A. Griffinger, Jr., Ellen A. Cirangle, San Francisco, Tanya Herrera, Freitas, McCarthy, MacMahon & Keating, Thomas F. Keating, Jr., Neil J. Moran, San Rafael, for Respondents.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Senior Assistant Attorney General, Ronald A. Reiter, Supervising Deputy Attorney General, Kathrin Sears, Deputy Attorney General, for Amicus Curiae on Behalf of Respondents.

REARDON, J.

**\*693** A company that produces and publishes subscriber-based analytic reports on public companies, regularly collaborating with the principals of hedge funds and other institutional investors to produce custom, negative reports on targeted companies, stepped over the line into defamation and other torts with respect to the flurry and timing of reports on an online closeout retailer. The hedge fund principals took short positions in the stock and worked closely with the publisher to put out reports that were anything but the purported unbiased and objective assessment promised to subscribers. So says the targeted company in its complaint, and so aver various declarants in the papers opposing the anti-SLAPP [FN1] motions prosecuted by the publisher and the hedge fund **\*\*34** parties. In this scenario, and at this early stage of discovery, the trial court correctly declined to strike respondents' complaint. Accordingly, we affirm the judgment.

> FN1. Code of Civil Procedure section 425.16 (§ 425.16). SLAPP stands for strategic lawsuits against public participation. This statute provides in part: "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Califor-

nia Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(1), (2).)

# I. BACKGROUND

## A. *The Parties*

### 1. *Overstock.com, Inc.* [FN2]

> FN2. Respondents are Overstock.com, Inc. (Overstock or OSTK), Hugh D. Barron and Mary Helburn.

According to the Overstock's first amended complaint, Overstock is an online closeout retailer. It offers customers an opportunity to shop online for brand name merchandise at heavily discounted prices, while offering suppliers an alternative way to distribute inventory liquidation. Overstock launched its first Web site for customers in 1999. Its stock is publicly traded on the NASDAQ (National Association of Securities Dealers Automated Quotation System).

### 2. *The Gradient Appellants* [FN3]

> FN3. Appellants Gradient Analytics, Inc. (Gradient or the firm), James Carr Bettis, Donn Vickrey and Matthew Kliber are referred to collectively as Gradient appellants.

Gradient, formerly Camelback Research Alliance, Inc. (Camelback), provides analytical reporting services on publicly traded companies through a **\*694** subscription program. Its customer base of approximately 125 subscribers consists almost exclusively of large institutional investors. One product is the earnings quality analytics (EQA) report. The EQA reports rate public companies on an "A" through

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

"F" scale, with "A" being the highest mark.

The base price to subscribe to Gradient services is approximately $25,000 to $40,000 or more per year. For the base fee customers receive access to all of Gradient's newly published reports, as well as historic reports on publicly traded companies. Additionally, subscribers are entitled to order two custom reports on a specific company, at any time. Beyond that, subscribers can pay for more custom reports. As a marketing strategy, Gradient commonly offered the service free of charge to hedge fund managers for up to several months before it invoiced the investor and required payment.

3. *The Rocker Appellants* [FN4]

> FN4. Appellants (1) Rocker Partners, LP; (2) Rocker Management, LLC; and (3) Rocker Offshore Management Company, Inc., are referred to collectively as Rocker Partners. Rocker Partners, David Rocker (Rocker) and Marc Cohodes are referred to collectively as Rocker appellants.

Rocker and Marc Cohodes are managing members of the Rocker Partners entities. The Rocker Partners' investors include "funds of funds, university and hospital endowments, and individuals and families with substantial assets." Rocker describes Rocker Partners as a "short-biased" hedge fund that invests "long" in public companies but also sells "short" those securities which it believes are overvalued and likely to decline in price in the future. Rocker Partners is best known for its expertise in selling short. [FN5]

> FN5. A basic definition of "selling short" is: "When someone shorts a stock [sometimes called 'selling short'], [he or she] borrow[s] shares of a company from an investor and sell[s] those borrowed shares at the current market price. The hope is that the stock price will fall so the short seller can repurchase the stock at a lower price and pay back the person [he or she] borrowed from." (From "About: Investing for Beginners" found at

> <http://beginnersinvest.abou t.com/library/glossary/bldef-short selling.htm>; italics omitted, first bracketed insertion in original.)

**\*\*35 B.** *Gradient's Custom Research Reports*

[1] Demetrios Anifantis, [FN6] a former customer representative who worked for Camelback from November 2003 through November 2004, submitted a declaration in this litigation, revealing the following: [FN7] Typically a subscriber requesting a custom report would supply Gradient with information on the **\*695** company subject to the request, with instructions to consider the information and include it in the report. As well, the customer usually would instruct the appropriate personnel to generate either a positive or negative report on the subject company.

> FN6. Anifantis has a master's degree in economics. Prior to employment with Camelback, he was a research and marketing specialist for Thompson Financial.

> FN7. On appeal from an order denying a motion to strike, we do not weigh the evidence but accept as true all evidence favorable to the plaintiff. (*Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 605, 132 Cal.Rptr.2d 191.)

Anifantis was present on many telephone conversations between customers requesting special reports and Donn Vickery, editor-in-chief and executive vice-president of Gradient, in which the customers would suggest that Gradient focus on the negative information the customer supplied for inclusion in the report. Often there was no doubt that the customer was asking Gradient to research and draft a negative report on the target company.

Vickrey commonly altered the report to meet the customer's expectation and request. Vickrey and the customer would discuss the report contents in detail and many times the customer would request, and the company would receive, a lower grading than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29                                                                                                Page 7
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

the grade received in the initial version of the report. Although Vickrey retained the final editorial decisionmaking on these reports, based on his observations Anifantis concluded "there was no doubt that these reports were not the product of an unbiased, objective view of the subject companies, but rather ... the customer was paying for a report that would heavily favor the requesting customer's negative view of the company."

Indeed it was common knowledge at Gradient that customers who wanted negative reports prepared on subject companies--and who supplied negative information or guidance to Gradient in connection with a custom report--either held short positions in the securities of those companies or intended to take short positions upon publication of the reports. These negative reports on public companies were a key component in the customers' efforts to profit from the anticipated depression of the trading price of the subject companies' stock.

Customers would also ask Gradient not to disseminate the report to the public for a specified time period so they could obtain their position in the targeted company's stock prior to the public receiving the information. Many hedge funds requested Vickrey to delay public release of reports for three to seven days to allow the funds to take a position in the stock.

Gradient maintained a "Top Ten" list of stocks that performed in accordance with the rankings attributed by Gradient in its reports. The purpose of this list was to provide potential and current customers with the stock performance tracking results in order to demonstrate Gradient's ability to *696 predict and affect stock performance. Gradient also tracked what it referred to as " 'Blow ups by Grade.' " "Blow ups" were companies which suffered a one-day decline of -20 percent or more in the price of their stock, or better than -25 percent over the course of a week within **36 12 months of publication of a report. These reports were a successful part of Gradient's promotional materials to short-selling hedge fund clients.

Routinely, Gradient would publish all custom reports to their entire client base, without disclosing to the clients that the reports were ordered by subscribers; that subscribers had advance copies prior to publication; or that the subscribers exerted any influence over the content of the report, including influence over the negative assessment of the company. Moreover, Gradient understood that its subscribers intended to republish the custom reports to third parties who maintained positions in the stock, as well as to government regulatory agencies. Vickrey would also permit financial journalists to review the custom reports, knowing that this exposure would provide wider public circulation of the content of the reports.

The analysts who researched and wrote reports on publicly traded companies were recent university graduates with four-year degrees in business-related disciplines. However, when a subscriber asked about the report preparers, management instructed the sales and service representatives to tell them that the analyst team was made up of " 'CFAs' or 'CPAs' " although except for top management, the analysts did not have those advanced-degree designations.

While publishing the research reports described above, James Carr Bettis and Vickrey, the founders of Gradient, were portfolio managers for a hedge fund called Pinnacle Investments Advisors, LLC (Pinnacle). Their management of a hedge fund conflicted with Vickrey's instruction that if a customer ever inquired whether Gradient invested or managed money, staff should answer in the negative. One Gradient employee in fact answered one telephone on behalf of Gradient and another on behalf of Pinnacle.

C. *The Gradient and Rocker Appellants Focus on Overstock*

In 2003 and 2004, Rocker Partners, LP began requesting reports from Gradient on Overstock. In February 2004, Rocker Partners began establishing short positions in Overstock. Rocker Partners became a Gradient subscriber in July 2004.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29                                                    Page 8
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)

Rocker was in frequent telephone contact with Vickrey concerning the fund's requests for negative reports on Overstock. Anifantis was involved in the publication of three reports and participated in calls in which Vickrey and *697 Rocker discussed the reports in advance of publication. Vickrey sent Rocker drafts of Overstock reports prior to publication. Rocker suggested changes, including underscoring negative aspects, sometimes adding additional negative facts or suggesting a more negative perspective than was reflected in the drafts. At Rocker's request, Gradient wrote several reports on Overstock that gave the company a grade of "D" or "F." Based on his participation in telephone calls with Vickrey and Rocker, Anifantis concluded it appeared "that Vickrey accommodated Rocker's requests for [Gradient] to publish negative information on Overstock for the purpose of negatively influencing the price of Overstock shares so that Rocker could profit from its existing or intended short positions in Overstock shares and Vickrey and [Gradient] could gain favor with Rocker."

It was apparent to Anifantis that Rocker Partners had a short position in Overstock, or intended to establish such position prior to publication of the reports. Several times Rocker requested that Vickrey delay publication of the final report for a specified period so Rocker Partners could establish their own short position.

**37 D. *Litigation*

1. *The Complaint*

In August 2005 Overstock sued the Gradient and Rocker appellants. The first amended complaint alleged (1) libel and intentional interference with prospective economic advantage, based on allegedly false and defamatory statements contained in the Overstock reports published by Gradient, with the collaboration and cooperation of Rocker appellants; and (2) violations of the unfair competition law (UCL), [FN8] based on the alleged "knowing and intentional dissemination of negative reports on Overstock containing false and/or misleading statements," without disclosing Rocker appellants' parti-

cipation in the development of those reports, among other matters. As well, respondents Barron and Helburn, each former owners of Overstock common stock, sued Rocker appellants for violation of the state securities antifraud laws. (Corp.Code, § 25400 et seq.) This cause of action was based on defendants' actions designed to wrongfully depress the price of Overstock's common stock for their financial benefit, as parties holding short positions in that stock.

> FN8. Business and Professions Code section 17200 et seq.

2. *Motions to Strike; Opposition*

Both groups of appellants moved to strike the entire complaint under California's anti-SLAPP statute. In opposition to these motions, among other *698 items Overstock submitted the declaration of David Chidester, its senior vice-president of finance, who reviewed over 50 Gradient reports on Overstock from June 2003 through December 2005, [FN9] and identified multiple statements of fact about Overstock's accounting practices and related matters which in his opinion were "provably false." According to Chidester, these false assertions damaged the corporation. As he explained, prior to January 1, 2005, Overstock stock traded at just over $73 per share. Thereafter the price began to drop steadily and consistently to a low of under $30. As of January 2, 2006, it was trading in the high $20 range.

> FN9. Gradient's first report on Overstock issued in June 2003 and three reports followed that year. Another report issued in March 2004, and after Rocker appellants became subscribers in July 2004, another seven reports issued that year. Moving to the first half of 2005, Gradient increased its reporting with a flurry of over 20 negative reports on Overstock. Initially Overstock received a grade of "D" which dropped to "F" in December 2003 and remained there ever since. In all, Gradient published over 50 negative reports on

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

Overstock. The Gradient subscription was available to the media at no cost.

Chidester further indicated that the performance of Overstock's stock was a major component of its relationship with lenders, suppliers, banks, investors, customers and the media. In November 2005 Overstock's largest factor cut the company's unsecured line of credit in half, based on the price drop in Overstock's stock. This had multiple negative ramifications, including the delayed receipt of contracted-for inventory, the need to resort to a more expensive line of credit, and an increase in the amount the factor charged Overstock's vendors.

In addition, because its stock was not being fairly valued, Overstock had to scuttle the purchase of a company for stock, and instead pay cash, thereby causing its cash position to diminish. Similarly, with the artificially low stock price in 2005, Overstock had to forego negotiating with at least six on-line retailers that had asked if Overstock were interested in acquiring them in exchange for stock. Finally, because of Overstock's undervalued stock **38 price, it did not issue any stock in 2005 under a shelf registration statement filed with the Securities and Exchange Commission. Not issuing stock that year deprived the company of an ability to raise capital at a reasonable cost of dilution to the shareholders.

3. *Trial Court Decision*

The trial court found that appellants met their burden of showing that Overstock's complaint targeted acts in furtherance of their right to free speech in connection with an issue of public interest, as required by *699section 425.16, subdivision (b)(1). However, the court also concluded that respondents fulfilled their burden of establishing a probability of prevailing on the merits. On the issue of actual malice, the court held that the declaration of Anifantis "[was] sufficient prima facie evidence demonstrating Gradient's predecessor (Camelback) published 'special reports' in reckless disregard of the truth...." And, although the court determined that Gradient's reports were "liberally couched in

terms of opinion," it reasoned that the reports "imply that Overstock intentionally misstated financial metrics to artificially inflate its earnings reports and engaged in a variety of accounting improprieties that could be construed as statements of fact. The reports are not written in the form of loose, figurative, or hyperbolic language, but are serious in tone and content." (Capitalization omitted.) This appeal followed.

## II. DISCUSSION

*A. Introduction; Burdens of Proof*

[2][3] Resolving the merits of a section 425.16 motion involves a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if it does, proceeding secondly to whether the plaintiff can establish a probability of prevailing on the merits. *(Ampex Corp. v. Cargle (2005) 128 Cal.App.4th 1569, 1576, 27 Cal.Rptr.3d 863.)* We review de novo the trial court's ruling on an anti-SLAPP motion. *(Carver v. Bonds (2005) 135 Cal.App.4th 328, 342, 37 Cal.Rptr.3d 480.)*

Here we bypass the initial inquiry because everyone agrees that the first hurdle in obtaining anti-SLAPP relief has been met. Thus we focus solely on whether respondents have made a prima facie showing of facts which, if credited by the trier of fact, would sustain a favorable judgment.

[4][5][6] The filing of a notice of motion under the anti-SLAPP statute generally will stay all discovery in the action. (§ 425.16, subd. (g).) Nonetheless, a plaintiff opposing an anti-SLAPP motion cannot rely on allegations in the complaint, but must set forth evidence that would be admissible at trial. *(Ampex Corp. v. Cargle, supra, 128 Cal.App.4th at p. 1576, 27 Cal.Rptr.3d 863.)* Precisely because the statute (1) permits early intervention in lawsuits alleging unmeritorious causes of action that implicate free speech concerns, and (2) limits opportunity to conduct discovery, the plaintiff's burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29                                                                                    Page 10
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)

all evidence *700 favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law. (*Ibid.*) Only a cause of action that lacks "even minimal merit" constitutes SLAPP. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, 124 Cal.Rptr.2d 530, 52 P.3d 703.)

We review each cause of action below.

**39 B. *Libel*

Appellants are adamant that the trial court wrongly determined that Overstock established a probability of prevailing on its defamation claim. First we review the general principles pertinent to the libel claims. Next, we address Gradient appellants' arguments that the statements at issue cannot reasonably be viewed as implying provably false factual assertions and in any event Overstock did not introduce prima facie evidence of actual malice as required by *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. Finally, we tackle Rocker appellants' assertions that Overstock did not set forth evidence of actual malice or that any of the allegedly false statements in the Gradient reports were attributable to them.

1. *General Principles*

Libel, a form of defamation "is a false and unprivileged publication by writing ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which ... has a tendency to injure him in his occupation." (Civ.Code, §§ 44, subd. (a), 45.) A statement that is defamatory without the need for explanatory matter such as an inducement, innuendo or other extrinsic fact, constitutes "a libel on its face." (*Id.*, § 45a.) Defamatory language that is not libelous on its face is not actionable unless the plaintiff proves special damages as a proximate result of the libel. (*Ibid.*)

[7][8] Where, as here, the plaintiff is a limited public figure, [FN10] he or she must prove by clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or fals-

ity. (*New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279-280, 84 S.Ct. 710; *Ampex Corp. v. Cargle, supra,* 128 Cal.App.4th at pp. 1577-1578, 27 Cal.Rptr.3d 863.) In the context of an anti-SLAPP suit, the limited public figure who sues for defamation must establish a probability that he or she can produce such clear and convincing evidence. (*Ampex Corp. v. Cargle, supra,* at p. 1578, 27 Cal.Rptr.3d 863.)

> FN10. The parties do not dispute that the Overstock plaintiffs are limited public figures.

*701 In *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (*Milkovich* ), the United States Supreme Court moved away from the notion that defamatory statements categorized as opinion as opposed to fact enjoy wholesale protection under the First Amendment. Significantly, the court recognized that "expressions of 'opinion' may often imply an assertion of objective fact." (*Id.* at p. 18, 110 S.Ct. 2695.) The court went on to explain: "If a speakers says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications...." (*Id.* at pp. 18-19, 110 S.Ct. 2695.)

[9][10][11] Thus a false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable. (*Milkovich, supra,* 497 U.S. at p. 19, 110 S.Ct. 2695.) The key is not parsing whether a published statement is fact or opinion, but "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." **40(*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385, 10 Cal.Rptr.3d 429, citing *Milkovich, supra,* 497 U.S. at p. 19, 110 S.Ct. 2695, among other authority.) And, when deciding whether a statement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255

**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

communicates or implies a provably false assertion of fact, we use a totality of the circumstances test. *(Franklin v. Dynamic Details, Inc., supra,* at p. 385, 10 Cal.Rptr.3d 429.) This entails examining the language of the statement. " 'For words to be defamatory, they must be understood in a defamatory sense.... [¶] Next, the context in which the statement was made must be considered.' " *(Id.* at pp. 385-386, 10 Cal.Rptr.3d 429, quoting *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260-261, 228 Cal.Rptr. 206, 721 P.2d 87.) The contextual analysis requires that courts examine the nature and full content of the particular communication, as well as the knowledge and understanding of the audience targeted by the publication. *(Baker v. Los Angeles Herald Examiner, supra,* at p. 261, 228 Cal.Rptr. 206, 721 P.2d 87.)

2. *The Arguments of the Gradient Appellants*

a. *The Allegedly False Statements Concerning Accounting Irregularities*

Overstock has accused Gradient of repeatedly making statements in its reports that state or imply that the company intentionally falsified its accounting reports in order to defraud investors. According to Chidester, effective July 1, 2003, due to a change in its operations that resulted in the company *702 assuming an inventory risk, it began accounting for revenue received in fulfillment partner transactions on a gross basis as opposed to a net basis. Its outside auditor determined that the change was proper and met the appropriate criteria set forth by the Financial Accounting Standards Board (FASB).

Nonetheless, Gradient relentlessly attacked Overstock's revenue recognition accounting. For example, the August 26, 2004 EQA alert stated: "[T]he most important update in this *Alert* is new evidence indicating that *there is literally 'no there there' with respect [to] OSTK's claimed motivation for changing its revenue recognition model. As a consequence, we believe that it is misstating revenues through a substantive violation of GAAP."* [FN11] Gradient also explained its reasoning: "As we show, *the amount of risk borne by OSTK is vir-*

*tually nil and, as a consequence, we believe that its use of gross method revenue recognition violates the intent (if not the form) of GAAP."* [FN12] The report reiterates: *"[W]e do not believe that OSTK's accounting choice is compliant with current accounting practice.* In this regard, *we believe that the company has materially overstated its sales since July 1, 2003 and that its assertions about the economic activity of the firm are misleading.* A further concern is the likelihood that the company's sole motivation for this change was the desire to report higher revenues--presumably to fit the **41 company's story with respect to the projected growth in and level of revenues."

> FN11. GAAP is the acronym for generally accepted accounting principles.

> FN12. The risk referred to is the inventory risk with respect to fulfillment partner sales transactions. Inventory risk, in turn, relates to product returns. In that regard, this same Gradient report stated: *"[I]it appears that OSTK does little more than provide a software interface for the partner to use in the vast majority of returns. OSTK only appears to accept the burden of return in one specific instance--'buyer's remorse' ."* These matters were reiterated in the November 3, 2004 research report, which stated: *"In our opinion, the company does not appear to take on any meaningful amount of general inventory risk "* and *"the primary causes for returns"* would appear to be causes other than buyer's remorse.

Similarly, the September 24, 2004 EQA bulletin asserted that "OSTK's change in revenue recognition policy was a highly questionable move," indicating that the reporters "don't believe that OSTK's claimed reasons for the change are valid or defensible. Rather, *our view is that the company changed its revenue policy in order to drive its share price higher (and give Mr. Byrne[* [FN13]] *a chance to meet his seemingly unattainable sales goal of $2 billion by 2006).*" Toward the end of the report

Case 5:07-cv-03795-JW    Document 45    Filed 08/23/2007    Page 19 of 30

61 Cal.Rptr.3d 29                                                                                            Page 12
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)

Gradient wraps it up: *"This is the type of accounting policy choice that we believe the SEC would be very interested in looking at."*

FN13. Patrick Byrne is the chief executive officer of Overstock.

Further, the November 3, 2004 research report expressed Gradient's *"professional opinion that any argument to the effect that gross revenue *703 recognition is 'preferred' or 'appropriate' is complete balderdash.* Nothing more than searching for answers in the market for excuses."* Gradient also sought to tie the resignation of Overstock's chief financial officer (CFO) FN14 to the change in revenue recognition practices: *"The contemporaneous nature of (1) the change in revenue recognition model and (2) the resignation of the CFO was (and still is) a significant concern."* And in an appendix Gradient repeated its belief "that the company is violating GAAP due to the use of gross method revenue recognition."

FN14. On August 22, 2003, Gradient accurately reported that Jason Lindsey, Overstock's president and CFO, had resigned to devote more time to a family health matter, and that he would remain at Overstock in a limited, advisory role. Nonetheless Gradient treated this departure as a red flag, explaining that "[t]he departure of a CFO is necessarily a concern as it can be an indication of latent accounting irregularities or internal, accounting-related disputes." The bulletin concluded that Lindsey's departure lent "credence" to Gradient's concerns.

Additionally, in its February 4, 2005 research report Gradient reported: "We have also argued that a change in revenue recognition was implemented in H2 2003 in an effort to bolster the company's efforts to drive revenues and share price even higher--though management has vehemently denied our theory in regards to its revenue recognition change. Although we strongly disagree with the revenue recognition change, we avoid further discussion of the issue in this report...."

That report also stated that Overstock's cash flow was artificially boosted in 2004 and its "operating cash flow was severely overstated by float cash in 2004." This item was substantially repeated in seven EQA greatest concerns listings issued thereafter, through April 19, 2005.

1. *The Assertions:* Gradient appellants insist that the highlighted statements are nonactionable speech because they are either (1) "opinions based on fully disclosed fact"; (2) "rational interpretations of ambiguous sources"; (3) "statements embodying complex and debatable technical judgments"; or (4) "statements too inexact or subjective to be proven true or false." Overstock counters that the contested material implies defamatory statements of fact that can be objectively verified and as such these statements are actionable as provably false statements of fact. We think Overstock has the better argument.

[12][13][14] 2. *The Publications Can be Understood as Implying Defamatory Statements:* As the trial court pointed out, the Gradient reports were "liberally couched in terms of opinion." (Capitalization omitted.) However, statements in the **42 publications do not attain constitutional protection simply because they are sprinkled with words to the effect that something does or does not "appear" to be thus and so; or because they are framed as being "in our *704 opinion" or as a matter of "concern." We line up with Division One of this District: "In the same manner that the *Milkovich* court rejected the concept that preceding an assertion of defamatory fact by the language 'in my opinion,' should insulate the speaker from a defamation action, we reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' or even putting it in the form of a question, necessarily defuses the impression that the speaker is communicating an actual fact. [¶] The use of interrogative language alone does not entitle statements to constitutional protection where, as here, they otherwise can be understood as implying defamatory fact." *(Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1004, 283 Cal.Rptr. 644, fn. omitted.)

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

Without question, the reports reasonably could be understood as implying that Overstock changed its accounting methodology in order to boost revenue figures artificially; the change was a substantive violation of GAAP that led to continuing material overstatements of revenue; the company knowingly inflated its cash flow; and the president and CFO resigned as a result of these transgressions. In other words, Overstock was "cooking the books" and manipulating accounting procedures to boost the price of its stock. These implications are strengthened by the sheer flurry of negative reports, as well as by the stylistic emphasis placed on key phrases. And, as we discuss below, Chidester presented evidence of the falsity of these implications. Thus, the publications reasonably could be understood as implying provably false assertions of fact. (*Milkovich, supra, 497 U.S. at p. 19, 110 S.Ct. 2695.*)

Gradient nonetheless touts the fact that the reports ran a disclaimer that the information in them "reflects our judgment at the time of original publication and is subject to change without notice." But wrapping an article around a disclaimer that the contents represented a "judgment" does not conclusively resolve the dispositive question—whether a reasonable fact finder could conclude that the publication declares or implies a provably false assertion of fact. (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471, 37 Cal.Rptr.3d 133.)

[15] Gradient also urges that its "critical opinion" of Overstock's accounting change was based on nondefamatory, disclosed facts. However, Chidester refuted the truth of certain disclosed factual bases concerning the impropriety of Overstock's financials, namely that it bore no meaningful inventory risk; the primary causes for return are causes other than buyer's remorse; and the company did little more than provide a software interface for the majority of *705 returns. [FN15] Even where the **43 speaker states facts upon which he or she bases an opinion, if the facts are incorrect or incomplete, or if the speaker's assessment of them is erroneous, the statement can still imply an actionable statement. (*Milkovich, supra, 497 U.S. at pp. 18-19,*

110 S.Ct. 2695.)

FN15. Chidester stated: "Gradient asserts that Overstock has no real inventory risk with respect to fulfillment partner sales transactions because Overstock is responsible only for the category of returns described as 'buyer's remorse.' ... Contrary to the assertion that Overstock 'does not appear to take on any meaningful amount of general inventory risk,' ..., between 60% and 70% of returns are for 'buyer's remorse.' Fulfillment partner transactions comprise over half of the company's business. Thus, the statement that it bears no real inventory risk is provably false." (Italics omitted.)

Gradient suggests that its choice of the word "meaningful" is too inexact and subjective to be proven true or false. Even if true, other statements, such as that the risk was "**virtually nil**" and Overstock does "**little more than provide a software interface for the partner to use in the vast majority of returns**" are capable of being proven false by Chidester's declaration.

3. *The Context and Tenor of the Publications Do Not Negate the Impression that the Defamatory Statements were Assertions of Facts:* Taking up Gradient appellants' invitation to employ the totality of the circumstances test and examine the " 'full content of the communication' " (*Franklin v. Dynamic Details, Inc., supra,* 116 Cal.App.4th at p. 389, 10 Cal.Rptr.3d 429), we first look at these statements in their broad context. The Gradient publications are "Research Reports" and EQA bulletins, alerts, and "Greatest Concerns" lists. Gradient characterizes its reports, alerts and bulletins as presenting the firm's "unbiased, independent and objective analysis of a company's earnings quality" and tells subscribers who ask that they are prepared by professional certified public accountants and financial analysts. The tone and content is serious, and a typical subscriber would take the materials seriously.

61 Cal.Rptr.3d 29                                                                                                                Page 14
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

These publications are nothing like the commentary appearing in a financial newsletter that criticized two advertisements published by a mutual fund, and survived an action for libel. (*Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 680, 29 Cal.Rptr.2d 547.) The advertisements in that case boasted the performance of the mutual fund in five different categories. The article, entitled " 'Lies, Damn Lies, and Fund Advertisements,' " sported a drawing of a smiling court jester with the word " 'Commentary' " above it, and the name of the author. This context forewarned the reader that what followed was one person's opinion. (*Id.* at pp. 681, 693, 29 Cal.Rptr.2d 547.) Moreover, the reviewing court found the title to be " 'rhetorical hyperbole' " or " 'imaginative expression,' " the flavor of which was not lost on the sophisticated readers. (*Id.* at pp. 690-691, 29 Cal.Rptr.2d 547.) A reasonable fact finder would not conclude that the published statements implied a probably false factual assertion. Rather, the title and text suggested that the mutual fund manipulated statistics--which it did not deny--not that it lied. (*Id.* at p. 694, 29 Cal.Rptr.2d 547.)

**\*706** Moreover, Gradient holds itself out to its subscribers as having specialized knowledge in the areas of financial accounting and issues of earnings quality. Its business was built around developing reader confidence to rely on its opinions as reflecting the truth about Overstock and other frequently targeted companies. (See *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 904, 17 Cal.Rptr.3d 497.) Indeed, Gradient tracked its ability to move the price of a stock based on its reports, and used this tracking information to promote itself with hedge fund clients and others.

Gradient also asserts that the readers would understand that the reported data involved questions that were inherently technical, complex, subjective and debatable, raising reasonably debatable questions of interpretation. [FN16] For example, Gradient **\*\*44** characterizes one of its reports as *a disagreement* between Gradient analysts and Overstock management about how to interpret the change in Overstock's revenue recognition policy, which amounted to a technical issue for which there was no right or

wrong answer. Gradient is wrong. There is a right or wrong answer to whether in multiple reports Gradient made false statements of fact that are objectively verifiable and provably false, for example, that Overstock's accounting violated GAAP, with the implication that Overstock falsified its financials to mislead investors. That is what this lawsuit is all about. *Jefferson Sch. Dist. R-1 v. Moody's Investor's, supra,* 175 F.3d 848 is readily distinguishable on this basis.

> FN16. Among other authority, Gradient appellants cite *Jefferson Sch. Dist. R-1 v. Moody's Investor's* (10th Cir.1999) 175 F.3d 848, wherein the reviewing court held that a bond rater's article indicating that a school district's ongoing financial pressures contributed to a negative outlook did not imply a provably false statement about the district's creditworthiness. The statement was so vague and the range of factors that could cause financial pressures so vast that the district--which had not pinpointed more specific statements or factors discernable from the bond rater's general negative assessment--could not prevail. (*Id.* at pp. 850-851, 855.)

[16] 4. *Evidence of Falsity:* Chidester declared that Overstock's revenue-recognition accounting is dictated by GAAP; approved by outside auditors; reflects the substantial inventory risk the company has with respect to fulfillment partner sales transactions; and is not driven by any effort to increase the company's reported revenues. Further, the accounting change from net to gross revenue recognition was evaluated by outside auditors according to criteria set forth by the FASB, and the auditor's national office determined that the change was proper.

With respect to the issue of operating cash flow, Chidester stated that the accounting pronouncement FAS 95, which would be of common knowledge to any certified public accountant, describes cash flow statements and defines operating cash flows as "operating cash inflow minus operating cash outflow." The company's statements of operating cash flow

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29                                                                                      Page 15
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

derive directly from *707 that definition and are proper in all respects. Chidester concluded that "Gradient's repeated implication that Overstock engaged in accounting irregularities in reporting its operating cash flows for 2004 is therefore also provably false...." [FN17]

> FN17. Gradient comments that Chidester's testimony is "conclusory, improper, and inadmissible" yet the firm does not challenge the trial court decision *overruling* its objections to this declaration. Therefore, any objection to the declaration is waived.

Chidester declared he was familiar with and responsible for the company's financial statements and accounting. Taking the evidence in his declaration as true, it was sufficient to establish a probability that Overstock would prevail in demonstrating the falsity of Gradient's assertions that the company engaged in accounting irregularities with respect to revenue recognition accounting and operating cash flow, and the implication that it did so to mislead investors.

b. *Purchase of Bulk Diamonds*

In late 2004, an entity specializing in the diamond industry purchased bulk diamonds at below market price on behalf of Overstock, with funds from Overstock. For GAAP purposes, under a FASB interpretation, the entity that purchased the diamonds is defined as a variable interest entity (VIE). Per the accounting rules, once an entity is determined to meet the definition of a VIE, its financial statements are consolidated with the company with which it transacted the particular business matter.

In a series of reports Gradient attacked the structure of the transaction, in effect accusing Overstock of acting improperly in selecting a VIE to purchase diamonds. For example, Gradient "believed" that "the **45 use of the VIE is likely to reflect the use of clever accounting" and will allow Overstock to *"report the top line benefits of the jewelry business without reporting 100% of the unit's losses."* In another report the firm indicated Overstock would only have to report 50 percent of the VIE's losses

and that it believed *"the use of the VIE lacks economic substance and is likely motivated purely by cosmetic earnings management."* Similar statements were repeated in four other publications.

Chidester declared that these statements were false because all components of the VIE's financial statements would be incorporated into and reported within Overstock's financial statements; the use of the VIE is required and proper under the accounting rules in all respects; and considerations of " 'cosmetic earnings management' " did not play any role in structuring the transaction. With this declaration Overstock established its prima facie case. *708 Again, Gradient criticizes Chidester's declaration as conclusory and inadmissible, but does not challenge the trial court decision overruling its objections to it.

c. *Stock Buy-back Program*

Gradient also assailed Overstock's stock buy-back program in a number of publications, calling it ill advised, and estimating the company was "on the hook to pay out an additional $13.9 million (or deliver shares of an equivalent amount) at the market price on May 3, 2005. While OSTK's share price could rise or fall (further) before any settlement, we do not believe that it is appropriate to gamble with shareholder funds in this fashion." In a later publication, Gradient asserted that "[t]he risk exposure is born by OSTK, leading to further dilution if OSTK shares continue to underperform." Still later it announced that "the plan has backfired thus far, as OSTK's share price has fallen well below the strike price."

Again, Chidester declared that the assertions that Overstock subjected shareholders to a substantial risk and was on the hook for millions of dollars were false. He explained that the total amount Overstock could be required to pay out under the program was fixed from inception and publicly reported; there was no basis for the claim that the company would or could have any additional payout obligation; and nothing in the company's public filings implied that additional cash would have to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

be paid. Indeed, Gradient later admitted that the as-
sertion that Overstock was on the hook for millions
of dollars was mistaken.

Gradient reverts to its refrains that its "opinion"
was couched with a sprinkling of subjective words
such as "believe" and "estimate" and that the gist of
its comments remained true even if the $13.9 mil-
lion "estimate" was inaccurate. Wrapping an asser-
tion of defamatory fact or an implied defamatory
statement around these terms does not mitigate the
impression that the reports, taken as a whole, imply
that Overstock put its shareholders in harm's way
by implementing a stock buy-back program. (See
_Weller v. American Broadcasting Companies, Inc.,_
_supra, 232 Cal.App.3d at pp. 1003-1005, 283_
_Cal.Rptr. 644.)_

### d. _Gradient's "Gist" Argument is Not Persuasive_

Quoting from the November 3, 2004 research re-
port, Gradient maintains that the overarching theme
of the entire series of articles, viewed over time,
was its repeated mantra of a "fatal flaw" in Over-
stock's business model, namely the "exceptionally
high rate of customer churn" that left the company
with "no choice but to spend ever increasing
amounts for customer acquisition, or see its sales
falter." Due to this **46 fatal flaw, Gradient con-
cluded that the *709 company's stock was overval-
ued and a bad investment. Citing _Carver v. Bonds,_
_supra, 135 Cal.App.4th 328, 37 Cal.Rptr.3d 480,_
Gradient reasons that because Overstock does not
challenge the "fatal flaw" commentary, which it
posits is the "gist" of the 50-plus articles, the art-
icles are constitutionally protected.

_Carver_ does not help Gradient. There, a chiropract-
or challenged a single article published by a news-
paper. The gist of the article was that the plaintiff
exaggerated his relationships with famous athletes
to market his practice. Allegations to that effect
were substantially true. The one allegedly false
statement--that the plaintiff boasted of a 100 per-
cent success rate--"was at most a minor instance" of
the type of behavior others reported at length in the
article and would not have affected the reader's

view of him. This minor error regarding a passing
reference to a boast could not sustain a defamation
claim. _(Carver v. Bonds, supra, 135 Cal.App.4th at_
_pp. 357-359, 37 Cal.Rptr.3d 480.)_

In contrast, Gradient's allegations of fraudulent ac-
counting, inappropriate gambling with shareholder
funds and accusations concerning Overstock's use
of a VIE do not constitute a single straying from the
main story line, nor are they minor factual errors.
Rather, these critiques were repeatedly put before
readers and were part and parcel of Gradient's on-
going negative coverage and assessment of the
company. More to the point, it is one thing to as-
sault a company's business model and quite another
to assault the company's leadership as committing
accounting fraud, gambling with shareholder funds,
and the like.

### e. _Malice_

[17][18] Limited public purpose figures who sue
for defamation, such as the Overstock respondents,
"must establish a probability that they can produce
clear and convincing evidence that the allegedly de-
famatory statements were made with knowledge of
their falsity or with reckless disregard of their truth
or falsity. [Citations.] ... [¶] ... [¶] Actual malice
may be proved by circumstantial or direct evidence.
[Citation.] However, we will not infer actual malice
solely from evidence of ill will, personal spite or
bad motive. [Citation.]" _(Ampex Corp. v. Cargle,_
_supra, 128 Cal.App.4th at pp. 1578- 1579, 27_
_Cal.Rptr.3d 863.)_

[19][20] " '[E]vidence of negligence, of motive and
of intent may be adduced for the purpose of estab-
lishing, by cumulation and by appropriate infer-
ences, the fact of a defendant's recklessness or of
his knowledge of falsity.' [Citations.] A failure to
investigate [citation], anger and hostility toward the
plaintiff [citation], reliance upon sources known to
be unreliable [citations], or known to be biased
against the plaintiff [citations]--such factors may, in
an appropriate case, indicate that the publisher him-
self had serious doubts regarding the *710 truth of
his publication." _(Reader's Digest Assn. v. Superior_

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

_Court (1984) 37 Cal.3d 244, 257-258, 208 Cal.Rptr. 137, 690 P.2d 610,_ fn. omitted.)

[21] The trial court held that the Anifantis declaration constituted prima facie evidence demonstrating that Gradient's predecessor (Camelback) published special reports on Overstock in reckless disregard of the truth. We concur.

The evidence showed that Gradient's way of doing business was to allow customers such as Rocker appellants to order custom reports; provide information to Gradient on the target company and request that it be used; instruct the principals to produce a positive or negative report and discuss the report in detail with **47 them. Gradient in turn frequently altered the report to meet customer requests and expectations. The special reports were not the product of an unbiased view of the target companies. Instead, the customer paid for a report that would heavily favor its negative view of the target. Nonetheless, Gradient advertised its reports as independent and objective.

Gradient tracked the stock performance of the reported companies, listing the "Top Ten" whose stock performed in accordance with the rankings given by Gradient. An aspect of Gradient's marketing strategy was to show potential and existing customers the results of this tracking in order to demonstrate its ability to predict and affect stock performance.

In keeping with the publisher/customer relationship described above, Rocker appellants requested reports on Overstock that contained more negative information, or emphasized specific negative facts and downplayed positive facts. Gradient knew that Rocker Partners was "a devoted short." During prepublication calls, Rocker frequently requested more negative treatment of Overstock than was reflected in the report, or suggested augmentation or strengthening of a negative aspect. He received drafts in advance and suggested changes underscoring negative items, sometimes requesting adding additional negative facts or a perspective making facts appear more negative. Anifantis noted specific

language that ended up in final disseminated versions of reports after Rocker requested that Vickrey include such language. Rocker also on several occasions requested that Gradient hold off on publication for a period so he could take a position in the stock. It was common knowledge that Rocker wanted Gradient to publish frequent, negative reports on Overstock and that he spoke frequently with Vickrey about this matter. Anifantis indicated that based on telephone calls he participated in with Rocker and Vickrey, it appeared that Vickrey accommodated Rocker's requests to publish negative information for the purpose of negatively influencing the price of Overstock shares so Rocker could profit from short positions in Overstock shares and Gradient could gain favor with Rocker.

*711 This picture establishes Overstock's minimum burden defending against the anti-SLAPP motions. It shows that Gradient colluded with Rocker to publish reports that met the negative expectations of Rocker in order to please Rocker and drive down the value of Overstock's stock. (See _Suzuki Motor Corp. v. Consumers Union of U.S._ (9th Cir.2003) 330 F.3d 1110, 1135: evidence that the defendant sought to produce a predetermined result in a product test-- in other words, that it rigged the test--demonstrated awareness of the probable falsity of the negative product rating and was sufficient to preclude summary judgment on the issue of malice.) This model of doing business resulted in reports with defamatory statements and implications about the company's accounting practices, stock buy-back program and diamond investment efforts. Through the company's form 10-Q filings and conference calls held during 2003, Gradient was repeatedly advised, contrary to its false statements, that the change in revenue recognition did not violate GAAP. Similarly, there was no basis for the accusations about Overstock being on the hook for additional funds and gambling with shareholders' money with respect to the stock buy-back program, or for implying that Overstock improperly used a VIE to purchase diamonds.

Gradient appellants insist that unless the dots can be connected between "the allegedly Rocker-sup-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255

**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

plied statements identified by Anifantis" and "the allegedly false and defamatory statements identified by **48 Chidester," Overstock cannot satisfy the malice requirement. The point here is not that Rocker supplied the specific false statements and implications discussed in this opinion, but that the business model and way of doing, promoting and retaining business hinged on producing biased reports that were rigged to please the customer's expectations. In producing those biased reports, clients such as Rocker, who want a preconceived result from the reports, provide information to Gradient, ask for changes, suggest amplifying negative aspects, plot the timing of the release of reports with Gradient, again, all as a matter of course. This model supports an inference of malice, namely that Gradient relied on information from biased sources, made statements in its reports without doing the necessary investigation and due diligence, and made statements with defamatory implication to achieve a preconceived result. This dynamic, described in detail by Anifantis, suffices to show a reasonable probability that the statements discussed above were made with actual malice. That Gradient promoted itself as independent and objective when the opposite was true cinches our conclusion.

Gradient appellants also maintain that the publisher's purported financial interest in lowering Overstock's share price is not probative of malice because malice cannot be inferred alone from evidence of ill will or intention to injure. But again Gradient misses the point. There was no independent ill will or malice, or desire to injure, Overstock. The malice is in the very business model and practices that preordain negative reports and provides probative *712 evidence that Gradient acted in reckless disregard of the truth in making the false statements and implications that it did.

### 3. *The Arguments of Rocker Appellants*

[22] Rocker appellants first assert that because the statements in the Gradient reports that were attributed to them by Anifantis were not alleged to have been false or otherwise are nonactionable, Overstock has no libel claim against them. But Over-

stock's libel claim is not based on any particular statement that Rocker appellants insisted be included in the reports. Rather, it stems from their involvement in the publication of the reports on Overstock that included defamatory statements.

[23][24] One who takes a responsible part in a publication of defamatory material may be held liable for the publication. (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1245, 7 Cal.Rptr.3d 576, 80 P.3d 676.) Thus, participating in publication of an article as editor can subject a person to liability. (*Jones v. Calder* (1982) 138 Cal.App.3d 128, 134, 187 Cal.Rptr. 825.) However, liability will not attach to a business manager of a newspaper published in a foreign language he or she did not understand, where there was no evidence the manager exerted control over editorial staff and it was undisputed he or she had no advance knowledge of the preparation or contents of the defamatory articles. (*Sakuma v. Zellerbach Paper Co.* (1938) 25 Cal.App.2d 309, 321-322, 77 P.2d 313). Nor is financial contribution to a political campaign a sufficient hook for liability where the contributor is not involved in the preparation, review or publication of the allegedly defamatory campaign literature. (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 549, 46 Cal.Rptr.2d 880.)

Rocker appellants maintain that Overstock did not produce any evidence that they played a responsible part in the publication of any of the Gradient reports. We disagree. The evidence adduced showed that Rocker appellants initiated a negative campaign against Overstock in 2003, before becoming a Gradient subscriber, soliciting frequent, negative reports on the **49 company. Rocker was in regular telephone contact with Vickrey concerning the substance of the reports and frequently requested that the reports contain more negative information or emphasize negative facts. He received and reviewed the Overstock reports in advance of publication, exercised editorial influence over the substantive content of the reports, and controlled the timing of publication. With this evidence Overstock made a prima facie showing that Rocker appellants played a responsible part in the publication of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

subject reports.

Rocker appellants also dispute that there was evidence to support a showing of actual malice. Again, we disagree. The exercise of editorial *713 influence, the presence of a strong financial interest in driving down the price of Overstock's shares, and the control of timing of publication all play a circumstantial role in our analysis. Moreover, by virtue of Rocker appellants' very involvement in preparation of the Gradient reports on Overstock, they had direct knowledge that, contrary to Gradient's public assertion that their reports were independent and objective, in reality the publications were subject to manipulation by interested parties. From this collusion and knowledge one reasonably could infer that Rocker appellants had reason to doubt the reports. [FN18]

> FN18. By way of example, one of the statements that, according to Anifantis, Gradient included in a report at the request of Rocker appellants is the following: "For the record, while we do occasionally take on 'custom report requests' from clients (less than 5% of our output historically), we have *never* received a custom report request on OSTK. We initiated coverage on OSTK more than a year ago based on our quantitative screens and subsequent detailed analyses." This statement appeared in a lengthy "Research Report" on Overstock issued November 3, 2004. Although the record does not indicate that Rocker appellants specifically ordered "custom reports" on Overstock, the record is clear that by the time of the November 2004 report, Rocker appellants were enmeshed in their relationship with Gradient in pursuit of the negative campaign against Overstock.

C. *Intentional Interference with Prospective Economic Advantage*

[25][26][27] To establish a prima facie case of intentional interference with prospective economic advantage, a plaintiff must demonstrate (1) an economic relationship between the plaintiff and a third party, with a probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of this relationship; (3) intentional and wrongful conduct on the part of the defendant, designed to interfere with or disrupt the relationship; (4) actual disruption or interference; and (5) economic harm to the plaintiff as a proximate result of the defendant's wrongful conduct. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 241, 26 Cal.Rptr.3d 798.) A plaintiff's burden includes pleading and proving "that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393, 45 Cal.Rptr.2d 436, 902 P.2d 740.) We consider an act independently wrongful "if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159, 131 Cal.Rptr.2d 29, 63 P.3d 937, fn. omitted.)

Both sets of appellants argue that if Overstock does not prevail on its libel claim, it cannot succeed on its intentional interference claim, since liability for that tort cannot rest on mere expressions of opinion to a third party. (See **50*Morningstar, Inc. v. Superior Court, supra,* 23 Cal.App.4th at p. 696, 29 Cal.Rptr.2d 547.) We have dispelled this concern in part II.B., *ante.*

*714 D. *UCL Claim*

The UCL cause of action alleged: "Gradient's knowing and intentional dissemination of negative reports on Overstock containing false and/or misleading statements concerning Overstock, and without disclosing the input of the Rocker Defendants ..., and Rocker's knowing and intentional false statements concerning Overstock, constitute unlawful, unfair, or fraudulent business acts or practices by the Defendants ..., in violation of Business and Professions Code §§ 17200, *et seq.* and §§ 17500,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29                                                                                                     Page 20
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

*et seq.*"

Appellants repeat their unsuccessful arguments that this claim must fall with the faulty libel claim. Gradient appellants also suggest that this cause is limited to the defamatory reports, but, as can be seen from the above quote, it is not. They also attack the UCL claim as improperly requesting injunctive relief amounting to an unconstitutional prior restraint. But Overstock is not seeking to enjoin speech; it is seeking to enjoin unfair business practices.

In its reply brief, Gradient appellants contend that Overstock did not present any evidence that the business practices at issue--such as failing to disclose Rocker's participation in the reports and claiming to be unbiased and objective--were likely to deceive a reasonable consumer, citing *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538, 833 P.2d 545. [FN19] Overstock submitted evidence that, unbeknownst to Gradient subscribers, Rocker colluded with Gradient in preparing the negative, defamatory reports about Overstock and Gradient falsely held itself out as publishing unbiased and objective reports. Unquestionably a reasonable implication of this evidence is that the Gradient subscribers would likely be deceived by the nondisclosure and falsehood.

> FN19. Gradient also asserts that Overstock's brief on the UCL cause of action represents a 180-degree turn from the theories argued at trial. Gradient's argument is not persuasive. It takes too narrow a view of the pleadings and papers submitted in the trial court.

Rocker appellants further take umbrage with the trial court's ruling that this cause of action "does not involve a 'securities transaction.' (See *Bowen v. Ziasun Technologies, Inc.* (2004) 116 Cal.App.4th 777, 788, 11 Cal.Rptr.3d 522.)" (Capitalization omitted.) This ruling on a substantive point of law was handed down in conjunction with the trial court's order overruling Gradient's demurrer to two causes in the first amended complaint, not as part of

the order denying the special motions to strike. However, since Rocker appellants also raised this issue in their motion to strike, we address it.

The plaintiffs in *Bowen* were investors who alleged they were defrauded by a pyramid or Ponzi scheme orchestrated by the company from which they purchased stock. The reviewing court held that securities transactions were ***715** exempt from the UCL, reasoning that Business and Professions Code section 17200 mirrors the Federal Trade Commission (FTC) Act; historically the FTC has not viewed that legislation as reaching securities transactions; and many other states considering whether securities violations were actionable under their consumer protection statutes concluded they were not. (*Bowen v. Ziasun Technologies, Inc., supra*, 116 Cal.App.4th at pp. 788-790, 11 Cal.Rptr.3d 522.) Whether one agrees with *Bowen* or **51** not, [fn20] ITS HOLDING THAT securities transactions are not covered under the UCL bars lawsuits based on deceptive conduct in the sale and purchase of securities, nothing more. *Overstock's claims do not arise from any stock transactions between the parties.* Rather, they arise from the allegedly defamatory reports published by Gradient, Gradient's business practices in producing such reports and Rocker appellants' role in this wrongdoing.

> FN20. The Attorney General has filed an amicus brief on this issue arguing, among other points, that *Bowen* was wrongly decided.
> CFA Institute also filed an amicus brief as did the Reporters Committee for Freedom of the Press, along with the Copley Press, Inc. and the Bakersfield Californian.

[28] Rocker appellants argue nonetheless that transactions more broadly relating to the securities market are also beyond the reach of the UCL, turning to, among other authority, *Spinner Corp. v. Princeville Development Corp.* (9th Cir.1988) 849 F.2d 388, which the *Bowen* court found instructive (*Bowen v. Ziasun Technologies, Inc., supra*, 116 Cal.App.4th at p. 788, 11 Cal.Rptr.3d 522). In *Spinner*, the plaintiff launched a hostile tender offer

against Princeville. During litigation brought by Spinner to invalidate certain antitakeover provisions that Princeville had adopted earlier, Princeville learned that confidential information had been provided to Spinner. Princeville counterclaimed for deceit under Hawaii's "baby FTC Act." The question for the Ninth Circuit was whether the act applied to conduct "ordinarily associated with securities transactions." *(Spinner, supra,* at p. 390.) Concluding that the Hawaii consumer protection statute did not encompass such transactions, it relied in part on a provision directing that the statute "be construed in accordance with the judicial interpretation of similar federal antitrust statutes." *(Id. at pp. 390-391.)* The Hawaii statute was nearly identical to a provision of the FTC Act, and that act had not been applied in a securities context since 1923. *(Id. at p. 391.)*

In contrast, the California UCL contains no directive to interpret our consumer protection statute consistently with the FTC Act, and is thus distinguished from the Hawaii law on this basis. (See *Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 355, footnote 8, 95 Cal.Rptr.2d 258, further holding that California's UCL "has always been given a broad and sweeping ambit by our Legislature and our Supreme Court. [Citations.] The UCL contains no language supporting an exclusion for *716 securities, and under the plain language of the UCL, we cannot create such an exclusion.") Indeed the sweeping language of the UCL is intended " 'to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur.' " *(Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181, 83 Cal.Rptr.2d 548, 973 P.2d 527.)

Although, as Overstock points out, *Roskind* addressed the ultimate question of whether federal securities law preempts a UCL claim relating to securities transactions, the court began its analysis with a review of the broad precedents underpinning the UCL. It concluded that the UCL potentially *could* provide a remedy for the securities violation at issue if not preempted by federal law in that con-

text. *(Roskind v. Morgan Stanley Dean Witter & Co., supra,* 80 Cal.App.4th at pp. 350-351, 95 Cal.Rptr.2d 258.)* This ruling thus was integral to its determination that federal securities law *did not* preempt the plaintiff's UCL claim. *(Id. at pp. 352-356, 95 Cal.Rptr.2d 258.)*

**52 [29] Rocker appellants also charge that Overstock lacks standing to bring its UCL claim because it did not plead it "suffered injury in fact and has lost money or property as a result of" the alleged misconduct as required by Business and Professions Code sections 17204 and 17535. Their theory is that Overstock was not deceived by the Gradient reports and therefore it is relying on a " 'fraud on the market' " theory "as a substitute for actual inducement in pleading proximate causation." This approach, they claim, has been roundly rejected by courts in other states applying their consumer protection statutes with similar proximate cause language. First, to state the obvious, the authority cited is from other jurisdictions, and does not construe or apply the broad mandate of the California UCL. Second, each is a consumer class action involving false advertising claims in which the defendant is accused of artificially inflating the price of a consumer commodity. *(Oliveira v. Amoco Oil Co.* (2002) 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 155-156 [gasoline]; *Weinberg v. Sun Co., Inc.* (2001) 565 Pa. 612, 777 A.2d 442, 443-445 [same]; *New Jersey Citizen Action v. Schering-Plough* (2003) 367 N.J.Super. 8, 842 A.2d 174, 176 [allergy medication].) Thus, unlike the present case, the harm to the plaintiffs in the cited cases stemmed from the effect of the defendants' actions on the consumer market. Third, Overstock's purported damage does not stem from reliance on, or deception by, the Gradient reports. Rather it has pleaded "unlawful, unfair, or fraudulent business acts or practices" resulting in diminution in value of its assets and decline in its market capitalization and other vested interests. This meets the statutory requirement of "injury in fact" resulting from defendants' misconduct.

*717 E. Claim for Violation of Corporations Code Section 25400*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29    Page 22
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
**(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)**

[30] Respondents Barron and Helburn, former owners of Overstock common stock, alleged that Rocker appellants engaged in concerted wrongful actions designed to wrongfully depress the price of Overstock's common stock for their financial benefit. This cause was brought under California's securities antifraud statute, Corporations Code section 25400. This statute "provides that it is unlawful in this state to make false statements or engage in specified fraudulent transactions which affect the market for a security when done for the purpose of inducing purchase or sale of the security or raising or depressing the price of the security. In short, it prohibits market manipulation." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1040, 80 Cal.Rptr.2d 828, 968 P.2d 539, fn. omitted.) Corporations Code section 25500 creates a remedy for buyers or sellers of stock damaged by the forms of market manipulation banned by section 25400.

Rocker appellants argue that Overstock cannot prevail on this claim because the company has not submitted any evidence that they made a "false or misleading" statement or had "reasonable ground to believe" any such statement was false (Corp.Code, § 25400, subd. (d)), or that they traded in a manner which created a misleading market in Overstock's shares (*id.*, subds. (a), (b)).

As laid out in part II.B. *ante*, Overstock provided prima facie evidence that Rocker appellants willfully participated in a wrongful scheme to depress the price of Overstock's stock by, among other things, participating in the development and publication of false statements concerning Overstock; concealing their role in deciding the tenor and content of the reports, giving lie **53 to the assertion that the reports were independent and objective analyses; and delaying publication to facilitate establishing a short position in the stock. The trial court properly denied Rocker appellants' special motion to strike this cause of action.

F. *Causation*

Wrapping up their case against Overstock, the Rocker appellants are convinced Overstock cannot demonstrate probability of success on any cause of action for want of establishing causation of any damages. First they reiterate that there is no tie between the statements attributed to them and a decline in the Overstock share price. Again, liability was never premised on those statements; liability is premised on Rocker's participation in the preparation of negative reports falsely represented to be independent and unbiased, containing provably false assertions for the purpose of financial gain.

*718 Next, Rocker appellants contend that Overstock was required to introduce an "event study" showing a correlation between issuance of the Gradient reports and the decline in share price. They trot out a string of federal cases involving federal securities fraud claims by shareholders against the stock issuer, each concluding that such a study was a prerequisite to recovery. For example, in *In re Northern Telecom Ltd. Securities Litigation* (S.D.N.Y.2000) 116 F.Supp.2d 446, discovery had been completed and the defendant moved successfully for summary judgment, the district court ruling, among other matters, that the testimony of the plaintiff's expert was " fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert." (*Id.* at p. 460.) Similarly, the matter of *In re Executive Telecard, Ltd. Securities Litigation* (S.D.N.Y.1997) 979 F.Supp. 1021, 1025-1026 also proceeded to the summary judgment stage. Ruling on a challenge to the plaintiff's expert witness, the district court indicated that the reliability of the expert's proposed testimony was called into question because he failed to indicate whether he had conducted an event study to determine if the defendants' stock price was affected by company-specific factors exclusive of the alleged fraud. And finally *In re Oracle Securities Litigation* (N.D.Cal.1993) 829 F.Supp. 1176, 1181 involved approval of a settlement agreement. The district court criticized the plaintiffs' expert for failing to employ an events study that would allow more precise isolation of influences of information on the stock's price behavi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Cal.Rptr.3d 29                                                                                    Page 23
151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255
(Cite as: 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29)

or.

In contrast to the above cases which were at the summary judgment or settlement stage of proceedings, here the motions to strike came at the beginning of litigation and discovery. Overstock's prima facie case of causation need not be dependent on the completion of an events study. Overstock's prima facie evidence of causation includes the following: Its stock price had been on a steady rise for several years; appellants began frequently publishing defamatory reports starting in late 2004; these reports were sent to financial journalists as well as large institutional investors, including hedge funds, that had the ability to affect the stock price with purchases, sales or shorts; appellants continued collaborating on and publishing negative reports on Overstock for the purpose of negatively influencing the price of Overstock shares so Rocker appellants could profit from existing or intended short positions; Gradient delayed publication several times so Rocker appellants could establish their short position; and the price plummet in Overstock shares **54 occurred in 2005, after the flurry of Gradient reports had gathered steam.

### *719 III. DISPOSITION

The orders denying appellants' special motions to strike are affirmed. Appellants to bear costs on appeal.

We concur: RUVOLO, P.J. RIVERA, J.

151 Cal.App.4th 688, 61 Cal.Rptr.3d 29, 07 Cal. Daily Op. Serv. 6200, 2007 Daily Journal D.A.R. 8255

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.