# EXHIBIT 26
## To Appendix to California State Authorities

Westlaw.

71 Cal.App.4th 226                                                                                     Page 1

71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337

**(Cite as: 71 Cal.App.4th 226)**

▷

DONALD SIPPLE, Plaintiff and Appellant,

v.

FOUNDATION FOR NATIONAL PROGRESS et al., Defendants and Respondents.

**No. B120358.**

Court of Appeal, Second District, Division 2, California.

Apr. 7, 1999.

SUMMARY

A nationally known political consultant who had developed campaigns for political candidates based on the prevention and punishment of domestic violence and other crimes against women brought a defamation action against a magazine that published an article on a custody dispute between plaintiff and his first wife, revealing testimony of his first and second wives that he had physically and verbally abused them. The trial court granted defendant's motion to strike the complaint pursuant to Code Civ. Proc., § 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute, which is directed against litigation filed without merit to dissuade or punish the exercise of free speech rights. The trial court also denied plaintiff's motion for further discovery. (Superior Court of Los Angeles County, No. BC176755, Ernest M. Hiroshige, Judge.)

The Court of Appeal affirmed. The court held that the trial court did not err in granting defendant's motion to strike the complaint, since the custody dispute was a judicial proceeding ( Code Civ. Proc., § 425.16, subd. (e)(1)), and the additional interviews reflected in the article concerned domestic violence, an issue of public interest ( Code Civ. Proc., § 425.16, subd. (e)(3)). The court further held that the trial court correctly concluded that plaintiff would not have prevailed in his defamation action, since the article, including that portion derived from deposition testimony, was privileged under the litigation privilege ( Civ. Code, § 47, subd.

(d)); the article, even though it expanded on specific instances of abuse, did not alter the gist and sting of the custody hearing; and plaintiff was a public figure who did not demonstrate malice. The court also held that the trial court did not err in denying plaintiff's motion for specific discovery related to the article. (Opinion by Nott, J., with Boren, P. J., concurring. Concurring and dissenting opinion by Zebrowski, J. (see p. 250).) *227

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b) Pleading § 93--Motion to Strike Pleading as a Whole--Anti-SLAPP Statute--Public Issue.
Code Civ. Proc., § 425.16, was enacted to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. These meritless suits, referred to under the acronym SLAPP, or strategic lawsuits against public participation, are subject to a special motion to strike unless the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail. A defendant making a motion to strike under Code Civ. Proc., § 425.16, subd. (e)(1) and (2), need not separately demonstrate that the statement alleged to be libelous concerned an issue of public significance. In crafting the statute, the Legislature equated a public issue with the authorized official proceeding to which it connects.

(2a, 2b, 2c, 2d, 2e, 2f, 2g, 2h, 2i) Pleading § 93--Motion to Strike Pleading as a Whole--Anti-SLAPP Statute--Showing Required of Defendant--Coverage of Statute--Likelihood that Plaintiff Will Not Prevail.
In a defamation action brought by a nationally known political consultant against a magazine that published an article on a custody dispute between plaintiff and his first wife, revealing testimony of plaintiff's first two wives that he physically and verbally abused them, the trial court did not err in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                    Page 2
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

granting defendant's motion to strike the complaint pursuant to Code Civ. Proc., § 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute, which is directed against litigation filed without merit to dissuade or punish the exercise of free speech rights. The custody dispute was a judicial proceeding (Code Civ. Proc., § 425.16, subd. (e)(1)), and the additional interviews reflected in the article concerned domestic violence, an issue of public interest (Code Civ. Proc., § 425.16, subd. (e)(3)). Furthermore, the trial court correctly concluded that plaintiff would not have prevailed in his defamation action, since the article, including that portion derived from deposition testimony, was privileged under the litigation privilege (Civ. Code, § 47, subd. (d)); the article, even though it expanded on specific instances of abuse, did not alter the gist and sting of the custody hearing; and plaintiff was a public figure who did not demonstrate malice.

[See 5 Witkin, Cal. Procedure (4th ed. 1985) Pleading, § 963.]

(3) Libel and Slander § 18--Privileged Communications--Absolute Privilege-- Legislative and Judicial Proceedings.
Reports of *228 official proceedings are not privileged merely to satisfy the curiosity of individuals, but to tell them how their government is performing. While the public may not have an overriding interest in knowing the details of every crime committed, its interest in overseeing the conduct of the prosecutor, the police, and the judiciary is strong indeed.

(4) Pleading § 93--Motion to Strike Pleading as a Whole--Anti-SLAPP Statute--Benefit to Newspapers and Publishers.
Code Civ. Proc., § 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute, which is directed against litigation filed without merit to dissuade or punish the exercise of free speech rights, is not limited to suits filed by powerful and wealthy plaintiffs, such as developers, against impecunious protesters. The language of the statute is broad enough to cover news reporting

activity. Hence, newspapers and publishers, that regularly face libel litigation, are among the prime beneficiaries of § 425.16.

(5a, 5b, 5c) Libel and Slander § 25--Privileged Communications-- Qualified Privilege--Reports of Judicial and Other Proceedings.
In determining the scope of the term, judicial proceeding, within the purview of the litigation privilege for statements made by the participants during litigation (Civ. Code, § 47, subd. (b)), the requirement that the statements must bear a connection or logical relation to the action is functional in nature. That is, the communicative act must be a useful step in the litigation process and serve its purposes in order to come under the subdivision's protection, which was established to protect those seeking relief through the court system. However, Civ. Code, § 47, subd. (d), which confers an absolute privilege on any fair and true report in, or communication to, a public journal of a judicial proceeding, or anything said there, involves different policy considerations. A media defendant does not have to justify every word of the alleged defamatory material that is published. The media's responsibility lies in ensuring that the gist or sting of the report-its very substance-is accurately conveyed. Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a fair report. In addition, a deposition is considered a judicial proceeding within the meaning of Civ. Code, § 47, subds. (b) and (d).

(6)       Libel       and       Slander       §
48--Actions--Evidence--Malice--Alteration       of
Speaker's Words.
If an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the *229 manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation. A deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity, unless the alteration results in a material change in the meaning conveyed by the statement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                    Page 3
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

(7) Pleading § 93--Motion to Strike Pleading as a Whole--Anti-SLAPP Statute--Propriety of Trial Court's Denial of Plaintiff's Motion for Further Discovery.

In a defamation action brought by a nationally known political consultant against a magazine that published an article on a custody dispute between plaintiff and his first wife, revealing testimony of plaintiff's first two wives that he physically and verbally abused them, in which the trial court granted defendant's motion to strike the complaint pursuant to Code Civ. Proc., § 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute, the trial court did not err in denying plaintiff's motion for specific discovery related to the article. Because the article was derived from the accurate reporting of court records and reports, the trial court did not abuse its discretion in finding that further discovery would not have resulted in the disclosure of information that would permit plaintiff to demonstrate a prima facie case on any of his claims.

(8) Libel and Slander § 23--Qualified Privilege--Malice--Public Figures.

In order to prevail on a libel action, public figures must prove, by clear and convincing evidence, that the libelous statement was made with actual malice, i.e., with knowledge that it was false or with reckless disregard for the truth. There are two types of public figures. The first is the all-purpose public figure who has achieved such pervasive fame or notoriety that he or she becomes a public figure for all purposes and in all contexts. The second category is that of the limited purpose or vortex public figure, an individual who voluntarily injects himself or herself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. Thus, one who undertakes a voluntary act through which he or she seeks to influence the resolution of the public issues involved is a public figure. The limited purpose public figure loses certain protection for his or her reputation only to the extent that the allegedly defamatory communication relates to the role assumed in a public controversy.

COUNSEL

Bostwick & Hoffman, Gary L. Bostwick, Paul L. Hoffman; Greines, Martin, Stein & Richland, Kent L. Richland, Michael D. Fitts and Edward L. Xanders for Plaintiff and Appellant. *230

Skjerven, Morrill, MacPherson, Franklin & Friel, Edward P. Davis, Jr., and James M. Chadwick for Defendants and Respondents.

NOTT, J.

Appellant Donald Sipple appeals from a judgment entered after the trial court dismissed his complaint in favor of respondents Foundation for National Progress, doing business as "Mother Jones," and Richard Blow (hereinafter sometimes referred to individually, or collectively as respondents). In this appeal we determine whether an article published by Mother Jones was privileged under Civil Code section 47, subdivision (d), therefore subjecting appellant's defamation action against respondents to the protection of the "anti-SLAPP" (strategic lawsuit against public participation) statute. We decide in the affirmative.

Contentions

Appellant contends that the trial court (1) erred in ruling an article published by Mother Jones was privileged; (2) erred in finding that the anti-SLAPP statute applied; and (3) abused its discretion in refusing to stay the motion to dismiss in order to permit discovery or, alternatively, in finding that appellant had not demonstrated a probability of prevailing on the merits.

Facts and Procedural Background

Appellant, a nationally known political consultant, is the owner of Sipple: Strategic Communications, Inc., which produces advertising for political candidates and other businesses. His clients include former Governor Pete Wilson of California, Governor Jim Edgar of Illinois, Governor George W. Bush of Texas, Senator Bob Dole, Senator Orrin Hatch and Senator John Chaffee. Appellant has been prominently featured in newspaper articles and magazines as an image maker and media

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                                                              Page 4
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

strategist. The themes he developed for his clients include the prevention and punishment of domestic violence and other crimes against women.

In its September/October 1997 issue, Mother Jones published an article written by Blow that is the subject of this action. The article focused on a 1992 custody dispute between appellant and his first wife, Regina Sipple, which occurred in Missouri. Regina and appellant's second wife, Deborah Steelman, an attorney active in Washington, D.C. political circles, testified at the custody dispute. Both women testified that appellant had physically and verbally abused them. Appellant's third and current wife, Joyce Sipple, **\*231** testified that appellant had never abused her in 15 years of marriage. Missouri Supreme Court Chief Justice Chip Robertson also testified on appellant's behalf.

*The defamation action*

On August 22, 1997, appellant filed a verified complaint for (1) libel, (2) intentional interference with contract, and (3) intentional interference with prospective economic advantage against respondents.

Respondents filed a motion to strike the complaint pursuant to Code of Civil Procedure section 425.16. As discussed, *post*, that statute is designed to allow early termination of lawsuits filed to chill free speech made in connection with a public issue.

On February 6, 1998, the trial court entered an order granting the motion to strike on two grounds: (1) most of the allegedly defamatory statements were taken from judicial proceedings; the remaining statements filled in details of the abusive behavior but did not contain any information to alter the "gist or sting" of the evidence presented in the judicial proceedings; and the article was privileged pursuant to Civil Code section 47, subdivision (d); and (2) appellant, having been found to be a public figure, failed to establish a prima facie case that the article was published with knowledge of its falsity or with reckless disregard of its truth or falsity.

The trial court denied appellant's request to continue the motion to strike the complaint pending further discovery and his motion for discovery because

he failed to make a showing sufficient to establish good cause for discovery. That is, appellant failed to identify the additional facts he expected to discover or the facts necessary to establish the absence of privilege or the existence of actual malice. Moreover, the article was privileged because it was based largely on an accurate account of court records and because the article reported that appellant and his supporters denied the allegations of abuse.

*Declaration of Richard Blow in support of motion to strike pursuant to Code of Civil Procedure section 425.16*

Blow, senior editor of George magazine, researched the article by reading court and deposition transcripts from the custody case. He also examined a photograph admitted into evidence in the custody case which Regina testified was taken shortly after appellant had beaten her.

Blow conducted independent interviews with Regina and Deborah in which each told him that appellant had physically and mentally abused them, **\*232** providing consistent details of abuse. Both described appellant as having a charming public persona, but as extremely jealous and possessive, and physically and verbally abusive to them.

Blow interviewed friends and relatives of the women to determine if Regina had discussed the abuse allegations with anyone prior to the custody dispute. Several confirmed that she had and that they believed her. Blow could see no credible reason why Deborah would perjure herself during the custody trial.

Patricia Spencer, Regina's mother, confirmed that Regina had confided to her that she had been abused by appellant. Patricia thought appellant would have killed Regina if Regina had stayed with him.

Meredith Sharp, Regina's sister, confirmed that Regina had told her about the abuse shortly after one violent episode, and that immediately after that discussion, Regina left appellant. Meredith confirmed another incident of abuse about which she testified at the custody trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                        Page 5
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

Robert Smith, Regina's divorce lawyer, confirmed that he had observed bruises on Regina which she said resulted from an assault by appellant. He knew of the abuse allegations at the time of the divorce and believed Regina was being truthful.

Colly Durley, Regina's attorney during the custody hearing, confirmed that Regina did not know of Deborah's abuse allegations until Durley contacted Deborah as a potential witness in the custody lawsuit.

John Rother, a friend of Deborah's, confirmed that during work one day Deborah suddenly said she had to leave appellant, began crying and described the physical abuse she had suffered.

Gregg Ward, a former coworker of Deborah's, and now her husband, confirmed that she had confided in him about the abusive relationship after a violent assault and that she left appellant shortly thereafter.

David Steelman, Deborah's brother who handled her divorce, confirmed that Deborah had told him about the abuse prior to the custody lawsuit.

Three independent experts on spousal abuse stated that the pattern of abuse by appellant described by the ex-wives was consistent with that of an abuser.

Blow interviewed appellant about the allegations of abuse. Appellant denied abusing the women, and did not provide information in contradiction *233 of his ex-wives' versions, other than referring to the results of the custody hearing. When Blow asked appellant what motive Deborah would have to commit perjury, appellant told him to ask Deborah.

*Declaration of Kerry Lauerman in support of motion to strike pursuant to*
*Code of Civil Procedure section 425.16*
Lauerman declared that he is the investigative editor for Mother Jones. He had previously fact-checked two other articles written by Blow for Mother Jones, an exposé and a profile of two top Democratic figures. Prior to the publication of the article, Lauerman spoke with Regina and Deborah. Both women had reviewed the article with Blow

and were satisfied that Blow had been fair and the information was accurate. Both women confirmed their allegations of abuse by appellant. Lauerman testified that Blow's article had been independently fact-checked by two people.

*Deposition of Regina taken during the custody*
*hearing*
Regina testified that appellant beat her numerous times during the last two years of her four-year marriage. For instance, once when she came home late from work, as soon as the friend she drove home with left, appellant grabbed her by the back of the neck and ground her face into the carpet. Another time, appellant hit her for no reason when she woke up in the morning; and on another occasion, he knocked her down, then kicked her. Once, he grabbed her by the hair, yanked her head back and slapped her. On a vacation to Lake Tahoe with their young son Evan, appellant became angry because Evan's diaper was dirty. He then beat Regina. Throughout their marriage, appellant was suspicious and jealous without reason. When she danced with Missouri Governor Christopher "Kit" Bond at one of the governor's mansion parties, appellant became jealous and hit her afterward. Regina was so fearful of appellant's violence and temper that she finally fled the house without his knowledge, leaving a note behind.

*Regina's testimony at the custody hearing*
Regina testified that appellant has never been present for Evan's birthdays or parent-teacher conferences, nor has he attended any of his graduation ceremonies. She testified that during the time she was married to him, appellant physically abused her by pushing her, kicking her and hitting her.

*Deborah's testimony at the custody hearing*
Deborah testified that she argued with appellant several times about his making Regina's situation so difficult by failing to send Regina her child *234 support payments in a timely manner. Deborah stated that during her marriage to appellant, he struck Deborah, physically abused her on more than one occasion, hit her in public and accused her of things that were not true. She testified that she was

71 Cal.App.4th 226                                                                           Page 6
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

afraid of appellant, and that "[n]o matter what he said about me later, no matter what he'll say about me after this, [I left] because I was hit." She said that she was accused of infidelity throughout her relationship with appellant, but that she had never had an affair during the time she was married to him. She testified that she did not raise the allegations of abuse during her divorce proceedings because she wanted the most expeditious way out, she was embarrassed and afraid, and did not want to admit to herself what had happened.

*Interview of appellant by Blow*

The transcription of Blow's interview of appellant shows that appellant denied his ex-wives' allegations that he physically or emotionally abused them and that appellant stated that neither Deborah nor Regina ever brought up the alleged abuse during divorce proceedings. Appellant attributed Regina's false testimony to the bitter custody battle but repeatedly denied any knowledge of Deborah's motivation to testify falsely. He advised Blow to contact Deborah for information on her reasons. Appellant stated that his attorney advised him that false allegations related to abuse would be made against him in the custody battle.

*Declaration of appellant in opposition to motion to strike pursuant to Code
of Civil Procedure section 425.16*

Appellant declared that when Blow interviewed him, he told him he did not want to talk to Blow about his ex-wives' motives. Appellant stated that until the custody proceeding, neither Regina nor Deborah nor any other person had ever accused him of physical abuse. He stated that Blow ignored the following in writing his article: the report of the guardian ad litem recommending Evan's placement with appellant; appellant's expert's opinion at the custody hearing; the fact that the reliability of the photograph of Regina's bruises was seriously questioned at the custody hearing; that Deborah's brother was running for Attorney General against a candidate aided by appellant during the time of the custody hearing; and that Regina wrote a letter to Senator Dole threatening to expose appellant's behavior. *235

Discussion
I. *Whether the lawsuit falls under the ambit of the
anti-SLAPP statute*
A. *The statute*

(1a) Code of Civil Procedure [FN1] section 425.16 was enacted in 1992 to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. (*Lafayette Morehouse, Inc.* v. *Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46], review den.) These meritless suits, referred to under the acronym SLAPP, or strategic lawsuit against public participation, are subject to a special motion to strike unless the person asserting that cause of action establishes by pleading and affidavit a probability that he or she will prevail. (*Ibid.*; § 425.16, subd. (b)(1).) The actions are subject to the anti-SLAPP statute if they are (1) against a person, (2) arising from any act of that person in furtherance of the person's right of petition or free speech, and (3) in connection with a public issue. (*Ibid.*)

> FN1 All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Section 425.16, subdivision (a) provides that "[t]he Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." In 1997, the Legislature amended the statute to add the following language to section 425.16, subdivision (a): "To this end, this section shall be construed broadly."

In 1997, the Legislature also added part (4) to section 425.16, subdivision (e): "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public is-

sue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the \*236 constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

### B. *Public issue*

(2a) Appellant contends that his treatment of his previous wives is not a public issue and that the trial court erred in finding the article came within the protection of anti-SLAPP legislation.

Although he urges upon us a narrow construction of section 425.16, we note that all [FN2] of the cases cited by appellant predate the 1997 amendment requiring a broad interpretation of section 425.16, including *Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers* (1996) 49 Cal.App.4th 1591 [57 Cal.Rptr.2d 491] (speech in connection with a public issue include attempts to inform the general public about an issue of public significance) and *Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 1131 [55 Cal.Rptr.2d 909] (every comment on a lawsuit does not necessarily involve a public issue; statute applies to right of petition and free speech).

> FN2 Appellant's citation to *Los Carneros Community Associates, Inc.* v. *Penfield & Smith Engineers, Inc.*\* (Cal.App.) does not avail him, since review has been granted. \*Reporter's Note: Review granted October 21, 1998 (S072581). On January 13, 1999, review dismissed and cause remanded to Court of Appeal, Second Appellate District, Division Six.

Indeed, a review of the statute's legislative history shows that the Senate Judiciary Committee expressly amended section 425.16 to mandate a broad interpretation of the statute in reaction to the over-narrow interpretation of *Zhao v. Wong, supra,* 48 Cal.App.4th 1114. (Stats. 1997, ch. 271, § 1, Sen. Judiciary Com., Analysis of Sen. Bill No. 1296 (1997-1998 Reg. Sess.) May 13, 1997.) The Judiciary Committee cited with approval the broad interpretation pronounced in *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] and *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628 [49 Cal.Rptr.2d 620]. As well, the expansive interpretation of *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036 [61 Cal.Rptr.2d 58] (*Braun*) was looked upon with approval, while the appellate court decision overruled in *Briggs v. Eden Council for Home & Opportunity* (1999) 19 Cal.4th 1106 [81 Cal.Rptr.2d 471, 969 P.2d 564], cited by appellant, advocates a narrow construction and was mentioned with disfavor by the Assembly Committee on the Judiciary.

(1b) In *Briggs,* the California Supreme Court held that a defendant making a motion to strike under section 425.16, subdivision (e)(1) and (2) need not separately demonstrate that the statement concerned an issue of public significance. Section 425.16, subdivision (e) defines a protected act in connection with a public issue as "(1) any written or oral statement or \*237 writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law ...." Drawing on statutory analysis, legislative intent, and public policy considerations, the court agreed with the *Braun* court that in crafting the statute, the Legislature equated a "public issue" with the authorized official proceeding to which it connects. (*Briggs v. Eden Council for Home & Opportunity, supra,* 19 Cal.4th at p. 1118.) Thus, in making a motion to strike, a defendant need not demonstrate the existence of a public issue for the purposes of section 425.16, subdivision (e)(1) and (2).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                                          Page 8
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

In *Braun*, the complaint for defamation and other torts put at issue five news reports published by the Chronicle Publishing Company and its reporter, Ben Wildavsky, regarding the state auditor's probe of the Center for Pre-Hospital Research and Training (CPRT) and events leading up to that investigation. The *Braun* court rejected the *Zhao* court's holding that "the only activities qualifying for statutory protection are those which meet the lofty standard of pertaining to the heart of self-government." (*Braun, supra,* 52 Cal.App.4th at pp. 1046-1047.) The *Braun* court held that clauses 1 and 2 of section 425.16, subdivision (e) "safeguard free speech and petition conduct aimed at advancing self government, as well as conduct aimed at more mundane pursuits. Under the plain terms of the statute it is the context or setting itself that makes the issue a public issue: all that matters is that the First Amendment activity take place in an official proceeding or be made in connection with an issue being reviewed by an official proceeding." (52 Cal.App.4th at p. 1047.) Thus, in *Braun*, the court found that the news articles fell within the public issue definition because the audit of CPRT was an authorized official proceeding, and the articles reported on this proceeding. (*Id.,* at pp. 1048-1049.)

In *Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra,* 37 Cal.App.4th 855, 863, the court found that articles published in a newspaper which reported on the dispute between More University and its neighbors over the university's decision to open its property to the homeless and the related hearings held by the county board of supervisors, as well as lawsuits connected with the action, came within section 425.16. In the articles, the dispute was described, as well as the parties themselves, in colorful terms. The court cited section 425.16, subdivision (e) in holding that the articles were " 'writing[s] made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law.' " (*Lafayette, supra,* at p. 863.)

(2b) We conclude that the custody dispute itself clearly comes within section 425.16, subdivision

(e)(1) as it is "... a legislative, executive, or *238 judicial proceeding, or any other official proceeding authorized by law." Hence, the article, insofar as it discusses the statements made during deposition or at the hearing at the custody trial, falls within the ambit of section 425.16, subdivision (e)(1), and respondents need not separately show that these statements concern an issue of public interest.

Nevertheless, appellant directs our attention to the wife-beating allegations gathered from Blow's interviews, which were not part of the custody hearing. Appellant claims that as to those allegations, section 425.16, subdivision (e)(3) is the pertinent subsection: "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." He asserts that the article should not be privileged because wife-beating is not an issue of public interest.

We disagree. Domestic violence is an extremely important public issue in our society. (*Baugh v. CBS, Inc.* (N.D.Cal. 1993) 828 F.Supp. 745, 755 [in invasion of privacy case, issue of domestic violence is newsworthy].) On different levels, the article addresses the issue of domestic violence. Central to the article, of course, are the allegations of physical and verbal abuse against a prominent media strategist by two former wives, one of whom is an attorney with no plausible reason to lie. According to the record, appellant, a top figure in national politics, has been interviewed by the press and profiled in the media scores of times. In 1994, appellant devised media strategy based on gender-based advertising against domestic violence for the gubernatorial races of Pete Wilson in California, George W. Bush in Texas and Jim Edgar in Illinois. Ironically, the custody dispute occurred while appellant was running the media strategy for Bob Dole's 1996 presidential campaign based on morality issues. In other words, appellant was able to capitalize on domestic violence issues in order to further his career.

(3) Moreover, " 'reports of official proceedings are

71 Cal.App.4th 226                                                                 Page 9
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

not privileged "merely to satisfy the curiosity of individuals," but to tell them how their government is performing. While the public may not have an over-riding interest in knowing the details of every crime committed, its interest in overseeing the conduct of the prosecutor, the police, and the judiciary is strong indeed.' [Citation.]" (*McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975 [234 Cal.Rptr. 702].) In *Church of Scientology v. Wollersheim, supra,* 42 Cal.App.4th 628, 650-651, the court held that "matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals. Examples are product liability suits, real estate or investment scams, etc...." The court also found that public interest can be *239 "evidenced by media coverage," and in that specific case, the extent of the Church of Scientology's membership and assets. (See *Averill v. Superior Court, supra,* 42 Cal.App.4th 1170, 1175 [placement of battered women's shelter is a public issue].)

(2c) The article's theme that rich and powerful men may use the legal system to their advantage over women who may have been abused by them is further exposition on the same issue of domestic violence. An example of appellant's ability to use his influence was the appearance of Missouri Supreme Court Chief Justice Chip Robertson at the custody hearing, which appearance Blow reported as having been criticized as highly unusual and posing a potential conflict of interest for the trial judge. Thus, like it or not, appellant injected himself into the controversy by using his influential position and his ready access to the press to define crime and violence as central issues in American politics.

Nor is appellant's cause advanced by his reference to *Time, Inc. v. Firestone* (1976) 424 U.S. 448, 454 [96 S.Ct. 958,965, 47 L.Ed.2d 154], which he cites for the proposition that the courts do not find that an individual's personal and family life constitutes a public controversy for purposes of First Amendment protection. There, the United States Supreme

Court recognized that public figures are those who occupy persuasive power and influence or who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. (*Id.,* at p. 453 [96 S.Ct. at pp. 964-965].) The court held that the divorce of an extremely wealthy person did not in and of itself constitute a public controversy sufficient to cast the divorcé as a public figure. Here, on the other hand, the issues of spousal abuse generated in the custody proceedings are of public interest when the person accused of the abuse is a nationally known figure identified with morality campaigns for national leaders and candidates for the office of President of the United States.

Similarly, *Callaway v. Hafeman* (7th Cir. 1987) 832 F.2d 414 does not assist appellant. While the court there found that the plaintiff's complaints touched upon sexual harassment, an issue of public concern generally, when it looked at the content, form and context of the plaintiff's communications to the school district, it found that she spoke as an employee attempting to resolve her private dilemma, and therefore the communications were not privileged. (*Id.,* at p. 417.) Appellant, on the other hand, has spoken publicly on his candidates and his observations, and has directed extremely successful campaigns based on the problem of violence toward women.

We conclude that the details of appellant's career and appellant's ability to capitalize on domestic violence issues in his advertising campaigns for *240 politicians known around the world, while allegedly committing violence against his former wives, are public issues, and the article is subject to the protection of section 425.16.

### C. Whether the media can benefit from section 425.16

(4) Appellant's assertion that the statute was aimed at protecting economically weak individuals, rather than the media, has been addressed and rejected in *Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra,* 37 Cal.App.4th 855, 863. There, the court found that anti-SLAPP suits are not limited to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                                    Page 10
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

paradigm SLAPP suits filed by powerful and wealthy plaintiffs, such as developers, against impecunious protesters, and that section 425.16 does apply to media defendants in libel actions. The court cited an attorney who helped draft portions of the Senate bill who observed that "the language of the statute was broad enough to cover news reporting activity and that newspapers and publishers, who regularly face libel litigation, would be one of the 'prime beneficiaries' of section 425.16." (37 Cal.App.4th at p. 863; see also *Braun, supra,* 52 Cal.App.4th 1036, 1044 [news reporting is free speech and section 425.16 motions can apply to media defendants in libel actions].) In light of our agreement with these authorities, we need not discuss this matter further.

II. *Whether appellant showed a probability of prevailing on the claim*
   A. *Whether the article was privileged under California authority*
   1. *Civil Code section 47, subdivision (d) is applied broadly*

(2d) Under section 425.16, the plaintiff's action is subject to a motion to strike unless the plaintiff can show that there is a probability that he or she will prevail on the claim. Appellant claims that he will prevail on his complaint because the article is not privileged under Civil Code section 47, subdivision (d), and the trial court erred in applying the privilege.

(5a) Civil Code section 47, subdivision (d) confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof. The courts have construed Civil Code section 47, subdivision (d) broadly: "In determining the scope of the term 'judicial proceeding' within the purview of the rule, the courts of this state seem to take a comparatively broad view of the question." (*Hayward v. Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255, 260 [71 Cal.Rptr. 295]; *Kurata v. Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224, 228 [40 P.2d 520]; *241Glenn v. Gibson* (1946) 75 Cal.App.2d 649, 660 [171 P.2d 118], disapproved on other grounds in *Lipman v.*

*Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 233 [11 Cal.Rptr. 97, 359 P.2d 465].) Even in the face of these authorities, appellant urges that the privilege should be applied narrowly and should not shield the entire article but only those statements that are part of the proceedings. We are not convinced by appellant's citations to California cases for his proposition that Civil Code section 47, subdivision (d) should be construed narrowly, or to a Seventh Circuit case interpreting Illinois law, or to a case from the District of Columbia. (See *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742 [257 Cal.Rptr. 708, 771 P.2d 406] [Civil Code section 47, subdivision (c) privilege need not be expanded further than federal standard]; *Gertz v. Robert Welch, Inc.* (7th Cir. 1982) 680 F.2d 527; *Dameron v. Washington Magazine, Inc.* (D.C. Cir. 1985) 779 F.2d 736.)

Appellant also refers to *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134 [57 Cal.Rptr.2d 284], which applied a functional analysis to the litigation privilege found at Civil Code section 47, subdivision (b), a privilege protecting statements made by the participants during litigation. We disagree with appellant's conclusion that the same functional analysis should limit application of Civil Code section 47, subdivision (d) in the instant matter.

Since the purpose of Civil Code section 47, subdivision (b) is to "afford the utmost freedom of access to the courts without fear of being subsequently harassed by derivative tort actions" (*Rothman v. Jackson, supra,* 49 Cal.App.4th at p. 1146), the *Rothman* court concluded that the requirement that the statements must bear a connection or logical relation to the action is functional in nature. (*Ibid.*) That is, the communicative act must be a useful step in the litigation process and serve its purposes in order to come under the protection of the litigation privilege, which was established to protect those seeking relief through the court system. (*Ibid.*) It is true, as appellant urges, that *McClatchy Newspapers, Inc. v. Superior Court, supra,* 189 Cal.App.3d 961, 975, holds that the fair report privilege's purpose is to facilitate the public's supervisory role over government. However, in arguing that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                     Page 11
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

the out-of-court statements in the article do not fulfill the policy purposes of Civil Code section 47, subdivision (d), appellant fails to mention that the *McClatchy* court recognized a distinction between the policy of Civil Code section 47, subdivision (b) and the policy of subdivision (d). The court stated: "While our discussion of the absolute immunity provided by [Civil Code] section 47, subdivision 2, appears to support a similar immunity under subdivision 4, we recognize that different policy considerations are involved when the media are reporting the contents of a judicial proceeding." (189 Cal.App.3d at p. 974.) Thus, the substantial public concerns implicated in Civil Code section 47, subdivision (d) support the extension of a broad *242 protection over the media. According to the *McClatchy* court, "[t]he meaning of a 'fair and true report' is well established in California case law. It is undenied that a media defendant does not have to justify every word of the alleged defamatory material that is published. [Citation.] The media's responsibility lies in ensuring that the 'gist or sting' of the report-its very substance-is accurately conveyed. [Citation.] Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a 'fair report.' [Citation.]" (189 Cal.App.3d at pp. 975-976.)

Nor are we convinced by appellant's citation to *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d 711, in which the court declined to expand the protections of Civil Code section 47, subdivision (c) to create a public interest privilege since public figures, who were the persons most likely to sue or be injured by media reports, were already subject to the constitutional malice standard, and because the media has at its disposal to remedy its defamatory reports, through retractions and corrections. (48 Cal.3d at p. 751.)

2. *The privilege under Civil Code section 47, subdivision (d) applies to discovery*

(2e) Appellant contends that the pretrial depositions of Regina were not made part of the record at the

custody proceeding, and therefore only those portions of the article that reported statements which were part of the proceeding should be protected. We disagree. As previously mentioned, Civil Code section 47, subdivision (d) confers an absolute news media privilege for publications made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative or (C) other public official proceeding, or (D) of anything said in the course thereof ...."

(5b) "In the context of judicial proceedings, case law is clear that reports which comprise a history of the proceeding come within the privilege, as do statements made outside the courtroom and invoking no function of the court, e.g., representations and theories expressed by criminal justice personnel in relation to pretrial events such as pursuit and arrest of the defendant. [Citation.]" (*Braun, supra,* 52 Cal.App.4th at p. 1050.) In *Braun,* the court held that an article detailing the investigation of CPRT by the state auditor, statements made by persons concerned with the audit, and background reports and charges leading up to the investigation came squarely within the protection of Civil Code section 47, subdivision (b). *243

More specifically, a deposition is considered a judicial proceeding within the meaning of Civil Code section 47, subdivisions (b) and (d). (*McClatchy Newspapers, Inc. v. Superior Court, supra,* 189 Cal.App.3d 961, 968, fn. 2.) In *McClatchy,* the Fresno Bee published articles implicating one Moseian as a member of the mob based on reporter Walsh's testimony and excerpts from one of the reports he produced at his deposition in an unrelated libel case. Parts of the report, a California State Department of Justice report prepared by Special Agent John Gill on organized crime in the Fresno area, were read verbatim by Walsh in his deposition testimony. For purposes of Civil Code section 47, subdivision (b), the court held that the allegedly defamatory article was related to the original litigation. The court dismissed the plaintiff's argument that the article contained fractionalized, conclusory statements from the deposition and the report, which did not comply with the fair and true report

71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

requirement of Civil Code section 47, subdivision (d). Rather, the article accurately conveyed the gist and sting of the deposition testimony. (*McClatchy Newspapers, Inc. v. Superior Court, supra,* at pp. 976-977; see also *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc. (1986) 42 Cal.3d 1157, 1168* [232 Cal.Rptr. 567, 728 P.2d 1202] [for purposes of Civil Code section 47, subdivision (b), which protects statements made in the course of a judicial proceeding, answers and questions at depositions are such statements].)

(2f) Under the above authorities, we are compelled to conclude that the deposition testimony of Regina, as reported in the Mother Jones article, was protected under Civil Code section 47, subdivision (d). We reject appellant's attempts to distinguish *McClatchy* on the basis that in the instant case, Regina's deposition was not introduced into the custody action. Regina's deposition was taken under oath; both parties were represented by attorneys during the deposition. Importantly, the information taken from the deposition testimony was consistent with trial testimony and only filled in the details. The deposition testimony was relevant and would have been properly admitted into evidence. Surely a deposition taken during the course of custody proceedings should be considered within a judicial proceeding when statements and reports have been found to be made within the course of a judicial proceeding even though they occurred outside the actual court proceedings, under Civil Code section 47, subdivision (d). (*Howard v. Oakland Tribune (1988) 199 Cal.App.3d 1124, 1128* [245 Cal.Rptr. 449] [state administrative agency investigation of misuse of public funds by a local state-subsidized child care program held to be public official proceedings under Civil Code section 47, subdivision (d)]; *Braun, supra, 52 Cal.App.4th at p. 1051* [newspaper reports about state audit of CPRT were privileged although audit was confidential]; *Hayward v. Watsonville Register-Pajaronian and Sun, supra, 265 Cal.App.2d at pp. 259-261* [articles \*244 rephrasing police and FBI crime reports released upon arrest of a suspect were deemed to be a fair and true report of a judicial proceeding and privileged under Civil Code section 47, subdivision

(d)].)

Nor does appellant's reliance on *Seattle Times Co. v. Rhinehart (1984) 467 U.S. 20* [104 S.Ct. 2199, 81 L.Ed.2d 17] avail him. In that case, the United States Supreme Court held that a protective order restricting the dissemination of pretrial discovery does not offend the First Amendment. In that context, the court stated: "Moreover, pretrial depositions and interrogatories are not public components of a civil trial." (*Id., at p. 33* [104 S.Ct. at p. 2207].) That case did not touch on the issue here: whether a deposition taken during the course of custody proceedings is considered a judicial proceeding for the purposes of Civil Code section 47, subdivision (d).

Appellant's further argument that the article failed to attribute the reported information to sources, rather than stating it as a proven fact (*Hayward v. Watsonville Register-Pajaronian and Sun, supra, 265 Cal.App.2d at p. 259*), fails on review of the article which attributes the information contained therein to the reporter's interview of friends and family, as well as his reliance on deposition testimony and the custody hearing itself.

B. *Whether the article was a fair and true report*
(5c) "It is well settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified, and if the gist of the charge be established by the evidence the defendant has made his case." (*Kurata v. Los Angeles News Pub. Co., supra, 4 Cal.App.2d 224, 227.*) " '[A] slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently ....' " (*Ibid.*)

In *Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra, 37 Cal.App.4th 855,* the court held that the series of articles published by the San Francisco Chronicle was protected by the fair and true reporting privilege. The public hearings which led to the articles published in the San Francisco Chronicle included descriptions of the university as

71 Cal.App.4th 226                                                                          Page 13
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

a "sensuality school," which offered a "unique course in carnal knowledge"; its founder was characterized as a "reclusive guru" who was the subject of an LSD drug prosecution in Hawaii. The articles also reported that a former student alleged that the university coerced students into prostitution and provided them with LSD and other illegal drugs, and that the university had filed a libel suit against that student. The court held that the articles were essentially \*245 accurate, in light of the sexually graphic course descriptions for the "Advanced Sensuality" and the "mutual pleasurable stimulation of the human nervous system" classes. It also found that the term "reclusive guru" was not a provably false assertion of fact and could not be libelous and that the report of the libel suit was accurate. (*Id., at pp. 859-860.)*

(2g) We find that the gist or sting of the testimony by Regina and Deborah at the Sipple custody hearing was that appellant physically and emotionally abused his ex-wives. The article expanded on the theme but did not otherwise alter the substance of the privileged material such that a reader would be affected differently if the information garnered by interviews surrounding the wife-beating allegations were not included.

Without identifying any statements in particular, appellant urges that "most of the statements in the article-and all of the most damaging ones-are simply absent from the court proceedings." On the contrary, we note that at the custody proceeding, Regina testified that during the time she was married to him, appellant physically abused her by pushing her, kicking her, and hitting her. Deborah testified that appellant physically abused her on more than one occasion, hit her in public, and accused her of things that were not true. She testified that she was afraid of appellant, and that "[n]o matter what he said about me later, no matter what he'll say about me after this, [I left] because I was hit." She stated that she was accused of infidelity throughout her relationship with appellant but that she had never had an affair during the time she was married to him. She testified that she did not raise the allegations of abuse during her divorce proceed-

ings because she wanted the most expeditious way out, she was embarrassed and afraid, and did not want to admit to herself what had happened. The article, although it expands on specific incidents of abuse, does not change the gist or sting of the courtroom statements or the complexion of the affair.

We disagree with appellant's second point, that the custody proceedings reflect only that Deborah answered yes to questions as to whether appellant physically abused her and that an average reader could only speculate on her notion of abuse. As noted above, Deborah testified that appellant struck her on more than one occasion, acted irrationally, had a violent temper, physically abused her, frightened her, accused her of things that were not true, and hit her in public.

Nor do we agree with appellant's third point, that the article alters the gist and sting because it is organized to present the reader with a litany of egregious incidents as if they were fact, prior to presenting the allegations of physical abuse made in the court proceedings. Our review of the article \*246 shows that prior to going into the specific incidents the women complained of, Blow wrote: "This article is based on court documents, depositions, and transcripts of the custody case. It's also supported by the accounts of friends and relatives of Sipple's ex-wives." Moreover, appellant's firm denial precedes the specific details of which he complains.

Appellant cites *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 511 [111 S.Ct. 2419, 2429-2430, 115 L.Ed.2d 447] for the proposition that outrageous statements attributed verbatim to an individual may result in injury to reputation because the manner of expression indicates a negative personal trait. He urges that the quotation attributed to him, after slapping Deborah in the face: "I was just doing to you what you did to me, you cunt," was false and in itself injured his reputation. (6) However, *Masson* goes on to hold that "[i]f an author alters a speaker's words but effects no material change in meaning, including any meaning con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                                Page 14

71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337

**(Cite as: 71 Cal.App.4th 226)**

veyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation." (*Id.,* at p. 516 [111 S.Ct. at p. 2432].) "We conclude that a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co. v. Sullivan* [(1964)] 376 U.S. [254,] 279-280 [84 S.Ct. at pp. 725-726] and *Gertz v. Robert Welch, Inc.* [(1974) 418 U.S. 323,] 342 [94 S.Ct. at p. 3008], unless the alteration results in a material change in the meaning conveyed by the statement." (*Id.,* at p. 517 [111 S.Ct. at p. 2433].) (2h) Thus, the statement attributed to appellant is consistent with the physical and emotional abuse testified to in the court proceedings, and does not change the gist of the hearing.

Nor do we credit appellant's attempt to distinguish cases which applied the fair report privilege on the basis that the reports in those cases were slightly inaccurate, while the article at issue attempted to "shield accounts as fact of serious crimes and outrageous behavior simply because they are possible inferences from an ambiguous accusation made in court." The cases he cites actually support application of the privilege. (See *Hayward v. Watsonville Register-Pajaronian and Sun, supra,* 265 Cal.App.2d 255, 262; *Kurata v. Los Angeles News Pub. Co., supra,* 4 Cal.App.2d 224; *Glenn v. Gibson, supra,* 75 Cal.App.2d 649, 660; *Dorsey v. National Enquirer, Inc.* (9th Cir. 1992) 973 F.2d 1431; and *Hearne v. De Young* (1898) 119 Cal. 670, 672-675.)

Accordingly, we conclude that the article was a fair and true report. It was not spun out of whole cloth, but was supported by the court testimony of Regina and Deborah, as well as Regina's deposition testimony, interviews with appellant and his supporters, and interviews with Regina and Deborah as well as their supporters. *247

### C. *Whether the trial court abused its discretion in refusing to permit*
#### *appellant limited discovery*

(7) In his motion for specified discovery, appellant requested written discovery related to the article.

He also requested depositions of the following people: Kerry Lauerman, two fact-checkers referred to in Lauerman's declaration, Regina Sipple, Deborah Steelman, Richard Blow, Patricia Spencer, Meredith Sharp, Robert Smith, Colly Durley, John Rother, Gregg Ward, David Steelman, and three independent experts in Blow's declaration. On appeal, appellant does not explain what additional facts he expects to uncover, or why such far-ranging discovery is necessary to carry his burden of showing Blow's malice. (*Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190-1191 [31 Cal.Rptr.2d 1931].) The most he argues is that he should be "permitted to test respondents' self-serving declarations and elicit circumstantial evidence through discovery before being subjected to dismissal for failure to establish a prima facie case." Indeed, as the trial court pointed out, the article springs from the accurate reporting of court records and reports. It also reflects that appellant and his supporters deny the allegations of abuse. We find that the court did not abuse its discretion in finding that "it does not appear that further discovery could result in the disclosure of information that would permit [appellant] to demonstrate a prima facie case on any of his claims." We conclude that to allow appellant such extensive discovery would subvert the intent of the anti-SLAPP legislation.

### D. *Whether the trial court erred in concluding that appellant failed to*
#### *demonstrate a probability of success*

(8) In order to prevail on a libel action, public figures must prove, by clear and convincing evidence, that the libelous statement was made with actual malice-with knowledge that it was false or with reckless disregard for the truth. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253 [208 Cal.Rptr. 137, 690 P.2d 610].) There are two types of public figures: "The first is the 'all purpose' public figure who has 'achieve[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is that of the 'limited purpose' or ' vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                                                      Page 15
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

limited range of issues.' " (*Ibid.*) Thus, one who undertakes a voluntary act through which he seeks to influence the resolution of the public issues involved is a public figure. (*Id.*, at pp. 254-255.) The limited purpose public figure "loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Id.*, at p. 254.)

(2i) The record shows that appellant is a nationally known political strategist, that he has been profiled, quoted, interviewed, and has used the *248 media for his professional advantage many times, and that he represents national leaders. His campaign strategy includes the topics of violence against women, crime, health care, illegal immigration, and the death penalty. Indeed, the record shows that he is one of the experts to whom the media turns for comment, and that he has publicly commented on the strengths and weaknesses of political candidates. We are not convinced by appellant's argument that "because he is told what campaign themes to develop, it would be the height of unfairness to conclude that he is a public figure." He also minimizes the notoriety he has achieved through exposure in the media, claiming that the press has only sought his observations concerning the relative political impact of particular issues. The fact that the media seeks his observations on the political climate, political issues, and national figures, and that he has sought out media attention as exemplified by the press conference he called after he left the Dole campaign does not lend credibility to his claim of anonymity. We conclude that appellant is a public figure. (*Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 675 [247 Cal.Rptr. 304] [individuals closely associated with public figures, functioning as alter ego and personal representative to the world, are themselves public figures]; *Rudnick v. McMillan*, *supra*, 25 Cal.App.4th 1183, 1190 [person can become limited purpose public figure by discussing matter with the press or by being quoted by the press]; *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1290 [286 Cal.Rptr. 198] [managers of publishing company are public figures because they are intimately involved in public political debate in their community and the com-

munity has a legitimate and substantial interest in their conduct regarding the operation of the newspaper].)

Regardless of whether he is an all-purpose public figure, or a limited purpose public figure, appellant has failed to show by clear and convincing evidence that the article was published with malice. Appellant simply failed to show that respondents entertained serious doubts as to the truth of the publication. (*Reader's Digest Assn. v. Superior Court*, *supra*, 37 Cal.3d 244, 256.) He points to his declaration as evidence that respondents recklessly disregarded the truth or falsity of the statements about him. In his declaration, he states that Blow ignored the following in his article: that the abuse allegations by Regina and Deborah never came up until the custody hearing; "the fact that [appellant] spent close to *$300,000.00* and voluntarily exposed [himself] to a proceeding where [he] knew that these kinds of false assertions are frequently made"; "the fact that the reliability of the photograph of Regina's bruises was seriously questioned at the custody hearing"; that the judge and guardian ad litem concluded that Evan's best interests would be served by placement with appellant; that an expert testified Regina's and Deborah's behavior was not consistent with abused spouses; that appellant *249 was aiding a competitor to Deborah's brother in his race for Attorney General; and that Regina had sent a letter to Senator Dole threatening to expose appellant's spousal abuse.

However, in our perusal of the article, we find that it states that appellant "calls the wife-beating allegations wholly false, the byproducts of a bitter custody fight. He was told, he says, that in a custody trial 'there will be false allegations made against you, probably related to abuse.' And, he says, those charges were never raised until the custody trial. He denies the accounts in this story in both their essentials and specifics." The article also reveals that appellant's side of the story is that Deborah used appellant to get to Washington, then cheated on him and left. One supporter of appellant is quoted as saying, "Debbie is ambitious." The article comments on the fact that appellant spent between

71 Cal.App.4th 226                                                    Page 16
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

$250,000 and $500,000 in legal fees and that appellant's counsel attacked the reliability of the photograph at the custody hearing. The article also refers to the psychiatrist called by appellant at the custody hearing who averred that appellant was not a wife-beater, and that Evan would make a healthy transition to his father's home. The article states that the judge ruled that the best interests of Evan would be served if he was in the custody of appellant, and cites appellant's statement: "I won ... [a]nd I think if the judge or any other party to the action believed there was validity to those false allegations, I would not have had the result that I had." When asked why his ex-wives would lie, appellant states in the article as precisely reported in the transcription: "I cannot speak for them. All I can say is it never happened. It's fiction. It never happened."

On appeal, appellant argues that the following is circumstantial evidence of Blow's malice: that appellant had to contact Blow first, that such abuse allegations are common in custody proceedings, and that Regina and Deborah had ulterior motives. He claims that Blow disregarded: Regina's extortion attempt; the ex-wives' failure to allege spousal abuse during the divorce proceedings; the fact that the guardian ad litem recommended placement of Evan with appellant; that Regina's letters to appellant over the years did not mention abuse; and that Deborah's brother was running for office against a pro bono client of appellant.

However, these assertions do not show that appellant did not physically abuse his ex-wives and that respondents knew the two women were lying. Regina's letter asking Dole to assist her in obtaining money she believed appellant owed her does not demonstrate that she lied or Blow believed she lied. Nor did appellant raise the issue of the letter to Dole in his interview with Blow. The fact that Regina never mentioned spousal abuse in her letters to appellant requesting prompt payment of child support is not surprising. Nor is it evidence that Regina was not abused or that Blow knew she was not *250 abused. Failure to previously report the physical abuse was reported in the article and, in any event, does not prove that the women lied. Even

though the recommendation of the guardian ad litem that the best interests of Evan would be served by Evan's placement with appellant has no relationship to the spousal abuse allegations, we note that the article stated that the judge found that it was in Evan's best interests to be so placed. We also cannot believe that appellant's allegation that Deborah's motivation stemmed from her brother's campaign against a client of appellant's (a motivation which appellant did not discuss with Blow during his interview), shows that Blow recklessly disregarded the truth or that Deborah lied.

We conclude that the trial court did not err in concluding that appellant failed to demonstrate a probability of success.

Respondents are entitled to attorney fees and costs on appeal. (§ 425.16, subd. (c); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785 [54 Cal.Rptr.2d 830].)

Disposition
The judgment is affirmed. Respondents are entitled to attorney fees and costs on appeal.

Boren, P. J., concurred.

**ZEBROWSKI, J.,**

Concurring and Dissenting.-How far can a new concept stretch? How should it fit with other, preexisting, concepts? These are recurrent issues, and they arise here. Here we consider the reach of the new concept embodied in the SLAPP (strategic lawsuit against public participation) statute. As a legislative creation, its reach is defined by legislative intent. Clearly it is intended to protect the exercise of free speech rights from the burdens of unmeritorious litigation, and to do so at an early stage. The majority quite properly emphasizes this objective, and places an expansive construction on the statute. However, notwithstanding my respect for the opinion of my colleagues and the expansive reading they give to this aspect of the Legislature's intent, and even though the Legislature has expressly directed that the statute be construed "broadly," I do not agree that the Legislature inten-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

ded the SLAPP concept to reach quite so far as the majority holds.

Here we consider an article about a "spin doctor." Yet at this stage of the proceedings, the record does not permit determination of who is doing the spinning. Any legal conclusions we draw must be uninfluenced by any assumption that the factual allegations in the article are true. The evidence is in conflict and, so far as we know, the factual allegations in the article could be substantially false. *251

I nevertheless agree that much of the article appears entitled to SLAPP protection. Much of it appears to be extracted from the records of the custody trial or depositions. A true report of such matters is privileged. However, it cannot be definitively determined from this record exactly what allegations are taken from court records or depositions, and what come from other sources. There are two reasons for this uncertainty. The first is the story-like manner in which the article is written. It does not directly link particular sources with particular allegations. Instead it appears to attempt to create an impression that substantiation exists even though none can be cited. The second reason for the uncertainty is that the SLAPP motion, and its ban on discovery, shortstopped development of a record which might have more clearly identified the sources for the various allegations.

Although respondents filed papers purporting to demonstrate that many of the allegedly defamatory statements in the article were taken from court records, their effort was in many instances misleading. A few examples: as a purported record source for the allegation that appellant hit his wife "in the shoulder-hard," respondents cite only to a transcript containing the question "Have you ever seen him strike your sister Regina?" and the answer "Yes." There is no record source cited for the embellishment, and it may be false. As a record source for the allegation that appellant "abruptly slapped [his wife] in the face in the school parking lot during [his wife's] tenth high school reunion," respondents cite only to a transcript containing the question "Did he ever hit you in a public place ..." and the

answer "Yes." There is no record source for the further embellishments, and they may be false. As to many of the other allegedly defamatory statements contained in the article, there is no citation whatever to any record source. Hence uncertainty remains about the origin of many of the allegations; apparently respondents concede that many were not drawn from court records or depositions.

The rulings of the trial court and the majority suggest that my concern about sources may be unwarranted, since they find the entire article privileged. I appreciate this view, but take a different one with regard to those portions of the article which have their sources outside the court records or depositions. It is with regard to these latter allegations, not drawn from court records or depositions (the precise identity and origin of which would have to be developed by further proceedings) that I dissent.

The majority affirms with respect to allegations in the latter class on two grounds. First, the majority concludes that they do not alter the "gist and sting" of the privileged material extracted from court records and depositions (hereafter collectively referred to as "litigation records"). For two reasons, I view the "gist and sting" issue differently:

1) First, as noted above, it is not completely clear just which allegations come from clearly privileged litigation records, and which come from other *252 sources. Before the "gist and sting" of the material from the litigation records can be accurately characterized, that material must first be identified, segregated from the other material, and separately evaluated. If respondents can cite no sources in the litigation records other than those cited in this record, I would find the "gist and sting" substantially altered and magnified by the article. The more graphic allegations of spousal violence which seem not to have emanated from litigation records alter the "gist and sting" in two ways. First, they magnify it by suggesting that these incidents occurred with significantly greater frequency than is reflected in the litigation records. Second, they magnify it by suggesting a higher level of severity. In considering this point, as well as the others above, we must bear

71 Cal.App.4th 226                                                    Page 18

71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337

**(Cite as: 71 Cal.App.4th 226)**

in mind that, so far as we are entitled to assume on a SLAPP motion, these allegations may be false. (Cf. *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855 [44 Cal.Rptr.2d 46] [on SLAPP motion, court determines whether sufficient evidence has been presented to demonstrate a prima facie case, does not weigh evidence]; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628 [49 Cal.Rptr.2d 620] [test on SLAPP motion similar to that on summary judgment motion].)

2) Some unattributed allegations are particularly injurious. For example, one allegation from the article for which no source in litigation records is cited is the allegation that appellant referred to his wife as a "cunt." This word has been in use at least since Shakespearian times, and its connotation, if not its literal meaning, may have varied over the centuries. However, given what appears to be its modern pejorative connotation, a reasonable jury could find this accusation to be of a kind different from the allegations of spousal mistreatment taken from the litigation records. It suggests not only difficulty with temper and conduct control, but also a mindset disdainful and disrespectful of women. The libelous extent of such an accusation under the circumstances presented is a jury question which I cannot answer here, but a jury might find, upon complete development of the facts, that such an accusation is even more injurious to a person in appellant's position than the accusations which emanate from privileged sources. (Cf. *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 511 [111 S.Ct. 2419, 2430, 115 L.Ed.2d 447] [false attribution of quote "may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold"].)

The majority also affirms as to those statements not having their source in the litigation records on the second ground that appellant failed to present clear and convincing evidence of constitutional malice. I concur that appellant must present evidence of malice, and also concur that the evidence presented

by appellant falls short of that necessary to support a finding of *253 constitutional malice by the clear and convincing standard. There are, however, a number of factors that are sufficient to support at least a reasonable suspicion of constitutional malice. Although reasonable suspicion alone will not either support a judgment or defeat a SLAPP motion, it ought to be enough to require discovery. Malice in this context would mean that respondents either subjectively doubted the veracity of some of the accusations they were publishing, or harbored a reckless lack of concern for veracity. Such a subjective state of mind is unlikely to be admitted; circumstantial evidence is the primary method of proof. Yet appellant had no opportunity to compel the production of evidence regarding the manner in which Blow conducted his investigation, possible editorial pressures to sensationalize or distort, why he omitted material which could cast doubt on the veracity of the accusations, why he omitted material favorable to appellant, the extent to which he inquired why the long dormant events chronicled in his article were not contemporaneously reported, etc. Not every case will raise the reasonable bases for suspecting constitutional malice that are reflected in this record, hence the exception in Code of Civil Procedure section 425.16 which allows discovery only upon a showing of good cause would not swallow the general rule of no discovery before ruling on a SLAPP motion.

The words of *Lafayette Morehouse* are prophetic in this connection: "We acknowledge, however, that the discovery stay and 30-day hearing requirement of section 425.16 literally applied in all cases might well adversely implicate a plaintiff's due process rights, particularly in a libel suit against a media defendant.... That opportunity [for discovery] *if sought* is of prime import in a libel suit against a media defendant who will generally be the principal, if not the only, source of evidence concerning such matters as whether that defendant knew the statement published was false, or published the statement in reckless disregard of whether the matter was false and defamatory.... If the plaintiff makes a timely and proper showing in response to the motion to strike, that a defendant or witness

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                                                                    Page 19
71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
(Cite as: 71 Cal.App.4th 226)

possesses evidence needed by plaintiff to establish a prima facie case, the plaintiff must be given the reasonable opportunity to obtain that evidence through discovery before the motion to strike is adjudicated." (*Lafayette Morehouse Inc.,* v. *Chronicle Publishing Co.,* supra, 37 Cal.App.4th at pp. 867-868.) Appellant had no access to evidence on the ultimate issue-the respondents' state of mind. The record does reflect that many of the accusations in the article were not drawn from litigation records. Appellant did cite *Lafayette Morehouse* to the trial court, but the trial court nevertheless denied any discovery. Both the trial court and the majority opinion find that appellant failed to make a sufficient showing of what additional facts he expected to discover. It seems reasonably clear from the context, however, that the issue was constitutional malice and the need was to inquire into possible circumstantial evidence of constitutional malice. *254

*Masson v. New Yorker Magazine, Inc., supra,* 501 U.S. 496, is also instructive. *Masson* was decided in 1991. It reviewed a summary judgment granted by the United States District Court for the Northern District of California in a 1987 libel case. The summary judgment was granted only after "extensive discovery." (*Id.* at pp. 501-502 [111 S.Ct. at p. 2425].) In *Masson,* the United States Supreme Court reversed the summary judgment, finding evidence that the author had attributed false quotations to the plaintiff and that the evidence the plaintiff was able to present, by virtue of the "extensive discovery," constituted substantial evidence which "would support a jury determination under a clear and convincing standard" that the author had acted with constitutional malice. (*Id.* at p. 521 [111 S.Ct. at p. 2435].) *Masson* is now the leading United States Supreme Court case on the subject of defamation and the use of quotations. However, *Masson* was decided in federal court and before the SLAPP statute was enacted in 1992. If the SLAPP statute had been applied to *Masson,* and if the majority opinion is correct and I am mistaken, we would not now have the benefit of *Masson's* guidance on defamation and the use of quotations, for the *Masson* case would never have survived the in-

evitable SLAPP motion. Instead of a remand for trial, the *Masson* plaintiff would have obtained only a summary dismissal, coupled with an order to pay his opponent's attorney's fees.

Although it is common to think first of the First Amendment when thinking of defamation law, defamation is a state law tort. The First Amendment simply places constitutional limitations on the permissible extent of state law on this subject. As a state law tort, defamation is subject to structuring and limitation by state legislation. If the Legislature chose to curtail the availability of remedies for defamation under state law as severely as the majority finds, the Legislature could properly do so. The question is whether the Legislature so intended in enacting the SLAPP statute. In this connection, it may be instructive to note that by parity of reasoning with those portions of the majority opinion with which I concur, a similar article about the marital experiences of a state legislator would also be a matter of public interest. A legislator's defamation suit would similarly be vulnerable to summary SLAPP dismissal without discovery. Appellant is alleged to be a public figure because he affects the course of law and public policy by producing advertisements. State legislators affect law and public policy much more directly, by directly enacting law and setting policy, and hence are even more clearly public figures. I doubt that the legislators who voted for the SLAPP statute intended it to permit respondents to publish an article falsely accusing a male legislator of referring to his wife as a "cunt" while, in practical effect, insulating respondents from any legal consequences and leaving the maligned legislator without recourse. Yet without the means to delve into the circumstantial evidence necessary to demonstrate respondents' *255 state of mind, which evidence would be necessary to demonstrate constitutional malice, the legislator's defamation action would be "SLAPPed" down in short order and he would be ordered to pay respondents' attorney's fees. I doubt that the legislators who enacted the SLAPP statute intended it to reach so far and to constrict defamation protections so tightly.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Cal.App.4th 226                                                      Page 20

71 Cal.App.4th 226, 83 Cal.Rptr.2d 677, 99 Cal. Daily Op. Serv. 2602, 1999 Daily Journal D.A.R. 3337
**(Cite as: 71 Cal.App.4th 226)**

Nor should a decision that the media may publish false reports with virtual impunity be applauded as a victory for the free press. The constitutional value of a free press is that it is free to inform, not that it is free to deliberately or recklessly misinform. As public confidence in the veracity of the press declines, so too does the constitutional value of a free press. (Cf. *Masson v. New Yorker Magazine, Inc., supra,* 501 U.S. 496 at p. 520 [111 S.Ct. at p. 2434] ["By eliminating any method of distinguishing between the statements of the subject and the interpretation of the author, we would diminish to a great degree the trustworthiness of the printed word and eliminate the real meaning of quotations. Not only public figures but the press doubtless would suffer under such a rule.... We would ill serve the values of the First Amendment if we were to grant a near absolute, constitutional protection for such a practice."].)

I concur that the Mother Jones article concerned a matter of public interest. I concur that those allegations which were extracted from the litigation records are privileged. I concur that any additional allegations which did not alter the "gist and sting" of those extracted from the litigation records are also privileged. I also concur that appellant is a public figure who must present evidence of constitutional malice by a clear and convincing standard. I further concur that respondents are entitled to the protection of the SLAPP statute. I dissent from the majority holding that the allegations drawn from sources other than the litigation records did not alter the "gist and sting" of the privileged allegations, and were hence themselves privileged. I also dissent from the majority holding that appellant was not entitled to discovery on the issue of constitutional malice. I would reverse and direct the trial court to consider respondents' SLAPP motion anew after allowing reasonable discovery and additional briefing.

Appellant's petition for review by the Supreme Court was denied July 28, 1999. *256

Cal.App.2.Dist.,1999.

Sipple v. Foundation For Nat. Progress

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.