# EXHIBIT 29
## To Appendix to California State Authorities

Westlaw.

26 Cal.Rptr.3d 350                                                                 Page 1
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

▷

Court of Appeal, Sixth District, California.
John VOGEL et al., Plaintiffs and Respondents,
v.
Joseph FELICE, Defendant and Appellant.
**No. H024448.**

March 24, 2005.

**Background:** Two candidates for public office filed action against operator of website for defamation and related causes of action for allegedly false information appearing on the website. The Superior Court of San Benito County, No. CV0127424, Harry J. Tobias, J., denied defendant's motion to strike complaint pursuant to the anti-SLAPP (strategic lawsuit against public participation) statute. Defendant appealed.

**Holdings:** The Court of Appeal, Rushing, P.J., held that:

(1) anti-SLAPP statute applied to the causes of action;

(2) complaint was legally insufficient for failure to allege statements were made with actual malice, and

(3) if the meaning conveyed by an allegedly defamatory statement such as appeared on website cannot by its nature be proved false, it cannot support a libel claim.

Reversed with directions.

West Headnotes

**[1] Pleading ☞358**
302k358 Most Cited Cases
A defendant's attempt to invoke the protections of the special motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute raises three questions: (1) whether the challenged cause of action arose from conduct in furtherance of the defendant's petition or speech rights, (2) whether the conduct was connected with a public issue, and (3) if so, whether plaintiff established a probability of success on the claim. West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading ☞358**
302k358 Most Cited Cases
A defendant moving to strike complaint under anti-SLAPP (strategic lawsuit against public participation) need not demonstrate that the action actually has had a chilling effect on the exercise of free speech rights. West's Ann.Cal.C.C.P. § 425.16.

**[3] Pleading ☞358**
302k358 Most Cited Cases

**[3] Torts ☞437**
379k437 Most Cited Cases
    (Formerly 379k14)
The term "chill," in the context of the right of free speech underlying the anti-SLAPP (strategic lawsuit against public participation) statute, refers not to a direct interference with ongoing speech by injunctive or similar relief but to the inhibiting effect on speakers of the threat posed by possible lawsuits. U.S.C.A.Const.Amend. 1; West's Ann.Cal.C.C.P. § 425.16.

**[4] Damages ☞149**
115k149 Most Cited Cases
**[4] Libel and Slander ☞71**
237k71 Most Cited Cases
    (Formerly 237k79.1)

**[4] Pleading ☞358**
302k358 Most Cited Cases

**[4] Torts ☞437**
379k437 Most Cited Cases
    (Formerly 379k14)
The anti-SLAPP (strategic lawsuit against public participation) statute applied to causes of action alleged by candidates for public office for libel, false light invasion of privacy, intentional and negligent infliction of emotional distress, and negligent damage to reputation, insofar as they rested exclusively and entirely on defendant's conduct in publishing the offending statements on his website. West's Ann.Cal.C.C.P. § 425.16.
*See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003) ¶*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.Rptr.3d 350                                                                 Page 2
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

*7:237 (CACIVP Ch. 7-C).*

**[5] Pleading ☞360**
302k360 Most Cited Cases
Once defendant shows that anti-SLAPP (strategic lawsuit against public participation) statute applies in action against him, burden shifts to plaintiff to demonstrate probability of prevailing on the merits, which

requires that he demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by plaintiff is credited. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading ☞360**
302k360 Most Cited Cases
In deciding the question of potential merit of plaintiff's lawsuit under anti-SLAPP (strategic lawsuit against public participation) statute, trial court considers the pleadings and evidentiary submissions of both plaintiff and defendant, and, though the court does not weigh credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, defendant's evidence supporting the motion defeats plaintiff's attempt to establish evidentiary support for the claim. West's Ann.Cal.C.C.P. § 425.16.

**[7] Libel and Slander ☞85**
237k85 Most Cited Cases
The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.

**[8] Libel and Slander ☞83**
237k83 Most Cited Cases
A complaint for defamation filed by two candidates for public office was legally insufficient on its face, since it failed to plead that defendant made the challenged statements with "actual malice," i.e., with knowledge that it was false or with reckless disregard of whether it was false or not; such a mental state must be pleaded and proved by any candidate for public office seeking recovery for supposedly injurious statements relating to his or her suitability for office.

**[9] Libel and Slander ☞83**
237k83 Most Cited Cases
Conclusory boilerplate allegation by public figure plaintiff in defamation action that defendant acted "maliciously and oppressively, and in conscious disregard of plaintiff's rights" is insufficient to state a cause of action in a case where actual malice is required.

**[10] Damages ☞149**
115k149 Most Cited Cases

**[10] Libel and Slander ☞83**
237k83 Most Cited Cases

**[10] Torts ☞415**
379k415 Most Cited Cases
   (Formerly 379k26(1))
Complaint by candidates for public office for false light invasion of privacy, intentional and negligent infliction of emotional distress, and negligent damage to reputation, failed to state a cause of action where plaintiffs failed to plead actual malice arising from a knowing or reckless falsehood.

**[11] Libel and Slander ☞6(1)**
237k6(1) Most Cited Cases
The accusation on a web site that two candidates for public office were top-ranking "Dumb Asses" could not survive application of the rule that in order to support a defamation claim, the challenged statement must be found to convey a provably false factual assertion.

**[12] Libel and Slander ☞6(1)**
237k6(1) Most Cited Cases
If the meaning conveyed by an allegedly defamatory statement cannot by its nature be proved false, it cannot support a libel claim.

**[13] Libel and Slander ☞30**
237k30 Most Cited Cases

**[13] Libel and Slander ☞55**
237k55 Most Cited Cases
A public figure or public official who seeks to recover damages for a defamatory statement bears the burden of proving that the challenged statement

was false, and cannot be said to have carried this burden so long as the statement appears substantially true; to bar liability, it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.

**[14] Libel and Slander ☞30**
237k30 Most Cited Cases
In a defamation action in which the primary factual assertions identified by plaintiff as false were that he was a "deadbeat dad" and "wanted" as such, and that he "owes Wife and kids thousands," plaintiff failed to demonstrate the assertions were false, where his only evidence concerning the true facts was the averment, "I do not owe my wife and kids thousands;" this was a "negative pregnant," i.e., a mere denial of the literal truth of the total statement, but not of its substance.
*See* 5 Witkin, Cal. Procedure (4th ed. (1997) Pleading, § 995.

**[15] Libel and Slander ☞30**
237k30 Most Cited Cases
In a defamation action, plaintiff failed to demonstrate any substantial falsity in the characterization of him as "Drunk and Chewin' tobaccy, " as he only described this characterization as false, but never stated the true facts to which the statement would have to be compared in order to establish its substantial falsity; he denied being an alcoholic, but not that he consumed alcohol to the point of inebriation, or that he had done so often, or that he liked to do so, and he used only the present tense in denying that he chewed tobacco.

**[16] Libel and Slander ☞15**
237k15 Most Cited Cases
The linking of plaintiffs' names to websites with objectionable names furnished no basis for recovery in a defamation action in the absence of a provably false assertion of fact.

**[17] Libel and Slander ☞21**
237k21 Most Cited Cases
A defamation action may proceed only where the challenged statement conveys a meaning of and concerning the plaintiff, and the limitation applies

not only in defamation cases, but is constitutionally required with respect to all claims whose gravamen is the alleged injurious falsehood of a statement.

**[18] Constitutional Law ☞1581**
92k1581 Most Cited Cases
    (Formerly 92k90.1(1))

**[18] Constitutional Law ☞2144**
92k2144 Most Cited Cases
    (Formerly 92k90.1(1))
First Amendment right of freedom of speech includes the right to remain anonymous, which right clearly encompasses all forms of expression whether they be writings, or a recorded message published over the telephone. U.S.C.A. Const.Amend. 1; West's Ann.Cal. Const. Art. 1, § 1.
**352 Robinson & Wood, Jesse F. Ruiz, Ann A. Nguyen, for Defendant and Appellant Joseph Felice.

**353 Leslie Shearer, William C. Dresser, for Plaintiffs and Respondents John Vogel et al.

RUSHING, P.J.

*1010 In this action, two candidates for public office and their wives seek damages for libel and other torts based on statements posted on a public Web site. Defendant, who hosted the Web site and apparently authored the offending statements, brought a special motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16 (section 425.16 or the Act). The trial court denied the motion, apparently finding that the challenged statements could be shown to have exceeded whatever privileges might be afforded under California law and the federal Constitution. We have concluded that this was error. Plaintiffs' claims fall squarely within the Act, which therefore required plaintiffs to show that they could prevail on the merits. They failed to carry this burden. We will therefore reverse with instructions to grant the special motion to strike.

BACKGROUND
In September 2001 plaintiffs John Vogel and Paul

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.Rptr.3d 350                                                                            Page 4
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)

Grannis filed a complaint charging defendant Joseph Felice with libel, false light invasion of privacy, intentional and negligent infliction of emotional distress, and negligent damage to reputation. [FN1] The gist of the complaint was that from December 2, 1999, through November 2000, defendant "ran a website through www.geocities.com/bobvalenzuelasass [ and www.geocities.com/bobvalenzuelasass.isonfire.com ," which "contained defamatory statements about Plaintiffs, including but not limited to, a list entitled 'Top Ten Dumb Asses,' " in which Vogel and Grannis were "listed as the number 1 and number 2 dumb asses, respectively." Plaintiffs alleged that the Web site "contained statements associating Plaintiffs with criminal conduct and fraud," and specifically noted "the statement 'J. J. Vogel's Wanted as a Dead Beat Dad,' which, when clicked upon, opened another web site dedicated to locating 'deadbeat dads,' " and "the statement, 'Paul Grannis-Bankrupt, Drunk & Chewin' tobaccy' which when clicked upon, opened a new web page associating Plaintiff Grannis with criminal, fraudulent, and immoral conduct." Plaintiffs alleged that additional (but unspecified) defamatory statements appeared in "[n]umerous e-mails and bulletin messages ... *1011 sent and received through said web site" as well as in "[o]ther web pages in said web site," which "contained false and defamatory statements about Plaintiffs, including ... patent associations with criminal and fraudulent conduct." It was further alleged that "[a]ll statements about Plaintiffs were false," that they were publicly accessible and read worldwide, and that "[t]he actions of Defendants [ and in conscious disregard of [plaintiffs'] **354 rights...."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.Rptr.3d 350                                                                                                          Page 5
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)

concerning plaintiff Vogel in Schuylkill County, Pennsylvania, and Santa Clara County, California. Apparent copies of these materials indicated that in 1984, the Pennsylvania court entered an order requiring plaintiff Vogel to make payments of $30 per week toward the support of three minor children, plus "an additional $10.00 per week for arrearage." In 1987 the children's mother, Barbara Vogel, brought a complaint for support in that court alleging that she was raising the three children on income of $6,000 per year, that defendant was residing in Santa Clara County, and that he had "refused and neglected to provide reasonable support for [her] and the other dependents...." An accompanying statement asserted "arrearages" of $4,050 as of dated May 18, 1987, and a worksheet indicated that Vogel had paid no part of his support obligations to that time. In September 1990, plaintiff Vogel *1012 filed a declaration in the Santa Clara County Superior Court, asserting that he was a full-time student with no income or assets and with household expenses exceeding his then wife's income. On December 9, 1990, the Santa Clara Superior Court issued a bench warrant for Vogel's arrest. In April 1991, the court entered a stipulated order requiring him to pay monthly sums of $130 for child support and $45 toward an arrearage of $10,650 accrued from November 1984 to April 1991. [FN2] The court issued a wage assignment order to effectuate the support order.

> FN2. According to our calculations, at $45 per month it would take 19.7 years to discharge a debt of $10,650--excluding interest.

In opposition to the special motion to strike, plaintiffs conceded having "r[u]n for an office in Hollister and lost." Their opposition memorandum essentially reiterated the allegations of the complaint. In a supporting declaration, plaintiff Vogel averred that the Web site "contained false **355 and offensive statements about me including, 'J. J. the Dead Beat Dad owe[s] Wife and kids thousands.' This statement is false in that I do not owe my wife and kids thousands. [¶] ... Defendant's website also contained the statement that 'J. J. Vo-

gel's WANTED as a Dead Beat Dad.' This statement is also false. [¶] ... The statement, 'J. J. Vogel's WANTED as a Dead Beat Dad.' served as a link [which]when clicked on, would lead the viewer to another website dedicated to locating 'deadbeat dads.' This patent association with a person who is wanted by the government is false and highly offensive. [¶] ... Defendant's website also had a list entitled 'Top Ten Dumb Asses' in which I was listed as number 1. My name served as a link to a website with the address of www.satan.com. [¶] ... [¶] ... Defendant's websites also contained emails and bulletin messages containing false statements about me. [¶] ... The entire content of the websites were [sic ] false as it pertained to me and highly offensive."

Plaintiff Grannis similarly declared: "Defendant's website contained false and offensive statements about me including, 'Paul Grannis--Bankrupt, Drunk, & Chewin tobaccy.' This statement is false and highly offensive in that I am not an alcoholic or chew tobacco. [¶] ... The statement 'Paul Grannis-Bankrupt, Drunk, & Chewin tobaccy' served as a link [which] when clicked on, would lead the viewer to another webpage with the address of www.olddrunk.com. This patent association of being a drunk was highly offensive. [¶] ... Defendant's website also had a list entitled 'Top Ten Dumb Asses' in which I was listed as number 2. My name served as a link to a website with the address of www.bankrupta [* *]hole.com. [¶] ... Defendant's websites also contained emails and bulletin messages containing statements that I bankrupted many businesses throughout California. These statements were also false. [¶] ... The entire content of the websites were [sic] false as it pertained to me and highly offensive."

*1013 Also accompanying the opposition were (1) a declaration by Brian Conroy stating that he was ranked fifth on the list of "Top Ten Dumb Asses" and that his name was linked to a Web site with the address <http:www.idiot.com>; and (2) a declaration by Richard Scagliotti stating that he was ranked seventh on the list and was linked to the address <http:www.old buttman.com>. Each of these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.Rptr.3d 350                                                                                          Page 6
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

declarants stated that his depiction on the site was highly offensive, and that having his name linked "to a sophomoric website was also offensive and is not connected to a public issue."

Defendant objected to plaintiffs' supporting exhibits on a variety of grounds including hearsay, lack of foundation (i.e., authenticity), and relevance. Plaintiffs in turn filed objections on the eve of the hearing to defendant's own exhibits on grounds including relevance, hearsay, and excessive prejudicial potential.

The trial court heard the special motion to strike on February 5, 2002. The court sustained defendant's objections to all of plaintiffs' exhibits, as well as to the declarations of Conroy and Scagliotti. The court sustained plaintiffs' objections to all of defendant's exhibits except the bankruptcy petition filed by plaintiff Grannis and the vote totals offered to prove that plaintiff Vogel was a candidate for public office. The court then ruled that it was "going to deny the motion to dismiss at this point in time. I believe that the communication exceeded what would be--for purposes of pleading and at this stage of the proceeding, I believe that the evidence indicates that the communications exceeded what would be reasonably considered relevant as between interested parties." The court opined that the case of plaintiff **356 Grannis "is more difficult to perhaps prevail on in the future because the allegation is that he's bankrupt. Well, in fact he did file a petition under Chapter VII ... in, I think it was, 1997 or so. And generally I think you can file those petitions in bankruptcy once every seven years or so. So it's perhaps relevant for someone in the year 2000 or 2001 to consider the comments that Mr. Felice is making ... I think the information is similar to, [d]o you want this guy running his city government when he can't even take care of his own personal finances? But I believe that there were other links on that Web site to other issues that I don't think were relevant. And so I'm denying the motion to dismiss on Grannis. [¶] On Mr. Vogel, I believe he has perhaps a stronger claim, in that it's alleged that he was a deadbeat dad in 1991. I think the court record is that he was in fact a deadbeat dad.

That's the evidence. However, I don't know that at what point in time his status as a father who owed support was cured, and as of 1999 or 2000, Mr. Kim [i.e., counsel for *1014 plaintiffs] is arguing, and he may have evidence to sustain this, that that was no longer the case.... I don't think the Web site was alleging that the person was previously a deadbeat dad and is that the kind of person you want controlling your government, it was he is a deadbeat dad.... [B]ut again, as in the Grannis case, there were other links on the Web site that tended to be less flattering."

On April 9, 2002, the court signed and filed a formal order denying the motion to strike and allowing defendant "thirty days from Notice of this Order to respond to Plaintiffs' complaint." Plaintiffs' counsel served notice of entry of the order on May 1, 2002. Defendant filed his notice of appeal on May 6, 2002. The order is appealable (§ 425.16, subd. (j)), and the appeal is timely (Cal. Rules of Court, rule 2(a), (f)).

## DISCUSSION

### I. *Applicability of Statute*

Section 425.16 is intended to bring about an early test of the merits in actions tending to chill citizen participation in public affairs. (See § 425.16, subd. (a) [declaration of legislative purpose].) The Legislature has directed that the statute "shall be construed broadly" in order "to encourage continued participation in matters of public significance." (*Ibid.*) The statute entitles a defendant to bring a "special motion to strike" (*ibid.*) any cause of action "arising from any act of [the defendant] in furtherance of [his or her] right of petition or free speech under the United States or California Constitution in connection with a public issue ... unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim" (§ 425.16, subd. (b)(1)). The statute further provides, "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.Rptr.3d 350                                                                   Page 7
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)

writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

**357 *1015 [1] A defendant's attempt to invoke the protections of the statute thus raises three questions: (1) does the challenged cause of action arise from conduct in furtherance of the defendant's petition or speech rights? (2) Was the conduct connected with a public issue? (3) If those questions are answered affirmatively, has the plaintiff established a probability of success on the claim?

In the present matter we find little room for doubt that the first and second questions must be answered affirmatively. Plaintiffs' own descriptions establish that the Web pages underlying their claims consist of "writing made in ... a public forum." A common meaning of "forum" is "a medium (as a newspaper) of open discussion or expression of ideas." (Merriam-Webster's Collegiate Dict. (10th ed.1999) p. 460.) All cases we have found considering public Web sites in this context have concluded that such a site constitutes a public forum within section 425.16. (Wilbanks v. Wolk (2004) 121 Cal.App.4th 883, 897, 17 Cal.Rptr.3d 497; ComputerXpress, Inc. v. Jackson (2001) 93 Cal.App.4th 993, 1007, 113 Cal.Rptr.2d 625; Bernardo v. Planned Parenthood Federation of America (2004) 115 Cal.App.4th 322, 358, 9 Cal.Rptr.3d 197.)

Moreover there can be no serious doubt that the conduct underlying plaintiff's claims was taken "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free

speech ...." (§ 425.16, subd. (e)(4); see Wilbanks v. Wolk, supra, 121 Cal.App.4th at p. 897, 17 Cal.Rptr.3d 497 [subd. (e)(4) has effect of extending statute to "private communications, so long as they concern a public issue"].) Indeed it is doubtful that this characteristic would ever be lacking where, as here, the conduct underlying the plaintiff's claims consists of pure speech. We therefore conclude that the conduct on which plaintiffs seek to predicate liability was of a character protected by section 425.16.

Nor can there be serious doubt that the challenged statements were made "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) It is undisputed that both plaintiffs were candidates for public office at the time the offending Web pages were published. The character and qualifications of a candidate for public office constitutes a "public issue or an issue of public interest." (Conroy v. Spitzer (1999) 70 Cal.App.4th 1446, 1451, 83 Cal.Rptr.2d 443 [the defendant's statements "obviously fell within the purview of section 425.16 because they addressed a matter of public concern--a candidate's qualifications and conduct in office"]; see *1016Matson v. Dvorak (1995) 40 Cal.App.4th 539, 548, 46 Cal.Rptr.2d 880, quoting Aisenson v. American Broadcasting Co. (1990) 220 Cal.App.3d 146, 154, 269 Cal.Rptr. 379 ["The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. 'Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment' "]; Yorty v. Chandler (1970) 13 Cal.App.3d 467, 472, 91 Cal.Rptr. 709, quoting Eva v. Smith (1928) 89 Cal.App. 324, 328-330, 264 P. 803 [" 'An individual who seeks or accepts public office invites and challenges public criticism so far as it may relate to his fitness and qualifications.... The right of criticism rests upon public policy....' "].)

[2][3] In an attempt to show that defendant's conduct fell outside the reach of section 425.16, plaintiffs suggest that their lawsuit will not "chill"

speech because it seeks only damages for conduct already completed. The Supreme Court has already **358 declared, however, that a defendant moving to strike under section 425.16 need not "demonstrate that the action actually has had a chilling effect on the exercise of such rights. [Citation.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88, 124 Cal.Rptr.2d 530, 52 P.3d 703 (*Navellier* ).) This makes it unnecessary to address plaintiffs' misapprehension of the term "chill," which in this context refers not to a direct interference with ongoing speech by injunctive or similar relief but to the inhibiting effect on speakers of the *threat* posed by *possible* lawsuits. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 300-301, 84 S.Ct. 710, 11 L.Ed.2d 686 (*Sullivan* ) (conc. opn. of Goldberg, J.) ["The opinion of the Court conclusively demonstrates the chilling effect of the Alabama libel laws on First Amendment freedoms...."]; *Dombrowski v. Pfister* (1965) 380 U.S. 479, 494, 85 S.Ct. 1116, 14 L.Ed.2d 22, ["So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression"].)

[4] We conclude that the Act applies to plaintiffs' claims. This includes all of plaintiffs' causes of action, regardless of the underlying theories of recovery, insofar as they are "*based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78, 124 Cal.Rptr.2d 519, 52 P.3d 695.) Here all of the causes of action alleged by plaintiffs rest exclusively and entirely on defendant's conduct in publishing the offending statements on his Web site. Since that conduct fell squarely within the realm protected by section 425.16, all of plaintiffs' causes of action are subject to the statute.

*1017 **II. *Success on Merits***

**A. *Failure to Plead Actual Malice***

[5][6][7] Once a defendant shows that the Act ap-

plies, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the merits. (*Navellier, supra,* 29 Cal.4th at pp. 88-89, 95, 124 Cal.Rptr.2d 530, 52 P.3d 703; § 426.16, subd. (b).) [FN3] "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must ' "state[ ] and substantiate[ ] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the *complaint is both legally sufficient* and *supported by a sufficient prima facie showing of facts* to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's **359 attempt to establish evidentiary support for the claim. [Citation.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733, first and second italics added, third italics in original.)

> FN3. Our consideration of this question has been needlessly complicated by plaintiffs' failure to clearly and comprehensively specify the statements by which they claim to have been injured. "The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint. [Citations.]" (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1612, fn. 5, 284 Cal.Rptr. 244.) In view of this rule we would be justified in disregarding any evidence or argument concerning statements not explicitly set forth in the complaint. As will be seen, however, *none* of the statements of which plaintiffs have complained in their various filings below was shown by them to furnish a ground for judgment in their favor.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03795-JW     Document 49     Filed 08/23/2007     Page 10 of 32

26 Cal.Rptr.3d 350                                                                                   Page 9
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

[8] The complaint here is legally insufficient on its face. For one thing, it fails to plead that defendant made the challenged statements with "actual malice" as that term is used in *Sullivan, supra,* 376 U.S. at pages 279-280, 84 S.Ct. 710 i.e., "with knowledge that it was false or with reckless disregard of whether it was false or not." Such a mental state must be pleaded and proved by any candidate for public office seeking recovery for supposedly injurious statements relating to his or her suitability for office. (*Miller v. Nestande* (1987) 192 Cal.App.3d 191, 201, 237 Cal.Rptr. 359 ["Although both the *Coleman* and *New York Times* cases involved alleged libels pertaining to in-office conduct of public officials, the reference to the need to protect a free flow of information regarding qualifications of persons applying for, as well as already holding, public office compels the application of an actual malice standard to candidates for office"]; see *1018*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 952, 52 Cal.Rptr.2d 357 [special motion to dismiss properly granted; candidate for Congress was public figure, and record lacked "evidence upon which a reasonable fact finder could find that [the defendant] acted with the requisite malice"]; *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 28-29, fn. 6, 81 Cal.Rptr. 360, 459 P.2d 912 [candidate for city council could recover only on showing of knowing or reckless falsehood]; *Noonan v. Rousselot* (1966) 239 Cal.App.2d 447, 452, 48 Cal.Rptr. 817 [candidate for Congress in primary election, though "not a 'public official' in the narrow sense," had to show actual malice as defined in *Sullivan* ].)

[9] The complaint here makes no attempt to plead a knowing and reckless falsehood. It contains only the conclusory boilerplate allegation that defendant acted "maliciously and oppressively, and in conscious disregard of [plaintiffs'] rights...." Such an allegation is insufficient to state a cause of action in a case where "actual malice" of the *Sullivan* type is required. (*Noonan v. Rousselot, supra,* 239 Cal.App.2d at p. 454, 48 Cal.Rptr. 817; *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1615, 284 Cal.Rptr. 244; cf. *Mullins v. Brando* (1970) 13 Cal.App.3d 409, 420, 421, 91 Cal.Rptr. 796

[holding sufficient an allegation that defendants published "with wanton and reckless disregard for the truth or falsity of the statements made"].)

[10] Nor does plaintiffs' failure to plead a knowing or reckless falsehood affect only their claims for libel. Rather it constitutes a fatal defect as to all of their claims "hav[ing] as their gravamen the alleged injurious falsehood of a statement." (*Blatty v. New York Times Co., supra,* 42 Cal.3d at p. 1045, 232 Cal.Rptr. 542, 728 P.2d 1177; *Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1615, 284 Cal.Rptr. 244.) Since plaintiffs' entire case is predicated on such statements, the complaint as a whole, and each cause of action therein, fails to state facts sufficient to constitute a cause of action.

Plaintiffs seem to imply that defendant's statements were not constitutionally privileged because they did not relate to a matter of public concern. We doubt that this point has been presented with sufficient cogency to require that we address it, but it is any event readily dispelled. Assuming the doubtful proposition that the offending statements had to separately appear to address matters of public concern, there is no basis on this record to doubt that they did so. Plaintiff Vogel's asserted default on child support obligations, and **360 plaintiff Grannis's reported petition for bankruptcy, had an obvious bearing on each respective plaintiff's character and fitness for public office.

*1019 Plaintiffs may be understood to suggest that Vogel's default and Grannis's bankruptcy were not germane to their electoral qualifications because they took place in the past. Again we may assume, without deciding, the potential pertinence of the argument as framed, and yet categorically reject it as inapplicable here. The determination of what facts are germane to a candidate's suitability for office is entrusted by our system of government to voters, not judges or juries. For that reason, persons commenting or reporting on a candidate's history must be allowed the broadest possible latitude. So long as past conduct has any arguable bearing on a candidate's honesty, integrity, prudence, judgment, wisdom, trustworthiness, responsibility, or any oth-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Cal.Rptr.3d 350                                                                    Page 10
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)

er trait fairly implicated by his or her aspiration to elected office, we would be very reluctant to permit the imposition of damages for an otherwise permissible report based merely on the premise that the passage of time has rendered the reported conduct irrelevant. (See *Beruan v. French* (1976) 56 Cal.App.3d 825, 828, 128 Cal.Rptr. 869 ["A charge of criminal conduct, no matter how remote, is relevant to a candidate's fitness for office"].)

We conclude that the complaint is deficient on its face and that since plaintiffs at no time offered to amend it in any pertinent respect, they failed to establish the requisite likelihood that they could prevail on the merits if allowed to proceed with the lawsuit. We are constrained to observe, however, that this point was never clearly raised by defendant as a distinct ground for dismissal. Therefore we will not rely on it for our own disposition (see Gov.Code, § 68081), but will proceed to consider whether plaintiffs carried their burden of showing an ability to *prove* their case on the merits.

**B. *Proof of Defamatory Utterance***

In support of their claims plaintiffs have identified three distinct defamatory assertions as well as a host of other less clearly defined features of defendant's website. We will first consider whether plaintiffs have demonstrated an ability to prevail on the basis of the distinctly described statements, which consist of the following: (1) Both plaintiffs are among the "Top Ten Dumb Asses." (2) Plaintiff Vogel is a "deadbeat dad" who "owed thousands" to his wife and children. (3) Plaintiff Grannis is or was "Bankrupt, Drunk, and Chewin' tobacco." For a variety of reasons, none of these statements can sustain any of plaintiffs' claims.

[11] The accusation that plaintiffs are top-ranking "Dumb Asses" cannot survive application of the rule that in order to support a defamation claim, the challenged statement must be found to convey "a provably false factual assertion." *1020(Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724, 275 Cal.Rptr. 494.) A statement that the plaintiff is a "Dumb Ass," even

first among "Dumb Asses," communicates no factual proposition susceptible of proof or refutation. It is true that "dumb" by itself can convey the relatively concrete meaning "lacking in intelligence." Even so, depending on context, it may convey a lack less of objectively assayable mental function than of such imponderable and debatable virtues as judgment or wisdom. To call a man "dumb" often means no more than to call him a "fool." One man's fool may be another's savant. Indeed, a corollary of Lincoln's famous aphorism is that *every* person is a fool some of the time.

**361 [12] Here defendant did not use "dumb" in isolation, but as part of the idiomatic phrase, "dumb ass." When applied to a whole human being, the term "ass" is a general expression of contempt essentially devoid of factual content. Adding the word "dumb" merely converts "contemptible person" to "contemptible fool." Plaintiffs were justifiably insulted by this epithet, but they failed entirely to show how it could be found to convey a provable factual proposition. (See *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385, 10 Cal.Rptr.3d 429 ["the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact"].) If the meaning conveyed cannot by its nature be proved false, it cannot support a libel claim. (See *ibid.; Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1475-1476, 48 Cal.Rptr.2d 235.)

Nothing in the record before us suggests that the context in which the challenged statements were made would have infused them with a provably false meaning. Judging from additional portions of the Web site offered by plaintiffs in their opposition papers below, the Web site's overall tone was one of puerile vituperation and wretchedly excessive tastelessness. The ostensible author of the list of "Top Ten Dumb Asses," apparently a fictionalized figure, is *himself* presented as a "dumb ass," i.e., "Dumb Ass Bob," who purports to be providing "advice" to supposed readers who may or may not themselves be fictional or fictionalized. If the page containing the "Top Ten List" is any example,

26 Cal.Rptr.3d 350                                                                 Page 11
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

"Dumb Ass Bob" refers to his readers (real or concocted) as "dumb ass[es]." In fact, the main purpose of the page seems to be to employ the term "ass" as often as possible, preferably in conjunction with "dumb." In such a context it is inconceivable that placement on the "Top Ten Dumb Asses" list could be understood to convey any imputation of provable defamatory fact. This statement simply cannot support a defamation claim, or any other claim pleaded by plaintiffs.

**\*1021 C. *Proof of False Utterance***

In contrast to the "Dumb Ass" charge, the statements that Vogel was a "deadbeat dad" and that Grannis was bankrupt, drunk, and "[c]hewin' tobaccy" are at least *capable* of conveying a provably false factual imputation. However, plaintiffs failed to substantiate their claims with respect to these statements, because they failed to make a prima facie showing that the statements were substantially false.

[13] A public figure or public official who seeks to recover damages for a defamatory statement bears the burden of proving that the challenged statement was false. (*Stolz v. KSFM 102 FM* (1994) 30 Cal.App.4th 195, 202, 35 Cal.Rptr.2d 740.) The plaintiff cannot be said to have carried this burden so long as the statement appears *substantially* true. To bar liability, " 'it is sufficient if the *substance* of the charge be proved true, irrespective of slight inaccuracy in the details.' [Citations.] ... [Citation.] ... Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' [Citations.] Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' [Citations.]" (*Masson v. New Yorker Magazine* (1991) 501 U.S. 496, 516-517, 111 S.Ct. 2419, 115 L.Ed.2d 447, italics added [discussing California law].) [FN4]

> FN4. The passage just quoted suggests that the plaintiff may be under a burden to *plead* the "truth" concerning the matters

embraced by the allegedly defamatory statement. Such a requirement would suggest yet another fatal deficiency in plaintiffs' complaint, which contains only the blanket generalization that "All statements about Plaintiffs were false." As appears below, this coyness about the actual facts pervades the record in the trial court and on appeal.

**\*\*362** Because plaintiffs were public figures, or quasi-public officials, with respect to their candidacies for public office, they could not demonstrate their ability to succeed on the merits without (1) identifying statements that conveyed a provably false and defamatory imputation, and (2) presenting evidence that the statements were in fact substantially false, i.e., diverged from the true facts in and to such manner and degree as to produce a more damaging effect on the mind of the reader than would the truth. Neither plaintiff came close to carrying this burden.

[14] The primary factual assertions identified by plaintiff Vogel as false were that he was a "deadbeat dad" and "wanted" as such, and that he "owes Wife and kids thousands." His only evidence concerning the true facts was the averment, "I do not owe my wife and kids thousands." This is a "negative pregnant," i.e., "a denial of the literal truth of the total statement, but not of its substance." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 995, p. 451.) By denying a debt in a specified amount, it leaves open the **\*1022** possibility of a debt in some other, perhaps substantially equivalent, amount. Thus if "thousands" means $2,000 or more, Vogel's simple negation leaves open the possibility that he owes $1,999.99, in which case the challenged statement remains substantially true.

Further, the use of the conjunction "and" in both the challenged statement and the denial raises a hosts of difficulties. In all likelihood the meaning of the challenged statement was that Vogel's combined debt to both his wife and children was at least $2,000. But the use of "and" in Vogel's denial ("I do not owe my wife and kids thousands") could

26 Cal.Rptr.3d 350                                                                                           Page 12
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

mean a number of things: (1) the combined debt to his wife and children is less than $2,000; (2) the debt to his children is less than $2,000, but the debt to his wife may be greater; or (3) the debt to his wife is less than $2,000, but the debt to his children may be greater. This ambiguity becomes all the more striking considering the presumptive ease with which Vogel could have stated the true facts, i.e., how much he owed, and when and how the debt, or portions of it, were discharged. Vogel's failure to plainly refute the defamatory imputation by stating the true facts may be understood to imply that he did in fact continue to owe substantial amounts of unpaid child support. [FN5] Certainly it was insufficient to establish **363 his ability to prove the substantial falsity of the imputations that he was a "deadbeat dad" who "owed thousands."

> FN5. If A asserts, "The car is red and blue," B's simple negation of that statement ("The car is not red and blue") fails entirely to disclose the car's true colors as asserted by B. He may believe the car is blue but not red; he may believe the car is red but not blue; or he may believe the car is neither blue nor red. Indeed his failure to plainly state what he *does* believe may justify a suspicion that he is engaged in a deliberate evasion, which in turn raises the question whether he may not have found some way to reveal even less than appears, most obviously by attributing some secret and unexpected construction to the proposition thus seemingly denied. So B might privately posit that "red and blue" refers to a *blend* of those two colors, justifying his denial of the original statement so long as the car is not *purple.* Presumably it was judicial frustration with such devices that led to the rule under which a pregnant denial in a *pleading* works to *admit* the allegation thus ostensibly negated. (5 Witkin, Cal. Procedure, *supra,* § 995, pp. 451-452.) We do not assume that the same rule should be invariably applied to averments in a declaration. At the same time, the common-sense principles underlying the rule do not become wholly inapplicable merely because pleadings are not involved.

[15] Plaintiff Grannis tacitly admitted the substantial truth of describing him as "bankrupt"; certainly he did not deny that he had filed a bankruptcy petition as asserted in defendant's moving papers. And he failed to demonstrate any *substantial* falsity in the characterization "Drunk and Chewin' tobaccy." He described this characterization as false, but never stated the true facts to which the statement would have to be compared in order to establish its *substantial* falsity. He denied being an alcoholic, but not that he consumed alcohol to the point of inebriation, or that he had done so often, or that he liked to do so. Similarly, he used only the present tense in denying that he *1023 chewed tobacco; for all the record shows, he might have chewed it in the very recent past, and might intend to chew it again in the future. Further, while some people may consider the chewing of tobacco an unsavory or even repellent practice, there is no indication that it carries such opprobrium that a false imputation of engaging in it works compensable harm to an individual's reputation. We also question whether any viewer of the site would take seriously an imputation couched in a whimsical dialect ("Chewin' tobaccy") and surrounded by persiflage and raillery of the most self-indulgent and fanciful sort.

[16] Both plaintiffs also complain about other aspects of defendant's Web site. Thus they assert that defendant linked their names to certain web addresses with objectionable names. For most of these complaints here is no indication of the actual content to be found at these addresses; rather, plaintiffs' complaints are based entirely on the *name* of the linked *address.* Thus Vogel complains that his name was linked to "www.satan.com," and Grannis complains that he was linked to "bankrupta[**]hole.com" and "olddrunk.com." But merely linking a plaintiff's name to the word "satan" conveys nothing more than the author's opinion that there is something devilish or evil about the plaintiff. [FN6] Similarly, "bankrupta[**]hole.com" tied an undisputed fact (bankruptcy) to a derogatory epithet devoid of

26 Cal.Rptr.3d 350                                                                                              Page 13
127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489
**(Cite as: 127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350)**

provable meaning. In the absence of a provably false assertion of fact, such imputations furnish no basis for recovery. Linking Grannis's name to the address "olddrunk.com" was not shown to convey a substantially false meaning.

> FN6. Vogel also complains that defendant's Web site included a picture of him altered to "look like a devil." This grievance adds nothing of substance to the points addressed in the text. Similarly Vogel complains that his name was linked to "a Web site dedicated to locating 'deadbeat dads.'" This adds nothing to the direct assertion that he was a "deadbeat dad." Nowhere in the record do we find any basis for the notion that defendant's website portrayed Vogel as being sought by authorities.

[17] Plaintiffs also complain that defendant's Web site contained scurrilous text as well as links to pornographic material on other sites. There is no suggestion that defendant asserted any factual association between this material and plaintiffs, or that the material would be understood to refer to them in any way. A defamation action may proceed only where the challenged statement conveys a meaning " 'of and concerning' the plaintiff." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 728 P.2d 1177.) This limitation applies not only in defamation cases, but is constitutionally required with respect to "all claims whose gravamen **364 is the alleged injurious falsehood of a statement." (*Ibid.*)

*1024 Nor need we be long detained by plaintiffs' assertion that the Web site included emails and "bulletin messages" containing other statements defamatory of plaintiffs. The only evidence of any specific statement is the averment by plaintiff Grannis that the Web site included "emails and bulletin messages containing statements that I bankrupted many businesses throughout California." Such a statement might indeed support a judgment if shown to be attributable to defendant, substantially false, and made with knowledge of falsity or reck-

less disregard for the truth. However the record provides no basis to conclude that plaintiff Grannis could prove any of these elements. The owner or host of a Web site is not automatically liable for everything that appears there. (See Rest.2d, Torts. § 581(1); Communications Decency Act of 1996, 47 U.S.C. § 230; *Carafano v. Metrosplash.com Inc.* (C.D.Cal.2002) 207 F.Supp.2d 1055.) Nor does the record provide any basis to conclude that the statement is substantially false, [FN7] or was made with knowledge of its falsity or serious doubts about its truth.

> FN7. Once again plaintiffs' simple negation of the challenged statement fails to fairly meet its substance. An assertion that someone "bankrupted many businesses throughout California" may be *substantially* true even if it is literally false. Most obviously, plaintiff might have bankrupted many businesses, but all in one part of the state; or he might have bankrupted only two or three, but in various parts of the state. For that matter, a simple negation that he "bankrupted" businesses might mean no more than that he, personally, did not file a bankruptcy petition. The statement that he "bankrupted many businesses" would be substantially true if he brought about the unremedied insolvency of some number of California businesses. Nothing in this record demonstrates that Grannis could prove the falsity of that proposition.

### D. *Other Matters*

[18] Plaintiffs repeatedly emphasize that defendant's Web site was "anonymous," without explaining the intended meaning or significance of that characterization. While a speaker's attempt to remain anonymous might have some logical relevance in an otherwise colorable defamation action, it does not categorically dispel the protections of the First Amendment. On the contrary, "the First Amendment right of freedom of speech *includes* the right to remain anonymous." (*Huntley v. Public*

*Util. Com.* (1968) 69 Cal.2d 67, 73, 69 Cal.Rptr. 605, 442 P.2d 685, italics added.) This right "clearly encompasses all forms of expression whether they be writings, or ... a recorded message published over the telephone." (*Ibid.*) "The right to speak anonymously draws its strength from two separate constitutional wellsprings: the First Amendment's freedom of speech and the right of privacy in article I, section 1 of the California Constitution. The anonymous pamphleteer is one of the enduring images of the American revolutionary heritage." (*Rancho Publications v. Superior Court* (1999) 68 Cal.App.4th 1538, 1540-1541, 81 Cal.Rptr.2d 274.) "While anonymity could be used to conceal dirty tricks,' ... the interest in having anonymous works enter the marketplace of ideas *1025 unquestionably outweighs any public interest in requiring disclosure as a condition of entry.' " (*Id.* at p. 1547, 81 Cal.Rptr.2d 274, quoting *McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 342, 115 S.Ct. 1511, 131 L.Ed.2d 426.)

Plaintiffs also draw repeated attention to an "apology" ostensibly signed by defendant and assertedly printed in a local newspaper. Plaintiffs offered no competent evidence of the relevant facts, including the authenticity of the document, to which defendant objected on the ground **365 (among others) that it lacked foundation. This objection was well taken, since there was no declaration identifying the document or laying a basis for its admission. The trial court thus acted properly in sustaining defendant's objection to this document.

Even if the document were properly before us, it would have no tendency to establish that plaintiffs could succeed on the merits. The apology is addressed not to plaintiffs, but to "Bob Valenzuela, Tracie Cone, and the employees and friends of the Pinnacle...." None of these persons are competently identified in this record. The apology acknowledges that defendant's Web site "contained false and hurtful statements about Bob Valenzuela and Tracie Cone," and it sought "forgiveness from Bob Valenzuela, Tracie Cone, the employees and friends of The Pinnacle, and the citizens of this community." Nowhere does it expressly or impliedly acknow-

ledge that defendant said anything false *about plaintiffs* or felt he had anything to apologize to them for. Nothing in this record ties the apology to plaintiffs' claims in any way.

Plaintiffs contend that the trial court properly excluded defendant's evidence in support of the special motion to strike. Plaintiffs' suggestion that these materials were irrelevant verges on frivolousness. Plaintiffs' remaining objections in the trial court are likewise meritless. Plaintiffs raise a more colorable argument on appeal by asserting that defendant failed to properly authenticate the pleadings from the child support and bankruptcy proceedings involving plaintiffs. It is at least arguable that defendant should have offered certified copies of these materials. However, no such objection was lodged in the trial court, where defendant might readily have cured it. Nor have plaintiffs contested the factual accuracy of these materials. We decline to entertain this objection for the first time on appeal.

Plaintiffs bore the burden of showing that they had pleaded, and had evidence to substantiate, a valid cause of action. They failed to carry that burden in virtually every respect. The order denying the special motion to strike cannot be sustained on this record.

**\*1026 DISPOSITION**

The order under review is reversed with directions to grant the special motion to strike. Costs on appeal to appellant.

WE CONCUR: SELIA and MIHARA, JJ.

127 Cal.App.4th 1006, 26 Cal.Rptr.3d 350, 05 Cal. Daily Op. Serv. 2561, 2005 Daily Journal D.A.R. 3489

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 30
## To Appendix to California State Authorities

Westlaw.

17 Cal.Rptr.3d 497                                                                          Page 1
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

▷

Court of Appeal, First District, Division 1, California.

Scott WILBANKS et al., Plaintiffs and Appellants,
v.
Gloria WOLK, Defendant and Respondent.
No. A101100.

Aug. 17, 2004.

**Background:** Viatical settlements brokerage sued industry consumer watchdog for defamation and unfair business practices, arising from statements published by consumer watchdog on her website. The Superior Court, City and County of San Francisco, No. 322652, James J. McBride, J., granted consumer watchdog's special motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute. Brokerage appealed.

**Holdings:** The Court of Appeal, Stein, Acting P.J., held that:

(1) statements on website concerned issue in public interest and were published in public forum within meaning of anti-SLAPP statute, and thus complaint was potentially subject to special motion to strike, but

(2) brokerage made requisite showing of reasonable probability of prevailing on merits of claim under anti-SLAPP statute.

Reversed.

West Headnotes

**[1] Pleading ☞358**
302k358 Most Cited Cases
Anti-SLAPP (strategic lawsuit against public participation) statute does not attempt to distinguish "ordinary lawsuits" from SLAPP suits, i.e., suits brought primarily for the purpose of chilling protected rights of speech or petition; plain language of the statute encompasses any action based on protected speech or petitioning activity as defined by the statute, with no requirement that the defendants moving thereunder also prove that the suit was intended to chill their speech. West's Ann.Cal.C.C.P.

§ 425.16.

**[2] Appeal and Error ☞842(7)**
30k842(7) Most Cited Cases
On appeal of a trial court's grant of a party's special motion to strike a complaint under the anti-SLAPP (strategic lawsuit against public participation) statute, Court of Appeal reviews the record independently to determine whether the asserted cause of action arises from the defendant's free speech or petition activity, and, if so, whether the plaintiff has shown a probability of prevailing. West's Ann.Cal.C.C.P. § 425.16.

**[3] Pleading ☞358**
302k358 Most Cited Cases
Alleged statements made by industry consumer watchdog on her website to effect that viatical settlements brokerage was under investigation by Department of Insurance, subject to judgment against it in favor of viator, a provider of incompetent advice, and unethical concerned issue in public interest and were published in public forum within meaning of anti-SLAPP (strategic lawsuit against public participation) statute, and thus complaint by brokerage against consumer watchdog for defamation and unfair business practices was potentially subject to special motion to strike; even though consumer watchdog was source of all information posted on her website, and business practices of brokerage were not topic of widespread public interest, website was available to public, and consumer information posted there was directly connected to issue of public concern. West's Ann.Cal.C.C.P. § 425.16(e)(3, 4).
See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962A.

**[4] Pleading ☞360**
302k360 Most Cited Cases
When a defendant demonstrates that a complaint is potentially subject to a special motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute, and the burden shifts to the plaintiff to establish a probability of prevailing on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497                                                                          Page 2
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

the claim, the plaintiff's burden is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment; the plaintiff is required to demonstrate that the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the plaintiff's evidence is credited. West's Ann.Cal.C.C.P. § 425.16(b)(1).

**[5] Libel and Slander** ☜═➣9(1)
237k9(1) Most Cited Cases
Viatical settlements brokerage stated sufficient prima facie claim in complaint against industry consumer watchdog for defamation, arising from alleged statements made by consumer watchdog on her website to effect that brokerage was under investigation by Department of Insurance, subject to judgment against it in favor of viator, a provider of incompetent advice, and unethical, despite inclusion within publication of some truthful facts; although viator had indeed obtained small claims court judgment against brokerage and complained about them to Department, consumer watchdog omitted significant facts that judgment was entered in small claims court and that Department had failed to pursue claim, thus suggesting, on purported industry watchdog website, that Department claim was viable and that brokerage had engaged in incompetent and unethical practices, which suggestion was based on facts that were provably false. West's Ann.Cal.C.C.P. § 425.16(b)(1).

**[6] Pleading** ☜═➣358
302k358 Most Cited Cases
A special motion to strike a complaint under the anti-SLAPP (strategic lawsuit against public participation) statute is not a vehicle for testing the strength of a plaintiff's case, or the ability of a plaintiff, so early in the
proceedings, to produce evidence supporting each theory of damages asserted in connection with the plaintiff's claims; it is a vehicle for determining whether a plaintiff, through a showing of minimal merit, has stated and substantiated a legally sufficient claim. West's Ann.Cal.C.C.P. § 425.16(b)(1).

**[7] Appeal and Error** ☜═➣173(1)

30k173(1) Most Cited Cases
Ordinarily, a defendant's failure to plead and prove a defense in the trial court precludes the defendant from raising the defense in the appellate court.
**\*\*498** Steven Ames Brown, for Plaintiffs and Appellants.

James R. Wheaton, Oakland, David Greene, Matthew J. Zimmerman, First Amendment Project, for Defendant and Respondent.

STEIN, Acting P.J.

**\*889** This is an appeal from an order granting a special motion to strike a complaint as a **\*\*499** Strategic Lawsuit Against Public Participation (SLAPP), pursuant to Code of Civil Procedure section 425.16, and awarding defendant her attorney fees. We find that the suit was subject to the special motion to dismiss, requiring plaintiffs to establish a reasonable probability of prevailing on the merits. We further find that plaintiffs made the requisite showing. We therefore reverse.

### BACKGROUND
The case concerns statements allegedly made against a viatical settlements brokerage, and the owner of the brokerage. [FN1] According to a 2001 article in Forbes Magazine, viaticals are arrangements that allow dying persons with life insurance policies to sell their policies to investors for a percentage of the death benefits. As a practical matter, the sooner the viator dies, the greater the return on the investment. In the meantime, the viator obtains funds to pay for medical care or other expenses. Viatical settlement firms provide the capital used to purchase the policies, typically receiving a fee of 20 to 30 percent of the amount of the death benefits. The policies are sold through independent sales agents, or brokers, such as plaintiffs here. The agents or brokers can receive sales commission of 9 percent or more. (Coolidge, *Death Wish* (Mar. 19, 2001) Forbes Magazine, at p. 206.)

> FN1. The owner, Scott Wilbanks, points out he is not a joint entity with the brokerage, Wilbanks & Associates, Inc., a point that provides him with appellate arguments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497                                                                                           Page 3
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
**(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)**

not available to the brokerage. We need not, and do not, address this matter in any detail, and for convenience generally refer to the owner and the brokerage, jointly, as plaintiffs.

Gloria Wolk, a former insurance agent, has written several books on viaticals, acting as a "consumer watchdog" and an expert on issues surrounding viatical settlements. Wolk established a Web site entitled Viatical & Life Settlements: Consumer Information <www.viatical-expert.net> (as of Aug. 17, 2004). The Web site presents information about viatical settlements, based, apparently, on Wolk's own research. It advertises Wolk's books. It posts advertisements from other sources. In addition, as is particularly relevant here, Wolk, through her Web site, provides information about those who broker life insurance policies, including information about licenses, suits brought by clients against brokers and investigations of brokers by governmental agencies.

Plaintiff Scott Wilbanks is, or was, the president and chief executive officer of Wilbanks & Associates. Plaintiff Wilbanks & Associates is, or was, a viatical settlements broker. According to plaintiffs, Wolk published the following statements about them on her Web site:

**\*890** *"Be very careful when dealing with this broker. Wilbanks and Assoc. is under investigation by the CA dept. of insurance. The complaint originated with a California viator who won a judgment against Wilbanks. How many others have been injured but didn't have the strength to do anything about it?*

*"The company is under investigation. Stay tuned for details.*

*"Wilbanks and Associates provided incompetent advice.*

*"Wilbanks and Associates is unethical."*

On July 5, 2001, plaintiffs filed a complaint against Wolk for defamation and unfair business practices,

seeking damages and an injunction. Wolk moved to strike the claim for defamation as a SLAPP suit. The court granted Wolk's motion, and awarded Wolk attorney fees and costs in the amount of $7,000.

Plaintiffs appealed.

**\*\*500 DISCUSSION**
**I.**
**SLAPP Suits, and Legislative Response to SLAPP Suits**

The court in *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 33 Cal.Rptr.2d 446 (disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5, 124 Cal.Rptr.2d 507, 52 P.3d 685), one of the first cases to apply anti-SLAPP legislation, explained:

"Litigation which has come to be known as SLAPP is defined by the sociologists who coined the term as 'civil lawsuits ... that are aimed at preventing citizens from exercising their political rights or punishing those who have done so.' (Canan & Pring, Strategic Lawsuits Against Public Participation (1988) 35 Social Problems 506.) The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. [Citations.]

"The favored causes of action in SLAPP suits are defamation, various business torts such as interference with prospective economic advantage, **\*891** nuisance and intentional infliction of emotional distress. [Citation.] Plaintiffs in these actions typically ask for damages which would be ruinous to the defendants. [Citations.]

"SLAPP suits are brought to obtain an *economic* advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. [Citations.] Indeed, one of the common characteristics of a SLAPP suit is its lack of merit. [Citation.] But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497                                                                    Page 4
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

sufficient length of time to accomplish plaintiff's underlying objective. [Citation.] As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff in the political arena is substantially diminished. [Citations.] The SLAPP strategy also works even if the matter is already in litigation because the defendant/cross-complainant hopes to drive up the cost of litigation to the point where the plaintiff/cross-defendant will abandon its case or have less resources available to prosecute its action against the defendant/cross-complainant and to deter future litigation. [Citation.]

"Thus, while SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPP's are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so. [Citation.] Because winning is not a SLAPP plaintiff's primary motivation, defendants' traditional safeguards against meritless actions[ ] (suits for malicious prosecution and abuse of process, requests for sanctions) are inadequate to counter SLAPP's. Instead, the SLAPPer considers any damage or sanction award which the SLAPPee might eventually recover as merely a cost of doing business. [Citation.] By the time a SLAPP victim can win a 'SLAPP-back' suit years later the SLAPP plaintiff will probably already have accomplished its underlying objective. Furthermore, retaliation against the SLAPPer may be counter-productive because it ties up the SLAPPee's resources even longer than defending the SLAPP suit itself. [Citations.]" *(Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 815-817, 33 Cal.Rptr.2d 446, fn. omitted.)

Civil Code section 47, which creates statutory privileges for specified publications **501 or broadcasts, provides some protection from SLAPP suits. Not all communications or conduct leading to SLAPP suits are privileged, however, and while Civil Code section 47 allows a defendant to avoid liability for covered publications or broadcasts, it is not a particularly effective tool for preventing the abuses inherent in SLAPP litigation--the filing of specious suits as a means of causing the defendants to exhaust their resources by defending against the suits.

*892 In 1992, the Legislature enacted Code of Civil Procedure section 425.16 (hereafter section 425.16), finding and declaring that "there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," and "it is in the public interest to encourage continued participation in matters of public significance, and ... this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).)

Under section 425.16, a cause of action asserted "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue [is] subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

The section defines acts "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue," as including: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The first category essentially echoes Civil Code

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497                                                                 Page 5
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

section 47, subdivision (b)(1), [FN2] protecting statements made in official proceedings. The second category goes further, referring to statements made outside of official proceedings but in connection with an issue under consideration in official proceedings, whether or not those statements are themselves privileged. *893 Statements in this category are subject to a special motion to strike whether or not the issue under consideration is a "public issue." The Legislature, in enacting section 425.16, sought to protect *all* **502 direct petitioning of governmental bodies and petition-related statements and writings. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120-1121, 81 Cal.Rptr.2d 471, 969 P.2d 564 (*Briggs* ).) This broad application of section 425.16 means that meritorious suits will be subject to a special motion to strike; the section reflects the balance struck by the Legislature between the concern for the viability of meritorious lawsuits and the concern of encouraging participation in matters of public significance. (*Briggs, supra,* at p. 1122, 81 Cal.Rptr.2d 471, 969 P.2d 564.)

> FN2. Civil Code section 47, subdivision (b) makes privileged a communication or broadcast made in "(1) any legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) the initiation or course of any other proceeding authorized by law and reviewable [by writ of mandamus], except ... [¶][a]n allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action."

Unlike the first and second category of statement or conduct protected by section 425.16, the third and fourth categories protect only statements or conduct connected to an issue of public interest. Beyond that requirement, however, these categories are quite broad, applying by their terms to any statements made in a place open to the public or in a public forum, or any conduct engaged in, in furtherance of the rights of petition or free speech.

[1] Section 425.16 does not attempt to distinguish "ordinary lawsuits" from SLAPP suits; i.e., suits brought primarily for the purpose of chilling protected rights of speech or petition. The Supreme Court, accordingly, has held that the plain language of the statute encompasses any action based on protected speech or petitioning activity as defined by the statute, with no requirement that the defendants moving thereunder also prove that the suit was intended to chill their speech. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 734, 3 Cal.Rptr.3d 636, 74 P.3d 737; citing *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89-95, 124 Cal.Rptr.2d 530, 52 P.3d 703, *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 58, 124 Cal.Rptr.2d 507, 52 P.3d 685, and *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75, 124 Cal.Rptr.2d 519, 52 P.3d 695.) It also has recognized the probability that any and all malicious prosecution actions fall within the statute's purview. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 735, 3 Cal.Rptr.3d 636, 74 P.3d 737.) In addition, in response to case law, the Legislature added to section 425.16 the proviso that it "shall be construed broadly." (§ 425.16, subd. (a) as amended by Stats.1997, ch. 271, § 1; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997-1998 Reg. Sess.) as amended May 12, 1997, p. 4.) In sum, "[w]henever possible, [the courts] should interpret the First Amendment and section 425.16 in a manner 'favorable to the exercise of freedom of speech, not to its curtailment.' " (*Briggs, supra,* 19 Cal.4th 1106, 1119, 81 Cal.Rptr.2d 471, 969 P.2d 564.) [FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_FN3._ The disapproved case law on this point includes _Zhao v. Wong (1996) 48 Cal.App.4th 1114, 1122, 55 Cal.Rptr.2d 909,_ where we construed the statute narrowly, to safeguard activities protected by the petition clause. _(Id._ at p. 1125, 55 Cal.Rptr.2d 909.)

**\*894 II.**
**Procedure Under Section 425.16, and Standard of Review**

"The moving party bears the initial burden of establishing a prima facie showing the plaintiff's cause of action _arises_ from the defendant's free speech or petition activity. [Citation.] ... If the defendant establishes a prima facie case, then the burden shifts to the plaintiff to establish ' "a probability that the plaintiff will prevail on the claim," ' i.e., 'make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor.' [Citation.] In making its determination, the trial court is required to consider the pleadings and the supporting and opposing affidavits stating **\*\*503** the facts upon which the liability or defense is based. (§ 425.16, subd. (b).) Discovery is stayed upon the filing of the motion. (§ 425.16, subd. (g).) However, upon noticed motion and for good cause shown, the court may allow specified discovery." _(Church of Scientology v. Wollersheim (1996) 42 Cal.App.4th 628, 646-647, 49 Cal.Rptr.2d 620,_ overruled on other grounds in _Equilon Enterprises v. Consumer Cause, Inc., supra,_ 29 Cal.4th at p. 68, fn. 5, 124 Cal.Rptr.2d 507, 52 P.3d 685.)

[2] We review the record independently to determine whether the asserted cause of action arises from the defendant's free speech or petition activity, and, if so, whether the plaintiff has shown a probability of prevailing. _(ComputerXpress, Inc. v. Jackson (2001) 93 Cal.App.4th 993, 999, 113 Cal.Rptr.2d 625 (Computer Xpress_ ).)

**III.**
**Application of Section 425.16 to Plaintiffs' Causes of Action**

[3] Plaintiffs contend, and we agree, that this is not by any means the prototypical SLAPP suit.

Plaintiffs are not a large private interest, and Wolk, although certainly a consumer advocate, derives economic advantages from her advocacy by promoting her books on her Web site. There is no reason to suppose that plaintiffs filed this lawsuit to force Wolk to exhaust her resources in litigation. Rather, the evidence is that plaintiffs legitimately sought to protect their names and reputations, filing suit only after Wolk refused to publish their side of the story. Nonetheless, as discussed above, section 425.16, although enacted in response to SLAPP litigation, is to be broadly interpreted. It can and does apply to suits bearing very little relationship to SLAPP litigation, and we conclude that, through section 425.16, subdivisions (e)(3) and (e)(4), it applies here.

**\*895 A. _Public Forum_**

Wolk's statements are published in her Web site on the Internet, meaning that they are accessible to anyone who chooses to visit her Web site. As a result, her statements hardly could be more public. The Internet "provides relatively unlimited, low-cost capacity for communication of all kinds.... This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue. Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." _(Reno v. American Civil Liberties Union (1997) 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874.)_ The court in _ComputerXpress, supra,_ 93 Cal.App.4th 993, 1007, 113 Cal.Rptr.2d 625, accordingly held that disparaging remarks made on Web sites were made in a public forum when the evidence showed that the Web sites were accessible free of charge to any member of the public and persons who chose to do so could post their own opinions there.

Plaintiffs contend that Wolk's Web site is not a true public forum because, unlike the Web sites in _Com-_

121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
**(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)**

puterXpress, supra, 93 Cal.App.4th 993, 113 Cal.Rptr.2d 625, which accepted postings from anyone, Wolk controls her site, and does not post information or opinions from other sources. This contention is supported in part by case law finding or suggesting that a newsletter or newspaper is not a public forum if its contents are controlled. In **504Lafayette Morehouse, Inc. v. Chronicle Publishing Co. (1995) 37 Cal.App.4th 855, 863, footnote 5, 44 Cal.Rptr.2d 46, for example, the court, in dicta, questioned whether a private newspaper might be considered a public forum: "No authorities have been cited to us holding a newspaper printing allegedly libelous material is a 'place open to the public or a public forum.' Newspaper editors or publishers customarily retain the final authority on what their newspapers will publish in letters to the editor, editorial pages, and even news articles, resulting at best in a controlled forum not an uninhibited 'public forum.' " In Weinberg v. Feisel (2003) 110 Cal.App.4th 1122, 1130- 1131, 2 Cal.Rptr.3d 385, similarly, the court concluded that a trade newsletter is not a public forum: "A public forum is a place open to the use of the general public ' "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." ' [Citations.] Means of communication where access is selective, such as most newspapers, newsletters, and other media outlets, are not public forums. [Citation.] Some of the statements of which plaintiff complains were printed in [the trade newsletter]. There is nothing in the record to establish [the newsletter] is sufficiently open to general public access to be considered a public forum."

**896** The court in Damon v. Ocean Hills Journalism Club (2000) 85 Cal.App.4th 468, 102 Cal.Rptr.2d 205 (Damon ) reached a different conclusion on the facts before it. The court was concerned with statements published by the Village Voice, a private homeowners association club newsletter. In deciding whether the private newsletter was a public forum, the court assumed for purposes of argument that the newsletter was in essence the mouthpiece for a small group of homeowners who generally would not permit contrary viewpoints to be published in the newsletter.

The Damon court held: "Even assuming the record supports this characterization, these facts do not take the publication outside of the anti-SLAPP statutory protection. First, numerous courts have broadly construed section 425.16, subdivision (e)(3)'s 'public forum' requirement to include publications with a single viewpoint. [Citations.] [¶] We agree with this approach. The Village Voice was a public forum in the sense that it was a vehicle for communicating a message about public matters to a large and interested community. All interested parties had full opportunity to read the articles in the newsletter. Although the Village Voice newsletter may not have offered a 'balanced' view, the Association's other newsletter ... was the place where Association members with differing viewpoints could express their opposing views. It is in this marketplace of ideas that the Village Voice served a very public communicative purpose promoting open discussion--a purpose analogous to a public forum. Given the mandate that we broadly construe the anti-SLAPP statute, a single publication 'does not lose its 'public forum' character merely because it does not provide a balanced point of view. [¶] This construction comports with the fundamental purpose underlying the anti-SLAPP statute, which seeks to protect against 'lawsuits brought primarily to chill the valid exercise of constitutional rights' and 'abuse of the judicial process ....' (§ 425.16, subd. (a).) This purpose would not be served if we were to construe the statute to make section 425.16, subdivision (e)(3) inapplicable to all newspapers, magazines, and other public media merely because the publication is arguably 'one-sided.' This is particularly true because **505section 425.16, subdivision (e)(3) requires not only that the statement be made in a public forum, but also that it concern an issue of public interest. Further, because section 425.16, subdivision (e)(4) includes conduct in furtherance of free speech rights, regardless whether that conduct occurs in a place where ideas are freely exchanged, it would be anomalous to interpret section 425.16, subdivision (e)(3) as imposing that requirement merely because the challenged speech is an oral or written statement." (Damon, supra, 85 Cal.App.4th at pp. 476-477, 102

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497                                                                                          Page 8
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
**(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)**

Cal.Rptr.2d 205.)

These somewhat differing views can be reconciled, at least in part, by recognizing that under some circumstances the relevant forum is limited to a single source of information, while in other circumstances the forum will include several or many sources of information. In our view, whether a **\*897** statement is "made in a place open to the public or in a public forum" depends on whether the means of communicating the statement permits open debate. We agree that Wolk's Web site--and most newspapers--are not public forums in and of themselves. It does not follow, however, that statements made on a Web site or in a newspaper are not made in a public forum. Where the newspaper is but one source of information on an issue, and other sources are easily accessible to interested persons, the newspaper is but one source of information in a larger public forum.

In a sense, the Web, as a whole, can be analogized to a public bulletin board. A public bulletin board does not lose its character as a public forum simply because each statement posted there expresses only the views of the person writing that statement. It is public because it posts statements that can be read by anyone who is interested, and because others who choose to do so, can post a message through the same medium that interested persons can read. Here, while Wolk controls her Web site, she does not control the Web. Others can create their own Web sites or publish letters or articles through the same medium, making their information and beliefs accessible to anyone interested in the topics discussed in Wolk's Web site.

We conclude, therefore, that Wolk's statements were made in a public forum.

In addition, as the court in _Damon v. Ocean Hills Journalism Club, supra,_ 85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, noted, section 425.16, subdivision (e)(4) includes _conduct_ in furtherance of free speech rights, regardless whether that conduct occurs in a place where ideas are freely exchanged. Section 425.16, therefore, governs even private

communications, so long as they concern a public issue. _(Averill v. Superior Court (1996) 42 Cal.App.4th 1170, 50 Cal.Rptr.2d 62.)_ [FN4] It follows **\*\*506** that even if Wolk's communications were not made in a public forum, and therefore do **\*898** not fall under section 425.16, subdivision (e)(3), they fall under subdivision (e)(4).

> FN4. _Averill_ was decided before the Legislature added subdivision (e)(4) to section 425.16, but lends support to the supposition that subdivision (e)(4) is intended to cover private communications on public issues. In _Averill,_ the defendant, who opposed a plan by a charitable organization to locate a battered women's shelter in her neighborhood, expressed to her employer her opposition to the plan and her belief that the employer should not support the organization as a Christmas charity. The organization sued her for slander. The court noted that in specifying what constitutes "acts in furtherance of a person's right [of petition or] free speech," subdivision (e) uses the word "includes." The court concluded that the Legislature intended the statute to have broad application, and held that even private conversations on public issues were covered, citing "the stated purpose of the statute, which includes protection of not only the constitutional right to 'petition for the redress of grievances,' but the broader constitutional right of freedom of speech." _(Averill v. Superior Court, supra,_ 42 Cal.App.4th at pp. 1175- 1176, 50 Cal.Rptr.2d 62.) The Legislature responded to this holding by amending section 425.16 to express its intent that the section be broadly applied and by adding the fourth category of protected activity to subdivision (e).

**B. Issue of Public Interest**

Of course, not all statements made in a public forum, and not all conduct in furtherance of the rights of petition or free speech, fall under section 425.16,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subdivision (e)(3) or (e)(4). Both categories are limited by the requirement that the statement or conduct be connected with an issue of public interest--a limitation that, among other things, means that in many cases the statement or conduct will be a part of a public debate and the public therefore will be exposed to varying viewpoints on the issue.

The most commonly articulated definitions of "statements made in connection with a public issue" focus on whether (1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) the statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest. *(Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33, 1 Cal.Rptr.3d 390; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924, 130 Cal.Rptr.2d 81 *(Rivero* ).) As to the latter, it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate. *(Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 1 Cal.Rptr.3d 501 *(Du Charme* ) [report that an employee was removed for financial mismanagement was informational, but not connected to any discussion, debate or controversy]; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601, 132 Cal.Rptr.2d 191 [advertisements about a pill offering a natural alternative to breast implants are not about the general topic of herbal supplements]; *Rivero, supra,* 105 Cal.App.4th at p. 924, 130 Cal.Rptr.2d 81 [reports that a particular supervisor was fired after union members complained of his activities are not a discussion of policies against unlawful workplace activities].)

Wolk's comments on plaintiffs' business practices do not meet these criteria, as plaintiffs are not in the public eye, their business practices do not affect a large number of people and their business practices

are not, in and of themselves, a topic of widespread public interest. Consumer information, however, at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest. *899*Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528, 1 Cal.Rptr.2d 514, although not itself a section 425.16 case, noted that the First Amendment protected a consumer's statements about the quality of a seller's products and service and her unhappiness with them, finding, in part, that the statements concerned a matter of public interest. "Courts have recognized the importance of the public's access to consumer information. The growth of "consumerism" in the United States is a matter of common knowledge. Members of the public have recognized their roles as **507 consumers and through concerted activities, both private and public, have attempted to improve their ... positions vis-à-vis the supplies [sic] and manufacturers of consumer goods. They clearly have an interest in matters which affect their roles as consumers, and peaceful activities, such as plaintiffs', which inform them about such matters are protected by the First Amendment.' [Citation.]" *(Id. at p. 1544, 1 Cal.Rptr.2d 514*; and see *Commonwealth Energy Corp. v. Investor Data Exchange, Inc., supra,* 110 Cal.App.4th 26, 34, 1 Cal.Rptr.3d 390, citing *Paradise Hills Associates v. Procel, supra,* 235 Cal.App.3d 1528, 1 Cal.Rptr.2d 514, on this point in connection with a special motion to strike brought under section 425.16.)

In *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 92 Cal.Rptr.2d 755, the plaintiffs alleged that a manufacturer of Coumadin, an anticoagulant medication, had made false statements about the drug. The court found that these statements met the public issue requirement, noting allegations that the drug was used by more than 1.8 million Americans for the prevention and treatment of life-threatening conditions. *(Id. at p. 567, 92 Cal.Rptr.2d 755.) ComputerXpress, supra,* 93 Cal.App.4th 993, 113 Cal.Rptr.2d 625 concerned disparaging remarks about a company selling computer-related products to the public. The court found that the public issue requirement was

17 Cal.Rptr.3d 497                                                                 Page 10
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

met, noting evidence suggesting that the company had a large number of shareholders, allegations that the postings had caused it to lose $10 million as a result of the failure of potential customers to purchase its stock and evidence that the company had promoted itself through press releases. (*Id.* at p. 1008, 113 Cal.Rptr.2d 625.)

Here, it appears that the viatical industry touches a large number of persons, both those who sell their insurance policies and those who invest in viatical settlements. According to plaintiffs, their own business generated an average monthly income of $58,333 before Wolk's statements about them appeared on her Web site--and plaintiffs are but one of many brokers. It is undisputed that Wolk has studied the industry, has written books on it, and that her Web site provides consumer information about it, including educating consumers about the potential for fraud. As relevant here, Wolk identifies the brokers she believes have engaged in unethical or questionable practices, and provides information for the purpose of aiding viators and investors to choose between brokers. The information provided by Wolk on this topic, including the statements at issue here, was more than a report of some earlier conduct or proceeding; it was consumer protection information.

**\*900** That the information provided here is in the nature of consumer protection information distinguishes this case from others recognizing that a publication does not become connected with an issue in the public interest simply because it is widely disseminated, or because it can be used as an example of bad practices or of how to combat bad practices. [FN5] The statements **\*\*508** made by Wolk were not simply a report of one broker's business practices, of interest only to that broker and to those who had been affected by those practices. Wolk's statements were a warning not to use plaintiffs' services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of public concern. [FN6]

FN5. In *Rivero, supra,* 105 Cal.App.4th

913, 130 Cal.Rptr.2d 81, for example, a union reported that a supervisor had been terminated for unlawful workplace activity. The court held that the termination of the supervisor did not rise to the level of a public issue, and could not become a public issue simply because the reports were widely disseminated to union members. "If the mere publication of information in a union newsletter distributed to its numerous members were sufficient to make that information a matter of public interest, the public-issue limitation would be substantially eroded, thus seriously undercutting the obvious goal of the Legislature that the public-issue requirement have a limiting effect." (*Id.* at p. 926, 130 Cal.Rptr.2d 81.) The court did not find it persuasive that the information could be used as an example of workplace abuses or to show how employees could take steps to stop misconduct. "[I]nformation that can be used as an example or as a motivator is not the same as information that has intrinsic value to others." (*Id.* at p. 925, 130 Cal.Rptr.2d 81.) A similar conclusion was reached in *Du Charme, supra,* 110 Cal.App.4th 107, 1 Cal.Rptr.3d 501, concerning allegedly defamatory statements made on a union's Web site about an employee's termination. The statements, although undoubtedly of interest to the membership, were unconnected to any discussion, debate or controversy, and thus unconnected to any matter of public interest. The court, after surveying the cases, held "that in order to satisfy the public issue/issue of public interest requirement of ... subdivision (e)(3) and (4) of the anti-SLAPP statute, in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such

Case 5:07-cv-03795-JW    Document 49    Filed 08/23/2007    Page 27 of 32

17 Cal.Rptr.3d 497                                                    Page 11
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Id.* at p. 119, 1 Cal.Rptr.3d 501.)

FN6. *Weinberg v. Feisel, supra,* 110 Cal.App.4th 1122, 2 Cal.Rptr.3d 385, probably is the case most helpful to plaintiffs' position. The parties in that case were aficionados of token collecting. The defendant believed that the plaintiff had stolen a token from him while at a token show, and began a campaign against the plaintiff that included letters to other collectors accusing plaintiff of the theft, and advertisements in a club newsletter describing the theft, although not naming the plaintiff as the thief. The court found that the defendant's communications were published to a limited number of persons and concerned only a private dispute, and, therefore, were not connected to an issue in the public interest, even though they accused the plaintiff of criminal activity. (*Id.* at pp. 1132, 1134, 2 Cal.Rptr.3d 385.) The court did not consider whether the publications might have been a kind of warning to consumers, alerting other token collectors to the perils of dealing with the defendant. In any event, the situation there is distinguishable from the situation here in that the defendant's accusations were not part of a general broadcast, but were made only to a few collectors, and the defendant's purpose appears to have been an attempt to exact a personal revenge on the plaintiff by causing him to be ostracized from the token collector community.

**\*901** We conclude, therefore, that plaintiffs' claims arose from statements made in connection with an issue in the public interest, and that Wolk, therefore, met the burden imposed on her by section 425.16.

### C. Probability That the Plaintiffs Will Prevail

[4] As Wolk met her burden, the burden shifted to plaintiffs to establish a probability that they would prevail on their claims. (§ 425.16, subd. (b)(1); *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808-809, 119 Cal.Rptr.2d 108 (*Seelig* ).) A plaintiff's burden under section 425.16 " 'is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment.' " The plaintiff is required to demonstrate that the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the plaintiff's evidence is credited. (*Seelig,* at p. 809, 119 Cal.Rptr.2d 108.) The court considers the pleadings and the supporting and opposing affidavits stating facts on which the liability or defense is based, and the motion to strike should be **\*\*509** granted if, as a matter of law, the properly pleaded facts do not support a claim for relief. (*Ibid.*)

Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation. (Civ.Code, § 45; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1140, 57 Cal.Rptr.2d 284.)

To reiterate, plaintiffs alleged that they were defamed by the following statements that appeared on Wolk's Web site:

*"Be very careful when dealing with this broker. Wilbanks and Assoc. is under investigation by the CA dept. of insurance. The complaint originated with a California viator who won a judgment against Wilbanks. How many others have been injured but didn't have the strength to do anything about it?*

*"The company is under investigation. Stay tuned for details.*

*"Wilbanks and Associates provided incompetent advice.*

*"Wilbanks and Associates is unethical."*

[5] There is evidence that Wolk's publication contained some truths. A viator had obtained a small

17 Cal.Rptr.3d 497                                                                Page 12
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

claims court judgment against plaintiffs, and had complained about them to the California Department of Insurance, which had responded by opening a file and assigning an investigator to the matter. That a publication states a truth, however, does not insulate the *902 publication as a whole from a claim of defamation. It also is not determinative that Wolk's publication asked a rhetorical question. The ultimate question is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion. (*Seelig, supra,* 97 Cal.App.4th 798, 809, 119 Cal.Rptr.2d 108.)

As we found in *Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 283 Cal.Rptr. 644, the court "must determine whether the statements that form the basis of a defamation claim: (1) expressly or impliedly assert a fact that is susceptible to being proved false; and (2) whether the language and tenor is such that it cannot ' "reasonably [be] interpreted as stating actual facts." ' " (*Id.* at p. 1001, 283 Cal.Rptr. 644, citing *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1.) For similar reasons, couching an assertion in the form of a conjecture does not, in and of itself, entitle the assertion to constitutional protection. (*Weller v. American Broadcasting Companies, Inc., supra,* 232 Cal.App.3d at pp. 1003-1004, 283 Cal.Rptr. 644.) And while constitutional protection has been accorded " 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of ... contempt,' and language used 'in a loose, figurative sense' " (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401, 88 Cal.Rptr.2d 843; see also *Seelig, supra,* 97 Cal.App.4th at p. 809, 119 Cal.Rptr.2d 108), such communications may be actionable if they convey false and defamatory information.

Wolk's alleged statements were not limited to reports that a viator obtained a judgment against plaintiffs, or that the Department of Insurance had initiated an investigation of the viator's complaint. They include express assertions that plaintiffs provided incompetent advice and engaged in uneth-

ical business practices. A person reading Wolk's statements reasonably could conclude that Wolk was aware not only of the judgment and investigation, but of the facts underlying them, and had **510 concluded that they demonstrated incompetence and a lack of ethics.

Indeed, even without the express assertions of incompetence or lack of ethics, Wolk's publication suggests a knowledge that plaintiffs engaged in unethical or incompetent practices leading to a judgment and to an investigation by the Department of Insurance. In context, a reader considering the question, "How many others have been injured but didn't have the strength to do anything about it?" reasonably could understand the question to be a positive assertion that plaintiffs prey on persons whose age or illness rendered them unable to protect themselves.

It also is not determinative that the express and/or implied assertions of incompetent and unethical business practices could be viewed as statements of opinion. A statement of opinion may be actionable if it implies *903 the allegation of undisclosed defamatory facts as the basis for the opinion. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." (*Milkovich v. Lorain Journal Co., supra,* 497 U.S. at pp. 19-20, 110 S.Ct. 2695; *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1181, 96 Cal.Rptr.2d 136.)

This point has application here, where Wolk's report omitted significant facts. While it does appear that a viator won a judgment against plaintiffs, Wolk did not report that the judgment was entered in the small claims court. Wolk did not disclose the nature of the viator's grievance, whether plaintiffs appeared, or if they by some means attempted, unsuccessfully, to defend themselves from the viator's suit. That a judgment was entered against plaintiffs in the small claims court certainly shows that a vi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497                                                                                   Page 13
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
**(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)**

ator had a grievance against plaintiffs, but it does not carry the same suggestion of malfeasance that attends a report of a judgment entered on a fully contested matter in the trial court. By omitting the forum, therefore, Wolk allowed readers to assume the worst, when it is possible that plaintiffs simply decided not to defend the matter, irrespective of its merits.

Wolk's report of the Department of Insurance investigation similarly omits potentially significant facts. In support of the special motion to strike, Wolk declared that she had been informed by the viator who won the judgment that he had filed a complaint about plaintiffs with the department. She called the department, and was informed that it investigates all complaints that are made. She was given the name of the person in charge of the investigation and was given the investigation case number. Wolk later learned that the department did not pursue the case "due to an overwhelming backlog of investigations related to supervision of more than 4,000 insurance agents," after which she "immediately changed [her] site to reflect this."

By omitting the facts that the Department of Insurance investigates every complaint, Wolk suggested that the department had formed an opinion that the viator's claim was worthy of investigation. The department's failure to pursue the investigation suggests the contrary, even though that failure may have been due, at least in part, to the large number of claims filed with the department and the lack of sufficient personnel to handle them all.

The actual facts therefore show only that a disgruntled viator contacted the department. Wolk's assertions, in context, suggest that the department had formed **\*\*511** the opinion that the viator's claims had validity.

**\*904** Wolk's own position as a crusader and watchdog to the industry also works against any argument that she was merely stating the facts and drawing her own opinion from them. An accusation that, if made by a layperson, might constitute opinion may be understood as being based on fact if

made by someone with specialized knowledge of the industry. *(Slaughter v. Friedman (1982) 32 Cal.3d 149, 154, 185 Cal.Rptr. 244, 649 P.2d 886.)* Wolk here held herself out to have special knowledge resulting from extensive research into the viatical industry; i.e., she claimed to be a person who could recognize and identify unethical practices that the average person might not recognize. Wolk clearly expected readers to rely on her opinions as reflecting the truth. [FN7]

> FN7. Wolk cites *Dodds v. American Broadcasting Co.* (9th Cir.1998) 145 F.3d 1053, 1067-1068, and *Standing Committee v. Yagman* (9th Cir.1995) 55 F.3d 1430, 1439, for the proposition that there can be no liability when the publisher reveals the facts upon which an opinion is based. This proposition may have validity when the publisher reveals all relevant facts, the publication does not suggest that the publisher's own opinion is based in part on facts known only to her, and the publisher has no expertise beyond that of the average reader. It has no application here.

We conclude, therefore, that Wolk's publication reasonably can be construed as asserting as fact that plaintiffs had engaged in specific wrongful conduct leading to a judgment and an investigation, and that plaintiffs engaged in incompetent and unethical business practices, taking advantage of persons unable to defend themselves.

We conclude, further, that the facts implied by the publication as a whole are provably false. While the existence of the judgment is true, plaintiffs may be able to show that it does not establish that they engaged in incompetent or unethical business practices. Plaintiffs also may be able to show that their business practices in fact were fair, honest and competent, and that they suffered actual damages as a result of the publication. Plaintiffs declared that their business practices conformed to accepted standards of ethics and complied with the law. They never had been under actual investigation by the Department of Insurance, and never had been con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tacted by the department about a viator's complaints. Scott Wilbanks declared that he telephoned Wolk when he learned of the publication to ask her to print plaintiffs' side of the story, that she refused to discuss the allegations and hung up on him. Plaintiffs claimed damages in the amount of $1,080,667 in lost income through January 2002, which sum they determined, in part, by calculating their average monthly income for the year prior to Wolk's publication.

Wolk contends that her statements are protected by Civil Code section 47, subdivision (d)(1), making privileged a publication made by a fair and true report in, or a communication to, a public journal, of a judicial or other public official proceeding of a verified charge or complaint made by any *905 person to a public official, upon which complaint a warrant has been issued. Assuming, for purposes of argument, that Wolk's private Web site is a public journal, Wolk's statements were more than a fair and true report of an official proceeding; they were express and implied assertions that plaintiffs' business practices were incompetent and unethical. Civil Code section 47, subdivision (d) does not protect Wolk from liability for those assertions.

Wolk also contends that should the matter go to trial, it is not probable plaintiffs will be able to show that she in fact published **512 the express statements that plaintiffs provided incompetent advice and engaged in unethical business practices. (Wolk declared that she did not recall writing that "Wilbanks & Associates provided incompetent advice" or that "Wilbanks & Associates is unethical," although it is her subjective opinion that both statements are true.) Wolk further claims that plaintiffs have not produced sufficient evidence that they actually were damaged by Wolk's publication and that the evidence produced by them cannot support a finding that Wolk acted negligently, let alone that she acted with malice.

Wolk's argument assumes that a court ruling on a special motion to strike has the power to weigh the evidence. Such a procedure would be subject to constitutional attack as allowing the court to weigh

and adjudicate factual disputes in violation of the jury clause of the California Constitution. (Cal.Const., art. I, § 16.) Statutes such as section 425.16, therefore, are construed to require the lower court to consider the challenged plaintiff's affidavits for the purpose of determining whether sufficient evidence has been presented to demonstrate a prima facie case and, " '[i]n making this judgment, the trial court's consideration of the defendant's opposing affidavits does not permit a weighing of them against plaintiff's supporting evidence, but only a determination that they do not, *as a matter of law,* defeat that evidence.' [Citation.]" *(Lafayette Morehouse v. Chronicle Publishing Co., supra, 37 Cal.App.4th at p. 867, 44 Cal.Rptr.2d 46.)* A motion to strike under section 425.16 is not a substitute for a motion for a demurrer or summary judgment *(Lam v. Ngo (2001) 91 Cal.App.4th 832, 851, fn. 12, 111 Cal.Rptr.2d 582.)* In resisting such a motion, the plaintiff need not produce evidence that he or she can recover on every possible point urged. It is enough that the plaintiff demonstrates that the suit is viable, so that the court should deny the special motion to strike and allow the case to go forward.

Wolk's evidence does not, as a matter of law, defeat plaintiffs' evidence that she expressly asserted that plaintiffs were incompetent and engaged in unethical business practices. In any event, as we have found that even without the express assertions, the publication implies incompetence and a lack of ethics, plaintiffs can prevail even if they are unable to convince the finder of fact that the alleged express statements were published. Plaintiffs, by *906 asserting loss of income and a means of calculating lost income, produced sufficient evidence from which it may be concluded that they suffered actual damages as a result of Wolk's publication.

Plaintiffs' evidence also allows an inference that Wolk acted at least negligently, and quite possibly with a reckless disregard for the truth. It appears that Wolk did not check with plaintiffs before publishing the material. She knew that the judgment was in the small claims court. She apparently knew that the Department of Insurance would investigate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172

(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

any complaint submitted to it, and therefore was aware that an investigation by the department did not establish that the complaint had validity. Wolk's refusal to discuss the viator's claim with Wilbanks could be viewed as demonstrating a lack of interest in the truth.

[6] Plaintiffs were not required to prove malice. Wolk points out, correctly, that a private individual cannot recover presumed or punitive damages in a defamation action without proving malice (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 747, 257 Cal.Rptr. 708, 771 P.2d 406; *Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1360, 78 Cal.Rptr.2d 627), and that malice must be shown by **513 "clear and convincing" proof. (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 511, fn. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502; *Brown v. Kelly Broadcasting Co., supra,* at p. 747, 257 Cal.Rptr. 708, 771 P.2d 406.) Here, plaintiffs were not relying on a theory of presumed damages. They stated a theory of actual compensatory damages, and provided evidence supporting that theory. In short, they made a sufficient showing that they could recover on their claim for defamation against Wolk. Plaintiffs adequately established a probability of prevailing on their claim against Wolk even if they did not demonstrate the ability to recover every element of damages sought on that claim. An anti-SLAPP-suit motion is not a vehicle for testing the strength of a plaintiff's case, or the ability of a plaintiff, so early in the proceedings, to produce evidence supporting each theory of damages asserted in connection with the plaintiff's claims. It is a vehicle for determining whether a plaintiff, through a showing of minimal merit, has stated and substantiated a legally sufficient claim. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th 53, 63, 124 Cal.Rptr.2d 507, 52 P.3d 685; *Navellier v. Sletten, supra,* 29 Cal.4th 82, 95, 124 Cal.Rptr.2d 530, 52 P.3d 703.)

Finally, we decline to find that the "single-publication rule" (Civ.Code, § 3425.3) defeats plaintiffs' claims. Wolk raised the rule for the first time during oral argument, noting that the recently decided case of *Traditional Cat Assn., Inc. v. Gil-breath* (2004) 118 Cal.App.4th 392, 13 Cal.Rptr.3d 353, applied the rule to statements published on the Internet. In essence, the rule holds that a cause of action for defamation accrues on the first general distribution of the publication to the public. (*Id.* at p. 401, 13 Cal.Rptr.3d 353, citing *907Belli v. Roberts Brothers Furs* (1966) 240 Cal.App.2d 284, 289, 49 Cal.Rptr. 625.) The rule is qualified in that the repetition of the defamatory statement, such as in a new edition of a book or newspaper, may give rise to a new cause of action with a new accrual date. *Traditional Cat,* at p. 401, 13 Cal.Rptr.3d 353.

It is undisputed that Wolk first began publishing statements about plaintiffs in 1998. Since plaintiffs filed their complaint on July 1, 2001, more than one year later, Wolk contends that the single-publication rule bars plaintiffs' action as a matter of law.

Plaintiffs' complaint alleged that Wolk's injurious statements were made "within one year past." In responding to the motion to dismiss, plaintiffs asserted that Wolk's stories changed over time, but that the statements at issue here "were present on or after July 5, 2000." It is undisputed that Wolk has altered her statements from time to time. Plaintiffs claim that the evidence therefore allows the inference that Wolk effectively published a "new edition" of her Web site within one year of their complaint such that their action accrued within the applicable one-year limitations period.

[7] For us to hold that the single-publication rule bars plaintiffs' claims, we would have to adopt the reasoning in *Traditional Cat Assn., Inc. v. Gil-breath, supra,* 118 Cal.App.4th 392, 13 Cal.Rptr.3d 353, which applies settled law to a new and not perfectly analogous setting, and may not reflect the final statement of the law on the issue. We also would have to conclude that plaintiffs' evidence does not support a finding that Wolk altered her words during the year before the complaint was filed or, at least, that her alterations did not rise to the level of a "new edition." Finally, we would have to conclude that plaintiffs should not be permitted to go forward because they failed to make a factual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 Cal.Rptr.3d 497
121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172
(Cite as: 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497)

Page 16

showing sufficient to disprove a defense that was not raised by Wolk until late in the appellate process. We decline to do so, choosing instead to apply the appellate **514 rule that, ordinarily, a defendant's failure to plead and prove a defense in the trial court precludes the defendant from raising the defense in the appellate court. (*Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 498, 23 Cal.Rptr.2d 450.) Our ruling here should not be viewed as preventing Wolk from raising the single-publication rule as a defense below, where the parties will have the ability to address the defense fully, and produce such evidence as they have in support or opposition to it.

We conclude that plaintiffs here made a sufficient showing of a probability of prevailing. The trial court, therefore, erred in granting the special motion to strike and awarding Wolk attorney fees.

### *908 DISPOSITION

The order granting the special motion to strike and awarding attorney fees to Wolk is reversed. Plaintiffs are awarded their costs on appeal.

We concur: SWAGER and MARGULIES, JJ.

121 Cal.App.4th 883, 17 Cal.Rptr.3d 497, 04 Cal. Daily Op. Serv. 7575, 2004 Daily Journal D.A.R. 10,172

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.