**EXHIBIT E**

# Psychoneuroendocrinology                           MS # 1599

Authors:     J.A. Posener, et al
Referee:     Dr. Anthony Rothschild                              **REVIEWER 1**

Date Sent:   June 23, 2003        Suggested Return Date:  **July 11, 2003**

## REFEREE'S COMMENTS TO CHIEF EDITOR

### ACCEPTABLE:

\_\_\_\_     **A.**    Acceptable in present form or after minor revisions.

\_x       **B.**    Acceptable provided author agrees to revisions.

### NOT ACCEPTABLE:

\_\_\_\_     **C.**    Unsatisfactory in present form but could be reconsidered after major revision. Referee is prepared to read the revised version.

\_\_\_\_     **D.**    Reject due to unsound experiments or interpretation, or due to unsuitability for the journal. Referee to specify precise grounds for rejection on sheet for author.

| Check Points | | Yes | No |
|---|---|---|---|
| 1. | Is this a new and original contribution? | _x__ | ___ |
| | Is it justified to publish all the results? | x___ | ___ |
| 2. | Is the title suitable? | _x__ | ___ |
| 3. | Is the abstract clearly written and understandable to the non-specialist? | _x__ | ___ |
| 4. | Are the methods sound and adequately described? | _x__ | ___ |
| 5. | Are the conclusions and interpretations sound and justified by data? | _x__ | ___ |
| 6. | Are points of interpretation clearly separated from the results? | _x__ | ___ |

7.    The language or style of the article needs:

| | | |
|---|---|---|
| No correction | _x__ | |
| Minor corrections | ___ | |
| Major corrections | ___ | |
| Rewriting | ___ | |

| | | Yes | No |
|---|---|---|---|
| 8. | Are the references all necessary? | _x__ | ___ |
| 9. | Do the legends fully explain the figures? | __x_ | ___ |


EXHIBIT __E__

## Results

What was the effect of smoking on cortisol levels?

## Discussion

What is the significance of these observations compared to Sachar's early reports that the HPA axis was dysregulated in depression? Is this study a new finding or a replication of Sachar's work?

## Disclosures

There are no disclosures of possible conflicts of interest from the authors. Since the main conclusion of the paper is that the abnormality in depression is in cortisol production in the adrenal gland, the authors potential conflicts in this area need to be disclosed. According to public filings with the Securities and Exchange Commission, Dr. Schatzberg owns 18% or approximately 4,000,000 shares in Corcept Therapeutics, which is developing an anti-cortisol medication for the treatment of depression. This should be disclosed. Given that many readers of PNE will not be familiar with Corcept Therapeutics, the company's role in this field should be clarified in the disclosure. I would suggest,"Corcept Therapeutics, a company developing a cortisol receptor antagonist". Also, given the large equity holdings that Dr. Schatzberg has in Corcept, a simple statement that Dr. Schatzberg has an equity position in Corcept would be misleading without disclosure of the extent of his equity interest. Furthermore, I believe that Dr. DeBattista has been and may still be an employee of Corcept Therapeutics. The remaining authors should also disclose any potential conflicts.

Page 170

[1] **A:** I'm going to have to go back. It's been a
[2] while since I've read this paper.
[3] **Q:** Did you ever do any work with the
[4] approximate entropy technique?
[5] **A:** Me personally?
[6] **Q:** Yes.
[7] **A:** No.
[8] **Q:** Had you heard of that technique before this
[9] paper?
[10] **A:** I had heard of it, yes.
[11] **Q:** Had you read any articles about the
[12] technique?
[13] **A:** At the time I heard about this paper I had
[14] to — well, yes. I had read some articles, yes.
[15] **Q:** Who are the articles by?
[16] **A:** By one of the coauthors of this paper, a
[17] fellow named Veldhuis.
[18] **Q:** Any others?
[19] **A:** That's all I recall.
[20] **Q:** Does Mr. or Dr. Veldhuis have any
[21] relationship to Corcept?
[22] **A:** Not that I know of.
[23] **Q:** I see one of the authors on this paper is
[24] Charles DeBattista. I think that's who we were just

Page 171

[1] talking about. Is that Chuck DeBattista?
[2] **A:** That's right.
[3] **Q:** Joel Posener?
[4] **A:** Posener (pronounced POSEner).
[5] **Q:** Posener. Does he have a relationship with
[6] Corcept?
[7] **A:** Not that I know of.
[8] **Q:** Dr. Schatzberg obviously we've talked
[9] about. What about either Mr. or Drs. Province and
[10] Williams; do you know who they are?
[11] **A:** I know who Dr. Williams is. He's here in
[12] Boston.
[13] **Q:** Does he have a relationship with Corcept?
[14] **A:** Not that I know of.
[15] **Q:** What about Dr. Province?
[16] **A:** Not that I know of.
[17] **Q:** Were you asked to do a peer review on this
[18] article?
[19] **A:** Yes.
[20] **Q:** When?
[21] **A:** I'd have to look in the folder. Probably
[22] sometime in 2003, if I recall. Yes, 2003.
[23] **Q:** Who asked you to do that review?
[24] **A:** The office of — the Journal

Page 172

[1] Psychoneuroendocrinology, Dr. Kalin's office.
[2] **Q:** Dr. Kalin is on the journal?
[3] **A:** He's the editor-in-chief.
[4] **MR. FREEMAN:** Could I have that marked,
[5] please.
[6]     (Document marked as Rothschild
[7] Exhibit 14 for identification)
[8] **Q:** Dr. Rothschild, the court reporter has just
[9] handed you what's been marked as Exhibit 14, which
[10] is also another document that you produced today.
[11] Can you tell me what this is?
[12] **A:** This was I guess we would call it a
[13] thank-you letter from Dr. Kalin thanking me for my
[14] review and appreciating my input and expertise.
[15] **Q:** This was your review of the article that we
[16] were just looking at, which was Exhibit 13?
[17] **A:** Yes.
[18] **Q:** In the second paragraph he writes, "At this
[19] time, I would like to invite to you submit a
[20] manuscript for publication in the journal." Is that
[21] typical, after a peer review that the editor of a
[22] journal would ask you to submit a manuscript?
[23] **A:** I wouldn't say it's typical, no.
[24] **Q:** Has it ever happened before?

Page 173

[1] **A:** I can't recall, but I'm thinking some of
[2] the journals I've reviewed for in the last year, I
[3] don't recall actually getting an invitation.
[4] Usually it's just thank you for the review, if you
[5] even get that.
[6] **Q:** Do you know why he was making an invitation
[7] in this instance?
[8] **A:** I don't know.
[9] **Q:** Did you submit a manuscript after you
[10] received this invitation?
[11] **A:** No.
[12] **MR. FREEMAN:** Could I have that marked,
[13] please.
[14]     (Document marked as Rothschild
[15] Exhibit 15 for identification)
[16] **Q:** The court reporter has just handed you
[17] Exhibit 15. Can you tell me what this is.
[18] **A:** This is a copy of my review of the Posener
[19] paper.
[20] **Q:** Did you fill out this form on the first
[21] page?
[22] **A:** Yes.
[23] **Q:** And you wrote the review that comprises the
[24] second and third pages of this exhibit?

Page 174

[1]   **A:** Yes.

[2]   **Q:** If you'd look at the third paragraph from
[3] the bottom, the paragraph that starts "I would
[4] suggest."

[5]   **A:** Yes.

[6]   **Q:** Can you tell me what that means, what that
[7] paragraph means?

[8]   **A:** Well, this was — the multiparameter
[9] deconvolution analysis was a technique that I had
[10] seen in Dr. Veldhuis' prior papers, and I was
[11] wondering why they didn't use that technique in this
[12] particular paper. I thought it would be interesting
[13] to see a comparison.

[14]   **Q:** What is the technique?

[15]   **A:** I'm not sure I could explain it. It's very
[16] complicated. I had to take a lot of time sitting
[17] there with Dr. Veldhuis' manuscripts and papers to
[18] try and figure it out. But it looked to me like it
[19] was something that in the Posener paper they ought
[20] to do.

[21]   **Q:** Can you describe it in just bare-bones
[22] fashion?

[23]   **A:** It's a mathematical technique. I'm not
[24] sure I could explain it in English.

Page 175

[1]   **Q:** Why did you think it was something they
[2] should have taken into account in the paper?

[3]   **A:** Because looking back at Veldhuis' 1987
[4] paper and 1992 paper, I thought that they ought
[5] to — it would be useful to compare. The paper, the
[6] Posener paper in itself is also very complicated,
[7] this approximate entropy theory, at least for me it
[8] was, to get a handle on what it actually meant. So
[9] I thought it would be useful for them to compare it
[10] to the Veldhuis paper, particularly since Veldhuis
[11] was an author on the Posener paper as well, to get
[12] some sort of estimate of the half-life of the
[13] cortisol.

[14]   **Q:** Is Dr. Veldhuis the first person who came
[15] up with such an analysis, a multiparameter
[16] deconvolution analysis?

[17]   **A:** I don't know.

[18]   **Q:** Had you ever seen such an analysis in any
[19] other place?

[20]   **A:** No.

[21]   **Q:** Have you to this day?

[22]   **A:** No. It's not a literature, mathematical
[23] techniques, that I follow very closely, no.

[24]   **Q:** I think you described pulsatile hormone

Page 176

[1] secretions. What are basal hormone secretions?

[2]   **A:** Basal?

[3]   **Q:** Basal.

[4]   **A:** I think it refers to sort of the general
[5] minimum level of hormone secretion. You would
[6] almost have to use it in context, it's hard to give
[7] a definition just of the word. But usually it means
[8] the baseline, baseline level.

[9]   **Q:** You wrote about it right here. You say, "I
[10] would suggest analyzing the data using a
[11] multiparameter deconvolution analysis to quantitate
[12] underlying basal and pulsatile hormone secretion" —

[13]   **A:** Yes. Basal in that sense is the sort of
[14] chronic, constant level of secretion, and then on
[15] top of that you get the pulses.

[16]   **Q:** The paragraph right under that starting
[17] with ApEn, "ApEn is also dependent on the series
[18] length," what does that paragraph mean?

[19]   **A:** Well, again, this was something I found in
[20] one of Dr. Veldhuis' papers, a 2001 paper, where he
[21] used this technique of computing the mean ratio of
[22] observed ApEn sort of compared to a random shuffle
[23] of cards, and I thought it would be interesting for
[24] them to look at it that way.

Page 177

[1]   **Q:** Had you ever seen that analysis in any
[2] other place?

[3]   **A:** No. I remember viewing this paper, I
[4] remember — I'm embarrassed to say I have trouble
[5] understanding it. And so I had to — I don't
[6] usually have to do this, but I had to go back to do
[7] a literature search — I found it very
[8] interesting — but to pull out Veldhuis' papers and
[9] to sit there and try to understand. I learned a lot
[10] by doing it.

[11]   But when I was doing it, I couldn't figure
[12] out why in the Posener paper they weren't doing the
[13] same analysis, even if they didn't really refer to
[14] it. So I thought they should comment on it. You
[15] have to understand, as a reviewer, these are just
[16] suggestions. These are suggestions I make for them
[17] to think about, they don't have to do it. But I
[18] thought that that was — I remember sitting there at
[19] my desk with the Posener paper and these Veldhuis
[20] papers, and it took me a long time to understand it,
[21] I have to say.

[22]   **Q:** You say these are suggestions, and on the
[23] first page you checked off "Acceptable provided
[24] author agrees to revisions." Did you want the

**EXHIBIT F**

00001

Volume I

Pages 1 to 220

Exhibits 1-19

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss. Superior Court Department
of the Trial Court

Civil Action No. 05-5389 C

IN RE:  CORCEPT THERAPEUTICS  :
INC., et als.              :

DEPOSITION OF ANTHONY J. ROTHSCHILD, M.D.,
a witness called on behalf of the Plaintiffs, taken
pursuant to Rule 30 of the Massachusetts Rules of
Civil Procedure, before Anne H. Bohan, Registered
Diplomate Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Choate, Hall & Stewart LLP, Two International Place,
Boston, Massachusetts, on Monday, February 13, 2006,
commencing at 9:33 a.m.

PRESENT:

Choate, Hall & Stewart LLP
(by Mark S. Freeman, Esq. and
Dara Y. Zelnick, Esq.)
Two International Place, Boston, MA 02110,
for the Plaintiffs.

Holland & Knight LLP
(by Harold W. Potter, Jr., Esq.)
10 St. James Avenue, 11th Floor,
Boston, MA 02116, for the Deponent.

---

Page 2

[1]                    INDEX
[2]
WITNESS              DIRECT   CROSS
[3]
[4] ANTHONY J. ROTHSCHILD, M.D.
[5]  BY MR. FREEMAN           5
[6]
[7]
[8]
                    EXHIBITS
[9]
NO.      DESCRIPTION          PAGE
[10]
 1 Belanoff, et al., article entitled   42
[11]    "An Open Label Trial of C-1073
        (Mifepristone) for Psychotic Major
[12]    Depression"
[13]  2   United States Patent 6,150,349   51
        issued to Schatzberg et al.
[14]
      3   Case No. 105CV051322 pleading   98
[15]    entitled "Complaint for Defamation"
[16]  4 E-mail dated October 28, 2005, to   100
        corcepttherapeutics@hotmail.com
[17]    from Notice-User2
        [notice-user@yahoo-Inc.com]
[18]
      5   E-mail dated October 28, 2005,   101
[19]    to corceptisafraud@yahoo.com
        and corcept@hotmail.com from
[20]    Notice-User2
        [notice-user@yahoo-Inc.com]
[21]
      6 Subpoena duces tecum to Dr. Anthony   106
[22]    J. Rothschild with attached Exhibit
        A and Exhibit 1
[23]
[24]

EXHIBIT ___ F

Page 3

[1]        EXHIBITS, Continued
[2] NO.        DESCRIPTION        PAGE
[3] 7    Document entitled "Yahoo! Message    118
     Boards:  CORT, Contact info for Dr.
[4]    Robert T. Rubin"
[5] 8    Document entitled "Yahoo! Message    123
     Boards:  CORT, A Practicing
[6]    Psychiatrist Speaks"
[7] 9    Document entitled "Yahoo! Message    126
     Boards:  CORT, The bottom line"
[8]
     10    Document entitled "Yahoo! Message    127
[9]     Boards:  CORT, The inside story"
[10] 11    Document entitled "Yahoo! Message    135
     Boards:  CORT, Update from Grand
[11]    Rounds"
[12] 12    Document entitled "Yahoo! Message    148
     Boards:  CORT, Re:  Update from
[13]    Grand Rounds"
[14] 13    Psychoneuroendocrinology article    167
     entitled "Process Irregularity of
[15]    Cortisol and Adrenocorticotropin
     Secretion in Men with Major
[16]    Depressive Disorder" by Posener, et
     al.
[17]
     14    Letter dated August 18, 2003, to Dr.    172
[18]    Anthony J. Rothschild from Ned H.
     Kalin, M.D.
[19]
     15    Psychoneuroendocrinology document    173
[20]    entitled "Referee's Comments to
     Chief Editor," authors J.A. Posener,
[21]    et al., Referee:  Dr. Anthony
     Rothschild
[22]
     16    E-mail dated January 3, 2004, to    187
[23]    Anthony Rothschild from Rosemarie
     Bluthe
[24]

Page 4

[1]        EXHIBITS, Continued
[2] NO.        DESCRIPTION        PAGE
[3] 17    Article entitled "Design Decisions    198
     to Optimize Reliability of Daytime
[4]    Cortisol Slopes in an Older
     Population" by Kraemer, et al.
[5]
     18    E-mail dated September 12, 2005, to    200
[6]    Anthony Rothschild from Dilip Jeste,
     M.D., with attachment
[7]
     19    Undated document to Dear Colleague    208
[8]    from Alan Schatzberg with attachment
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 5

[1]        **PROCEEDINGS**
[2] ANTHONY J. ROTHSCHILD, M.D.
[3] a witness called for examination by counsel for the
[4] Plaintiffs, having been satisfactorily identified by
[5] the production of his driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:
[8]        **DIRECT EXAMINATION**
[9]        **BY MR. FREEMAN:**
[10]    **Q:** Good morning, Dr. Rothschild.
[11]    **A:** Good morning.
[12]    **Q:** Have you ever been deposed before?
[13]    **A:** Yes.
[14]    **Q:** Then you may know what I'm about to say,
[15] but just so it's clear. You are here today to
[16] answer questions under oath, which means that the
[17] truth is very important, obviously. If at any time
[18] you are confused by one of my questions, I ask that
[19] you ask me to clarify it, and I'll be happy to do
[20] so. We'll be taking breaks about every hour or so.
[21] If at any time you need a break earlier than that,
[22] please just pipe up and we'll take a break.
[23]    Does that make sense?
[24]    **A:** Okay.

Page 6

[1] Q: Is there anything that would prevent you
[2] from testifying truthfully and accurately today?
[3] A: No.
[4] Q: Dr. Rothschild, where are you currently
[5] employed?
[6] A: I'm a professor of psychiatry at the
[7] University of Massachusetts Medical School.
[8] Q: How long have you worked there?
[9] A: Since July of 1996.
[10] Q: Do you both teach and do research?
[11] A: Yes.
[12] Q: What courses do you teach?
[13] A: Well, I teach — I'm codirector of the
[14] Biological Psychiatry Seminar; that's for residents.
[15] I'm a lecturer in a lot of different things for
[16] residents and medical students. And I'm director of
[17] the Senior Scholars Program; that's for medical
[18] students.
[19] Q: What does your research focus on?
[20] A: Mood disorders. Within that,
[21] psychopharmacology, and within that, I've had a
[22] long-standing interest in psychotic depression.
[23] Q: I think you mentioned psychopharmacology.
[24] Can you just tell me what that is?

Page 7

[1] A: Psychopharmacology is the use of
[2] medications to treat psychiatric disorders.
[3] Q: Since working at UMass Medical School, has
[4] your research focused on those areas?
[5] A: Yes.
[6] Q: Where did you work before you went to UMass
[7] Medical School?
[8] A: Before that I was at McLean Hospital.
[9] Q: For how long?
[10] A: Well, I did my residency there. I came
[11] there in 1979, finished my residency in 1983, and
[12] then stayed there until 1996.
[13] Q: From 1983 through 1986, what was your
[14] position at McLean Hospital?
[15] MR. POTTER: Objection. '83 to '96.
[16] Q: Excuse me, '83 to '96.
[17] MR. FREEMAN: Thank you.
[18] A: Well, I had several different positions.
[19] Q: What was your first position?
[20] A: I think I was instructor in psychiatry,
[21] that was my academic rank, and I was what's called a
[22] psychiatrist in charge. I worked on one of the
[23] inpatient units.
[24] Q: When did that position change?

Page 8

[1] A: I think in 1985, I became an assistant
[2] professor at Harvard Medical School. In 1988, I was
[3] sort of bumped upstairs to become clinical director
[4] of several inpatient units and an outpatient program
[5] and a partial hospital program. In 1992, I was
[6] promoted to associate professor at Harvard Medical
[7] School.
[8] Q: I'm sorry, that was '92?
[9] A: Yes.
[10] Q: Did you engage in research while you were
[11] at McLean Hospital?
[12] A: Yes.
[13] Q: In what areas?
[14] A: The same areas that I do at UMass.
[15] Q: Did you also teach?
[16] A: Yes.
[17] Q: What classes did you teach, just in general
[18] terms, if you remember?
[19] A: I don't really remember. McLean — Harvard
[20] is a little bit different, the medical students sort
[21] of float out there from Boston. It was mostly
[22] teaching of residents and lots of courses in mood
[23] disorders. I know I taught a course on mood
[24] disorders, I remember doing that.

Page 9

[1] Q: Can you briefly describe your educational
[2] background.
[3] A: Bachelor's degree from Princeton, medical
[4] school at the University of Pennsylvania School of
[5] Medicine, and then after that I came up to McLean to
[6] do my residency.
[7] Q: I'm sorry, where did you say you went to
[8] medical school again?
[9] A: The University of Pennsylvania in
[10] Philadelphia.
[11] Q: Thank you. When did you graduate medical
[12] school?
[13] A: 1979.
[14] Q: Did you specialize in any particular area
[15] while in medical school?
[16] A: No.
[17] Q: Are you currently a member of any
[18] psychiatric or medical groups?
[19] A: I'm not sure I understand the question.
[20] You mean professional?
[21] Q: Professional groups.
[22] A: Yes.
[23] Q: Can you tell me which ones?
[24] A: The American College of

In Re: Corcept Therapeutics Inc., et al.
Case 5:07-cv-03795-JW    Document 70-3    Filed 10/29/2007    Page 9 of 15

Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

**Page 22**

[1] MR. POTTER: Yeah, that's all right.

[2] (Card exhibited to Mr. Freeman)

[3] MR. FREEMAN: Thank you.

[4] Q: What about your American Express card; is

[5] that in there?

[6] A: It should be.

[7] (Card exhibited to Mr. Freeman)

[8] MR. FREEMAN: That's fine. Thank you.

[9] Q: So you no longer have a VISA card; is that

[10] correct?

[11] A: That's right.

[12] Q: In opening your wallet are you reminded of

[13] any other credit cards that you currently have

[14] besides those that we just talked about?

[15] A: I have another American Express card

[16] through Delta.

[17] Q: Delta Air Lines?

[18] A: Yes. Delta SkyMiles.

[19] Q: How long have you had that one?

[20] A: It says on it "Member since '84."

[21] Q: Do you pay for travel expenses through that

[22] credit card as well?

[23] A: Sometimes.

[24] Q: And your VISA card, do you remember which

**Page 23**

[1] company or bank issued that card?

[2] A: No.

[3] Q: How do you pay the bills for both of your

[4] American Express cards?

[5] A: That I usually write a check.

[6] Q: When the statement comes in each month, you

[7] write a check and just send it in?

[8] A: Yes.

[9] Q: You don't pay those online?

[10] A: No.

[11] Q: What about your Discover card?

[12] A: I pay that online.

[13] Q: Do you know who Alan Schatzberg is?

[14] A: Yes.

[15] Q: Can you tell me who he is?

[16] A: He's Professor of Psychiatry and Chairman

[17] of the Department of Psychiatry at Stanford.

[18] Q: When did you first meet him?

[19] A: When I was a resident at McLean.

[20] Q: What was your relationship to him at the

[21] time?

[22] A: At which time?

[23] Q: When you were a resident at McLean.

[24] A: He was a young assistant professor and

**Page 24**

[1] while I was a resident we started working together.

[2] Q: Were you essentially working under him?

[3] A: Initially, yes.

[4] Q: What type of work did you do?

[5] A: Well, when I was a resident, he was the

[6] psychiatrist in charge on one of the inpatient

[7] units, and that's where I first started working with

[8] him. When I finished my residency, he moved up, he

[9] was promoted to a position, I can't remember what it

[10] was called, but it was like clinical director or

[11] program director, and I moved into his position as

[12] the psychiatrist-in-charge on the inpatient unit.

[13] During that time as well, we worked together on

[14] research projects. We were a team; we worked very

[15] closely together.

[16] Q: How long did you work together on research

[17] projects; from what date until what date?

[18] A: Well, we started during my residency. It

[19] was probably around 1980, sometime in 1980, and then

[20] we worked together continuously until 1991. Alan

[21] left McLean in '88 to move over to Mass. Mental in

[22] Boston, but while he was there we still continued to

[23] work together, he came out to McLean and I went to

[24] Mass. Mental.

**Page 25**

[1] In '91 or sometime in '91, he moved to

[2] California. Although we didn't physically work

[3] together anymore, we still had very frequent contact

[4] when he was in California. We spoke several times a

[5] month, probably for the next ten years.

[6] Q: What did your research initially focus on,

[7] the research that you were doing with Dr.

[8] Schatzberg?

[9] A: I think the first thing we worked on was

[10] the cortisol abnormality, the abnormality in the HPA

[11] axis that we found occurred frequently in people

[12] with psychotic depression.

[13] Q: What is cortisol?

[14] A: Cortisol is a hormone produced by the

[15] adrenal gland.

[16] Q: You said cortisol abnormality. What's the

[17] abnormality with people that occurred with psychotic

[18] depression?

[19] A: Their levels were high.

[20] Q: Their cortisol levels were high?

[21] A: Correct.

[22] Q: Who initially determined that people with

[23] psychotic depression had abnormally high cortisol

[24] levels?

Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

Case 3:04-cv-03795-JW    Document 70-3    Filed 10/29/2007    Page 11 of 37
In Re Corcept Therapeutics Inc., et als.

Page 74

[1] claim as an inventor?

[2] A: Yes.

[3] Q: How did you feel about that decision?

[4] A: I mean, I was surprised, mainly because I
[5] had been told by the attorneys at Nutter that —
[6] well, they told me that they were surprised by it,
[7] too, that they didn't think he was going to rule
[8] that way.

[9] Q: Why didn't they think he was going to rule
[10] that way?

[11] A: You'd have to ask them; that's a legal
[12] question.

[13] Q: Did you feel that the decision was fair?

[14] A: Yeah. The arbitrator had a very good
[15] reputation, you know, and I'm not an expert or don't
[16] even claim to know anything about patent law. So I
[17] have no ability to judge whether it was fair or not,
[18] but I accept it.

[19] Q: Were you disappointed in not being an
[20] inventor?

[21] A: I was disappointed because I thought that I
[22] did contribute to the conceptualization of the
[23] invention.

[24] Q: Were you angry at Corcept in any way?

Page 75

[1] A: No.

[2] Q: During the time that this dispute was going
[3] on, did you have any conversations with anybody at
[4] Corcept?

[5] A: No.

[6] Q: When was it resolved?

[7] A: In January of 2005.

[8] Q: So from approximately August 2002 until
[9] January 2005, you've had no conversations with
[10] anybody at Corcept?

[11] A: No.

[12] Q: I'm sorry, no conversations?

[13] A: No conversations.

[14] Q: At your meeting with Dr. Schatzberg in
[15] August of 2002, did you ever tell him that your
[16] feeling was that you should have a larger stake in
[17] the company than just being on the Scientific
[18] Advisory Board?

[19] A: No.

[20] Q: Did you ever tell him that you really
[21] thought you should be a founder of the company and
[22] be on the patent?

[23] A: No. Well, on the patent, yes. A founder
[24] of the company, no.

Page 76

[1] Q: Do you have a computer at home?

[2] A: Yes.

[3] Q: Let me back up and say, where do you
[4] reside?

[5] A: In Sherborn, Massachusetts.

[6] Q: Do you have any other residences?

[7] A: I have a house in Maine.

[8] Q: Anything else?

[9] A: No.

[10] Q: Where in Maine?

[11] A: Harrison, Maine.

[12] Q: Is the house in Maine a summer house?

[13] A: It can be used all year round.

[14] Q: Is your primary residence the residence in
[15] Sherborn?

[16] A: Yes.

[17] Q: And you own outright the house in Maine?

[18] A: The bank owns some of it.

[19] Q: Understood. But you're not renting that?

[20] A: No.

[21] Q: Do you lease it out ever?

[22] A: No.

[23] Q: It's there for your enjoyment when you want
[24] to use it?

Page 77

[1] A: Yes.

[2] Q: Do you have a computer at your house in
[3] Sherborn?

[4] A: Yes.

[5] Q: How many?

[6] A: Four.

[7] Q: Four computers?

[8] A: Four laptops.

[9] Q: They're all laptops?

[10] A: Yes.

[11] Q: Do you have any desktop computers?

[12] A: No.

[13] Q: Do the laptops have wireless capabilities?

[14] A: Yes.

[15] Q: All of them?

[16] A: Yes.

[17] Q: Do you use all four laptops?

[18] A: No.

[19] Q: How many laptops do you use?

[20] A: One.

[21] Q: Are the others used by other members of
[22] your family?

[23] A: Yes.

[24] Q: Do you ever use any of the other laptops?

In Re: Concept Therapeutics Inc., et al.     Document 70-3     Filed 10/29/2007     Page 12 of 37

Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

Page 126

[1] or research patient?

[2] **A:** No. I refer people to the guys who do the
[3] ECT, but I've never actually done it.

[4] **Q:** But you have made referrals?

[5] **A:** Sure.

[6] **Q:** So it says, "It is highly unlikely I will
[7] refer these patients away to take RU-486." Did you
[8] make that statement?

[9] **A:** No.

[10] **Q:** Do you get money for making referrals to
[11] ECT?

[12] **A:** No.

[13] **MR. FREEMAN:** Would you mark that, please.

[14]     (Document marked as Rothschild
[15] Exhibit 9 for identification)

[16] **Q:** The court reporter has just handed you
[17] Exhibit 9. Have you ever seen this before?

[18] **A:** I think I may have seen this after I
[19] received the subpoena and I Googled
[20] "stanfordinsider."

[21] **Q:** Did you make the statement that's
[22] referenced in this document?

[23] **A:** No.

[24] **Q:** Who is Shockman?

Page 127

[1] **A:** I have no idea.

[2] **Q:** Have you ever heard the name Shockman
[3] before?

[4] **A:** No.

[5] **Q:** One of the statements in here says that
[6] "The CEO and the company" — this is referring to
[7] Corcept — "create press releases to raise the price
[8] of the stock and then sell on the news." Do you
[9] agree or disagree with that statement?

[10] **A:** I don't know anything about that.

[11] **Q:** And you didn't make that statement?

[12] **A:** That's right.

[13] **MR. FREEMAN:** Would you mark this, too,
[14] please.

[15]     (Document marked as Rothschild
[16] Exhibit 10 for identification)

[17] **Q:** The court reporter has just handed you
[18] Exhibit 10. Have you ever seen this before?

[19] **A:** I think I saw this, again, after I received
[20] the subpoena, after I Googled it.

[21] **Q:** Again, this is another Internet posting.
[22] Did you make the statement that's reflected in this
[23] posting?

[24] **A:** No.

Page 128

[1] **Q:** The first time you saw it was when you
[2] Googled "stanfordinsider"?

[3] **A:** Yes.

[4] **Q:** Do you stay in regular contact with anybody
[5] at Stanford in the department of psychiatry?

[6] **A:** No.

[7] **Q:** When was the last time you spoke to
[8] somebody at Stanford's department of psychiatry?

[9] **A:** Let's see. I ran into a former resident of
[10] ours. I'm blocking on her name. This past January
[11] she stopped by for a visit.

[12] **Q:** You don't recall the name?

[13] **A:** I just talked to her in the hallway. It
[14] will come to me. I apologize, I can't remember her
[15] name.

[16] **Q:** What did you talk about?

[17] **A:** She was back for a visit, and I think she
[18] was asking people at UMass to help her practice for
[19] the board exams. And I saw her in the hallway, and
[20] we passed and we chatted for about a minute or two.

[21] **Q:** It wouldn't be Sarah Yasmin, would it?

[22] **A:** That's right, Sarah Yasmin.

[23] **Q:** Did you talk about Corcept at all?

[24] **A:** No.

Page 129

[1] **Q:** Did you talk about cortisol or mifepristone
[2] at all?

[3] **A:** No. The only thing she talked about was a
[4] recent meeting she had had with Dr. Schatzberg.

[5] **Q:** What did she say about that?

[6] **A:** She talked about that Schatzberg, Dr.
[7] Schatzberg had come into her office asking lots of
[8] questions about me, and she wanted to let me know
[9] that, and she felt kind of threatened by it all.

[10] **Q:** I'm sorry, remind me of her relation to
[11] you. She was —

[12] **A:** She had been a resident at UMass, I can't
[13] remember when she graduated, it was probably about a
[14] year and a half or so ago. And I don't think I've
[15] seen her since, she didn't work directly with me.
[16] And I knew she had gone out to Stanford. I don't
[17] recall seeing her until this past January when I ran
[18] into her in the hallway.

[19] **Q:** This past January being January of 2006?

[20] **A:** Correct.

[21] **Q:** And you ran into her in the hallway at
[22] UMass?

[23] **A:** Yeah. On the seventh floor where the
[24] psychiatry department is.

**Anthony J. Rothschild, M.D.**
**Vol. 1, February 13, 2006**
Case 3:04-cv-03795-JW   Document 70-3   Filed 10/29/2007   Page 13 of 37
In Re: Corcept Therapeutics Inc., et als.

Page 138

[1]   A: No.
[2]   Q: Have you followed their research or
[3] development of any drugs at all in the past?
[4]   A: I followed their development of Remeron, an
[5] antidepressant, but that was a long time ago.
[6]   Q: Is Remeron a cortisol-receptor antagonist?
[7]   A: No.
[8]   Q: What's Remeron?
[9]   A: It's an antidepressant.
[10]   Q: Does it act to suppress cortisol levels?
[11]   A: No.
[12]   Q: It doesn't act to block cortisol's
[13] reception in the brain?
[14]   A: No.
[15]   Q: Are you aware whether Organon is developing
[16] any drug along those lines similar to mifepristone?
[17]   A: I don't know.
[18]   Q: I think you told me on November 4th, you
[19] were out of town, November 4, 2005?
[20]   A: Yes.
[21]   Q: Where were you?
[22]   A: I was in Pittsburgh.
[23]   Q: What were you doing there?
[24]   A: A couple of things. I was presenting at a

Page 139

[1] symposium, and I was also meeting with colleagues
[2] who were involved in an NIMH study of the treatment
[3] of psychotic depression. So those were the two
[4] reasons.
[5]   Q: Let's take those one at a time. Excuse me.
[6] What's symposium were you presenting at?
[7]   A: It was a symposium on psychotic depression,
[8] and the name of the meeting was the International
[9] College of Geriatric Psychopharmacology.
[10]   Q: What days was that conference being held?
[11]   A: I think it was for a couple of days.
[12]   Q: One of which being November 4th?
[13]   A: That's right.
[14]   Q: On November 5th or November 3rd as well, do
[15] you remember?
[16]   A: I don't know; I wasn't there.
[17]   Q: On what day did you present at the
[18] symposium?
[19]   A: November 4th.
[20]   Q: Where was that symposium held?
[21]   A: At the Athletic Center on the campus of the
[22] University of Pittsburgh.
[23]   Q: You said you were also meeting with
[24] colleagues on an NIMH study?

Page 140

[1]   A: Yes.
[2]   Q: Is that National Institute of Mental
[3] Health?
[4]   A: Yes.
[5]   Q: What was the study?
[6]   A: It's the study of the treatment of
[7] psychotic depression, the medication treatment of
[8] psychotic depression.
[9]   Q: Who were your colleagues that you were
[10] meeting with?
[11]   A: Let's see. Dr. Barnett Meyers, Dr. Ben
[12] Mulsant and Dr. Alistair Flint.
[13]   Q: Who is the second one again, I'm sorry?
[14]   A: Ben Mulsant.
[15]   Q: You mentioned his name before, correct?
[16]   A: I think I did.
[17]   Q: Alistair?
[18]   A: Flint.
[19]   Q: Flint. Where is Dr. Meyers from?
[20]   A: Cornell.
[21]   Q: And Dr. Mulsant, remind me again?
[22]   A: Now he's in Toronto. He used to be in
[23] Pittsburgh.
[24]   Q: Was he in Pittsburgh at the time?

Page 141

[1]   A: What time?
[2]   Q: At the time of this meeting that you had
[3] with him?
[4]   A: We were all in Pittsburgh.
[5]   Q: Was he working at Pittsburgh at that time?
[6]   A: No.
[7]   A: He was working in Toronto?
[8]   A: University of Toronto.
[9]   Q: How about Alistair Flint; where is he from?
[10]   A: The University of Toronto.
[11]   Q: On what day did you meet with those
[12] individuals?
[13]   A: November 4th.
[14]   Q: How did you get to Pittsburgh that day?
[15]   A: I took an early flight out of Boston on
[16] November 4th.
[17]   Q: Were you just there for one day?
[18]   A: That's right.
[19]   Q: Did you fly back on November 4th as well?
[20]   A: Yes.
[21]   Q: How long was your meeting with these three
[22] individuals?
[23]   A: Let's see. We rendezvoused around sometime
[24] between 9:00 and 9:30. We met till about 11 a.m.,

In Re: Corcept Therapeutics Inc., et als.
Case 5:07-cv-03757-JW Document 70-3 Filed 10/29/2007 Page 14 of 16
Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

Page 142

[1] give or take five minutes. We then walked over
[2] together to the Athletic Center where I remember
[3] picking up my — Dr. Mulsant getting me my
[4] credentials for the meeting, badge, from the lady at
[5] the desk. Then we walked into — well, behind her
[6] was like a conference room. We walked into the
[7] meeting, it was kind of like a business meeting.
[8] That went from about 11:15 until about 12:00 or
[9] 12:15.
[10] Then we walked upstairs to the second floor
[11] where Dr. Mulsant had rented a conference room, and
[12] I remember eating lunch there. We met there
[13] probably until about 1:20 or so. Then we walked
[14] down the hall to the symposium room where the four
[15] of us were giving a symposium together. That went
[16] until about 3:30. Then at 3:30 we walked back down
[17] the hall to the meeting room. We probably met there
[18] until about 5:30 or so.
[19] Then we walked downstairs together to the
[20] poster session, and I hung around the poster session
[21] for probably a half-hour, 45 minutes or so. By that
[22] time, around 6:30 p.m., I hopped in a cab and went
[23] back to the airport.
[24] Q: When you met with those other individuals

Page 143

[1] from 9:00 until approximately 11:00, where were you
[2] meeting?
[3] A: We were in the lobby of one of the hotels.
[4] Q: Do you remember which hotel?
[5] A: No. But I know it was close to the
[6] Athletic Center, because I remember we walked over
[7] together to the Athletic Center.
[8] Q: Was it a Holiday Inn?
[9] A: I don't remember. It could have been; I
[10] don't remember.
[11] Q: Do you recall whether there was a Holiday
[12] Inn nearby?
[13] A: I don't know.
[14] Q: You said that you were meeting from
[15] approximately — let me back up. You said from
[16] 11:15 to about 12:15 you were where?
[17] A: After we walked over to the Athletic Center
[18] and I picked up my credentials, we went to a meeting
[19] in the room behind the desk, which was a business
[20] meeting. There were a lot of people there. There
[21] were probably at least 100 people, if not more, in
[22] this meeting.
[23] Q: What was that meeting about?
[24] A: It was a business meeting. I had no

Page 144

[1] particular great interest in it; I remember sitting
[2] in the back. But it was like a business meeting of
[3] the college.
[4] Q: Did it have to do with the symposium at
[5] all?
[6] A: No.
[7] Q: Why did you decide to attend it?
[8] A: Well, they wanted to attend it, and they
[9] said, "Why don't you come along." So we were
[10] together the whole day, so I went with them.
[11] Q: Why did they want to attend?
[12] A: There was some business or something that
[13] they wanted to attend. I think everybody went in
[14] there. It looked like everybody was there.
[15] Q: Were there people there that weren't
[16] attending the symposium?
[17] A: I'm sure, because when we did our symposium
[18] there were other symposia running at the same time,
[19] so there were more people there than were at our
[20] symposium.
[21] Q: This meeting, this was at the Pittsburgh
[22] Athletic Center?
[23] A: That's right.
[24] Q: Did you bring your laptop on this trip?

Page 145

[1] A: No.
[2] Q: Did you use a computer at all on this trip?
[3] A: No.
[4] Q: Did you access the Internet at all while
[5] you were on this trip?
[6] A: No.
[7] Q: You said from after the meeting, that ended
[8] about 12:15, this meeting that was behind the desk?
[9] A: Around 12:15, yes.
[10] Q: What were people talking about at that
[11] meeting?
[12] A: I wasn't really paying that much attention,
[13] but I remember Dr. Jeste was speaking about
[14] something, I think it was about the journal. I
[15] remember Chip Reynolds, Dr. Reynolds was speaking
[16] about something. But I was spending most of my time
[17] thinking about what I was going to say at the
[18] symposium; I was going over my notes.
[19] Q: You said Dr. Jeste was speaking about the
[20] journal?
[21] A: I think so.
[22] Q: What journal?
[23] A: I wasn't really paying attention. I
[24] remember Dr. Jeste being at the microphone; what

Page 146

[1] exactly he was speaking about, I can't remember.
[2]   Q: This was a meeting of the International
[3] College of Geriatric Psychiatrists?
[4]   A: I think it's called Geriatric
[5] Psychopharmacology.
[6]   Q: Excuse me.
[7]   A: It's called ICGP. I don't know what the
[8] "P" stands for; I think it's psychopharmacology.
[9]   Q: Does that college have its own journal?
[10]   A: I don't know.
[11]   Q: Who were you sitting next to when you were
[12] in there?
[13]   A: I don't remember.
[14]   Q: Was it your colleagues: Drs. Meyers,
[15] Mulsant or Flint?
[16]   A: I don't remember.
[17]   Q: Did you sit in their general location?
[18]   A: Yeah, I think so.
[19]   Q: And you were in there for the whole hour
[20] from 11:15 to 12:15?
[21]   A: Yes.
[22]   Q: Then after that, I'm sorry, you said you
[23] met with them separately in a meeting room?
[24]   A: Well, we went upstairs to the second floor,

Page 147

[1] and Dr. Mulsant had reserved a meeting room where we
[2] met and we had lunch in there.
[3]   Q: What did you guys talk about during lunch?
[4]   A: Well, the whole day that we were meeting in
[5] the morning, that meeting. Then after the symposium
[6] we were discussing issues related to the grant and
[7] looking at some of the data from the grant and the
[8] progress of the grant.
[9]   Q: This is the NIMH grant?
[10]   A: Yes.
[11]   Q: So you were basically talking about the
[12] study that you guys were collaborating on?
[13]   A: Yes.
[14]   Q: That lunch meeting ran until about 1:20,
[15] did you say?
[16]   A: Yes. Because then we had to go down the
[17] hall and get our slides loaded onto the laptop that
[18] they were using for the symposium.
[19]   Q: During that meeting did you ever leave the
[20] room at any time, or were you in there eating lunch
[21] the whole time, do you recall?
[22]   A: We didn't leave the room. We ate lunch, we
[23] were in that room the whole time.
[24]   Q: Then when the symposium started, where did

Page 148

[1] that symposium actually take place?
[2]   A: On the second floor, on the same floor as
[3] the meeting room, it was just down the hall.
[4]   Q: Were you in that room the whole time from
[5] 1:20 to about 3:30?
[6]   A: Yes.
[7]   Q: Then again I think you said you had another
[8] meeting from 3:30 to 5:30 with your colleagues on
[9] the NIMH study?
[10]   A: Right. After the symposium was over, we
[11] walked back into that same meeting room and
[12] continued to meet until about 5:30.
[13]   Q: What did you talk about at that time?
[14]   A: The same thing, we talked about the grant.
[15]   Q: Did anybody have a computer with them?
[16]   A: That I don't recall.
[17]   Q: But you didn't use anybody else's computer
[18] at that time?
[19]   A: No.
[20]   MR. FREEMAN: Mark that.
[21]   (Document marked as Rothschild
[22] Exhibit 12 for identification)
[23]   Q: The court reporter has just handed you
[24] Exhibit 12, which is another posting made on an

Page 149

[1] Internet message board. Have you ever seen this
[2] before?
[3]   A: Again, I may have seen it after I got the
[4] subpoena when I Googled "stanfordinsider."
[5]   Q: Did you make this posting?
[6]   A: No.
[7]   Q: Are you the author of this posting?
[8]   A: No.
[9]   Q: Do you see in the last two sentences it
[10] says, "The Organon drug will be in direct
[11] competition with the Corcept drug. It has a similar
[12] mechanism, without the side effect and political
[13] bagage"? Do you agree or disagree with that
[14] statement?
[15]   A: I think I testified, I don't know anything
[16] about the Organon drug, so I wouldn't be able to
[17] comment.
[18]   Q: You may have said this earlier. Are you a
[19] member of the American Society of Clinical
[20] Psychopharmacologists?
[21]   A: You know, I may have left that one out, but
[22] I am.
[23]   Q: How long have you been a member of that
[24] society?

In Re: Corcept Therapeutics Inc., et al.    Document 70-3    Filed 10/29/2007    Page 1 of 37

Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

Page 150

[1] **A:** I don't know. It's been many years.
[2] Whenever they got started, I think I joined shortly
[3] thereafter.
[4] **Q:** And you're still currently a member?
[5] **A:** Yes.
[6] **Q:** It's been the past ten years that you've
[7] been a member?
[8] **A:** That's around the amount of time they've
[9] been in existence, so it's probably around ten
[10] years.
[11] **Q:** Are you on their mailing list?
[12] **A:** I think I am, yes.
[13] **Q:** Do you get regular newsletters about
[14] meetings and conferences that they have coming up?
[15] **A:** I think they come by e-mails, but I do get
[16] things from them, yes.
[17] **Q:** Do you attend their meetings and
[18] conferences?
[19] **A:** I'm embarrassed to say I never have.
[20] **Q:** Are you aware of whether they had a meeting
[21] in November of 2002 in New York City?
[22] **A:** I have no idea.
[23] **Q:** Did you ever receive notification that they
[24] were holding a meeting then?

Page 151

[1] **A:** I may have, but I've never really planned
[2] on ever attending, so I probably throw it away or
[3] delete it as soon as it comes.
[4] **Q:** Do you recall noticing if Dr. Schatzberg
[5] was scheduled to speak at that meeting?
[6] **A:** No.
[7] **Q:** On November 15, 2002, did you call the
[8] Hilton Hotel in New York City and leave a message
[9] for Dr. Schatzberg?
[10] **A:** No.
[11] **Q:** Did you call the Hilton Hotel pretending to
[12] be Dean Pizzo?
[13] **A:** No.
[14] **Q:** Who is Dean Pizzo?
[15] **A:** I have no idea.
[16] **Q:** Have you ever heard of Philip Pizzo from
[17] Stanford?
[18] **A:** No.
[19] **Q:** Did you leave a message for Dr. Schatzberg
[20] that day saying that the Wall Street Journal was
[21] calling and asking about a conflict of interest
[22] between Stanford and Corcept?
[23] **A:** No.
[24] **Q:** Do you recall where you were on November

Page 152

[1] 15, 2002?
[2] **A:** No.
[3] **Q:** Have you heard of a New Clinical Drug
[4] Evaluation Unit Conference?
[5] **A:** NCDEU, yes.
[6] **Q:** When you say NCDEU, is that N-C-U-E —
[7] **A:** N-C-D-E-U, that's what people usually call
[8] it. I think that's what you're referring to.
[9] **Q:** Yes. What is that conference?
[10] **A:** It's a conference run by NIMH with a focus
[11] on medications that are in development.
[12] **Q:** Have you attended the conference before?
[13] **A:** I'm embarrassed to say, I never have.
[14] **Q:** Do you receive mailings about the
[15] conference?
[16] **A:** Actually, I don't, but it usually occurs
[17] around the time of the APA.
[18] **Q:** Were you aware that Dr. Belanoff was
[19] scheduled to give a talk at the May 2003 conference
[20] for NCDEU?
[21] **A:** No.
[22] **Q:** Were you aware whether Dr. Belanoff was
[23] staying at the Boca Raton Resort at that time?
[24] **A:** No.

Page 153

[1] **Q:** Did you call the Boca Raton Resort and
[2] leave a message for Dr. Belanoff to the effect he
[3] should call his wife because there had been an
[4] emergency at the hospital?
[5] **A:** No.
[6] **Q:** Have you heard of a Melanie Peterson?
[7] **A:** Melanie Peterson, no.
[8] **Q:** Have you heard of a reporter at The New
[9] York Times by that name?
[10] **A:** No.
[11] **Q:** Do you read The New York Times?
[12] **A:** No.
[13] **Q:** Who is Charlie Nemeroff?
[14] **A:** He's the chairman of the department of
[15] psychiatry at Emory.
[16] **Q:** Does he have any relation to Corcept, as
[17] far as you know?
[18] **A:** I believe he is a shareholder and a member
[19] of the advisory board.
[20] **Q:** Did you ever read a story about potential
[21] conflict of interest between Charlie Nemeroff and
[22] Corcept?
[23] **A:** I think there was a New York Times article
[24] about that, yes.

Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

Case 5:07-cv-03795-JW · Document 70-3 · Filed 10/29/2007 · Page 17 of 37
In Re: Corcept Therapeutics Inc., et als.

Page 154

[1] **Q:** Did you read that article?

[2] **A:** I think I have.

[3] **Q:** Do you know whether it was written by a
Melanie Peterson?

[5] **A:** I don't know.

[6] **Q:** Do you have a copy of that article?

[7] **A:** No.

[8] **Q:** Do you know Bruce McEwen?

[9] **A:** I know who he is.

[10] **Q:** Who is he?

[11] **A:** He's a well-known researcher in the field
[12] of psychoneuroendocrinology.

[13] **Q:** Where does he work?

[14] **A:** The last I remember I think he worked at
[15] Rockefeller in New York City, but I'm not sure, he
[16] may have moved.

[17] **Q:** Did you attend a September 2003 meeting of
[18] the International Society of Psychoneuro-
[19] endocrinology?

[20] **A:** I don't think so, no.

[21] **Q:** Did you ever attend a meeting that they had
[22] at Rockefeller University?

[23] **A:** No.

[24] **Q:** Were you aware of whether Dr. McEwen was

Page 155

[1] organizing a meeting at Rockefeller University of
[2] the ISPNE in September of 2003?

[3] **A:** No. I haven't been to an ISPNE meeting in
[4] many years.

[5] **Q:** Have you ever spoken to Dr. McEwen?

[6] **A:** No.

[7] **Q:** Have you ever called his office?

[8] **A:** No.

[9] **Q:** Around September 8, 2003, did you ever call
[10] his office and leave a message pretending to be a
[11] Mel Peterson and asking to speak to Dr. Schatzberg
[12] about a conflict of interest between Dr. Schatzberg
[13] and Corcept?

[14] **A:** No.

[15] **Q:** Do you know — I'm going to have trouble
[16] saying this, let me try to pronounce it, and if you
[17] need help I can spell it. Madhukar Trived?

[18] **A:** Madhukar Trivedi.

[19] **Q:** Thank you. Correct me if I'm wrong, Dr.
[20] Rothschild. I think his first name is spelled —

[21] **A:** I don't know how to spell it. I know how
[22] to spell his last name.

[23] **Q:** His first name I believe is
[24] M-a-d-h-u-k-a-r, and I thought his last name was

Page 156

[1] T-r-i-v-e-d.

[2] **A:** d-i. There's an "i" at the end. I know
[3] him.

[4] **Q:** Who is he?

[5] **A:** He's a professor at the University of
[6] Texas, I think it's called Southwest, in Dallas.

[7] **Q:** Have you ever collaborated with him?

[8] **A:** We've both been investigators at our
[9] respective sites on the same study.

[10] **Q:** Which studies were those?

[11] **A:** Well, the one that comes to mind is a
[12] recent study sponsored by Wyeth and a study of
[13] chronic depression.

[14] **Q:** I'm sorry, you said you were investigators
[15] at different sites?

[16] **A:** Yeah. He's in Texas and I'm at UMass.

[17] **Q:** Are those studies still going on?

[18] **A:** I guess the short answer is no, but the
[19] data is still being analyzed.

[20] **Q:** Is that the only study that you have in
[21] common?

[22] **A:** There may have been others, but I don't
[23] recall them.

[24] **Q:** When did that study begin?

Page 157

[1] **A:** When did it begin? I don't remember. It's
[2] got to have been sometime maybe in 2001.

[3] **Q:** Have you been in regular contact with him?

[4] **A:** No. I run into Dr. Trivedi at meetings
[5] from time to time. I see him once or twice a year.

[6] **Q:** Do you know whether you spoke to him around
[7] or about October 2003?

[8] **A:** I don't recall.

[9] **Q:** Were you aware that Dr. Schatzberg was
[10] scheduled to give a talk at grand rounds at the
[11] University of Texas-Southwestern on October 1, 2003?

[12] **A:** No, not aware of that.

[13] **Q:** Did you call the University of Texas-
[14] Southwestern neurology department and cancel Dr.
[15] Schatzberg's talk claiming to be Dr. Schatzberg
[16] yourself?

[17] **A:** No.

[18] **Q:** Do you still stay in touch with Dr. Patel?

[19] **A:** Yes.

[20] **Q:** He still works at UMass?

[21] **A:** Yes.

[22] **Q:** Are you still the head of his department?

[23] **A:** It's called a division, but yes.

[24] **Q:** Is he currently working for Corcept?

In Re: Corcept Therapeutics Inc., et al.
Case 5:04-cv-00618-JW   Document 70-3   Filed 10/29/2007   Page 18 of 37

Anthony J. Rothschild, M.D.
Vol. 1, February 13, 2006

**Page 166**

[1] A: I just thought it was — I was just
[2] curious, I'd never seen anybody trace a lineage back
[3] from the Greeks to the present time.
[4] Q: Did you think it was a little pretentious?
[5] A: I don't know; I just found it humorous.
[6] Q: Since that time to the present, have you
[7] gone on Corcept's Web site at all?
[8] A: I don't think so, no.
[9] Q: How about before that; when was the time
[10] that you went on Corcept's Web site before that
[11] time?
[12] A: There was only like one or two times around
[13] the time that somebody said, "You should check this
[14] out, you might find it interesting."
[15] Q: Did you go on Corcept's Web site while you
[16] were working for Corcept?
[17] A: I don't think so. I wasn't aware they had
[18] a Web site.
[19] Q: So you've only been on their Web site once
[20] or twice and it was around this time?
[21] A: Once or twice sometime in the past year or
[22] so.
[23] Q: Could that have been in September 2005?
[24] A: No. It was before that.

**Page 167**

[1] Q: How long before that?
[2] A: It was at least nine months ago, so
[3] probably closer to a year ago.
[4] Q: Were you aware that Dr. Belanoff was going
[5] to be speaking in Boston on September 6, 2005?
[6] A: No.
[7] Q: Were you aware that the talk was going to
[8] be held at the Four Seasons Hotel?
[9] A: No.
[10] Q: Did you call the Four Seasons Hotel and
[11] cancel Dr. Belanoff's reservation?
[12] A: No.
[13] MR. FREEMAN: The next exhibit.
[14] (Document marked as Rothschild
[15] Exhibit 13 for identification)
[16] MR. FREEMAN: Mr. Potter, I'm going to have
[17] to ask you to look on with your client. I'm going
[18] to start making reference to documents that were
[19] produced today.
[20] MR. POTTER: That's fine. So long as
[21] you'll send me a copy as marked. I'd like to have
[22] copies marked, so if it comes up later.
[23] MR. FREEMAN: Sure.
[24] Q: Dr. Rothschild, the court reporter has just

**Page 168**

[1] handed you Exhibit 13. Have you seen this before?
[2] A: Yes.
[3] Q: What is it?
[4] A: It's a paper that was published in the
[5] journal Psychoneuroendocrinology in 2004.
[6] Q: What's the paper about?
[7] A: It's about cortisol and ACTH secretion in
[8] men with major depression.
[9] Q: What conclusions does the article reach?
[10] A: It's been a while, I'll have to check. I
[11] think it had a lot of conclusions. Let's see. I
[12] mean, I can read it to you if you'd like.
[13] Q: I don't think you need to read me the full
[14] article —
[15] A: No, no. I was just going to read you the
[16] conclusion, one of the conclusions.
[17] Q: Sure.
[18] A: "The ApEn findings suggest a loss of
[19] regulatory control over cortisol secretion and
[20] possibly increased cortisol feedback on the
[21] pituitary in the depressed patients. Together,
[22] these results are most consistent with a primary
[23] abnormality of the adrenal gland and suggest that
[24] further investigation of adrenal gland physiology

**Page 169**

[1] may be informative for the pathophysiology of
[2] depression."
[3] Q: Where are you reading from?
[4] A: I was reading the last two sentences in the
[5] "Summary" on Page 1130.
[6] Q: In laymen's terms, what does that mean,
[7] what you just read to me?
[8] A: Well, I'm not sure I can explain this in
[9] layman's terms. This is a complicated paper using a
[10] statistical technique called approximate entropy.
[11] You may remember entropy from physics; it's very
[12] complicated. But basically, what they found is an
[13] irregular secretion and degree of disorder in the
[14] pulsatile release of cortisol. So it pointed to a
[15] problem in the adrenal gland.
[16] Q: What does the pulsatile release of cortisol
[17] mean?
[18] A: Cortisol is normally released in pulses,
[19] it's not just like a steady stream, it has
[20] intermittent increased surges of release and then
[21] less. That's the best I can do.
[22] Q: Approximate entropy, that refers to what?
[23] A: That's a statistical technique.
[24] Q: Statistical technique for what?

**Page 210**

[1] MR. FREEMAN: The first page is the note
[2] and then there are three pages that relate to the
[3] manuscript.
[4] MR. POTTER: Okay.
[5] MR. FREEMAN: I have a few more questions;
[6] we're nearly done. Why don't we take a five-minute
[7] break, I'll go over my remaining questions and
[8] follow-up and see if I have anything else to ask and
[9] hopefully get out of here soon.
[10] (Recess from 3:03 p.m. to 3:15 p.m.)
[11] BY MR. FREEMAN:
[12] Q: Have you ever been told by any journal that
[13] you can no longer be a reviewer for that particular
[14] journal?
[15] A: No.
[16] Q: When was the last time you spoke to anybody
[17] at Corcept?
[18] A: It was probably that meeting in August of
[19] 2002 with Dr. Schatzberg. I might have — it's
[20] possible I might have run into Dr. DeBattista at a
[21] meeting but just would have said "Hello, how are you
[22] doing?"
[23] Q: Did you talk about the clinical trials at
[24] all?

**Page 211**

[1] A: No.
[2] Q: Do you recall when the last time you ran
[3] into Dr. DeBattista was?
[4] A: I don't recall.
[5] Q: When was the last time you spoke to
[6] somebody inside the department of psychiatry at
[7] Stanford?
[8] A: Well, I already testified I ran into Dr.
[9] Yasmin a couple of weeks ago. Prior to that, I
[10] think I may have run into at a meeting Dr. Glick,
[11] Ira Glick.
[12] Q: When was that?
[13] A: I don't remember. It was probably at one
[14] of the APA meetings or ACNP.
[15] Q: Did Dr. Glick have any relationship to
[16] Corcept?
[17] A: Not that I'm aware of.
[18] Q: Did you talk about Corcept at all?
[19] A: No.
[20] Q: Did you talk about cortisol or mifepristone
[21] with Dr. Glick?
[22] A: No. I think I've run into Dr. Rona Hu at
[23] meetings too.
[24] Q: Dr. Rona Hu?

**Page 212**

[1] A: Rona Hu, H-u. I think that's how she
[2] spells her name. She's at Stanford.
[3] Q: Does she have any relationship with
[4] Corcept?
[5] A: Not that I know of.
[6] Q: Did you talk to her about Corcept?
[7] A: No.
[8] Q: Did you talk to her about cortisol or
[9] mifepristone?
[10] A: No.
[11] Q: Any other contacts with people at Stanford?
[12] A: Not that I can recall.
[13] Q: If we can turn back to the subpoena that
[14] you were issued, which if I can find it I can tell
[15] you the exhibit number.
[16] MR. POTTER: Exhibit 6.
[17] MR. FREEMAN: Thank you. Exhibit 6.
[18] Q: What efforts did you undertake to comply
[19] with the document requests in the subpoena?
[20] A: Could you point me to which one you're
[21] talking about?
[22] Q: Sure. Let's start with Request No. 1.
[23] A: There aren't any documents.
[24] Q: I take it your answer is the same for

**Page 213**

[1] Request No. 2?
[2] A: Correct.
[3] Q: And the same for Requests Nos. 3, 4 and 5?
[4] A: Correct.
[5] Q: What about Request No. 6? I think you
[6] testified that you spoke to Ted about your locations
[7] on certain dates, this administrative assistant at
[8] UMass Medical Center. What else did you do to try
[9] to comply with Request No. 6?
[10] A: I tried to wrack my brain to remember, and
[11] I did remember that I was in Pittsburgh November
[12] 4th. But other than that, I couldn't really. And
[13] then the one date that was a Sunday, I think I was
[14] either in Maine or in Sherborn. That's all I know
[15] about that one.
[16] MR. POTTER: Also he checked the records of
[17] patient visits.
[18] A: I checked the computer.
[19] Q: Understood. And I think you testified that
[20] you looked for your 2005 calendar but couldn't find
[21] it?
[22] A: Well, it's not that I couldn't find it. I
[23] knew I had tossed it, as I do every year, between
[24] Christmas and New Year's at the end of the year,

**EXHIBIT G**

US006150349A

# United States Patent [19]

## Schatzberg et al.

[11] **Patent Number:** 6,150,349

[45] **Date of Patent:** Nov. 21, 2000

[54] **METHODS FOR TREATING PSYCHOSIS ASSOCIATED WITH GLUCOCORTICOID RELATED DYSFUNCTION**

[75] Inventors: **Alan F. Schatzberg**, Los Altos; **Joseph K. Belanoff**, Cupertino, both of Calif.

[73] Assignee: **The Board of Trustees of the Leland Stanford Junior University**, Palo Alto, Calif.

[21] Appl. No.: **09/244,457**

[22] Filed: **Feb. 4, 1999**

**Related U.S. Application Data**

[63] Continuation of application No. PCT/US98/20906, Oct. 5, 1998.

[60] Provisional application No. 60/060,973, Oct. 6, 1997.

[51] **Int. Cl.**[7] ...................................................... **A61K 31/56**

[52] **U.S. Cl.** ........................................................ **514/179**

[58] **Field of Search** .............................................. 514/179

[56] **References Cited**

U.S. PATENT DOCUMENTS

4,814,333   3/1989   Ravaris ................................... 514/255

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0763541 | 3/1997 | European Pat. Off. . |
| WO 9322685 | 11/1993 | WIPO . |
| WO 9408588 | 4/1994 | WIPO . |
| WO 9710827 | 3/1997 | WIPO . |
| WO 9737664 | 10/1997 | WIPO . |
| WO 9826783 | 6/1998 | WIPO . |
| WO 9826785 | 6/1998 | WIPO . |

OTHER PUBLICATIONS

Van der Lely, Derwent Drug File, abstract No. 1993–29824, 1993.

Piazza et al, Chemical Abstracts, abstract No. 126:84476, 1996.

Behl et al, Chemical Abstracts, abstract No. 126:55042, 1997.

Beck C.A. et al. (1993) "The Steroid Antagonist RU486 Exerts Different Effects on the Glucocorticoid and Progesterone Receptors" Department of Pathology and Program in Molecular Biology, University of Colorado Health Sciences Center (S.K.N.D.P.E.) vol. 123, No. 2, pp. 728–740.

Chrousos, G.P. et al. (1989) "Clinical Applications of RU 486, a Prototype Glucocorticoid and Progestin Antagonist." In:Baulieu, E.E. and Segal, S.J. eds. The Antiprogestin Steroid RU 486 and Human Fertility Control. New York: Plenum Press, pp. 273–284.

F. Cadepond, Ph.D. et al., (1997) "RU486 (Mifepristone): Mechanisms of Action and Clinical Uses" Anna. Rev. Med. 1997, 48:129–56.

Krishnan, K.R.R.et al. (1992) "RU 486 in depression" Prog. Neuro–Psychopharmacol. & Biol. Psychiat., 16:913–920.

Murphy, B.E.P. et al. (1993) "Possible Use of Glucocorticoid Receptor Antagonists in the Treatment of Major Depression: Preliminary Results Using RU 486" J. Psychiatr. Neurosci., 18:209–213.

Murphy, B.E.P. s(1997) "Antiglucocorticoid therapies in major depression: A review" Psychoneuroendocrinology, 22:s125–132.

Nieman, L.K. et al. (1985) "Successful treatment of Cushing's Syndrome with the Glucocorticoid Antagonist RU 486" J. Clin. Endocrinol. Metab., 61:536–540.

Rothschild, A.J. et al. (1982) "The Dexamethasone Suppression Test as a Discriminator among Subtypes of Psychotic Patients" Brit. J. Psychiat. 141:471–474.

Rothschild, A.J. et al. (1985) "The effects of a single acute dose of dexamethasone on monoamine and metabolite levels in rat brain" Life Sci. 36:2491–2501.

Sartor, O.et al. (1996) "Mifepristone: Treatment of Cushing's Syndrome" Clin. Obstetrics and Gynecol. 39:506–510.

Schatzberg, A.F. et al. (1983) "The Dexamathasone Suppression Test: Identification of Subtypes of Depression" Am. J. Psychiat., 140:88–91.

Schatzberg, A.F. et al. (1985) "A corticosteroid/dopamine hypothesis for psychotic depression and related states" J. Psychiat. Res., 19:57–64.

Schatzberg, A.F. et al. (1988) "The Roles of Glucocorticoid and Dopaminergic Systems in Delusional (Psychotic) Depression" Annals N.Y. Acad. of Sci., 537:462–471.

Van der Lely, A.J. et al. (1991) "Rapid Reversal of Acute Psychosis in the Cushing Syndrome with the Cortisol–Receptor Antagonist Mifepristone (RU 486)" Ann. Intern. Med., 114:143–144.

Van der Lely, A.J. (1993) Pharmacy World & Science, 15:89–90.

Primary Examiner—William R. A. Jarvis

*Attorney, Agent, or Firm*—Bozicevic, Field & Francis

[57] **ABSTRACT**

This invention pertains to the discovery that agents which inhibit the binding of cortisol to its receptors can be used in methods for amelirating psychotic major depression. Mifepristone, a potent glucocorticoid receptor antagonist, can be used in these methods.

**13 Claims, No Drawings**

EXHIBIT __G__

6,150,349

1

# METHODS FOR TREATING PSYCHOSIS ASSOCIATED WITH GLUCOCORTICOID RELATED DYSFUNCTION

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of PCT/US98/20906, filed Oct 5, 1998 which is a Continuation-In-Part application of U.S. Provisional Application Ser. No. 60/060,973, filed Oct. 06, 1997. The aforementioned application is explicitly incorporated herein by reference in its entirety and for all purposes.

## FIELD OF THE INVENTION

This invention generally pertains to the field of psychiatry. In particular, this invention pertains to the discovery that agents which inhibit the binding of cortisol to its receptor can be used in methods of ameliorating psychosis, including the psychotic component of pathologies or conditions with psychotic symptoms.

## INTRODUCTION

This invention is directed to a method for treating psychosis whose pathogenesis is related to glucocorticoid regulatory dysfunction. The types of psychosis treated by the methods of the invention must be distinguished from the older definition of psychosis, which referred to schizophrenia and manic states. Schizophrenia and manic states are not associated with dysfunction of the glucocorticoid regulatory pathway and there is no basis to believe that possibility. Thus, the treatment methods of the invention encompass the modern usage of the term psychosis, i.e., non-schizophrenia and non-manic state associated psychosis.

There has been historic confusion in the definition of psychosis. This is, in part, based on a lack of understanding of a common pathophysiologic mechanism causing psychosis in various conditions. For example, Oberlander, et al., WO 98/26785, teaches use of an anti-glucocorticoid to treat schizophrenia and manic states. However, schizophrenia and manic states are are believed to be the result of abnormal nerve structure, i.e., "hard-wiring" problems. In contrast, it is believed that the pathophysiology of psychosis (the term used in its modern sense, as used in the instant invention) is related to neurochemical (glucocorticoid regulatory) problems. This theory is extended by the instant invention, in which it was surprisingly discovered that agents which inhibit the binding of cortisol to its receptor can be used to treat psychosis.

Today it is known that psychotic patients can be distinguished from other psychiatric problems in that they have a glucocorticoid regulatory dysfunction. In contrast, patients with schizophrenia and manic states do not have glucocorticoid regulatory dysfunction (see, e.g., Rothschild (1982) *Br. J. Psychiatry* 141:471–474; Clower (1986) *J. Clin. Psychopharmacol.* 6:363–365). Thus, schizophrenia and manic states are not within the scope of the definition of "psychosis" (as defined either by the medical profession, or, as used herein), and thus are not treated by the methods of the invention.

In most species, including man, the physiological glucocorticoid is cortisol (hydrocortisone). Glucocorticoids are secreted in response to ACTH (corticotropin), which shows both circadian rhythm variation and elevations in response to stress and food. Cortisol levels are responsive within minutes to many physical and psychological stresses,

2

including trauma, surgery, exercise, anxiety and depression. Cortisol is a steroid and acts by binding to an intracellular, glucocorticoid receptor (GR). In man, glucocorticoid receptors are present in two forms: a ligand-binding GR-alpha of 777 amino acids; and, a GR-beta isoform which differs in only the last fifteen amino acids. The two types of GR have high affinity for their specific ligands, and are considered to function through the same transduction pathways.

The biologic effects of cortisol, including those caused by hypercortisolemia, can be modulated at the GR level using receptor antagonists. Several different classes of agents are able to block the physiologic effects of GR-agonist binding. These antagonists include compositions which, by binding to GR, block the ability of an agonist to effectively bind to and/or activate the GR. One such known GR antagonist, mifepristone, has been found to be an effective anti-glucocorticoid agent in humans (Bertagna (1984) *J. Clin. Endocrinol. Metab.* 59:25). Mifepristone binds to the GR with high affinity, with a K of dissociation $\leqq 10^{-9}$ M (Cadepond (1997) *Annu. Rev. Med.* 48:129).

Patients with some forms of psychiatric illnesses have been found to have increased levels of cortisol (Krishnan (1992) *Prog. Neuro-Psychophannacol. & Biol. Psychiat.* 16:913–920). For example, some patients with depressed mood have had their mood improve with treatments which lower the levels of cortisol. In some individuals, reversing increased cortisol levels using inhibitors of steroid biosynthesis can be effective in treating depression (Murphy (1991) *J. Steroid Biochem. Mol. Biol.* 39:239; Murphy (1991) *J. Clin. Psychopharmcol.* 11:121; Dhar (1989) *Clin. Invest. Med.* 12:B27). Alternatively, some depressed individuals can be responsive to treatments which block the effect of cortisol, as by administering GR antagonists (Van Look (1995) *Human Reproduction Update* 1:19–34). In one study, a patient with depression secondary to Cushing's Syndrome (hyperadrenocorticism) was responsive to a high dose, up to 1400 mg per day, of GR antagonist mifepristone (Nieman (1985) *J. Clin Endocrinol. Metab.* 61:536). Another study which used mifepristone to treat Cushing's syndrome found that it improved the patients' conditions, including their psychiatric status (Chrousos, pp 273–284, In: Baulieu, ed. The Antiprogestin Steroid RU 486 and Human Fertility Control. Plenum Press, New York (1989), Sartor (1996) *Clin. Obstetrics and Gynecol.* 39:506–510). Mifepristone has been used to treat major depression. Using from about 2.5 to 4.4 mg/kg per day for periods up to eight weeks, one group found that four patients with chronic severe depression, who were resistant to conventional therapies, responded to treatment (Murphy (1993) *J. Psychiatr. Neurosci.* 18:209).

Psychosis has also been associated with Cushing's syndrome (Gerson (1985) *Can. J. Psychiatry* 30:223–224; Saad (1984) *Am. J. Med.* 76:759–766). Mifepristone has been used to treat acute psychiatric disturbances secondary to Cushing's syndrome. One study showed that a relatively high dose of mifepristone (400 to 800 mg per day) was useful in rapidly reversing acute psychosis in patients with severe Cushing Syndrome due to adrenal cancers and ectopic secretion of ACTH from lung cancer (Van der Lely (1991) *Ann. Intern. Med.* 114:143; Van der Lely (1993) *Pharmacy World & Science* 15:89–90; Sartor (1996) supra).

Psychotic major depression has long been recognized as a distinct psychiatric illness, having both psychotic and depressive components. In a differential diagnosis, it is important that psychotic major depression be distinguished from nonpsychotic major depression, because effective treatments and patterns of response to pharmacologic thera-

6,150,349

**3**

pies for psychotic major depression are very different from those relating to non-psychotic major depression. Successful treatment depends on the accuracy of the initial diagnosis. (Glassman (1981) *Arch. Gen. Psychiatry* 38:424–427, Schatzberg (1992) *Am. J. Psychiatry* 149:733–745, Schatzberg (1988) *Annals N.Y Acad. of Sci.*537:462). Psychotic major depression is very common. It has been estimated that twenty five percent of depressed patients admitted to the hospital have psychotic major depression (Coryell (1984) *J. Nerv. Ment. Dis.* 172:521).

Before this invention, there was to fast-acting effective treatment without significant side effects for the treatment of psychosis or the psychotic component of illnesses and conditions associated with psychosis, such as psychotic major depression. Individuals suffering from psychotic major depression have a low placebo response rate and respond poorly to antidepressant therapy alone, i.e., without concurrent treatment with antipsychotic medication (Glassman (1975) *Am. J. Psychiatry* 132:716–719; Avery (1979) *Am. J. Psychiatry* 135:559–562). While psychotic depression can respond to electroconvulsive therapy (ECT), this form of treatment is controversial, can have significant side effects, has a relatively slow response rate and has a high level of related morbidity. Similarly, another commonly used treatment for psychotic major depression, a combination therapy of currently available antipsychotic and antidepressant medications, has a slow onset of action and a relatively high rate of morbidity (Minter (1979) *J. Nerv. Ment. Dis.* 167:726–733).

Thus, there exists a great need for a more effective and safer treatment for psychosis and illnesses and conditions associated with psychosis, including psychotic major depression. There is a great need for a new treatment for psychotic major depression which has a quick response time, has few side effects, decreases the amount of time a patient must be institutionalized and has a lower rate of morbidity. Furthermore, there exists a variety of conditions which have a psychotic element for which there is no known cure or effective treatment. These include schizoaffective disorder, Alzheimer's Disease and cocaine addiction. Thus, there exists a great need for a safe and effective treatment for these conditions. The present invention fulfills these and other needs.

SUMMARY OF THE INVENTION

The invention is directed to a method of treating psychosis associated with glucocorticoid related dysfunction by administration of an amount of a glucocorticoid receptor antagonist effective to ameliorate the psychosis, with the proviso that the patient not be suffering from Cushing's Syndrome. In alternative embodiments of this method, the psychosis is associated with psychotic major depression, schizoaffective disorder, Alzheimer's Disease and cocaine addiction.

In further embodiments, the glucocorticoid receptor antagonist used in the methods can comprise a steroidal skeleton with at least one phenyl-containing moiety in the 11-beta position of the steroidal skeleton. The phenyl-containing moiety in the 11-beta position of the steroidal skeleton can be a dimethylaminophenyl moiety.

In alternative embodiments of the invention, the glucocorticoid receptor antagonist can comprise mifepristone (RU486), RU009 or RU044. The glucocorticoid receptor antagonist can be administered in a daily amount of between about 8 to 20 mg per kilogram of body weight per day, or, in a daily amount of about 8 to 12 mg per kilogram of body

**4**

weight per day. The glucocorticoid receptor antagonist can be administered for about four days. It can be administered in a daily amount of about 600 mg per day. The administration can be once per day. Its mode of administration can be oral or transdermal.

In a preferred embodiment, the invention relates to a method of ameliorating psychotic depression comprising administering a mifepristone in a daily amount of about 8 to 12 mg per kilogram of body weight per day, wherein the administration continues for a period of about four days.

The invention also relates to a kit for the amelioration of psychosis in a human, the kit comprising: a glucocorticoid receptor antagonist; and, an instructional material teaching the indications, dosage and schedule of administration of the glucocorticoid receptor antagonist. The kit's instructional material can indicate that the glucocorticoid receptor antagonist can be administered in a daily amount of about 8 to 12 mg per kilogram of body weight per day. The instructional material can indicate that the administration of the glucocorticoid receptor antagonist can continue for a period of about four days.

In one embodiment, the kit is for the amelioration of psychosis as a component of psychotic major depression and the instructional material indicates that the glucocorticoid receptor antagonist can be used for the treatment of psychotic major depression. In a preferred embodiment, the kit's glucocorticoid receptor antagonist is mifepristone, which can be in tablet form.

The invention also relates to a novel means of diagnosing and assessing treatments for psychosis using color-word recognition tests. In one embodiment, the Stroop Color and Word Test, or variations thereof, is used to objectively determine whether an individual is psychotic, the degree of psychosis and the efficacy of an antipsychotic treatment regimen. The invention also provides a color-word test to differentially diagnose psychotic major depression from non-psychotic major depression.

A further understanding of the nature and advantages of the present invention is realized by reference to the remaining portions of the specification, the figures and claims.

All publications, patents and patent applications cited herein are hereby expressly incorporated by reference for all purposes.

DEFINITIONS

The term "ameliorating" or "ameliorate" refers to any indicia of success in the treatment of a pathology or condition, including any objective or subjective parameter such as abatement, remission or diminishing of symptoms or an improvement in a patient's physical or mental well-being. Amelioration of symptoms can be based on objective or subjective parameters; including the results of a physical examination and/or a psychiatric evaluation. For example, a clinical guide to monitor the effective amelioration of a psychiatric disorder, such as psychosis or depression, is found in the Structured Clinical Interview for DSM-IV Axis I mood disorders ("SCID-P") (see fourth edition of *Diagnostic and Statistical Manual of Mental Disorders* (1994) Task Force on DSM-IV, American Psychiatric Association ("DSM-IV"); Kaplan, Ed. (1995) *Comprehensive Textbook of Psychiatry/VI*, vol. 1, sixth ed., pp 621–627, Williams & Wilkins, Balt., Md.).

The term "glucocorticoid receptor antagonist" refers to any composition or compound which partially or completely inhibits (antagonizes) the binding of a glucocorticoid receptor (GR) agonist, such as cortisol, or cortisol analogs,

6,150,349

5

synthetic or natural, to a GR. A "glucocorticoid receptor antagonist" also refers to any composition or compound which inhibits any biological response associated with the binding of a GR to an agonist.

The term "glucocorticoid receptor" ("GR") refers to a family of intracellular receptors also referred to as the cortisol receptor, which specifically bind to cortisol and/or cortisol analogs. The term includes isoforms of GR, recombinant GR and mutated GR.

The term "cortisol" refers to a family of compositions also referred to hydrocortisone, and any synthetic or natural analogues thereof.

The term "mifepristone" refers to a family of compositions also referred to as RU486, or RU38.486, or 17-beta-hydroxy-11-beta-(4-dimethyl-aminophenyl)-17-alpha (1-propynyl)-estra-4,9-dien-3-one), or 11-beta-(4dimethylaminophenyl)-17-beta-hydroxy17-alpha-(1-propynyl)-estra-4,9-dien-3-one), or analogs thereof, which bind to the glucocorticoid receptor, typically with high affinity, and inhibit the biological effects initiated/mediated by the binding of any cortisol or cortisol analogue to a receptor.

Chemical names for RU-486 vary; for example, RU486 has also been termed:

11B-[p-(Dimethylamino)phenyl]-17B-hydroxy-17-(1-propynyl)-estra-4,9-dien-3-one;

11B-(4-dimethyl-aminophenyl)-17B-hydroxy-17A-(prop-1-ynyl)-estra-4,9-dien-3-one;

17B-hydroxy-11B-(4-dimethylaminophenyl-1)-17A-(propynyl-1)-estra-4,9-diene-3-one;

17B-hydroxy-11B-(4-dimethylaminophenyl-1)-17A-(propynyl-1)-E; (11B,17B)-11-[4-dimethylamino)-phenyl]-17-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one; and

11B-[4-(N,N-dimethylamino)phenyl]-17A-(prop-1-ynyl)-D-4,9-estradiene-17B-ol-3-one.

The term "psychotic" as used herein refers to a psychiatric condition in its broadest sense, as defined in the DSM-IV (Kaplan, ed. (1995) supra) and described below. The term "psychotic" has historically received a number of different definitions, ranging from narrow to broadly described. A psychotic condition can include delusions or prominent hallucinations, including prominent hallucinations that the individual realizes are hallucinatory experiences, and those with hallucinations occurring in the absence of insight into their pathological nature. Finally, the term includes a psychotic condition characterized by a loss of ego boundaries or a gross impairment in reality testing. Unlike this definition, which is broad and based primarily on symptoms, characterization of psychosis in earlier classifications (e.g., DSM-II and ICD-9) were more inclusive and focused on the severity of functional impairment (so that a mental disorder was termed "psychotic" if it resulted in "impairment" that grossly interferes with the capacity to meet ordinary demands of life). Different disorders which have a psychotic component comprise different aspects of this definition of "psychotic." For example, in schizophreniform disorder, schizoaffective disorder and brief psychotic disorder, the term "psychotic" refers to delusions, any prominent hallucinations, disorganized speech, or disorganized or catatonic behavior. In psychotic disorder due to a general medical condition and in substance-induced psychotic disorder, "psychotic" refers to delusions or only those hallucinations that are not accompanied by insight. Finally, in delusional disorder and shared psychotic disorder, "psychotic" is equivalent to "delusional" (see DSM-IV, supra, page 273).

6

Objective tests can be also be used to determine whether an individual is psychotic and to measure and assess the success of a particular treatment schedule or regimen. For example, measuring changes in cognitive ability aids in the diagnosis and treatment assessment of the psychotic patient. Any test known in the art can be used, such as the so-called "Wallach Test," which assesses recognition memory (see below, Wallach (1980) *J. Gerontol.* 35:371–375). For example, as described in Example 1, when the Wallach Recognition Test was used to measure the degree of amelioration of psychosis in the study's subjects, on the average, test subjects identified fewer distracters over words they had actually heard before. The number of distracting words misidentified as words actually presented in the test declined between 25% and 100% after treatment. Another example of an objective text which can be used to determine whether an individual is psychotic and to measure efficacy of an antipsychotic treatment is the Stroop Color and Word Test ("Stroop Test") (see Golden, C. J., Cat. No. 30150M, In *A Manual for Clinical and Experimental Uses*, Stoelting, Wood Dale, Ill.). The Stroop Test is an objective neuropsychiatric test that can differentiate between individuals with psychosis and those without, and is described in detail below.

The term "psychosis" refers to a psychiatric symptom, condition or syndrome in its broadest sense, as defined in the DSM-IV (Kaplan, ed. (1995) supra), comprising a "psychotic" component, as broadly defined above. The term psychosis can refer to a symptom associated with a general medical condition, a disease state or other condition, such as a side effect of drug abuse (a substance-induced disorder) or as a side effect of a medication. Alternatively, the term psychosis can refer to a condition or syndrome not associated with any disease state, medical condition, drug intake or the like.

Psychosis is typically defined as a mental disorder or condition causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others to the degree of interfering with his capacity to cope with the ordinary demands of everyday life.

Historically, the term "psychosis" was sometimes used to describe schizophrenia and manic states (these conditions are separately described in the DSM-IV, supra). However, the current medical view, as embraced by the DSM-IV, supra, does not include these psychiatric conditions as including psychosis. There is a physiologic basis for this discrimination, which was recognized as early as Rothschild, et al. (1982) "The dexamethasone suppression test as a discriminator among subtypes of psychotic patients," *Br. J. Psychiatry* 141:471–474; and, Clower (1986) "The 2-mg dexamethasone suppression test in differentiating major depression with psychosis from schizophrenia," *J. Clin. Psychopharmacol.* 6:363–365. The dexamethasone suppression (DS) test indicates a dysfunction in the glucocorticoid regulatory feedback pathway, which is controlled by the hypothalamic-pituitary-adrenal (HPA) axis (non-responsiveness in the test means a patient cannot suppress (negatively feedback) cortisol production when challenged with a test dose of a synthetic glucocorticoid, dexamethasone). Most psychotic patients have a glucocorticoid regulatory dysfunction (as indicated by non-responsiveness in the DS test). In contrast, patients with, e.g., schizophrenia (including those historically described as "psychotic schizophrenics") and manic states, do not have glucocorticoid regulatory dysfunction (as indicated by responsiveness in the DS test). It is widely believed

6,150,349

**7**

that schizophrenia and manic states are caused by abnormal nerve structure, i.e., a "hardwiring" problem. In contrast, it is believed that the pathophysiology of psychosis is related to neurochemical problems, particularly, HPA axis regulatory dysfunction (this theory is extended by the instant invention, in which it was discovered that that agents which inhibit the binding of cortisol to its receptor will treat psychosis). Thus, schizophrenia and manic states are not within the scope of the definition of "psychosis" (as defined either by the medical profession, or, as used herein), and thus are not treated by the methods of the invention.

The term "psychotic major depression," also referred to as "psychotic depression" (Schatzberg (1992) *Am. J. Psychiatry* 149:733–745), "psychotic (delusional) depression" (Ibid.), "delusional depression" (Glassman (1981) supra) and, "major depression with psychotic features" (see the DSM-III-R), refers to a distinct psychiatric disorder which includes both depressive and psychotic features. Individuals manifesting both depression and psychosis, i.e. psychotic depression, are herein referred to as "psychotic depressives." It has been long-recognized in the art as a distinct syndrome, as described, for example, by Schatzberg (1992) supra. Illustrative of this distinctness are studies which have found significant differences between patients with psychotic and nonpsychotic depression in glucocorticoid activity, dopamine-beta-hydroxylase activity, levels of dopamine and serotonin metabolites, sleep measures and ventricle to brain ratios. Psychotic depressives respond very differently to treatment compared to individuals with other forms of depression, such as "non-psychotic major depression." Psychotic depressives have a low placebo response rate and a respond poorly to antidepressant therapy alone (without concurrent anti-psychotic treatment). Psychotic depressives are markedly unresponsive to tricyclic (anti-depressive) drug therapy (Glassman, et al. (1975) supra). While psychotic depressives can respond to electroconvulsive therapy (ECT), their response time is relatively slow and the ECT has a high level of related morbidity. Clinical manifestations and diagnostic parameters of "psychotic major depression" is described in detail in the DSM-IV (Kaplan, ed. (1995) supra). Thus, due to its unique pathophysiology, high rate of morbidity and response to treatment, there is great practical need to differentially diagnose and specifically treat psychotic major depression as compared to non-psychotic depression.

**DETAILED DESCRIPTION OF THE INVENTION**

This invention pertains to the discovery that agents that can inhibit a biological response caused by an agonist-occupied glucocorticoid receptor (GR) are effective for ameliorating the mental disorder, or syndrome, of psychosis. Because the condition of psychosis can be associated with or caused by a variety of conditions and disease processes, the methods of the invention also are used to ameliorate the psychotic component of pathologies or conditions involving psychosis. These pathologies or conditions include psychotic major depression, schizoaffective disorders, Alzheimer's Disease, cocaine addiction, drug side effects and the like.

In one embodiment, the methods of the invention use agents that act as GR antagonists, blocking the interaction of cortisol with GR, thereby ameliorating psychosis. In another embodiment, mifepristone, a potent GR antagonist, is used in methods to ameliorate psychosis. The invention provides a new, effective treatment for psychotic major depression which is relatively fast, has fewer side effects, decreases the

**8**

amount of time a patient must be institutionalized and has a lower rate of morbidity when compared to alternative treatments.

As psychosis can be manifested as a mental illness in the form of a syndrome or as an element of a disease process or other condition, various means of diagnosing and assessing the success of treatment, i.e., the success and extent the psychosis is ameliorated, are set forth below. These means include classical psychological evaluations and various laboratory procedures. As the methods of the invention include use of any means to inhibit the biological effect of a GR to ameliorate psychosis, illustrative compounds and compositions which can be used to treat psychosis are also set forth. Routine procedures that can be used to identify further compounds and compositions able to block the biological response caused by a GR-agonist interaction for use in practicing the methods of the invention are also described. As the invention provides for administering these compounds and compositions as pharmaceuticals, routine means to determine GR antagonist drug regimens and formulations to practice the methods of the invention are set forth below.

**1. GENERAL LABORATORY PROCEDURES**

A number of general laboratory tests can be used to assist in the diagnosis, progress and prognosis of the patient. Monitoring of parameters such as blood cortisol, drug metabolism, brain function and the like may be needed because all patients metabolize and react to drugs uniquely. In addition, such monitoring may be important because each GR antagonist has different pharmacokinetics. Different disease conditions may require different dosage regimens and formulations. Such procedures are well described in the scientific and patent literature. A few illustrative examples are set forth below.

a. Determining Blood Cortisol Levels

Because levels of blood cortisol have been associated with psychosis and depression, monitoring blood cortisol levels can be a useful laboratory test to aid in the diagnosis, treatment and prognosis of the patient. A wide variety of laboratory tests exist that can be used to determine whether an individual is normal, hypo- or hypercortisolemic. Immunoassays such as radioimmunoassays are commonly used because they are accurate, easy to do and relatively cheap. Because levels of circulating cortisol is an indicator of adrenocorticol function, a variety of stimulation and suppression tests, such as ACTH Stimulation, ACTH Reserve, Dexamethasone Suppression, can also provide diagnostic, prognostic or other information to be used adjunctively in the methods of the invention.

One such assay available in kit form is the radioimmunoassay available as "Double Antibody Cortisol Kit™" (Diagnostic Products Corporation, Los Angeles, Calif., (1984) *Acta Psychiatr. Scand.* 70:239–247). This test is a competitive radioimmunoassay in which $^{125}$I-labeled cortisol competes with cortisol from an clinical sample for antibody sites. In this test, due to the specificity of the antibody and lack of any significant protein effect, serum and plasma samples require neither preextraction nor predilution. This assay is described in further detail in Example 1, below.

i. Determining Blood/Urine Mifepristone Levels

Because a patient's metabolism, clearance rate, toxicity levels, etc. differs with variations in underlying primary or secondary disease conditions, drug history, age, general medical condition and the like, it may be necessary to measure blood and urine levels of GR antagonist. Means for

6,150,349

**9**

such monitoring are well described in the scientific and patent literature. As in one embodiment of the invention mifepristone is administered to ameliorate psychosis, an illustrative example of determining blood and urine mifepristone levels is set forth below.

ii. Other Laboratory Procedures

Because psychosis can be associated with a variety of diseases, conditions, and drug effects, a number of additional laboratory tests can be used adjunctively in the methods of the invention to assist in diagnosis, treatment efficacy, prognosis, toxicity and the like. For example, as increased hypercortisolemia has been associated with psychosis and depression, diagnosis and treatment assessment can be augmented by monitoring and measuring glucocorticoid-sensitive variables, including but limited to fasting blood sugar, blood sugar after oral glucose administration, plasma concentrations thyroid stimulating hormone (TSH), corticosteroid-binding globulin, luteinizing hormone (LH), testosteroneestradiol-binding globulin, and/or total and free testosterone. Laboratory tests monitoring and measuring GR antagonist metabolite generation, plasma concentrations and clearance rates, including urine concentration of antagonist and metabolites, may also be useful in practicing the methods of the invention. For example, mifepristone has two hydrophilic, N-monomethylated and N-dimethylated, metabolites. Plasma and urine concentrations of these metabolites (in addition to RU486) can be determined using, for example, thin layer chromatography, as described in Kawai (1987) *Pharmacol. and Experimental Therapeutics* 241:401–406.

### 2. GLUCOCORTICOID RECEPTOR ANTAGONISTS TO TREAT PSYCHOSIS

The invention provides for methods of treating psychosis utilizing any composition or compound that can block a biological response associated with the binding of cortisol or a cortisol analogue to a GR. Antagonists of GR activity utilized in the methods of the invention are well described in the scientific and patent literature. A few illustrative examples are set forth below.

a. Steroidal Anti-Glucocorticoids as GR Antagonists.

In one embodiment of the invention, steroidal glucocorticoid antagonists are administered for the amelioration of psychosis. Steroidal antiglucocorticoids can be obtained by modification of the basic structure of glucocorticoid agonists, i.e., varied forms of the steroid backbone. The structure of cortisol can be modified in a variety of ways. The two most commonly known classes of structural modifications of the cortisol steroid backbone to create glucocorticoid antagonists include modifications of the 11-beta hydroxy group and modification of the 17-beta side chain. (Lefebvre (1989) *J. Steroid Biochem.* 33:557–563).

i. Removal or Substitution of the 11-beta Hydroxy Group

In another embodiment of the invention, glucocorticoid agonists with modified steroidal backbones comprising removal or substitution of the 11-beta hydroxy group are administered. This class includes natural antiglucocorticoids, including cortexolone, progestertone and testosterone derivatives, and synthetic compositions, such as mifepristone (Lefebvre, et al. (1989) Ibid). Preferred embodiments of the invention include all 11-beta-aryl steroid backbone derivatives because these compounds are devoid of progesterone receptor (PR) binding activity (Agarwal (1987) *FEBS* 217:221–226). Another preferred embodiment comprises an 11-beta phenyl-aminodimethyl steroid backbone derivative, i.e., mifepristone, which is both an effective anti-glucocorticoid and anti-progesterone agent.

**10**

These compositions act as reversibly-binding steroid receptor antagonists For example, when bound to a 11-beta phenyl-aminodimethyl steroid, the steroid receptor is maintained in a conformation that cannot bind its natural ligand, such as cortisol in the case of GR (Cadepond, et al., (1997), supra).

Synthetic 11-beta phenyl-aminodimethyl steroids include mifepristone, also known as RU486, or 17-beta-hydrox-11-beta-(4-dimethyl-aminophenyl) 17-alpha-(1-propynyl)estra-4,9-dien-3-one). It has been shown to be a powerful antagonist of both the progesterone and glucocorticoid (GR) receptors: Another 11-beta phenyl-aminodimethyl steroids shown to have GR antagonist effects includes RU009 (RU39.009), 11-beta-(4-dimethyl-aminoethoxyphenyl)-17-alpha-(propynyl-17 beta-hydroxy-4,9-estradien-3-one) (see Bocquel (1993) *J. Steroid Biochem. Molec. Biol.* 45:205–215). Another GR antagonist related to RU486 is RU044 (RU43.044) 17-beta-hydrox-17-alpha-19-(4-methylphenyl)-androsta-4,9 (11)-dien-3-one) (Bocquel (1993) supra). See also Teutsch (1981) *Steroids* 38:651–665; U.S. Pat. Nos. 4,386,085 and 4,912,097.

One embodiment includes compositions containing the basic glucocorticoid steroid structure which are irreversible anti-glucocorticoids. Such compounds include alpha-keto-methanesulfonate derivatives of cortisol, including cortisol-21-mesylate (4-pregnene-11-beta, 17- alpha, 21-triol-3, 20-dione-21-methane-sulfonate and dexamethasone-21-mesylate (16-methyl-9 alpha-fluoro-1,4-pregnadiene-11 beta, 17-alpha, 21-triol-3, 20-dione-21-methane-sulfonate). See Simons (1986) *J. Steroid Biochem.* 24:25–32 (1986); Mercier (1986) *J. Steroid Biochem.* 25:11–20; U.S. Pat. No. 4,296,206.

ii. Modification of the 17-beta Side Chain Group

Steroidal antiglucocorticoids which can be obtained by various structural modifications of the 17-beta side chain are also used in the methods of the invention. This class includes synthetic antiglucocorticoids such as dexamethasone-oxetanone, various 17, 21-acetonide derivatives and 17-beta-carboxamide derivatives of dexamethasone (Lefebvre (1989) supra; Rousseau (1979) *Nature* 279:158–160).

iii. Other Steroid Backbone Modifications

GR antagonists used in the various embodiments of the invention include any steroid backbone modification which effects a biological response resulting from a GR-agonist interaction. Steroid backbone antagonists can be any natural or synthetic variation of cortisol, such as adrenal steroids missing the C-19 methyl group, such as 19-nordeoxycorticosterone and 19-norprogesterone (Wynne (1980) *Endocrinology* 107:1278–1280).

In general, the 11-beta side chain substituent, and particularly the size of that substituent, can play a key role in determining the extent of a steroid's antiglucocorticoid activity. Substitutions in the A ring of the steroid backbone can also be important. 17-hydroxypropenyl side chains generally decrease antiglucocorticoidal activity in comparison to 17-propinyl side chain containing compounds.

b. Non-Steroidal Anti-Glucocorticoids as Antagonists.

Non-steroidal glucocorticoid antagonists are also used in the methods of the invention to ameliorate psychosis. These include synthetic mimetics and analogs of proteins, including partially peptidic, pseudopeptidic and non-peptidic molecular entities: For example, oligomeric peptidomimetics useful in the invention include (alpha-beta-unsaturated) peptidosulfonamides, N-substituted glycine derivatives, oligo carbamates, oligo urea peptidomimetics, hydrazinopeptides, oligosulfones and the like (de Bont

6,150,349

**11**

(1996) *Bioorganic & Medicinal Chem.* 4:667–672). The creation and simultaneous screening of large libraries of synthetic molecules can be carried out using well-known techniques in combinatorial chemistry, for example, see van Breemen (1997) *Anal Chem* 69:2159–2164; Lam (1997) *Anticancer Drug Des* 12:145–167 (1997). Design of pepti-domimetics specific for GR can be designed using computer programs in conjunction with combinatorial chemistry (combinatorial library) screening approaches (Murray (1995) *J. of Computer-Aided Molec. Design* 9:381–395); Bohm (1996) *J. of Computer-Aided Molec. Design* 10:265–272). Such "rational drug design" can help develop peptide isomerics and conformers including cycloisomers, retro-inverso isomers, retro isomers and the like (as discussed in Chorev (1995) *Tib Tech* 13:438–445).

c. Identifying Glucocorticoid Receptor Antagonists

Because any GR antagonist can be used for the amelioration of psychosis in the methods of the invention, in addition to the compounds and compositions described above, additional useful GR antagonists can be determined by the skilled artisan. A variety of such routine, well-known methods can be used and are described in the scientific and patent literature. They include in vitro and in vivo assays for the identification of additional GR antagonists. A few illustrative examples are described below.

One assay that can be used to identify a GR antagonist of the invention measures the effect of a putative GR antagonist on tyrosine amino-transferase activity in accordance with the method of Granner (1970) *Meth. Enzymol.* 15:633. This analysis is based on measurement of the activity of the liver enzyme tyrosine amino-transferase (TAT) in cultures of rat hepatoma cells (RHC). TAT catalyzes the first step in the metabolism of tyrosine and is induced by glucocorticoids (cortisol) both in liver and hepatoma cells. This activity is easily measured in raw extracts. TAT converts the amino group of tyrosine to 2-oxoglutaric acid, and p-hydroxyphenylpyruvate is also formed, which is converted to the more stable p-hydroxybenzaldehyde in alkaline solution, which can be measured at 331 nm. The putative GR antagonist is co-administered with cortisol to whole liver, in vivo or ex vivo, or hepatoma cells or cell extracts. A compound is identified as a GR antagonist when its administration decreases the amount of induced TAT activity, as compared to control (i.e., only cortisol or GR agonist added) (see also Shirwany (1986) "Glucocorticoid regulation of hepatic cytosolic glucocorticoid receptors in vivo and its relationship to induction of tyrosine aminotransferase," *Biochem. Biophys. Acta* 886:162–168).

Further illustrative of the many assays which can be used to identify compositions utilized in the methods of the invention, in addition to the TAT assay, are assays based on glucocorticoid activities in vivo. For example, assays that assess the ability of a putative GR antagonist to inhibit uptake of $^3$H-thymidine into DNA in cells which are stimulated by glucocorticoids can be used. Alternatively, the putative GR antagonist can complete with $^3$H-dexamethasone for binding to a hepatoma tissue culture GR (see, for example, Choi (1992) "Enzyme induction and receptor-binding affinity of steroidal 20-carboxamides in rat hepatoma tissue culture cells," *Steroids* 57:313–318). As another example, the ability of a putative GR antagonist to block nuclear binding of $^3$H-dexamethasone-GR complex can be used (Alexandrova (1992) "Duration of antagonizing effect of RU486 on the agonist induction of tyrosine aminotransferase via glucocorticoid receptor," *J. Steroid Biochem. Mol. Biol.* 41:723–725). To further identify putative GR antagonists, kinetic assays able to discriminate between

**12**

glucocorticoid agonists and antagonists by means of receptor-binding kinetics can also be used (as described in Jones (1982) *Biochem J.* 204:721–729).

In another illustrative example, the assay described by Daune (1977) *Molec. Pharm.* 13:948–955, and in U.S. Pat. No. 4,386,085, can be used to identify antiglucocorticoid activity. Briefly, the thymocytes of surrenalectomized rats are incubated in nutritive medium containing dexamethasone with the test compound (the putative GR antagonist) at varying concentrations. $^3$H-uridine is added to the cell culture, which is further incubated, and the extent of incorporation of radiolabel into polynucleotide is measured. Glucocorticoid agonists decrease the amount of $^3$H-uridine incorporated. Thus, a GR antagonist will oppose this effect.

For additional compounds that can be utilized in the methods of the invention and methods of identifying and making such compounds, see U.S. Pat. Nos. 4,296,206 (see above); 4,386,085 (see above); 4,447,424; 4,477,445; 4,519, 946; 4,540,686; 4,547,493; 4,634,695; 4,634,696; 4,753, 932; 4,774,236; 4,808,710; 4,814,327; 4,829,060; 4,861, 763; 4,912,097; 4,921,638; 4,943,566; 4,954,490; 4,978, 657; 5,006,518; 5,043,332; 5,064,822; 5,073,548; 5,089, 488; 5,089,635; 5,093,507; 5,095,010; 5,095,129; 5,132, 299; 5,166,146; 5,166,199; 5,173,405; 5,276,023; 5,380, 839; 5,348,729; 5,426,102; 5,439,913; and 5,616,458; and WO 96/19458, which describes non-steroidal compounds which are high-affinity, highly selective modulators (antagonists) for steroid receptors, such as 6-substituted-1, 2-dihydro N-1 protected quinolines.

## 3. DIAGNOSING AND ASSESSING CONDITIONS AND ILLNESSES INVOLVING PSYCHOSIS

Psychosis can be manifested as a mental illness in the form of a syndrome or as an element of a variety of disease processes. There are various means to diagnose these various forms of psychosis and assess the success of treatment. These means include classical psychological evaluations in addition to the various laboratory procedures described above. Such means are well-described in the scientific and patent literature, and some illustrative examples are provided below.

a. Assessing and diagnosing psychosis

The psychosis ameliorated in the methods of the invention encompasses a broad range of mental conditions and symptoms, as broadly described in the DSM-IV (Kaplan, ed. (1995) supra). Psychosis can refer to a symptom associated with a general medical condition, a disease state or other condition, such as a side effect of drug abuse (a substance-induced disorder) or as a side effect of a medication. While the practitioner can use any set of proscribed or empirical criteria to diagnose the presence of a psychosis as an indication to practice the methods of the invention, some illustrative diagnostic guidelines and examples of relevant symptoms and conditions are described below.

Psychosis can be diagnosed by formal psychiatric assessment using, for example, a semi-structured clinical interview described as "The Structured Clinical Interview for DSM-II-R, or "SCID." SCID is designed to be administered by clinicians and researchers familiar with the diagnostic criteria used in the DSM-II-R (the revised third edition of DSM). The SCID has two parts, one for Axis I disorders (clinical disorders and other conditions that may be a focus of clinical attention) and another for Axis II personality disorders (personality disorders and mental retardation) (see DSM-IV, supra, pgs 25–31, for a general description of a "multiaxial assessment system" to guide clinicians in plan-

6,150,349

13

ning treatment and predicting outcome). At the start of the SCID interview, an overview of the present illness, chief complaint, and past episodes of major psychopathology are obtained before systematically asking the patient questions about specific symptoms. The interview schedule itself has many questions which are openended so that patients have an opportunity to describe symptoms in their own words.

At the conclusion of the interview, the interviewer also completes the Global Assessment of Functioning (GAF) scale, the fifth ("V") Axis on DSM-IV's multiaxial assessment system. Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact, and in predicting outcome. The GAF scale is particularly useful in tracking the clinical progress of individuals in global terms using a single measure (see DSM-IV, supra, pages 30 to 31; Kaplan, ed. (1995), supra). In some settings, it may be useful to assess social and occupational disability and to track progress in rehabilitation independent of the severity of the psychological symptoms. For this purpose, use, for example, the proposed Social and Occupational Functioning Assessment Scale (SOFAS) DSM-IV, supra, pg. 760, Appendix B. Additional assessment schemes can be used, for example, the Global Assessment of Relational Functioning (GARF) Scale (DSM-IV, supra, pg 758, Appendix B) or the Defensive Functioning Scale (DSM-IV, supra, pg 751, Appendix B).

To assess the progress of a treatment for psychosis or aid in its diagnosis or prognosis, the "Brief Psychiatric Rating Scale (BPRS)" can also be used after the semistructured interview with the patient. The BPRS is an 18-dimension rating scale. Each dimension represents a domain of behavior and psychiatric symptoms, such as anxiety, hostility, affect, guilt and orientation. These are rated on a seven-point "Likert Scale" from "not present" to "extremely severe." The BPRS is brief, easily learned and provides a quantitative score that reflects global pathology. The BPRS is useful in providing a crude barometer of a patient's overall benefit from treatment, and thus is useful in assessing changes in an individual's condition after treatment and amelioration using the methods of the invention (Overall (1962) *Psychol. Rep.* 10:799; Kaplan (1995), supra).

Objective tests can be also be used with these subjective, diagnostic criteria to determine whether an individual is psychotic and to measure and assess the success of a particular treatment schedule or regimen. Diagnosis, categorization, or assessment of treatment of psychosis or any psychiatric condition can be objectively assessed using any test known in the art, such as that described by Wallach (1980) *J. Gerontol.* 35:371–375, or the Stroop Color and Word Test.

The so-called "Wallach Test" can measure the presence and degree of psychosis by evaluating cognitive changes in the individual. The test assesses recognition memory, as described above. As discussed in Example 1, the Wallach Recognition Test was used to measure the degree of amelioration of psychosis in the study's subjects.

The Stroop Color and Word Test ("Stroop Test") is another means to objectively determine whether an individual is psychotic and to measure efficacy of treatment (see Golden, supra). The Stroop Test can differentiate between individuals with psychosis and those without. Briefly, the test developed from the observation that the naming of colors is always slower than the reading of color names in literate adults. For instance, it always takes less time to read the printed word "yellow" than it does to recognize what color a word is printed in (for example, "XXX" printed in

14

yellow ink). Furthermore, if color words are printed in non-matching colored inks (as, the word yellow in red ink), it takes a normal individual 50% longer to name the proper color (red) than if they are shown only the color (such as a red rectangle, or "XXX" in red). This delay in color recognition is called "the color-word interference effect" and is the time is the variable parameter measured in the Stroop Test. The greater the delay, the lower the Stroop Test score (see also Uttl (1997) *J. Clin. Exp. Neuropsychol.* 19:405–420). Individuals .with psychosis have statistically significantly lower scores on the Stroop Test than individuals without psychosis. Importantly, patients with psychotic major depression have statistically significantly lower scores than those with major depression, further confirming the finding that psychotic major depression is a distinct condition as compared to non-psychotic severe depression.

Psychiatric conditions, such as psychosis, can be further diagnosed and evaluated using any of the many tests or criteria well-known and accepted in the fields of psychology or psychiatry.

The features (symptoms) of and criteria for diagnosing psychotic disorders, such as psychotic major depression, are further described DSM-IV, supra. While the practitioner can use any criteria or means to evaluate whether an individual is psychotic to practice the methods of the invention, the DSM-IV sets forth a generally accepted standard for such diagnosing, categorizing and treating of psychiatric disorders, including psychosis. Several illustrative examples of such criteria utilized in the methods of the invention are set forth below.

Psychosis is typically characterized as a mental disorder or condition causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others to the degree of interfering with his capacity to cope with the ordinary demands of everyday life. In a condition or illness involving psychosis, delusions or hallucinations can be present. The content of the delusions or hallucinations have many depressive themes. In psychotic major depression there can be "mood-congruent" psychotic features, including, for example, delusions of guilt, delusions one deserves punishment (e.g. because of a personal inadequacy or moral transgression), nihilistic delusions (e.g. of world or personal destruction), somatic delusions (e.g. having cancer), or delusions of poverty. Hallucinations, when present in psychotic major depression are usually transient and not elaborate and may involve voices that berate the patient for shortcomings or sins. More rarely, the content of the delusions or hallucinations has no apparent relationship to depressive themes. In this situation these "mood-incongruent" psychotic features include, for example, grandiose delusions.

Psychosis can include bipolar I disorder with psychotic features. The essential feature of this disorder is a clinical course that is characterized by the occurrence of one or more manic episodes or mixed episodes. Often individuals have also had one or more major depressive episodes. In addition, the episodes are not better accounted for by schizoaffective disorder and are not superimposed on schizophrenia, schizophreniform disorder, delusional disorder or psychotic disorder not otherwise specified (see DSM-IV, supra, pages 350–352, 320, 328, 333). In bipolar I disorder with psychotic features, delusions or hallucinations, typically auditory, are also present. The content of the delusions or hallucinations commonly have a manic theme. The features can be "mood-congruent" psychotic features, including for example delusions that God's voice can be heard explaining

6,150,349

15

the person has a special mission or persecutory delusions. More rarely, the content of the delusions or hallucinations has no apparent relationship to manic themes. In this situation these "mood-incongruent" psychotic features include the same as those described for "mood-congruent" features of severe depression with psychotic features.

A condition or illness involving psychosis can also include brief psychotic disorder, in which one or more of the following symptoms can be present: delulsions, hallucinations, disorganized speech (e.g. frequent derailment or incoherence) and grossly disorganized or catatonic behavior. Duration of an episode of the disturbance is at least one day but less than one month.

Psychosis can also be classified as "delusional disorder." According to DSM IV, diagnostic criteria for delusional disorder includes: nonbizarre delusions of at least one month's duration; criteria A for schizophrenia has never been met, apart from the impact of the delusions; functioning is not markedly impaired; and, behavior is not obviously odd or bizarre.

A condition or illness involving psychosis can be classified as "shared psychotic disorder." According to DSM IV, the diagnostic criteria for shared psychotic disorder includes: a delusion in the context of a close relationship with another person who has an already-established delusion; the delusion is similar in content to that of the person who already has the established delusion; and, the disturbance is not better accounted for by another psychotic disorder (e.g. schizophrenia) or a mood disorder with psychotic features, and, is not due to the direct physiological effects of a substance or general medical condition.

A condition or illness involving psychosis can be classified as a "substanceinduced" psychotic disorder. According to DSM IV criteria, there must be evidence of recent or prolonged substance use, withdrawal from a substance or exposure to a toxin. Alternatively, a condition or illness involving psychosis can also be classified as a "psychotic disorder due to a general medical condition." According to DSM IV criteria, there must be: evidence from the history, physical examination or laboratory findings that the disturbance is the direct physiological consequence of a general medical condition, prominent hallucinations or delusions, the disturbance is not better accounted for by another mental disorder, and, the disturbance does not occur exclusively during the course of a delirium.

A condition or illness involving psychosis can be classified as a psychotic disorder not otherwise specified. According to DSM IV criteria, this category includes psychotic symptomology (i.e. delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific psychotic disorder. Examples include: postpartum psychosis that does not meet other DSM IV categories; psychotic symptoms that have lasted for less than one month but have not yet remitted; persistent auditory hallucinations in the absence of other features; persistent nonbizarre delusions with period of overlapping mood episodes that have been present for a substantial portion of the delusional disturbance; and, situations in which the clinician has concluded that a psychotic disorder is present but is unable to determine whether it is primary, due to general medical condition or is substance-induced.

b. Assessing and diagnosing depression

The psychotic component of psychotic major depression, which has elements of psychosis and depression, is amelio-

16

rated by the methods of the invention. Other conditions and illnesses with some degrees or forms of depression associated with psychosis are also ameliorated by the methods of the invention. Thus, in practicing some embodiments of the invention the practitioner should be aware of means to assess and diagnose depression. Such criteria are well known in the art, and some illustrative examples are set forth below.

Diagnosis of depression can be assisted by formal psychiatric assessment using a structured interview instrument like the SCID (discussed above), as well as a measure of the degree of depressive symptoms, such as, for example, the Hamilton Rating Scale for Depression ("HAM-D") (Hamilton (1962) *J. Aeurol. Psychiatry* 23:56–62, Avery (1979) *Am. J. Psychiatry* 135:559–562), a widely used scale. The HAM-D is scored on the basis of a semistructured interview. The patient is rated on depression-related symptoms, including psychomotor retardation, insomnia, mood and insight. Several forms of depression with different numbers of symptoms ratings exist, leading to some confusion. However, the combined score correlates highly with the degree of depression severity. The rating scale is effective in monitoring a depressed state over time and is useful as an index of treatment effectiveness. The Hamilton Rating Scale can be used with an additional assessment device that focuses on the mood, affective, and cognitive changes known to accompany major depression (Kaplan, et al., (1995), supra).

As with psychosis, the "Brief Psychiatric Rating Scale (BPRS)" can also be used to diagnose or evaluate the efficacy of a treatment for depression in conjunction with the semi-structured interview. The BPRS is useful in providing a crude barometer of a patient's overall benefit from treatment, and thus is useful in assessing changes in an individual's condition after treatment and amelioration using the methods of the invention (Overall (1962) supra; Kaplan (1995), supra). Also as with psychosis, depression can be assessed by evaluating cognitive changes using any test known in the art, such as that described by Wallach (1980) *J. Gerontol.* 35:371–375. The so-called "Wallach Test" assesses recognition memory. Psychiatric conditions, such as depression, can be further diagnosed and evaluated using any of the many tests or criteria well-known and accepted in the fields of psychology or psychiatry.

c. Assessing and Diagnosing Schizoaffective Disorder

The psychotic component of schizoaffective disorder is ameliorated by the methods of the invention. The diagnostic criteria for schizoaffective disorder includes: an uninterrupted period of illness during which, at same time, there is either a major depressive episode, a manic episode or a mixed episode concurrent with symptoms that meet the criteria for schizophrenia. In schizoaffective disorder there must be: a mood episode that is concurrent with the active-phase symptoms of schizophrenia; mood symptoms must be present for a substantial portion of the total duration of the disturbance; and, delusions or hallucinations must be present for at least two weeks in the absence of prominent mood symptoms. In contrast, mood symptoms in schizophrenia either have a duration that is brief relative to the total duration of the disturbance, occur only during the prodromal or residual phases, or do not meet full criteria for a mood episode. The diagnostic criteria for schizophrenia include characteristic symptoms, social or occupational dysfunction, and/or persistence of symptoms. The "schizophrenia" criteria for schizoaffective disorder can also be classified as "schizophreniform disorder," which is diagnosed if the DSM IV criteria A, D and E of schizophrenia are met. An episode

6,150,349

17

of this disorder lasts at least one month but less than six months. See also: Sharma (1997) *Am. J. Psychiatry* 154:1019–1021; McElroy (1991) *J. Clin. Psychiatry* 52:411–414.

The "Brief Psychiatric Rating Scale (BPRS)" can also be used after the semi-structured interview with the patient to evaluate schizophrenia and distinguish it from schizophreniform disorder (SD) and the psychosis associated with SD, as treated by the methods of the invention (Overall (1962) supra; Kaplan (1995), supra). It can be used to access changes in condition after treatment and amelioration when utilizing the methods of the invention (Kaplan (1995), supra).

d. Diagnosing and Assessing Alzheimer's Disease Related Psychosis

Psychosis associated with senile dementias and Alzheimer's disease is ameliorated by the methods of the invention. Behavioral changes are common in Alzheimer's disease and include psychosis, agitation, depression, anxiety, personality alterations, and neurovegetative changes. See Engelborghs (1997) *Acta Neurol. Belg.* 97:67–84; Cummings (1996) Neurology 47:876–883; Samson (1996) *Eur. Neurol.* 36:103–106.

Criteria to assess and diagnose psychosis associated with Alzheimer's Disease are the same as those used for psychosis, as described in Section 3.a, above.

e. Diagnosing and Assessing Drug-Related Psychosis

Psychosis associated with substance abuse or psychosis as a side-effect of medication is ameliorated by the methods of the invention. For example, psychosis is associated with cocaine abuse and addiction. Thus, the GR antagonists of the invention, such as mifepristone, can be used as a treatment for cocaine-induced psychosis. In another embodiment, the methods of the invention can treat cannabis-induced chronic psychosis, see Longhurst (1997) *Aust. N. Z. J. Psychiatry* 31:304–305. See also Evans (1997) "Drug induced psychosis with doxazosin," *BMJ* 3 14:1869; Bhatia (1996) "Chloroquine—induced recurrent psychosis," Indian *J. Med. Sci.* 50:302–304; Scurlock (1996) "Another case of nicotine psychosis" *Addiction* 91:1388; Cohen (1996) "Substance-induced psychosis" *Br. J. Psychiatry* 168:651–652; Popli (1997) "Sertraline and psychotic symptoms: a case series," *Ann. Clin. Psychiatry* 9:15–17; Schreiber (1997) "Metronidazole-induced psychotic disorder," *Am. J. Psychiatry* 154:1170–1171.

Criteria to assess and diagnose psychosis associated with drug abuse and drug addiction are the same as those used for psychosis, as described in Section 3as above.

f. Other Psychosis-Associated Conditions

The anti-psychotic GR antagonists and methods of the invention can be effective in treating psychotic aggressive patients, conduct-disordered children, and mentally retarded patients. See Fava (1997) *Psychiatr. Clin. North Am.* 20:427–451. In another embodiment, the methods of the invention can be used as a adjunct in treating AIDS patients with psychiatric disorders, as psychosis secondary to AIDS infection is common (see Susser (1997) *Am. J. Psychiatry* 154:864–866; Schiff(1997) *N. Engl. J. Med.* 336:1190). In another embodiment, the methods of the invention can be used to treat psychosis associated with Parkinson's disease. Many patients with Parkinson's disease and dementia experience psychosis and psychotic symptoms. In Parkinson's disease, dementia is associated with major behavioral, cognitive, and functional problems (Nainark (1996) "Psychotic symptoms in Parkinson's disease patients with dementia." *J. Am. Geriatr. Soc.* 44:296–299. Means to diagnose these conditions are well known in the art and are described in these references and other relevant texts.

18

4. TREATMENT OF CONDITIONS AND ILLNESSES ASSOCIATED WITH PSYCHOSIS USING GLUCOCORTICOID RECEPTOR ANTAGONISTS

Antiglucocorticoids, such as mifepristone, are formulated as pharmaceuticals to be used in the methods of the invention. Any composition or compound that can block a biological response associated with the binding of cortisol or a cortisol analogue to a GR can be used as a pharmaceutical in the invention. Routine means to determine GR antagonist drug regimens and formulations to practice the methods of the invention are well described in the patent and scientific literature, and some illustrative examples are set forth below.

a. Glucocorticoid Receptor Antagonists as Pharmaceutical Compositions

The GR antagonists used in the methods of the invention can be administered parenterally, topically, orally, or by local administration, such as by aerosol or transdermally. The methods of the invention provide for prophylactic and/or therapeutic treatments. The GR antagonists as pharmaceutical formulations can be administered in a variety of unit dosage forms depending upon the condition or disease and the degree of psychosis, the general medical condition of each patient, the resulting preferred method of administration and the like. Details on techniques for formulation and administration are well described in the scientific and patent literature, see, for example, the latest edition of "Remington's Pharmaceutical Sciences" (Maack Publishing Co, Easton Pa.).

GR antagonist pharmaceutical formulations can be prepared according to any method known to the art for the manufacture of pharmaceuticals. Such drugs can contain sweetening agents, flavoring agents, coloring agents and preserving agents. Any GR antagonist formulation can be admixtured with nontoxic pharmaceutically acceptable excipients which are suitable for manufacture.

Pharmaceutical formulations for oral administration can be formulated using pharmaceutically acceptable carriers well known in the art in dosages suitable for oral administration. Such carriers enable the pharmaceutical formulations to be formulated in unit dosage forms as tablets, pills, powder, dragees, capsules, liquids, lozenges, gels, syrups, slurries, suspensions, etc., suitable for ingestion by the patient. Pharmaceutical preparations for oral use can be obtained through combination of GR antagonist compounds with a solid excipient, optionally grinding a resulting mixture, and processing the mixture of granules, after adding suitable additional compounds, if desired, to obtain tablets or dragee cores. Suitable solid excipients are carbohydrate or protein fillers include, but are not limited to sugars, including lactose, sucrose, mannitol, or sorbitol; starch from corn, wheat, rice, potato, or other plants; cellulose such as methyl cellulose, hydroxypropylmethylcellulose, or sodium carboxymethylcellulose; and gums including arabic and tragacanth; as well as proteins such as gelatin and collagen. If desired, disintegrating or solubilizing agents may be added, such as the cross-linked polyvinyl pyrrolidone, agar, alginic acid, or a salt thereof, such as sodium alginate.

Dragee cores are provided with suitable coatings such as concentrated sugar solutions, which may also contain gum arabic, talc, polyvinylpyrrolidone, carbopol gel, polyethylene glycol, and/or titanium dioxide, lacquer solutions, and suitable organic solvents or solvent mixtures. Dyestuffs or pigments may be added to the tablets or dragee coatings for product identification or to characterize the quantity of active compound (i.e., dosage). Pharmaceutical preparations

6,150,349

19                                    20

of the invention can also be used orally using, for example, push-fit capsules made of gelatin, as well as soft, sealed capsules made of gelatin and a coating such as glycerol or sorbitol. Push-fit capsules can contain GR antagonist mixed with a filler or binders such as lactose or starches, lubricants such as talc or magnesium stearate, and, optionally, stabilizers: In soft capsules, the GR antagonist compounds may be dissolved or suspended in suitable liquids, such as fatty oils, liquid paraffin, or liquid polyethylene glycol with or without stabilizers.

Aqueous suspensions of the invention contain a GR antagonist in admixture with excipients suitable for the manufacture of aqueous suspensions. Such excipients include a suspending agent, such as sodium carboxymethylcellulose, methylcellulose, hydroxypropylnethylcellulose, sodium alginate, polyvinylpyrrolidone, gum tragacanth and gum acacia, and dispersing or wetting agents such as a naturally occurring phosphatide (e.g., lecithin), a condensation product of an alkylene oxide with a fatty acid (e.g., polyoxyethylene stearate), a condensation product of ethylene oxide with a long chain aliphatic alcohol (e.g., heptadecaethylene oxycetanol), a condensation product of ethylene oxide with a partial ester derived from a fatty acid and a hexitol (e.g., polyoxyethylene sorbitol mono-oleate), or a condensation product of ethylene oxide with a partial ester derived from fatty acid and a hexitol anhydride (e.g., polyoxyethylene sorbitan monooleate). The aqueous suspension can also contain one or more preservatives such as ethyl or n-propyl p-hydroxybenzoate, one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, aspartame or saccharin. Formulations can be adjusted for osmolarity.

Oil suspensions can be formulated by suspending a GR antagonist in a vegetable oil, such as arachis oil, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. The oil suspensions can contain a thickening agent, such as beeswax, hard paraffin or cetyl alcohol. Sweetening agents can be added to provide a palatable oral preparation. These formulations can be preserved by the addition of an antioxidant such as ascorbic acid. As an example of an injectable oil vehicle, see Minto (1997) *J. Pharmacol. Exp. Ther.* 281:93–102.

Dispersible powders and granules of the invention suitable for preparation of an aqueous suspension by the addition of water can be formulated from a GR antagonist in admixture with a dispersing, suspending and/or wetting agent, and one or more preservatives. Suitable dispersing or wetting agents and suspending agents are exemplified by those disclosed above. Additional excipients, for example sweetening, flavoring and coloring agents, can also be present.

The pharmaceutical formulations of the invention can also be in the form of oil-in-water emulsions. The oily phase can be a vegetable oil, such as olive oil or arachis oil, a mineral oil, such as liquid paraffin, or a mixture of these. Suitable emulsifying agents include naturally-occurring gums, such as gum acacia and gum tragacanth, naturally occurring phosphatides, such as soybean lecithin, esters or partial esters derived from fatty acids and hexitol anhydrides, such as sorbitan mono-oleate, and condensation products of these partial esters with ethylene oxide, such as polyoxyethylene sorbitan mono-oleate. The emulsion can also contain sweetening and flavoring agents. Syrups and elixirs can be formulated with sweetening agents, such as glycerol, sorbitol or sucrose. Such formulations can also contain a demulcent, a preservative, a flavoring or a coloring agent.

The GR antagonist pharmaceutical formulations of the invention can be in the form of a sterile injectable preparation, such as a sterile injectable aqueous or oleaginous suspension. This suspension can be formulated according to the known art using those suitable dispersing or wetting agents and suspending agents which have been mentioned above. The sterile injectable preparation can also be a sterile injectable solution or suspension in a nontoxic parenterally-acceptable diluent or solvent, such as a solution of 1,3-butanediol. Among the acceptable vehicles and solvents that can be employed are water and Ringer's solution, an isotonic sodium chloride. In addition, sterile fixed oils can conventionally be employed as a solvent or suspending medium. For this purpose any bland fixed oil can be employed including synthetic mono- or diglycerides. In addition, fatty acids such as oleic acid can likewise be used in the preparation of injectables.

The GR antagonists of this invention can also be administered in the form of suppositories for rectal administration of the drug. These formulations can be prepared by mixing the drug with a suitable non-irritating excipient which is solid at ordinary temperatures but liquid at the rectal temperatures and will therefore melt in the rectum to release the drug. Such materials are cocoa butter and polyethylene glycols.

They can also be administered by in intranasal, intraocular, intravaginal, and intrarectal routes including suppositories, insufflation, powders and aerosol formulations (for examples of steroid inhalants, see Rohatagi (1995) *J. Clin. Pharmacol.* 35:1187–1193; Tjwa (1995) *Ann. Allergy Asthma Immunol.* 75:107–111).

Products of the invention which are preferably administered by the topical route can be administered as applicator sticks, solutions, suspensions, gels, creams, ointments, pastes, jellies, paints, powders, and aerosols. The GR antagonists of the invention, such as mifepristone, can be delivered by transdermally or via intradermal injection of drug (mifepristone)-containing microspheres, which slowly release subcutaneously (see Rao (1995) *J. Biomater Sci. Polym. Ed.* 7:623–645; for biodegradable and injectable gel formulations see Gao (1995) *Pharm. Res.* 12:857–863 (1995); for use of microspheres for oral administration, see Eyles (1997) *J. Pharm. Pharmacol.* 49:669–674). Both transdermal and intradermal routes afford constant delivery for weeks or months.

The GR antagonist pharmaceutical formulations of the invention can be provided as a salt and can be formed with many acids, including but not limited to hydrochloric, sulfuric, acetic, lactic, tartaric, malic, succinic, etc. Salts tend to be more soluble in aqueous or other protonic solvents that are the corresponding free base forms. In other cases, the preferred preparation may be a lyophilized powder in 1 mM–50 mM histidine, 0.1%–2% sucrose, 2%–7% mannitol at a pH range of 4.5 to 5.5, that is combined with buffer prior to use.

In another embodiment, the GR antagonist formulations of the invention are useful for parenteral administration, such as intravenous administration or administration into a body cavity or lumen of an organ. The formulations for administration will commonly comprise a solution of the mifepristone dissolved in a pharmaceutically acceptable carrier, preferably an aqueous carrier. A variety of aqueous carriers can be used, e.g., buffered saline and the like. These solutions are sterile and generally free of undesirable matter. These formulations may be sterilized by conventional, well known sterilization techniques. The formulations may contain pharmaceutically acceptable auxiliary substances as

6,150,349

**21**

required to approximate physiological conditions such as pH adjusting and buffering agents, toxicity adjusting agents and the like, for example, sodium acetate, sodium chloride, potassium chloride, calcium chloride, sodium lactate and the like. The concentration of GR antagonist in these formulations can vary widely, and will be selected primarily based on fluid volumes, viscosities, body weight and the like in accordance with the particular mode of administration selected and the patient's needs.

In another embodiment, the GR antagonist formulations of the invention can be delivered by the use of liposomes which fuse with the cellular membrane or are endocytosed, i.e., by employing ligands attached to the liposome, or attached directly to the oligonucleotide, that bind to surface membrane protein receptors of the cell resulting in endocytosis. By using liposomes, particularly where the liposome surface carries ligands specific for target cells, or are otherwise preferentially directed to a specific organ, one can focus the delivery of the GR antagonist into the target cells in vivo. See Al-Muhammed (1996) *J. Microencapsul.* 13:293–306; Ostro (1989) *Am. J. Hosp. Pharm.* 46:1576–1587.

b. Determining Dosing Regimens for Glucocorticoid Receptor Antagonists

The methods of the invention ameliorate psychosis, i.e., prevent, slow the onset of, decrease the frequency of, diminish the severity of or cure a psychosis and/or its complications. The amount of GR antagonist adequate to accomplish this is defined as a "therapeutically effective dose." The dosage schedule and amounts effective for this use, i.e., the "dosing regimen," will depend upon a variety of factors, including the stage of the disease or condition, the severity of the disease or condition, the general state of the patient's health, the patient's physical status, age and the like. In calculating the dosage regimen for a patient, the mode of administration also is taken into consideration.

The dosage regimen must also take into consideration the pharmacokinetics, i.e., the GR antagonists' rate of absorption, bioavailability, metabolism, clearance, and the like (see, for example, Hidalgo-Aragones (1996) *J. Steroid Biochem. Mol. Biol.* 58:611–617; Groning (1996) Pharmazie 51:337–341; Fotherby (1996) Contraception 54:59–69; Johnson (1995) *J. Pharm. Sci.* 84:1144–1146; Rohatgi (1995) *Pharmazie* 50:610–613; Brophy (1983) *Eur. J. Clin. Pharmacol.* 24:103–108; the latest Remington's, supra). In one study, less than 0.5% of the daily dose of mifepristone was excreted in the urine; the drug bound extensively to circulating albumin (see Kawai (1989) supra).

The state of the art allows the clinician to determine the dosage regimen for each individual patient, GR antagonist and disease or condition treated. As an illustrative example, the guidelines provided below for mifepristone can be used as guidance to determine the dosage regiment, i.e., dose schedule and dosage levels, of any GR antagonist administered when practicing the methods of the invention.

Single or multiple administrations of mifepristone formulations may be administered depending on the dosage and frequency as required and tolerated by the patient. The formulations should provide a sufficient quantity of mifepristone to effectively ameliorate the psychosis. Thus, a typical pharmaceutical formulations for oral administration of mifepristone would be about 8 to 20 mg/kg of body weight per patient per day. Dosages from about 2 mg to about 30mg per kg of body weight per patient per day may be used, particularly when the drug is administered to an anatomically secluded site, such as the cerebral spinal fluid (CSF) space, in contrast to administration orally, into the

**22**

blood stream, into a body cavity or into a lumen of an organ. Substantially higher dosages are possible in topical administration. Actual methods for preparing parenterally administrable GR antagonist formulations will be known or apparent to those skilled in the art and are described in more detail in such publications as *Remington's Pharmaceutical Science*, 15th ed., Maack Publishing Company, Easton, Pa. (1980). In a preferred embodiment of the invention, the invention provide for a method of treating psychosis by administering mifepristone in a daily amount of about 8 to 12 mg per kilogram of body weight per day. Using this dosage, the administration can continue for a period of about four days. Alternatively, in another embodiment the mifepristone is administered in a daily amount of about 600 mg per day. See also Nieman, In "Receptor Mediated Antisteroid Action," Agarwal, et al., eds., De Gruyter, New York (1987).

After a pharmaceutical comprising a GR antagonist of the invention has been formulated in a acceptable carrier, it can be placed in an appropriate container and labeled for treatment of an indicated condition. For administration of GR antagonists, such labeling would include, for example, instructions concerning the amount, frequency and method of administration. In one embodiment, the invention provides for a kit for the amelioration of psychosis in a human which includes a glucocorticoid receptor antagonist and instructional material teaching the indications, dosage and schedule of administration of the glucocorticoid receptor antagonist. When mifepristone is the GR antagonist used, the instructional material indicates that the GR antagonist can be used for in a daily amount of about 8 to 12 mg per kilogram of body weight per day, and, the administration of the glucocorticoid receptor antagonist continues for period of about four days.

It is understood that the examples and embodiments described herein are for illustrative purposes only and that various modifications or changes in light thereof will be suggested to persons skilled in the art and are to be included within the spirit and purview of this application and scope of the appended claims.

### EXAMPLES

The following examples are offered to illustrate, but not to limit the claimed invention.

#### Example 1

Treating Psychotic Major Depression with Mifepristone

The following example details studies which demonstrate that the method of the invention is an effective treatment for psychosis.

Study Background

This study demonstrates that a glucocorticoid receptor antagonist, mifepristone, administered in dosages of about 10 mg per kg per day over a relatively short treatment period, is an effective treatment for psychotic major depression. The basic strategy was to demonstrate that high dose mifepristone, in the range of 600 mg per day, over a relatively short period of time—about four days—is an effective treatment for psychotic major depression. The study requires a nine day, closely observed hospital stay.

Patient Selection

Individuals included in this study were diagnosed as psychotic depressives using criteria as set forth by the DSM-IV, as described above. This diagnosis was confumed by two psychiatrists. All are between the ages of 18 and 75.

6,150,349

23

Apart from hypercortisolemia, they have no major medical problems. They have no signs of Cushings Syndrome. No children of childbearing potential are included in the study. Individuals admitting to having used illicit drugs within a month prior to admission for the study are excluded. Individuals admitting to drinking in excess of two ounces of alcohol daily are excluded from the study. No anti-psychotic medication was taken within three days of entering the study. While, concurrent anti-depressant was not a criteria used to excluded anyone from the study, no individual was started on an anti-depressant medication while participating in the study. All patients gave their written consent to a protocol approved by the Human Subjects Committee at Stanford University Medical Center.

All participants were given the Hamilton Rating Scale for Depression (HAM-D, Hamilton (1962) J. Neurol. Psychiatry, supra, discussed above) and the Structured Clinical Interview for DSM-IV Axis I mood disorders tests (as described above). Only individuals with a score greater than 21 on the HAM-D test continued in the study (a HAM-D score of >21 indicates moderate to severe depression). The HAIM-D Rating Scale was also given after administration of mifepris tone, as described below.

On the basis of these criteria, sixteen (16) individuals with psychotic major depression were selected.

Measuring Blood Cortisol Levels

The "Double Antibody Cortisol Kit™" (Diagnostic Products Corporation, Los Angeles, Calif.) was used to measure blood cortisol levels. This test is a competitive radioimmunoassay in which $^{125}$I-labeled cortisol competes with cortisol from an clinical sample for antibody sites, and was performed essentially according to manufacturer's instructions using reagents supplied by manufacturer.

Briefly, blood was collected by venipuncture and serum separated from the cells. The samples were stored at 2 to 8° C. for up to seven days, or up to two month frozen at −20° C. Before the assay, samples were allowed to come up to room temperature (15–28° C.) by gentle swirling or inversion. Sixteen tubes in duplicate at 25 microliters of serum per tube was prepared. Cortisol concentrations were calculated from the prepared calibration tubes. Net counts equaled the average CPM minus the average non-specific CPM. Cortisol concentrations for the unknowns were estimated by interpolation from the calibration curve (Dudley, et al. (1985) Clin. Chem. 31:1264–1271).

Assessing Amelioration of Psychosis

Formal psychiatric assessment, including the HAM-D rating scale (Overall (1962) supra; Kaplan (1995), supra, discussed above), the Brief Psychiatric Rating Scale (BPRS) (Overall (1962) supra; Kaplan (1995), supra, discussed above) and the Clinical Global Impression (GAF) evaluation (DSM-IV, supra, pages 30 to 31; Kaplan, ed. (1995), supra) was carried out on days one, three, five, seven and nine of the study at 10:00 AM (at 1000 hours). A paragraph recall test (see below) was given at 11:30 AM (at 1130 hours) on days one, five and nine. Cortisol levels were measured serially every half hour from 1:30 to 4:00 PM (1300 to 1600 hours) on days one, five and nine. Plasma ACTH and Plasma HVA was measured serially every hour from 1300 to 1600 on days one, five and nine. Routine biological and hematological studies were conducted daily, particularly to screen for evidence of relative adrenal insufficiency, i.e., hypoglycemia, eosinophilia.

One means used to assess/measure improvement, or amelioration of psychosis in the study was the "Wallach Recognition Test" (a paragraph recall test). Newly evaluated individuals with an initial diagnosis of psychotic major

24

depression, diagnosed as described above, were given a recognition task adapted from Wallach (1980) supra. Subjects listened to a taped recording of a sixteen-word list presented at the rate of one word every ten seconds. The subject repeats each of the sixteen words and is asked to think of what the words mean to them. Following the presentation of the list, the subject engages in a twenty minute motor distraction task. The subject then listens to a fifty-word list containing the sixteen original target words plus thirty-four background distraction words. The subject then is asked to discern between target words and distractors.

Dosage Regimen and Administration of Mifepristone

Sixteen newly admitted patients with an admitting diagnosis of psychotic major depression confirmed by two psychiatrists were enrolled in the study. Each patient conformed with all of the above described criteria. The subject is given either: 600 milligrams of mifepristone per day orally, in one dose, over four days, followed by four days of placebo; or, four days of placebo followed by the same dose and regimen of mifepristone (patients serving as their own control in this "cross-over" study). In the patients administered mifepristone, three two hundred milligram tablets per day were given for four days. The mifepristone (RU486) tablets were supplied by The Population Council and Roussel Uclaf, Hoechst Marion Roussel USA, Kansas City, Mo. The tablets were manufactured by Shanghai HuaLian Pharmaceuticals Co., Ltd., Shanghai, China (currently the sole commercial source of RU486).

Both patients and the investigators are "blind" as to which compound (test mifepristone or placebo) the patient received.

Results

The protocol has been competed for three patients. While the study is a double-blind placebo controlled study, and to date the blind has not been broken, two preliminary observations can be made. First, each subject receiving mifepristone as described above showed a significant improvement in their psychiatric condition. Second, no adverse effects were subjectively reported by the patient or objectively observed by raters or staff.

When the Wallach Recognition Test was used to measure the degree of amelioration of psychosis in the study's subjects, all individuals who received mifepristone showed an amelioration of their psychosis. On the average, the number of times test subjects perceived distracters as words they had actually heard before (in the test's tape recording) declined between 25% and 100% after treatment.

On the average HAM-D scores declined from about 26 to about 13.5. Brief Psychiatric Rating Scale (BPRS) scores declined from about 40.5 to about 29.5.

Clinical Global Impression (CGI scale, based on a GAF evaluation, discussed above, see DSM-IV, supra, pages 30 to 31; Kaplan, ed. (1995)) scores dropped from about 5 (indicating "markedly depressed") to about 3 ("mildly depressed"). As discussed above, the GAF scale is particularly useful in tracking the clinical progress of individuals in global terms using a single measure.

These data demonstrate that high dose mifepristone, in the range of 600 mg per day, over a relatively short period of time—about four days—is an effective and safe treatment for psychotic major depression.

It is understood that the examples and embodiments described herein are for illustrative purposes only and that various modifications or changes in light thereof will be suggested to persons skilled in the art and are to be included within the spirit and purview of this application and scope of the appended claims.

6,150,349

25

26

What is claimed is:

1. A method of ameliorating psychosis in a patient in need thereof by administration of an amount of a glucocorticoid receptor antagonist effective to ameliorate the psychosis, with the proviso that the patient not be suffering from Cushing's Syndrome and the psychosis is associated with major depression.

2. The method of claim **1**, wherein the glucocorticoid receptor antagonist comprises a steroidal skeleton with at least one phenyl-containing moiety in the 11-beta position of the steroidal skeleton.

3. The method of claim **2**, wherein the phenyl-containing moiety in the 11-beta position of the steroidal skeleton is a dimethylaminophenyl moiety.

4. The method of claim **2**, wherein the glucocorticoid receptor antagonist comprises mifepristone.

5. The method of claim **2**, wherein the glucocorticoid receptor antagonist is selected from the group consisting of RU009 and RU044.

6. The method of claim **1**, wherein the glucocorticoid receptor antagonist is administered in a daily amount of between about 8 to 20 mg per kilogram of body weight per day.

7. The method of claim **1**, wherein the glucocorticoid receptor antagonist is administered in a daily amount of about 8 to 12 mg per kilogram of body weight per day.

8. The method of claim **1**, wherein the glucocorticoid receptor antagonist is administered for about four days.

9. The method of claim **1**, wherein the glucocorticoid receptor antagonist is administered in a daily amount of about 600 mg per day.

10. The method of claim **1**, wherein the administration is once per day.

11. The method of claim **1**, wherein the mode of administration is oral.

12. The method of claim **1**, wherein the mode of administration is transdermal.

13. A method of ameliorating psychotic major depression in a patient in need thereof comprising administering to the patient mifepristone in a daily amount of about 8 to 12 mg per kilogram of body weight per day, wherein the administration continues for a period of about 4 days, with the proviso that the patient is not suffering from Cushing's Syndrome.

*     *     *     *     *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,150,349                                    Page 1 of 1
DATED           : November 21, 2000
INVENTOR(S)  : Schatzberg et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 1,
Line 4, please enter:

--     STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH
        This invention was made with goverment support under contract no. 5T32MH
awarded by the National Institutes of Health. The government may have certain rights in
this invention. --

Signed and Sealed this

Fifteenth Day of April, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

**EXHIBIT H**

1  STUART C. CLARK (SBN 124152)
   clark@carrferrell.com
2  CHRISTINE S. WATSON (SBN 218006)
   cwatson@carrferrell.com
3  CARR & FERRELL *LLP*
   2200 Geng Road
4  Palo Alto, California 94303
   Telephone: (650) 812-3400
5  Facsimile:  (650) 812-3444

6  Attorneys for Plaintiffs
   CORCEPT THERAPEUTICS, INC., JOSEPH
7  K. BELANOFF, and ALAN F. SCHATZBERG

8
                UNITED STATES DISTRICT COURT
9
              NORTHERN DISTRICT OF CALIFORNIA
10
                    SAN JOSE DIVISION
11

12 CORCEPT THERAPEUTICS, INC.,          CASE NO. C07-03795 JW (RS)
   JOSEPH K. BELANOFF, and
13 ALAN F. SCHATZBERG,                  **DECLARATION OF STUART
                                        CLARK IN SUPPORT OF
14          Plaintiffs,                 PLAINTIFFS' OPPOSITION TO
                                        ROTHSCHILD'S MOTIONS TO
15     v.                               DISMISS AND FOR CHANGE
                                        OF VENUE**
16 ANTHONY ROTHSCHILD,
                                        Date:    November 19, 2007
17          Defendant.                  Time:    9.00 a.m.
                                        Court:   Courtroom 8
18                                      Judge:   Hon James Ware

19

20

21         EXHIBITS "A" AND "H"
22

23

24
           FILED UNDER SEAL
25

26

27

28