# EXHIBIT 2

Westlaw.

44 Cal.App.4th 572                                                        Page 1
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
**(Cite as: 44 Cal.App.4th 572)**

**C**

LOUIS P. CAMPANELLI, Plaintiff and Appellant,
v.
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA et al., Defendants and Appellants.
**No. A068857.**

Court of Appeal, First District, Division 2, California.

Apr 11, 1996.

SUMMARY

The former head basketball coach at a university brought a defamation action against the athletic director who had fired him and the vice-chancellor of the university. The local newspaper had published the vice-chancellor's statement to the effect that a star player's father felt that the coach had applied pressure to his son that made his son physically ill. A newspaper published the athletic director's allegation that the basketball players were beaten down and in trouble psychologically after having witnessed the coach's harsh lecture to the team. The court sustained defendants' demurrer without leave to amend and entered judgment in favor of defendants. (Superior Court of Alameda County, No. 737685-4, James R. Lambden, Judge.)

The Court of Appeal affirmed. The court held that the trial court properly sustained defendants' demurrers, since their statements were not verifiable assertions of fact, but rather, when viewed in context, nonactionable opinion. Examined against the charged atmosphere surrounding the coach's firing and the highly publicized facts set forth in the articles, the statement regarding the star player's father constituted either a subjective assessment based on parent intuition or colorful hyperbole illustrative of the vice-chancellor's apprehension over the former coach's behavior. Similarly, the statement of the athletic director (a public figure) was of the kind typically generated in a spirited dispute between two divergent viewpoints. Furthermore, the coach conceded the accuracy of the athletic director's

statement, as he alleged and factually asserted in his complaint that he engaged in temper tantrums directed at his players which included verbally abusive and profane remarks of a personal nature. (Smith, Acting P. J., with Phelan and Haerle, JJ., concurring.) *573

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 23--Demurrer on Complaint--Application of Rule on Appeal.
A reviewing court treats a demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. Further, the court gives the complaint a reasonable interpretation, reading it as a whole and its parts in their context. When it is sustained without leave to amend, the reviewing court decides whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and reversal is warranted; if not, there has been no abuse of discretion and the judgment is affirmed.

(2) Libel and Slander § 7--Actionable Words--Statement of Fact Versus Opinion.
Libel is a false and unprivileged publication by writing which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him or her to be shunned or avoided, or which has a tendency to injure the person's occupation ( Civ. Code, § 45). However, there is no such thing as a false idea. A publication must contain a false statement of fact to give rise to liability for defamation. Even if they are objectively unjustified or made in bad faith, publications which are statements of opinion rather than fact cannot form the basis for a libel action. The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court and therefore suitable for resolution by demurrer. If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be re-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.App.4th 572                                                              Page 2
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
(Cite as: 44 Cal.App.4th 572)

solved by a jury.

(3) **Libel and Slander § 7--Actionable Words-
-Statement of Fact Versus Opinion--Test for De-
termining.**
In drawing the distinction between opinion and fact
in the libel context, California courts have de-
veloped a totality of the circumstances test. The
court must put itself in the place of an average read-
er and decide the natural and probable effect of the
published allegedly defamatory statement. The
words themselves must be examined to see if they
have a defamatory meaning, or if the sense and
meaning fairly presumed to have been conveyed to
those who read it have a defamatory meaning.
Statements cautiously phrased in terms of appar-
ency are more likely to be opinions. In addition to
the language, the context of a statement must be ex-
amined. The court must look at the nature and full
content of the communication and to the knowledge
and understanding of the audience to whom **\*574**
the publication was directed. Where the comments
are made in the arena of public debate and contro-
versy, a reviewing court has an obligation to exam-
ine the whole record in order to ensure that there is
no infringement of the constitutional guaranty of
free expression.

(4) **Libel and Slander § 9--Actionable Words-
-Intent and Understanding--Fact Versus Opinion-
-Parent's Feeling Regarding Coach's Treatment of
His Son.**
In a libel action brought by a fired university bas-
ketball coach against the school's vice-chancellor
based on his statements to a local newspaper to the
effect that a star player's father felt that the coach
had applied pressure to his son that made his son
physically ill, the court properly sustained defend-
ant's demurrer, since the challenged statement was
not a statement of fact, but rather, when viewed in
context, a statement of opinion. The statement was
not an expression of the vice-chancellor's own sen-
timent, but rather a feeling conveyed to him by a
parent. Examined against the charged atmosphere
surrounding the coach's firing and the highly publi-
cized facts set forth in the article, the statement by
the star player's father about what he felt consti-

tuted either a subjective assessment based on parent
intuition or colorful hyperbole illustrative of his ap-
prehension over the former coach's behavior, but
could not be construed as intending to convey a
verifiable assertion regarding his son's health.

[See 5 **Witkin**, Summary of Cal. Law (9th ed.
1988) Torts § 486.]

(5a, 5b, 5c) **Libel and Slander § 26--Privileged
Communications-- Qualified Privilege--Public Fig-
ures--Athletic Director Who Fired State University
Basketball Coach.**
In a libel action brought by a former university bas-
ketball coach against the school's athletic director
who had fired him, based on the director's state-
ment to a newspaper that the basketball players
were beaten down and in trouble psychologically
after having witnessed the coach's harsh lecture to
the team, the court properly sustained defendant's
demurrer, since the challenged statement was non-
actionable opinion, and the athletic director was a
public figure. The director's statement was of the
kind typically generated in a spirited dispute
between two divergent viewpoints, an emphatic
way of expressing the thought that the players felt
"beaten down" as a result of the coach's harsh meth-
ods. Furthermore, the coach conceded the accuracy
of the director's statement, as he alleged and factu-
ally asserted in his complaint that he engaged in
temper tantrums directed at his players which in-
cluded verbally abusive and profane remarks of a
personal nature. **\*575**

(6) **Libel and Slander § 27--Privileged Communica-
tions--Qualified Privilege--Newspaper and Other
Broadcasting Publications--Employer's Evaluation
of Employee.**
The public has an interest in receiving information
on issues of public importance even if the trustwor-
thiness of the information is not absolutely certain.
The U.S. Const., 1st Amend., is served not only by
articles and columns that purport to be definitive
but by those articles that, more modestly, raise
questions and prompt investigation or debate. Fur-
thermore, an employer's evaluation of his employe-
ee's performance contains an inherent degree of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.App.4th 572                                                                                    Page 3
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
(Cite as: 44 Cal.App.4th 572)

subjectivity, and courts should be extremely cautious before allowing such comments to become the basis of a libel action.

(7)    Libel    and    Slander    §
43--Actions--Pleading--Defenses--Truth as Defense.
Truth is an absolute defense to any libel action. In order to establish the defense, the defendant need not prove the literal truth of the allegedly libelous accusation, so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.

COUNSEL

Joseph L. Alioto and Lawrence Alioto for Plaintiff and Appellant.

James E. Holst, John F. Lundberg and Jeffrey A. Blair for Defendants and Appellants.

**SMITH, Acting P. J.**

Appellant Louis P. Campanelli appeals from a judgment in favor of defendants-respondents, The Regents of University of California (The Regents), Robert L. Bockrath and Daniel Boggan, after the court sustained respondents' demurrer without leave to amend in his action for defamation. We agree with the trial court that the alleged defamatory remarks were nonactionable statements of opinion, and affirm.

Background
(1) As this case comes before us after the sustaining of a demurrer, we are guided by the following principles: " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] ...' Further, we give the complaint a *576 reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] ... And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we

affirm. [Citations.]" (_Blank v. Kirwan_ (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 581.) We summarize the allegations of the complaint:

Campanelli became head basketball coach at the University of California at Berkeley (Cal) in 1985. Bockrath, who was athletic director at Cal, traveled with the team on a road trip to Arizona in February 1993. Following two difficult losses, Bockrath overheard "a frustrated and angry Campanelli address sharp criticism to the players in the locker room." On February 8, Bockrath met with Cal's vice-chancellor, defendant Boggan, and Chancellor Tien, recommending that Campanelli be terminated. Later the same day both defendants met with all but two of the team's players and learned that seven were threatening to transfer to other schools unless Campanelli was fired. That afternoon, Bockrath called Campanelli into his office and fired him. The contract between Cal and Campanelli permitted Cal to terminate his employment at any time without cause.

Campanelli's firing received "wide coverage in local and national press, radio and television." On or about February 15, 1993, Boggan gave an interview to C.W. Nevius of the San Francisco Chronicle (Chronicle). The article, which is attached as an exhibit to the complaint, states that "Jason Kidd's father felt that former Cal basketball coach Lou Campanelli was putting so much pressure on his son he was making him physically ill." (Nevius, _Cal Grew Weary of Lou's Tirades_, S.F Chronicle (Feb. 16, 1993) p. E1.) The statement was attributed to Boggan. Although Boggan heard the statement from Kidd's father, Boggan knew the elder Kidd wished to see Campanelli replaced to the extent that he would deliberately make false statements if it would accomplish that result. Boggan's statement was false and uttered with malice and in reckless disregard for the truth. In fact, Kidd did not become physically ill at any relevant time. Any illness he may have had was not caused by Campanelli.

The same week Bockrath gave an interview to the New York Times (Times) explaining the reasons

Case 5:07-cv-03795-JW    Document 83    Filed 11/05/2007    Page 5 of 25

44 Cal.App.4th 572                                                                                    Page 4
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
**(Cite as: 44 Cal.App.4th 572)**

for Campanelli's termination. Recalling the coach's final tirade, Bockrath said, " 'There were things that were unwarranted and inexcusable.... It was so incredibly bad. I said, "Sheesh, something must be done." *The players were beaten down and in trouble psychologically.* Every other word was a four-letter one. Let me tell you, if I *577 hadn't made that wrong turn, I wouldn't have known the fix the team was in.' " (Italics added.)

Bockrath's allegation that Campanelli inflicted "psychological damage" on his players was false and defamatory. It was uttered with malice and in reckless disregard of the truth. Bockrath had no evidence of psychological damage to any player when he made the statement that they were "in trouble psychologically."

Campanelli seeks general and punitive damages against Boggan, Bockrath and the their employer, The Regents, as a result of the defamation.

*Procedural History*
Campanelli originally filed a multicount lawsuit in federal district court, including civil rights violation (42 U.S.C. § 1983), breach of implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. Campanelli's complaint was dismissed by the district court for "failure to state a claim." The court declined to exercise jurisdiction over his pendent state law claims.

Campanelli then filed the present lawsuit in San Francisco Superior Court. The court granted defendants' motion to transfer the case to Alameda County, and a petition for writ of mandate challenging that ruling was denied by this court. After the parties stipulated that the federal civil rights cause of action would not be pursued and one demurrer was sustained with leave to amend, Campanelli filed the "amended complaint" now before us. This complaint sets forth two counts of defamation based on the statement about Jason Kidd made by Boggan and the "in trouble psychologically" statement made by Bockrath.

The court sustained defendants' demurrer without leave to amend and this appeal followed.

*Appeal*
I. *Boggan's Statement*
(2) "Libel is a false and unprivileged publication by writing ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injury him *578 in his occupation." (Civ. Code, § 45.) However, "... there is no such thing as a false idea" (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]). A publication " 'must contain a false statement of *fact*' to give rise to liability for defamation." (*Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 970 [18 Cal.Rptr.2d 83] (*Jensen*), quoting *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425] (*Gregory*); see also *Gill v. Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306].) Even if they are objectively unjustified or made in bad faith, publications which are statements of *opinion* rather than fact cannot form the basis for a libel action. (*Jensen, supra,* 14 Cal.App.4th at p. 971.)

(3) The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87] (*Baker*); *Gregory, supra,* 17 Cal.3d at p. 601) and therefore suitable for resolution by demurrer. (E.g., *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720 [275 Cal.Rptr. 494] (*Moyer*).) If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. (*Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 680 [150 Cal.Rptr. 258, 586 P.2d 572] (*Good Government*).)

In drawing the distinction between opinion and fact " 'California courts have developed a "totality of the circumstances" test ....' [Citation.] The court must put itself in the place of an ' " 'average reader' " ' and decide the ' " 'natural and probable effect' " ' of the statement. [Citations.] The words themselves must be examined to see if they have a defamatory meaning, or if the ' " 'sense and meaning ... fairly

44 Cal.App.4th 572                                                                                    Page 5
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
**(Cite as: 44 Cal.App.4th 572)**

presumed to have been conveyed to those who read it' " ' have a defamatory meaning. [Citations.] Statements ' " cautiously phrased in terms of apparency" ' are more likely to be opinions. [Citations.] [¶] In addition to the language, the context of a statement must be examined. [Citation.] The court must 'look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.' [Citation.]" (*Hofmann Co. v. E.I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 398 [248 Cal.Rptr. 384].)

Where, as here, the comments are made in the arena of public debate and controversy, a reviewing court has an obligation to examine the whole record in order to ensure that there is no infringement of the First Amendment guarantee of free expression. (*Moyer, supra,* 225 Cal.App.3d 720, 724; *579 *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 17 [111 L.Ed.2d 1, 16-17, 110 S.Ct. 2695].)

(4) Applying these principles, vice-chancellor Boggan's utterance that star player Jason Kidd's father "felt that ... Campanelli was putting so much pressure on his son he was making him physically ill" (Nevius, *Cal Grew Weary of Lou's Tirades,* S.F Chronicle, *supra,* at p. E1) cannot be characterized as statement of fact. First, Boggan made clear that the statement did not express his own sentiment, but was something he was told by a parent. Second, the statement was not couched in terms of a factual assertion, but a *feeling* ("Jason Kidd's father *felt* ...." [*ibid.,* italics added]). The very word "felt" inherently connotes a subjective judgment.

As indicated, context can also be a major determinant of whether an alleged defamatory statement constitutes fact or opinion. (*Grillo v. Smith* (1983) 144 Cal.App.3d 868, 875 [193 Cal.Rptr. 414]; *Good Government, supra,* 22 Cal.3d 672, 680.) "Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be con-

sidered as statements of fact may well assume the character of statements of opinion." (*Gregory, supra,* 17 Cal.3d 594, 601.)

Throughout the Chronicle article, Boggan describes his concern that Campanelli's tirades were "tear[ing] [the] kids down." (Nevius, *Cal Grew Weary of Lou's Tirades,* S.F Chronicle, *supra,* at p. E1.) Even though Kidd tried to stay out of it, "[he] seemed to be having problems." (*Ibid.*) Cal player Brian Hendrick was quoted as saying, "You kind of numb yourself to it ... but lately it came on a more consistent basis. It was happening after every loss, so many personal blows." Boggan recalled that three of the parents had called to complain about Campanelli and that Kidd's father was "watching his son get sick because he couldn't stand the pressure the coach was putting on him." [FN1] Examined against the charged atmosphere surrounding Campanelli's firing and the highly publicized facts set forth in the article, the statement by the elder Kidd about what he *felt* constituted either a subjective assessment based on parent intuition or colorful hyperbole illustrative of his apprehension over Campanelli's behavior, but cannot be construed as intending to convey a verifiable assertion regarding his son's health. *580

> FN1 Even though the article was attached to the complaint in its entirety, none of the above quotations were alleged to be false or libelous, except Boggan's repetition of the comment by Kidd's father.

Parents are not generally thought of as experts in the medical field. A statement such as the one attributed to Kidd's father has a much different effect on the reader when made by a parent than if the same statement were uttered by a professional with some expertise in the subject matter. (See *Slaughter v. Friedman* (1982) 32 Cal.3d 149, 154 [185 Cal.Rptr. 244, 649 P.2d 886].) When a parent states that he feels someone or something is making his son sick, the general public would not reasonably expect the parent to be making an observation which could be proven true or false in a medical sense. Yet the objective "truth" of such a statement

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.App.4th 572                                                                                          Page 6
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
(Cite as: 44 Cal.App.4th 572)

is exactly what Campanelli would have a jury decide. Campanelli is not entitled to a jury trial on the issue of whether Kidd's father's "feeling" about the effect of Campanelli's behavior on his son was empirically sound or medically justified.

As a matter of law, no "reasonable fact finder could conclude that the published statements imply a provably false factual assertion." (*Moyer, supra,* 225 Cal.App.3d 720, 724-725.)

## II. Bockrath's Statement
### *Opinion or Fact*

(5a) The action against Bockrath is predicated on his statement to the Times that "The players were beaten down and in trouble psychologically ..." which, Campanelli asserts, amounts to a false charge that he inflicted psychological damage on his players.

As with the Boggan statement, context is a crucial factor. The article attached to the complaint is entitled "Campanelli's tirade last straw for Bockrath." In it, Bockrath describes how, on the evening of a loss to Arizona State, he entered a wrong door by accident and was shocked when he overheard Campanelli's lecture to his team. Bockrath, a former football player himself, told the Times " 'I can swear with the rest,' but he found himself appalled by what he called Campanelli's 'personal attacks' on the players." Bockrath then decided that something must be done. It is at this point Bockrath states that the players were "beaten down and in trouble psychologically." The article goes on to relate Campanelli's side of it as well: " 'What you say in a locker room should be between the coach and the players,' Campanelli said Friday. 'No one else's business. I may have used some curse words ... there's not a coach in the country who doesn't.' "

Campanelli admits that for purposes of the present action he was a public figure, and that the subject matter was highly publicized. In considering the **\*581** totality of the circumstances, the court must factor into the equation the extent to which the public is legitimately concerned with the issue discussed, that is to say, whether the matter is one of

public concern. (6) "[T]he public has an interest in receiving information on issues of public importance even if the trustworthiness of the information is not absolutely certain. The First Amendment is served not only by articles and columns that purport to be definitive but by those articles that, more modestly, raise questions and prompt investigation or debate." (*Ollman v. Evans* (D.C. Cir. 1984, en banc) 750 F.2d 970, 983 [242 App.D.C. 301], quoted in *Baker, supra,* 42 Cal.3d 254, 269.) Furthermore, an employer's evaluation of his employee's performance contains an inherent degree of subjectivity, and courts should be extremely cautious before allowing such comments to become the basis of a libel action. (*Jensen, supra,* 14 Cal.App.4th 958, 964-965.)

(5b) In light of the nature of the controversy and the overall tenor of the article, we cannot conclude the Bockrath statement was intended to be a factual assertion. Bockrath was not seriously maintaining that Cal's players had suffered "psychological damage" in any scientific, verifiable sense. Instead, the phrase "in trouble psychologically" was an emphatic way of expressing Bockrath's central theme that he thought the players felt "beaten down" as a result of Campanelli's harsh methods. The totality of the remarks and the background against which they were made dispel the notion that Bockrath's comment was imbued with the meaning which Campanelli would ascribe to it, i.e., that Cal's players had suffered measurable damage to their psyches, which could be causally attributed to Campanelli. Instead, Bockrath's statement was of the kind typically generated in a spirited dispute between two divergent viewpoints-in short, nonactionable opinion.

### *Truth as a Defense*
In his pleading, Campanelli admits that he was a "strict disciplinarian" who exhibited an "emotional outburst" in which he leveled "sharp criticism" at the players in a "fit of anger." The complaint itself alleges that, at the time of his termination, seven of Cal's players had threatened to leave the team if Campanelli stayed on. In the articles which Campanelli attaches to his complaint, Bockrath calls his outburst "profane and abusive," and Cal player

44 Cal.App.4th 572                                                                                                   Page 7
44 Cal.App.4th 572, 51 Cal.Rptr.2d 891, 108 Ed. Law Rep. 801, 96 Cal. Daily Op. Serv. 2636, 96 Daily Journal
D.A.R. 4305
**(Cite as: 44 Cal.App.4th 572)**

Hendricks is quoted as saying Campanelli's tirades included "so many personal blows" against which the players tried to "numb" themselves. Campanelli's complaint does not deny the truth of any of these statements. [FN2]

> FN2 Although he alleges that the Times interview was the inspiration for a Washington Post "op-ed" piece calling Campanelli "an abusive bully" who "cursed his players incessantly" and "treated his players shabbily," Campanelli neither denied these charges, nor did he name either the Post or the author of the article as defendants in this action.

(7) Truth, of course, is an absolute defense to any libel action. (*Gill v. Hughes, supra, 227 Cal.App.3d 1299, 1309*.) In order to establish the **\*582** defense, the defendant need not prove the literal truth of the allegedly libelous accusation, so long as the imputation is substantially true so as to justify the "gist or sting" of the remark. (*Emde v. San Joaquin County etc. Council* (1943) 23 Cal.2d 146, 160 [143 P.2d 20, 150 A.L.R. 916].)

(5c) Campanelli's own allegations, coupled with assertions of fact which he attached to his complaint and incorporated therein, show that he engaged in temper tantrums directed at his players which included verbally abusive and profane remarks of a personal nature, to the extent that seven members of the team wanted to transfer unless he was fired. Through these concessions, Campanelli has admitted the essential accuracy of Bockrath's statement that the players were "in trouble psychologically." For this additional reason, the demurrer to the cause of action against Bockrath was properly sustained without leave to amend.

Our conclusion that the trial court's ruling on the demurrer was correct renders it unnecessary to reach Campanelli's second contention that the San Francisco Superior Court erred in transferring the case to Alameda County. On these allegations, defendants would be entitled to judgment in any court of competent jurisdiction in this state.

Disposition

The judgment is affirmed.

Phelan, J., and Haerle, J., concurred. **\*583**

Cal.App.1.Dist.,1996.

Campanelli v. Regents of University of California

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 3

85 Cal.App.4th 468                                                                                    Page 1
85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
**(Cite as: 85 Cal.App.4th 468)**

▷

DENNIS E. DAMON, Plaintiff and Appellant,
v.
OCEAN HILLS JOURNALISM CLUB et al., De-
fendants and Respondents.
**No. D034890.**

Court of Appeal, Fourth District, Division 1, Cali-
fornia.

Dec 13, 2000.

**[Opinion certified for partial publication.  [FN1]
]**

FN1 Pursuant to California Rules of Court.
rule 976.1, this opinion is certified for pub-
lication with the exception of Discussion
section, parts II and III.

SUMMARY

A former manager of a homeowners association
brought a defamation action against several of the
association members, two members of the associ-
ation's board of directors, and a private homeown-
ers association club that published a newsletter. The
trial court granted defendants' motion to strike the
complaint under the anti-SLAPP (strategic lawsuit
against public participation) statute, which is direc-
ted against litigation filed without merit to dissuade
or punish the exercise of free speech rights ( Code
Civ. Proc., § 425.16). (Superior Court of San Diego
County, No. N079698, Michael M. Anello, Judge.)

The Court of Appeal affirmed, holding that the anti-
SLAPP statute applied, since the evidence showed
the alleged defamatory statements were made in a
place open to the public or in a public forum and
concerned an issue of public interest within the
meaning of Code Civ. Proc., § 425.16, subd. (e)(3).
The two locations where the alleged defamatory
statements were made, board meetings and the
newsletter, were open to the public and constituted
public forums. In addition, each of the alleged de-
famatory statements concerned the manner in which
the more than 3,000 homeowners would be gov-

erned, an inherently political question of vital im-
portance to each individual and to the community.
Moreover, the statements were made in connection
with board election and recall campaigns, thus
presenting the application of U.S. Const., 1st
Amend., safeguards. (Opinion by Haller, J., with
Kremer, P. J., and Huffman, J., concurring.)  **\*469**

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 93--Motion to Strike Pleading as a
Whole--Anti-SLAPP Statute--Procedure--Appellate
Review.
The Legislature enacted the anti-SLAPP (strategic
lawsuit against public participation) statute ( Code
Civ. Proc., § 425.16) to provide a procedure for a
court to dismiss at an early stage nonmeritorious lit-
igation meant to chill the valid exercise of the con-
stitutional rights of freedom of speech and petition
in connection with a public issue. When a plaintiff
brings a SLAPP suit, the defendant may immedi-
ately move to strike the complaint under § 425.16.
To prevail on this motion, the defendant must make
an initial prima facie showing that the plaintiff's
suit arises from an act in furtherance of the defend-
ant's right of petition or free speech. If this burden
is met, the plaintiff must establish a reasonable
probability that he or she will prevail on the merits.
The trial court's determinations on these questions
are reviewed de novo on appeal.

(2a, 2b, 2c, 2d) Pleading § 93--Motion to Strike
Pleading     as     a     Whole--Anti-SLAPP    Stat-
ute:Associations     and     Clubs     §
11--Actions--Defamation     Action     Against
Homeowners Association.
In a defamation action brought by the former man-
ager of a homeowners association against the asso-
ciation members, two members of the association's
board of directors, and a private homeowners asso-
ciation club that published a newsletter, the trial
court properly granted defendants' motion to strike
the complaint under the anti-SLAPP (strategic law-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

85 Cal.App.4th 468                                                                      Page 2

85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
**(Cite as: 85 Cal.App.4th 468)**

suit against public participation) statute, which is directed against litigation filed without merit to dissuade or punish the exercise of free speech rights (Code Civ. Proc., § 425.16). The evidence showed the alleged defamatory statements were made in a place open to the public or in a public forum and concerned an issue of public interest within the meaning of Code Civ. Proc., § 425.16, subd. (e)(3). The two locations where the alleged defamatory statements were made, board meetings and the newsletter, were open to the public and constituted public forums. Further, even if the newsletter did not offer a balanced view of the issues, given the mandate that courts broadly construe the anti-SLAPP statute (Code Civ. Proc., § 425.16, subd. (a)), a single publication does lose its character as a public forum merely because it does not offer a balanced point of view. In addition, each of the alleged defamatory statements concerned the manner in which the more than 3,000 homeowners would be governed, an inherently political question of vital importance to each individual and to the community. Moreover, the statements were made in connection with board election and recall *470 campaigns, thus presenting the application of U.S. Const., 1st Amend., safeguards.

[See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 963.]

(3) Words, Phrases, and Maxims--Public Forum.
A public forum is traditionally defined as a place that is open to the public where information is freely exchanged.

(4)   Associations   and   Clubs   §   10--Powers--Homeowners   Association--Quasi-governmental Character.
Owners of planned development units comprise a little democratic subsociety. In exchange for the benefits of common ownership, the residents elect an legislative-executive board and delegate powers to this board. This delegation concerns not only activities conducted in the common areas, but also extends to life within the confines of the home itself. A homeowners association board is in effect a quasi-government entity paralleling in almost every

case the powers, duties, and responsibilities of a municipal government.

(5) Pleading § 93--Motion to Strike Pleading as a Whole--Anti-SLAPP Statute--Definition of Public Interest.
The anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16), which is directed against litigation filed without merit to dissuade or punish the exercise of free speech rights is applicable to an issue of public interest (Code Civ. Proc., § 425.16, subd. (e)(3)). The definition of public interest has been broadly construed to include not only governmental matters, but also private conduct that affects a broad segment of society or that affects a community in a manner similar to that of a governmental entity. Matters of public interest include activities that involve private persons and entities, especially when a large, powerful organization may affect the lives of many individuals.

COUNSEL

Laturno & Graves, David W. Graves and G. Ehrich Lenz for Plaintiff and Appellant.

Bragg, Short, Serota & Kuluva, William P. Harris III, Lori D. Serota and Henry Nicholls for Defendants and Respondents Ron Terry and Barney Feldman.

Gray Cary Ware & Freidenrich, Guylyn R. Cummins, Marcelle E. Mihaila and Joann F. Peters for Defendants and Respondents Ocean Hills Journalism *471 Club, Estate of Jack Hess, Rosmarie Treher, Sherry Marsh, Art Rosenberg, Estate of James J. Nihan, and Joe Grant.

**HALLER, J.**

Dennis E. Damon, a former manager of a homeowners association, brought a defamation complaint against several of the association members, two board of directors members, and a private homeowners association club. [FN2] The trial court granted defendants' motion to strike the complaint under California's anti-SLAPP (strategic lawsuit

85 Cal.App.4th 468                                           Page 3
85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
(Cite as: 85 Cal.App.4th 468)

against public participation) statute. (Code Civ. Proc., § 425.16.) Damon appeals.

> FN2 The named defendant homeowners association members were Jack Hess, Rosemarie Treher, Sherry Marsh, Art Rosenberg, James J. Nihan, and Joe Grant. Nihan and Hess have since died, and their estates have been substituted. The defendant board members were Ron Terry and Barney Feldman. The private club is the Ocean Hills Journalism Club.

In the published portion of this decision, we hold the trial court properly determined the anti-SLAPP statute applied because the evidence showed the alleged defamatory statements were made "in a place open to the public or in a public forum" and concerned "an issue of public interest" within the meaning of Code of Civil Procedure section 425.16, subdivision (e)(3). In the unpublished portion of the opinion, we conclude Damon failed to satisfy his burden to show a probability he would prevail on his claims at trial, and failed to show the trial court erred in refusing to grant him relief from the statutory discovery stay.

Facts

Leisure Village at Ocean Hills is a planned development residential community for seniors, consisting of 1,633 homes, a golf course and many other recreational facilities. The residents are members of the Ocean Hills Country Club Homeowners Association (Association), which is governed by a seven-member elected board of directors (Board). The Board's duties include managing all aspects of the Association, including security, maintenance, and the selection and removal of officers and employees. The Association's annual budget generally exceeds $3 million.

In 1994 through 1996, a professional company managed the Association under the Board's direction. In February 1996, the Board terminated these services and chose to become self-managed. The Board hired Damon, a retired United States Marine Corps officer, as its general manager. Damon had

previously served as the Association's general manager under the *472 direction of various professional management companies. Thereafter, Damon managed the Association's day-to-day operations under the Board's direction and supervised the approximately 60 Association employees.

By late 1996, many homeowners were displeased with Damon's management style and wanted to return to professional management. The homeowners were concerned about Damon's handling of numerous aspects of the Association, including the security department, employee relations, maintenance activities, and contractor selection. These homeowners began to express their views in articles, editorials, and letters to the editor in the Village Voice newsletter, which was published by a private homeowners club (Journalism Club) and was circulated to Association members and local businesses. The homeowners criticized Damon's competency to manage the Association and urged residents to replace Damon with a professional management company. The Village Voice was one of two newsletters for Ocean Hills residents; the other newsletter was the Board's official publication.

In March 1997, several Journalism Club members met with the Association's security department employees (many of whom were also Ocean Hills residents), who complained about Damon's management policies. When Damon learned of the meeting, he reminded the employees they were required to follow grievance procedures outlined in the personnel manual, rather than directing their complaints to Association members.

The 1996/1997 Board supported Damon's continued service. But in August 1997, the Association held the annual Board member elections, and the residents elected several new directors who wanted to return to professional management, including respondents Terry and Feldman. Terry and Feldman thereafter made comments during Board meetings that were critical of Damon's performance as general manager, and questioned Damon's competency and veracity. Additionally, Terry, who was the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

85 Cal.App.4th 468                                                                                      Page 4

85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
(Cite as: 85 Cal.App.4th 468)

Board member responsible for overseeing the security department, authored memoranda discussing problems with Damon's management of that department and criticizing Damon's overall performance.

By the end of 1997, the senior citizen residents of Ocean Hills were largely split into two camps: those who favored Damon's continued service and those who wanted Damon terminated as general manager. One homeowner characterized the highly emotional atmosphere surrounding this dispute as a "war zone with verbal salvo[s] being lobbed back and forth," reflecting feelings of "hate and discontent" among the homeowners. Most residents were aware that the Village Voice publisher fell into the camp supporting Damon's termination. *473

About this same time, Damon wrote an article in the official Association newsletter discussing the advantages and disadvantages of self-management, and urging the residents to maintain their self-managed governance status. The article was contained in Damon's regular monthly column that appeared in this newsletter.

In early 1998, some homeowners who supported Damon initiated a recall election to remove Terry and Feldman. The recall effort was unsuccessful; a majority of the homeowners supported Terry and Feldman. Damon thereafter notified the Association he did not intend to renew his contract. The Board declined his offer to continue his employment on a monthly basis until a replacement could be found. The homeowners later voted to return to professional management.

Damon then filed a defamation complaint against (1) the six Association members who had authored letters or articles published in the Village Voice criticizing Damon's performance; (2) Board members Feldman and Terry; and (3) the Village Voice publisher (the Journalism Club).

Defendants successfully moved to strike Damon's complaint under the anti-SLAPP statute, Code of Civil Procedure section 425.16 (section 425.16). The trial court found (1) Damon's complaint was subject to the anti-SLAPP statute because it arose

from defendants' exercise of their free speech rights in connection with a public issue; and (2) Damon failed to show it was probable he would prevail on his claims because (a) he was a "limited-purpose" public figure who failed to demonstrate actual malice; and (b) the alleged defamatory statements were privileged and/or nonactionable opinions. Damon appeals.

Discussion

(1) In 1992, the Legislature enacted section 425.16 to provide a procedure for a court "to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. [Citation.]" (Sipple v. Foundation for Nat. Progress (1999) 71 Cal.App.4th 226, 235 [83 Cal.Rptr.2d 677].) This type of nonmeritorious litigation is referred to under the acronym SLAPP, or strategic lawsuit against public participation. (Ibid.) In 1997, the Legislature added a provision to section 425.16 mandating that courts "broadly" construe the anti-SLAPP statute to further the legislative goals of encouraging participation in matters of public significance and discouraging abuse of the judicial process. (§ 425.16, subd. (a).)

When a plaintiff brings a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16. To prevail on this *474 motion, the defendant must "make an initial prima facie showing that plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech." (Braun v. Chronicle Publishing Co. (1998) 52 Cal.App.4th 1036, 1042-1043 [61 Cal.Rptr.2d 581].) If this burden is met, the plaintiff must establish a reasonable probability he or she will prevail on the merits. (Wilcox v. Superior Court (1994) 27 Cal.App.4th 809, 824-825 [33 Cal.Rptr.2d 446].) In determining whether each party has met its burden, the trial court must "consider the pleadings, and supporting and opposing affidavits ...." (§ 425.16, subd. (b)(2).) These determinations are legal questions, and we review the record de novo. (Matson v. Dvorak (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880].)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

85 Cal.App.4th 468                                                                                                    Page 5
85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
(Cite as: 85 Cal.App.4th 468)

Under these standards, we examine the record to determine whether the court properly granted defendants' motion to strike under section 425.16.

### I. *Damon's Defamation Claims Come Within the Anti-SLAPP Statute*

Section 425.16, subdivision (b)(1) states that the statute applies when the cause of action arises from *"any act ... in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue ...."* (Italics added.) Section 425.16, subdivision (e) defines this italicized phrase as including four categories. The first two categories pertain to statements or writings made before, or in connection with, a "legislative, executive or judicial body, or any other official proceeding ...." (§ 425.16, subd. (e)(1), (2).) The third category involves statements or writings made "in a place open to the public or in a public forum." (§ 425.16, subd. (e)(3).) The fourth category includes "any other conduct in furtherance of" free speech or petition rights. (§ 425.16, subd. (e)(4).) The latter two categories require a specific showing the action concerns a matter of public interest; the first two categories do not require this showing. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117-1118 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

(2a) As explained below, we conclude the alleged defamatory statements identified in Damon's complaint fall within the third statutory category: "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest ...." [FN3] (§ 425.16, subd. (e)(3).) The two locations where the alleged defamatory statements were made-at the Board meetings and in the Village Voice newsletter-were open to the public and constituted "public forums." Additionally, because each of the allegedly defamatory statements concerned \*475 the manner in which a large residential community would be governed, they concerned "issue[s] of public interest." (§ 425.16, subd. (e)(3).)

FN3 This conclusion renders it unnecessary for us to consider the issue of whether the alleged defamatory statements come under section 425.16, subdivision (e)(1) or (2).

#### A. *Public Forum*

(3) A "public forum" is traditionally defined as a place that is open to the public where information is freely exchanged. (See *Clark v. Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].) (2b) The Board meetings fit into this definition. The Board meetings were televised and open to all interested parties, and the meetings served as a place where members could communicate their ideas. Further, the Board meetings served a function similar to that of a governmental body. (4) As our Supreme Court has recognized, owners of planned development units " 'comprise a little democratic subsociety ....' " (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 374 [33 Cal.Rptr.2d 63, 878 P.2d 1275]; see *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 651 [191 Cal.Rptr. 209].) In exchange for the benefits of common ownership, the residents elect an legislative/executive board and delegate powers to this board. This delegation concerns not only activities conducted in the common areas, but also extends to life within " 'the confines of the home itself.' " (*Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at p. 373.) A homeowners association board is in effect "a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government." (*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at p. 651.)

(2c) Because of a homeowners association board's broad powers and the number of individuals potentially affected by a board's actions, the Legislature has mandated that boards hold open meetings and allow the members to speak publicly at the meetings. (Civ. Code, §§ 1363.05, 1363, 1350-1376.) These provisions parallel California's open meeting laws regulating government officials, agencies and boards. (Ralph M. Brown Act, Gov. Code, § 54950 et seq.) Both statutory schemes mandate open governance meetings, with notice, agenda and minutes requirements, and strictly limit closed executive

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

85 Cal.App.4th 468                                                                                                          Page 6
85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
(Cite as: 85 Cal.App.4th 468)

sessions. (See, e.g., Civ. Code, § 1363.05, subd. (b).)

The Board here played a critical role in making and enforcing rules affecting the daily lives of Ocean Hills residents. Those rules were promulgated at Board meetings, which were televised, open to all Association members, and served as a place for open discussion among directors and members. Approximately 3,000 residents were affected by the policies adopted at Board meetings. On this record, the Board meetings were "public forums." (See Foothills Townhome Assn. v. Christiansen (1998) 65 Cal.App.4th 688, 695-696 [76 Cal.Rptr.2d 516].) *476

The Village Voice newsletter was also a "public forum" within the meaning of section 425.16, subdivision (e)(3). Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication. (See American Heritage Dict. (New College ed. 1981) p. 518.) The stated purpose of the Village Voice newsletter was to "communicate information of interest and/or concern to the residents." The newsletter was distributed to the approximately 3,000 Ocean Hills residents and neighboring businesses. Further, although most of the articles and letters were critical of Damon's management, the Village Voice publisher also solicited contrary opinions, printed at least two letters with different viewpoints, and included articles on many other Association-related topics (such as a series on proposed CC&R amendments).

Damon argues the Village Voice newsletter cannot be considered a "public forum" because it was essentially a mouthpiece for a small group of homeowners who generally would not permit contrary viewpoints to be published in the newsletter.

Even assuming the record supports this characterization, these facts do not take the publication outside of the anti-SLAPP statutory protection. First, numerous courts have broadly construed section 425.16, subdivision (e)(3)'s "public forum" requirement to include publications with a single view-

point. (See Macias v. Hartwell (1997) 55 Cal.App.4th 669, 674 [64 Cal.Rptr.2d 222] [union campaign flyer is a "recognized public forum under the SLAPP statute"]; see also Metabolife Internat., Inc. v. Wornick (S.D.Cal. 1999) 72 F.Supp.2d 1160, 1165 ["a widely disseminated television broadcast ... is undoubtedly a public forum"]; Sipple v. Foundation for Nat. Progress, supra, 71 Cal.App.4th at p. 238 [assuming that Mother Jones magazine is a public forum within the meaning of the anti-SLAPP statute]; Foothills Townhome Assn. v. Christiansen, supra, 65 Cal.App.4th at pp. 695-696; Tate, California's Anti-SLAPP Legislation: A Summary of and Commentary on its Operation and Scope (2000) 33 Loyola L.A. L.Rev. 801, 828-832; see also Averill v. Superior Court (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 621.)

We agree with this approach. The Village Voice was a public forum in the sense that it was a vehicle for communicating a message about public matters to a large and interested community. All interested parties had full opportunity to read the articles in the newsletter. Although the Village Voice newsletter may not have offered a "balanced" view, the Association's other newsletter-the Board's official newsletter-was the place where Association members with differing viewpoints could express their opposing views. It is in this marketplace of ideas that the Village Voice served a very public communicative purpose promoting open discussion-a purpose analogous to *477 a public forum. Given the mandate that we broadly construe the anti-SLAPP statute, a single publication does not lose its "public forum" character merely because it does not provide a balanced point of view.

This construction comports with the fundamental purpose underlying the anti-SLAPP statute, which seeks to protect against "lawsuits brought primarily to chill the valid exercise of constitutional rights" and "abuse of the judicial process ...." (§ 425.16, subd. (a).) This purpose would not be served if we were to construe the statute to make section 425.16, subdivision (e)(3) inapplicable to all newspapers, magazines, and other public media merely because the publication is arguably "one-sided." This is par-

85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
**(Cite as: 85 Cal.App.4th 468)**

ticularly true because section 425.16, subdivision (e)(3) requires not only that the statement be made in a public forum, but also that it concern an issue of public interest. Further, because section 425.16, subdivision (e)(4) includes *conduct* in furtherance of free speech rights, regardless whether that conduct occurs in a place where ideas are freely exchanged, it would be anomalous to interpret section 425.16, subdivision (e)(3) as imposing that requirement merely because the challenged speech is an oral or written statement.

We recognize that two courts have more narrowly construed section 425.16, subdivision (e)(3)'s "public forum" requirement, but we are not persuaded this is the correct approach. (See *Zhao v. Wong* (1996) 48 Cal.App.4th 1114 [55 Cal.Rptr.2d 909], overruled on other grounds in *Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at p. 1107 (*Zhao*); *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863, fn. 5 [44 Cal.Rptr.2d 46] (*Lafayette Morehouse*).)

In *Lafayette Morehouse*, the plaintiff sued the publisher of the San Francisco Chronicle newspaper, alleging the newspaper printed defamatory articles. (*Lafayette Morehouse, supra*, 37 Cal.App.4th at p. 863.) The court found the challenged statements fell within section 425.16, subdivision (e)(2) because they concerned a matter that was pending before a legislative body. (37 Cal.App.4th at pp. 862-863.) The court thus declined to reach the defendant publisher's alternate argument that the newspaper constituted a "public forum" under section 425.16, subdivision (e)(3). (37 Cal.App.4th at p. 863, fn. 5.) In dicta, however, the court stated it found the publisher's argument "dubious" because "[n]ewspaper editors or publishers customarily retain the final authority on what their newspapers will publish in letters to the editor, editorial pages, and even news articles, resulting at best in a controlled forum not an uninhibited 'public forum.' " (*Ibid.*)

In *Zhao*, the plaintiff sued an individual for defamation based on the defendant's statements made privately to a San Jose Mercury newspaper *478 reporter. Not surprisingly, the court concluded that such "private" statements did not occur in a "public forum" within the meaning of section 425.16, subdivision (e)(3). (*Zhao, supra*, 48 Cal.App.4th at p. 1131.) Although further discussion on this matter was arguably unnecessary, the court went on to conclude that the San Jose Mercury newspaper (which published the statements) was also not a public forum. (*Ibid.*) Relying on *Lafayette Morehouse*'s dicta and expressly applying a "narrow definition" of the statutory phrase, the *Zhao* court reasoned that a public forum " 'refers typically to those places historically associated with First Amendment activities, such as streets, sidewalks, and parks,' " and has been extended only to other public facilities open for certain limited purposes such as libraries and schools. (*Id.* at pp. 1126-1127.) The court further relied on *Lafayette Morehouse*'s statements that a private newspaper cannot as a matter of law constitute a public forum because the publisher has ultimate control over the newspaper's message. (*Id.* at pp. 1126, 1131.) Noting that the phrase "public forum" potentially triggers a more "elastic" definition, the *Zhao* court expressly declined to adopt this definition and instead adhered to the more "restricted" approach. (*Id.* at pp. 1125, 1127.)

Both *Zhou* and *Lafayette Morehouse* predate the 1997 amendment requiring a broad interpretation of section 425.16. In adopting that amendment, the Legislature expressly intended to overrule *Zhao*'s narrow view of the statute. (See *Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at p. 1120.) Moreover, as at least one commentator has noted, the *Zhao* and *Lafayette Morehouse* courts' conclusions appear to be at odds with the definition of a "public forum" under the plain meaning of the phrase and under the California Constitution. (See Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on its Operation and Scope, supra*, 33 Loyola L.A. L.Rev. at pp. 828-832.) Read in context of the entire statutory scheme, a "public forum" includes a communication vehicle that is widely distributed to the public and contains topics of public interest, re-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

85 Cal.App.4th 468                                                                                              Page 8
85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
(Cite as: 85 Cal.App.4th 468)

gardless whether the message is "uninhibited" or "controlled."

Because the Village Voice newsletter was a vehicle for open discussion of public issues and was widely distributed to all interested parties, it was a "public forum."

### B. *Public Issue*

In addition to the "public forum" requirement, defendants were also required to show the topics of the allegedly defamatory statements concerned "issue[s] of public interest." (§ 425.16, subd. (e)(3).) The record shows defendants satisfied this element. *479

(5) The definition of "public interest" within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. (See *Macias v. Hartwell, supra,* 55 Cal.App.4th at p. 674; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650-651 [49 Cal.Rptr.2d 620].) " '[M]atters of public interest ... include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals.' " (*Macias v. Hartwell, supra,* 55 Cal.App.4th at p. 674.) In *Macias*, the court found that campaign statements made during a union election constituted a "public" issue because the statements affected 10,000 union members and concerned a fundamental political matter-the qualifications of a candidate to run for office. (*Id.* at pp. 673-674.)

(2d) As detailed below, each of the alleged defamatory statements concerned (1) the decision whether to continue to be self-governed or to switch to a professional management company; and/or (2) Damon's competency to manage the Association. These statements pertained to issues of public interest within the Ocean Hills community. Indeed, they concerned the very manner in which this group of more than 3,000 individuals would be governed-an inherently political question of vital importance

to each individual and to the community as a whole. (See *Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 922 [45 Cal.Rptr.2d 11].) Moreover, the statements were made in connection with the Board elections and recall campaigns. "The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. 'Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment.' " (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 548; accord, *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1451 [83 Cal.Rptr.2d 443] [the defendant's "statements obviously fell within the purview of section 425.16 because they addressed a matter of public concern-a candidate's qualifications and conduct in office"].)

Although the allegedly defamatory statements were made in connection with the management of a private homeowners association, they concerned issues of critical importance to a large segment of our local population. "For many Californians, the homeowners association functions as a second municipal government ...." (*Chantiles v. Lake Forest II Master Homeowners Assn., supra,* 37 Cal.App.4th at p. 922.) Given the size of the Ocean Hills community, the nature of the challenged statements as involving fundamental choices regarding future management and leadership of the Association, *480 and our Legislature's mandate that homeowner association boards be treated similar to governmental entities, the alleged defamatory comments involved "public issues" within the meaning of the anti-SLAPP statute. (§ 425.16, subd. (e)(3).)

We reject Damon's alternate argument the case does not fall within section 425.16 because the "primary purpose" of his lawsuit was to "vindicate the damage done to his reputation" and not to "interfere with and burden the defendant's exercise of his free speech rights ...." We find nothing in the statute requiring the court to engage in an inquiry as to the plaintiff's subjective motivations before it may determine the anti-SLAPP statute is applicable. (See

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

85 Cal.App.4th 468                                                                    Page 9
85 Cal.App.4th 468, 102 Cal.Rptr.2d 205, 00 Cal. Daily Op. Serv. 9925, 2000 Daily Journal D.A.R. 13,185
**(Cite as: 85 Cal.App.4th 468)**

*Church of Scientology v. Wollersham, supra,* 42 Cal.App.4th at p. 648 [rejecting plaintiff's argument that "only a direct personal attack on the defendant would be subject to a motion to strike"].) The fact the Legislature expressed a concern in the statute's preamble with lawsuits brought "primarily" to chill First Amendment rights does not mean that a court may add this concept as a separate requirement in the operative sections of the statute. (See *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1118.)

Damon's reliance on *Foothills Townhome Assn. v. Christiansen, supra,* 65 Cal.App.4th 688 is misplaced. Damon directs us to the court's statement that "[w]hen considering a section 425.16 motion, a court must consider the actual objective of the suit and grant the motion if the true goal is to interfere with and burden the defendant's exercise of his free speech and petition rights." (*Id.* at p. 696.) This statement must be viewed in the specific factual context in which the case arose, involving a homeowners association's attempt to collect on an assessment from a homeowner. Because this form of action did not reflect an attempt to "chill" the homeowner's free speech, the *Foothills Townhome* court found the anti-SLAPP statute inapplicable. (*Ibid.*) Here, the defamation action certainly had the potential for punishing the defendants for exercising their First Amendment rights, thus serving to "chill" the exercise of their rights and to deter them from speaking freely on topics of public importance.

II. , III. [FN*]

FN* See footnote 1, *ante*, page 468.

. . . . . . . . . .*481
Disposition
Judgment affirmed.

Kremer, P. J., and Huffman, J., concurred. *482

Cal.App.4.Dist.,2000.

DENNIS E. DAMON, Plaintiff and Appellant, v. OCEAN HILLS JOURNALISM CLUB et al., De-

fendants and Respondents.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

Westlaw.

47 Cal.App.4th 777                                                                                                    Page 1
47 Cal.App.4th 777, 54 Cal.Rptr.2d 830, 96 Cal. Daily Op. Serv. 5363, 96 Daily Journal D.A.R. 8672
(Cite as: 47 Cal.App.4th 777)

▷

DOVE AUDIO, INC., Plaintiff and Appellant,
v.
ROSENFELD, MEYER & SUSMAN et al., Defendants and Respondents.
**No. B096308.**

Court of Appeal, Second District, Division 4, California.

Jul 18, 1996.

SUMMARY

After the death of an esteemed actress, her son asked a law firm to investigate the minimal royalty payments from the actress's work on a recording which had been paid to the actress's designated charity by a recording company. Accordingly, the law firm attempted to contact other celebrities that had participated in the recording as well as representatives of their designated charities. After the firm sent a letter to those celebrities it had reached confirming their support of the firm's investigation preparatory to filing a complaint with the Attorney General, the recording company filed an action against the law firm for defamation and interference with economic relationship. The trial court sustained the law firm's demurrer, granted the firm's special motion to strike the complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16), awarded the firm its attorney fees and costs, and entered judgment of dismissal. (Superior Court of Los Angeles County, No. BC127709, Jan A. Pluim, Judge.)

The Court of Appeal affirmed. The court held that the trial court properly held that the letter at issue was protected by the litigation privilege of Civ. Code, § 47, subd. (b). That privilege is not limited to or from governmental officials, but also applies to communications made during an attorney's investigatory interviews with private individuals preparatory to a hearing or official proceeding. The court also held that the trial court properly struck the company's complaint un-

der the anti-SLAPP suit statute, since a SLAPP suit is a meritless suit filed primarily to chill the defendant's exercise of U.S. Const., 1st Amend., rights, and the constitutional right to petition includes the basic act of filing litigation or otherwise seeking administrative action. Finally, the court held that the trial court did not abuse its discretion in awarding over $27,000 in attorney fees to the law *778 firm. (Opinion by Epstein, Acting P. J., with Hastings, J., and Aranda, J., [FN*] concurring.)

> FN* Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

HEADNOTES

Classified to California Digest of Official Reports

(1) Libel and Slander § 21--Privileged Communications--Absolute Privilege-- Official Proceedings--Letter in Anticipation of Attorney General Investigation.
In an action for defamation and interference with economic relationship brought by a recording company against a law firm, the trial court properly held that a letter that had been sent by the firm to celebrities that had performed on a recording for the company was protected by the litigation privilege of Civ. Code, § 47, subd. (b). The firm had sent the letter to confirm the celebrities' endorsement of the filing of a complaint to the Attorney General with regard to the recording company's alleged underpayment of royalties to their designated charities. Although § 47, subd. (b), provides an absolute privilege for a publication or broadcast made in any legislative, judicial, or other official proceeding authorized by law, the privilege is not limited to communications to or from governmental officials. It applies to communications preliminary to a proposed judicial proceeding, such as a demand letter from an attorney to a potential adversary It also applies to communications made during an attorney's investigatory interviews with private indi-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

47 Cal.App.4th 777                                                                                                    Page 2
47 Cal.App.4th 777, 54 Cal.Rptr.2d 830, 96 Cal. Daily Op. Serv. 5363, 96 Daily Journal D.A.R. 8672
(Cite as: 47 Cal.App.4th 777)

viduals preparatory to a hearing or official proceeding.

[See 5 **Witkin,** Summary of Cal. Law (9th ed. 1988) Torts, § 506.]

(2) Pleading § 93--Motion to Strike Pleading as Whole--Anti-SLAPP Suit-- Defamation Action Regarding Communications in Preparation for Official Proceeding.
In an action for defamation and interference with economic relationship brought by a recording company against a law firm, the trial court properly struck the company's complaint under the anti-SLAPP suit statute (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16). The law firm had sent a letter to certain celebrities that had performed on a recording for the company seeking to confirm their support for the filing of a complaint to the Attorney General with regard to the recording company's alleged *779 underpayment of royalties to the celebrities' designated charities. A SLAPP suit is a meritless suit filed primarily to chill the defendant's exercise of U.S. Const., 1st Amend., rights. The constitutional right to petition includes the basic act of filing litigation or otherwise seeking administrative action. Since communications preparatory to an official proceeding are within the protection of the litigation privilege of Civ. Code, § 47, subd. (b), the recording company could not have established a probability of prevailing at trial. The law firm's statements were equally entitled to the benefits of Code Civ. Proc., § 425.16.

(3) Costs § 20--Attorney Fees--Anti-SLAPP Suit.
A trial court did not abuse its discretion in awarding over $27,000 in attorney fees to a law firm that prevailed in its special motion to strike a recording company's defamation complaint as an anti-SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16). A court is authorized to make an award of reasonable attorney fees to a prevailing defendant that will adequately compensate the defendant for the expense of responding to a baseless lawsuit. In this case, while the award was generous, the trial court did not exceed the

bounds of reason, given that it included attorney fees and costs incurred in connection with the appeal, and § 425.16 does not preclude recovery of appellate fees and costs.

COUNSEL

Steven A. Soloway for Plaintiff and Appellant.

Irell & Manella, Steven A. Marenberg, Bruce A. Wessel, Rosenfeld, Meyer & Susman, Kirk M. Hallam and Norman H. Becker for Defendants and Respondents.

**EPSTEIN, Acting P. J.**

Dove Audio, Inc. appeals from the dismissal of its defamation action after a demurrer was sustained without leave to amend, and from the granting of a special motion to strike the action as a "SLAPP" (strategic lawsuit against public participation) suit. We affirm the orders of the trial court.

Factual and Procedural Summary
In 1992, Dove Audio, Inc., published a recording of "Carnival of the Animals" (the record), a compilation of lyrics by Ogden Nash read to the *780 music of Camille Saint-Saens. The lyrics were read by Audrey Hepburn and 13 other celebrities. Dove agreed to pay a 2 percent royalty for the participation of these celebrities, divided equally among the charities they designated.

Sometime after Ms. Hepburn's death, it came to the attention of her son, Sean Hepburn Ferrer, that Ms. Hepburn's designated charity, the American Society for the Prevention of Cruelty to Animals, had received only minimal royalty payments (less than $100) from Dove. Mr. Ferrer asked the law firm of Rosenfeld, Meyer & Susman (RM&S) to look into the situation and, after obtaining the support of other celebrities who participated in the recording, contact the proper governmental agency to request an investigation. RM&S attempted to contact the participating celebrities as well as representatives of the charities that had been designated to receive royalties from the record. RM&S sent a letter to those celebrities it had reached confirming their

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

47 Cal.App.4th 777                                                           Page 3
47 Cal.App.4th 777, 54 Cal.Rptr.2d 830, 96 Cal. Daily Op. Serv. 5363, 96 Daily Journal D.A.R. 8672
(Cite as: 47 Cal.App.4th 777)

support of RM&S's efforts. The April 12, 1995, letter to Arte Johnson, which is representative of the other letters, provided:

"It was a pleasure speaking to you several weeks ago. As we discussed, we represent the Audrey Hepburn family and estate. You donated your time to work with Ms. Audrey Hepburn and approximately twelve other celebrities on a record entitled 'Carnival of the Animals.' This record was supposed to generate royalties for charities that each celebrity designated as their personal charity. Unfortunately, little if any money went to the charities. As a result, we intend to file a complaint with the State Attorney General's office.

"To confirm that you are in fact willing to endorse our efforts in this regard (with no other obligations of any kind), please sign below and return it to the undersigned."

On May 12, 1995, Dove Audio filed an action against RM&S and others (collectively RM&S) seeking damages for libel and for interference with economic relationship. Dove alleged that the letter sent by RM&S was defamatory because it implied that Dove failed to pay royalties to the celebrities and kept the royalties for itself, which was false, resulting in damage to Dove's reputation and business. Dove also alleged that the letter disrupted Dove's economic relationship with other celebrities, who have refused to perform readings for Dove as a consequence of the defamatory information contained in the letter.

RM&S demurred on the ground that both causes of action are barred by the litigation privilege (Civ. Code, § 47, subd. (b)). RM&S also moved to *781 strike the complaint as a "SLAPP" suit (Code Civ. Proc., § 425.16). The court sustained the demurrer without leave to amend, granted the special motion to strike, and awarded RM&S its attorney fees and costs in the amount of $28,296. Dove appeals from the judgment of dismissal.

Discussion
I. Privilege
(1) Appellant claims the court erred in holding that

RM&S's letter was protected by the litigation privilege of Civil Code section 47, subdivision (b) because the communication was between private parties not acting in an official capacity.

Civil Code section 47, subdivision (b) provides an absolute privilege for a publication or broadcast made in any legislative, judicial, or other official proceeding authorized by law. (Albertson v. Raboff (1956) 46 Cal.2d 375, 379 [295 P.2d 405].) Contrary to appellant's assertion, the privilege is not limited to communications to or from governmental officials. It applies to communications preliminary to a proposed judicial proceeding, such as a demand letter from an attorney to a potential adversary (Lerette v. Dean Witter Organization, Inc. (1976) 60 Cal.App.3d 573, 577 [131 Cal.Rptr. 592].) It also applies to communications made during an attorney's investigatory interviews with private individuals preparatory to a hearing. (Ascherman v. Natanson (1972) 23 Cal.App.3d 861, 866 [100 Cal.Rptr. 656].)

In Rubin v. Green (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044], the Supreme Court held the privilege applicable to communications by a law firm to residents of a mobilehome park intended to induce the filing of a lawsuit against the park owners with regard to park conditions. The court reviewed cases establishing that "the 'principal purpose of section 47([b]) is to afford litigants ... the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.' " (Id. at p. 1194.) "In light of this extensive history, it is late in the day to contend that communications with 'some relation' to an anticipated lawsuit are not within the privilege." (Id. at p. 1194.)

Our case is much like Rubin. The communication at issue was a letter from a law firm to individuals confirming their endorsement of the filing of a complaint to the Attorney General with regard to appellant's alleged underpayment of royalties to their designated charities. As in Rubin, the *782 communication was between a law firm and persons with potential claims, seeking support for the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

47 Cal.App.4th 777, 54 Cal.Rptr.2d 830, 96 Cal. Daily Op. Serv. 5363, 96 Daily Journal D.A.R. 8672
**(Cite as: 47 Cal.App.4th 777)**

filing of a claim.

The applicability of the litigation privilege is also supported by *Cayley v. Nunn* (1987) 190 Cal.App.3d 300 [235 Cal.Rptr. 385]. In *Cayley*, while circulating a neighborhood petition seeking support for their appeal to the city council for a height variance, the defendants made allegedly defamatory statements about the Cayleys, who opposed the variance. Those statements, made by defendants to other private citizens while defendants were marshaling evidence and preparing for their presentation at the city council meeting, were held to be within the litigation privilege. (*Cayley v. Nunn, supra,* 190 Cal.App.3d at p. 304.)

Appellant argues the privilege is inapplicable because RM&S's letter was not made in any judicial or quasi-judicial proceeding, or in preparation for any such proceeding. According to appellant, since the Attorney General has no power to hold hearings, decide issues, or affect the personal or property rights of private persons, neither a petition to the Attorney General, nor an investigation by the Attorney General would constitute an "official proceeding" within the meaning of Civil Code section 47, subdivision (b).

Appellant claims *Slaughter v. Freidman* (1982) 32 Cal.3d 149 [185 Cal.Rptr. 244, 649 P.2d 886] is directly on point. We disagree. The allegedly defamatory communications in *Slaughter* were letters from a private insurance claim administration company to certain of plaintiff's patients denying their claims. In these letters, the company described some of plaintiff's dental work as unnecessary, stated that it would no longer process dental treatment claims from plaintiff because of overcharging, announced that it would report plaintiff to the California Dental Association for disciplinary proceedings, and advised the patients to make no further payments to plaintiff pending resolution of the dispute. The Supreme Court held that these communications were not privileged under Civil Code section 47, subdivision (b) because they could not be deemed part of any legislative, judicial, or official proceeding, or any proceeding authorized by law

and reviewable by writ of mandate. (32 Cal.3d at p. 156.) Unlike the communication in the case before us, the letters in *Slaughter* were not made as part of the preparation for an official proceeding. (See *Rubin v. Green, supra,* 4 Cal.4th at pp. 1194- 1195.)

Appellant correctly recognizes that a communication *to* the Attorney General would be privileged. (See Bus. & Prof. Code, § 17535 [Attorney General may prosecute action for false advertising upon complaint of any **\*783** person]; Gov. Code, § 12598 [Attorney General has broad power to protect assets of charitable trusts]; Corp. Code, §§ 5142, 7142, 7240 [same]; Corp. Code, § 9230, subd. (d) [where property solicited on representation that it will be used for charitable purposes, Attorney General may investigate or institute action to correct any improper diversion of funds.].) The communication at issue in this case was in preparation for the sending of a complaint to the Attorney General. As we have explained, communications preliminary to the institution of an official proceeding come within the privilege of Civil Code section 47, subdivision (b). (See *Rubin v. Green, supra,* 4 Cal.4th 1187, 1194-1195.) The trial court correctly held that RM&S's letter is a privileged communication, and properly sustained the demurrer without leave to amend on that ground.

### II. "SLAPP" Suit

(2) Appellant also asserts it was error for the court to strike its complaint under the anti-SLAPP suit statute (Code Civ. Proc., § 425.16; all statutory references are to this code unless otherwise noted). In general terms, a SLAPP suit is "a meritless suit filed primarily to chill the defendant's exercise of First Amendment rights." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815, fn. 2 [33 Cal.Rptr.2d 446].) Under section 425.16, subdivision (b), "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

47 Cal.App.4th 777                                                                              Page 5
47 Cal.App.4th 777, 54 Cal.Rptr.2d 830, 96 Cal. Daily Op. Serv. 5363, 96 Daily Journal D.A.R. 8672
(Cite as: 47 Cal.App.4th 777)

Section 425.16, subdivision (e) provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest."

Appellant claims its action did not fall within the statutory definition of a SLAPP suit because neither of its causes of action had anything to do with a *784 statement made before a legislative, executive, or judicial proceeding, or any other proceeding authorized by law, or with a statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, or with a statement made in a place open to the public or in a public forum.

RM&S's communication raised a question of public interest: whether money designated for charities was being received by those charities. The communication was made in connection with an official proceeding authorized by law, a proposed complaint to the Attorney General seeking an investigation. "The constitutional right to petition ... includes the basic act of filing litigation or otherwise seeking administrative action." (Ludwig v. Superior Court (1995) 37 Cal.App.4th 8, 19 [43 Cal.Rptr.2d 350].) Just as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) (see Rubin v. Green, supra, 4 Cal.4th at pp. 1194-1195), we hold that such statements are equally entitled to the benefits of section 425.16. (See Ludwig v. Superior Court, supra, 37 Cal.App.4th at p. 19, comparing the two statutes.)

The fact that the communication was made to other private citizens rather than to the official agency does not exclude it from the shelter of the anti-SLAPP suit statute. In Wilcox v. Superior Court, supra, 27 Cal.App.4th at pages 821-822, the court held statements made exhorting shorthand reporters to contribute to the cost of pursuing litigation to challenge the practice of "direct contracting" was rationally connected to the litigation, and hence a proper basis for the protection of section 425.16. In Ludwig v. Superior Court, supra, 37 Cal.App.4th 8, the court held that a defendant's recruiting and encouraging others to speak out on a matter of public interest came within the protection of section 425.16. (See also Averill v. Superior Court (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] [private conversations regarding a public issue are protected under the SLAPP statute].) RM&S's letter seeking support for its petition to the Attorney General for an investigation of appellant's royalty payments to designated charities is similarly entitled to the protection of section 425.16 for its act in furtherance of its constitutional right of petition.

Once the party moving to strike the complaint makes that threshold showing, the burden shifts to the responding plaintiff to establish a probability of prevailing at trial. Appellant did not, and cannot do so in this case. As we have explained, RM&S's communications were absolutely privileged under Civil Code section 47, subdivision (b). That privilege is applicable to *785 both causes of action alleged by appellant, defamation and interference with economic relationship. (See Silberg v. Anderson (1990) 50 Cal.3d 205, 215 [266 Cal.Rptr. 638, 786 P.2d 365].) The trial court did not err in granting RM&S's special motion to strike under section 425.16.

(3) Appellant's final argument is that the court abused its discretion in awarding over $27,000 in attorney fees for the special motion to strike. Under subdivision (c) of section 425.16, "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." This section authorizes the court to make an award of reasonable attorney fees to a prevailing

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

47 Cal.App.4th 777                                                                                                                   Page 6
47 Cal.App.4th 777, 54 Cal.Rptr.2d 830, 96 Cal. Daily Op. Serv. 5363, 96 Daily Journal D.A.R. 8672
(Cite as: 47 Cal.App.4th 777)

defendant, which will adequately compensate the defendant for the expense of responding to a baseless lawsuit. (_Robertson v. Rodriguez_ (1995) 36 Cal.App.4th 347, 362 [42 Cal.Rptr.2d 464].) While the award in this case is generous, "[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (_Shamblin v. Brattain_ (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339].) Applying this standard, we find no abuse of discretion.

RM&S makes a claim for its attorney fees and costs incurred in connection with this appeal. "A statute authorizing an attorney fee award at the trial court level includes appellate attorney fees unless the statute specifically provides otherwise." (_Evans v. Unkow_ (1995) 38 Cal.App.4th 1490, 1499 [45 Cal.Rptr.2d 624].) Since section 425.16, subdivision (c) provides for an award of attorney fees and costs to a prevailing defendant on a special motion to strike, and does not preclude recovery of appellate attorney fees by a prevailing defendant-respondent, those fees are recoverable. (38 Cal.App.4th at p. 1500.)

Disposition

The judgment of dismissal is affirmed. RM&S shall recover its costs and attorney fees on appeal, the amount of which shall be determined by the trial court.

Hastings, J., and Aranda, J., [FN*] concurred.

> FN* Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Appellant's petition for review by the Supreme Court was denied October 16, 1996.

Cal.App.2.Dist.,1996.

Dove Audio, Inc. v. Rosenfeld, Meyer & Susman

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.