**EXHIBIT 5**

Westlaw.

63 Cal.Rptr.3d 798                                                                                                Page 1
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)

**H**

Court of Appeal, Second District, Division 3, California.
Blanche HALL, Plaintiff and Respondent,
v.
TIME WARNER, INC., et al., Defendants and Appellants.
**No. B192371.**

Aug. 2, 2007.

**Background:** Housekeeper of famous movie actor, who had been named in actor's will as beneficiary of his living trust, sued producer of television show that had broadcast interview of housekeeper in her room at retirement home, for trespass, intrusion upon seclusion, public disclosure of private facts, intentional infliction of emotional distress, and elder abuse. The Superior Court, Los Angeles County, No. BC343204, Robert L. Hess, J., denied producers' special motion to strike complaint under anti-SLAPP (strategic lawsuit against public participation) statute. Producers appealed. The Court of Appeal reversed, but granted rehearing.

**Holdings:** On rehearing, the Court of Appeal, Croskey, Acting P.J., held that:

(1) complaint arose from act in furtherance of free speech within meaning of anti-SLAPP statute;

(2) remand was required for trial court to determine whether housekeeper demonstrated probability of prevailing on merits; and

(3) trial court was not required to deny SLAPP motion based on scheduling of hearing.
Reversed and remanded with directions.

West Headnotes

**[1] Appeal and Error** 🔗842(7)
30k842(7) Most Cited Cases
On appeal from a ruling on a motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the reviewing court independently determines whether the challenged cause of action arises from the defendant's exercise of the constitutional right of petition or free speech and whether the plaintiff has demonstrated a probability of prevailing on the merits of the claim. West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading** 🔗358
302k358 Most Cited Cases

**[2] Pleading** 🔗360
302k360 Most Cited Cases
To demonstrate a probability of prevailing on the merits so as to defeat a defendant's motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the plaintiff must show that the complaint is legally sufficient and must present a prima facie showing of facts that, if believed by the trier of fact, would support a judgment in the plaintiff's favor. West's Ann.Cal.C.C.P. § 425.16.

**[3] Pleading** 🔗360
302k360 Most Cited Cases
To demonstrate a probability of prevailing on the merits so as to defeat a defendant's motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the plaintiff's showing of facts must consist of evidence that would be admissible at trial. West's Ann.Cal.C.C.P. § 425.16.

**[4] Pleading** 🔗360
302k360 Most Cited Cases
In determining whether the plaintiff has demonstrated a probability of prevailing on the merits so as to defeat a defendant's motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the court cannot weigh the evidence, but must determine whether the evidence is sufficient to support a judgment in the plaintiff's favor as a matter of law, as on a motion for summary judgment. West's Ann.Cal.C.C.P. § 425.16.

**[5] Pleading** 🔗360
302k360 Most Cited Cases
If the plaintiff presents a sufficient prima facie showing of facts to demonstrate a probability of prevailing on the merits, so as to defeat a defendant's motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                      Page 2
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)

moving defendant can defeat the plaintiff's evidentiary showing only if the defendant's evidence establishes as a matter of law that the plaintiff cannot prevail. West's Ann.Cal.C.C.P. § 425.16.

**[6] Pleading** ☞358
302k358 Most Cited Cases

**[6] Torts** ☞437
379k437 Most Cited Cases
A cause of action "arises from protected activity" within the meaning of the anti-SLAPP (strategic lawsuit against public participation) statute only if the defendant's act underlying the cause of action, and on which the cause of action is based, was an act in furtherance of the defendant's right of petition or free speech in connection with a public issue. U.S.C.A. Const.Amend. 1; West's Ann.Cal.C.C.P. § 425.16.

**[7] Pleading** ☞358
302k358 Most Cited Cases
Television show producers' acts of entering private retirement home room of famous movie actor's housekeeper named as beneficiary in actor's will, interviewing her on camera, and broadcasting interview on national television were "in furtherance of the right of petition or free speech in connection with a public issue" for producers' motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute made in response to housekeeper's action for trespass, intrusion upon seclusion, public disclosure of private facts, intentional infliction of emotional distress, and elder abuse, in light of public's fascination with actor and widespread public interest in his personal life. U.S.C.A. Const.Amend. 1; West's Ann.Cal.C.C.P. § 425.16(e).
*See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962 et seq.; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2007) ¶ 7:233 et seq. (CACIVP Ch. 7-C); Cal. Jur. 3d, Pleading, § 299 et seq.; Cal. Civil Practice (Thomson/West 2003) Civil Rights Litigation, § 14:9.*

**[8] Pleading** ☞358

302k358 Most Cited Cases

**[8] Torts** ☞437
379k437 Most Cited Cases
A statement or other conduct is "in connection with an issue of public interest" or "in connection with a public issue or an issue of public interest," within the meaning of the anti-SLAPP (strategic lawsuit against public participation) statute, if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic. West's Ann.Cal.C.C.P. § 425.16(e)(3, 4).

**[9] Appeal and Error** ☞1177(6)
30k1177(6) Most Cited Cases
After Court of Appeal reversed trial court's finding that television show producers' acts of entering private retirement home room of famous movie actor's housekeeper named as beneficiary in actor's will, interviewing her on camera, and broadcasting interview on national television were in not furtherance of right of petition or free speech in connection with public issue for producers' motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, remand was required for trial court to rule on evidentiary objections and determine whether housekeeper demonstrated a probability of prevailing on the merits of her complaint alleging trespass and other torts. U.S.C.A. Const.Amend. 1; West's Ann.Cal.C.C.P. § 425.16.

**[10] Appeal and Error** ☞842(7)
30k842(7) Most Cited Cases

**[10] Appeal and Error** ☞970(2)
30k970(2) Most Cited Cases
On review of trial court's ruling on motion to strike under anti-SLAPP (strategic lawsuit against public participation) statute, the Court of Appeal independently determines whether cause of action arises from defendant's exercise of right of petition or free speech and whether plaintiff has demonstrated probability of prevailing on the merits, but the Court of Appeal reviews ruling on evidentiary objection in connection with special motion to strike for abuse of discretion. West's Ann.Cal.C.C.P. §

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

425.16.

**[11] Pleading ⊂⇒360**
302k360 Most Cited Cases
In light of amendment to anti-SLAPP (strategic lawsuit against public participation) statute, providing that hearing on motion shall be scheduled by court clerk, trial court is no longer required to deny SLAPP motion based on movant's failure to ensure scheduling of timely hearing. West's Ann.Cal.C.C.P. § 425.16(f).

**801** White O'Connor Curry, Michael J. O'Connor, David E. Fink and Amanda M. Leith, Los Angeles, for Defendants and Appellants.

Law Offices of Bruce Altschuld and Bruce Altschuld, Beverly Hills, for Plaintiff and Respondent.

CROSKEY, Acting P.J.

**1341** Blanche Hall was Marlon Brando's housekeeper many years ago. Brando's will was filed in probate after his death in July 2004. The will revealed that Brando had named Hall as a beneficiary in his living trust. A reporter for the producers of *Celebrity Justice*, a nationally broadcast television program, visited Hall in her room in a retirement home, interviewed her, and portions of the interview were televised. She sued the producers for trespass, intrusion upon seclusion, public disclosure of private facts, intentional infliction of emotional distress, and elder abuse. The trial court denied the defendants' special motion to strike the complaint (Code Civ. Proc., § 425.16) [FN1] because it concluded that the complaint did not arise from an act in furtherance of the defendants' right of petition or free speech *in connection with a public issue.*

> FN1. Unless otherwise stated, all further statutory references are to the Code of Civil Procedure.

We conclude otherwise. The terms of Brando's will and living trust *were* an issue of widespread public interest, and the complaint arises from conduct by the defendants in furtherance of their right of free speech in connection with that public issue. The tri-

al court's conclusion to the contrary was error. Because the court did not reach or decide the question whether Hall had established a probability of prevailing on the counts alleged in her complaint or rule on objections to evidence presented by the parties with respect to that question, we will reverse the order and remand the matter with directions to decide those matters in the first instance. Finally, we reject Hall's argument that the defendants' failure to schedule the motion for a hearing within 30 days after the motion was served mandated the denial of the motion.

### FACTUAL AND PROCEDURAL BACK-GROUND
*1. Factual Background*

Brando was a well-known actor, first on stage and later in motion pictures. He won Academy Awards for his performances in *On the Waterfront* (Columbia Pictures 1954) and *The Godfather* (Paramount Pictures 1972) and appeared in numerous other films. He was often in the public eye for his exploits on and off the screen and his at times tumultuous private life. Brando died on July 1, 2004, at the age of 80. His obituary appeared on the first page of major newspapers, including the New York Times, Los Angeles Times, and International Herald Tribune.

**1342** A petition for probate of Brando's will was filed in the Los Angeles Superior Court on July 9, 2004, together with a copy of the will. The will identified 10 living children, including an adopted daughter, and one deceased daughter. The will stated that Brando intentionally did not provide for either his adopted daughter or the issue of his predeceased daughter in his will or living trust, and disinherited those heirs. The pour-over provisions of the will **802** stated that his living trust provided for monthly payments to Hall and another individual who also was not a Brando family member. The petition for probate stated that Brando's relationship with Hall and the other individual was as friends and listed Hall's address at a retirement home in Los Angeles. Various newspapers and other publications published the details of the will in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                                                Page 4
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)

the days that followed and specifically identified Hall as a beneficiary.

Time Warner, Inc., TTT West Coast, Inc., Time Telepictures Television, and Harvey Levin Productions, Inc. (the defendants), produced the nationally broadcast television program *Celebrity Justice,* which reported on legal proceedings involving well-known individuals. They obtained a copy of Brando's will from the court file and assigned a reporter, Joe Tobin, to interview Hall. Tobin visited the retirement home on July 12, 2004. He approached the reception desk in the lobby and asked to see Hall. The receptionist directed him to a building across the street, which was part of the retirement home. Tobin entered the second building, approached a worker, and asked to see Hall. She asked Tobin who he was. The parties dispute his response. The worker then led Tobin to Hall's room.

Hall was Brando's housekeeper from approximately 1963 until some unspecified date. She was 82 years old at the time of the interview and had been suffering from dementia and Alzheimer's disease for several years. Her sister had informed her of Brando's death on several occasions before the interview. Hall was dressed and sitting on the bed with the television on when Tobin entered her room. She stated, "I don't know you." Tobin stated that he was a reporter and was doing a story on Brando. When he mentioned Brando's death, Hall responded with surprise. Tobin stated that Hall was named as a beneficiary in Brando's will, and Hall responded that she was not aware of that. Tobin maintains that Hall consented to an on-camera interview. [FN2] Tobin asked her some questions and recorded the interview using a video recorder. Part of the interview was broadcast on *Celebrity Justice* that evening in a segment lasting approximately three minutes.

> FN2. The defendants objected to Tobin's declaration on this and other points.

*1343 Hall filed a complaint against the corporate owner of the retirement home in July 2005, alleging that it failed to provide adequate security for its res-

idents, failed to protect her from an unwanted intrusion by the defendants, and provided deficient care and supervision. She alleged that the defendants' reporters "exploited the non-existent security features of the ... facility and thereby gained easy access to Ms. Hall," and that the reporters "purposefully and viciously awakened, intimidated, and illegally obtained audio-tape and videotape of [Hall]." She alleged counts for breach of contract, fraud, negligence, intentional and negligent infliction of emotional distress, unfair business practices, and elder abuse under both the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act) (Welf. & Inst.Code, § 15600 et seq.) and Penal Code section 368, subdivision (c). The complaint apparently was dismissed with prejudice in January 2006.

Hall also filed a complaint against Time Warner, Inc., in the United States District Court for the Central District of California in July 2005. She alleged counts for trespass, intrusion upon seclusion, public disclosure of private facts, intentional infliction of emotional distress, and elder abuse under the Elder Abuse Act. She later dismissed that complaint and then commenced the present action in the trial court below.

**\*\*803** 2. *Trial Court Proceedings*

Hall filed her complaint in the present action in November 2005, alleging counts for trespass, intrusion upon seclusion, public disclosure of private facts, intentional infliction of emotional distress, and elder abuse under the Elder Abuse Act. She alleges that the retirement home "maintains the contractually required rigorous supervisory safety procedures and security measures to keep its patients safe and to protect the patients from outsiders." She also alleges that the retirement home maintained a closed-circuit television monitoring system and required guests to sign in before visiting residents. Hall alleges that the defendants' reporters intentionally circumvented the security measures and sign-in procedure and informed the staff who confronted them in the hallway that they were her family relatives. She alleges that the reporters "took their cam-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                        Page 5
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
**(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)**

eras clandestinely beyond the staff that they had just defrauded," "burst into Blanche Hall's room," "aroused Mrs. Hall[,] told her the news of Marlon Brando's death[, and] then recorded her virtually incoherent response." Hall alleges that the reporters "ambushed and awakened" her, "harassed, provoked, and intimidated" her, and "bombarded with questions about her financial interest as a named beneficiary in the Brando Will."

*1344 The defendants filed a special motion to strike the complaint under the anti-SLAPP statute (§ 425.16) in April 2006. They argued that their news gathering and reporting were acts in furtherance of their constitutional right of free speech and that Hall could not demonstrate a probability of prevailing on her counts against them. They filed declarations by Tobin and Levin describing the events surrounding the interview and submitted additional evidence of Brando's fame and notoriety and publicity concerning his will.

Hall argued in opposition that the defendants' conduct was tortious, that the interview was not newsworthy, and that Hall had no capacity to consent to the interview. She did not cite or discuss the requirement that a cause of action subject to the anti-SLAPP statute must arise from an act in furtherance of the defendant's right of petition or free speech in connection with a public issue (§ 425.16, subd. (b)(1)). She filed declarations by her sister, a worker at the retirement home, and a physician. She also filed objections to the declarations by Tobin and Levin. The defendants filed objections to Hall's declarations.

The trial court concluded that the defendants had failed to satisfy their predicate burden to show that Hall's complaint arose from an act in furtherance of their right of petition or free speech "*in connection with a public issue* " (§ 425.16, subd. (b)(1), italics added). The court stated in its order, filed on June 8, 2006, that although Brando was a public figure, Hall was neither a public figure nor a limited purpose public figure and did not become a public figure by virtue of her association with Brando's will. The court stated that the media reports submitted by

the defendants mentioning Hall in connection with the will did not disclose "any real degree of public interest in Ms. Hall or her relationship to Mr. Brando. [Fn. omitted.]" The court therefore denied the special motion to strike, without reaching or ruling on the evidentiary objections or deciding whether Hall had demonstrated a probability of prevailing on her complaint. The defendants timely appealed the order.

### CONTENTIONS

The defendants contend (1) Brando's decisions regarding the disposition of his assets after his death were issues of public interest within the meaning of the anti-**804 SLAPP statute; (2) Hall consented to the interview in her room, so the defendants cannot be liable for either trespass or intrusion upon seclusion; *1345 (3) the defendants cannot be liable for intrusion upon seclusion because their manner of entry into the room was not highly offensive to a reasonable person; (4) the defendants cannot be liable for public disclosure of private facts because they disclosed no private facts, the information disclosed was neither offensive nor objectionable, and the information was newsworthy; (5) the defendants cannot be liable for intentional infliction of emotional distress because their conduct was not extreme and outrageous, and there is no evidence that they intended to cause injury; and (6) the defendants cannot be liable under the Elder Abuse Act because they had no duty of care toward Hall, and their conduct was not "abuse of an elder" within the meaning of the act.

Hall disputes each of those contentions and argues that the trial court was required to deny the special motion to strike because the motion was not scheduled for a hearing within 30 days after the date the motion was served.

### DISCUSSION

*1. The Anti-SLAPP Statute*

The anti-SLAPP statute states that a cause of action shall be subject to a special motion to strike if (1) the cause of action arises from an act in furtherance of the defendant's constitutional right of petition or

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                                                          Page 6
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
**(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)**

free speech in connection with a public issue, and (2) the plaintiff is unable to establish a probability of prevailing on the merits of the claim. (§ 425.16, subd. (b)(1).) The purpose of the statute is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. (§ 425.16, subd. (a).) The Legislature has declared that the statute must be "construed broadly" to that end. (*Ibid.*)

[1] A defendant moving to strike a cause of action under the anti-SLAPP statute must show that the cause of action "aris[es] from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue" (§ 425.16, subd. (b)(1)). (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67, 124 Cal.Rptr.2d 507, 52 P.3d 685.) If the defendant makes that showing, the plaintiff must establish a probability of prevailing on the merits of the claim in order to avoid dismissal. (§ 425.16, subd. (b)(1); *Equilon, supra,* at p. 63, 124 Cal.Rptr.2d 507, 52 P.3d 685.) On appeal, we independently determine whether the challenged cause of action arises from the defendant's exercise of the *1346 constitutional right of petition or free speech and whether the plaintiff has demonstrated a probability of prevailing on the merits of the claim. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055, 39 Cal.Rptr.3d 516, 128 P.3d 713; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999, 113 Cal.Rptr.2d 625.)

[2][3][4][5] To demonstrate a probability of prevailing on the merits, the plaintiff must show that the complaint is legally sufficient and must present a prima facie showing of facts that, if believed by the trier of fact, would support a judgment in the plaintiff's favor. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713-714, 54 Cal.Rptr.3d 775, 151 P.3d 1185; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733.) The plaintiff's showing of facts must consist of evidence that would be admissible at trial. **805(*HMS Capital, Inc. v. Lawyers Title Co.*

(2004) 118 Cal.App.4th 204, 212, 12 Cal.Rptr.3d 786.) The court cannot weigh the evidence, but must determine whether the evidence is sufficient to support a judgment in the plaintiff's favor as a matter of law, as on a motion for summary judgment. (*Wilson, supra,* at p. 821, 123 Cal.Rptr.2d 19, 50 P.3d 733; *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907, 84 Cal.Rptr.2d 303; see *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192, 25 Cal.Rptr.3d 298, 106 P.3d 958.) If the plaintiff presents a sufficient prima facie showing of facts, the moving defendant can defeat the plaintiff's evidentiary showing only if the defendant's evidence establishes as a matter of law that the plaintiff cannot prevail. (*Wilson, supra,* at p. 821, 123 Cal.Rptr.2d 19, 50 P.3d 733.)

### 2. *The Complaint Arises From an Act in Furtherance of the Defendants' Right of Free Speech*

[6][7] A cause of action "aris[es] from" protected activity within the meaning of section 425.16, subdivision (b)(1) only if the defendant's act underlying the cause of action, and on which the cause of action is based, was an act in furtherance of the defendant's right of petition or free speech in connection with a public issue. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78, 124 Cal.Rptr.2d 519, 52 P.3d 695; *ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at p. 1001, 113 Cal.Rptr.2d 625.) The defendants' acts on which the counts alleged in the complaint are based were the acts of entering Hall's private room, interviewing her on camera, and broadcasting the interview on national television. Those acts arose from protected activity for purposes of the anti-SLAPP statute only if the acts were in furtherance of the defendants' right of petition or free speech in connection with a public issue.

*1347 Section 425.16, subdivision (e) describes four categories of conduct that constitute an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " within the meaning of subdivision (b)(1): " (1) any written or oral statement or writing made before a legislat-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                                                                            Page 7
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
**(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)**

ive, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.,* subd. (e).)

[8] A statement or other conduct is "in connection with an issue of public interest" (§ 425.16, subd. (e), clause (3)) or "in connection with a public issue or an issue of public interest" (*id.,* clause (4)) if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic. *(Wilbanks v. Wolk (2004) 121 Cal.App.4th 883, 898, 17 Cal.Rptr.3d 497.)* The public's fascination with Brando and widespread public interest in his personal life made Brando's decisions concerning the distribution of his assets a public issue or an issue of public interest. Although Hall was a private person and may not have voluntarily sought publicity or to comment publicly on Brando's will, she nevertheless became involved in an issue of public interest by virtue of being named in Brando's will. The defendants' television **806 broadcast contributed to the public discussion of the issue by identifying Hall as a beneficiary and showing her on camera. We conclude that the acts from which the complaint arises, specified *ante,* constituted conduct in furtherance of the defendants' right of free speech "in connection with a public issue or an issue of public interest" (§ 425.16, subd.(e), clause (4)).

[9][10] The trial court concluded that the complaint did not arise from an act in furtherance of the defendants' right of petition or free speech and therefore did not decide whether Hall had demonstrated a probability of prevailing on the merits of her complaint or rule on the parties' evidentiary objec-

tions. Rulings on the evidentiary objections are necessary before the trial court or this court *1348 can determine whether Hall has presented admissible evidence that demonstrates a probability of prevailing on the merits of her claims. Rulings on evidentiary objections involve an exercise of discretion, and it is the trial court's responsibility to rule on the objections in the first instance. [FN3] (Cf. *Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1217-1218, 35 Cal.Rptr.3d 411 [summary judgment motion]; *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 235-236, 114 Cal.Rptr.2d 151 [same]; but see *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 656, 24 Cal.Rptr.3d 619 [stated that because the ruling on a special motion to strike is reviewed de novo, the reviewing court should rule on evidentiary objections in the first instance in order to avoid further delay].) Although the trial court's failure to rule on the objections is understandable in light of its conclusion, the trial court on remand must rule on the evidentiary objections and then decide whether Hall has demonstrated a probability of prevailing on the merits of her claims. (Cf. *Parkview Villas Assn., supra,* at pp. 1217-1218, 35 Cal.Rptr.3d 411.)

> FN3. Just as we independently determine whether there is a triable issue of material fact in reviewing the ruling on a summary judgment motion, but review a ruling on an evidentiary objection in connection with a summary judgment motion for abuse of discretion *(Mitchell v. United National Ins. Co.* (2005) 127 Cal.App.4th 457, 467, 25 Cal.Rptr.3d 627), we independently determine whether a cause of action arises from the defendant's exercise of the right of petition or free speech and whether the plaintiff has demonstrated a probability of prevailing on the merits, but review a ruling on an evidentiary objection in connection with a special motion to strike for abuse of discretion. *(Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1440, 1444, 57 Cal.Rptr.3d 885.)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                                                    Page 8
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)

3. *The Court Was Not Required to Deny the Motion Based on the Scheduling of the Hearing*

[11] Hall contends the trial court was required to deny the special motion to strike because the defendants failed to schedule a hearing on the motion for a date within 30 days after the service of the motion. [FN4] We disagree.

> FN4. A respondent may request review of the appealed decision and any intermediate ruling that involves the merits, necessarily affects the appealed order or judgment, or substantially affects the rights of a party, for the purpose of determining whether the appellant was prejudiced by the error asserted by the appellant. (§ 906.)

Former section 425.16, subdivision (f) stated: "The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion *shall be noticed for hearing* not more than 30 days after service unless the docket conditions of the court require a later hearing." (Stats.1999, ch. 960, § 1, italics added.) **807*1349*Decker v. U.D. Registry, Inc.*, (2003) 105 Cal.App.4th 1382, 1387-1390, 129 Cal.Rptr.2d 892 held that the statutory requirement of a timely noticed hearing was mandatory and that the trial court must deny a special motion to strike that was noticed for a hearing more than 30 days after service of the motion, absent a showing that the court's docket conditions necessitated the later hearing date. *Fair Political Practices Com. v. American Civil Rights Coalition, Inc.* (2004) 121 Cal.App.4th 1171, 1174-1178, 18 Cal.Rptr.3d 157, cited by Hall, followed the holding in *Decker. Greka Integrated, Inc. v. Lowrey* (2005) 133 Cal.App.4th 1572, 1577-1578, 35 Cal.Rptr.3d 684, also cited by Hall, cited the rule from *Decker* and *Fair Political Practices Com.*, but held that the plaintiff waived the right to object to the late hearing date by expressly consenting to the hearing date.

The Legislature amended section 425.16, subdivision (f) on October 5, 2005, as an urgency statute

effective immediately on that date. (Stats.2005, ch. 535, §§ 1, 4.) Subdivision (f), as amended, states: "The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper. The motion *shall be scheduled by the clerk of the court for a hearing* not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing." (Italics added.) An uncodified section of the statute states: "It is the intent of the Legislature, in amending subdivision (f) of Section 425.16 of the Code of Civil Procedure, to overrule the decisions in *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1387-1390 [129 Cal.Rptr.2d 892], and *Fair Political Practices Commission v. American Civil Rights Coalition, Inc.* (2004) 121 Cal.App.4th 1171, 1174-1178 [18 Cal.Rptr.3d 157]." [FN5] (Stats.2005, ch. 535, § 3.)

> FN5. *Greka Integrated, Inc. v. Lowrey, supra,* 133 Cal.App.4th 1572, 35 Cal.Rptr.3d 684 was filed on November 15, 2005, after the 2005 amendments to section 425.16, subdivision (f) became effective. *Greka* neither mentioned the statutory amendments nor explained why the amendments did not apply in that action. In any event, *Greka* concluded that the plaintiff waived any objection to the hearing date and therefore did not hold that the trial court should have denied the special motion to strike.

Thus, the Legislature expressly abrogated the rule on which Hall relies. Section 425.16, subdivision (f), as amended, requires the court clerk to schedule a special motion to strike for a hearing no more than 30 days after the motion is served if such a hearing date is available on the court's docket, but does not require the moving party to ensure that the hearing is so scheduled and does not justify the denial of a special motion to strike solely because the motion was not scheduled for a hearing within 30 days after the motion was served. Accordingly, we cannot affirm the order on that basis.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

63 Cal.Rptr.3d 798                                                                                         Page 9
153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal. Daily Op. Serv. 9236, 2007 Daily Journal D.A.R. 11,842
**(Cite as: 153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798)**

***1350 DISPOSITION***

The order is reversed with directions to the trial
court to rule on the parties' evidentiary objections,
decide whether Hall has demonstrated a probability
of prevailing on each count alleged in her com-
plaint, and enter a new order ruling on the special
motion to strike. The defendants are entitled to re-
cover costs on appeal.

We Concur: <u>KITCHING</u>, and <u>ALDRICH</u>, JJ.

153 Cal.App.4th 1337, 63 Cal.Rptr.3d 798, 07 Cal.
Daily Op. Serv. 9236, 2007 Daily Journal D.A.R.
11,842

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 6**

Westlaw.

44 Cal.Rptr.3d 517                                                                                    Page 1
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

▷

Court of Appeal, Fourth District, Division 3, Cali-
fornia.
INTEGRATED HEALTHCARE HOLDINGS,
INC., Plaintiff and Respondent,
v.
Michael FITZGIBBONS, Defendant and Appellant.
**No. G036080.**

June 14, 2006.

**Background:** Medical holding company brought
action, alleging defamation and other causes of ac-
tion, against hospital's medical executive committee
member, who opposed company's proposed pur-
chase of four hospitals and whose disparaging e-
mail allegedly stalled negotiations between com-
pany and health insurer for higher paying managed
care contract. Committee member made special mo-
tion to strike pleading under anti-SLAPP (strategic
lawsuit against public participation) statute. The
Superior Court, Orange County, No. 05CC07563,
Geoffrey T. Glass, J., denied motion, and commit-
tee member appealed.

**Holdings:** The Court of Appeal, Aronson, J., held
that:
(1) e-mail concerned issue of public interest;
(2) opinions expressed in e-mail were not action-
able defamation;
(3) e-mail did not breach contract in which medical
staff agreed to express public support for acquisi-
tion; and
(4) e-mail did not form basis of claim for interfer-
ence with contractual relationship.
Reversed with directions.

West Headnotes

**[1] Pleading** ☜⟶**358**
302k358 Most Cited Cases
The anti-SLAPP (strategic lawsuit against public
participation) statute arose from the Legislature's
recognition that SLAPP suit plaintiffs are not seek-
ing to succeed on the merits, but to use the legal
system to chill the defendant's First Amendment

right of free speech. U.S.C.A. Const.Amend. 1;
West's Ann.Cal.C.C.P. § 425.16.

**[2] Pleading** ☜⟶**358**
302k358 Most Cited Cases

**[2] Pleading** ☜⟶**360**
302k360 Most Cited Cases
To prevail on anti-SLAPP (strategic lawsuit against
public participation) motion, movant must first
make threshold showing that challenged cause of
action arises from act in furtherance of right of peti-
tion or free speech in connection with public issue;
once movant meets this burden, plaintiff must
demonstrate probability of prevailing on claim, and
if plaintiff cannot meet this burden, trial court must
strike cause of action. West's Ann.Cal.C.C.P. §
425.16.

**[3] Pleading** ☜⟶**358**
302k358 Most Cited Cases
Disparaging e-mail sent by hospital's medical exec-
utive committee member, who opposed medical
holding company's proposed purchase of four hos-
pitals, concerned issue of public interest so as to
support committee member's special motion to
strike, under anti-SLAPP (strategic lawsuit against
public participation) statute, company's complaint
alleging defamation and other causes of action;
transactions were subject of state and county hear-
ings and were discussed in media, and financial sur-
vival of four hospitals in county was of widespread
public interest. West's Ann.Cal.C.C.P. §
425.16(e)(4).
*See 5 Witkin, Cal. Procedure (4th ed. 1997) Plead-
ing, § 962 et seq.; Weil & Brown, Cal. Practice
Guide: Civil Procedure Before Trial (The Rutter
Group 2005) ¶ 7:233 et seq. ( CACIVP Ch. 7-C);
Cal. Jur. 3d, Pleading, § 299 et seq.; Cal. Civil
Practice (Thomson/West 2003) Civil Rights Litiga-
tion, § 14:1 et seq.*

**[4] Pleading** ☜⟶**358**
302k358 Most Cited Cases
"Matters of public interest," within meaning of anti-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.Rptr.3d 517                                                                                   Page 2

140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407

**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

SLAPP (strategic lawsuit against public participation) statute, include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals. West's Ann.Cal.C.C.P. § 425.16(e).

**[5] Pleading ☜358**
302k358 Most Cited Cases
There is no per se rule excluding all commercial competitors' statements from anti-SLAPP (strategic lawsuit against public participation) protection for speech made in connection with public issue or issue of public interest; instead, courts must consider each case in light of its own unique facts. West's Ann.Cal.C.C.P. § 425.16(e).

**[6] Pleading ☜360**
302k360 Most Cited Cases
To establish probability of prevailing on cause of action challenged under anti-SLAPP (strategic lawsuit against public participation) statute, plaintiff must demonstrate that complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if evidence submitted by plaintiff is credited. West's Ann.Cal.C.C.P. § 425.16.

**[7] Pleading ☜360**
302k360 Most Cited Cases
In determining whether plaintiff established probability of prevailing on cause of action challenged under anti-SLAPP (strategic lawsuit against public participation) statute, trial court considers pleadings and evidentiary submissions of both plaintiff and defendant; although court does not weigh credibility or comparative probative strength of competing evidence, it should grant motion if defendant's evidence supporting motion defeats plaintiff's attempt to establish evidentiary support for claim. West's Ann.Cal.C.C.P. § 425.16.

**[8] Pleading ☜360**
302k360 Most Cited Cases
To establish probability of prevailing on cause of action challenged under anti-SLAPP (strategic law-

suit against public participation) statute, plaintiff cannot rely on allegations of complaint, but must produce evidence that would be admissible at trial. West's Ann.Cal.C.C.P. § 425.16.

**[9] Libel and Slander ☜6(3)**
237k6(3) Most Cited Cases

**[9] Libel and Slander ☜30**
237k30 Most Cited Cases
Opinions expressed in e-mail sent by hospital's medical executive committee member, who opposed medical holding company's proposed purchase of four hospitals, were not actionable defamation; e-mail set forth basis for opinions that company's financial position was poor and did not imply other facts, and company did not meet its burden of demonstrating underlying factual statements were false. West's Ann.Cal.Civ.Code § 45.

**[10] Libel and Slander ☜6(1)**
237k6(1) Most Cited Cases
In determining whether disparaging remarks are actionable defamation, the question is not strictly whether the published statement is fact or opinion; rather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. West's Ann.Cal.Civ.Code § 45.

**[11] Libel and Slander ☜19**
237k19 Most Cited Cases
When determining whether a statement of opinion is actionable defamation, courts examine the totality of the circumstances, starting with the language of the allegedly defamatory statement itself. West's Ann.Cal.Civ.Code § 45.

**[12] Libel and Slander ☜6(1)**
237k6(1) Most Cited Cases
Satirical, hyperbolic, imaginative, or figurative statements are not actionable defamation, because the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact. West's Ann.Cal.Civ.Code § 45.

**[13] Contracts ☜312(1)**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.Rptr.3d 517                                                                                                    Page 3
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)

95k312(1) Most Cited Cases
Disparaging e-mail sent by hospital's medical executive committee member, who opposed medical holding company's proposed purchase of four hospitals, did not breach contract in which medical staff agreed to express public support for acquisition; there was no evidence that member did not fulfill requirements under contract, and e-mail was sent to limited number of recipients rather than publicly.

[14] Constitutional Law ☞947
92k947 Most Cited Cases
    (Formerly 92k43(1))
A waiver of First Amendment rights may only be made by a clear and compelling relinquishment of them. U.S.C.A. Const.Amend. 1.

[15] Constitutional Law ☞947
92k947 Most Cited Cases
    (Formerly 92k43(1))

[15] Constitutional Law ☞950
92k950 Most Cited Cases
    (Formerly 92k43(1))
Courts closely scrutinize waivers of constitutional rights, and indulge every reasonable presumption against a waiver.

[16] Constitutional Law ☞948
92k948 Most Cited Cases
    (Formerly 92k43(1))
Contract in which medical staff of hospital agreed to "express public support" for medical holding company's acquisition of four hospitals was not sufficiently clear and definite on its face to imply waiver of medical executive committee member's First Amendment rights to criticize acquisition in private e-mail. U.S.C.A. Const.Amend. 1.

[17] Torts ☞245
379k245 Most Cited Cases
Disparaging e-mail sent by hospital's medical executive committee member, who opposed medical holding company's proposed purchase of four hospitals, which was forwarded to medical insurer during time company was attempting to renegotiate increase in rates with insurer, did not form basis of

claim for interference with contractual relationship; there was no evidence that committee member intended that insurer receive e-mail or that member was negligent, and there was no evidence of breach or disruption of contract between company and insurer.

[18] Torts ☞212
379k212 Most Cited Cases
Establishing prima facie case of intentional interference with contractual relations requires proof of (1) valid contract between plaintiff and third party, (2) defendant's knowledge of this contract, (3) defendant's intentional acts designed to induce breach or disruption of contractual relationship, (4) actual breach or disruption of contractual relationship, and (5) resulting damage.

[19] Torts ☞216
379k216 Most Cited Cases
In addition to protection against acts intentionally designed to interfere with contractual relations, the law also protects against injury caused by negligence.

**520 Bond Curtis, Tom Curtis, Berkeley and Alexander W. Kirkpatrick, Pasadena, for Defendant and Appellant.

McNeil, Tropp & Braun, Costa Mesa, Yolita Nowak Lecellier, Jeff I. Braun and Deborah S. Tropp, Costa Mesa, for Plaintiff and Respondent.

Catherine I. Hanson, San Francisco and Gregory M. Abrams, for California Medical Association and American Medical Association as Amici Curiae on behalf of Defendant and Appellant.

*519 OPINION
ARONSON, J.

Defendant Michael Fitzgibbons appeals the trial court's denial of his special motion to strike brought under the anti-SLAPP statute [FN1] (Code Civ. Proc., § 425.16). [FN2] Fitzgibbons contends an e-mail message he sent questioning the financial condition of plaintiff Integrated Healthcare Holdings, Inc., (IHHI) concerned a matter of public interest under section 425.16, subdivision (e)(4), and that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.Rptr.3d 517                                                                                                                          Page 4
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

IHHI failed to demonstrate a probability of prevailing on the merits of its claims for defamation, breach of contract, tortious interference, and violations of <u>Business and Professions Code section 17200 et seq.</u>

> <u>FN1.</u> SLAPP is an acronym for strategic lawsuit against public participation, first coined by two University of Denver professors. (See Comment, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions* (1990/1991) 27 Cal. Western L.Rev. 399.)

> <u>FN2.</u> Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

We agree with these contentions and reverse the trial court's order.

I

FACTUAL AND PROCEDURAL BACK-
GROUND

In 2004, Tenet Healthcare Corporation sought to divest itself of a number of California hospitals it owned, including four in Orange County. Among those seeking to purchase the Orange County hospitals was IHHI, a holding company formed for this purpose. As its president concedes, IHHI is a "heavily debt leveraged" company "trying to develop sufficient cash flow to survive in a difficult healthcare market." Because of concerns about IHHI's financial ability to operate the four hospitals, the County of Orange and the California Senate conducted public hearings on the proposed acquisitions.

Among the hospitals IHHI sought to purchase was Western Medical Center--Santa Ana (WMC), a 282-bed acute care facility and one of only three trauma centers in Orange County. WMC's medical staff opposed IHHI's acquisition of WMC, due to concerns about both IHHI's financial stability and its principal, Dr. Kali P. Chaudhuri, who had been involved in the failure of a previous healthcare company. One of the medical staff opposing IHHI's purchase was Fitzgibbons, a member of the medical staff's medical executive committee and WMC's former chief of staff.

**\*520** The medical staff dropped its opposition to the purchase when they entered into a written agreement with IHHI, effective **\*\*521** January 1, 2005. Under the three-year contract, WMC's medical staff received significant financial oversight of WMC's operations, and Dr. Chaudhuri agreed to limit his interest in IHHI to a minority share. The agreement also assured WMC that IHHI had "a lender commitment for a working capital line of credit loan in the approximate aggregate amount of $50 Million, to be available to the Hospital no later than ten (10) days following the closing of the purchasing parties' acquisition of the Hospitals."

Under the heading, "Consideration," the agreement provided: "The Parties further agree that this Agreement will be submitted to [the Department of Health Services] as part of the Hospital's license application process. In consideration for the binding and enforceable commitments of IHHI, and in reliance upon these commitments, the Medical Staff of Western Medical Center-- Santa Ana will express public support for the acquisition and operation of IHHI of, and issuance of hospital licenses to IHHI for, the Hospitals, in accordance with the commitments made herein, including being represented at any public hearings on this proposed acquisition and delivering to DHS (Mark Helmar) a letter supporting IHHI's acquisition and licensure of the Hospitals."

IHHI's acquisition and licensing of the hospitals was completed in March 2005. On May 9, 2005, the lender on IHHI's $50-million acquisition loan, and a $30 million non-revolving working capital line of credit, served IHHI with a notice of default. The default was disclosed in IHHI's filing with the Securities Exchange Commission (SEC), and reported in an article in the May 17, 2005, Orange County Register, which cited an analyst's warning that IHHI needed to "find another investment partner 'really quickly' or the whole thing could be headed for bankruptcy court."

Two days after the article appeared, Fitzgibbons

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.Rptr.3d 517                                                                                                        Page 5
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

sent an e-mail message to medical executive committee members and other individuals Fitzgibbons believed might offer financial assistance to the hospital, expressing concern IHHI could be headed for bankruptcy. The e-mail stated: "By the way, the hospital appears to be underwater and I don't think IHHI can get an investor to pony up the $20 million, for the 60-70 million shares of stock which they are selling. Admissions are down 20%. They got a reduction of costs by dumping Tenet by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8%--so they're in the red. No way to get out. That is ominous. What would the buyer get buying IHHI stock? Control of IHHI, but not the land? Sounds like its going BK. Get ready. [¶] Now, if the doctors had been in the deal ... interest rates would have been better say 9%??, would have had our capital say 10 **\*521** million, and admissions would have been even. Result happiness. Sad. [¶] It might work if they came to us on hands and knees and gave us the stock in exchange for our telling the world we support them, and get a refinance at a better rate??? Who would lend? Ligon's the CFO's family supposedly hasmoney. [¶] The loan default is classic 'chaudhuri.' I guess Mr. Mogel won't be pooring [*sic*] expensive brandy on the table today. [¶] Mike Fitzgibbons."

On June 23, 2005, IHHI filed a complaint against Fitzgibbons based on his May 19 e-mail message, seeking damages for (1) defamation; (2) intentional interference with a contractual relationship; (3) negligent interference with a contractual relationship; (4) breach of contract; (5) breach of the duty of good faith and fair dealing; and (6) violation of Business and Professions Code section 17200 et seq. **\*\*522** The complaint alleges Fitzgibbons's e-mail message was forwarded to Blue Cross/Wellpoint, Inc., (Blue Cross) with whom IHHI had been negotiating for higher insurance payments, and the e-mail message provoked concern on the part of Blue Cross, stalling negotiations. IHHI alleges this delay has cost it over $500,000.

Fitzgibbons filed a special motion to strike under the anti-SLAPP statute, which the trial court

denied. Fitzgibbons now appeals.

## II
## STANDARD OF REVIEW
An order denying an anti-SLAPP special motion to strike is appealable under Code of Civil Procedure sections 425.16, subdivision (j), and 904.1. We review the order de novo. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999, 113 Cal.Rptr.2d 625.)

## III
## DISCUSSION
A. *Fitzgibbons Has Met His Burden of Demonstrating the May 19 E-Mail Message Concerned "an Issue of Public Interest"*

The anti-SLAPP statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).) An act in furtherance of the right of free speech **\*522** includes "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

[1] The anti-SLAPP statute arose from the Legislature's recognition that SLAPP suit plaintiffs are not seeking to succeed on the merits, but to use the legal system to chill the defendant's first amendment right of free speech. (*Moore v. Liu* (1999) 69 Cal.App.4th 745, 81 Cal.Rptr.2d 807.) Thus, the statute notes: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.Rptr.3d 517                                                                                                    Page 6
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly." (§ 425.16, subd. (a).)

[2] To prevail on an anti-SLAPP motion, the movant must first make " 'a threshold showing that the challenged cause of action' arises from an act in furtherance of the right of petition or free speech in connection with a public issue." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192, 25 Cal.Rptr.3d 298, 106 P.3d 958.) Once the movant meets this burden, the plaintiff must demonstrate " 'a probability of prevailing on the claim.' " (*Ibid.*) If the plaintiff cannot meet this burden, the trial court must strike the cause of action. (*Ibid.*)

[3] Section 425.16, subdivision (e), clarifies what speech is covered by the statute: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral **523 statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Fitzgibbons contends his e-mail message falls within both clauses (2) and (4) of section 425.16, subdivision (e).

*523 We have little trouble concluding Fitzgibbons's e-mail message concerned "a public issue" and "an issue of public interest" under section 425.16, subdivision (e)(4). IHHI's acquisition and operation of four Orange County hospitals was the subject of public hearings held by both the California Senate and the Orange County Board of Super-

visors, and discussed in numerous articles in newspapers and other periodicals. The hearings and articles focused on IHHI's financial ability to successfully operate the hospitals, and the potential harm to the public should IHHI fail. Fitzgibbons's e-mail message expressing concern for IHHI's financial health and its ability to operate WMC falls squarely within these issues.

Citing *Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 55 Cal.Rptr.2d 909, IHHI contends the e-mail did not concern a public issue because it did not relate to "the exercise of democratic self-government." (*Id.* at p. 1122, 55 Cal.Rptr.2d 909.) IHHI's reliance on *Zhao* is misplaced, however, because its discussion of the anti-SLAPP statute's scope has been superseded by the 1997 amendments to section 425.16. (See *Sipple v. Foundation for National Progress* (1999) 71 Cal.App.4th 226, 236, 83 Cal.Rptr.2d 677.) ["the Senate Judiciary Committee expressly amended section 425.16 to mandate a broad interpretation of the statute in reaction to the over-narrow interpretation of *Zhao v. Wong* "].) Indeed, the California Supreme Court expressly disapproved *Zhao* on the very point for which IHHI cites it. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1116, 81 Cal.Rptr.2d 471, 969 P.2d 564 ["We agree ... that '*Zhao* is incorrect in its assertion that the only activities qualifying for statutory protection are those which meet the lofty standard of pertaining to the heart of self-government' "].)

[4] "The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.] ' "[M]atters of public interest ... include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." ' " (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479, 102 Cal.Rptr.2d 205.) Although IHHI asserts it is "a small corporate entity" that is "heavily debt leveraged," its owner-

44 Cal.Rptr.3d 517
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

ship and operation of four Orange County hospitals makes it large and powerful enough to impact the healthcare needs of the county's residents.

IHHI also notes the public hearings on IHHI's acquisition and operation of the four hospitals had ended months before Fitzgibbons sent the e-mail, making the issues involved in the hearings "moot." IHHI asserts its SEC filing and newspaper **524 article reporting on the lender's default notice did not create a new public issue.

*524 IHHI relies on _Du Charme v. International Brotherhood of Electrical Workers_ (2003) 110 Cal.App.4th 107, 1 Cal.Rptr.3d 501 (_Du Charme_ ) and _Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO_ (2003) 105 Cal.App.4th 913, 130 Cal.Rptr.2d 81 (_Rivero_). _Du Charme_ held a statement posted on a labor union's local Web site announcing that the local's business manager had been removed because of financial mismanagement did not concern a public issue or issue of public interest within section 425.16, subdivision (e)(4). In reaching this conclusion, the court determined "in order to satisfy the public issue/issue of public interest requirement of section 425.16, subdivision (e)(3) and (4) of the anti-SLAPP statute, in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging _participation_ in matters of public significance." (_Du Charme_, at p. 119, 1 Cal.Rptr.3d 501.) _Du Charme_ rejected the defendant's attempt to invoke the anti-SLAPP statute because the Web site statement was "unconnected to any discussion, debate or controversy" then existing. (_Id._ at p. 118, 1 Cal.Rptr.3d 501.)

_Du Charme_ contrasted its situation involving union members with matters "of _widespread_ public interest," providing as examples of the latter, increased traffic and natural drainage impacts of a proposed mall, a television show that generated considerable media debate, and issues concerning domestic violence and child molestation. (_Du Charme, supra,_ 110 Cal.App.4th at p. 117, 1 Cal.Rptr.3d 501.) The court noted such matters involve " 'private conduct [which] ... impacts a broad segment of society....' " (_Ibid._)

We have no difficulty placing the financial survival of four hospitals within the county into the category of "_widespread_ public interest," and thus not subject to the "ongoing controversy" rule enunciated in _Du Charme._ [FN3] Thus, _Du Charme_ provides no support to IHHI's position.

> FN3. Moreover, even if we applied _Du Charme's_ "ongoing controversy" rule, the e-mail would still relate to an issue of public concern. Although IHHI's acquisition itself may have been a dead issue when the e-mail was sent, the body was not yet cold. The public hearings and articles centered on IHHI's financial ability to operate the hospitals and the impact IHHI's failure would have on the public's access to health care. The default, touching squarely upon IHHI's financial health, occurred just two months after IHHI's acquisition of the hospitals, and was the immediate subject of a newspaper article. Fitzgibbons's e-mail message just two days after the article's publication was not remote in time.

In _Rivero,_ a demoted supervisor sued former subordinates and a union over statements accusing him of abuse, theft, and extortion. The union contended its statements concerned an issue of public interest because they related to " 'abusive supervision of employees throughout the University of California *525 system [which] impacts a community of public employees numbering 17,000.' " (_Rivero, supra,_ 105 Cal.App.4th at p. 919, 130 Cal.Rptr.2d 81.) The union also contended its communications concerned a public issue because plaintiff's purported wrongdoing occurred at a publicly financed institution. (_Ibid._) Rejecting the union's contentions, _Rivero_ viewed the statements as relating primarily

44 Cal.Rptr.3d 517                                                                                                                    Page 8
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

to the plaintiff and eight employees. The court noted that it accepted the union's **525 contentions, every workplace dispute would qualify as a matter of public interest.

We have interpreted *Rivero* as outlining three general categories of cases falling within subdivision (e)(4) of section 425.16: "(1) The subject of the statement or activity precipitating the claim was a person or entity in the public eye. [Citations.] [¶] (2) The statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants. [Citations.] [¶] (3) The statement or activity precipitating the claim involved a topic of widespread public interest. [Citations.]" (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33, 1 Cal.Rptr.3d 390.) Here, each of these three criteria has been met. Accordingly, *Rivero* also provides IHHI no support.

Finally, IHHI contends the anti-SLAPP statute does not apply to the challenged e-mail because Fitzgibbons was IHHI's competitor, and therefore the e-mail fell into the category of unprotected commercial speech. [FN4] Specifically, IHHI introduced evidence that Fitzgibbons belonged to an entity called Western Medical Center Acquisition, LLC (WMCA), formed to purchase WMC. Tenet Healthcare rejected WMCA's offer, and later accepted IHHI's. In support of its argument, IHHI relies on *MCSi, Inc. v. Woods* (N.D.Cal.2003) 290 F.Supp.2d 1030 (*MCSi* ) and *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 15 Cal.Rptr.3d 215 (*Mann* ).

> FN4. In making this argument, IHHI notes the e-mail was sent to only a small number of people. As we recognized in *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1470, fn. 5, 37 Cal.Rptr.3d 133 (*Ruiz* ), subdivision (e)(4), applies to private communications concerning public issues.

In *MCSi,* a federal court formulated a rule that statements by a commercial competitor about the

competition are not matters of public interest. (*MCSi, supra,* 290 F.Supp.2d at p. 1034.) The only basis for this rule, however, stemmed from the same court's earlier ruling in *Globetrotter Software, Inc. v. Elan Computer Group, Inc.* (N.D.Cal.1999) 63 F.Supp.2d 1127, 1129 (*Globetrotter* ) in which the court relied on the *lack* of any California case law addressing the issue as support for its decision. [FN5]

> FN5. *Globetrotter* reasoned: "The Court has been unable to locate any California cases concluding that the 'issue of public interest' test is met by statements of one company regarding the conduct of a competitor company. If such statements were construed as coming within the statute's protection, any lawsuit alleging trade libel, false advertising or the like in the context of commercial competition would be subject to attack as a SLAPP suit. This clearly is not the result intended by the Legislature when enacting the anti-SLAPP statute. Accordingly, in the absence of clear California case law to the contrary, this Court declines to apply the statute's protection to the speech at issue in this case." (*Globetrotter, supra,* 63 F.Supp.2d at p. 1130.)

[5] *526 Although in most cases a competitor's statements regarding its competition would not fall within section 425.16, subdivision (e)(4), we decline to adopt a per se rule excluding all competitor's statements from anti-SLAPP protection. Instead, we must consider each case in light of its own unique facts. This was the approach taken in *Mann, supra,* 120 Cal.App.4th 90, 15 Cal.Rptr.3d 215, in which the defendants were alleged to have solicited the customers of a former employer with false statements that the former employer used toxic chemicals. After considering the facts surrounding the communications at issue, the court rejected the defendants' contention their speech concerned a public issue because "they presented no argument or **526 evidence that [their former employer] is an entity in the public eye." (*Id.* at p. 111, 15 Cal.Rptr.3d 215.) In the present case, however, IH-

44 Cal.Rptr.3d 517                                                                                                                Page 9
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)

HI was very much in the public eye at the time Fitz-gibbons sent his e-mail missive.

Further, to the extent Fitzgibbons's activities with WMCA prior to IHHI's purchase of the hospitals made him IHHI's competitor, this competition ended when Tenet accepted IHHI's offer, months before Fitzgibbons sent the e-mail. Moreover, Fitz-gibbons's membership in the medical staff's medical executive committee at WMC does not make him a "competitor" of IHHI. (See *Redding v. St. Francis Medical Center* (1989) 208 Cal.App.3d 98, 107, 255 Cal.Rptr. 806 [hospitals and doctors are not in competition with each other].)

Because we conclude the challenged e-mail mani-festly concerned a public issue, we need not decide whether it concerned an issue under consideration or review by a legislative, executive, or judicial body, under section 425.16, subdivision (e)(2).

B. *IHHI Has Not Established a Probability of Pre-vailing on Any of Its Claims*

Having determined Fitzgibbons met his burden of demonstrating his e-mail message fell within the anti-SLAPP statute, the burden now shifts to IHHI to demonstrate a probability of prevailing on its claims.

[6][7][8] *527 To establish a probability of prevail-ing, the plaintiff " 'must demonstrate that the com-plaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733.) In doing so, the trial court considers the pleadings and evidentiary sub-missions of both the plaintiff and the defendant. (*Ibid.*) Although "the court does not *weigh* the cred-ibility or comparative probative strength of compet-ing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to estab-lish evidentiary support for the claim." (*Ibid.*) Moreover, the plaintiff cannot rely on the allega-tions of the complaint, but must produce evidence

that would be admissible at trial. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212, 12 Cal.Rptr.3d 786 (*HMS Capital* ).) With these standards in mind, we now address each of IHHI's claims.

1. *Defamation*

[9] Civil Code section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to in-jure him in his occupation." Fitzgibbons contends his May 19 e-mail message is not actionable be-cause it consists of only his opinion, and not factual assertions. IHHI, on the other hand, asserts that opinions and criticism may be actionable even though they are based on true statements of fact. Neither paints an accurate picture of the law.

[10] In determining whether disparaging remarks are actionable defamation, " 'the question is not strictly whether the published statement is fact or opinion ... [r]ather, the dispositive question is whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' [Citation.]" (*Ruiz, supra, 134 Cal.App.4th at p. 1471, 37 Cal.Rptr.3d 133.*) In other **527 words, an opinion or legal conclusion is actionable only " ' "if it could reasonably be un-derstood as declaring or implying actual facts cap-able of being proved true or false." ' [Citation.] Thus, an opinion based on implied, undisclosed facts is actionable if the speaker has no factual basis for the opinion. [Citation.] An opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true. [Citation.] An opinion is actionable if it discloses all the statements of fact on which the opinion is based and those statements are false. [Citation.]" (*Ibid.*)

*528 In *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429 (*Franklin* ), we contrasted opinions based upon expressly

44 Cal.Rptr.3d 517
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)

Page 10

stated facts from opinions based on implied, undisclosed facts: " 'The statement, "I think Jones is an alcoholic," for example, is an expression of opinion based on implied facts, [citation], because the statement "gives rise to the inference that there are undisclosed facts that justify the forming of the opinion," [citation]. Readers of this statement will reasonably understand the author to be implying he knows facts supporting his view--*e.g.*, that joNes stops at a bar every night after work and has three martinis. If the speaker has no such factual basis for his assertion, the statement is actionable, even though phrased in terms of the author's personal belief.' [Citation.]" (*Id.* at p. 387, 10 Cal.Rptr.3d 429.)

An expression of opinion based on express facts would be: " ' "[Jones] moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair ... with a drink in his hand. I think he must be an alcoholic." [Citation.]' [Citation.] This opinion disclosed all the facts on which it was based and did not imply there are other, unstated facts supporting the belief Jones is an alcoholic. The opinion that Jones ' "must be an alcoholic" ' is actionable only if the disclosed facts are false and defamatory. 'A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning.' [Citation.] The rationale for this rule is that '[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts.' [Citation.] When the facts supporting an opinion are disclosed, 'readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.' [Citations.]" (*Franklin, supra,* 116 Cal.App.4th at p. 387, 10 Cal.Rptr.3d 429.)

[11] When determining whether a statement of opinion is actionable "we examine the totality of the circumstances, starting with the language of the allegedly defamatory statement itself." (*Ruiz, supra,* 134 Cal.App.4th at p. 1471, 37 Cal.Rptr.3d 133.)

The first paragraph of Fitzgibbons's e-mail message reads: "By the way, the hospital appears to be underwater and I don't think IHHI can get an investor to pony up the $20 million, for the 60-70 million shares of stock which they are selling. Admissions are down 20%. They got a reduction of costs by dumping Tenet by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8%--so they're in the red. No way to get out. That is ominous. What would the buyer get buying IHHI stock? Control of IHHI, but not the land? Sounds like its going BK. Get ready."

**\*529** IHHI contends the opinions expressed in this portion of the e-mail-- the hospital is "underwater," IHHI is unable to find **\*\*528** investors to purchase its stock, and it is going bankrupt--are false and actionable libel. This portion of the e-mail, however, sets forth the basis for these opinions and does not imply other facts. Specifically, these opinions appear based on the following facts: "Admissions are down 20%. They got a reduction of costs by dumping Tenet by 13%, and increased insurance payment of 7% (but that is neutralized by the factoring). Then their nursing salaries went up 8% ...." Because the e-mail discloses the facts underlying Fitzgibbons's opinions, the opinions are actionable only if these facts are false. IHHI challenges only one of the underlying facts, that "[a]dmissions are down 20%."

In its brief, IHHI argues that Fitzgibbons bears the burden of proving the truth of the statements in his e-mail message, and that "[t]his burden is shifted to the plaintiff *only* if the plaintiff is a public figure, which in this case, IHHI is not." For this proposition, IHHI cites *Philadelphia Newspapers, Inc. v. Hepps* (1988) 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (*Hepps* ). IHHI apparently did not read *Hepps* closely because the Supreme Court in *Hepps* held that the burden to prove falsity shifts to the plaintiff when the statement relates to an issue of public concern, even when the plaintiff *is not* a public figure. (*Id.* at p. 777, 106 S.Ct. 1558.) True, *Hepps* applied the burden-shifting to a situation involving a media defendant. But California has since

44 Cal.Rptr.3d 517                                                                    Page 11
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)

applied *Hepps* to cases involving nonmedia defendants. *(Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 377, 54 Cal.Rptr.2d 781; see also *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 747, 257 Cal.Rptr. 708, 771 P.2d 406 ["When the speech involves a matter of public concern, a private-figure plaintiff has the burden of proving the falsity of the defamation"].) Because we have determined the e-mail at issue related to an issue of public concern, IHHI bears the burden of demonstrating the challenged statements are false.

In challenging the e-mail's assertion that "[a]dmissions are down 20%," IHHI cites two one-page reports covering, respectively, April and May of 2005. These reports purport to show the number of inpatient and outpatient surgeries performed, and the revenues generated from them. IHHI asserts these reports show WMC to be above budget for these two months. This evidence fails to establish the challenged statement is false.

Specifically, IHHI provides no evidence of how the budget was created or its relation to past events. Indeed, IHHI may have adjusted its budget prior to the reports to take into account a 20 percent drop in admissions. Moreover, the reports relate only to revenues received from surgeries; unless all patient *530 admissions are for surgery, a proposition unsupported by any evidence, the reports cannot provide an accurate picture about admissions. Thus, IHHI has failed to prove the facts underlying the challenged opinions are false.

Moreover, even if we were to construe the e-mail's assertion that IHHI is going bankrupt as implying undisclosed facts, it would still not constitute actionable libel because IHHI has failed to provide competent evidence that it was not headed toward bankruptcy at the time Fitzgibbons sent his e-mail. The reports cited by IHHI show only the revenue from surgeries from one hospital for two months, but fail to provide any information on expenses, cash flow, assets, debts, etc. In addition to the reports, IHHI also cites a financial statement IHHI filed on June 8, 2005, as evidence it was not close to bankruptcy. IHHI's brief, however, does not cite

to any particular part of the filing and, **529 based on our review of the document, we discern nothing germane to IHHI's potential for declaring bankruptcy at the time it was filed. [FN6]

> FN6. We deny Fitzgibbons's request for judicial notice of a Los Angeles Times newspaper article.

We are inclined to allow the plaintiff in a SLAPP motion a certain degree of leeway in establishing a probability of prevailing on its claims due to "the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery [citation]." *(Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823, 33 Cal.Rptr.2d 446, disapproved on other grounds by *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5, 124 Cal.Rptr.2d 507, 52 P.3d 685.) Nonetheless, we must presume IHHI had evidence of its own financial condition. Consequently, we will not engage in a leap of faith that, despite its inadequate evidentiary showing in opposition to the special motion to strike, IHHI will present substantial evidence supporting its defamation claim at trial.

Having concluded IHHI failed to demonstrate anything in the e-mail's first paragraph constitutes actionable liable, we now turn to the second, which reads. "Now if the doctors had been in the deal ... interest rates would have been better say 9%? ?, would have had our capital say $10 million, and admissions would have been even. Result happiness. Sad." IHHI does not contend any of the factual assertions in this paragraph are false. Accordingly, it is not actionable defamation.

[12] Finally, the e-mail's last two paragraphs read: "It might work if they came to us on hands and knees and gave us the stock in exchange for our telling the world we support them, and get a refinance at a better rate??? Who would lend? Ligon's the CFO's family supposedly has money. [¶] The loan default is classic 'chaudhuri.' I guess Mr. Mogel won't be pooring [*sic* ] *531 expensive brandy on the table today." Although the statements in this

44 Cal.Rptr.3d 517                                                      Page 12
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

portion of the message are undeniably derisive, they are not actionable defamation. Satirical, hyperbolic, imaginative, or figurative statements are not actionable because " 'the context and tenor of the statements negate the impression that the author seriously is maintaining an assertion of actual fact.' " *(Franklin, supra, 116 Cal.App.4th at p. 385, 10 Cal.Rptr.3d 429.)* Because IHHI failed to meet its burden of demonstrating a probability of success on its defamation cause of action, it must be stricken.

## 2. Breach of Contract/Breach of Covenant of Good Faith and Fair Dealing

[13] IHHI contends Fitzgibbons waived his right to complain about IHHI's operation of WMC when he executed the agreement between the medical staff and IHHI, and that his e-mail message therefore breached the contract. We disagree.

[14][15] " ' "A waiver of First Amendment rights may only be made by a 'clear and compelling' relinquishment of them...." [Citation.] "Moreover, it is well established that courts closely scrutinize waivers of constitutional rights, and indulge every reasonable presumption against a waiver.' [Citations.]" ' " *(People ex rel. Lockyer v. R.J. Reynolds Tobacco Co. (2003) 107 Cal.App.4th 516, 532, 132 Cal.Rptr.2d 151.)*

The clause IHHI relies upon reads: "[T]he Medical Staff of Western Medical Center--Santa Ana will express *public* support for the acquisition and operation of IHHI of, and issuance of hospital licenses to IHHI for, the Hospitals, in accordance with the commitments made herein, **530 including being represented at any public hearings on this proposed acquisition and delivering to DHS (Mark Helmar) a letter supporting IHHI's acquisition and licensure of the Hospitals." (Italics added). IHHI provides no evidence demonstrating the medical staff did not fulfill their requirements to express support at the hearings on IHHI's acquisition of the hospitals, or send a letter to the Department of Health Services supporting IHHI. Rather, IHHI contends the legal staff's promise to "express public support for the acquisition and operation of IHHI" prohibited Fitz-

gibbons from making any negative comments during the three-year term of the agreement.

[16] As an initial matter, we note that Fitzgibbons did not send out his e-mail message publicly, but only to a limited number of recipients. Accordingly, the e-mail did not violate the express provisions of the agreement. More importantly, however, the phrase "express public support for the acquisition and *532 operation of IHHI" is not sufficiently clear and definite on its face to imply a waiver of Fitzgibbons's First Amendment rights, and IHHI fails to provide any evidence Fitzgibbons expressed an understanding he relinquished all right to criticize IHHI or its operation of WMC when he signed the agreement.

Indulging every reasonable presumption against a waiver of First Amendment rights, we conclude IHHI failed to demonstrate a reasonable probability of prevailing on its breach of contract cause of action. Similarly, because courts will not imply a waiver of free speech rights, IHHI's cause of action for breach of the implied covenant of good faith and fair dealing must also be stricken.

## 3. Interference With Contract

[17] IHHI alleges Fitzgibbons's e-mail was forwarded to Blue Cross during the time IHHI was attempting to renegotiate an increase in rates with Blue Cross. IHHI provided evidence that Blue Cross expressed concern about IHHI's financial condition after receiving the e-mail, and due to that concern delayed executing a contract for higher rates. IHHI contends this delay has resulted in damages exceeding $500,000.

[18] Establishing a prima facie case of intentional interference with contractual relations requires proof of "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *(Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

44 Cal.Rptr.3d 517                                                                    Page 13
140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407
**(Cite as: 140 Cal.App.4th 515, 44 Cal.Rptr.3d 517)**

P.2d 587.) IHHI contends it has provided evidence sufficient to establish each of these elements. We disagree.

In support of this claim, IHHI cites the declaration of Mario Rodriguez, a business consultant negotiating with Blue Cross on IHHI's behalf for higher rates. The declaration does not state who forwarded Fitzgibbons's e-mail message to Blue Cross, and IHHI presented no evidence demonstrating Fitzgibbons intended to send, either personally or through an agent, the e-mail to Blue Cross. The only evidence IHHI cited concerning intent are the disparaging remarks Fitzgibbons made in his e-mail and Fitzgibbons's membership **\*533** in a group which competed with IHHI for the purchase of WMC. This evidence may show Fitzgibbons's distain for IHHI, but fails to demonstrate he intended to disrupt IHHI's negotiations with Blue Cross.

We recognize the evidence may support an inference of " 'culpable intent from conduct "substantially certain" to interfere with the contract [or prospective economic relationship].' " **\*\*531**(*Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 449, 26 Cal.Rptr.2d 305.) IHHI has failed to provide any evidence demonstrating a substantial certainty that Fitzgibbons's e-mail message would reach Blue Cross. Indeed, the copy of the message received by Blue Cross indicates it was sent to them from an e-mail address that was not one of the original recipients.

[19] In addition to protection against acts intentionally designed to interfere with contractual relations, the law also protects against injury caused by negligence. (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803, 157 Cal.Rptr. 407, 598 P.2d 60.) IHHI, however, cites no evidence demonstrating negligence by Fitzgibbons in sending his e-mail message. As noted above, we do not construe the agreement between IHHI and the medical staff as imposing a duty on Fitzgibbons to refrain from criticizing IHHI, and nothing indicates he intended to forward the message to Blue Cross.

Finally, we note IHHI's interference with contract claims also fail because it presented no evidence demonstrating any breach or disruption of its existing contract with Blue Cross. Instead, IHHI demonstrated interference with its negotiations for a new Blue Cross contract. Thus, the wrong of which IHHI complains is interference with prospective economic advantage, a tort not pleaded in its complaint. Even if it had been pleaded, however, IHHI failed to establish the interference was wrongful apart from the interference itself, a required element of that tort. (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1152, 17 Cal.Rptr.3d 289, 95 P.3d 513.)

4. *Unfair Business Practices Act, Business and Professions Code Section 17200*

IHHI seeks injunctive relief under the Unfair Business Practices Act, Business and Professions Code section 17200. This cause of action arises out of Fitzgibbons's alleged defamation of IHHI in his e-mail message. Because we conclude the message did not constitute actionable defamation, IHHI's action for violation of the Unfair Business Practices Act also fails for this reason.

**\*534** IV
DISPOSITION

The order denying Fitzgibbons's special motion to strike is reversed, and the trial court is directed to enter a new order granting the motion in its entirety. Fitzgibbons is entitled to his costs on appeal.

WE CONCUR: RYLAARSDAM, Acting P.J., and FYBEL, J.

140 Cal.App.4th 515, 44 Cal.Rptr.3d 517, 06 Cal. Daily Op. Serv. 5081, 2006 Daily Journal D.A.R. 7407

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 7

Westlaw.

50 Cal.Rptr.3d 607                                                                                          Page 1
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

C

Court of Appeal, Second District,
Division 8.
Kierin KIRBY, Plaintiff and Appellant,
v.
SEGA OF AMERICA, INC. et al., Defendants and
Respondents.
No. B183820.

Sept. 25, 2006.

**Background:** Celebrity sued distributors of video
game asserting claims for common law right of
publicity, statutory misappropriation of likeness,
unfair competition, interference with prospective
business advantage, and a violation of the Lanham
Act based on the alleged use of her likeness and
identity to create a character in the game. The Su-
perior Court, Los Angeles County, James C. Chal-
fant, J., entered summary judgment in defendants'
favor. Celebrity appealed.

**Holding:** The Court of Appeal, Boland, J., held that
the video game character was transformative and
protected by the First Amendment.
Affirmed and remanded with directions.

West Headnotes

**[1] Torts ⬅➡390(1)**
379k390(1) Most Cited Cases
In the context of a celebrity, the "invasion of pri-
vacy" tort for appropriation turns on a right of pub-
licity arising from commercially exploitable oppor-
tunities embodied in the plaintiff's likeness.

**[2] Torts ⬅➡385**
379k385 Most Cited Cases
The elements of a common law claim for invasion
of privacy for appropriation are the unauthorized
use of the plaintiff's identity to the defendant's ad-
vantage by appropriating the plaintiff's name, voice,
likeness, etc., commercially or otherwise, and res-
ulting injury.

**[3] Torts ⬅➡383**

379k383 Most Cited Cases
**[3] Torts ⬅➡411**
379k411 Most Cited Cases
The legislative prohibition against the unauthorized
appropriation of one's likeness was intended to
complement, not supplant, common law claims for
"right of publicity." West's Ann.Cal.Civ.Code §
3344(a).

**[4] Antitrust and Trade Regulation ⬅➡30**
29Tk30 Most Cited Cases
The Lanham Act is the federal equivalent of a right
of publicity claim; it protects against use of a
celebrity's image or persona in connection with a
product in a manner likely to falsely imply a
celebrity product endorsement. Lanham Act, § 1 et
seq., 15 U.S.C.A. § 1051 et seq.

**[5] Constitutional Law ⬅➡1490**
92k1490 Most Cited Cases
   (Formerly 92k90(1))
The freedom of expression protected by the First
Amendment exists to preserve an uninhibited mar-
ketplace of ideas and to further individual rights of
self expression. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law ⬅➡1490**
92k1490 Most Cited Cases
   (Formerly 92k90.1(6), 92k90(1))

**[6] Constitutional Law ⬅➡1576**
92k1576 Most Cited Cases
   (Formerly 92k90.1(1))

**[6] Constitutional Law ⬅➡1885**
92k1885 Most Cited Cases
   (Formerly 92k90.1(6), 92k90(1))
First Amendment protections may extend to all
forms of expression, including written and spoken
words, be they fact or fiction, and music, films,
paintings, and entertainment, whether or not sold
for a profit. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law ⬅➡1540**
92k1540 Most Cited Cases
   (Formerly 92k90.2)

50 Cal.Rptr.3d 607                      Page 2
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv. 9978, 2006 Daily Journal D.A.R. 14,190
**(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)**

Even commercial speech receives significant First Amendment protection, unless it is false and misleading, in which case it receives no protection. U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law ⚖1899**
92k1899 Most Cited Cases
(Formerly 92k90.1(6))
Video games are expressive works entitled to as much First Amendment protection as the most profound literature. U.S.C.A. Const.Amend. 1.

**[9] Constitutional Law ⚖1630**
92k1630 Most Cited Cases
(Formerly 92k90.1(1))
To maintain the balance between a celebrity's right to control the commercial exploitation of his or her likeness or identity and the First Amendment right of free expression, a defendant may raise the First Amendment as an affirmative defense to a celebrity's allegation of misappropriation of likeness if the defendant's work adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message, so that the new work contains significant transformative elements. U.S.C.A. Const.Amend. 1.

**[10] Constitutional Law ⚖1630**
92k1630 Most Cited Cases
(Formerly 92k90.1(1))
If a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression of what he or she is trying to create or portray, rather than the celebrity's likeness, it is protected by the
First Amendment. U.S.C.A. Const.Amend. 1.

**[11] Antitrust and Trade Regulation ⚖67**
29Tk67 Most Cited Cases

**[11] Constitutional Law ⚖1602**
92k1602 Most Cited Cases
(Formerly 92k90.1(6))

**[11] Constitutional Law ⚖1604**
92k1604 Most Cited Cases
(Formerly 92k90.1(6))

**[11] Constitutional Law ⚖1652**
92k1652 Most Cited Cases
(Formerly 92k90.1(6))

**[11] Torts ⚖241**
379k241 Most Cited Cases

**[11] Torts ⚖391**
379k391 Most Cited Cases
Video game character was transformative and protected by the First Amendment; notwithstanding certain similarities between character and celebrity who alleged claims for infringement of her common law right of publicity, statutory misappropriation of likeness, unfair competition, interference with prospective business advantage, and a Lanham Act violation against game distributors, First Amendment afforded distributors a complete defense to all of those claims, since the game character contained sufficient expressive dissimilar content to constitute a protected transformative work. U.S.C.A. Const.Amend. 1; Lanham Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.; West's Ann.Cal.Bus. & Prof.Code § 17200; West's Ann.Cal.Civ.Code § 3344(a).
See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 680; Annot., First Amendment Protection Afforded to Commercial and Home Video Games, 106 A.L.R.5th 337.

**[12] Courts ⚖91(1)**
106k91(1) Most Cited Cases

**[12] Courts ⚖95(1)**
106k95(1) Most Cited Cases
The Court of Appeal is bound to follow the decisions of the state Supreme Court, not those of another state.

**[13] Costs ⚖194.25**
102k194.25 Most Cited Cases
Video game distributors who prevailed in asserting First Amendment defense to celebrity's misappropriation of likeness claim were entitled to mandatory award of attorney fees. U.S.C.A. Const.Amend. 1; West's Ann.Cal.Civ.Code § 3344(a).

**[14] Costs ⚖252**

50 Cal.Rptr.3d 607                                                                              Page 3
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
**(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)**

102k252 Most Cited Cases
Statutory authorization for the recovery of attorney
fees incurred at trial necessarily includes attorney
fees incurred on appeal unless the statute specific-
ally provides otherwise.
**608 Blecher & Collins, Maxwell M. Blecher and
Courtney A. Palko, Los Angeles, for Appellant.

Baker & McKenzie, Tod L. Gamlen, Keith L.
Wurster, Palo Alto, and Christopher J. Keller, San
Francisco, for Respondents Sega of America, Inc.,
AGETEC, Inc. and THQ, Inc.

BOLAND, J.

### *50 SUMMARY

A celebrity sued distributors of a video game al-
leging that, in creating a character in the video
game, the distributors misappropriated her likeness
and identity in violation of state and federal law.
The distributors moved for summary judgment as-
serting the First Amendment provided a complete
defense to each of the celebrity plaintiff's claims.
The trial court agreed, **609 granted the motions,
and subsequently awarded the distributors mandat-
ory attorney's fees, as prevailing parties under Civil
Code section 3344, subdivision (a). We affirm the
judgment and remand for a determination regarding
the amount of attorney's fees.

### FACTUAL AND PROCEDURAL BACK-
### GROUND

From 1986 to approximately 1995, appellant Keirin
Kirby, professionally known as "Lady Miss Kier,"
"Miss Kier" or "Lady Kier" (hereafter, Kirby) was
the lead singer of a retro-funk-dance musical group
known as "Deee-Lite" which was popular in the
early 1990's. Deee-Lite made five albums which
were distributed and sold throughout the world. The
band was best known for its song "*Groove is in the
Heart* " from its first album released in *51 1990.
The song's music video, which received extensive
airplay on MTV, features band members clad in "
funky retro outfits, vivid graphics, groovy dance
moves, a futuristic setting and an overall party
feel."

In addition to being a musician, Kirby is a dancer,

artist, choreographer and fashion designer. Kirby
insists that, as "Lady Kier," she developed a "specif-
ic, distinctive ... look," of a "fashionable, provocat-
ive, and funky diva-like artistic character." Kirby
claims her "unique public identity," which com-
bines retro and futuristic visual and musical styles,
results from her signature costumes and lyrical ex-
pression. Kirby's costumes included platform shoes,
knee-socks, brightly-colored form-fitting clothes
and unitards, short pleated or cheerleader-type
skirts, bare midriffs, cropped tops with words or a
numeral written on the chest, space or other hel-
mets, a blue backpack, and red/pink hair worn in a
"page-boy flip" held back by a headband, pigtails
and other styles. Kirby alleges her "signature" lyric-
al expression, with which she introduces herself in
the opening of the music video for "*Groove is in the
Heart,*" and which is included in three of her songs,
is "ooh la la." Kirby claims substantial, commer-
cially valuable goodwill in her sound, appearance,
persona and likeness.

Deee-Lite disbanded by the mid-1990's. Since then,
Kirby has been involved in preparing--but has not
released--an album of her own, and does not pursue
publicity or grant press interviews. She alleges she
has been and is regularly approached by advertisers
and manufacturers interested in licensing her name
and likeness to sell products. Kirby declines most
offers, but derives some income from commercial
endorsements.

Respondents are distributors of a videogame called
"Space Channel 5" (SC5, or the game). SC5 was
created from 1997-1999 by Takashi Yuda, an em-
ployee of Sega Japan, and was released in Japan in
December 1999. Yuda originally conceived the
main character as a male, but changed the character
to a female in order to develop a video game to ap-
peal to girls. Yuda testified the name "Ulala" was a
derivative of a Japanese name "Urara," modified to
make it easier for English-speakers to pronounce.
Yuda claims he developed the Ulala character
based on the "anime" style of Japanese cartoon
characters, and denied using Kirby as a reference.
Ulala has six main dance moves (up, down, right,
left, forward and backward). The character's dance

50 Cal.Rptr.3d 607                                                                                      Page 4
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

moves were created by Nahoko Nezu, a Japanese choreographer and dancer. Nezu's dance moves were hers alone. At the time she created the moves, Nezu did not know Kirby, and had not ever heard of her. Nezu created and performed dance moves for Ulala at Yuda's direction. He videotaped the moves and used the tapes to create Ulala's dance moves in the game. **610 The musical theme song for SC5 is *Mexican Flyer.* That song, written in the 1960's, is performed by composer Ken Woodman. The music is not based on, or used in reference to, any music by Deee-Lite or Kirby.

*52 The game, set in outer space in the 25th Century, features the computer-generated image of a young, fictional elongated and extremely thin female reporter named "Ulala" who works for a news channel called Space Channel 5. In the game, Ulala wears a few different costumes, but is primarily seen in an almost entirely orange outfit which includes a midriff-exposing top bearing the numeral "5," a mini-skirt, elbow-length gloves, and stiletto-heeled, knee-high platform boots. Her hot pink hair is always worn in short pigtails placed high on the back of her head, and she wears a blue headset and jet pack and a blue gun holster strapped to her right thigh. Orange and blue were chosen as the primary colors for Ulala's costume because orange is the official color of Dreamcast, and the corporate color of Sega Japan is blue.

In the game, Ulala is dispatched to investigate an invasion of Earth by dance-loving aliens who shoot earthlings with ray guns, causing them to dance uncontrollably. During her investigation, Ulala encounters the aliens and competitor reporters. The player attempts to have Ulala match the dance moves of the other characters. If successful, the player acquires points, eliminates certain characters, and causes others to become part of Ulala's dance troupe. The player moves to higher levels of more difficult play until he or she reaches a final level and a surprise ending to Ulala's story. One character at the final level is known as "Space Michael." It was created to resemble the celebrity Michael Jackson, who performed the character's voice and receives credit in the game.

Several promotional products are associated with the game. Sega produced a give-away promotional video with samples of music from SC5. Sega also sub-licensed the sale of three Ulala-related products in the United States: (1) a strategy guide for playing SC5; (2) a lunch box displaying characters from the game, including Ulala; and (3) a "Hot Wheels" car containing a picture of Ulala.

Respondent Sega of America, Inc. (Sega) released a "localized" version of the game in North America in June 2000. The localized North American version differs from the Japanese version in that voices are different, and the language is changed to English.

In July 2000, Kirby was contacted by PD*3 Tully Co. (PD3), a firm retained by a subsidiary of Sega Japan, in connection with its effort to launch a version of SC5 in England. PD3 was considering using one of several music videos or songs, including *Groove is in the Heart,* to promote the game. PD3 contacted Kirby to determine if she was interested in promoting the SC5 in England and, possibly, Europe. Kirby was not.

Under a license granted by Sega Japan, respondent THQ, Inc. (THQ) was authorized to release and market a hand-held version of SC5 in June 2003 for *53 use on the Nintendo Gameboy Advance platform. Later that year, respondent Agetec, Inc. (Agetec) received Sega's authorization to market a special edition of the game for the "Playstation 2" platform. [FN1]

> FN1. The special edition consisted of SC5, originally published for the Dreamcast platform, and a sequel, SC5 Part 2, which had been released in Japan for both the Dreamcast and Playstation 2 platforms.

Kirby initiated this action in April 2003. The operative second amended complaint **611 alleges causes of action for: (1) common law infringement of the right of publicity; (2) misappropriation of likeness (Civ.Code, § 3344); (3) violation of the Lanham Act (15 U.S.C. § 1125(a)); (4) unfair competition (Bus. & Prof.Code, § 17200); (5) interfer-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

50 Cal.Rptr.3d 607                                                                                                       Page 5
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
**(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)**

ence with prospective business advantage; and (6) unjust enrichment. Kirby alleged respondents wrongfully used her name, likeness and identity in developing and marketing the game and, specifically, its Ulala character.

Sega, Agetec and THQ each moved for summary judgment asserting Kirby could not establish all elements of her claims and, even if she could, the First Amendment provided a complete defense to the entire action. [FN2] The motions were granted after the trial court found all claims constitutionally foreclosed.

> FN2. Sega also argued the action was barred by the statute of limitations, and Agetec and THQ asserted the defense of laches. The trial court declined to address those arguments, which are not at issue in this appeal.

Respondents subsequently moved for a "mandatory" award of attorneys fees in the amount of approximately $763,000, collectively. (Civ.Code, § 3344, subd. (a).) Kirby opposed the motion, arguing the "mandatory" fee provision of Civil Code section 3344 created public policy concerns. She also asserted the amount of fees sought was unreasonable, any fees awarded must be apportioned among the state claims, and no fees should be awarded on the federal claim. The trial court declined to award fees on the Lanham Act claim and reduced the fee award to approximately $608,000, but granted the remainder of the motion. This appeal followed.

## DISCUSSION

### 1. Standard of review

The standard of review articulated by the Supreme Court applies in this case. In _Aguilar v. Atlantic Richfield Co._ (2001) 25 Cal.4th 826, 107 Cal.Rptr.2d 841, 24 P.3d 493 (_Aguilar_ ), the Supreme Court described a party's burdens on summary judgment. "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to **\*54** judgment as a matter of law." (_Id._ at p. 850, 107

Cal.Rptr.2d 841, 24 P.3d 493.) " 'That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. [Citation.] There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.... [Citation.]' " (_TrafficSchoolOnline, Inc. v. Clarke_ (2003) 112 Cal.App.4th 736, 738, 739, 5 Cal.Rptr.3d 408.) A defendant moving for summary judgment satisfies its burden of showing a claim lacks merit if the defendant can show one or more elements of a cause of action cannot be established because the plaintiff does not possess and cannot reasonably obtain the evidence necessary to establish the claim, or a complete defense to that cause of action exists. (Code Civ. Proc., § 437c, subds. (o )(2), (p)(2).); (_Aguilar, supra_, 25 Cal.4th at pp. 849, 854-855, 107 Cal.Rptr.2d 841, 24 P.3d 493.) If this burden of production is met, the burden shifts to the plaintiff to set forth specific facts sufficient to establish a _prima facie_ showing of the existence of a triable material issue of fact. (Code Civ. Proc., § 437c, subds. (o )(2), (p)(2); _Aguilar, supra_, 25 Cal.4th at p. 854, 107 Cal.Rptr.2d 841, 24 P.3d 493.)

**\*\*612** In cases involving free speech, a speedy resolution is desirable because protracted litigation may chill the exercise of First Amendment rights. For that reason, summary judgment is a favored remedy in free speech cases. (_Winter v. DC Comics_ (2003) 30 Cal.4th 881, 891-892, 134 Cal.Rptr.2d 634, 69 P.3d 473 (_Winter_ ); _Shulman v. Group W Productions, Inc._ (1998) 18 Cal.4th 200, 228, 74 Cal.Rptr.2d 843, 955 P.2d 469.) Indeed, in an appropriation case not dissimilar from this one, the Supreme Court instructed that: "courts can often resolve the question as a matter of law simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person or persons portrayed. Because of these circumstances, an action presenting this issue is often properly resolved on summary judgment...." (_Winter, supra_, 30 Cal.4th at pp. 891-892, 134 Cal.Rptr.2d 634, 69 P.3d 473.) The trial court's decision to enter sum-

50 Cal.Rptr.3d 607                                                                                                    Page 6
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

mary judgment is reviewed de novo. However, if the decision is correct on any ground, the judgment must be upheld regardless of the reasons given by the trial court. (*TrafficSchoolOnline, Inc. v. Clarke, supra,* 112 Cal.App.4th at pp. 738-739, 5 Cal.Rptr.3d 408.)

## 2. Material issues of fact exist as to whether Kirby's likeness or identity was appropriated.

### a. The state statutory and common law claims of appropriation.

Kirby alleges both a common law and statutory appropriation claim, a claim for violation of the Lanham Act, and several claims related to unfair competition. Her claims are predicated on the same underlying misconduct, i.e., respondents' alleged misappropriation and exploitation of Kirby's likeness or identity as depicted by the game's Ulala character.

[1][2] *55 In the context of a celebrity, the "invasion of privacy" tort for appropriation turns on a right of publicity arising from commercially exploitable opportunities embodied in the plaintiff's likeness. (*Baugh v. CBS, Inc.* (N.D.Cal.1993) 828 F.Supp. 745.) The cause of action may be both common law and statutory. The elements of a common law action are the unauthorized use of the plaintiff's identity to the defendant's advantage by appropriating the plaintiff's name, voice, likeness, etc., commercially or otherwise, and resulting injury. (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417, fn. 6, 198 Cal.Rptr. 342.)

[3] The statutory claim provides: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, ... shall be liable for any damages sustained by the person or persons injured as a result thereof." (Civ.Code, § 3344, subd. (a) [§ 3344, subd. (a) ].) The legislative prohibition against the unauthorized appropriation of one's likeness was intended to complement, not supplant,

common law claims for "right of publicity." (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 391, 106 Cal.Rptr.2d 126, 21 P.3d 797 (*Comedy III* ); *Eastwood v. Superior Court, supra,* 149 Cal.App.3d at pp. 416-417, 198 Cal.Rptr. 342.) The common law and statutory claims are similar but not identical, but both are involved here. A statutory cause of action for appropriation not only encompasses the common law elements, it requires a knowing use of the plaintiff's name, likeness, etc. (*Eastwood v. Superior Court, supra,* 149 Cal.App.3d at pp. 417-418, 198 Cal.Rptr. 342; **613§ 3344, subd. (a).)** The privacy invasion is actionable under either the statute or common law regardless of whether the purpose is commercial. (See *KNB Enterprises v. Matthews* (2000) 78 Cal.App.4th 362, 367-368, fn. 5, 92 Cal.Rptr.2d 713.)

Kirby repeatedly insists the trial court found, as a matter of law, that her "likeness and identity had been misappropriated." Her insistence is not supported by the record. The trial court found only the existence of material factual issues as to whether, by creating Ulala, respondents misappropriated Kirby's likeness and identity. Our review of the record reveals the court's conclusion was correct.

The misappropriation of one's "likeness" refers to a person's visual image. (*Midler v. Ford Motor Co.* (9th Cir.1988) 849 F.2d 460, 463.) Ulala resembles Kirby in certain respects. Certain of Ulala's characteristics and computer-generated features resemble Kirby's. Both images are thin, and have similarly shaped eyes and faces, red lips and red or pink hair. Both wear brightly-colored, form-fitting clothing, including short skirts and platform *56 shoes in a 1960's retro style. In addition, Ulala's name is a phonetic variant of "ooh la la," a phrase often used by Kirby and associated with Kirby. Finally, as the trial court pointed out, both Kirby and Ulala used the phrases "groove," "meow," "dee-lish," and "I won't give up." These similarities support Kirby's contention her identity was misappropriated.

However, Ulala and Kirby also differ in significant respects. Although Ulala dons assorted costumes in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

50 Cal.Rptr.3d 607                                                                                                 Page 7
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

the game, she is seen most often with her hair in short, high pigtails, wearing an orange cropped-top bearing the numeral "5" and orange miniskirt, orange gloves and boots with stiletto heels, a blue ray-gun holster strapped to her thigh, and a blue headset and jetpack. Kirby asserts she often wears short skirts, crop tops with numbers, elbow-length gloves, pigtails and space helmets. Kirby, as the record reflects, is found more frequently in form-fitting body suits, with her hair shaped into a pageboy flip, held back with a head band. And, unlike Ulala, when Kirby wears her hair in pigtails, the pigtails not only are longer than Ulala's, but Kirby has tendrils of hair draping over her forehead which she holds back with clips. Kirby concedes she has no singular identity, her appearance and visual style are "continually moving," and she "is not the type of artist that wants to do the same thing every time." This lack of stasis is inconsistent with a claim of appropriation. Moreover, unlike the game, which is set in outer space several centuries in the future, Kirby's fashion approach harkens back to a retro 1960's style, and neither her videos nor photographs relate to outer space.

Notwithstanding the differences between Kirby and Ulala, we agree with the trial court that a material factual issue exists as to whether respondents misappropriated Kirby's likeness. Ulala's facial features, her clothing, hair color and style, and use of certain catch phrases are sufficiently reminiscent enough of Kirby's features and personal style to suggest imitation. In addition, although no evidence indicates Kirby's likeness was actually used to create Ulala, Kirby was specifically asked by a Sega affiliate in 2003 to endorse SC5. This solicitation suggests Sega knew of Kirby and believed her celebrity association would benefit the release of the European version of the game.

The differences also give rise to a factual issue on the common law claim of misappropriation of Kirby's identity. Again, Kirby's admission that she possesses no singular identity militates against a successful claim of appropriation. (Compare **614 *White v. Samsung Electronics America, Inc.* (9th Cir.1992) 971 F.2d 1395, 1399

[Nonconsensual use of robotic image of celebrity Vanna White, dressed in wig, gown and jewelry regularly worn by White, turning letters on a game show set designed to look like the "Wheel of Fortune," constitutes common law appropriation of celebrity's singular identity].) In *57 addition, we agree with the trial court that Ulala's limited and consistently short and choppy dance movement and style differ markedly from Kirby's, a finding consistent with Sega's claim that Ulala's dance moves were created by a dancer who knew nothing of Kirby. Nevertheless, the differences are sufficient to give rise to a triable factual issue on the common law claim as well. [FN3]

> FN3. Kirby's remaining state law claims--unfair competition in violation of Business & Professions Code section 17200, interference with prospective business advantage and accounting-ride the coattails of her privacy claims. That is, each is predicated on the unauthorized appropriation of her likeness or identity. As such, material issues of fact exist as to these claims as well.

**b. The Lanham Act.**

[4] The Lanham Act is the federal equivalent of a right of publicity claim. It protects against use of a celebrity's image or persona in connection with a product in a manner likely to falsely imply a celebrity product endorsement. (*ETW Corp. v. Jireh Pub., Inc.* (6th Cir.2003) 332 F.3d 915, 924) (*ETW*). Critical to a Lanham Act claim is the likelihood reasonable consumers will be confused about the celebrity's endorsement. (*Id.* at pp. 925-926.) For reasons discussed above, we agree with the trial court's finding that "[t]he same issues of fact concerning likeness and identity which support [Kirby's] appropriation claims also support her Lanham Act claim. There is a question of fact that [Kirby's] identity, though constantly evolving, has been appropriated for SC5." [FN4]

> FN4. Ordinarily, a Lanham Act claim requires analysis of the key element of false

50 Cal.Rptr.3d 607                                                                                                    Page 8
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

endorsement which is not required by the state law appropriation claims. In other words, the court must evaluate the likelihood an ordinary consumer would reasonably believe the celebrity endorsed or sponsored the product or service at issue. (See e.g., _White v. Samsung Electronics America, Inc., supra,_ 971 F.2d at p. 1401.) That evaluation need not be conducted here. The test does not apply in a case such as this, in which there is a colorable defense that the use of the celebrity's likeness or identity is entitled to First Amendment protection. _(ETW, supra,_ 332 F.3d at p. 926.)

### 3. The First Amendment affords a complete defense to Kirby's claims.

Respondents contend here, as they did below, that their right of free expression under the First Amendment of the United States Constitution and the even greater speech protections afforded by the California Constitution, Article I, section 2, provide a complete defense to Kirby's claims. (See _Robins v. Pruneyard Shopping Center_ (1979) 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 [Cal. Const. provides broader speech protection than does U.S. Const.].) The trial court agreed, as do we.

[5][6][7][8] The freedom of expression protected by the First Amendment exists to preserve an uninhibited marketplace of ideas and to further individual *58 rights of self expression. _(Winter, supra,_ 30 Cal.4th at p. 887, 134 Cal.Rptr.2d 634, 69 P.3d 473.) The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, whether or not sold for a profit. [FN5] **615_(COMEDY III, supra,_ 25 cal.4th at pp. 387, 406, 106 Cal.Rptr.2d 126, 21 P.3d 797; _Winter, supra,_ 30 Cal.4th at p. 888, 134 Cal.Rptr.2d 634, 69 P.3d 473; _ETW, supra,_ 332 F.3d at p. 924.) Video games are expressive works entitled to as much First Amendment protection as the most profound literature. _(Interactive Digital Software v. St. Louis County_ (8th Cir.2003) 329 F.3d 954, 956-958;

_Video Software Dealers Ass'n v. Maleng_ (W.D.Wash.2004) 325 F.Supp.2d 1180, 1184-1185.)

> FN5. Even commercial speech receives significant First Amendment protection, unless it is false and misleading, in which case it receives no protection. (See _Comedy III, supra,_ 25 Cal.4th at p. 396, 106 Cal.Rptr.2d 126, 21 P.3d 797.)

[9] As this case illustrates, a tension frequently exists between the First Amendment's goal of fostering a marketplace of ideas and respect for individual expression, and a celebrity's right of publicity. In _Comedy III_ and again in _Winter,_ the Supreme Court addressed the balance between a celebrity's right to control the commercial exploitation of his or her likeness or identity and the First Amendment right of free expression. (See _Comedy III, supra,_ 25 Cal.4th at p. 400, 106 Cal.Rptr.2d 126, 21 P.3d 797; _Winter, supra,_ 30 Cal.4th at pp. 887-888, 134 Cal.Rptr.2d 634, 69 P.3d 473.) In _Comedy III,_ the Court held a defendant may raise the First Amendment as an affirmative defense to an allegation of appropriation if the defendant's work " 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.... [Citation.]' " _(Comedy III, supra,_ 25 Cal.4th at p. 404, 106 Cal.Rptr.2d 126, 21 P.3d 797.) In other words, the new work must contain significant "transformative elements." _(Id._ at pp. 406-407, 106 Cal.Rptr.2d 126, 21 P.3d 797.) The "transformative" test protects the right of publicity. It continues to shield celebrities from literal depictions or imitations for commercial gain by works which do not add significant new expression. Moreover, a work which has been "transformed" is less likely to interfere with the economic interests protected by the right of publicity, because a distorted image of a celebrity is a poor substitute for more conventional forms of celebrity depictions, and thus less likely to threaten the market for celebrity memorabilia. _(Comedy III, supra,_ 25 Cal.4th at p. 405, 106 Cal.Rptr.2d 126, 21 P.3d 797.)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

50 Cal.Rptr.3d 607                                                                                                  Page 9
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

[10] The transformative test is straightforward: The "inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question." (Comedy III, supra, 25 Cal.4th at p. 406, 106 Cal.Rptr.2d 126, 21 P.3d 797.) If the "product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression" of what he or she is trying to create or portray, rather than the celebrity's likeness, it is protected. (Id. at pp. 406-407, 106 Cal.Rptr.2d 126, 21 P.3d 797.) Applying this test in Comedy III, which involved *59 drawings depicting The Three Stooges, and T-shirts made from those drawings, the Court concluded the drawings and T-shirts were not entitled to First Amendment protection. The artist who created them, while highly skilled, contributed nothing other than a trivial variation that transformed the drawings from literal likenesses of the three actors. (Id. at pp. 408-409, 106 Cal.Rptr.2d 126, 21 P.3d 797.)

The Supreme Court applied the transformative test again two years later in Winter. In that case, the defendant published a series of comics featuring two half-worm, half-human characters based on singers Edgar and Johnny Winter. Both characters had long white hair and albino features similar to the Winter brothers, while one wore a hat similar to one often worn by Johnny Winter. **616(Winter, supra, 30 Cal.4th at p. 886, 134 Cal.Rptr.2d 634, 69 P.3d 473.)

The Winter brothers sued for statutory appropriation and lost. Applying the transformative test, the Court found the comic depictions contained significant expressive content beyond the Winters' mere likenesses. (Winter, supra, 30 Cal.4th at p. 890, 134 Cal.Rptr.2d 634, 69 P.3d 473.) The Winters were merely part of the raw material from which the comics' plot and characters were fashioned. In addition, the characters were distorted pictures of the Winters for the purpose of lampoon, parody or caricature. In short, and in stark contrast to the near literal depictions of the Three Stooges in Comedy III, the comic book characters depicted were "fanciful,

creative characters, not pictures of the Winter brothers." (Id. at p. 892, 134 Cal.Rptr.2d 634, 69 P.3d 473.)

[11] Applying the comparison required by Comedy III and Winter to the evidence in the record, we agree with the trial court that, notwithstanding certain similarities, Ulala is more than a mere likeness or literal depiction of Kirby. Ulala contains sufficient expressive content to constitute a "transformative work" under the test articulated by the Supreme Court. First, Ulala is not a literal depiction of Kirby. As discussed above, the two share similarities. However, they also differ quite a bit: Ulala's extremely tall, slender computer-generated physique is dissimilar from Kirby's. Evidence also indicated Ulala was based, at least in part, on the Japanese style of "anime." Ulala's typical hairstyle and primary costume differ from those worn by Kirby who varied her costumes and outfits, and wore her hair in several styles. Moreover, the setting for the game that features Ulala--as a space-age reporter in the 25th century--is unlike any public depiction of Kirby. Finally, we agree with the trial court that the dance moves performed by Ulala--typically short, quick movements of the arms, legs and head--are unlike Kirby's movements in any of her music videos. Taken together, these differences demonstrate Ulala is "transformative," and respondents added creative elements to create a new expression.

Conceding the game adds "new expression," Kirby nevertheless contends respondents violated her right of privacy because, unlike the comics in Winter *60 which were intended to "poke fun," the game lacks any " element of caricature, lampoon, or parody." Notwithstanding the added expression, Kirby insists Ulala is no more than a "look-alike, an imitation or emulation or rip-off of Lady Kier's entire persona," co-opted by respondents with the "commercial objective to us[e] Lady Kier's likeness and identity" and to capitalize in the game and its affiliated products on the commercial value attached to her persona. Kirby insists "Ulala is nothing other than a mere emulation of Lady Kier with minor digital enhancements and manipulations." It

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

50 Cal.Rptr.3d 607                                                                                                         Page 10
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

is not entitled to First Amendment protection because the character fails to "say [anything]--whether factual or critical or comedic--about a public figure." Neither contention has merit.

First, for the reasons discussed above, we reject the claim that Ulala merely emulates Kirby. Sufficient similarities preclude a conclusion that, as a matter of law, Ulala was not based in part on Kirby. However, we are similarly unable to conclude, as a matter of law, that Ulala is nothing other than an imitative character contrived of "minor digital enhancements and manipulations." Respondents have added new expression, and the differences are not trivial. Ulala is not a mere imitation of Kirby.

Second, and more importantly, the transformative test specifically does not require the elements Kirby seeks to impose. **617 The law does not require Ulala to "say something--whether factual or critical or comedic" about Kirby the public figure in order to receive First Amendment protection. This argument has been soundly rejected by the Supreme Court. In _Winter,_ the court made clear the pivotal issue is whether the work is transformative, not the form of literary expression: "It does not matter what precise literary category the work falls into. What matters is whether the work is transformative, not whether it is parody or satire or caricature or serious social commentary or any other specific form of expression." _(Winter, supra,_ 30 Cal.4th at p. 891, 134 Cal.Rptr.2d 634, 69 P.3d 473.)_ Whether the Ulala character conveys any expressive meaning is irrelevant to a First Amendment defense. (See _Comedy III, supra,_ 25 Cal.4th at pp. 399, 403, 106 Cal.Rptr.2d 126, 21 P.3d 797.) All that is necessary is that respondents' work add "something new, with a further purpose or different character, altering the first with new expression, meaning, or message." _(Id._ at p. 404, 106 Cal.Rptr.2d 126, 21 P.3d 797.) A work is transformative if it adds "new expression." That expression alone is sufficient; it need not convey any "meaning or message" _(Ibid.)_ The Ulala character satisfies this test.

[12] Kirby alternatively invites us to "refine" the

"transformative test developed by our Supreme Court, "because its application is confusing and difficult and the result uncertain," or simply to reject the test outright in favor of the "predominant use" test recently adopted by the Missouri Supreme Court in _Doe v. TCI Cablevision_ (Mo.2003) 110 S.W.3d 363, cert. *61 denied, 540 U.S. 1106, 124 S.Ct. 1058, 157 L.Ed.2d 892 (2004). We decline the invitation. First and foremost, we are bound to follow the decisions of our Supreme Court, not those of another state. _(McClung v. Employment Development Dept._ (2004) 34 Cal.4th 467, 473, 20 Cal.Rptr.3d 428, 99 P.3d 1015.) "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court." _(Auto Equity Sales, Inc. v. Superior Court_ (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) [FN6]

> FN6. For the same reasons, we reject Kirby's assertion that we should ignore the standard established by _Comedy III_ and _Winter,_ and the rule that summary judgment is a favored remedy in First Amendment cases, and send the issue of whether respondents' work is "transformative" to the jury, under CACI 1805. This jury instruction applies only if a case presents a factual issue as to whether defendant has added new expression. In other cases, the Supreme Court has made it clear "courts can often resolve the question as a matter of law simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person ... portrayed." _(Winter, supra,_ 30 Cal.4th at pp. 891-892, 134 Cal.Rptr.2d 634, 69 P.3d 473.) This case falls squarely into the latter category.

Second, we disagree that the transformative test requires refinement or is confusing or difficult--at least in this instance--to apply. The test simply requires the court to examine and compare the allegedly expressive work with the images of the plaintiff to discern if the defendant's work contrib-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

50 Cal.Rptr.3d 607                                                                                                        Page 11
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

utes significantly distinctive and expressive content; i.e., is "transformative." If distinctions exist, the First Amendment bars claims based on appropriation of the plaintiff's identity or likeness; if not, the claims are not barred. *(Winter, supra, 30 Cal.4th at pp. 889-891, 134 Cal.Rptr.2d 634, 69 P.3d 473.)* As aptly summed up by the trial court, "any imitation of [Kirby's] likeness or identity in Ulala is not the sum and substance of that character. Rather, the imitation is part of the raw material from which the Ulala character, and **618 SC[5], were synthesized. As in *Winter,* Ulala is a 'fanciful, creative character' who exists in the context of a unique and expressive video game. Similar facts distinguished *Winter* from *Comedy III,* and the same distinction applies here. [Respondents'] portrayal of Ulala is protected by the First Amendment."

Because Kirby's claims are subject to a First Amendment defense, and the videogame is protected speech, Kirby's state common law and statutory claims fail. Kirby's Lanham Act claim is also barred. Ulala is not a literal depiction of Kirby. We agree with the trial court that any public confusion that Kirby endorses SC5, based on similarities between her and Ulala, would arise from a false assumption that the game could not contain a character resembling Kirby without her imprimatur. However, unlike the Three Stooges, Ulala is not a literal depiction of Kirby. Thus, given the many dissimilarities between the Ulala character and Kirby, any public confusion arising from a mistaken assumption is easily outweighed by the public interest in free artistic expression, so as to preclude application of the *62 Lanham Act. (See *ETW, supra,* 332 F.3d at p. 937; see also *Hoffman v. Capital Cities/ABC, Inc.* (9th Cir.2001) 255 F.3d 1180, 1183 [claims for violation of the Lanham Act, common law appropriation action, violation of § 3344, and violation of Bus. & Prof.Code, § 17200 each barred by First Amendment defense].)

**4. Respondents are entitled to attorney's fees.**

[13] Section 3344, subdivision (a) clearly states that "[t]he prevailing party in any action under this sec-

tion shall ... be entitled to attorney's fees and costs." Under this provision, respondents sought approximately $763,000 in attorney's fees and costs, and ultimately received an award of approximately $608,000. [FN7] Kirby concedes section 3344's directive that fees "shall" be awarded to the prevailing party in a statutory appropriation action is clearly mandatory. Nevertheless, she argues the statute should be applied permissively and only in cases in which the suit is deemed frivolous or brought in bad faith or without substantial justification. Otherwise, she insists, the statute "presents a clear disincentive for plaintiffs to enforce...." Her argument is misdirected. The mandatory fee provision of section 3344, subdivision (a) leaves no room for ambiguity. Whether the course is sound is not for us to say. *(People v. Ireland* (1995) 33 Cal.App.4th 680, 694, 39 Cal.Rptr.2d 870.)* This is the course the Legislature has chosen, and, until that body changes course, we must enforce the rule. The fee award was proper.

> FN7. As to the claim for violation of the Lanham Act, the trial court denied respondents attorney's fees concluding Kirby's action was neither unreasonable or groundless. (See *Stephen W. Boney, Inc. v. Boney Services, Inc.* (9th Cir.1997) 127 F.3d 821, 825, 827 [prevailing defendant may be awarded fees in an "exceptional case," i.e., one in which plaintiff's claims are groundless, unreasonable, vexatious or pursued in bad faith].) The amount of the fees awarded was reduced after the trial court concluded the amount sought by respondents was not reasonable. However, the court found all of Kirby's state statutory and common law claims "inextricably intertwined," and refused to further apportion the fee award. *(Akins v. Enterprise Rent-a-Car Co.* (2000) 79 Cal.App.4th 1127, 1133, 94 Cal.Rptr.2d 448 [When statutory claims providing for fees are combined with claims for which attorney's fees are not available, prevailing party may recover fees only on statutory claim unless claims are so intertwined or

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

50 Cal.Rptr.3d 607
144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv.
9978, 2006 Daily Journal D.A.R. 14,190
(Cite as: 144 Cal.App.4th 47, 50 Cal.Rptr.3d 607)

pertain to issues common to claims in which fees are properly allowed].) Kirby does not take issue with these rulings.

[14] Respondents also seek and are entitled to recover attorney's fees on appeal **619 under section 3344, subdivision (a). "Statutory authorization for the recovery of trial fees incurred at trial necessarily includes attorney fees incurred on appeal unless the statute specifically provides otherwise. [Citation.]" (*Akins v. Enterprise Rent-a-Car Co., supra,* 79 Cal.App.4th at p. 1134, 94 Cal.Rptr.2d 448; see also *Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 929, 275 Cal.Rptr. 187, 800 P.2d 543 [Stating the "general rule that statutory attorney fee provisions are interpreted to apply to attorney fees on appeal unless the statute specifically provides otherwise"].) Although we could appraise and fix *63 attorney fees on appeal, the more appropriate course of practice is to remand the case to the trial court to determine the appropriate amount of fees. (See *ibid.*)

### DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court for a determination of the amount of an award of attorney's fees to respondents as prevailing parties on this appeal. (§ 3344, subd. (a).) Respondents are awarded costs on appeal.

We concur: COOPER, P.J., and FLIER, J.

144 Cal.App.4th 47, 50 Cal.Rptr.3d 607, 81 U.S.P.Q.2d 1172, 35 Media L. Rep. 1075, 06 Cal. Daily Op. Serv. 9978, 2006 Daily Journal D.A.R. 14,190

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.