# EXHIBIT 8

Westlaw.

37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

▷

GLEN LUDWIG, Petitioner,

v.

THE SUPERIOR COURT OF RIVERSIDE
COUNTY, Respondent; CITY OF BARSTOW et
al.,
Real Parties in Interest.
**No. E015539.**

Court of Appeal, Fourth District, Division 2, Cali-
fornia.

Jul 26, 1995.

SUMMARY

In an action by a city against a developer for inter-
ference with contractual relations and economic ad-
vantage, and unfair competition, alleging defendant
was behind other persons' environmental objections
to plaintiff's efforts to attract a mall to the city, the
trial court denied defendant's motion to strike made
under Code Civ. Proc., § 425.16, for dismissal of
SLAPP suits (strategic lawsuits against public parti-
cipation). (Superior Court of Riverside County, No.
255017, Richard G. Van Frank, Judge.)

The Court of Appeal ordered issuance of a writ of
mandate directing the trial court to grant defend-
ant's motion to strike. The court held that under
Code Civ. Proc., § 425.16, enacted to allow prompt
disclosure and dismissal of SLAPP suits, the
plaintiff must establish, through the pleadings or af-
fidavits, a "probability" that it will prevail. The
plaintiff must make a prima facie showing by com-
petent admissible evidence within the personal
knowledge of the declarant, with reference to the
familiar standards applied to evidentiary showings
on summary judgment motions. Although Code
Civ. Proc., § 425.16, sets out a mere rule of proced-
ure, the court held that it is founded on the constitu-
tional doctrine that those who petition the govern-
ment are essentially immune from liability. Under
this doctrine the motive of the petitioners is irrelev-
ant, as long as the intent is genuinely to induce gov-
ernment to action rather than to frustrate or deter a
third party simply by the use of the governmental
process. Applying these standards, the court
held that plaintiff failed to show a "probability" of suc-
cess on the merits within the scope of the statute,
and that the trial court therefore erred in denying
defendant's motion. The court held that the fact that
defendant did not personally perform any of the
challenged acts did not preclude his motion to
strike the pleadings under § 425.16. The statute
covers "any act of [a] person in furtherance of the
person's right of petition or free speech ...," and a
person can exercise his or her own rights by sup-
porting the activities of others. The court further
held, as to claims based on the principles of mali-
cious prosecution, an essential element of an action
for *9 malicious prosecution is that the prior litiga-
tion have resulted in a "favorable termination" for
plaintiff, but the suits in question were terminated
by a settlement, which almost invariably does not
reflect on the merits. The settlements involved a
compromise and the surrender of something of
value by plaintiff, including payment of money and
a waiver of costs. Under these circumstances
plaintiff could not argue that it agreed to the settle-
ments only under duress and thus show that the set-
tlements reflected in its favor as a matter of fact.
(Opinion by Richli, J., with Dabney, Acting P. J.,
and McKinster, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 93--Motions and Objections--Motion
to Strike Pleading as a Whole--SLAPP Suit-
-Burden of Proof.
Under Code Civ. Proc., § 425.16, enacted to allow
prompt disclosure and dismissal of SLAPP suits
(strategic lawsuits against public participation), the
plaintiff must establish, through the pleadings or af-
fidavits, a "probability" that it will prevail. The
plaintiff must make a prima facie showing by com-
petent admissible evidence within the personal
knowledge of the declarant, with reference to the
familiar standards applied to evidentiary showings

37 Cal.App.4th 8                                                                                                                    Page 2
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

on summary judgment motions. The trial court, in ruling on such a request, does not weigh the evidence. Such a burden on the plaintiff is appropriately moderate and is compatible with the early stage at which the motion is brought and heard and the limited opportunity to conduct discovery. An overly lenient standard would be inappropriate, given that the statute is intended to provide a fast and inexpensive unmasking and dismissal of SLAPP suits.

(2) Pleading § 93--Motions and Objections--Motion to Strike Pleadings as a Whole--SLAPP Suits--Against Defendant Instigating Conduct of Others.
In an action by a city against a developer for interference with contractual relations and economic advantage, and unfair competition, alleging defendant was behind other persons' environmental objections to plaintiff's efforts to attract a mall to the city, the fact that defendant did not personally perform any of the challenged acts did not preclude his motion to strike the pleadings under Code Civ. Proc., § 425.16, which provides for a procedural remedy allowing prompt exposure and dismissal of SLAPP suits (strategic lawsuits against public participation). The statute covers "any act of [a] person in furtherance of the person's right of petition or free speech ...," *10 and a person can exercise his or her own rights by supporting the activities of others. Plaintiff's whole case against defendant depended on the fact that he instigated lawsuits by two persons, and encouraged two other persons to speak against plaintiff's project. Accordingly, plaintiff was seeking to hold defendant liable for the exercise of a right protected by § 425.16. Moreover, it could not be said that defendant's conduct was "noncommunicative," and thus not protected by the statute.

(3) Pleading § 93--Motions and Objections--Motion to Strike Pleading as a Whole--SLAPP Suits--Defendant's Environmental Opposition to Project--Evidence of Lack of Merit.
In an action by a city against a developer for interference with contractual relations and economic advantage, and unfair competition, alleging defendant was behind other persons' environmental objections to plaintiff's efforts to attract a mall to the city,

plaintiff failed to show, in response to defendant's motion to strike the pleadings under Code Civ. Proc., § 425.16, which provides for a procedural remedy allowing prompt exposure and dismissal of SLAPP suits (strategic lawsuits against public participation), that the comments of two "agents" of defendant at public hearings regarding environmental issues connected with the proposed mall, were objectively baseless. Although § 425.16 sets out a mere rule of procedure, it is founded in the constitutional doctrine that those who petition the government are essentially immune from liability. Under this doctrine the motive of the petitioners is irrelevant, as long as the intent is genuinely to induce government to action rather than to frustrate or deter a third party simply by the use of the governmental process. Plaintiff's declaration that the environmental claims were wholly without merit, for reasons not given, was merely conclusory. Plaintiff utterly failed to show that the expressed concerns had no reasonable basis or that no reasonable person could have expected the action taken to lead to governmental results; thus, the issue of the agents' motive, and defendant's, did not arise.

(4) Pleadings § 93--Motions and Objections--Motion to Strike Pleading as a Whole--SLAPP Suits--Based on Alleged Malicious Prosecution:Malicious Prosecution § 7--Essentials to Maintenance of Action--Favorable Termination--Settlement.
In an action by a city against a developer for interference with contractual relations and economic advantage, and unfair competition, alleging defendant was behind other persons' environmental objections to plaintiff's efforts to attract a mall to the city, the trial court erred in denying defendant's motion to strike the pleadings under Code Civ. Proc., § 425.16, which *11 provides for a procedural remedy allowing prompt exposure and dismissal of SLAPP suits (strategic lawsuits against public participation), as to claims based on the principles of malicious prosecution. An essential element of an action for malicious prosecution is that the prior litigation have resulted in a "favorable termination" for plaintiff, but the suits in question were terminated by a settlement, which almost invariably does

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                    Page 3
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

not reflect on the merits. The settlements involved a compromise and the surrender of something of value by plaintiff, including payment of money and a waiver of costs. Under these circumstances plaintiff could not argue that it agreed to the settlements only under duress and thus show that the settlements reflected in its favor as a matter of fact.

[See 5 **Witkin,** Cal. Procedure (3d ed. 1985) Pleading, § 960A.]

COUNSEL

Cummings & Kemp, Brian J. Simpson, Everett L. Skillman and Clive J. Kemp for Petitioner.

No appearance for Respondent.

Latham & Watkins, Dorn G. Bishop, Christopher Garrett, Smith, Silbar, Duffy & Parker and Keith M. Parker for Real Parties in Interest.

**RICHLI, J.**

Petitioner Glen Ludwig, defendant in the action below, seeks a writ of mandate to compel the trial court to grant his special motion to strike under Code of Civil Procedure section 425.16. [FN1] We conclude that real party the City of Barstow [FN2], plaintiff below, has failed to show a "probability" of success on the merits within the scope of the statute, and that the trial court therefore erred in denying Ludwig's motion. We will grant the relief prayed. *12

> FN1 All subsequent undifferentiated statutory references are to the Code of Civil Procedure.

> FN2 Additional plaintiffs and real parties are Barstow Investment "D" Limited Partnership, Barstow Investment "E" Limited Partnership, and Daniel Plies. For clarity, we will refer to Barstow as the sole real party, as it is Barstow which is obviously carrying the underlying litigation. We note at this point that none of the other plaintiffs/real parties were named as defendants in the two lawsuits which we dis-

cuss below. These plaintiffs/real parties apparently owned property which was a potential location for a discount mall in Barstow, and were interested in attracting a developer who would purchase the property.

Statement of the Case

In a nutshell, petitioner Ludwig wishes, or has wished, to develop a discount mall in or near the Cities of Hesperia or Adelanto, and has taken at least preliminary steps to do so. Barstow, in turn, hoped to attract a discount mall of its own. Due to the geographic proximity of the locations, and their situation along the same transportation corridor, it would be economically advantageous for *either* mall not to face competition from the *other*. As a result, Ludwig, who apparently had the initial edge, was naturally concerned when the prospect of a competing mall in Barstow arose. [FN3] As a result, Ludwig took certain actions which became the subject of this litigation.

> FN3 Ludwig has conceded that he encouraged the activities of Keating, Krier, Hendrix, and Sweet, as discussed below. Whether his motives were altruistically environmental, or selfishly financial, is in the end irrelevant to our analysis. We will assume, for the purposes of this opinion, that Ludwig was concerned for the viability of his own project.

Barstow's first amended complaint sets forth causes of action for interference with contractual relations, interference with prospective economic advantage, and unfair competition. It sets forth Ludwig's supposed misdeeds in considerable detail, which we will summarize.

After a developer (Tanger Properties) had conditionally agreed to purchase property in Barstow for the development of a mall, one Clyde Sweet appeared at a public city council meeting and opposed the Tanger project. Thomas Keating then filed a lawsuit challenging the project, which the complaint characterizes as "meritless." When Barstow

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                                Page 4

37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

attempted to take Ludwig's deposition in this action, Ludwig "sought to block the depositions" and subsequently failed to appear as allegedly promised. Ludwig was otherwise uncooperative with Barstow's efforts to ascertain whether he was "behind" the litigation.

Keating and Barstow then settled the litigation.

Wayne Hendrix then appeared at another public meeting and requested that additional hearings be held on the Tanger project.

Sheree Krier then filed an action under the California Environmental Quality Act (CEQA) challenging Barstow's adoption of a negative declaration for the Tanger project. Krier later dismissed the action in return for the payment by Barstow of at least $75,000; Barstow, as part of the settlement, asserted that Krier's claims had no merit and had been brought for harassment purposes.

The record as later developed indicates that the Keating lawsuit was dismissed with a mutual cost waiver. Barstow also agreed to recirculate the *13 negative declaration previously prepared, and in return Keating agreed not to further oppose the Tanger project. Barstow also promised that it would not proceed with its "Reimbursement Agreement" with Tanger until "environmental analysis ... has been completed."

The Krier settlement obligated Barstow to prepare an "updated Master Environmental Assessment" at a cost of at least $35,000 ($15,000 payable to a named "environmental attorney" who happened to be Krier's attorney), to create an "environmental advocacy fund" with a contribution of at least $30,000, evidently to go primarily to Krier or her attorney, and to pay her attorney fees of $10,000.

Barstow's position was that the Krier settlement was prompted by the imminency of a crucial deadline with Tanger Properties; that is, if the Krier litigation was not settled, Tanger would withdraw. Barstow "allowed" Keating to voluntarily dismiss his action in order to avoid the costs and delays which would have been involved in seeking a form-

al dismissal, which it could have done if Ludwig (and certain of his agents) refused to appear for depositions once the trial court had denied their motions for protective orders. [FN4]

> FN4 It is, of course, far from obvious that the trial court would have dismissed Keating's lawsuit because Ludwig et al. failed to appear for their depositions. Whether Ludwig was "behind" the litigation had no relevance to its merits.
> Ludwig *did* refuse to appear after the settlement was made. Barstow argued below that his appearance was a term of the settlement. No such term is apparent, and Keating would have no authority to bind Ludwig. However, until the action was actually dismissed, Ludwig was presumably under a legal obligation to comply with any properly served subpoena.

The trial court denied the motion, apparently on the ground that the litigation promised good sport. [FN5]

> FN5 Just prior to taking the case under submission, the court remarked "You know, when two groups of people come in and they're both so convinced, so righteous in their position, you hate to take those cases away from the jury, because they so enjoy determining which side that's so righteous is really correct."
> Earlier in the hearing, the trial court perciipiently observed to Ludwig's counsel "I think you're going to file a Cross-Complaint ...." We are informed that this is the case. The trial court also pointedly observed that "... both sides think you're going to get it both ways. You both essentially say one thing out of one side of your mouth and something else out of the other side of your mouth, and you know you're doing it." Although we conclude that the trial court should not have allowed this dispute to remain in court, we entirely share his view of the parties' positions. At the

37 Cal.App.4th 8                                                                                                           Page 5
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
(Cite as: 37 Cal.App.4th 8)

same time that he seeks to have this court throw out Barstow's interference complaint against him, Ludwig is pressing a similar suit based on Barstow's efforts to raise environmental objections to the Adelanto/ Hesperia project. Presumably Barstow, asserting here that this action is viable, is resisting Ludwig's cross-complaint on the basis that *its* actions were entirely justifiable.

Ludwig's motion to strike, and Barstow's opposition, generated a large amount of paperwork. Our acceptance of the propositions that Ludwig was *14 behind the opposition to the Tanger project and that his opposition was based on self-interest makes it unnecessary to detail the evidence adduced any farther than we have done. [FN6]

> FN6 It is therefore unnecessary for us to rule on the propriety of Barstow's request that we take judicial notice of statements made by another Ludwig ally, Robert Hammock, at a deposition which followed the hearing on this motion. It may be seriously doubted whether this court could judicially notice Hammock's statements for their truth. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [8 Cal.Rptr.2d 552] and cases cited.) We might accept it as "new evidence" under Code of Civil Procedure section 909 and California Rules of Court, rule 23-authorities not cited by Barstow. However, the matter is moot because we accept that Hammock did act at Ludwig's behest and for private purposes.
> We do take judicial notice of the existence of Ludwig's claim for damages against Barstow, although we do not find it significant as a matter of law.

### Discussion
### I.

We turn first to the statute on which Ludwig relied.

Section 425.16 was enacted to serve a specific purpose, which, happily if unusually, the Legislature explicitly set forth in subdivision (a): "... there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." Accordingly, any "cause of action against a person *arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution in connection with a public issue* shall be subject to a special motion to strike...." (Subd. (b), italics added.) If the statute applies, the plaintiff must establish, through the pleadings or affidavits, a "probability" that it will prevail. The special motion to strike is to be filed within 60 days of the service of the complaint, or later in the court's discretion. (Subd. (f).)

The history behind the enactment of section 425.16 has been explained in *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815-819 [33 Cal.Rptr.2d 446], and we need not repeat the explication in its particulars. The statute was a response to the pervasive use of "SLAPP suits" [FN7] to discourage citizens from seeking governmental action. As noted in *Wilcox*, the "paradigm" SLAPP suit is an action filed by a land developer against environmental activists or objecting neighbors of the proposed development. However, as the court noted, "SLAPP's ... are by no means limited to *15 environmental issues ... nor are the defendants necessarily local organizations with limited resources." (27 Cal.App.4th at p. 815.) The statute is appropriately applied to litigation involving conduct by a defendant which was directed to obtaining a financial advantage. Thus, in *Wilcox*, section 425.16 was applied to a dispute between groups of court reporters, in which the cross-complainant alleged that cross-defendants were supporting and encouraging litigation charging the cross-complainants with unfair business practices. [FN8]

> FN7 "Strategic Lawsuits [or Litigation]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                                          Page 6

37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117

**(Cite as: 37 Cal.App.4th 8)**

Against Public Participation."

FN8 Additional authorities involving cases far removed from the prototype "big developer v. private citizen" will be discussed when we move to our consideration of constitutional principles.

On the face of the matter, Ludwig's activities qualified under the stat ute. The development of the Barstow mall, with potential environmental effects such as increased traffic and impaction on natural drainage, was clearly a matter of public interest. (See *Dixon v. Superior Court* (1994) 30 Cal.App.4th 733, 743-744 [36 Cal.Rptr.2d 687] [stressing the importance of public comments in CEQA proceedings "to inform those who ultimately make important decisions regarding the environment."].)

(1) Assuming, then, that section 425.16 applies, Barstow had the burden of establishing a "probability" of success on the merits. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 820.) In *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704 [34 Cal.Rptr.2d 898, 882 P.2d 894], the Supreme Court considered section 425.13, which, somewhat analogously to section 425.16, limits the seeking of punitive damages against health care providers by requiring the plaintiff to establish a "substantial probability" of prevailing on the claim for punitive damages before such a claim may be made. The court rejected the argument that the trial court, in ruling on such a request, should weigh the evidence in making its assessment of the claim. Such an approach, the court noted, would implicate the plaintiff's right to trial by jury. (8 Cal.4th at p. 719.) Instead, the court held that the motion for leave to seek damages should be denied if the evidence introduced "either negates or fails to reveal the actual existence of a triable claim.... This test is largely consistent with the 'prima facie' approach formulated by the Courts of Appeal." The court also pointed out that this showing must be made by "competent admissible evidence within the personal knowledge of the declarant," with reference to the familiar standard applied to evidentiary showings in

summary judgment motions. (§ 437c, subds. (b) and (d).)

*College Hospital* is of particular significance because the court noted in passing a number of other statutes which set up procedural hurdles impeding the assertion of particular claims. (E.g., Civ. Code, § 1714.10, subd. (a) *16 requiring a plaintiff to show a "reasonable probability" of success in a conspiracy claim against an attorney; Code Civ. Proc., § 425.14, requiring a plaintiff to "substantiate" a claim for punitive damages against a religious organization.) The Supreme court found it "unlikely that each subtle difference in phraseology was intended to establish a completely different legal standard." (8 Cal.4th at p. 716.) As one of the statutes cited was section 425.16, we must construe it in accordance with the Supreme Court's analysis.

Barstow complains that the standard is too high in the context of section 425.16, which requires the defendant to make the motion to strike within 60 days of service of the complaint, and which therefore brings the question before the court at a time when the plaintiff will have had a limited opportunity to conduct discovery. (Cf. § 425.13, construed in *College Hospital,* which can allow up to two years for the plaintiff to seek leave to add a claim for punitive damages.) We recognize the concern, but we do not find it sufficiently compelling to justify a departure from the general standard of *College Hospital.* We note that the court in *Wilcox v. Superior Court, supra,* had concluded that section 425.16 imposed a "prima facie" standard before *College Hospital* was decided, holding that such a burden was appropriately moderate and was "compatible with the early stage at which the motion is brought and heard ... and the limited opportunity to conduct discovery [citation]." (27 Cal.App.4th at p. 823.) *Wilcox* therefore answers Barstow's objection. We agree, and we also believe that an overly lenient standard would be wholly inappropriate, given that the statute is intended to "provid[e] a fast and inexpensive unmasking and dismissal of SLAPP's." (*Ibid.*) Obviously, the purpose of the statute would be frustrated if the plaintiff could drag on proceedings for many months by claiming a need to con-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                          Page 7
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

duct additional investigation. The legislative intent is best served by an interpretation which would require a plaintiff to marshal facts sufficient to show the viability of the action *before* filing a SLAPP suit.

## II.

To this point, we have assumed, from the general nature of the case, that Ludwig is entitled to claim the protection of <u>section 425.16</u>. At first glance, the case appears entirely appropriate for the application of the statute. However, Barstow makes strongly urged arguments to the contrary. We find them without merit.

## A.

(2) Barstow's first argument, or first class of arguments, is that Ludwig cannot claim any protection because Ludwig did not, personally, perform *17 any of the challenged acts. Barstow points out that it is not suing Keating, Krier, Hendrix, or Sweet, and therefore is not attacking their exercise of any protected right. This point is not germane.

The right to petition the government, or to seek legal redress, does not confer legal protection [FN9] solely on those persons formally addressing the governmental agency or formally filing a lawsuit. In *Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) 50 Cal.3d 1118, 1135-1136 [270 Cal.Rptr. 1, 791 P.2d 587],* the court relied upon the vital need to prevent chilling the exercise of these rights in holding that no cause of action for interference with contract or prospective advantage would lie against a defendant who *induced* the actual contracting party to file a lawsuit seeking to have the contract declared void. The court sensibly pointed out that "we have no public policy against the funding of litigation by outsiders.... If any person who induced another to bring a lawsuit involving a colorable claim could be liable in tort, free access to the courts could be choked off with an assiduous search for unnamed parties." (50 Cal.3d at p. 1136.) Significantly, it referred to a case of classic environmental litigation (*Sierra Club v. Butz* (N.D.Cal. 1972) 349 F.Supp. 934) to demonstrate the folly and impropriety of allowing suits against persons

supporting litigation through funding.

> FN9 We discuss the parameters of this protection below.

This principle was recognized at least sub silentio in *Wilcox v. Superior Court, supra, 27 Cal.App.4th 809* in which the cross-defendant was not an actual party to the original unfair-competition action, but had apparently confined her activities to soliciting funds and providing support for the litigation and its aims. [FN10]

> FN10 The Ninth Circuit has also implicitly reached the same conclusion in a case factually very similar to this one. In *Liberty Lake Investments v. Magnuson* (9th Cir. 1993) 12 F.3d 155, 158-159, the court bluntly rejected any effort to deprive the defendant of constitutional protections because he had instigated and funded anti-development, environmentally based litigation brought by others. Although the court's primary discussion is based upon the plaintiff's inability to prove that the underlying litigation had been baseless and the irrelevance of the defendant's motivation (see below), it clearly found the fact that the defendant did not personally file the underlying action to be immaterial to its analysis.

The terms of the statute are consistent with this result. By its terms, it applies to a cause of action against a defendant "arising from *any act of that person in furtherance of the person's right of petition or free speech....*" (Italics added.) It expressly includes any writing or speech "made in connection with an issue under consideration or review by a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law...." There is no requirement that the writing or speech be promulgated directly *to* the official body. *18

It is well established that a statute open to more than one construction should be construed so as to avoid anomalous or absurd results. (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                    Page 8
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
(Cite as: 37 Cal.App.4th 8)

P.2d 549].) We assume the same principle applies to the Constitution. A person can exercise his own rights by supporting the forceful activities of others; it would be absurd to hold that the confident opponent who takes the public podium is protected, while the shy opponent who prefers to lend moral support by standing silently in the audience is not.

In this case, Barstow's whole case against Ludwig depends on the fact that he instigated the Keating and Krier lawsuits, and encouraged Hendrix and Sweet to speak against the Tanger project. We see no meaningful difference between a person who supports and encourages the filing of a lawsuit, and one who supports and encourages a third party to speak out publicly on a matter of public interest. *Pacific Gas & Electric* is dispositive on the issue. Its holding applies equally to the lawsuits and the public hearings, because "[t]he right of access to the courts is indeed but one aspect of the right of petition." (*California Motor Transport v. Trucking Unlimited* (1972) 404 U.S. 508, 510 [30 L.Ed.2d 642, 646, 92 S.Ct. 609].) As a threshold matter, Barstow is seeking to hold Ludwig liable for the exercise of a right protected by section 425.16.

### B.

Barstow also insists that Ludwig cannot seek shelter under section 425.16 because that statute only protects communicative conduct, and Barstow asserts that it is seeking to hold Ludwig liable for *noncommunicative* conduct. Barstow is wrong.

Barstow relies heavily on *Kimmel v. Goland* (1990) 51 Cal.3d 202 [271 Cal.Rptr. 191, 793 P.2d 524]-a case which we find remarkably inapposite. *Kimmel* involved a dispute between mobilehome park tenants and the park owners, a dispute which threatened to lead to litigation. In anticipation of the lawsuit, three of the tenants surreptitiously tape recorded conversations with park management personnel without the latter's consent. When management learned of the existence of the tapes, it filed a cross-complaint seeking damages for the illegal recording. (Pen. Code, §§ 632, 637.2.) The tenants, as cross-defendants, moved for judgment on the pleadings on the basis of the litigation privilege codified

in Civil Code section 47, subdivision 2 [FN11] , and the trial court granted the motion.

> FN11 Now Civil Code section 47, subdivision (b).

The Supreme Court upheld a judgment of the Court of Appeal *reversing* the judgment, for the simple and obvious reason that the tenants' acts of *19 secretly taping the conversations were not a "publication or broadcast"- the activities expressly protected by the statute controlling case. (51 Cal.3d at p. 209.) Expanding upon its earlier decision in *Ribas v. Clark* (1985) 38 Cal.3d 355, 365 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417], it explained that no cause of action could be based on any communication or publication of material obtained through the illegal wiretap, if that communication or publication occurred in the course of a judicial proceeding; however, this rule, deriving from the privilege set out in Civil Code section 47, subdivision 2, did not prevent the park management from suing for damages resulting from the illegal recording itself. [FN12] The court expressed the view that extending the litigation privilege as requested by the tenants would have "unacceptable consequences"; the example it used was that the benefit of such an extension could be claimed by a prospective plaintiff who, in anticipation of litigation, burgled his opponent's premises in order to obtain evidence.

> FN12 As then effective, Penal Code section 637.2 provided for a minimum award of damages of $3,000, with a potential for a greater award if the plaintiff could show actual damages. Of course, as *Kimmel* makes clear, the "actual damages" could not include damages resulting from the publication of the recorded material in the lawsuit.

We think that *Kimmel* was an easy case and very far from the matter at hand. We find Barstow's arguments that Ludwig is being sued for "noncommunicative" conduct to be impenetrable as well as off the point.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal D.A.R. 10,117

**(Cite as: 37 Cal.App.4th 8)**

To begin with, Civil Code section 47 expressly applies its privilege only to a "publication or broadcast" made in specified circumstances, which include, under subdivision (b), judicial, legislative, and other official proceedings. Code of Civil Procedure section 425.16 is not so limited; it extends to "*any* act ... in furtherance of the ... right [to] petition ...." [FN13] (Italics added.) The constitutional right to petition, as we have seen, includes the basic act of filing litigation or otherwise seeking administrative action. (*California Motor Transport Co. v. Trucking Unlimited, supra,* 404 U.S. 508.) It is respect for this right, and the free access to the courts which is encompassed therein, that has led our Supreme Court to refuse to permit a lawsuit for abuse of process to be based solely on the improperly motivated filing of a lawsuit. (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1170 [232 Cal.Rptr. 567, 728 P.2d 1202], noted in *Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d at p. 1133.)

> FN13 In *Pacific Gas & Electric v. Bear Stearns & Co., supra,* 50 Cal.3d at page 1132, footnote 12, the court noted that the privilege of Civil Code section 47 would not protect all of the conduct alleged in that case. Although it might protect an "exhortation to sue," it would not, on its face, protect financing litigation. The contrasting language in Code of Civil Procedure section 425.16 is thus illuminating.

However, we need not expand upon the type of conduct that is covered by the petition privilege and section 425.16, because we are wholly unable to *20 perceive any conduct by Ludwig which should not, in a fair analysis, be characterized as "communicative."

Barstow contends strenuously that Ludwig's activities in recruiting and encouraging his agents are "noncommunicative." We are at a loss to imagine how Ludwig accomplished the recruiting and encouragement without communication. (See *Rubin v. Green* (1993) 4 Cal.4th 1187, 1195-1196 [17

Cal.Rptr.2d 828, 847 P.2d 1044] [holding that misrepresentations in the course of alleged attorney solicitation were "communicative in their essential nature," limiting *Kimmel*].) We must assume that he asked Keating, Krier, Hendrix and Sweet to take certain actions on his behalf. This required a communication. Further communicative conduct was then committed by the agents in speaking, writing, and making allegations in legal documents.

Barstow's attempt to rely upon Ludwig's failure to reveal his role in the lawsuits and his refusal to comply with discovery requests is of no assistance. Even if Ludwig's secrecy was "wrongful" under some principle of law-which we do not find-it is clear from Barstow's evidence that Barstow was at the very least highly suspicious that Ludwig was behind the opposition to the Tanger project virtually from the beginning. Ludwig's efforts to conceal his role were entirely unsuccessful and can have had no real effect. [FN14] His failure to perform discovery obligations was subject to a speedy remedy in the court actions themselves, and, as a matter of policy, no separate tort claim can be stated for any such failure. (See *Lossing v. Superior Court* (1989) 207 Cal.App.3d 635, 639 [255 Cal.Rptr. 18] [defendant's conduct in seeking a discovery sanction in one lawsuit could not be the basis for a separate malicious prosecution action, with strong policy statement]; *Silver v. Gold* (1989) 211 Cal.App.3d 17, 23-24 [259 Cal.Rptr. 185] [unsuccessful motion to disqualify counsel in the main action cannot be the basis for a separate malicious prosecution suit.])

> FN14 For example, Clyde Sweet admitted to Barstow's city attorney that he was working for Ludwig after Sweet spoke at the public meeting on January 10, 1994 - the first opposition voiced by any of Ludwig's agents. In February 1994, after Attorney Cynthia Ludvigsen made a request for information on the project, her purported client, Robert Hammock, admitted to Barstow's city manager that he was being prompted by Ludwig. The attorney for Sheree Krier virtually admitted that Lud-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                    Page 10
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

wig was behind her lawsuit *before* it was filed.

Thus, we find that all of Ludwig's alleged actions were entitled to be evaluated under section 425.16. However, that section does not *bar* lawsuits against persons who are involved in matters of public interest; it merely requires that the plaintiff show that there is a "probability" that the claim asserted will be successful. We now turn to Barstow's effort to show that it would prevail against Ludwig. *21

### III.

(3) We first deal with the actions of Sweet and Hendrix. To recap, Sweet appeared at a Barstow City Council meeting on January 10, 1994, and "opposed" the Tanger project. As best one can tell, this opposition was based on environmental factors. Hendrix appeared on May 16, 1994, "requesting additional public hearings." He apparently also raised traffic and drainage concerns. [FN15] Hendrix also wrote to Barstow requesting a copy of final plans and the drainage study. It is alleged by Barstow that these acts were done with bad motives, inspired in turn by Ludwig's bad motives. [FN16]

FN15 The declaration of Christopher Garrett consistently indicates that Hendrix merely spoke in a neutral manner, and in fact that he stated he was *not* opposed to the project but merely wanted more information.

FN16 In this context we deal briefly with Barstow's attempt to show that the environmental objections raised were meritless. The community development director, Paul Warner, declared that "the claims" by Sweet and Hendrix (whatever these claims were) "were wholly without merit" for reasons not given. With all due deference to Mr. Warner, we think his flat assertion of a legal conclusion carries little weight. Similarly, Attorney Christopher Garrett informed the court that his review of the Keating lawsuit demonstrated that it was "without merit" for three reasons: 1) Keat-

ing lacked standing, because "based on a review of public records" (which ones? by who?) "the City determined that he resided in the City of San Bernardino and did not own property in the City of Barstow," 2) Keating had failed to appear before the city council and thus had not exhausted his administrative remedies, and 3) "the City had provided for compliance with CEQA ...." Again, with respect to (3), we cannot accept Mr. Garrett's bald resolution of the legal issue underlying the Keating lawsuit. His explanation of the lack of merit of the Krier lawsuit is similar. Neither declaration meets the requirement of *College Hospital, Inc. v. Superior Court, supra, 8 Cal.4th 704* that the plaintiff provide *competent* and *admissible* evidence in support of its claim.

Section 425.16 sets out a mere rule of procedure, but it is founded in constitutional doctrine. "Those who petition the government are generally immune from ... liability." [FN17] (*Real Estate Investors v. Columbia Pictures (1993) 508 U.S. 49 [123 L.Ed.2d 611, 621, 113 S.Ct. 1920, 1926].*) The principle is often referred to as the *"Noerr-Pennington"* [FN18] doctrine and, as the recent decision in *Real Estate Investors* demonstrates, retains full vitality. The principle unquestionably applies to commercial speech and competitive *22 activity-even *anticompetitive* activity. (*Mine Workers v. Pennington, supra, 381 U.S. at p. 670 [14 L.Ed.2d at p. 636].*)

FN17 The omitted word in the text is "antitrust." However, the principle applies to virtually any tort, including unfair competition and interference with contract. (See *Hi-Top Steel Corp. v. Lehrer (1994) 24 Cal.App.4th 570, 577-578 [29 Cal.Rptr.2d 646]* and cases cited.) Obviously, " 'the principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity [should be applied], regardless of the underlying cause of action asserted

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                      Page 11
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

by the plaintiffs.' [Citation.] '[T]o hold otherwise would effectively chill the defendants' First Amendment rights.' [Citation.]" (*Ibid.*) We discuss one arguably relevant exception later.

FN18 *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523]; *Mine Workers v. Pennington* (1965) 381 U.S. 657 [14 L.Ed.2d 626, 85 S.Ct. 1585].

Under this doctrine, it has long been clear that the motive of the petitioners is irrelevant, *as long as* the intent is genuinely to induce government action rather than to frustrate or deter a third party simply by the *use* of the governmental process. (See *Columbia v. Omni Outdoor Advertising, Inc.* (1991) 499 U.S. 365, 379-380 [113 L.Ed.2d 382, 397-398, 111 S.Ct. 1344, 1354], discussed in *Real Estate Investors v. Columbia Pictures, supra*, 508 U.S. at p. ___ [123 L.Ed.2d at pp. 623-624, 113 S.Ct. at p. 1928]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 322 [216 Cal.Rptr. 718, 703 P.2d 58].) In this case, we will assume that it remains in question whether Sweet and Hendrix (and Ludwig behind them) genuinely hoped to persuade Barstow to delay the Tanger project for the purpose of addressing environmental concerns, or whether they hoped to discourage Tanger itself by a show of public opposition and the prospect of controversy. Barstow failed to show a "probability" of proving the viability of this portion of its claims because it failed to show that the concerns expressed by Sweet and Hendrix were without merit. [FN19] (See fn. 15, *ante*.)

FN19 Barstow argues that the conduct of Sweet and Hendrix was "objectively baseless" because they did not have "standing" in that neither resided in or owned property in Barstow. We are not sure where the proof of these facts is to be found. Nor does Barstow persuade us that a citizen requires "standing" simply to speak at a meeting or request information. No doubt a public entity may brush off objections or inquiries from nonresidents, but this does

not mean that such persons act "wrongfully" when they voice concerns in a public forum.

Barstow also argues that even if Sweet, for example, had "standing," he didn't *really* have standing because he was acting for Ludwig, who didn't have standing. This kind of argument takes us through the looking glass with Alice. Jam yesterday, and jam tomorrow, but never jam today.

The *Noerr-Pennington* doctrine, as refined and explained in *Real Estate Investors*, has two prongs. First (or rather second, under the usual analysis), the challenged action must have been undertaken with an improper motive. That is, it must have been done not with the hope of securing a favorable governmental result, but solely to harass and hinder another party. The other prong of the doctrine is that the challenged action must have been objectively baseless. Absent such a patent lack of merit, an action protected under the First Amendment by the right of petition cannot be the basis for litigation. (*Real Estate Investors v. Columbia Pictures supra*, 508 U.S. at p. ___ [123 L.Ed.2d at pp. 623-624, 113 S.Ct. at p. 1929].) [FN20]

FN20 At oral argument, Barstow argued that the case was controlled by *Hi-Top Steel Corp. v. Lehrer, supra,* 24 Cal.App.4th 570, at footnote 17, *ante*. We may assume that the opinion in that case accurately summarizes the "sham" exception as it was recognized before it was further refined in *Real Estate Investors*. (The opinion in *Hi-Top Steel*, although issued almost a year after the decision in *Real Estate Investors*, does not cite that case or discuss its requirement that the targeted actions have been "objectively baseless.") However, *Hi-Top's* recognition of a sham exception to First Amendment rights does not aid Barstow. That case involed the adequacy of *pleading*, not the ability of the plaintiff to support the action with facts. We will also assume that Barstow's pleading is adequate; it failed, however, to es-

37 Cal.App.4th 8                                                                                     Page 12
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
(Cite as: 37 Cal.App.4th 8)

tablish the likelihood of prevailing as a matter of fact.

In this case, it is apparent from the record that the actions of Sweet and Hendrix were, to put it mildly, de minimis. Sweet spoke at one meeting, and *23 apparently made objections going to the effect of the Tanger project on traffic and drainage. [FN21] Hendrix apparently expressed the view that more information was necessary, or at least desirable, before the project was approved. Barstow utterly failed to show that these expressed concerns had no reasonable basis or that no reasonable person could have expected the action taken to lead to governmental results. [FN22] The trial court was provided with nothing to demonstrate, even at the prima facie level required by *College Hospital*, that proper consideration *in fact* had been given to potential traffic and drainage problems at the time Sweet and Hendrix spoke. Barstow failed to show that the comments of Sweet and Hendrix were objectively baseless. [FN23] *24

> FN21 We are not informed whether Barstow actually took action in response to Sweet's objections. If it did not, then Sweet's actions can hardly be said to have had any damaging effect (although we discuss the "pattern" issue below).

> FN22 We note again that although some of the language in the cases on which we rely is not entirely apposite to the situation of a public comment at a legislative meeting, *Noerr-Pennington* applies to all facets of the exercise of the right of petition, from litigation to attempts to influence opinion. (*California Motor Transport v. Trucking Unlimited, supra,* 404 U.S. at p. 510 [30 L.Ed.2d at p. 646].)

> FN23 Barstow may complain that we put too onerous a burden on it. We do not decide what showing would be sufficient, but we note that Barstow made no effort to explain to the trial court what preliminary steps and studies had been done. In fact,

the record leaves Barstow's manner of proceeding obscure. It appears that Barstow's agreement with Tanger Properties contemplated completion of environmental steps after the project was approved.

On the other hand, it cannot be said to have been unreasonable for any citizen to have raised questions about the propriety of entering into an agreement for the construction of a project before any environmental information had been collected. Although the agreement purported to be contingent on satisfactory environmental studies, a reasonable person could suspect that Barstow would be under pressure to find the studies "satisfactory" so as to avoid the inevitably messy cancellation of a lucrative project in progress. A reasonable person could also suspect that Barstow's election to enter into such an agreement signalled its intention to allow the project to proceed no matter what the studies showed after the project was approved. For these reasons as well, Barstow's failure to explicitly describe its preliminary environmental steps hampered its attempt to show that the objections were baseless.

We do not say that Barstow's method of proceeding was either illegal or improper. (See *Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 778-782 [1 Cal.Rptr.2d 107].) When time is of the essence, it is not necessarily unreasonable for a public entity to offer at least preliminary assurance to the developer that his project is viewed favorably by the entity.

We also stress again that the purpose of section 425.16 is well served by requiring the plaintiff to make a positive showing. The statute clearly expresses a legislative suspicion of SLAPP suits and an intent to weed out all but those having demonstrable merit. It is not unfair to insist that a party who chooses to bring what appears on its face to be a SLAPP suit be prepared to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                          Page 13
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

back up his claim with facts. Under *College Hospital*, it is not sufficient for the plaintiff simply to assure the court that the defendant's actions were legally and/or factually baseless.

(4) We now address the Keating and Krier lawsuits. We find them subject to an insuperable barrier. [FN24]

> FN24 As we begin our discussion of a possible cause of action for malicious prosecution, we are aware that Barstow has not attempted to state any such claim and has not formally been given the opportunity to do so in the trial court. However, in our request for an informal response, we expressly asked Barstow to address the issue of whether any tort remedy other than malicious prosecution was available, as well as the "favorable termination" problem we discuss below. Thus, Barstow has had every opportunity to argue the issue, and the factual record is complete in all pertinent respects. Thus, we have deemed it more efficient to consider whether, if Barstow were to plead such a claim against Ludwig, it could support it to the extent required by section 425.16.

In recent years our Supreme Court has several times had occasion to consider the scope of the "litigation privilege" established by Civil Code section 47, subdivision (b). The court has consistently and forcefully reiterated that the privilege is virtually absolute and that the *only* tort cause of action which can be based upon the initiation of a lawsuit (or communicative acts related to the lawsuit) is that of malicious prosecution. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 215-216 [266 Cal.Rptr. 638, 786 P.2d 365]; *Rubin v. Green, supra,* 4 Cal.4th at p. 1194; see also *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 45 [32 Cal.Rptr.2d 200, 876 P.2d 999].) [FN25] The basis for the rule, which gives preference to the policy of encouraging free access to the courts over the interest in being free from damaging activities which otherwise might be

categorized as defamation or the infliction of emotional distress, has been thoroughly discussed in the cases and, as an intermediate court bound by the pronouncements of the Supreme Court, we need not repeat it. (See also *Pacific Gas & Electric v. Bear, Stearns & Co., supra,* 50 Cal.3d 1118.)

> FN25 In *Heller,* the court found it unnecessary to decide whether a cause of action based on an invasion of the constitutional right of privacy committed during litigation would be another permitted action in addition to malicious prosecution. (8 Cal.4th at p. 42.) In *Urbaniak v. Newton* (1991) 226 Cal.App.3d 1128, 1138 [277 Cal.Rptr. 354], the court held that Civil Code section 47, subdivision (b) could not immunize conduct made actionable by the California Constitution. That court also recognized, however, that Civil Code section 47, subdivision (b) frequently also protects a constitutional right, thus requiring a difficult balancing of interests. The issue is not before us.

Thus, were Barstow to have sued Keating and Krier, without question its sole remedy would have been an action for malicious prosecution.

However, as Barstow repeatedly stresses, it is not suing Keating or Krier; it is suing Ludwig. We will agree, arguendo, that a former defendant *can* assert other tort causes of action against a party who *urged* the prior **\*25** litigation, but did not *file* it. [FN26] The holding in *Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d 1118 does not prohibit the filing of such torts; we note that such other claims were made against the cross-defendant in *Wilcox v. Superior Court, supra,* 27 Cal.App.4th 809. However, this does not aid Barstow.

> FN26 However, a person who urges, procures, or otherwise is actively instrumental in the filing of a lawsuit may be sued for malicious prosecution along with the actual plaintiff/prosecutor. (*Pacific Gas &*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                 Page 14
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

*Electric v. Bear Stearns & Co., supra, 50 Cal.3d at p. 1131, fn. 11; Cedars-Sinai Medical Center v. Superior Court (1988) 206 Cal.App.3d 414, 417 [253 Cal.Rptr. 561];* 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 418, p. 503.) Thus, under the facts developed in the record, Ludwig is subject to suit as a defendant in a malicious prosecution action.

In *Pacific Gas & Electric v. Bear Stearns & Co.,* the court was confronted with claims similar to those here, including one for intentional interference with contract. Although the court did not hold that the plaintiffs only remedy against the defendant was a cause of action for malicious prosecution, [FN27] it *did* hold that the plaintiff's claims against the defendant must be measured by the standards applicable to a malicious prosecution action. That is, the plaintiff "must allege that the litigation was brought without probable cause and that the litigation concluded in plaintiff's favor." (50 Cal.3d at p. 1137.) Thus, for Barstow to prevail it was essential that it provide a prima facie case on these points no matter how it chose to label its claims.

> FN27 No such cause of action could have been pleaded in that case, because the underlying litigation was still pending when the complaint was filed.

We find that Barstow failed to do so and cannot do so. We have commented above on the inadequacy of Barstow's efforts to show that the challenges to its procedures in approving the Tanger project were "objectively baseless." Barstow was required to provide "competent, admissible evidence" (*College Hospital, Inc.; Wilcox*), not merely the cryptic, conclusionary opinion of its attorney.

Barstow, however, has urged repeatedly that the lawsuits were "objectively baseless" because neither Keating nor Krier had legal standing to sue. [FN28] The issue of standing to bring a CEQA challenge is a complex one, both in respect to the concept of exhaustion of administrative remedies and that of possession of a legal beneficial interest.

(See and cf., e.g., *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017]; *26California Aviation Council v. County of Amador* (1988) 200 Cal.App.3d 337, 340-345 [246 Cal.Rptr. 110]; *Kane v. Redevelopment Agency* (1986) 179 Cal.App.3d 899, 903-908 [224 Cal.Rptr. 922]; *Environmental Law Fund, Inc. v. Town of Corte Madera* (1975) 49 Cal.App.3d 105, 114 [122 Cal.Rptr. 282].) On the record before us, it would not be easy to resolve. [FN29] Fortunately, we need not do so, because Barstow has effectively resolved it for us.

> FN28 At least one federal case takes the position that the prosecution of a lawsuit-however meritorious-by one who does not possess legal standing to sue can constitute "objectively baseless" conduct. (*In re Burlington Northern, Inc.* (5th Cir. 1987) 822 F.2d 518, 530.) We might question the wisdom of applying such an approach to an action raising environmental concerns, given both the importance of encouraging public participation in land use decisions, and the uncertainty concerning standing, which we mention below.

> FN29 Again we refer to the defects in Barstow's efforts to show that neither Keating nor Krier had standing in the sense of a protectible beneficial interest in a project to be built in Barstow. (See *Bozung.*) The question of whether either attempted to exhaust administrative remedies appears to have been more susceptible to resolution in Barstow's favor.

One of the essential elements of an action for malicious prosecution (see *Pacific Gas & Electric Co. v. Bear Stearns & Co.*) is that the prior litigation have resulted in a " 'favorable termination' " as far as the plaintiff is concerned. The basis for the requirement is that it " 'tends to indicate the innocence of the accused ....' " (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 [159 Cal.Rptr. 693, 602 P.2d 393].) "The requirement of favorable termination has been variously defined but the core of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                                    Page 15
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
(Cite as: 37 Cal.App.4th 8)

concept is that termination must reflect on the *merits* of the prior action." [FN30] (*Warren v. Wasserman, Comden & Casselman* (1990) 220 Cal.App.3d 1297, 1301 [271 Cal.Rptr. 579], citing *Lackner v. LaCroix*, *supra*, italics in original.)

> FN30 The holding of *Lackner*, followed in *Warren v. Wasserman, Comden & Casselman*, is that a termination based on a "technical or procedural as distinguished from substantive" issue is not "on the merits" for the purpose of bringing a subsequent malicious prosecution action. Thus, in those cases, a termination based on the statute of limitations did not qualify as a "favorable termination."

Under this rule, we question whether even a dismissal based on any lack of standing or exhaustion of administrative remedies should be held to reflect on the *merits*. Barstow's assertion that the Keating and Krier lawsuits were vulnerable on these grounds does not appear to assist it. (See also *Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827 [145 Cal.Rptr. 829] [citing authority to the effect that a dismissal based on lack of jurisdiction does not reflect on the merits].)

In the Keating and Krier cases, plaintiffs voluntarily dismissed the actions. A voluntary and *unilateral* dismissal can constitute a decision on the merits. Thus, in *MacDonald v. Joslyn* (1969) 275 Cal.App.2d 282, 289 [79 Cal.Rptr. 707, 35 A.L.R.3d 641] the defendant, as plaintiff in the prior action (a will contest) had gone through three sets of lawyers in less than five months; the third firm sought and received leave to withdraw on the ground that defendant had failed to provide them with any information or evidence supporting the contest; defendant then appeared in propria persona and dismissed the action. In the circumstances, the dismissal reflected on the merits. Somewhat analogously, a dismissal for failure to diligently prosecute creates an "assumption that one does not simply abandon a meritorious action once instituted," and thus constitutes a termination in favor of

the defendant. (*Minasian v. Sapse, supra*, 80 Cal.App.3d at p. 827.) *27

However, a dismissal resulting from a *settlement* is almost invariably held not to reflect on the merits and not to support any cause of action for malicious prosecution. "Generally, a dismissal resulting from a settlement does not constitute a favorable determination because '... the dismissal reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence.' " (*Pender v. Radin* (1994) 23 Cal.App.4th 1807, 1814 [29 Cal.Rptr.2d 36], quoting *Minasian v. Sapse, supra*, 80 Cal.App.3d at p. 827, fn. 4.)

Here, both the Keating and Krier lawsuits were dismissed by the plaintiffs after the execution of settlement agreements. In the Keating case, the parties agreed to a cost waiver *and* Barstow agreed to re-circulate the proposed negative declaration for the Tanger project. Barstow's concessions in the Krier matter involved the payment of at least $75,000, mostly to Krier and/or her attorney, and the remainder for the environmental purposes presumably favored by Krier. [FN31] A simple waiver of costs is alone enough to disqual ify a settlement as a "favorable termination." (*Pender v. Radin, supra*, 23 Cal.App.4th at p. 1814.) Thus, it is clear that the settlements here involved a compromise and the surrender of something of value by Barstow. [FN32]

> FN31 We comment again, with some puzzlement, that the agreement contemplated that Krier would receive $20,000 for work opposing *Ludwig's* proposed Adelanto project.

> FN32 That the Krier settlement was the result of actual negotiation is indicated by the fact that unsigned drafts of an agreement in the record provide for smaller payments and fundings by Barstow.

Barstow, however, argues that the reasons underlying a dismissal are a question of fact, and that as it agreed to the settlements only under duress, it may

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8                                                                                                    Page 16
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
**(Cite as: 37 Cal.App.4th 8)**

now argue that the settlements reflect in its favor as a matter of fact. Barstow is wrong.

There is some authority to support the proposition that if a termination is not clearly on the merits (as by a judgment after trial), "the reasons underlying the termination must be examined to see if it reflects the opinion of either the court or the prosecuting party that the action would not succeed." (*Haight v. Handweiler* (1988) 199 Cal.App.3d 85, 88 [244 Cal.Rptr. 488].) In *Haight*, for example, the prior action had resulted in a settlement by one defendant in return for plaintiff's dismissal of that defendant *and* the defendant who later sued for malicious prosecution. The latter case went to trial and evidence was taken on the question of the original plaintiff's motives in dismissing the defendant, with the court ruling that the dismissal was made solely because the paying defendant required it. This was held not to reflect on the merits, and the malicious prosecution suit failed. *28

However, *Haight* must be read in light of its facts-specifically, that it involved a dismissal in favor of a defendant who did *not* pay anything, did *not* give up anything, and did *not* even consent to the settlement. Despite these apparent *indicia* in favor of defendant, the court allowed the *plaintiff* to show that the dismissal was motivated by considerations not going to the merits. By contrast, where a defendant has participated in a settlement, efforts to argue that the settlement really does reflect the plaintiff's opinion on the merits have met with no success.

In *Pender v. Radin, supra*, three family members were sued on a contract. One defendant settled for the payment of cash, and all three waived costs and attorney fees; furthermore, the two who did not personally pay money to plaintiff assisted the relative who *did* pay by forgiving a debt he owed them. In affirming the granting of summary judgment for the malicious prosecution defendant, the court stated flatly that "the Penders cannot establish that Radin's lawsuit was terminated in their favor ... by the terms of the settlement, the Penders waived fees and costs and thereby gave up something to get the lawsuit against them dismissed. *On these facts, the*

*Penders cannot show there had been a legal termination of the Radin lawsuit in their favor; rather, the Radin litigation was terminated by agreement without regard to its merits."* (23 Cal.App.4th at p. 1814, italics added.)

*Villa v. Cole* (1992) 4 Cal.App.4th 1327 [6 Cal.Rptr.2d 644], cited by Barstow, is similar to *Haight v. Handweiler*. The malicious prosecution action was brought by a defendant who was dismissed as part of a "global settlement" in which he did not participate and to which he did not agree. However, once it was established that the defendant who negotiated the settlement had demanded the dismissal of the other defendant as a condition of settling, the matter was closed; no cause of action for malicious prosecution could be brought by the nonagreeing defendant.

Significant to this case is the court's treatment of the argument that the malicious prosecution plaintiff should be permitted to inquire into the motivations of the original plaintiff, in an effort to establish that they *really* dismissed him because they felt the action could not be won against him. The court pointed out that this argument "wrongly confuses the elements of probable cause and favorable termination. 'Whether a prior action was legally tenable goes to the issue of probable cause, that is, did the defendant have an honest and reasonable belief in the truth of the allegations. [Citation.] Whether a prior action was terminated favorably tends to show the innocence of the defendant in the prior action [citations] and is not affected by the objective tenability of the claim. In short, these two elements of the malicious prosecution tort serve different purposes, and the legal tenability *29 of the underlying action is not the standard by which to judge whether the action was terminated in [the malicious prosecution plaintiff]'s favor. The standard ... is simply whether the termination bears on the merits of the underlying action.' " (4 Cal.App.4th at p. 1337, citing *Warren v. Wasserman, Comden & Casselman, supra*, 220 Cal.App.3d at p. 1303.) The *Villa* court then held that, because the nature of the settlement as a matter of law did not constitute a favorable termination, the original

37 Cal.App.4th 8                                                                                      Page 17
37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal
D.A.R. 10,117
(Cite as: 37 Cal.App.4th 8)

plaintiffs' motivations for settling the prior action, and the viability of that action, were irrelevant.

These principles control this case, especially when it is remembered that, according to the statutory scheme, Barstow had to show a "probability" that it would prevail. Once again we note that, with the possible exception of the standing/exhaustion issues, Barstow did not come close to establishing that the two lawsuits lacked merit. We are unimpressed with its argument that the settlements were prompted solely by the nuisance value of the lawsuits and, in the Krier case, by the danger of losing the Tanger project. *Villa* and *Handweiler* make clear that if a dismissal results from a negotiated settlement, the plaintiff's motivation is not to be considered; we hold that a defendant who elects to settle a lawsuit may not later come into court as a plaintiff and insist that because he only did so under duress, he should be allowed to prove that the action was baseless. As the cases demonstrate, this argument misses the point. A negotiated settlement does not constitute a "favorable termination."

Of course we recognize that cases are settled for many reasons and we are sympathetic to the problem of nuisance suits. However, actions for malicious prosecution have historically been viewed with disfavor due to the potential chilling effect on persons considering reporting a crime or pursuing legal remedies in court. (*Pender v. Radin, supra,* 23 Cal.App.4th at p. 1818.) For this reason, the twin requirements of no probable cause and favorable termination are, and should be, strictly enforced. There is no legal way for a defendant who elects to settle a suit rather than going to trial to demonstrate that the dismissal resulting from the settlement constituted a favorable termination on the merits.

Having, pursuant to the direction in *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* applied the standards for malicious prosecution actions to Barstow's claims here, we determine that they cannot succeed. [FN33] The trial court erred in denying Ludwig's motion to strike under section 425.16. *30

FN33 Barstow proffers the argument that Ludwig engaged in a "series" of baseless challenges. Federal cases recognize that one or more successful actions or administrative challenges may nevertheless form part of an overall pattern of strategic, bad faith action designed to frustrate a competitor. (See *USS-POSCO Indust. v. Contra Costa Cty. Bldg. & Const.* (9th Cir. 1994) 31 F.3d 800, 810-811.) However, we find the rule inapplicable here. Barstow alleged only four acts, two of which, as we have found, cannot be said to have been meritless. We need not decide whether brief comments at a public meeting, or the requesting of information, can constitute part of a pattern of what is overall baseless opposition, because a total of four activities, two of which are not meritless as a matter of law, cannot constitute such a pattern. Compare *USS-POSCO Indust.,* which involved a total of 29 proceedings, 15 of which ended successfully; held, no pattern of baseless litigation was shown.

Barstow also insists that Ludwig, by concealing his role, perpetrated a fraud on the court. We have earlier commented on the ineffectiveness of any efforts by Ludwig in this respect. We also distinguish the situation in which a party commits "fraud" which has no effect on the outcome of litigation from that in which a party presents false evidence in an effort to corrupt the result. We agree that the latter conduct is not protected. (*Whelan v. Abell* (D.C. Cir. 1995) 48 F.3d 1247, 1255 [310 App.D.C. 396]; see also *Liberty Lake Investments, Inc. v. Magnuson, supra,* 12 F.2d at p. 159.) Here, any "fraud" by Ludwig had no effect on the litigation or Barstow's approach to the objections to the Tanger project. It was not actionable.

Let a peremptory writ issue as prayed. Costs and attorney fees to petitioner pursuant to subdivision (c) of § 425.16.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

37 Cal.App.4th 8

37 Cal.App.4th 8, 43 Cal.Rptr.2d 350, 23 Media L. Rep. 2313, 95 Cal. Daily Op. Serv. 5934, 95 Daily Journal D.A.R. 10,117

**(Cite as: 37 Cal.App.4th 8)**

Dabney, Acting P. J., and McKinster, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied November 22, 1995. Mosk, J., was of the opinion that the petition should be granted. **\*31**

Cal.App.4.Dist.,1995.

Ludwig v. Superior Court (City of Barstow)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT  9**

106 Cal.App.4th 1219                                                                                Page 1
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
(Cite as: 106 Cal.App.4th 1219)

▷

TUCHSCHER DEVELOPMENT ENTERPRISES,
INC., Plaintiff and Appellant,
v.
SAN DIEGO UNIFIED PORT DISTRICT et al.,
Defendants and Respondents.
No. D038811.

Court of Appeal, Fourth District, Division 1, Cali-
fornia.

Mar. 12, 2003.

SUMMARY

A developer brought an action for inducing breach
of contract, intentional and negligent interference
with prospective economic advantage, and violation
of the unfair competition law ( Bus. & Prof. Code, §
17200) against a port district and a port district
commissioner. Plaintiff, which had entered into an
exclusive negotiating agreement with a city and its
redevelopment agency relating to the commercial
development of bayfront property, alleged that de-
fendants conspired with another developer to dis-
rupt this agreement. The trial court granted defend-
ants' motion to strike plaintiff's complaint as a
SLAPP suit (strategic lawsuit against public parti-
cipation) ( Code Civ. Proc., § 425.16). (Superior
Court of San Diego County, No. GIC758620, Willi-
am R. Nevitt, Jr., Judge.)

The Court of Appeal affirmed. The court held that
the trial court did not err in granting defendants'
motion to strike plaintiff's complaint under Code
Civ. Proc., § 425.16, since the lawsuit arose from
defendants' exercise of their free speech rights in
connection with a public issue and plaintiff failed to
establish, with competent and admissible evidence,
the requisite probability of success on the merits of
any of its claims. The court further held that the tri-
al court did not err in reaffirming its ruling after it
granted plaintiff's motion for reconsideration. The
court also held that plaintiff failed to demonstrate a
legally sufficient claim for inducement of breach of
contract, since defendants' talks with another de-
veloper, even if communicated to the city, did not
constitute inducement of a breach. The court also
held that plaintiff failed to demonstrate a legally
sufficient claim for interference with prospective
economic advantage in failing to prove that defend-
ants engaged in conduct that was wrongful by some
legal measure other than the interference itself. The
court also held that plaintiff failed to demonstrate a
legally sufficient claim for violation of the unfair
competition law, since plaintiff failed to demon-
strate how defendants' actions were unlawful, un-
fair, or *1220 fraudulent business acts or practices.
Finally, the court held that the trial court did not ab-
use its discretion in denying plaintiff's discovery re-
quests prior to the hearing on defendants' motion to
strike. (Opinion by O'Rourke, J., with Benke, Act-
ing P. J., and Huffman, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1)            Appellate         Review          §
116--Dismissal--Determination on Merits Despite
Stipulated Request for Dismissal.
Even when the parties submit a stipulated request
for dismissal of a pending appeal, the appellate
court may exercise its discretion to proceed with
the appeal when the issues presented by the appeal
are important.

(2) Pleading § 93--Motion to Strike Pleading--As
SLAPP    Suit--Trial   Court's   Determination-
-Appellate Review.
A trial court's determination of a special motion to
strike a complaint as a SLAPP suit (strategic law-
suit against public participation) ( Code Civ. Proc.,
§ 425.16) is a legal question that is subject to de
novo review on appeal.

(3a, 3b, 3c, 3d, 3e, 3f) Pleading § 93--Motion to
Strike Pleading--As SLAPP Suit--Showing Re-
quired of Plaintiff and Defendant--Protected Activ-
ity--Legally Sufficient Claim.
A defendant who brings a motion to strike a com-
plaint as a SLAPP suit (strategic lawsuit against

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

106 Cal.App.4th 1219                                                                                        Page 2
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

public participation) (Code Civ. Proc., § 425.16) must first demonstrate that the causes of action asserted by the plaintiff are based on the defendant's constitutionally protected free speech or petitioning activity. The trial court considers not only the pleadings, but also the supporting and opposing affidavits, to determine whether this first requirement has been met. Communications made in connection with a public issue or an issue of public interest are protected under the statute, with "public interest" broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society or affects a community in a governmental manner. The plaintiff's subjective motivations in bringing suit are irrelevant to application of the statute. The plaintiff, in responding to the anti-SLAPP motion, must state and substantiate a legally sufficient claim, looking ahead to trial and to admissible evidence that will be presented at that time. A claim that is legally sufficient is one that a reasonable attorney would think was tenable. The trial court should grant the anti-SLAPP motion if, as *1221 a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. The anti-SLAPP motion operates like a demurrer or motion for summary judgment in reverse.

(4a, 4b, 4c, 4d, 4e) Pleading § 93--Motion to Strike Pleading-- As SLAPP Suit--Showing Required to Oppose Motion--Competent, Admissible Evidence in Support of Legally Sufficient Claim.
In an action for inducing breach of contract, intentional and negligent interference with prospective economic advantage, and violation of the unfair competition law (Bus. & Prof. Code, § 17200) against a port district and a port district commissioner by a developer, the trial court properly granted defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16). Plaintiff, which had entered into an exclusive negotiating agreement with a city and its redevelopment agency relating to the commercial development of certain bayfront property, alleged that defendants conspired with another developer to disrupt the negotiating agreement. The proposed development of

this bayfront property, with its potential environmental impacts, was plainly a matter of public interest that was protected activity under Code Civ. Proc., § 425.16, subd. (e)(4). Further, plaintiff, in opposing the motion, failed to demonstrate with competent and admissible evidence the requisite possibility of prevailing on its claims (Code Civ. Proc., § 425.16, subd. (b)(1)). The substantial portion of the evidence presented by plaintiff was argumentative, speculative, and based on impermissible opinions, and it also lacked foundation and personal knowledge.

[See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 962; West's Key Number Digest, Pleading ☞ 358.]

(5) Interference § 2--Interference with Contract Relationship--Elements.
The elements of a cause of action for intentional interference with contract are: (1) a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship, (4) actual breach or disruption of the contractual relationship, and (5) resulting damage. The required intent is shown if the defendant knows that the interference is certain or substantially certain to occur as a result of his or her action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to be a necessary *1222 consequence of his or her action. Whether the interference was justified as merely incidental to the defendant's legitimate pursuit of his or her own interests is a question of fact. Wrongfulness independent of the inducement to breach the contract is not an element of the tort of intentional interference with existing contractual relations.

(6a, 6b) Interference § 4--Interference with Contract Relationship-- Actions--Interference with Negotiation Agreement:Pleading § 93--Motion to Strike Pleading--As SLAPP Suit.
In an action for inducing breach of contract against a port district and a port district commissioner by a

Case 5:07-cv-03795-JW    Document 85    Filed 11/05/2007    Page 23 of 40

106 Cal.App.4th 1219                                                    Page 3
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

developer, the trial court properly granted defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16), since plaintiff, in opposing the motion, failed to demonstrate with competent and admissible evidence the requisite possibility of prevailing on its claim (Code Civ. Proc., § 425.16, subd. (b)(1)). Plaintiff, which had entered into an exclusive negotiating agreement with a city and its redevelopment agency relating to the commercial development of certain bayfront property, alleged that defendants conspired with another developer to disrupt the negotiating agreement. The record, however, did not contain any admissible direct or indirect evidence from which a breach could be inferred. The negotiating agreement did not obligate the city to enter into a development agreement with plaintiff, but merely to negotiate with plaintiff diligently and in good faith during the term of the agreement. Even giving credit to all of plaintiff's admissible evidence, it merely showed that the city permitted the negotiating agreement to expire, which was the city's right under the agreement. Even if defendants had talks with another developer that they communicated to the city, this did not constitute inducement of a breach. Finally, since there was no guaranty that the city would have approved the development agreement with plaintiff, there was no competent evidence of damages.

(7) Interference § 7--Interference with Prospective Economic Advantage-- Actions--Interference with Negotiation Agreement:Pleading § 93--Motion to Strike Pleading--As SLAPP Suit.

In an action for intentional and negligent interference with prospective economic advantage against a port district and a port district commissioner by a developer, the trial court properly granted defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16), since plaintiff, in opposing the motion, failed to demonstrate the requisite possibility of prevailing **\*1223** on its claim (Code Civ. Proc., § 425.16, subd. (b)(1)). Plaintiff, which had entered into an exclusive negotiating agreement with a city and its re-

development agency relating to the commercial development of certain bayfront property, alleged that defendants conspired with another developer to disrupt the negotiating agreement. Plaintiff, however, failed to carry its burden of proving that defendants engaged in conduct that was wrongful by some legal measure other than the interference itself. Even assuming defendants helped draft an agreement between another developer and the city or advocated that developer to the city, defendants had no contractual obligation to refrain from such discussions. In order to establish a civil conspiracy, a plaintiff must prove a wrongful act done in furtherance of the conspiracy.

(8) Unfair Competition § 8--Actions--Interference with Negotiation Agreement:Pleading § 93--Motion to Strike Pleading--As SLAPP Suit.

In an action for violation of the unfair competition law (Bus. & Prof. Code, § 17200) against a port district and a port district commissioner by a developer, the trial court properly granted defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16), since plaintiff, in opposing the motion, failed to demonstrate the requisite possibility of prevailing on its claim (Code Civ. Proc., § 425.16, subd. (b)(1)). Plaintiff, which had entered into an exclusive negotiating agreement with a city and its redevelopment agency relating to the commercial development of certain bayfront property, alleged unfair competition in defendant's conspiracy with another developer to disrupt the negotiating agreement. Plaintiff could not maintain this action against the port district, since it was a governmental entity and not a "person" under Bus. & Prof. Code, § 17201. Further, even if the district were vicariously liable for the acts of the port district commissioner, plaintiff failed to demonstrate how the commissioner's actions were unlawful, unfair, or fraudulent business acts or practices under the unfair competition law.

(9a, 9b, 9c) Estoppel and Waiver § 1--Doctrine of Judicial Estoppel-- Relevance of Prior Ruling to Current Action:Pleading § 93--Motion to Strike Pleading--As SLAPP Suit.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

106 Cal.App.4th 1219                                                                    Page 4

106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827

**(Cite as: 106 Cal.App.4th 1219)**

In an action for inducing breach of contract, intentional and negligent interference with prospective economic advantage, and violation of the unfair competition law (Bus. & Prof. Code, § 17200) against a port district and a port district commissioner by a developer, the trial court did not err, after it granted plaintiff's motion for reconsideration, in reaffirming its ruling granting *1224 defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16). Plaintiff, which had entered into an exclusive negotiating agreement with a city and its redevelopment agency relating to the commercial development of certain bayfront property, alleged unfair competition in defendant's conspiracy with another developer to disrupt the negotiating agreement. The newly discovered evidence presented by plaintiff consisted of pleadings filed in a separate lawsuit against defendants, in which defendants had argued, in moving for summary judgment, that their jurisdiction extended only to tidelands, submerged lands, and the airport. However, since the trial court in the separate action denied defendants' summary judgment motion, the doctrine of judicial estoppel could not be applied against them in this action, since this doctrine may only be applied to a party who successfully asserted a contradictory legal position. Moreover, plaintiff failed to demonstrate how the issue of defendants' jurisdiction was relevant to the prima facie showing required of plaintiff to defeat defendants' anti-SLAPP motion.

(10)    Motions    and    Orders    §
9--Reconsideration--When Grant of Reconsideration Proper.
An order denying a motion for reconsideration is interpreted as a determination that the application does not meet the requirements of Code Civ. Proc., § 1008 (application for reconsideration or modification of prior order). If the requirements have been met to the satisfaction of the court but the court is not persuaded the earlier ruling was erroneous, the proper course is to grant reconsideration and to reaffirm the earlier ruling.

(11) Estoppel and Waiver § 1--Doctrine of Judicial

Estoppel--Underlying Policies.
The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings. Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts. Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion. Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding that directly contradicts an earlier assertion made in the same proceeding or a prior one. *1225

(12a, 12b) Pleading § 93--Motion to Strike Pleading--As SLAPP Suit-- Statutory Requirements Governing Plaintiff's Right to Discovery Prior to Hearing.
In an action for inducing breach of contract, intentional and negligent interference with prospective economic advantage, and violation of the unfair competition law (Bus. & Prof. Code, § 17200) against a port district and a port district commissioner by a developer, the trial court did not abuse its discretion in denying plaintiff's discovery requests prior to a hearing on defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16). Plaintiff failed to meet the requirements of Code Civ. Proc., § 425.16, subd. (g), in making its discovery requests, since its first request was not made by noticed motion, and its second request was not made until after the trial court had already granted defendant's anti-SLAPP motion.

(13) Pleading § 93--Motion to Strike Pleading--As SLAPP Suit--Trial Court's Ruling on Plaintiff's Discovery Request--Appellate Review.
The appellate court reviews for abuse of discretion a trial court's determination as to whether a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

plaintiff, in opposing a motion to strike a complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16), is entitled to discovery prior to a hearing on the motion under Code Civ. Proc., § 425.16, subd. (g). Under the abuse of discretion standard, the reviewing court will not disturb the trial court's decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.

(14) Pleading § 93--Motion to Strike Pleading--As SLAPP Suit--Award of Attorney Fees and Costs:Costs § 20--Statutory Provisions.
In an action for inducing breach of contract, intentional and negligent interference with prospective economic advantage, and violation of the unfair competition law (Bus. & Prof. Code, § 17200) against a port district and a port district commissioner by a developer, where the trial court properly granted defendants' motion to strike plaintiff's complaint as a SLAPP suit (strategic lawsuit against public participation) (Code Civ. Proc., § 425.16), plaintiff failed to demonstrate that the trial court abused its discretion in awarding defendants attorney fees. Plaintiff failed to present evidence that the award was based on unnecessary or duplicative work or any other improper basis, but merely asserted irregularity without further citation to the record or explanation. In addition, defendants were entitled to recover their attorney fees and costs on appeal under Code Civ. Proc., § 425.16, subd. (c).
*1226

COUNSEL

Kolodny & Pressman, Joel M. Pressman; Boudreau, Albert & Wohlfeil, Joel R. Wohlfeil; Mazzarella, Dunwoody & Caldarelli and Mark C. Mazzarella for Plaintiff and Appellant.

Post, Kirby Noonan & Sweat, David J. Noonan, Kristen T. Bruesehoff and Steven T. Coopersmith for Defendants and Respondents.

**O'ROURKE, J.**

Appellant Tuchscher Development Enterprises, Inc.

(TDE), sued the San Diego Unified Port District and one of its then commissioners David Malcolm (hereafter the Port District and Malcolm, or collectively, respondents) for inducing breach of contract, intentional and negligent interference with prospective economic advantage, and violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) stemming from respondents' conduct alleged to have interfered with an exclusive negotiating agreement between TDE and other entities relating to the commercial development of certain property. Respondents moved to strike TDE's complaint under Code of Civil Procedure section 425.16 (commonly referred to as the anti-SLAPP statute), [FN1] asserting the lawsuit arose from respondents' exercise of their rights of petition and free speech in connection with a public issue. The trial court granted the motion to strike, denied TDE's reconsideration motion, awarded respondents attorney fees, and entered judgment in respondents' favor. On appeal, TDE contends section 425.16 does not apply to its causes of action because there was no public issue that warranted Malcolm or the Port District's involvement and there was no pending public process-i.e., hearings before the Port District or California Environmental Quality Act (CEQA) proceedings-in which respondents' statements or writings occurred. TDE further contends that even assuming the anti-SLAPP statute applied, it established a probability of success on the merits of its claims against respondents. Finally, TDE contends the court erred by denying reconsideration and the opportunity to *1227 conduct further discovery, and awarding respondents $55,900 in attorney fees. (1)(See fn. 2) We reject these contentions and affirm the judgment. [FN2]

> FN1 All statutory references are to the Code of Civil Procedure unless otherwise indicated. "SLAPP" stands for "strategic lawsuit against public participation." (Ketchum v. Moses (2001) 24 Cal.4th 1122, 1127 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

> FN2 Several days before oral argument in this matter, the parties submitted a stipu-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

106 Cal.App.4th 1219                                                                                          Page 6
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

lated request to dismiss this appeal. We are not required to dismiss the appeal on stipulation at this stage, and we have exercised our discretion to proceed with our opinion because of the importance of the issues presented. (See *City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121, fn. 5 [84 Cal.Rptr.2d 361].)

Factual and Procedural Background

In November 1998, after several public notices and hearings, TDE entered into an exclusive negotiating agreement (the negotiating agreement) with the City of Chula Vista and the Chula Vista Redevelopment Agency (collectively the City) under which the City and TDE would take preliminary steps and negotiate towards a development agreement for the creation of a mixed use real estate project (the project or Crystal Bay) on certain bayfront property within the City. The negotiating agreement contained an exclusivity clause providing that during the agreement's term, the City "agree[d] not to negotiate with any other person or entity regarding the acquisition and development of the Project except for those owners or tenants of the Property to whom [the City] is obligated to extend owner participation rights." [FN3] As part of its preliminary steps toward the project, TDE obtained an option to purchase land from the primary landowner within the project area, Chula Vista Capital (CVC), a private company. That option was to expire on February 18, 2000. CVC waived its owner participation rights in connection with that option. In October 1999, the City agreed to extend the negotiating agreement's expiration date to May 17, 2000.

> FN3 The exclusivity provision further states: "Notwithstanding the foregoing, the [City] reserves the right to negotiate with parties with powers of condemnation with respect to all [City] properties. [The City] will, at its sole cost and expense, extend owner participation rights to all persons entitled thereto by law, and in connection therewith. [The City] will retain full and unfettered discretion to extend owner participation rights to current property owners

in the manner required by law, and to consider and evaluate any owner participation proposals submitted."

Both the February 18, 2000 option deadline, and the May 17, 2000 negotiating agreement deadline passed without TDE and the City reaching terms of a development agreement for Crystal Bay.

TDE eventually sued respondents, the City and several entities referred to as the Lennar defendants [FN4] for inducing breach of contract, intentional and negligent interference with prospective economic advantage, and violation *1228 of the unfair competition law. The gist of TDE's complaint was that respondents conspired with Lennar to deprive TDE of the benefits of the negotiating agreement by disrupting the City's staff from negotiating the development agreement and inducing the City to cease negotiations. TDE alleged respondents furthered the conspiracy by (1) communicating with the mayor and other agents and employees of the City of Chula Vista, and (2) facilitating communications and meetings between Lennar and a CVC representative, and that respondents' objective was to secure the rights to develop both the Crystal Bay project and the Port District's own commercial property located south of the project site.

> FN4 Specifically, these defendants were Lennar Corporation, LNR Property Corporation, Lennar Partners, and Lennar Communities (collectively Lennar). Procedurally, TDE first unsuccessfully filed a claim for damages against the Port District, which was deemed rejected. It filed its initial complaint in November 2000 against the Lennar entities only. The operative pleading is TDE's first amended complaint filed on February 15, 2001.

Respondents moved to strike TDE's complaint under section 425.16. They argued all of the causes of action against them fell within the statute because their alleged oral and written statements were made in connection with governmental review of plans for the commercial development of the Crystal Bay

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 5:07-cv-03795-JW    Document 85    Filed 11/05/2007    Page 27 of 40

106 Cal.App.4th 1219                                                    Page 7
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

project and Port District properties, which was also an issue of public interest. Respondents further argued TDE could not defeat the motion by proving a probability of prevailing on its claims because (1) Government Code section 810 et seq. immunized their actions; (2) the official duty privilege of Civil Code section 47, subdivision (a) protected their statements; and (3) the unfair competition law did not apply to governmental entities.

In opposition, TDE argued respondents did not meet their threshold burden of demonstrating section 425.16 applied because the development of Crystal Bay was not yet an issue of public interest, and respondents' actions were not taken in connection with a public issue because no formal public process-i.e., hearings before the Port District or CEQA proceedings-had been initiated. TDE further asserted respondents' conduct was not protected by any immunity or privilege afforded to the government or its officials. TDE finally argued it readily established prima facie tort causes of action against respondents, submitting the declaration of TDE's president and chief executive officer, William Tuchscher, as well as several documents it argued exemplified respondents' interfering communications. Tuchscher averred that in February of 2000, a few months before the negotiating agreement was to expire, he learned Malcolm had been communicating with Lennar and various City representatives in closed door meetings, telephone calls and e-mails concerning the proposed Crystal Bay project. He listed examples of such communications as follows:

(a) a January 18, 2000 electronic mail communication between two Lennar representatives, Bob Santos and Jim Moxham, in which Moxham reported a message from the director of Chula Vista's community development *1229 department, Chris Salomone, in which Salomone told him Malcolm felt Port District staff was leaning toward "giving Lennar an exclusive";

(b) a February 15 electronic mail communication from Santos to "cstephen" reporting that Malcolm was putting the question of authorization for staff to

negotiate with Lennar on a February 22 meeting agenda;

(c) a February 23 electronic mail communication from Santos to Curt Stephenson, Jim Moxham and Riley Johnson reporting what Malcolm told Santos about the February 22 meeting;

(d) a February 24 telephone call in which Malcolm told Tuchscher "the Mayor wants one project and one project team"; and

(e) a March 6 letter from Santos to Malcolm in which Santos reiterated Lennar's strong interest in developing the Port District's Chula Vista property, and indicated interest in Malcolm's proposal that Lennar enter into a joint development agreement with the City and Port District. In part, Santos's letter states: "This agreement would place a firm obligation on Lennar to construct H St. Marina View Parkway and demolish the existing structures on Port property. (Lennar would lose this investment only if an acceptable commercial agreement did not occur[.]) In exchange, Lennar would be allowed to develop residential housing on the adjacent fee owned property and commercial on Port property."

Further, Tuchscher related his understanding of conversations among City representatives and recounted conversations he had with Port District staff and City representatives in which those persons largely related Malcolm's conduct to him. [FN5] Tuchscher stated he had contacted a Lennar representative in the winter of 2000, who looked into Lennar's computer database and *1230 confirmed Crystal Bay was being pursued by Lennar and that the " 'contact person, procuring cause, or broker was David Malcolm.' " Finally, Tuchscher referred to a document received in discovery reflecting what he said were Santos's handwritten notes of a January 11, 2000 meeting among Lennar representatives, Malcolm and Salomone in which Santos noted Malcolm said TDE was up against deadlines and out of money.

> FN5 Tuchscher averred: "On March 20, 2000, I had a conversation with Port staff (Tom Morgan, Roy Nail and Jeff Gabriel)

Case 5:07-cv-03795-JW    Document 85    Filed 11/05/2007    Page 28 of 40

106 Cal.App.4th 1219                                                                                                                                                  Page 8
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
(Cite as: 106 Cal.App.4th 1219)

where they told me they were 'put under significant pressure from Chula Vista to sole source Lennar.' They further stated, 'Chris Salomone delivered Lennar corporate collateral to a Port Commission meeting.['] Afterwards, Debra DePratti (Chula Vista's project manager for Crystal Bay) confirmed to me that staff was doing this without direction from the city council, but at the behest of David Malcolm. [¶] On April 10, 2000, I spoke with City Council Member, Mary Salas, who had spoken with Frank Urtassan (Port Commissioner). I understand Mr. Urtassan confirmed that he had been told by David Malcolm that 'the City had selected Lennar [to build out the Bay Front], and that the entire City Council had taken action in this regard[.]' ... This prompted Ms. Salas to write a letter to City Council member, Paul Speer, to be careful to ensure 'public process' on the selection of a developer.... [¶] On April 13, 2000, I understand Patty Davis (a City Council Member) made Chula Vista staff aware that Malcolm misrepresented to other Port Commissioners that the City Council allegedly had taken action to select Lennar to develop the Bay Front. In this regard, I understand Ms. Davis had spoken with Port Commissioners Van Deventer and Urtassan. [¶] In or about late February 2000, I was told by Chris Salomone, Chula Vista Director of Community Development, that Malcolm advocated to various Chula Vista representatives that he and the Port District desired a total revision to the Crystal Bay land plan submitted by TDE. Malcolm promoted a relocation of all of Crystal Bay's commercial projects to the Port District's Bayfront property, and that the Crystal Bay property should be planned exclusively as residential housing (a land use not allowed on Port tideland properties)."

After sustaining numerous evidentiary objections lodged by respondents challenging the admissibility

of portions of TDE's declaration and several of the supporting documents, the court tentatively granted the motion as to all four of TDE's causes of action. It found respondents' acts were made in connection with an issue under consideration or review by a legislative body or other official proceeding authorized by law under section 425.16, subdivision (e)(2). It further ruled, in light of its evidentiary rulings, that TDE failed to meet its burden of establishing a probability of prevailing on the merits of its causes of action. The court ruled respondents were entitled to attorney fees under section 425.16, subdivision (c).

At oral argument on the matter, the court affirmed its telephonic ruling. It also denied TDE's verbal request, made by its counsel at the hearing, for an order shortening time to hear a motion for certain discovery. TDE moved for reconsideration and a stay of entry of judgment, and shortly thereafter filed a written motion for specified discovery under section 425.16, subdivision (g), claiming new information and circumstances had arisen in the intervening month since the court's prior discovery ruling. The court denied the discovery motion on the ground it sought information to support TDE's reconsideration motion and was therefore untimely under section 425.16, subdivision (g). As for TDE's motion for reconsideration/stay, the court granted reconsideration as to certain exhibits, but nevertheless affirmed its order granting respondents' section 425.16 motion. It denied TDE's request for a stay of entry of judgment and on August 16, 2001, entered judgment in respondents' favor.

The court awarded respondents $226 in costs and $55,900 in attorney fees, which included fees incurred by respondents in opposing one of TDE's discovery requests as well as its reconsideration motion; the court found *1231 those fees sufficiently connected to the motion to strike and thus recoverable under the statute. TDE appeals from the August 2001 judgment as well as the postjudgment attorney fees and costs order.

Discussion

I. *Section 425.16: Burdens and Standard of Review*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 5:07-cv-03795-JW     Document 85     Filed 11/05/2007     Page 29 of 40

106 Cal.App.4th 1219                                                                        Page 9
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

(2) Section 425.16 permits a court to dismiss certain types of nonmeritorious claims early in the litigation by means of a special motion to strike. (*Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1087 [114 Cal.Rptr.2d 825]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 473 [102 Cal.Rptr.2d 205] (*Damon*).) Section 425.16, subdivision (b)(1) provides in part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

In subdivision (e) of section 425.16, the Legislature set out the types of First Amendment activity from which a cause of action may arise to fall within the meaning of subdivision (b)(1). As pertinent here, the subdivision provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: ... (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; ... (4) ... any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

"Section 425.16, subdivision (b)(1) requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been

made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial *1232 court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*).) These determinations are legal questions subject to our de novo review. (*Damon, supra,* 85 Cal.App.4th at p. 474; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625]; *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1364 [102 Cal.Rptr.2d 864], disapproved on other grounds in *Equilon,* at p. 68, fn. 5.)

## II. *Application of Section 425.16 to TDE's Causes of Action*

(3a) We begin with the first inquiry in the section 425.16 analysis, which TDE only briefly addresses: whether it has made a threshold showing that the challenged causes of action "aris[e] from" protected activity. (*Id.,* subd. (b)(1); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 [124 Cal.Rptr.2d 519, 52 P.3d 695] (*City of Cotati*); *Equilon, supra,* 29 Cal.4th at p. 67.) "In the anti-SLAPP context, the critical consideration [for the defendant's initial burden] is whether the cause of action is based on the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*), italics omitted.) The statute's definitional focus is not on the form of the plaintiff's cause of action but rather the defendant's activity giving rise to his or her asserted liability and whether that activity constitutes protected speech or petitioning. (*Id.* at p. 92.) To decide whether this initial "arising from" requirement is met, we consider not only the pleadings, but also the supporting and opposing affidavits stating the facts on which the liability or defense is based. (*Id.* at p. 89; *City of Cotati,* at p. 79.)

(4a) TDE contends its lawsuit not intended to chill respondents' lawful right to free speech; it was intended to obtain monetary redress for respond-

106 Cal.App.4th 1219                                                                                              Page 10
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

ents' unlawful speech and conduct that caused it financial damage. TDE also contends the matter was not the subject of any formal public process, although it concedes the development itself is an issue of public interest. It argues: "[W]hile the development of Crystal Bay was an 'issue of public interest,' no issue was before the Port District concerning the project. The only 'public issue' at stake was whether or not TDE could negotiate a [development agreement] with [the City]. That issue did not, and should not, have involved the Port District and Malcolm in any manner, and certainly did not give rise or authority to [sic] Malcolm under any law to bring Lennar to [the City] to develop the ... property."

Respondents maintain any communication by them to the Chula Vista mayor, Chula Vista city manager, and other Chula Vista agents and employees was rationally connected to the City and Port District's review of plans *1233 for the commercial development of the Crystal Bay and Port District parcels and was therefore made "in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other official proceeding authorized by law" under section 425.16, subdivision (e)(2). They argue their communications to Lennar are likewise protected under this subdivision, which does not require "that the writing or speech be promulgated directly to the official body." (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 17 [43 Cal.Rptr.2d 350] (*Ludwig*), italics omitted.) As an independent basis for their motion, respondents further argue the communications were made in connection with a public issue or an issue of public interest so as to fall under subdivision (e)(4) of the statute; that this prong does not require the communications be made publicly or in connection with issues before an official proceeding.

We need not consider whether respondents' communications were made in connection with an issue under consideration or review by a legislative, executive or judicial body, because there appears to be no dispute that the proposed development of Crystal Bay is a matter of public interest, and thus

respondents' statements and writings fall within subdivision (e)(4) of section 425.16. (3b) "The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon, supra,* 85 Cal.App.4th at p. 479.)

(4b) Here, the activity underlying each of TDE's causes of action against respondents is Malcolm's communications to either the City or Lennar involving the proposed development of Crystal Bay and other bayfront property. The declaration of TDE's president and chief executive officer contains statements demonstrating the Crystal Bay development was a matter of public concern, having broad effects on the community. He averred Chula Vista's mayor and Chula Vista staff encouraged TDE to pursue the development of a large-scale multi-use, resort-oriented, master-planned project on the mid-bayfront in Chula Vista; that the Chula Vista City Council approved the exclusive negotiating agreement with TDE after being publicly noticed and agendized on four separate occasions; and that, in planning the project, TDE conducted numerous public forums with government agencies, local community groups, and individuals, as well as organized meetings with various environmental and habitat organizations, including the United States Fish and Wildlife Service and the California *1234 Department of Fish and Game. [FN6] The prospect of commercial and residential development of a substantial parcel of bayfront property, with its potential environmental impacts, is plainly a matter of public interest. (E.g., *Ludwig, supra,* 37 Cal.App.4th at p. 15 [development of a discount mall "with potential environmental effects such as increased traffic and impact[s] on natural drainage, was clearly a matter of public interest"].)

> FN6 More fully, Tuchscher avers: "To properly plan the [Crystal Bay] project, TDE conducted numerous public forums, presenting the project to government agencies, local community groups and inter-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

106 Cal.App.4th 1219                                                                                                          Page 11
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

ested individuals. In addition, TDE, in conjunction with the City of Chula Vista, engaged environmentalists and local conservation groups in a series of organized meetings to identify, and ultimately resolve, environmental and habitat impacts associated with the development of Crystal Bay. The meeting included habitat groups such as: the Environmental Health Coalition, San Diego Audubon Society, SurfRider Foundation, Baykeeper, The Sierra Club, SWEA, and others. The group became informally known as the 'Friends of South Bay Wildlife.' Also attending these meetings were the national Fish and Wildlife Service (Refuges and Ecological Services), California Fish and Game, TDE's consultants and Chula Vista."

TDE's argument that it did not intend to chill free speech rights by its lawsuit is irrelevant to the analysis. (3c) Although the Legislature has characterized SLAPP suits as having an underlying meritless goal to chill the defendant's exercise of First Amendment rights (§ 425.16, subd. (a); [FN7] see *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1414 [103 Cal.Rptr.2d 174] (*Dowling*)), the California Supreme Court has recently held plaintiff's subjective motivations in bringing the suit are irrelevant to the statute's application. (*City of Cotati, supra,* 29 Cal.4th at pp. 73-74; *Navellier, supra,* 29 Cal.4th at p. 88.) Thus, a defendant moving under section 425.16 need not demonstrate the targeted action was intended to chill its free speech or petition rights, nor need it show the action had such an effect. (*City of Cotati,* at pp. 73-75.)

FN7 Subdivision (a) of section 425.16 provides: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance,

and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."

(4c) TDE's other argument-that the public issue of the development agreement did not involve respondents or give them the authority to bring Lennar to Chula Vista-is similarly misplaced. This argument improperly focuses on the legitimacy of respondents' conduct and thus " 'confuses the threshold question of whether the SLAPP statute [potentially] applies with the question whether [an opposing plaintiff] has established a probability of success on the merits.' " (*Navellier, supra,* 29 Cal.4th at p. 94, quoting *1235*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906].) "[A]ny 'claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise and support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' " (*Navellier,* at p. 94, italics omitted.)

Having concluded TDE's claims fall within the ambit of section 425.16, subdivision (e)(4), we proceed to the second prong of the section 425.16 analysis and determine whether respondents have met their burden to establish a probability of prevailing on the merits.

III. *Probability of Prevailing on the Merits*
(3d) "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must " ' state[ ] and substantiate[ ] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submission of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative pro-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

bative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733] (*Wilson*); see also *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317 [126 Cal.Rptr.2d 516].)

### A. *Evidentiary Showing*

(4d) As a threshold matter, TDE contends it presented substantial admissible evidence to support its claims. It maintains that, in reaching its decision, the trial court erred by weighing the evidence instead of considering whether a triable issue of fact existed from the evidence presented.

TDE's challenge to the trial court's ruling is ultimately immaterial as this court must independently consider the moving and opposing papers. *1236 Nevertheless, the excerpt from the ruling cited by TDE [FN8] shows the court simply considered and ruled on the admissibility of TDE's opposing evidence, not that it weighed respondents' evidence against TDE's in any way. Its admissibility determination was proper under the applicable inquiry, which respondents correctly point out is whether TDE established with competent and admissible evidence it has a probability of prevailing on its claims. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 654-655 [49 Cal.Rptr.2d 620], disapproved on other grounds in *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5; *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497- 1498 [45 Cal.Rptr.2d 624] (*Evans*); see e.g., *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719-720, fn. 6 [34 Cal.Rptr.2d 898, 882 P.2d 894] (*College Hospital*).) (3e) "An assessment of the probability of prevailing on the claim looks to *trial*, and the evidence that will be presented at that time. [Citation.] Such evidence must be *admissible*. [Citation.] As the court in *Wilcox [v. Superior Court* (1994) 27 Cal.App.4th 809, 830 [33 Cal.Rptr.2d 446], disapproved on other grounds in *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5] explained, the plaintiff's burden of establishing 'facts

to sustain a favorable decision if the evidence submitted ... is credited' [citation] implies a requirement of admissibility, because 'otherwise there would be nothing for the trier of fact to credit.' [Citation.] At trial, 'the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter.' [Citation.] An averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim." (*Evans,* at pp. 1497-1498.)

> FN8 TDE points to the following portion of the trial court's ruling: "As to defendant Malcolm, plaintiff's opposition ... sets forth several ' examples of communications and documents' which purport to show that movants interfered with a contract or prospective economic advantage. This interference is the basis of each of plaintiff's four causes of action against movants. Of plaintiff's 'examples' ..., only h through I, citing Exhibits 'N' through 'R', survive movants' objections. This evidence does not show that Malcolm interfered with any contract or prospective economic advantage between the plaintiff and the City of Chula Vista and/or the Redevelopment Agency."

In *Evans,* the court reviewed the California Supreme Court's analysis of section 425.13, a closely related statute having a similar probability-of-prevailing standard. (*Evans, supra,* 38 Cal.App.4th at p. 1498, citing *College Hospital, supra,* 8 Cal.4th at pp. 719-720.) Under section 425.13, a court may allow a plaintiff to file an amended pleading including a claim for punitive damages against a health care provider if the plaintiff establishes there is a substantial probability that he or she will prevail on the claim pursuant to Civil Code section 3294. (§ 425.13, subd. (a).) In *College Hospital,* the California Supreme Court held that under section 425.13 and *1237 similar statutes, including section 425.16 (*College Hospital,* at p. 718), the required motion "operates like a demurrer or motion for summary judgment in 'reverse.' Rather than requiring the *defendant* to de-

106 Cal.App.4th 1219                                                                Page 13
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

feat the plaintiff's pleadings by showing it is legally or factually meritless, the motion requires the *plaintiff* to demonstrate that he possesses a legally sufficient claim which is 'substantiated,' that is, supported by competent, admissible evidence." (*Id.* at p. 719.) Thus, for example, according to the court, where the evidence in the " 'supporting and opposing affidavits' either negates or fails to reveal the actual existence of a triable claim," the motion must be denied. (*Ibid.*)

In *Wilson, supra,* 28 Cal.4th at page 820, our high court more recently reinforced the view that a plaintiff opposing a section 425.16 motion must support its claims with admissible evidence. There, the court held a trial court's earlier denial of a special motion to strike under section 425.16 established probable cause to bring that action and precluded maintenance of a later malicious prosecution suit. (*Wilson,* at p. 820.) In reaching its conclusion the court explained: "In denying a motion to strike on the ground that the plaintiff has established the requisite probability of success ... [a] trial court necessarily concludes that the plaintiff has substantiated a legally tenable claim through a facially sufficient evidentiary showing and that the defendant's contrary showing, if any, does not defeat the plaintiff's as a matter of law. This determination establishes probable cause to bring the claim, for such an action clearly is not one that ' "any reasonable attorney would agree ... is totally and completely without merit." ' [Citation.] A claim that is legally sufficient and can be substantiated by competent evidence is, on the contrary, one that a 'reasonable attorney would have thought ... tenable.' [Citation.]" (*Id.* at p. 821.) The court's discussion contemplates a SLAPP plaintiff's presentation of competent, i.e., admissible, evidence in support of its prima facie case in opposition to the motion.

However, respondents are incorrect to suggest the prima facie evidentiary showing required of TDE under section 425.16 is entirely different from the summary judgment existence of triable issue standard. In articulating the appropriate standard for assessing evidence under section 425.13 in *College Hospital,* the California Supreme Court pointed out

its test-requiring the court in part to determine whether the evidence in supporting and opposing affidavits either negates or fails to reveal the actual existence of a *triable claim*-is "largely consistent" with the "prima facie" approach formulated by the Courts of Appeal in construing section 425.13, subdivision (a) and other similar statutes. (*College Hospital, supra,* 8 Cal.4th at pp. 719-720 & fn. 6 [finding "little substantive difference" between the "prima facie" *1238 approach and the triable issue approach].) To apply the court's words in the context of a section 425.16 motion: "Under either formulation, a motion [under section 425.16] must be [granted if], after reviewing the supporting and opposing materials, the court concludes that the allegations made or the evidence adduced in support of the claim, even if credited, are insufficient as a matter of law to support a judgment ...." (*College Hospital,* at p. 720, fn. 6.)

(4e) Using these evidentiary standards to determine whether TDE met its burden, we are compelled to disregard a substantial portion of TDE's evidence. The January and February 2000 electronic mail printouts, the letters and the handwritten notes are without foundation. (Evid. Code, § 1401; see *Jacobson v. Gourley* (2000) 83 Cal.App.4th 1331, 1334 [100 Cal.Rptr.2d 3491].) Tuchscher's declaration recounting the Lennar representative's report on the contents of Lennar's computer database consists of hearsay. We further reject Tuchscher's declaration to the extent it is supported only by information and belief or his mere understanding of events (e.g., pars. 13, 18, 18(g), 18(h)). (*Evans, supra,* 38 Cal.App.4th at pp. 1497-1498.) And many of the statements made in Tuchscher's declaration, including as to respondents' authority to involve themselves with the project and the economic boon to Lennar, are argumentative, speculative and impermissible opinions, and also lack foundation and personal knowledge. [FN9]

> FN9 Examples of such statements are:
> "In my experience as a developer of large scale projects, including those on Port tidelands property, the Port District, Port Staff and Port Commissioners (including David

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 5:07-cv-03795-JW     Document 85     Filed 11/05/2007     Page 34 of 40

106 Cal.App.4th 1219                                                    Page 14
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

Malcolm) have no right to interfere with a project being processed outside of Port tidelands." "To my educated understanding of the public process, under no circumstances should a commissioner (like David Malcolm) be conducting 'closed door meetings' to advocate a personal position as an individual Port Commissioner. It is also my experience that a Port Commissioner cannot privately advocate land use changes if such position is not the official public policy of the Port District."

"If Malcolm and the Port District could convince Chula Vista to utilize Lennar for the entire development of both projects, and thereby eliminate TDE as a competitor, the economic boon to the Port District is approximated as follows: [¶] Having all of the hotel and commercial uses of Crystal Bay on Port District property would conservatively generate the following approximate revenues: [¶] 400 Room Resort: The Port District leases properties for hotels based on room revenue, and a percentage of various other departments (food & beverage, alcohol, etc.). In my experience, the Port typically charges hotel properties 13% of total revenues. TDE calculations show this would equate to approximately $2,915,687 per year. On a 66-year lease this equals $192,435,380 in total lease consideration to the Port District from this hotel alone...."

Nevertheless, we must credit all *admissible* evidence favorable to TDE and indulge in every legitimate favorable inference that may be drawn from it. With these principles in mind, for each of TDE's causes of action we *1239 proceed to determine whether there is admissible evidence showing facts that would, if proved at trial, support a judgment in its favor on those claims. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].)

### B. *Inducing Breach of Contract*

(5) The elements of a cause of action for intentional interference with contract are: (1) a valid contract between plaintiff and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514, fn. 5 [28 Cal.Rptr.2d 475, 869 P.2d 454]; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 339 [60 Cal.Rptr.2d 539].) The required intent is shown if the defendant "knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." (*Quelimane*, at p. 56.) Whether the interference was justified as merely incidental to the defendant's legitimate pursuit of his own interests is a question of fact. (*Ibid.*) Contrary to respondents' argument, "[w]rongfulness independent of the inducement to breach the contract is not an element of the tort of intentional interference with existing contractual relations ...." (*Id.* at p. 55, italics omitted.)

(6a) On appeal, TDE does not explain how its evidence substantiates the elements of this claim; it simply contends respondents failed to establish their actions were statutorily immune or privileged as they had asserted in their motion for section 425.16 relief. But this argument misunderstands the burdens on a section 425.16 motion. In moving for section 425.16 relief, it was not respondents' burden to show TDE *could not* demonstrate a probability of prevailing on its claims; its only burden was to establish that the claims fell within the ambit of the statute. The fact respondents also made arguments directed toward the second probability-of-prevailing prong does not relieve TDE of its own statutory burden, that is, " ' "[to] make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor. " ' " (*Dowling, supra,* 85 Cal.App.4th at p. 1417.) (3f) In this way section 425.16 differs significantly from the summary judgment statute, which places the initial

106 Cal.App.4th 1219                                                    Page 15
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
(Cite as: 106 Cal.App.4th 1219)

burden of production on the moving defendant to demonstrate the opposing plaintiff cannot establish one or more elements of his or her causes of action. (See *1240Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 850, 853-854, 855 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Consequently, TDE's opening brief arguments do not assist us in our review.

(6b) We in any event assess the pleadings and admissible evidence in the record to undertake our independent review. In its cause of action for inducing breach of contract, TDE alleges respondents, knowing of the negotiating agreement's existence, met with, corresponded with and exchanged TDE's proprietary information with Chula Vista's mayor, Shirley Horton, the Chula Vista city manager and other Chula Vista agents and employees to encourage a relationship between the City and Lennar and discourage any development agreement between TDE and the City. It also alleges Malcolm and Mayor Horton facilitated communications and meetings between Lennar and a CVC representative in order to encourage a purchase agreement between CVC and Lennar and discourage further negotiations between CVC and TDE. TDE alleges this conduct caused the City to breach the negotiating agreement, ignore the staff's recommendation to negotiate a development agreement with TDE, and refuse to extend the negotiating agreement's deadline, causing it damages.

While these allegations may state a prima facie case of interference with the negotiating agreement, the record is absent any admissible direct evidence or evidence from which we may infer respondents' actions induced a breach or disruption. The negotiating agreement in no way obligated the City to enter into a development agreement; the City's staff was merely obligated during the agreement's term to "negotiate diligently and in good faith the terms and conditions of [a development agreement]" to present to the City Board for review and consideration. Notably, the sole evidence of the City's abandonment or unreasonable failure to negotiate is in Tuchscher's declaration, in which he avers as a result of the purported communications between respondents, Lennar and the City "and the heavy

pressure wrongfully and greedily exerted by Malcolm and the Port District, [the City] abandoned negotiations towards a [development agreement], let the [negotiating agreement] expire without good faith negotiations with TDE, and Lennar was soon pursuing the development of the Crystal Bay project." We disregard these conclusionary and argumentative statements. (Cf. Hayman v. Block (1986) 176 Cal.App.3d 629, 638-639 [222 Cal.Rptr. 293] [affidavits must cite evidentiary facts, not legal conclusions or ultimate facts]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶¶ 10:119 (rev. #1 2001), 10:125, 10:127, pp. 10- 43 to 10-46.) Giving *1241 credit to all of TDE's admissible evidence, it shows the City merely permitted the negotiating agreement to expire, as was the City's right under its terms. [FN10]

> FN10 Although the negotiating agreement grants the City's executive director the authority to extend the agreement's term, it is within his sole discretion to do so.

Even if we disregarded TDE's evidentiary problems and assumed the Port District and Malcolm had discussions with Lennar, another developer, regarding the proposed project, or that Malcolm expressed to City representatives his vision for a different arrangement for Crystal Bay, such talks do not by themselves establish the City improperly negotiated with Malcolm or Lennar, abandoned the negotiating agreement, or otherwise refused to meet and confer or negotiate in good faith with TDE. It is not reasonable to infer from Malcolm's advocacy efforts directed to City representatives that the City did not in any event use its best efforts to deal exclusively with TDE while the negotiating agreement was in place. Indeed, TDE's president states in his declaration that during that 18-month period, TDE and Chula Vista "had interaction ... several times daily" and also worked together extensively to resolve environmental issues pertinent to Crystal Bay.

Also, important to the damages analysis, there was no guarantee the City would have approved the development agreement even had TDE and the City

reached final terms for such an agreement. The negotiating agreement contains a "No Pre-Commitment" clause providing: "The inclusion of the specific terms set forth above shall not be deemed to be acceptance of such items by either party until such time as the [City] may approve, and the parties execute the [development agreement]." It also contains a provision entitled "Retention of Discretion to Approve the Project and DDA [development agreement]" that states in part: "The parties understand that the [City] has the complete and unfettered discretion to reject the [development agreement] without explanation or cause."

Absent competent evidence supporting the elements of causation, disruption/breach, or damages, TDE has failed to meet its burden to establish a probability of prevailing on the merits of its cause of action for inducing breach of contract. Stated another way, these elements are not supported by a prima facie showing of facts sufficient to sustain a favorable judgment in TDE's favor. Having reached this conclusion, we need not reach respondents' contention their actions were statutorily immune under Government Code sections or protected by the official duty privilege of Civil Code section 47, subdivision (a). **\*1242**

### C. Intentional/Negligent Interference with Prospective Economic Advantage

(7) We similarly conclude TDE cannot meet its burden to establish a probability of prevailing on its causes of action for intentional and negligent interference with prospective economic advantage, which are based on the same allegations and evidence as its claim for inducing breach of contract. To prevail on the interference with prospective economic advantage causes of action, TDE has the burden of proving not only that respondents knowingly or negligently interfered with an economic relationship, but that they engaged in conduct that was wrongful by some legal measure other than the fact of interference itself. (Della Penna v. Toyota Motor Sales, U. S.A., Inc. (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740]; Gemini Aluminum Corp. v. California Custom Shapes, Inc. (2002) 95 Cal. App.4th 1249, 1256 [116 Cal.Rptr.2d 358]

Gemini); National Medical Transportation Network v. Deloitte & Touche (1998) 62 Cal.App.4th 412, 439-440 [72 Cal.Rptr.2d 720] [independently wrongful requirement applies to negligent interference claims].)

In opposition to respondents' section 425.16 motion, TDE did not explain how its evidence supported the elements of these claims. Likewise, TDE's opening brief arguments focus only upon the defenses of governmental immunity and privilege, and do not address this element (or any other) of its interference causes of action. On this basis, we could conclude without further discussion that TDE failed to meet its burden of making a prima facie showing of a probability of success on the merits. But even considering TDE's arguments in reply directed toward the wrongfulness prong of these causes of action, we must conclude it has not met its burden. In its reply brief, TDE lists Malcolm's wrongful acts as: (1) interfering with the negotiating agreement; (2) conspiring with Lennar and the City to oust TDE; (3) assisting in drafting language in an option agreement between Lennar and CVC entered into in April 2000; and (4) advocating the City to redesign Crystal Bay with Lennar as its developer. According to TDE, these acts "constituted anticompetitive conduct in light of the [negotiating agreement] providing the sole negotiating rights to Crystal Bay to TDE."

There are several reasons why this argument must fail. First, such unsupported argument does not persuade us these acts are wrongful for purposes of its interference with economic advantage causes of action. (See Gemini, supra, 95 Cal.App.4th at p. 1258; Kurinij v. Hanna & Morton (1997) 55 Cal.App.4th 853, 865 [64 Cal.Rptr.2d 324] [appellate court will not consider points unsupported by citation to pertinent authority].) Second, as we have **\*1243** stated, TDE's evidence fails in many respects and does not establish any purported "interference" or conspiracy. In addition to its formation and operation and resulting damage, in order to establish a civil conspiracy a plaintiff must prove a wrongful act done in the furtherance of the conspiracy. (Applied Equipment Corp. v. Litton

106 Cal.App.4th 1219                                                                Page 17
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

*Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511 [28 Cal.Rptr.2d 475, 869 P.2d 454]; see also *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 [47 Cal.Rptr.2d 752].) In this context, it is insufficient for TDE to baldly assert the wrongful conduct is the conspiracy. And even assuming respondents helped draft an agreement between Lennar and CVC or advocated their own development ideas to the City, such activity is not wrongful by some *legal measure*. (*Gemini*, at pp. 1258- 1259 [reviewing California cases applying wrongfulness standard; standard encompasses acts constituting a breach of fiduciary duty, violation of a statute or a tort, or other independently actionable conduct].) Although the point is obvious, Malcolm, the Port District, Lennar and CVC were not parties to the negotiating agreement and thus they were not bound by any contractual obligation or duty to refrain from taking steps-either among themselves or with the City-to push their own development ideas for Crystal Bay. Assuming respondents had talks with the City or its representatives regarding Crystal Bay, such talks do not make *respondents'* communications wrongful apart from the (presumed) interference. Absent any contractual obligation to avoid discussing the issues with the City, respondents' conduct does not amount to a breach of contract or other independently wrongful act sufficient to support plaintiffs' interference with economic advantage claim.

Although it is suggested by some of its arguments, TDE does not (and did not before the trial court) meaningfully contend Malcolm's conduct was wrongful by some legal measure because it was outside the scope of his authority as a port commissioner, and thus we do not address that point.

### D. *Violation of Unfair Competition Law*

(8) Citing *Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1204 [84 Cal.Rptr.2d 496], TDE argues its cause of action under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) must survive against both respondents because the Port District should be held vicariously liable for Malcolm's actions. TDE apparently concedes it cannot maintain such a cause of action against the

Port District because, as a governmental entity, it is not a "person" within the meaning of Business and Professions Code section 17201. (**\*1244***California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 551 & fn. 14 [94 Cal.Rptr.2d 194] [state university school of medicine and hospital are a public entity and thus is not a "person" within scope of prohibitions of unfair competition law, even though hospital is involved in commercial activity]; *Trinkle*, at p. 1203; *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824, 831 [80 Cal.Rptr.2d 549] [governmental entities, such as the Lottery Commission, are not included in the statutes' definitions of "persons"]; *Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1039-1040 [77 Cal.Rptr.2d 189, 959 P.2d 347] [Port District is a governmental entity under the San Diego Unified Port District Act (Harb. & Nav. Code, appen. 1)].)

Even if we were to conclude a cause of action could be maintained against Malcolm, TDE does not explain with any reasoned argument or authority how Malcolm's actions were unlawful, unfair or fraudulent business acts or practices within the meaning of the unfair competition law. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] [unfair competition law defines "unfair competition" to include any unlawful, unfair or fraudulent business act or practice].) It is not for us to make TDE's arguments for it, and consequently we do not consider the point. (*Gemini, supra,* 95 Cal.App.4th at p. 1258.)

### E. *New Evidence*

(9a) TDE contends the court erred when, after granting reconsideration and receiving certain newly discovered evidence, it nevertheless reaffirmed its ruling on respondents' section 425.16 motion to strike. According to TDE, such evidence, consisting of pleadings filed in a separate lawsuit (*Gorfine v. Malcolm* (Super. Ct. San Diego County, 2002, No. GIC759282) (*Gorfine*)) revealed inconsistent statements by Malcolm and the Port District relating to the Port District's authority and jurisdiction to involve itself in discussions concerning

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Crystal Bay, which should have operated as judicial estoppel in the present case. TDE argues that whether or not judicial estoppel applies, the inconsistency raises a triable issue as to "whether or not Malcolm exceeded his authority and jurisdiction by participating in negotiations concerning the Crystal Bay property"; and that a jury, not the trial court, should have decided if Malcolm's communications were wrongful and caused TDE damages.

Preliminarily, we reject respondents' argument we should not review these contentions. They maintain the trial court's order on the reconsideration *1245 motion is not an appealable order because it effectively denied reconsideration. They do not recognize that TDE's argument is made in connection with his challenge to the trial court's reaffirmation of the section 425.16 ruling, and stems from his appeal from the judgment, not from any challenge to the trial court's order granting reconsideration. (10) " 'An order denying a motion for reconsideration is interpreted as a determination that the application does not meet the requirements of section 1008. If the requirements have been met to the satisfaction of the court but the court is not persuaded the earlier ruling was erroneous, the proper course is to grant reconsideration and to reaffirm the earlier ruling.' " (*Mink v. Superior Court* (1992) 2 Cal.App.4th 1338, 1342 [4 Cal.Rptr.2d 195].)

(9b) Turning to TDE's arguments as to judicial estoppel, we conclude the trial court correctly rejected application of that doctrine. (11) " ' "The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. [Citation.] 'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." ' [Citation.] Judicial estoppel is ' intended to protect against a litigant playing "fast and loose with the courts." ' [Citation.] Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court

at its discretion .... Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one. [Citations.] " ' [Citation.]" (*International Engine Parts, Inc. v. Feddersen & Co.* (1998) 64 Cal.App.4th 345, 350 [75 Cal.Rptr.2d 178].)

(9c) According to summary judgment papers filed by Malcolm in the *Gorfine* action, that case involved plaintiff's allegations that Malcolm committed violations of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) by failing to report certain financial interests. A central issue was the Port District's jurisdiction, which would in turn establish the financial interests Malcolm and other Port District commissioners were obligated to disclose. In their moving papers, Malcolm and the Port District argued the Port District's jurisdiction extended only to tidelands, submerged lands in or adjacent to San Diego Bay, the airport and some limited annexations. As respondents point out, the trial court in the *Gorfine* action *denied* respondents' summary judgment motion, and in doing so specifically rejected their interpretation of the Port District's jurisdiction for purposes of the Political Reform Act. *1246

Under these circumstances, judicial estoppel will not operate against respondents. The doctrine should be applied only when the person against whom it is asserted "was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true)." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183 [70 Cal.Rptr.2d 96]; *New Hampshire v. Maine* (2001) 532 U.S. 742, 750-751 [121 S.Ct. 1808, 1815, 149 L.Ed.2d 968] ["Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' [citation], and thus poses little threat to judicial integrity"].)

Nevertheless, TDE asks that we follow the principles stated in *Thomas v. Gordon* (2000) 85 Cal.App.4th 113, 118 [102 Cal.Rptr.2d 28], in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

which the Court of Appeal observed some California courts do not limit application of judicial estoppel to situations where the litigant was successful in asserting the contradictory position. In *Thomas*, the appellant admitted transferring her interest in two corporations to an entity owned solely by her girlfriend in order to keep it out of her creditors' hands, and then filed for bankruptcy, expecting to reclaim her funds after her debts were discharged. (*Id.* at p. 119.) She signed documents in the bankruptcy court claiming to list all of her assets but said nothing about those interests. (*Ibid.*) She later sued her accountant for negligence and fraud, claiming he failed to keep her apprised of the financial affairs of both corporations. (*Id.* at p. 115.) The accountant successfully moved for summary judgment in part on the ground the appellant should be judicially estopped from claiming any legal or equitable interest in the corporations sufficient to require the accountant to keep her apprised of their affairs. (*Id.* at pp. 117, 120.) Finding this to be the "rare situation" where the litigant has made an egregious attempt to manipulate the legal system, the Court of Appeal agreed the circumstances warranted application of judicial estoppel absent proof of appellant's success in the earlier litigation. (*Id.* at p. 119 [agreeing with the trial court that " 'this is as egregious as it gets' "].) In reaching this conclusion, the court observed that because of the nature of bankruptcy law, the appellant obtained a legal benefit from her prior statements as soon as they were made, because they resulted in an automatic stay preventing creditors from taking any action against her for a period of time. (*Ibid.*)

The circumstances here are distinguishable from those in *Thomas*. Respondents' position in *Gorfine* was not adopted by the trial court here, and we cannot conclude they have gained any advantage in the present action by virtue of the inconsistent position taken in the *Gorfine* matter. Notably, TDE has not explained with any meaningful authority or argument how the Port District's jurisdiction is relevant to any particular element of its causes of action that would support the prima facie showing it must make to sustain its section 425.16 burden. Its statement that the jurisdiction issue was the "lynchpin" of the Port District's section 425.16 motion does not shed any light on that question, and it is simply incorrect; the Port District raised the jurisdiction argument in *reply* to TDE's assertion that respondents' actions fell outside the official duty privilege of Civil Code section 47, subdivision (a). As we have stated above, TDE's misplaced attack on respondents' assertion of defenses did not suffice to meet its independent burden in opposition to the section 425.16 motion to demonstrate a probability of prevailing on the merits of its claims.

IV. *The Court Did Not Abuse Its Discretion in Denying TDE's Discovery Requests*

(12a) TDE contends the court erred by taking a "short-sighted, technical approach" and denying TDE's oral and written motions for discovery. TDE maintains the court's rulings violated its constitutional right to a jury trial because the "assessment of probability of success looks to trial and the evidence that will be presented at that time." The arguments are without merit.

Section 425.16, subdivision (g) provides: "All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision."

(13) We review for abuse of discretion the trial court's decision as to whether a plaintiff has complied with the requirements of section 425.16, subdivision (g) to merit discovery prior to a hearing on the motion to strike. (*Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 190-191 [118 Cal.Rptr.2d 330]; see also *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 247 [83 Cal.Rptr.2d 677]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 868 [44 Cal.Rptr.2d 46].) "Under this standard the reviewing court will not disturb the trial court's decision unless it 'has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " (*Mendoza v. Club*

106 Cal.App.4th 1219                                                                           Page 20
106 Cal.App.4th 1219, 132 Cal.Rptr.2d 57, 03 Cal. Daily Op. Serv. 2244, 2003 Daily Journal D.A.R. 2827
**(Cite as: 106 Cal.App.4th 1219)**

*Car, Inc.* (2000) 81 Cal.App.4th 287, 301 [96 Cal.Rptr.2d 605].)

(**12b**) The court here did not abuse its discretion in denying TDE's requests. TDE's first request for discovery was not authorized under **\*1248**section 425.16, subdivision (g) because it was not made by noticed motion. (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 357 [42 Cal.Rptr.2d 464]; see also *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1052 [61 Cal.Rptr.2d 58] (*Braun*) [oral request for discovery at hearing on defendant's § 425.16 motion failed to comply with subd. (g) of § 425.16].) As for its second request for discovery, we will follow TDE's own cited authority-*Evans, supra,* 38 Cal.App.4th 1490-and conclude the court properly denied that request. In *Evans,* as here, the opposing plaintiff did not file a motion for discovery under subdivision (g) of section 425.16 until *after* the trial court granted the defendant's motion and the plaintiff moved for reconsideration of that ruling. (*Evans,* at pp. 1496, 1499.) The Court of Appeal concluded the tardy showing rendered the discovery request meritless. (*Id.* at p. 1499.) While the plaintiff in that case also did not make a proper showing of good cause, the statute requires *both* a timely motion and a showing of good cause. Absent either, the request must fail, as TDE's does here.

### V. *Attorney Fees*

(**14**) TDE contends the trial court erred by granting respondents $55,900 in attorney fees because respondents sought unreasonable and duplicative fees in their motion. Pointing out the trial court requested additional billing records from respondents' counsel before ruling on the motion, TDE maintains "[c]areful review of those records only confirms irregularity in the billing of this matter by Respondents' attorneys." The assertion is unaccompanied by any citation to the record or any explanation of which fees were unreasonable or duplicative. With this cursory argument, TDE has given us no basis to disturb the trial court's discretionary ruling on the attorney fees motion. (Cf. *Braun, supra,* 52 Cal.App.4th at pp. 1052-1053 [court upheld attorney fee award where plaintiff failed to present evid-

ence that the award was based on unnecessary or duplicative work or any other improper basis]; see *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1140 [abuse of discretion standard in trial court's assessment of lodestar fees under § 425.16, subd. (c)]; *Dowling, supra,* 85 Cal.App.4th at p. 1426 [same]; *Church of Scientology v. Wollersheim, supra,* 42 Cal.App.4th at p. 659.)

Under section 425.16, subd. (c), respondents are also entitled to recover their costs and attorney fees on appeal. (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785 [54 Cal.Rptr.2d 830].) **\*1249**

### Disposition

The judgment is affirmed. Respondents shall recover their costs and attorney fees on appeal, the amount of which shall be determined by the trial court.

Benke, Acting P. J., and Huffman, J., concurred. **\*1250**

Cal.App.4.Dist.,2003.

TUCHSCHER DEVELOPMENT ENTERPRISES, INC., Plaintiff and Appellant, v. SAN DIEGO UNIFIED PORT DISTRICT et al., Defendants and Respondents.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.