# EXHIBIT 10

75 Cal.App.3d 415                                                              Page 1
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
**(Cite as: 75 Cal.App.3d 415)**

►

DONALD WIDENER, Plaintiff, Cross-defendant
and Appellant,
v.
PACIFIC GAS AND ELECTRIC COMPANY et
al., Defendants, Cross-complainants and
Appellants
**Civ. No. 40240.**

Court of Appeal, First District, Division 4, Califor-
nia.

November 1, 1977.

SUMMARY

A documentary film producer sued a public utility
and one of its engineers for libel, based on the cir-
culation of a letter written by the engineer charging
the producer with a gross breach of journalistic eth-
ics in tampering with a filmed interview that, after
editing, was used in an anti-nuclear documentary
broadcast on N.B.C. television. Specifically, the
letter, which had been reviewed by staff members
of the utility, charged that the producer had secretly
recorded a response in a pre-interview discussion
and spliced it into the final film. According to the
transcript of the interview, the response, which was
to a question suggesting the use of ineffective
shielding materials in one of the utility's nuclear
power plants, was "I don't think we ought to answer
that; it's too lengthy a question," and, in the context
of the broadcast film (in which the interview was
reduced from four minutes to one minute) such re-
sponse gave the impression that the engineer was
being evasive. At trial, the engineer conceded that
the response had been made, not before the filmed
interview, but in a low-voiced exchange with the
producer during the interview, when he was trying
to get more time to answer the question. The jury
returned a verdict against the utility for $750,000
compensatory damages and against the utility and
the engineer for punitive damages in the amounts of
$7 million and $8,000 respectively. The trial court,
on the ground that the producer had failed to pro-

duce evidence of "actual malice," granted defend-
ants' motion for judgment notwithstanding the ver-
dict and entered a conditional order granting their
motion for new trial if for any reason such judg-
ment were reversed *416 on appeal. (Superior Court
of the City and County of San Francisco, No.
641292, Byron Arnold, Judge. [FN*])

On the producer's appeal from the judgment and
conditional order, and on defendants' precautionary
cross-appeal from the judgment entered on the
jury's verdict in favor of the producer, the Court of
Appeal reversed the judgment notwithstanding the
verdict, affirmed the order granting new trial, and
dismissed the cross-appeal as moot, noting that the
trial court had not limited the new trial to the issue
of damages and that all fact issues, therefore, were
set at large. The court held that, because the produ-
cer was stipulated to be a public figure, he had to
prove, with convincing clarity, defendants' actual
malice, namely, that defendants knew of the falsity
of the published statement or had published it in
reckless disregard of whether it was false or not.
From the jury's point of view, there was ample
evidence for inferring such malice on the part of the
engineer; similarly, the jury could have inferred
that the utility's motive to suppress the film had so
overwhelmed its attention that all of its agents, who
were in a position to control sending the letter, had
treated the question of truth or falsity as a matter of
total indifference. In ruling, however, on a motion
for new trial, the court held, a trial court may dis-
believe witnesses, reweigh evidence, and draw reas-
onable inferences that are contrary to those drawn
by the jury; the trial court cannot, on appeal, be
said to have abused its discretion in granting a new
trial if its reasons for doing so find any substantial
support in the record. In the instant case, the court
held, there was such support for the reasons spe-
cified by the trial court in ordering a new trial for
the utility and the engineer on the ground of excess-
ive damages, and for the engineer on the ground of
insufficiency of the evidence of actual malice. On
the latter ground, however, no reasons had been
given by the trial court with respect to the utility it-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

self.

> FN* Retired judge of the superior court sit-
> ting under assignment by the Chairman of
> the Judicial Council.(Opinion by Christian,
> J., with Rattigan, Acting P. J., and Emer-
> son, J., [FN*] concurring.)

> FN* Retired judge of the superior court sit-
> ting under assignment by the Chairman of
> the Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b, 1c, 1d) Libel and Slander § 54--Judgment
Notwithstanding the Verdict--Actual Malice--In
Charging Documentary Film Producer With Breach
of Professional Ethics.
It was reversible error for the trial*417 court to
grant defendants' motion for judgment notwith-
standing the verdict in a defamation action by a
film documentary producer against a public utility
and a nuclear power plant engineer. The engineer
had circulated a letter charging the producer with
a gross breach of journalistic ethics in tampering with
a filmed interview that was later used in an essen-
tially anti-nuclear documentary broadcast on televi-
sion. At trial, the producer, stipulated to be a public
figure, adduced ample evidence to support the
jury's inference that the engineer, however con-
vinced he may have been that the film was dishon-
est in portraying him as evasive in answering a
question on the safety of construction materials
used at the plant, had shown a reckless disregard as
to the truth of his specific charges, namely, that his
answer had been secretly recorded in a preinterview
discussion and spliced into the film itself. Simil-
arly, the evidence was amply sufficient to support
the jury's inference that the utility's motive to sup-
press the film had so overwhelmed its attention that
all of its agents who were in a position to control
sending the letter had treated the question of truth
or falsity as a matter of total indifference.

[See Cal.Jur.3d, Assault and Other Wilful Torts,
§§ 145, 146, 158; Am.Jur.2d, Libel and Slander,

§§ 110, 454 et seq.]

(2a, 2b, 2c) Libel and Slander § 5--Actual Malice-
-Public Figures and Officials.
For a public official or a public figure to be able to
recover for defamation, the First Amendment re-
quires that he prove, with convincing clarity, the
defendant's "actual malice" at the time of the pub-
lication. Whether or not there was such malice is a
question to be determined by the trier of fact.

(3a, 3b, 3c) Libel and Slander § 5--Actual Malice-
-How Proved.
"Actual malice," as an element of defamation of a
public official or public figure, depends primarily
on the defendant's attitude toward the truth or fals-
ity of the material published, and does not focus on
the defendant's attitude toward the plaintiff himself.
It can be shown by proving either that the defendant
knew of the falsity of the statement or that the de-
fendant uttered the statement in reckless disregard
for the truth; when the story is not "hot news," the
defendant's investigation into the facts must be
more thorough, and actual malice may be inferred
when such investigation is grossly inadequate in the
particular circumstances.*418

(4) Libel and Slander § 2--Definitions and Distinc-
tions--"Public Figure."
In the context of an action for defamation, plaintiff
is deemed a "public figure" for all purposes if he
has assumed a role of a special prominence in the
affairs of society. If, however, he has thrust himself
to the forefront to influence the resolution of a par-
ticular public controversy, he is deemed a "public
figure" only for a limited range of issues.

[Libel and slander: Who is "public figure" in the
light of Gertz v. Robert Welch, Inc. (1974) 418 U.S.
323 [41 L.Ed.2d 789, 94 S.Ct. 2997], note, 77
A.L.R.3d 616.]

(5) Libel and Slander § 3--Elements of Defamation-
-Of Private Individual.
For a private individual to recover for defamation,
it is only necessary to show the defendant's negli-
gence as to the statement's truth or falsity. To re-
cover punitive damages, however, the private indi-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415                                                                    Page 3
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
**(Cite as: 75 Cal.App.3d 415)**

vidual must show actual malice, namely, knowledge of falsity or reckless disregard for the truth.

(6) Libel and Slander § 5--Actual Malice--Reckless Disregard for Truth.
Though, in the context of defamation, no one infallible definition can encompass "reckless disregard for the truth," there is a stringent and subjective standard for such heedlessness. It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing; rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of his statement.

(7) Libel and Slander § 5--Actual Malice--Reckless Disregard for Truth-- Where "Hot News" Not Involved.
Where, in the context of defamation, the libelous statements published by the defendant do not involve an element of "hot news" and the need for expeditious release is not present, reckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts. This is particularly true where the substance of the published statements is such that substantial danger to the plaintiff's reputation is apparent.

(8) Libel and Slander § 5--Actual Malice--Reckless Disregard for Truth--Or Knowledge of Falsity--How Proved.
In an action for defamation, evidence of negligence, of motive, and of intent may be*419 adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of the defendant's recklessness or of his knowledge of falsity with respect to the defamatory statement.

(9) Evidence § 19--Inferences--State of Mind.
In all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence thereon may be rare; thus, the trier of fact is usually required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia.

(10) Judgments § 12--Notwithstanding Verdict-

-When Combined With Order Granting New Trial.
In an action in which the trial court granted defendants' motion for judgment notwithstanding the verdict and ordered that, if for any reason such judgment were reversed on appeal, defendants' additional motion for new trial "is hereby granted," the latter order, though interpretable as technically violating the 60-day limitation on a court's power to grant a new trial (Code Civ. Proc., § 660), could also, to give effect to the court's manifest intention, properly be construed as simply granting an alternative order for new trial under Code Civ. Proc., § 629, providing that such order "shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed."

(11a, 11b, 11c) New Trial § 107--Appeal--Determination and Disposition--Reversal of Order Granting New Trial--Insufficiency of Reasons.
An order granting a new trial in a civil case must be reversed on appeal, and the judgment will be automatically reinstated, where the specification of reasons to support each ground for granting the new trial (Code Civ. Proc., § 657) fails to identify the evidence or the portion of the record that convinces the court that the jury clearly should have reached the different verdict; if the trial court fails, that is to say, to make a record sufficiently precise to permit meaningful appellate review.

(12) New Trial § 97--Order Granting New Trial--Form and Requisites-- Specification of Reasons--Sufficiency.
If a trial court's specification of reasons to support each ground for granting a new trial is phrased merely in terms of ultimate fact, such specification fails to comply with Code Civ. Proc., § 657. The trial court's*420 "reason" must do more than simply reiterate the ground of the ruling itself.

(13a, 13b) New Trial § 107--Appeal--Affirmance of Order Granting New Trial--Sufficiency of Reasons--Support in Record.
Where a trial court adequately specifies its reasons to support a ground for granting a new trial (Code

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Civ. Proc., § 657) and there is any substantial support for such reasons in the record, it cannot be said, on appeal, that the trial court abused its discretion, and its order granting new trial will be upheld.

(14a, 14b, 14c, 14d) Libel and Slander § 56--New Trial-- Insufficiency of Evidence to Support Actual Malice--In Charging Documentary Film Producer With Breach of Professional Ethics.
Following a verdict for plaintiff in a defamation action against a public utility and one of its engineers, in which plaintiff was stipulated to be a public figure in the television industry, an order granting the engineer a new trial on the ground of insufficiency of the evidence to support actual malice on his part could not, under the circumstances, be overturned on appeal. The trial court adequately specified its reasons in support of such ground, and it could not be said as a matter of law that there was no substantial evidence in the record to support those reasons, namely, evidence of the engineer's pre-publication attempts to recollect the facts underlying his charge of plaintiff's breach of professional ethics.

(15) New Trial § 97--Order Granting New Trial--Form and Requisites-- Specification of Reasons--Amplification at Counsel's Request.
Where, following a verdict in plaintiff's favor in a civil action, defendants' motion for new trial was granted, and where, at the suggestion of defense counsel, the court, three days after such order, amplified its specifications of reasons in support of the stated ground for granting the new trial, such procedure was proper.

(16) New Trial § 107--Appeal--Determination and Disposition--Omission of Reasons for Granting New Trial.
Where a jury verdict was entered against a public utility and one of its employees in a defamation action, the trial court's order granting the utility's motion for new trial, on the particular ground of insufficiency of the evidence to show actual malice, could not be sustained on appeal in the absence of a specification by the trial court of the reasons to support its order on such ground.*421

(17) Appellate Review § 186--Determination and Disposition of Cause--Order on Motion for New Trial--Insufficiency of Evidence.
Code Civ. Proc., § 657, significantly limits the scope of appellate authority to review orders for new trial on the ground of insufficiency of the evidence. An order granting a motion for new trial on such ground may be reversed on appeal only where there is no substantial evidence to support the trial court's specified reason; only, that is to say, where the opposing party demonstrates that no reasonable finder of fact, on the theory stated by the court, could have found for the movant.

(18a, 18b) Libel and Slander § 56--New Trial--Insufficiency of Evidence to Support Damage--In Charging Documentary Film Producer With Breach of Professional Ethics.
Following a verdict for a documentary film producer in a defamation action against a public utility and one of its engineers, in which plaintiff was stipulated to be a public figure, an order granting both defendants a new trial on the ground of excessive damages (including $7 million punitive damages against the utility) was not, under the circumstances, an abuse of discretion. The trial court adequately specified its reasons in support of such ground, and it could not be said as a matter of law that there was no substantial evidence in the record to support those reasons; on the contrary, the trial court based its conclusions of absence of damage to the producer on evidence that none of the few recipients of the libelous letter involved was connected with the television industry except the producer's employer, whose relationship with the producer was not affected by the letter.

(19) New Trial § 88--Hearing and Determination--Trial Court's Review of Evidence.
In ruling on a motion for new trial, the trial court in a civil case may disbelieve witnesses, reweigh evidence, and draw reasonable inferences that are contrary to those drawn by the jury.

COUNSEL

Garry, Dreyfus, McTernan, Brotsky, Herndon &

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415                                                                    Page 5
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
**(Cite as: 75 Cal.App.3d 415)**

Pesonen, David E. Pesonen and Laurence H. Eldredge for Plaintiff, Cross-defendant and Appellant.

Charles T. Van Deusen, Arthur L. Hillman, Jr., F. Ronald Laupheimer, John E. Carne, and Crosby, Heafey, Roach & May for Defendants, Cross-complainants and Appellants.**\*422**

## CHRISTIAN, J.

Donald Widener (hereinafter appellant) appeals from a judgment notwithstanding the verdict and from an order granting a new trial after a jury had awarded him damages on his complaint for libel against Pacific Gas and Electric Company (PG&E) and its employee, James C. Carroll (hereinafter respondents). The verdict against PG&E was in the amount of $750,000 compensatory damages and $7 million in punitive damages and against Carroll in the amount of $8,000 punitive damages. The jury also found in favor of Widener on a cross-complaint by Carroll.

The trial court rendered a combined "Order for Judgment Notwithstanding the Verdict, Order Conditionally Granting New Trial, and Order Granting New Trial on Cross-complaint." In its order, the trial court stated that the judgment n.o.v. was granted on the ground that appellant had failed to produce any evidence of "actual malice" as required under _New York Times Co. v. Sullivan (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]_ and that the evidence was thus insufficient to support a verdict in favor of the plaintiff. The trial court also stated that "In the event that, for any reason, the aforesaid order for judgment notwithstanding the verdict is reversed on appeal then the motion of defendants James C. Carroll and Pacific Gas and Electric Company, a corporation, for a new trial is hereby granted ...." The trial court specified, as the reason for its "Order Conditionally Granting new Trial," the same reason that it had given for granting a judgment n.o.v. - that plaintiff had failed to produce clear and convincing evidence of actual malice. The trial court also conditionally granted the defendants a new trial on the basis that the dam-

ages awarded by the jury were excessive. The trial court also granted defendant Carroll a new trial on his cross-complaint.

Widener appeals from the judgment notwithstanding the verdict and from the alternate order granting a new trial. Defendants PG&E and Carroll have taken a protective cross-appeal from the judgment entered on the jury's verdict in favor of plaintiff.

This libel action concerns a certain letter, written by respondent James C. Carroll, a supervising steam generation engineer employed by respondent Pacific Gas & Electric. The letter, dated July 13, 1971, was**\*423** reviewed and revised several times by Carroll's superiors at PG&E, and was sent to Robert Howard, vice president of NBC and station manager of KNBC-TV in Los Angeles. In the letter, Carroll attacked the content of "Powers That Be," a nuclear power documentary produced by KNBC, and charged appellant Donald Widener, the producer of the documentary, with a gross breach of journalistic ethics - secretly taping a preinterview discussion with Carroll, concerning the problem of faulty fuel rods, and splicing that discussion into the final film.

Appellant Widener was employed by KNBC as a documentary producer. Widener had received professional recognition for previous documentaries made for KNBC, and in 1971, had a one-year exclusive contract with NBC to produce three documentaries. One of these films, "Powers That Be," concerned the subject of nuclear power as a source of electrical energy. The research, writing, interviewing, and editing of the film were done by appellant pursuant to his contract with KNBC. "Powers That Be" was narrated by the well-known film personality, Jack Lemmon, and was broadcast in prime evening time over KNBC in Los Angeles on May 17, 1971. The point of view of the film was essentially anti-nuclear.

During the preparation of "Powers That Be," appellant filmed an interview with respondent James C. Carroll. The filming occurred in the control room of Humboldt Unit No. 3, a nuclear power plant oper-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415                                                    Page 6
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
(Cite as: 75 Cal.App.3d 415)

ated by PG&E near the City of Eureka. The interview had been arranged by the public relations department of PG&E.

Respondent Carroll was aware that he was being filmed, and that his voice was being recorded on the NBC equipment, during the formal interview. During the filming, Carroll was seated facing Widener under bright lights especially set up for the interview. A member of the NBC camera crew fastened a sensitive Laveliere microphone on a cord around Carroll's neck. The filmed questioning was preceded by the sharp report of a clapboard held in front of Carroll's face. The entire filmed interview with Carroll was approximately four minutes in length. A one-minute segment was used in the finished film. The film as broadcast lasts approximately 50 minutes.

Carroll did not see the KNBC broadcast of the film; he first learned of the broadcast from an acquaintance. Carroll was informed that he*424 appeared "unable or not willing to answer a question that had been given to [him]."

On May 26, about a week after the broadcast, Frederick R. ("Fritz") Draeger, PG&E's "nuclear information specialist" and the employee who had made the arrangements for Widener's visit to the Humboldt Bay power plant, sent a memorandum to three of his superiors in the public relations department. The May 26th memo, which was sent to Larry R. McDonnell, head of the PG&E News Bureau, A. J. McCollum, head of public information, and Robert R. Gros, vice president of public relations, reported that a few of Draeger's friends who had seen the film "reacted violently" and that some friends of Dale Cook, western states public relations officer for the United States Atomic Energy Commission, "tagged the documentary as 'smooth, professional and devastating.'" The May 26 memo states in full as follows:

"LRM/AJM/RRG:

"'Powers that Be' was shown on KNBC Tuesday, May 18, 1971. A few of my friends saw it and reacted violently. I understand Jack Horton was con-

cerned and has Bill Walker trying to develop a rebuttal program. From all I heard, we should go in and ask for equal time to respond to a hatchet job. Dale Cook reports that his friends tagged the documentary as 'smooth, professional and devastating.'

"From all I could glean as relates to our work at the Humboldt Bay Power Plant, Jim Adams wound up on the cutting room floor and J. Carroll's footage was so placed as to give the worst possible impression.

"KNBC plans to repeat the documentary in a few months. In six to nine months they will put it in the studio's circulating library. The film is currently being offered to affiliate stations.

"Dale Cook has promised to send me a review of it which appeared in the Los Angeles Times. The review is negative from our point of view.

"Widener's contract has not been renewed by KNBC so he is going independent. Thus, I have had difficulties in trying to get more information. At present there is only an original of the documentary and the studio refuses to let it out. However, to assuage my feelings, a*425 transcript is being mailed to me today. It will be reproduced here and given broad circulation.

"FRD

"P.S. - Just received transcript in mail - attached.

"E. A. Boone

"JCCarroll

"cc: JRAdams"

A copy of the memo was also sent to Carroll.

Sometime soon after May 26, Carroll asked Draeger to seek a copy of the film for review. Draeger had already requested the film on his own. KNBC declined to release its only copy but, as Draeger had reported in his May 26 memorandum, "to assuage my feelings, a transcript is being mailed to me today. It will be reproduced here and given

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

broad circulation."

Draeger promptly circulated the transcript to "appropriate people in the company who might have an interest," but not to Carroll. Carroll finally received a copy of the film transcript about a month later, on June 25. Upon reading it, Carroll became "upset" and "quite angry" at being portrayed as evasive. Carroll believed that the transcript erroneously and unfairly portrayed him as unwilling to answer a question concerning fuel cladding. [FN*] The film transcript read, in part, as follows:

> FN* Cladding is the metallic shielding around the radioactive fuel elements of a nuclear power plant. Where cracks develop in the fuel cladding material, radiation leaks into the environment.

"(Jack Lemmon): This reactor in northern California has been operating since the 1950s. But not without criticism. Such as faulty fuel rods, a problem since corrected. We asked P.G. and E.'s James C. Carroll about such criticisms.

"(Don Widener): Mr. Carroll, as you know, there have been published criticisms of the plant here for using improper construction materials in the beginning. Can you describe what that's all about?

"(James C. Carroll): Well this is analogous to a problem you have in your industry. There were criticisms of improper design and constructiontechniques *426 in early color television sets that resulted in excessive radiation to people.

"(Don Widener): What was it exactly that the critics were talking about in your case?

"(James C. Carroll): I don't think we ought to answer that, it's too lengthy a question. [FN[1]]

> FN1] The "out-takes" show that the following occurred immediately after the exchange used in the finished film:
> "D. Widener: I didn't. I didn't, never did hear what he said. What did you say? I never did hear that last part. "J. Carroll: It's

too lengthy a question, I think, to answer.
"D. Widener: Oh, okay.
"J. Carroll: Do you want me to spend the ten minutes answering it right? I don't care. I will.
"D. Widener: No, we won't - we don't have ten minutes and if you - [Third voice]: "Cut -
"D. WIDENER: can't answer it in ten minutes, then - [Film ends, sound continues] [Blurred film]
"D. WIDENER: - it can't be done."
Carroll believed that Widener's editing of the finished film unfairly portrayed him as evasive on the fuel cladding issue, since, as the "out-takes" show, Carroll had offered to answer Widener's question about "improper construction materials" during the formal interview if he could take ten minutes to respond. It was Widener's position that the answer used in the film fairly captured what Widener perceived as Carroll's evasive attitude. The fuel cladding or improper construction material issue was discussed preliminarily when the film crew arrived, and Carroll repeatedly stressed the need for "five to ten minutes to discuss it." At that time, Widener informed Carroll that he could not give Carroll 10 minutes because it was only a 50-minute film. Also during this preliminary discussion, Carroll "offered the opinion that [he] did not see how fuel cladding problems were really of much public interest" in view of the fact that "Humboldt Bay, as well as all other U.S. commercial power reactors, had always operated well below A.E.C. limits for both gaseous and liquid radioactive waste discharges."

"(Jack Lemmon): Long questions. Sometimes short answers. It's tough to get a matched set. The questions about nuclear power involve radiation, long-lasting wastes, and the possibility of a major accident. Long questions, indeed."

Carroll's memory was somewhat cloudy as to

75 Cal.App.3d 415                                                      Page 8
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
(Cite as: 75 Cal.App.3d 415)

whether he had said the words shown in the transcript during the filming. In his testimony, Carroll did recall responding to Widener in a low voice during the filming, but "it was a mystery ... how my ... low voiced conversation could have ended up in the program." The following exchange occurred at trial:**427**

"The Court: But at the time that you were writing this [letter] or reflecting on it at your home one evening, your recollection is that something that you had said had either been dubbed out or something that you had said at a prior time had been put in. Is that what you - what did you conclude preliminarily?

"The Witness: Well, there were two things that troubled me. One is my recollection of my response to that question was that it had been held in a low voice. And I could not understand how it could have ended up in the program.

"The Court: Is this at the actual filming?

"The Witness: At the actual filming.

"The Court: And you couldn't understand what?

"The Witness: How that could have ended up in the program because of the high background noise in the control room and the rest of it.

"The Court: What ended up in the program, these words that I've just read?

"The Witness: Yes.

"The Court: 'I don't think we ought to answer that. It's too lengthy a question'?

"The Witness: Well, not those specific words, but words in response to that question. Because I recalled and my memo shows that, when the question was asked I didn't know how to respond to it, and I dropped my voice to try to get Mr. Widener's attention."

Carroll testified that at the time he reviewed the film transcript and drafted the accusatory letter, he

was certain that Widener had unfairly created the impression that Carroll had not wanted to answer the fuel cladding question; but his recollection was not clear as to specifically what he had said during the filmed interview.

Concluding that the answers that he had given during the Humboldt Bay interview had been misrepresented, Carroll decided to write a letter of complaint to KNBC-TV. Carroll submitted a draft of a letter to FritzDraeger **428** on June 30. A week later, Fritz Draeger submitted the draft, with his own minor changes, to his superiors in the public relations department and to P. A. Crane in the law department for their review. The draft letter was submitted by Draeger to his two superiors with the following cover memorandum, dated July 6, 1971:

"LRM/AJM:

"J. C. Carroll proposes to send the attached letter to:

"Mr. Robert Howard, Station Manager

KNBC Television

3000 Alemeida

Burbank, California 90205

"I heartily concur that Jay should send this letter because he, along with the company, has been wronged by Widener's 'Powers That Be' documentary. In fact, his accusation that his tape recorded words 'recorded without his knowing it' and dubbed in on the TV film, could be most effective in preventing this highly biased program from either ever appearing on the air again or, at least, causing the section referring to us to be wiped out.

"This letter has been reviewed and approved by Paul Matthew; Bill Lindblad has reviewed it from an Engineering Department point of view. In fact, he suggests that a copy be sent to Spiro Agnew (in jest, I assume).

"By copy of this letter to P. A. Crane, I am asking for legal review and opinion.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
**(Cite as: 75 Cal.App.3d 415)**

"May I have your comment so Jay can receive any further counsel that is needed.

FRD

"Enclosure

cc: P. A. Crane, Law Department

J. C. Carroll, Steam Engineering

H. L. McMasters, Advertising-Publicity" (Emphasis added.)*429

On July 7, Draeger returned a marked-up draft to Carroll with a note informing Carroll that "Enclosed are comments from various people who have reviewed your proposed letter to Mr. Robert Howard, Station Manager, KNBC Television, Burbank." Draeger's note also pointed out the comment from Phil Crane in PG&E's law department that "... you should clarify more exactly what you consider to be the main point of contention - that a tape recorded bit was inserted into a film portion of the interview."

On July 13, the final letter, which reflected the editorial suggestions that Draeger had collected, was mailed to Robert Howard at the KNBC studios in Burbank. The three-page letter bitterly denounced the bias of the documentary produced by appellant for KNBC, characterizing the script as "replete with halftruths, innuendos, and worse." In the letter, Carroll charged that: "Mr. Widener apparently taped our informal discussion prior to the filmed interview without my knowledge. Some carefully edited excerpts from the taped discussion are what appears [in the film transcript]." Carroll conceded, at trial, that the charge of surreptitious taping and dubbing was false:

"Q. And as you sit here today, Mr. Carroll, is there any doubt in your mind that the words His Honor just read from the transcript, the words I just read that are transcription from this film we just saw a moment ago were uttered by you when you were on camera during the interview with Mr. Widener?

"A. No, there isn't.

"Q. There's no doubt in your mind now, is there?

"A. No, there isn't. Not at this time.

"Q. Those words were not taped off camera secretly without your knowledge, were they?

"A. No, they were not."

Carbon copies of the July 13 letter from Carroll to Robert Howard were sent to appellant Widener, Jack Lemmon, and Congressmen Chet Holifield and Craig Hosmer (two Southern California congressmen who were members of the Joint Committee on Atomic Energy). Copies of the letter were also sent to a nuclear information specialist employed by the*430 Southern California Edison Company, to Underwood and Jordan, a New York public relations firm, to the manager of media relations for the Atomic Industrial Forum, and to the California Nuclear Liaison Committee.

On July 28, 1971, additional copies of Carroll's July 13 letter were sent by Ralph B. Dewey, PG&E's Washington representative, to several members of Congress and to members of the Federal Communications Commission. As the jury was instructed, the letters sent to members of Congress and officials of the Federal Communications Commission were "absolutely privileged and no liability of the [respondents] could result therefrom." The letters were apparently received only for the purpose of showing the general context of other pertinent communications.

Everyone connected with the Carroll letter recognized that in the commercial television industry the charge of surreptitious taping and dubbing was a grave accusation that could destroy the reputation of a person in that industry. Draeger and Dewey knew that the charge was "very serious." Robert R. Gros, vice president of public relations for PG&E, testified that the charge was "quite serious," "very unethical journalism," that he would not permit such a practice in the production of PG&E's own films, and that if anyone under his supervision had engaged in such conduct "I would have fired him." Jack Lemmon characterized the accusation as

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415

75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260

**(Cite as: 75 Cal.App.3d 415)**

Page 10

"deadly" and "the kiss of death." Reece Halsey, an expert with 32 years' experience as an agent for television writers and producers, testified that the charge would destroy a producer's reputation if it "received any spreading around in any way." Robert Howard, station manager for KNBC-TV in Los Angeles indicated that proof of such an allegation would be cause for immediate dismissal from NBC.

On August 13, 1971, Robert Howard, NBC vice president and general manager of KNBC, replied to the July 13 letter he had received from Carroll. Howard stated in his letter that the charge of surreptitious taping and dubbing had been investigated by KNBC and found to be without basis in fact. Howard's reply concluded by inviting Carroll to appear on one of the station's interview programs.

On August 24, 1971, Carroll responded to Howard's reply letter, declining the invitation to appear on a subsequent program. Carroll's August 24 letter states, in part:**431

"Dear Mr. Howard:

"This is in response to your August 13 reply to my July 13 letter regarding the program 'Powers That Be' produced for KNBC by Mr. Don Widener. I have reviewed the events prior to and during the actual filming of my interview with Mr. Widener on February 10 with a number of P.G. and E. people who were present. The informal discussion between Mr. Widener and me which took place prior to the actual filming occurred while the camera crew were setting up their equipment and adjusting lighting and audio levels. Our collective recollection is that some or all of the material which was ultimately used in the program was recorded during this period.

"Even accepting your explanation that the filmed interview was a misunderstanding between Mr. Widener and me on what constituted the actual interview as contrasted to our informal discussion, I must continue to voice my same complaint about the manner in which the material from this interview was used in the program. Mr. Widener knows

full well that I did not decline to discuss the subject of the fuel difficulties which occurred early in the life of the Humboldt Plant as the program implies. ...

"Finally, I have reviewed your series of KNBC editorials of August 3, 4 and 5, and am pleased to note that KNBC now advocates that 'in spite of the risks, nuclear power development should continue in Southern California.' *I take this to mean that you have no future plans for showing 'Powers That Be' or for making it available to organizations which do not share your views and mine about the important role nuclear power must play in meeting our future electrical energy requirements. If this proves to be the case,* there is obviously no purpose in my pursuing this matter further. (Italics added.)"

In Washington, Ralph P. Dewey received several replies to his July 28 letters. Dewey also conferred by telephone with Nicholas Zapple, staff counsel of the Senate Committee on Commerce, who indicated that, while the charge of surreptitious taping appeared to be untrue, NBC was "deeply concerned" over the entire matter. Following this phone conversation with Zapple, Dewey scribbled a private memorandum on the reply correspondence as follows: "Called him [Zapple] 10 a.m. 9/13. He reiterated his own view that Carroll was 'off base.' I said - the case rests; *but the fact that NBC is upset at our aggressive approach is just what we wanted.*" (Italics added.)**432

On August 12, 1971, an NBC memo, entitled "Interdepartment Correspondence," from J. Marshall Wellborn to Corydon B. Dunham, stated in part as follows:

"Bob Howard telephoned today to inform me that a press relations officer at PG&E had telephoned him to discuss J. C. Carroll's letter.

"Essentially, PG&E wanted to make it clear that Mr. Carroll had written the letter on his own initiative and that his opinion did not express the views of PG&E. He stated that neither he nor Mr. Carroll had actually seen the program Powers That Be, and that Mr. Carroll had made his judgments concern-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

ing the programs solely on the basis of comments made by others concerning the program and on the basis of scripts that KNBC had provided to him."

(1a) Appellant contends that the trial court erred in granting respondents' motion for a judgment notwithstanding the verdict, on the ground that appellant had failed to produce sufficient evidence that the defamatory statements were made with "actual malice," as required by *New York Times Co. v. Sullivan, supra, 376 U.S. 254.* (2a) In *New York Times,* the United States Supreme Court held that, in order for a public official to be able to recover for defamation, the First Amendment required the public official to prove, with convincing clarity, the defendant's "actual malice," at the time of the publication. (3a) "Actual malice" can be shown by proving either that the defendant knew of the falsity of the statement or that the defendant uttered the statement in reckless disregard for the truth. ( *New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at pp. 706-707].) (2b) The *New York Times* rule also applies to plaintiffs who are "public figures." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 335-336, 342- 343 [41 L.Ed.2d 789, 803, 806-807, 94 S.Ct. 2997]; *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 154-155 [18 L.Ed.2d 1094, 1110-1111, 87 S.Ct. 1975] [plurality op. of Harlan, J.], reh. den. 389 U.S. 889 [19 L.Ed.2d 197, 88 S.Ct. 11]; *Carson v. Allied News Co.* (7th Cir. 1976) 529 F.2d 206, 209.) (4) "Public figures" are those who "have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 345 [41 L.Ed.2d at p. 808]; see **\*433***Time, Inc. v. Firestone* (1976) 424 U.S. 448, 453-455 [47 L.Ed.2d 154, 162-163, 96 S.Ct. 958].) Thus, a plaintiff may be a "public figure" for all purposes or for a "limited range of issues." (See *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) (5) Where a *private in-*

*dividual* has been defamed, actual malice need not be shown in order to recover for defamation. Only negligence as to the statement's truth or falsity need be shown when resolving the libel claims of private individuals. ( *Gertz v. Robert Welch, Inc., supra,* 418 U.S. 323.) However, even where the plaintiff is a private individual, actual malice - i.e., knowledge of falsity or reckless disregard for the truth - must be shown in order to recover punitive damages. (*Gertz v. Robert Welch, Inc., supra,* 418 U.S. at pp. 346-349 [41 L.Ed.2d at pp. 809-811].)

(1b) Appellant contended below that he was not a public figure. However, during the settlement of jury instructions, appellant stipulated that the *New York Times* standard would be applied, and the jury was so instructed. Therefore, the *New York Times* rule will be applied here. (See *Fopay v. Noveroske* (1975) 31 Ill.App.3d 182 [334 N.E.2d 79, 88]; see also *Davis v. Schuchat* (D.C.Cir. 1975) 510 F.2d 731 [166 App.D.C. 351].)

Actual malice must be proved with convincing clarity. ( *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, 285-286 [11 L.Ed.2d 686, 709-710]; *Goldwater v. Ginzburg* (2d Cir. 1969) 414 F.2d 324, 341, cert. den., 396 U.S. 1049 [24 L.Ed.2d 695, 90 S.Ct. 701]; see also *Field Research Corp. v. Patrick* (1973) 30 Cal.App.3d 603, 608 [106 Cal.Rptr. 473], cert. den., 414 U.S. 922 [38 L.Ed.2d 157, 94 S.Ct. 218].) (2c) Whether there was "actual malice," as required by the *New York Times* standard, is, of course, a question of fact for the jury. (See *St. Amant v. Thompson* (1968) 390 U.S. 727 [20 L.Ed.2d 262, 88 S.Ct. 1323]; *Time, Inc. v. Hill* (1967) 385 U.S. 374, 394 [17 L.Ed.2d 456, 470, 87 S.Ct. 534].) This court has a duty to closely examine the record to determine whether it could constitutionally support a judgment in favor of the plaintiff (see *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, 285 [11 L.Ed.2d 686, 709]), but this does not involve a de novo review of the trial court proceedings wherein the jury's verdict is entitled to no weight. (See *Alioto v. Cowles Communications, Inc.* (9th Cir. 1975) 519 F.2d 777, 780, cert. den., 423 U.S. 930 [46 L.Ed.2d 259, 96 S.Ct. 280]; *Guam Federation of Teachers, Loc.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

*1581, A. F. T. v. Ysrael* (9th Cir. 1974) 492 F.2d 438, 441, cert. den., 419 U.S. 872 [42 L.Ed.2d 111, 95 S.Ct. 132]; *Fopay* v. *Noveroske, supra,* 334 N.E.2d 79, 87.)

(1c) In the present case, appellant was required to prove by clear and convincing evidence that respondents made the defamatory statement inthe *434 July 13 letter with knowledge that the accusation of surreptitious taping was false, or with reckless disregard of whether it was false or not. ( *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, 280 [11 L.Ed.2d 686, 706-707].) (6) Reckless disregard "cannot be fully encompassed in one infallible definition"; rather, "its outer limits [must] be marked out through case-by-case adjudication, ..." (*St. Amant v. Thompson, supra,* 390 U.S. 727, 730 [20 L.Ed.2d 262, 267].) It is clear, however, that it involves a stringent and subjective standard. It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing. Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of his statement. (*St. Amant v. Thompson, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267]; *Alioto* v. *Cowles Communications, Inc., supra,* 519 F.2d 777, 779; *Montandon v. Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 947 [120 Cal.Rptr. 186], cert. den., 423 U.S. 893 [46 L.Ed.2d 126, 96 S.Ct. 193].) (3b) Actual malice, under *New York Times,* concentrates on the defendant's attitude toward the truth or falsity of the material published, and does not focus on the defendant's attitude toward the plaintiff. (*Cantrell v. Forest City Publishing Co.* (1974) 419 U.S. 245, 251- 252 [42 L.Ed.2d 419, 426, 95 S.Ct. 465]; *Carson v. Allied News Co., supra,* 529 F.2d 206, 214.) (7) Where the defamatory statements made by the defendant do not involve an element of "hot news" and the need for expeditious release is not present, reckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts. This is particularly true where the substance of the defamatory statements, which the defendant was publishing, were such that substantial danger to reputation was apparent. ( *Curtis Publish-*

*ing Co.* v. *Butts, supra,* 388 U.S. 130; *Goldwater v. Ginzburg, supra,* 414 F.2d 324, 339; *Carson v. Allied News Co., supra,* 529 F.2d 206, 211; *Fopay v. Noveroske, supra,* 334 N.E.2d 79, 88.) (3c) "[W]hen the story is not 'hot news,' ... the investigation must be more thorough, and 'actual malice may be inferred when the investigation ... was grossly inadequate in the circumstances.'" (*Vandenburg v. Newsweek, Inc.* (5th Cir. 1975) 507 F.2d 1024, 1026.) (8) "[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, *by cumulation* and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. See, e.g., Curtis Publishing Co. v. Butts, *supra,"* (*Goldwater v. Ginzburg, supra,* 414 F.2d 324, 342; italics added.) In *Curtis Publishing Co.,* the Supreme Court found that a muckraking intent, the absence of any "hot news" element, and an inadequate investigation, were all significant factors in determining actual malice.*435

The mere profession of a defendant that he believed in good faith that his statements were true does not automatically entitle him to a verdict in his favor. (*St. Amant v. Thompson, supra,* 390 U.S. at pp. 732-733 [20 L.Ed.2d at pp. 267-268].) (9) "As in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of fact is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia." (*Herbert v. Lando* (S.D.N.Y. 1977) 73 F.R.D. 387, 395.) As the court stated in *Goldwater* v. *Ginzburg, supra,* 414 F.2d 324, at page 343: "Recklessness is, after all, only negligence raised to a higher power. To hold otherwise would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness. It would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact, certainly a situation not intended by the Supreme Court. See St. Amant v. Thompson, supra, 390 U.S. at 732-733, 88 S.Ct. 1323."

(1d) An independent review of the evidence reveals

ample evidence from which the jury might infer that respondent PG&E acted with reckless indifference to the truth or falsity of the serious charge it made against Widener. There was no "hot news" element here. The PG&E executives, who participated in the drafting and review of the July 13 corporate letter, had cause seriously to question the veracity of their sole source, Carroll. Every one of them was aware of the extreme gravity of the charge of surreptitious tampering, of Carroll's anger, and of the fact that five months had elapsed since the filming session. None of them (nor Carroll) had viewed the film, in which Carroll's words are clearly synchronized with his lip movements and he appears to be looking directly at the camera. None checked into the technical feasibility of the charged tampering. Robert Gros, vice-president of public relations, testified as follows: "Q. Now, that's a very unusual event, is it not, the secret or clandestine taping of somebody's words and putting them in a finished film that goes out over broadcast? A. So unusual I've never heard of it." However, none of them questioned Carroll about the charge. Respondent PG&E was very much aware of the possible resulting harm; the seriousness of the charge it was making called for a thorough investigation, but the record reveals that little or no investigation was conducted. The record also indicates that respondent intensely desired the suppression of the anti-nuclear power film, which it viewed as "smooth, professional and devastating." Thus the jury, in applying the "clear and convincing evidence" test, might have inferred that respondent's motive to suppress the film so overwhelmed its attention that all of*436 its agents, who were in a position to control sending the letter, treated the question of truth or falsity as a matter of total indifference. (See *Alioto v. Cowles Communication, Inc., supra,* 519 F.2d 777, 780.)

Appellant contends that there was also sufficient evidence from which the jury might have found that respondent Carroll made the surreptitious taping charge with knowledge of its falsity, or in reckless disregard for whether it was accurate or not. Carroll testified that he did not remember saying, on camera, "the things that the transcript shows [him] as

saying." Matters of credibility, however, are for the jury. The jury was not required to believe Carroll's testimony that, at the time of the July 13 letter, he did not believe that he had said those words. There was much evidence that Carroll was extremely "upset and angry" at being portrayed as evasive. [FN2] Several months had elapsed since the filming and he could not remember specifically what he had said in the interview; his own notes of the February 10 interview indicated to him that at least some conversation concerning fuel cladding was held during the filmed interview. Carroll also greatly desired to suppress the film. There was sufficient evidence from which the jury could have found that Carroll knew the charge was false, or was recklessly indifferent as to whether his statement was accurate or not. The trial court therefore erred when it granted the motion for a judgment notwithstanding the verdict on the ground that appellant had failed to produce sufficient evidence of actual malice to support the jury's verdict.

> FN2 Carroll's February 14 notes on the February 10 interview lend some support to Widener's contention that Carroll was being evasive. Carroll's notes acknowledged that "... Widener apparently realized that ... Carroll would probably not respond to questions which [Carroll] considered improper ...." Also, Draeger's written comments on an August 17 memo from Gros stated in part: "... Widener *knew* Jay [Carroll] wouldn't answer the question as result of warm-up conversation."

(10) Appellant contends that the trial court was without power to make an order that it would grant a new trial if its order for judgment notwithstanding the verdict was reversed on appeal. Appellant is correct in his contention that the trial court's order conditionally granting motion for a new trial was technically defective. The trial court's order states: "In the event that, for any reason, the aforesaid order for judgment notwithstanding the verdict is reversed on appeal then the motion of defendants ... for a new trial is hereby granted ...." Under section 629 of the Code of Civil Procedure, the trial court

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415                                                                                                    Page 14
75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
(Cite as: 75 Cal.App.3d 415)

has the authority to simultaneously grant both a motion for judgment notwithstanding **437 the verdict and an alternative motion for a new trial. [FN3] If both motions are granted by the trial court, the statute provides that the order alternatively granting a new trial will come into effect only if the order granting a judgment notwithstanding the verdict is reversed on appeal, and the order granting a new trial, if appealed from, is affirmed. The "Conditional New Trial Order," in this case, appears to be an announcement that the trial court would grant a motion for new trial sometime in the future in the event its prior order were to be reversed. Such an act would be in excess of the trial court's jurisdiction (see Code Civ. Proc., § 660; [FN4] see also 4 Witkin, Cal. Procedure (2d ed. 1971) § 381, p. 3172). However, the language of the order can also be read as simply granting an alternative order for a new trial; it will be so construed, to give effect to the court's manifest intention.

> FN3 Code of Civil Procedure section 629 provides, in part: "If the court grants the motion for judgment notwithstanding the verdict or of its own motion directs the entry of judgment notwithstanding the verdict and likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed."

> FN4 Code of Civil Procedure section 660 provides, in part: "Except as otherwise provided in Section 12a of this code, the power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, or if such notice has not theretofore been given, then 60 days after filing of the first notice of inten-

tion to move for a new trial."

Appellant contends that the order granting respondents a new trial must be reversed, because (1) the specifications of reasons in the trial court's order are legally inadequate, and (2) there is "no substantial basis in the record" supporting the trial court's reasons (see Code Civ. Proc., § 657).

(11a) When a new trial is granted, section 657 of the Code of Civil Procedure requires that the trial court specify the ground or grounds upon which the new trial is granted and the court's reason or reasons for granting the new trial upon each ground stated. (See _Scala v. Jerry Witt & Sons, Inc._ (1970) 3 Cal.3d 359, 363 [90 Cal.Rptr. 592, 475 P.2d 864]; _Mercer v. Perez_ (1968) 68 Cal.2d 104, 115-116 [65 Cal.Rptr. 315, 436 P.2d 315].) In _Mercer v. Perez, supra,_ the California Supreme Court "explained that the requirement of a specification of reasons served the two-fold purpose of encouraging careful deliberation by the trial court before ruling on a motion for new trial, and of making a record sufficiently precise to permit meaningful appellate review." ( *438 _Scala v. Jerry Witt & Sons, Inc., supra,_ 3 Cal.3d at p. 363; see _Mercer v. Perez, supra,_ 68 Cal.2d at pp. 112-115; see also _Dizon v. Pope_ (1974) 44 Cal.App.3d 146, 148 [118 Cal.Rptr. 465].) [FN5] (12) A specification of reasons, phrased in terms of "ultimate fact," fails to comply with section 657 of the Code of Civil Procedure (

> FN5 Since orders granting motions for new trial are infrequently reversed, "it is essential that they be the product of a mature and careful reflection on the part of the judge. Society has a manifest interest in avoiding needless retrials ...." ( _Mercer v. Perez, supra,_ 68 Cal.2d at p. 113.) _Scala v. Jerry Witt & Sons, Inc., supra,_ 3 Cal.3d 359, 370.) The trial court's "reason" must do more than simply reiterate the ground of the ruling itself ( _Scala v. Jerry Witt & Sons, Inc., supra,_ 3 Cal.3d at pp. 367, 370). (11b) In specifying its reasons for granting the motion for a new trial, the trial court must briefly identify the portion of

the record which convinces the court that the jury clearly should have reached a different verdict. ( *Scala v. Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at p. 367; *Mercer v. Perez, supra,* 68 Cal.2d 104, 116; *Oberstein v. Bisset* (1976) 55 Cal.App.3d 184, 187 [127 Cal.Rptr. 413].) Where the specification of reasons in the order granting a new trial is inadequate to comply with the mandate of section 657 of the Code of Civil Procedure, as construed in *Mercer v. Perez, supra,* 68 Cal.2d 104, the new trial order must be reversed, and the judgment will be automatically reinstated (see *Scala v. Jerry Witt & Sons, Inc., supra,* 3 Cal.3d 359; *Oberstein v. Bisset, supra,* 55 Cal.App.3d 184, 190). (13a) Where the trial court's specification of reasons adequately complies with the requirements of section 657, the court's new trial order will be upheld on appeal if there is any substantial evidence in the record to support the specified reasons (see *Dizon v. Pope, supra,* 44 Cal.App.3d 146, 148).

The trial court conditionally granted the new trial order on two grounds: insufficiency of the evidence on the "actual malice" issue to justify the verdict, and excessive damages. The adequacy of the "insufficiency of the evidence" ground will be examined first.

*Insufficiency of the Evidence*

(14a) The order adequately sets forth the ground (insufficiency of the evidence) upon which the trial court relied in granting respondents a new trial but, as appellant argues, it does not contain the adequate specification of reasons mandated by section 657 of the Code of Civil Procedure. The trial court's stated "reason" is little more than a reiteration of the ground of the ruling itself; it is wholly conclusory and stated in terms of "ultimate fact." The trial court fails to cite the respects in which the **\*439** plaintiff's *evidence* is legally inadequate. There is no identification of the deficiencies which the trial court found in "the evidence," and in "the record," as opposed to merely in "the issues." ( *Scala v.*

*Jerry Witt & Sons, Inc., supra,* 3 Cal.3d 359, 366, 367, 369-370; *Oberstein v. Bisset, supra,* 55 Cal.App.3d 184, 187; *Previte v. Lincolnwood, Inc.* (1975) 48 Cal.App.3d 976, 987 [122 Cal.Rptr. 194].) (11c) The specification of reasons must briefly identify the evidence or portion of the record which convinces the judge that the jury clearly should have reached a different verdict (*Oberstein v. Bisset, supra,* 55 Cal.App.3d 184, 187).

(15) However, in response to a letter from defense counsel suggesting an amplification of the specification of reasons and citing the applicable case law in this area, the trial court, on January 12, 1976, filed an "Amplification of Orders of January 9, 1976," setting forth a specification of reasons for granting the motion for a new trial. This procedure was proper (see *LaManna v. Stewart* (1975) 13 Cal.3d 413, 418, 424 [118 Cal.Rptr. 761, 530 P.2d 1073]; *Mercer v. Perez, supra,* 68 Cal.2d 104, 123-124 at fn. 8; *Oberstein v. Bisset, supra,* 55 Cal.App.3d 184, 189).

(14b) The specification contained in the "Amplification" adequately set forth the trial court's reasons for granting a new trial on the ground of insufficiency of the evidence with regard to respondent Carroll. (16) However, no specification of reasons is given as to why "the evidence" was insufficient to support the jury's determination that "actual malice" (i.e., knowledge of falsity or reckless disregard for truth or falsity) was established with regard to respondent PG&E. Inasmuch as no reasons were specified with regard to respondent PG&E, the order granting respondent PG&E's motion for a new trial cannot be sustained on the ground of insufficiency of the evidence (see *LaManna v. Stewart, supra,* 13 Cal.3d at p. 425).

(14c) The question remains whether the order granting a new trial can be sustained on another basis. Appellant contends that, even if the specification of reasons with regard to respondent Carroll was adequate, there is "no substantial basis in the record" (Code Civ. Proc., § 657) supporting the reasons which were specified by the trial court. Therefore, appellant contends, the trial court abused

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

its discretion in granting Carroll a new trial on the ground of insufficiency of the evidence to justify the verdict. The trial court's amplification order pointed to the following evidence: The evidence shows, and the court finds, that before writing the letter of complaint dated July 13, 1971, Carroll recalled the subject matter of February 10, 1971, interview with Widener, both**440 before and during the filming of "Powers That Be." He also reviewed a transcript received from KNBC-TV. He reviewed a memorandum he had made on February 14, 1971, relating to the February 10 interview with Widener. Carroll also talked to Draeger, Ramsey and Weeks, fellow Pacific Gas and Electric Company employees. Carroll let them see the letter and check its contents for accuracy before the letter was mailed.

Appellant correctly argues that the record contains contradictory evidence on this matter. However, the court stated in _Dietrich v. Litton Industries, Inc._ (1970) 12 Cal.App.3d 704, 717 [90 Cal.Rptr. 856]: "In passing upon a motion for a new trial made upon the ground of insufficiency of the evidence the trial judge is required to weigh the evidence; and in so doing he may disbelieve witnesses and draw inferences contrary to those supporting the verdict. When the motion is granted upon this ground the appellate court may reverse only when, as a matter of law, there is no substantial evidence to support a contrary judgment. ( _Mercer v. Perez, supra,_ at p. 112.)" (17) Section 657 of the Code of Civil Procedure "_significantly_ limits the scope of appellate authority to review new trial orders ...." (_Jones v. Citrus Motors Ontario, Inc._ (1973) 8 Cal.3d 706, 710 [106 Cal.Rptr. 28, 505 P.2d 220]; italics added.) An order granting a new trial on the ground of insufficiency of the evidence may only be reversed on appeal where there is no substantial evidence to support the trial court's specified reason (_Hale v. Farmers Ins. Exch._ (1974) 42 Cal.App.3d 681, 693 [117 Cal.Rptr. 146]). As the court stated in _Jones v. Citrus Motors Ontario, Inc., supra,_ 8 Cal.3d 706, 710: "... [T]he trial court is required to state in its order the theory under which it concludes the jury should have returned a verdict for the moving party, and the order must be sustained on appeal unless the opposing party demonstrates

that no reasonable finder of fact could have found for the movant on that theory." (See _Dietrich v. Litton Industries, Inc., supra,_ 12 Cal.App.3d 704, 717.) (14d) It cannot be said, as a matter of law, that there is no substantial evidence to support a contrary judgment. Therefore the order granting respondent Carroll a new trial is to be upheld.

*Excessive Damages*

(18a) Turning to the second ground (i.e., excessive damages) on which the new trial order was based, appellant contends: (1) that there was an inadequate specification of reasons for the court's conclusion that there was no evidence of damages, and (2) even if the specification of*441 reasons to support the ground of excessive damages was formally sufficient under section 657, the trial court's conclusion is not supported by substantial evidence in the record.

The specification of reasons for granting the motion on the ground of excessive damages was as follows:

"In this action the jury awarded plaintiff a verdict of $750,000 general damages and $7,000,000 punitive damages.

"Except for copies sent to members of Congress, which were absolutely privileged, only the original and four copies of the July 13, 1971 letter were mailed and to be considered by the jury. There is no evidence that any of the recipients of said letter republished same. The original of the letter was sent to KNBC-TV, Los Angeles. Mr. Howard, its General Manager, testified that the letter did not affect plaintiff's relationship with National Broadcasting Company. None of the other recipients of the letter was connected in any way with the television industry.

"Plaintiff has failed to establish by a preponderance of the evidence any causal connection between the publication of the letter and his fluctuating income.

"The court is convinced that the award in this case was based on factors other than on any evidence which would indicate general or punitive damages sustained by plaintiff proximately resulting from

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260
**(Cite as: 75 Cal.App.3d 415)**

said published letter.

"After weighing the evidence the court is convinced from the entire record, including all reasonable inferences to be drawn therefrom, that plaintiff has not suffered any loss or damage, general or punitive, by reason of the publication of the aforesaid letter."

With regard to the excessive damages ground, the form of the January 9 order adequately complies with the requirements of section 657, that the order specify the ground or grounds upon which it is granted and the reasons for granting the new trial on each of the grounds stated. (See *Mercer v. Perez, supra,* 68 Cal.2d 104, 109-116.)

However, appellant contends that the trial court's conclusion that there was no evidence that appellant was damaged by the defamatory*442 statement is not sufficiently supported by the record, and thus the trial court abused its discretion in granting the motion for a new trial. According to the January 9 order, the trial court based its conclusion that appellant was not damaged by the libel on the narrow circulation of the libelous letter and on the fact that Robert Howard, general manager of KNBC, testified that the letter did not affect appellant's relationship with the National Broadcasting Company. The order also asserts that, aside from KNBC, "None of the other recipients of the letter was connected in any way with the television industry." Appellant points out that the letter was sent to Underwood and Jordan, a nationally known advertising firm concerned with media advertising for the utility industry, and contends that the PG&E public relations department sent the letter there in order to assure wide circulation to the television industry. Appellant argues that Reece Halsey testified that a producer's successes make up the principal promotional material used by agents seeking work for writers and producers in the television industry. Each of appellant's films had been important in advancing his career. Appellant contends that NBC's plans in May 1971 to rebroadcast "Powers That Be" and make it available to other stations were cancelled because of the controversy arising from the July 13

letter, and thus the libel deprived appellant of the benefit of exposure of his last film produced by KNBC. Appellant also argues that the jury could properly have inferred that, coming on the heels of respondents' surreptitious taping charge, appellant's inability to find significant work in the profession where he was acknowledged to be among the best, was a proximate result of the libel. Additionally, appellant contends that the trial court's order fails to mention the evidence in the record of general damages for "personal humiliation, and mental anguish and suffering." (*Time, Inc. v. Firestone, supra,* 424 U.S. 448, 460-461 [47 L.Ed.2d 154, 166-167]; *Gertz v. Robert Welch, Inc., supra,* 418 U.S. 323, 350 [41 L.Ed.2d 789, 811].) In *Gertz v. Robert Welch, Inc., supra,* the court stated (418 U.S. at p. 350 [41 L.Ed.2d at p. 811]): "Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." Appellant points out that there was much evidence of appellant's personal humiliation and mental suffering which the trial court fails to acknowledge in its order.*443

(19) However, in ruling on a motion for a new trial, the trial court may disbelieve witnesses, reweigh evidence, and draw reasonable inferences that are contrary to those drawn by the jury. (18b, 13b) Where, as here, the trial court's reasons find *any* substantial support in the record, it cannot be said that the trial court abused its discretion in granting a new trial. (*Hale v. Farmers Ins. Exch., supra,* 42 Cal.App.3d 681, 692-693; *Thompson v. John Strong & Sons* (1970) 5 Cal.App.3d 705, 709 [85 Cal.Rptr. 350]; see *Jones v. Citrus Motors Ontario, Inc., supra,* 8 Cal.3d 706, 710-711.) Therefore, the order granting respondents a new trial on the ground of excessive damages must be affirmed. The trial court did not limit the new trial to the issue of damages; therefore, all fact issues have been set at

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

75 Cal.App.3d 415                                                                 Page 18

75 Cal.App.3d 415, 142 Cal.Rptr. 304, 3 Media L. Rep. 1260

**(Cite as: 75 Cal.App.3d 415)**

large. (Cf. *Collins v. Lucky Markets, Inc.* (1969) 274 Cal.App.2d 645, 649 [79 Cal.Rptr. 454].)

The judgment notwithstanding the verdict is reversed. The order granting a new trial is affirmed. The precautionary appeal from the judgment on the verdict is dismissed as moot. Plaintiff will recover costs on appeal.

Rattigan, Acting P. J., and Emerson, J., [FN*] concurred.

> FN* Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

A petition for a rehearing was denied December 28, 1977, and respondent's petition for a hearing by the Supreme Court was denied February 22, 1978.

Cal.App.1.Dist.,1977.

Widener v. Pacific Gas & Elec. Co.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 11

Westlaw.

102 Cal.App.3d 129                                                                    Page 1
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

**H**

SAUL M. WEINGARTEN, Plaintiff and Appellant,
v.
PAUL BLOCK et al., Defendants and Respondents.
**Civ. No. 42705.**

Court of Appeal, First District, Division 2, California.

Feb 14, 1980.

SUMMARY

In an action by a lawyer who had formerly acted as attorney for a small city and who was the local attorney for its redevelopment agency against the owners and publishers of a newspaper, a reporter who wrote articles about plaintiff, and other defendants connected with the paper, the trial court granted defendants' motion for a nonsuit at the conclusion of plaintiff's evidence before a jury on his complaint for libel, conspiracy to libel, intentional infliction of emotional distress, and interference with economic advantage. The court had previously found that plaintiff was a "public official" and a "public figure" for purposes of application of the rule that such a person must prove that a complained of publication was false and that the defendant published with "actual malice," defined as publishing with knowledge that it was false or with reckless disregard of whether it was false or not. The publications related to plaintiff's involvement in a public controversy surrounding his dismissal as city attorney and the filling of the vacancy created thereby, his involvement in a movement to recall members of the city council who voted to discharge him, and his fitness to perform the services of city attorney or attorney for the redevelopment agency. (Superior Court of Monterey County, No. M 5520, Edward P. Fogg, Judge. [FN*])

The Court of Appeal affirmed, holding that plaintiff had failed to show that defendants' publications were knowingly false or were circulated with reckless disregard for their truth or falsity. The court also held that the trial court did not err in making

the determination of the public official/public figure privilege issue prior to the commencement of the jury trial, and that it had properly determined that plaintiff was both a public official and a public figure. Rejecting a contention that **\*130** the trial court had applied the wrong standard in grating the nonsuit, the court held that the record indicated the court had followed the proper rule that all inferences must be drawn in favor of the plaintiff and that it did not weigh the credibility of the evidence or draw any inferences in favor of defendants.

> FN* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.(Opinion by Taylor, P. J., with Rouse and Miller, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b) Libel and Slander § 42--Actions--Pleading--Answer--Amendment.
In a libel action, the trial court did not abuse its discretion in permitting defendants to amend their answers, which alleged that plaintiff was a "public figure," to include allegations that he was also a "public official," where plaintiff knew from the beginning that the qualified constitutional privilege applicable in cases involving "public persons," was a major issue, where his complaint was couched in the language of a decision setting forth that privilege, and where, in his trial brief, plaintiff referred to himself as a "public official."

(2) Pleading § 67--Amendment and Withdrawal--Amendment on Leave of Court-- In Interest of Justice.
In applying Code Civ. Proc., §§ 473, 576, which give a trial court discretion to allow an amendment to any pleading in furtherance of justice at any time before or after the commencement of trial, liberality in permitting amendments is the rule. As a matter of policy, a trial court's ruling in that respect will be upheld, unless a manifest or gross abuse of discre-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                    Page 2
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
(Cite as: 102 Cal.App.3d 129)

tion is shown.

(3) Libel and Slander § 50--Actions--Province of Court and Jury-- Privilege--Public Persons.
In a libel action, the trial court did not err in making a determination of the public official/public figure privilege issue prior to commencement of the jury trial. The procedure was consistent with the procedure generally followed for the determination of privilege, and, in any event, Evid. Code, § 320, leaves the order of proof in the discretion of the trial court except as otherwise provided by law. *131

(4) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Candidates, Public Officers, Official Acts and Public Figures--Who Is "Public Official."
In a libel action arising out of newspaper comments about plaintiff's involvement in a public controversy surrounding his dismissal as city attorney and the filling of the vacancy created thereby, his involvement in a movement to recall members of the city council who voted to discharge him, and his fitness to perform the services of city attorney or attorney for the local redevelopment agency, the trial court properly found that plaintiff was a "public official" within the meaning of the qualified constitutional privilege applicable in cases involving such persons. As attorney for the city and the redevelopment agency, plaintiff had substantial control over the conduct of governmental affairs of the city. After his discharge and the recall, the public had an independent interest in anything that might touch his fitness for that office and his continued service to the agency, including his involvements in matters (commented on in the challenged articles) relating to real property and whether or not he had misused public trust either for his own benefit or that of his personal clients.

[See Cal.Jur.3d, Assault and Other Willful Torts, § 224 et seq.; Am.Jur.2d, Libel and Slander, § 299.]

(5) Libel and Slander § 26--Privileged Communications--Qualified Privilege--Matters Concerning Candidates, Public Officers, Official Acts and Public Figures--Who Is "Public Figure."

In a libel action arising out of newspaper comments about plaintiff's involvement in a public controversy surrounding his dismissal as city attorney and the filling of the vacancy created thereby, his involvement in a movement to recall members of the city council who voted to discharge him, and his fitness to perform the services of city attorney or attorney for the local redevelopment agency, the trial court properly found that plaintiff was a "public figure" within the meaning of the qualified constitutional privilege applicable in cases involving such persons. The record indicated that plaintiff had thrust himself into the forefront of the controversy that arose around his termination and was actively involved in influencing its resolution by his involvement in the recall and his continuing representation of the redevelopment agency. By such voluntary and active participation, plaintiff relinquished his interest in the protection *132 of his own name, and, since he earned substantial amounts from his public assignments, there was sufficient concern about specified public expenditures to make him a public figure.

(6) Libel and Slander § 49--Actions--Nonsuit--Standard for Viewing Evidence.
In a libel action, the trial court applied the proper standard in granting a nonsuit at the close of plaintiff's evidence. The record indicated that the court followed the rule that all inferences must be drawn in favor of the plaintiff and that it did not weigh the credibility of the evidence or draw any inferences in favor of defendants.

(7) Libel and Slander § 48--Actions--Evidence--Weight and Sufficiency--Malice--"Actual Malice."
In a libel action arising out of newspaper comments about plaintiff, in which the trial court had properly found that plaintiff was a "public official" and a "public figure," the court properly granted defendants' motion for nonsuit at the close of plaintiff's evidence, where plaintiff failed to show "actual malice," i.e., that the publications were knowingly false or were circulated with reckless disregard for their truth or falsity. Every statement made was

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                                                     Page 3
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

traced to an identifiable source and there was no evidence that any of the sources denied giving the questioned information to a newspaper reporter or that he either knew or had clear grounds to suspect that the statements might be false. All that the evidence revealed was that the reporter relied on one or two persons for each statement, that two sources did not remember the statements attributed to them, and that others were actively involved in the events described in the article and had a bias against plaintiff.

COUNSEL

Jacque Boyle for Plaintiff and Appellant.

Noland, Hamerly, Etienne & Hoss, Myron E. Etienne, Jr., and Michael D. Cling for Defendants and Respondents. *133

TAYLOR, P. J.

The major questions presented by this appeal [FN1] are whether the trial court properly: 1) found that plaintiff, Saul M. Weingarten (Weingarten), the former City Attorney of Seaside and local attorney for its redevelopment agency, was a "public official" and "public figure" within the rule of *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], and *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; 2) granted a nonsuit at the conclusion of Weingarten's evidence before a jury on his complaint for libel, conspiracy to libel, intentional infliction of emotional distress, and interference with economic advantage against the owners and publishers of the Monterey Peninsula Herald and other defendants [FN2] (hereafter collectively Block). For the reasons set forth below, we have concluded that the judgment must be affirmed.

> FN1 The notice of appeal indicates that it is also taken from the order of November 24, 1976, which granted the defense motion for a court determination of the application of the New York Times privilege. As this order was merged in the judgment, it is

not separately appealable and that appeal must be dismissed.

> FN2 The defendants on appeal are Paul Block, the major stockholder; Toledo Blade Company, another owner; Monterey Peninsula Herald Company, the publisher; B. Gifford, the manager of the Monterey Herald; and M. Jaques, the author of the articles.

The instant case hinges on the application of the qualified constitutional privilege based on the First Amendment of the United States Constitution and extended to state court libel actions by the Fourteenth Amendment, as first set forth in *New York Times Co. v. Sullivan , supra., 376 U.S. 254*. The rule established that in a defamation action brought by a public official, the plaintiff must prove by clear and convincing evidence that the publication was false, and that the defendant published with "actual malice" (p. 280 [ 11 L.Ed.2d at p. 706]), defined as publishing "with knowledge that it was false or with reckless disregard of whether it was false or not" (p. 280 [ 11 L.Ed.2d at p. 706]). (See also *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469, 490 [43 L.Ed.2d 328, 346, 95 S.Ct. 1029]).

The New York Times rule was extended beyond "public officials" to "public figures" ( *Curtis Publishing Co. v. Butts , supra., 388 U.S. 130*, and its companion case, *Associated Press v. Walker* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]). In *Rosenbloom v. Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811], the United States Supreme Court held that a libel plaintiff's status as a public person was *134 not determinative of the availability of the qualified constitutional privilege; the privilege was extended to all discussion and communication concerning matters of public or general concern. Subsequently, in *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], the United States Supreme Court held that the *Rosenbloom* rule was not constitutionally required, and returned to a distinction between "public persons" (including both "public officials"

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

(1a)Preliminarily, we dispose of Weingarten's procedural contentions. Weingarten argues that the court abused its discretion by permitting Block to amend their answers at the time of trial to include an allegation that he was a "public official." The answers alleged as an affirmative defense that Weingarten was a "public figure." (2)The trial court has discretion to allow an amendment to any pleading in furtherance of justice at any time before or after the commencement of trial (Code Civ. Proc., §§ 473, 576). Liberality in permitting amendments is the rule ( Greenberg v. Equitable Life Assur. Society (1973) 34 Cal.App.3d 994 [110 Cal.Rptr. 470]). As a matter of policy, the ruling of the trial court will be upheld, unless a manifest or gross abuse of discretion is shown ( Bedolla v. Logan & Frazer (1975) 52 Cal.App.3d 118, 135 [125 Cal.Rptr. 59]).

(1b)As the court observed here, Weingarten knew from the beginning that the New York Times privilege was the major issue. Weingarten's complaint was pled in the language of New York Times and in his trial brief, he referred to himself as a "public official." Accordingly, we conclude that the court did not abuse its discretion in allowing the amendment of the answer.

(3)Weingarten next argues that the trial court erred by making a determination of the public official/ public figure issue prior to the commencement of the jury trial. In Rosenblatt v. Baer (1966) 383 U.S. 75, at page 88 [15 L.Ed.2d 597, 606, 86 S.Ct. 669], the United States Supreme Court indicated that "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a 'public official.'" The federal authorities agree that the question is a mixed one of law and fact to be preliminarily determined by the trial court ( Meeropol v. Nizer (2d Cir. 1977) 560 F.2d 1061 [195 U.S.Pat.Q. 273]; Rosanova v. Playboy Enterprises. Inc. (S.D.Ga. 1976) 411 F.Supp. 440; *135Hotchner v. Castillo-Puche (S.D.N.Y. 1975) 404 F.Supp. 1041; revd. jury verdict (2d Cir. 1977) 551

F.2d 910). Such a procedure is consistent with that followed in this state for the determination of privilege. In any event, Evidence Code section 320 leaves the order of proof in the discretion of the trial court "[e]xcept as otherwise provided by law." We conclude that the trial court properly determined the issue before submitting the case to the jury.

In this context, we turn to the facts as found [FN3] by the court.

> FN3 As findings of fact are not necessary on a nonsuit ( Mosk v. Scheinberg (1942) 52 Cal.App.2d 154, 157 [125 P.2d 872]), we treat the findings as pertaining to the court's pretrial determination that Weingarten was a public official and a public figure. We also need not discuss in detail Weingarten's contention that the court abused its discretion in filing the findings after the judgment. The record indicates that Weingarten made no objection to the proposed findings and conclusions. The judgment was entered on January 18, 1977; the findings and conclusions on February 11, nunc pro tunc as of January 18, 1977. The court had authority to do so and Weingarten was not prejudiced thereby ( Norton v. City of Pamona (1935) 5 Cal.2d 54, 62-63 [53 P.2d 952]; Kaliterna v. Wright (1949) 94 Cal.App.2d 926, 935 [212 P.2d 32]; Code Civ. Proc., § 473).

Weingarten served as city attorney for the City of Seaside for 15 years, from 1955 to 1970; he also served as city attorney for the City of Gonzales for 19 years, from 1954 to 1973, and as interim city attorney for the City of Pacific Grove for one year, from 1954 to 1955. In addition, Weingarten has served continuously as attorney for the Redevelopment Agency of the City of Seaside (Redevelopment Agency) from 1963 through 1977. Although the Redevelopment Agency was served by other counsel, Weingarten has been the only local counsel. Weingarten was the City Attorney of Seaside at the time the Redevelopment Agency was formed and was instrumental in forming the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                Page 5
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
(Cite as: 102 Cal.App.3d 129)

agency, in getting the federal funding and initiating and bringing to fruition a series of redevelopment projects in the city. Since the formation of the City of Seaside in the mid-1950's, Redevelopment Agency has played an important role in providing utilities, improvements and services which did not exist in Seaside prior to its incorporation. Weingarten has played an active and important role in the Redevelopment Agency since its inception in 1963, and has received much publicity concerning his role in the Redevelopment Agency throughout its history.

Prior to publication of the subject articles [FN4] In 1971, Weingarten was a member of the Democratic Central Committee for Monterey County *136 for approximately 10 years, and a member of the State Central Committee for 2 years. In 1958, Weingarten was a candidate for the public office of State Assembly and his name was suggested by Democratic organizations as a candidate for the United States Congress and the California State Senate.

> FN4 The publications involved are the story published on September 9, 1971, set forth in appendix A; the editorial on September 14, 1971, quoted in footnote 6 below, and the brief news story concerning Weingarten's taxes published on October 1, 1971. As the court conceded that the latter contained no defamatory material we need not quote it.

Weingarten pled in his fifth amended complaint that he was "public attorney." His activities as city attorney, attorney for the Redevelopment Agency, and civic leader in the community of Seaside and in the Monterey peninsula area received extensive publicity in the Monterey Peninsula Herald newspaper from 1967 to 1971. Because of his public stature, Weingarten had significantly greater access to the channels of communication than does an ordinary private person.

At the time of the publication of the subject articles in 1971, Weingarten had assumed a role of especial

prominence in the affairs of the community of Seaside, and occupied a position of persuasive fame and notoriety in the community of Seaside. Weingarten was discharged from his position as city attorney for the City of Seaside in October 1970 by vote of the Seaside City Council. Thereafter, he served as the attorney for the Seaside Citizens for Better Government, a corporation organized to initiate a recall of the members of the Seaside City Council who had voted for his discharge. In relation to the recall movement in Seaside, Weingarten also represented Bernard J. Dolan, Jr., in an action filed against the City of Seaside in Monterey County Superior Court, No. M 5020, entitled Dolan v. City of Seaside. The recall movement in Seaside generated public controversy in the community and received extensive publicity in the local newspaper.

The recall movement, organized and promoted by the corporation which Weingarten represented, successfully recalled from office three of four members of the Seaside City Council who had voted to discharge him. By his representation of the recall organization, Weingarten voluntarily injected himself into a public controversy in Seaside regarding the recall election and thereby invited public attention and comment.

After the discharge of Weingarten from the position of city attorney in October 1970, that position remained vacant and legal services were performed for Seaside by several interim city attorneys. In August of 1971, after completion of the recall election, the City of Seaside resumed its search for a city attorney. On August 5, 1971, an article *137 appeared in the Monterey Peninsula Herald indicating that the Seaside City Council was resuming the search for a city attorney. On September 9, 1971, the date of the publication of the first subject article, the Seaside City Attorney position was vacant and applications for the position were being solicited by the City of Seaside. The position of city attorney in Seaside was a matter of lively public interest throughout 1971 and remained so on September 9, 1971. Propositions for further change were abroad, and public interest in filling the vacancy

102 Cal.App.3d 129                                                                Page 6
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

created by the firing of Weingarten continued strong throughout 1971.

Weingarten was drawn into the public controversy in Seaside regarding the filling of the vacancy in the city attorney position because of his former position as Seaside City Attorney for 15 years, and because of his involvement as attorney for the organization which recalled 3 of the 4 members of the Seaside City Council who had voted to discharge him.

The comments about Weingarten which appeared in the subject articles relate to the following issues: 1) Weingarten's involvement in the public controversy surrounding his dismissal as city attorney and the filling of the vacancy created thereby; 2) Weingarten's involvement in the movement to recall the members of the Seaside City Council who voted to discharge him; 3) Weingarten's fitness to perform the services of City Attorney of the City of Seaside or attorney for the Redevelopment Agency.

The above findings were supported by substantial evidence. The court took judicial notice of a voluminous file of newspaper articles concerning the Seaside City Council and Weingarten from 1968 to 1971.

In *Rosenblatt v. Baer, supra., 383 U.S. 75,* which involved the former supervisor [FN5] of a county recreation area, the United States Supreme Court, at page 84 [ 15 L.Ed.2d at p. 604], rejected state law standards as the basis for determining who is a public official. The court then indicated, at page 85 [ 15 L.Ed.2d at p. 605], that it need not precisely define the term for the purpose of that case, and then stated at pages 85-86, and 87 [ 15 L.Ed.2d at pages 605-606]: "The motivating force for the decision in *New York Times* was twofold. We expressed 'a profound *138 national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, *and* that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *376 U.S., at 270,* (Emphasis supplied.) There is, first, a strong in-

terest in debate on public issues, and, second, *a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues.* Criticism of government is at the very center of the constitutionally protected area of free discussion. *Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.* It is clear, therefore, that *the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.*

> FN5  The court, at pages 87-88 [ 15 L.Ed.2d at pages 606-607], acknowledged that the plaintiff might be a public official but reserved the question for the trial court if a retrial were sought. In *Henry v. Collins (1965) 380 U.S. 356 [13 L.Ed.2d 892, 85 S.Ct. 992],* a per curiam opinion, the United States Supreme Court assumed that one of the defendants, a county attorney, was a "public official" within the New York Times rule.

"This conclusion does not ignore the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation. But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of *New York Times* is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. *Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in New York Times are present* [FN12] *and the New York Times malice standards apply.* [FN13]" (Italics partially added.) *139

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                                                Page 7
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

FN12 "We are treating here only the element of public position, since that is all that has been argued and briefed. We intimate no view whatever whether there are other bases for applying the *New York Times* standards-for example, that in a particular case the interests in reputation are relatively insubstantial, because the subject of discussion has thrust himself into the vortex of the discussion of a question of pressing public concern. Cf. *Salinger v. Cowles*, 195 Iowa 873, 889, 191 N.W. 167, 173- 174 (1922); *Peck v. Coos Bay Times Publishing Co.*, 122 Ore. 408, 420- 421, 259 P. 307, 311-312 (1927); *Coleman v. MacLennan*, 78 Kan. 711, 723- 724, 98 P. 281, 285-286 (1908); *Pauling v. News Syndicate Co.*, 335 F.2d 659, 671 (C. A. 2d Cir. 1964)."

FN13 "It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. *The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy*."

In *Gertz v. Robert Welch, Inc., supra.*, 418 U.S. 323, the court, in distinguishing between private and public individuals, observed at pages 344- 345 [ 41 L.Ed.2d at page 808]: "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

"More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. *An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties*. As the Court pointed out in *Garrison v. Louisiana*, 379 U.S. 64, 77, *the public's interest extends to 'anything which might touch on an official's fitness for office*.... Few important attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.'" (Italics added.)

(4)Weingarten's activities, set forth in the findings summarized above, indicate all of the *Rosenblatt* and *Garrison* criteria were met. As city attorney and attorney for the Redevelopment Agency, he had substantial control over the conduct of governmental affairs of Seaside. After his discharge and the recall, the public had an independent interest in anything that might touch on his fitness for that office and his continued services to the Redevelopment Agency. [FN6] Needless to say, these included his involvements in matters relating to real property and whether or not he had misused either public trust for his own benefit or that of his personal clients. We conclude that an appropriate balancing of freedom of expression against sanctity of reputation in the instant case requires the conclusion reached by the trial court, namely, that Weingarten was a "public official" within the meaning of *New York Times* and *Rosenblatt*, both *supra.*. *140

FN6 This was the thrust of Block's following editorial published on September 14, 1971:

"The Weingarten Case Out in the Open
"THE point-by-point revelation in last Thursday's Herald of the prolific real estate and

102 Cal.App.3d 129
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

legal practice maneuverings of former Seaside City Atty. Saul M. Weingarten should prompt that city's urban redevelopment agency - which continues to retain him as counsel - to reflect on the type of advice it may be getting.

"In all fairness to Weingarten, he has been credited with helping direct some of Seaside's major accomplishments in making the difficult transition from a World War II boom town into an orderly residential city. But while Saul Weingarten was being good to Seaside, Seaside certainly was being good to Saul Weingarten.

"During his 15 years of part-time public service, according to The Herald's examination of the record, he amassed a fortune valued at $1.5 million. He earned more than $50,000 in some years from his public employment as both city attorney and legal counsel for the redevelopment agency. The redevelopment plum alone has paid more than $41,000 a year.

"During all this profitable period, Weingarten was working his way in and out of various legal predicaments involving charges of negligence, malpractice and fraud from which he never has been completely exonerated.

"It was this questionable record and other dubious activities that finally provoked the former city council of Seaside to fire him as city attorney. In retrospect, the published record certainly vindicates the wisdom of that council's action.

"But incomprehensible as it may seem, the urban redevelopment agency - whose members are appointed by one of Weingarten's legal clients, Mayor Lou Haddad - has never seen fit to do anything about the recurring difficulties in which their chief adviser is from time to time involved.

"The fact that Weingarten's brushes were civil rather than criminal might work in his behalf were it not that the complaints against him so directly reflect upon his integrity as a public attorney. The fact remains that Seaside's important urban redevelopment program is officially represented by an attorney whose standard of ethics has been tried and found badly wanting.

"Whatever the agency does at this late date, it will not be able to eradicate the sorry public record

of this case, which is now completely out in the open. In most cities, a record similar to Weingarten's would have been cause for immediate dismissal, or at least suspension.

"In Seaside, so far, only four city councilmen had the courage to do anything about this mess - and three of them were subsequently repudiated at the polls for their judgment."

We note that the authorities in other jurisdictions agree that city attorneys or attorneys performing similar duties are "public officials" for the purpose of the *New York Times* rule ( *Finkel v. Sun Tattler Co., Inc.* (Fla.App. 1977) 348 So.2d 51 (former city attorney); *Frink v. McEldowney* (1971) 29 N.Y.2d 720 [325 N.Y.S.2d 755, 275 N.E.2d 337] (attorney employed by a town to render legal opinions on matter of town interest); *Tunnell v. Edwardsville Intelligencer, Inc.* (1968) 99 Ill.App.2d 1 [241 N.E.2d 28], revd. on other grounds, 43 Ill.2d 228 [252 N.E.2d 538]; *Ewald v. Roelofs* (1970) 120 Ill.App.2d 30 [256 N.E.2d 89] (municipal attorney conceded the issue)). [FN7] *141

> FN7 *Zeck v. Spiro* (1966) 52 Misc.2d 629 [276 N.Y.S.2d 395], the only contrary authority (attorney for a sewer district not a public official) turned on the finding that the statement did not involve official conduct rather than the status of the individual.

(5)As since the filing of the briefs in this case the U.S. Supreme Court decided *Wolston v. Reader's Digest Assn., Inc.* (1979), 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701] and *Hutchinson v. Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675] (both decided June 26, 1979), we are constrained to discuss the question of whether Weingarten also was a "public figure." The basis for the extension of the New York Times privilege to the libel claims of public figures was stated in the plurality opinion in *Curtis Publishing Co. v. Butts, supra.,* 388 U.S., pages 147-148 [18 L.Ed.2d page 1107], as follows: "From the point of view of deciding whether a constitutional interest of free speech and press is properly involved in the resolu-

tion of a libel question a rational distinction 'cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of...policy will be less important to the public interest than will criticism of government officials.' *Pauling v. Globe-Democrat Publishing Co., 362 F.2d 188, 196.*"

In his concurring opinion, Chief Justice Warren said: "Viewed in this context, then, it is plain that although they are not subject to the restraints of the political process, 'public figures,' like 'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities. Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct" (p. 164 [ *18 L.Ed.2d p. 1116*]). (Italics added.)

In *Gertz v. Robert Welch, Inc., supra., 418 U.S. 323,* the court noted at page 345 [ *41 L.Ed.2d at page 808*]: "Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed **\*142** public figures for all purposes. *More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.* In either event, they invite attention and comment" (italics

added).

The facts as found by the trial court here indicate that Weingarten thrust himself to the forefront of the public controversy [FN8] that arose around his termination and was actively involved in influencing its resolution by his involvement in the recall and his continuing representation of the Redevelopment Agency as its chief local counsel. By such voluntary and active participation, he relinquished his interest in the protection of his own name. [FN9] Further here, since Weingarten earned substantial amounts from his public assignments, there was sufficient concern about specific public expenditures to make him a public figure. *Hutchinson v. Proxmire, supra., 443 U.S. 111 [61 L.Ed.2d 411],* is therefore inapposite. In Hutchinson, a scientist who engaged in federally funded research received the "Golden Fleece Of The Month" award bestowed by a United States Senator. In rejecting a contention that Hutchinson was a limited purpose public figure, the court said at page 135 [ *61 L.Ed.2d at page 431*]: "Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefited from the myriad public grants for research could be classified as a **\*143** public figure-a conclusion that our previous opinions have rejected. The 'use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area.' *Time, Inc. v. Firestone, supra., at 456 [47 L.Ed.2d 154, 96 S.Ct. 958].*"

> FN8 *Wolston v. Reader's Digest Assn., Inc., supra., 443 U.S. 157 [61 L.Ed.2d 450],* is distinguishable. Wolston, who had been interrogated about the activities of Soviet intelligence agents in the United States, failed to respond to a grand jury

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

subpoena, subsequently pled guilty to contempt charges, and was sentenced. These proceedings received considerable newspaper publicity but Wolston then returned to relative obscurity until 15 years later when a publisher named him as a Soviet agent. In holding that Wolston was not a public figure, the United States Supreme Court said at page 167 [ 61 L.Ed.2d at page 460]: "Petitioner's failure to appear before the grand jury and citation for contempt no doubt was 'newsworthy,' but the simple fact that these events attracted media attention also is not conclusive of the public figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."

FN9 We agree with the view recently expressed by Division One of this court in *Franklin v. Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915, at pages 928-930 [159 Cal.Rptr. 131], that the broader definition previously suggested by this court in *Montandon v. Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 948 [120 Cal.Rptr. 186, 84 A.L.R.3d 1234], has been superseded by *Gertz, supra.,* 418 U.S. 323, *Time, Inc. v. Firestone* (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958], and *Wolston, supra..*

We hold that the trial court also properly concluded that Weingarten was a public figure.

(6)Next, we turn to Weingarten's contention that the trial court applied the wrong standard in granting the nonsuit. He asserts that following the concurring opinion of Justice Wright in *Wasserman v. Time, Inc.* (D.C. Cir. 1970) 424 F.2d 920 (cert. den. 398 U.S. 940 [26 L.Ed.2d 273, 90 S.Ct. 1844]), the trial court judged the credibility of witnesses and drew its own inferences from the evidence. The record, however, indicates that the court followed the more stringent rule of *Guam Federation of Teach-* *ers, Local 1581, A.F.T. v. Ysrael* (9th Cir. 1974) 492 F.2d 438, which held that all inferences must be drawn in favor of the plaintiff.

We acknowledge that the *Wasserman* rule was followed in *Bon Air Hotel, Inc. v. Time, Inc.* (5th Cir. 1970) 426 F.2d 858, 864-865. However, we find the reasoning of the Ninth Circuit persuasive. Justice Duniway said in *Guam Federation, supra.,* at page 441: "When civil cases may have a chilling effect on First Amendment rights, special care is appropriate. Thus, a judicial examination at these stages of the proceeding, closely scrutinizing the evidence to determine whether the case should be terminated in a defendant's favor, provides a buffer against possible First Amendment interferences. The Supreme Court has instructed trial courts to 'examine for [themselves] the statements in issue and the circumstances under which they were made to see... whether they are of a character which the principles of the First Amendment... protect.' To be unprotected, actual malice must be shown with 'convincing clarity.' *New York Times. supra.,* 376 U.S. at 285-286, 84 S.Ct. at 728-729.

"However, with respect, we are not persuaded by the second phase of Judge Wright's analysis in *Wasserman* which suggests that in deciding these motions, the trial court should judge the credibility of witnesses and draw its own inferences from the evidence. We think that in a libel case, as in other cases, the party against whom a motion for summary \***144** judgment, a motion for a directed verdict, or a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
(Cite as: 102 Cal.App.3d 129)

Page 11

"The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury."

As the Ninth Circuit rule is also in accord with the usual rule followed in this state for nonsuits, we conclude that the trial court applied the correct standard.

(7)Weingarten concedes that he must prove not only that the publication was false but that it was knowingly so or was circulated with reckless disregard for its truth or falsity ( *Cox Broadcasting Corp. v. Cohn, supra.,* 420 U.S., p. 490 [43 L.Ed.2d, p. 346]), by clear and convincing evidence ( *New York Times v. Sullivan, supra.,* 376 U.S. 254).

"Reckless disregard 'cannot be fully encompassed in one infallible definition'; rather, 'its outer limits [must] be marked out through case-by-case adjudication,....' ( *St. Amant v. Thompson, supra.,* 390 U.S. 727, 730 [20 L.Ed.2d 262, 267].) It is clear, however, that it involves a stringent and subjective standard. It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing. Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of his statement. ( *St. Amant v. Thompson, supra.,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267]; *Alioto v. Cowles Communications, Inc., supra.,* 519 F.2d 777, 779; *Montandon v. Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 947 [120 Cal.Rptr. 186], cert. den., 423 U.S. 893 [46 L.Ed.2d 126, 96 S.Ct. 193].) Actual malice, under *New York Times,* concentrates on the defendant's *145 attitude toward the truth or falsity of the material published, and does not focus on the defendant's attitude toward the plaintiff. ( *Cantrell v. Forest City Publishing Co.* (1974) 419 U.S. 245, 251-252 [42 L.Ed.2d 419, 426, 95 S.Ct. 465]; *Carson v. Allied News Co., supra.,* 529 F.2d 206, 214.) Where the defamatory

statements made by the defendant do not involve an element of 'hot news' and the need for expeditious release is not present, reckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts." ( *Widener v. Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 434 [142 Cal.Rptr. 304].)

Viewing the record in favor of Weingarten in the light of his burden of proof as to Block's attitude toward the truth or falsity of the material published, the following pertinent facts appear: Block actively took over management of the Herald around August 1970, and changed the editorial staff. After the change, the Herald opposed the recall.

L. N. Haddad, who was the Mayor of Seaside from 1966 to 1972, testified that in 1970, before Weingarten was fired as city attorney, he was contacted by Block. Block wanted to know why Haddad had so strongly defended Weingarten, and urged Haddad to join the other members of the city council and fire Weingarten as city attorney.

Block had become aware of Weingarten and his activities after conversations with people in Seaside and after receiving letters from Oliver Murray, one of the recalled city council members. Block also received copies of some of the documents in *Parker v. Weingarten.* In this matter, [FN10] Mrs. Parker was awarded damages for breach of trust and malpractice as Weingarten's actions caused her to lose her $4,045 equity in a parcel of real property. She had sought his help to prevent foreclosure. Weingarten arranged the refinancing which included a $5,000 third deed of trust at 10 percent interest to Allnav, Inc., a real estate investment group. Weingarten was a founder and shareholder of Allnav, acted as its attorney, and became the trustee under the third deed of trust. He did not reveal his interest in, and activities for, Allnav to Mrs. Parker. In the transaction, he also acted as trustee for both Mrs. Parker and her son, although their interests were adverse. After a court trial awarding Mrs. Parker $21,301.78, she consented to a reduction to $12,880 to avoid a conditional order granting a new trial; the *146 reduction eliminated

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

$3,421,78 general damages and $5,000 exemplary damages for fraud. The case received extensive publicity at all stages and apparently was one of the factors that led to Weingarten's termination as city attorney.

> FN10 We have based our summary on the unpublished opinion of this court which slightly modified and affirmed the reduced judgment in favor of Mrs. Parker on November 4, 1969; the state Supreme Court subsequently denied a hearing.

Block requested that a reporter be sent on a special assignment from another of its papers, the Pittsburgh Press, which was then on strike. M. Jaques, a reporter with over 25 years of experience, arrived in Monterey late in the summer of 1971 and spent a month investigating the matter before deciding to write an article. He researched court records, deeds, the Seaside city budget, Redevelopment Agency records, the Monterey County Grantor-Grantee Index, the financial statements and records of Allnav Corporation, the Monterey Superior Court files, and the Herald "morgue."

In addition to the city manager, city officials and the recalled council members, Jaques talked to Mr. Hoss, who had represented Mrs. Parker, and one of Hoss's partners, Mr. Etienne. Jaques also interviewed: 1) Mrs. Schacht, who was the adverse party in another publicized case in which Weingarten was the defendant after he represented her former husband; 2) some of the dissident shareholders of Allnav who disagreed with Weingarten about its management and succeeded in dissolving the corporation; 3) the black plaintiff in a housing discrimination action in which Weingarten represented the oriental defendants; 4) Mrs. Charbonneau whose sale of her property to the Redevelopment Agency was delayed because Weingarten had an unrecorded deed to the property obtained in a judgment against the former owner.

Fred Sorri, who was city editor of the Herald for one and one-half years and had been a reporter since 1955, was asked to give Jaques some background on Weingarten. Sorri indicated that Weingarten had done a good job and never lost a case for the city, survived all of the controversies with the city council, and was involved in the unpopular activity of obtaining property by eminent domain for the Redevelopment Agency. When Sorri indicated that Weingarten should be interviewed, Mr. Block said "No." In reply to a question on direct examination, [FN11] Sorri stated that Jaques had been brought out as a "hatchet man" for Block on the Weingarten story but he immediately qualified his answer to indicate that Block would not have brought Jaques out if Block had not had good reason to believe (from sources unknown to *147 Sorri) that there was a story. Sorri's testimony thus established Block's lack of malice toward Weingarten. Sorri's statement that there was no "hot news element" or "news hook" to the September 9, 1971, story, is also of little consequence, given the thorough and lengthy investigation conducted by Jaques.

> FN11 Sorri was a witness for Weingarten.

Nor, contrary to Weingarten's contention, was there any requirement that Jaques also talk to him to obtain his version of the events described. _Rosenbloom v. Metromedia, supra._, 403 U.S. 29, specifically so held at page 56 [ 29 L.Ed.2d 296, at page 319]. Jaques was also not required to provide an objective picture ( _New York Times Company v. Connor_ (5th Cir. 1966) 365 F.2d 567, 576). Inaccuracies in reporting judicial proceedings do not constitute actual malice ( _Time, Inc. v. Pape_ (1971) 401 U.S. 279 [28 L.Ed.2d 45, 91 S.Ct. 633]). Factual error alone, also will not suffice ( _Fadell v. Minneapolis Star & Tribune Co., Inc._ (7th Cir. 1977) 557 F.2d 107). Recklessness is not established by showing that the reporting in question was speculative or even sloppy ( _Oliver v. Village Voice, Inc._ (S.D.N.Y. 1976) 417 F.Supp. 235, 238).

It may be argued that some of Block's activities were indicative of ill will toward Weingarten. Civil Code section 48a, subdivision 4(d), unlike the _New York Times_ standard, includes in its definition of malice "hatred or ill will toward the plaintiff."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129    Page 13
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
(Cite as: 102 Cal.App.3d 129)

However, under that section, such a state of mind does not constitute malice if occasioned by a good faith belief on the part of the defendant in the truth of the publication. Even under the *New York Times* standard, ill will does not constitute proof of knowledge of falsity ( *Hotchner v. Castillo-Puche, supra, 551 F.2d, p. 913*).

An assertion that cannot be proved false cannot be held libelous ( *Gregory v. McDonnell Douglas Corp. (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425]*). A writer canot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expression of it may be ( *Gertz v. Robert Welch, Inc., supra., 418 U.S., pp. 339-400 [41 L.Ed.2d. pp. 804-805]*).

We turn in detail to the allegedly "false and reckless" statements in the order in which they appeared in the September 9 article of which Weingarten complains.

The reference to the possible return of Weingarten as city attorney for Seaside was not defamatory. In any event, Jaques indicated he **\*148** based this statement on sources at city hall and the city manager. Although the latter did not want to be quoted and did not remember making such a statement, Block's lack of malice is demonstrated by the legitimacy of the sources of information, as well as the extended controversy surrounding Weingarten's dismissal, the recall, and the length of time the city took to find a replacement.

As to the statement that the city attorney's position was a "$20,000 a year part-time legal job," the record indicates that the statement was accurate as of the time of the search, although Weingarten had been paid around $10,000- $12,000 annually during his tenure.

As to the innuendos that Weingarten misused his public positions to amass a fortune, the record, admittedly, contains no evidence indicating that anything of the kind had in fact occurred. However, we are not dealing with the correctness of the statements made, but the means by which Jaques obtained the information and the basis for the statements. Even an author whose function is to gather facts need not necessarily verify his information ( *Fadell v. Minneapolis Star & Tribune Co., Inc., supra.,* 425 F.Supp., p. 1085). The record indicates that at the time of his investigation, Jaques had no reason to disbelieve any of his sources. Erhman and Murray both charged Weingarten with making unfair and illegal profits in certain real estate transactions. The First Amendment protects the reporting of charges against a public official or figure "regardless of the reporter's private views regarding their validity. [Citations.] What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation. [Citation.] The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them" ( *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977) 556 F.2d 113, 120; *Pierce v. Capital Cities Communications, Inc.* (3d Cir. 1978) 576 F.2d 495, 498).

Jaques' admission that his use of the term "insider information ...may have been incorrect," at most, is an indication of carelessness. Weingarten did not dispute the fact and the $1.5 million estimate of his wealth, but indicated it was the result of some early and fortunate real **\*149** estate investments. The statement that Weingarten "earned more than $50,000 in some years" from his public employment as both city attorney and legal counsel for the Redevelopment Agency, was apparently true as to one year, in which it is not disputed that Weingarten received over $40,000 from the Redevelopment Agency. Thus, the inference that these earnings occurred in more than one year is mere negligence.

As to Weingarten's "prolific real estate practice," the record indicates that Weingarten testified that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                                                                    Page 14
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
(Cite as: 102 Cal.App.3d 129)

"real property investments" were one of his activities. Jaques based his statement on the grantor-grantee index, other official records, and a number of local attorneys who were identified. Several other attorneys named by Jaques were the source of the statement that some "found difficult to follow in business transactions" Weingarten's recollections of earlier oral agreements.

As to the statements concerning Weingarten's relations with the 50 percent black population of Seaside, the record indicates a number of instances where Weingarten's stand as city attorney or for the Redevelopment Agency, was opposed by a segment of the black community. For example, in 1969 the Redevelopment Agency was the defendant in a federal action charging racial discrimination brought by the Seaside Low Cost Housing Corporation which was represented by Mrs. Van Hook, the same attorney who represented the plaintiffs in the residential housing case discussed in the article. In 1969-1970, there was a controversy concerning the Seaside real estate disclosure ordinance as one council member believed it could be misused to foster racial discrimination. Jaques indicated that this portion of the article was based in part on a meeting he had with some of the dissident members of the black community at the home of Mrs. Carey, one of the recalled city council members.

There was also no "deliberate falsehood or recklessness" in statements pertaining to Weingarten's conduct as an officer, shareholder, and attorney for Allnav, Inc. The proxy fight and subsequent dissolution of Allnav are not disputed. Jaques met with former Allnav associates Hartmann and Gravelle, who both believed at that time that Weingarten, who was in total control of the corporation's assets, had unjustifiably taken $30,000 in fees. They described his activities, the mysterious disappearance and reappearance of some of the corporate records, and their reliance on the pro-forma balance sheet.
*150

As to the comments and innuendos concerning the Schacht litigation, the record also indicates that Jaques and Block believed them to be true. Mrs.

Schacht and her attorney, Mr. Shostak, told Jaques that Weingarten forced her to accept a reduction in the judgment against her former husband. Weingarten personally purchased $60,000 of Mr. Schacht's savings and loan association stock and made the availability of Mr. Schacht's Carmel Valley lots known to the Allnav investment committee. Weingarten had a power of attorney to sell or lease Mr. Schacht's Pebble Beach house and received Mr. Schacht's mail. The description of the Parker litigation also strikes us as an accurate one. As to the comments concerning the bar association, Mr. Etienne stated that at the time of the Parker case, as well as at the time of the instant trial, he believed Weingarten should have been disciplined by the bar association.

The statement that Weingarten's office "sometimes served as a meeting place for rump sessions of the City Council" was also substantially true. Jaques acquired this information from several named individuals and had it confirmed by others. Sorri stated in his depositions that when he covered Seaside City Council meetings, he customarily attended semiclosed sessions of the council which preceded the regular meetings, with the understanding that he was not to directly quote anything that was said.

As to the statement "where there is smoke, there may be fire," the record merely indicates that at the trial five years later, the person to whom it was attributed did not remember making it at all. Jaques stated that the statement was attributable to that person, who was assured that he would not be mentioned in the article. Thus, there was no clear and convincing evidence of known falsity.

When the evidence adduced to show malice or recklessness in the instant case is measured against the clear and convincing standard, it is obvious that it meets none of the stringent requirements for actionable libel of a public official. Every statement has been traced to an identifiable source. There was no evidence that any of the sources denied giving the questioned information to Jaques or that Jaques either knew or had clear grounds to suspect that the statements might be false. All that the evidence re-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                                    Page 15
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

veals is that Jaques relied on one or two persons for each statement; two sources did not remember the statements attributed to them; others were actively involved in the events described in the article *151 and had a bias against Weingarten. None of the statements under the circumstances constituted "reckless disregard for the truth."

Although accuracy and objectivity in reporting are goals for which all responsible news media strive, the protection of the First Amendment is not limited to statements whose validity are beyond question or which reflect an objective picture of the reported events. While verification of the facts remains an important reporting standard, a reporter, without a "high degree of awareness of their probable falsity" may rely on statements made by a single source, even though they reflect only one side of the story without fear of libel prosecution by a public official ( *New York Times Company v. Connor, supra., 365 F.2d, p. 576).*

We conclude therefore that the court properly granted the nonsuit as to the causes of action for libel. Weingarten acknowledges that if the libel count fails, the cause of action for intentional infliction of emotional distress must also fail. ( *Lerette v. Dean Witter Organization, Inc. (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592].)*

Weingarten's contention concerning the survival of the causes of action for conspiracy to commit libel is without merit. As Block's conduct was privileged under the *New York Times* rule, there was no wrongful act on which a conspiracy count could be based. ( *Agnew v. Parks (1959) 172 Cal.App.2d 756, 762 [343 P.2d 118]; Widdows v. Koch (1968) 263 Cal.App.2d 228, 234 [69 Cal.Rptr. 464].)*

As to the cause of action for interference with prospective advantage, unjustifiable and wrongful conduct is also one of the requisite elements ( *Scott v. McDonnell Douglas Corp. (1974) 37 Cal.App.3d 277, 292 [112 Cal.Rptr. 609]).* Thus, the nonsuit was also properly granted as to that cause of action.

The judgment of nonsuit is affirmed; the purported appeal from the order of November 24, 1976, is dis-

missed.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied March 14, 1980, and appellant's petition for a hearing by the Supreme Court was denied April 10, 1980. *152

"Weingarten Return as City Attorney Possibility in Seaside
"By Milton Jaques
"Herald Staff Writer

"Seaside City Council, which fired City Atty. Saul M. Weingarten last year, may want to hire him back if applicants continue to shun the $20,000 a year part-time legal job.

"That's the way some insiders in Seaside's gleaming and unpaid-for city hall view the desperate search to fill the vacant post.

"A Sept. 15 target date for picking a successor may soon go down the drain, it was learned. Applications are coming in slowly, with fewer than 10 in hand.

"Push Search
"City Manager Milton Farrell is pushing the search throughout California. Realistically, however, he expects the successful candidate will probably be a lawyer who is now engaged in private practice on the Monterey Peninsula.

"As the city's attorney since 1955, shortly after its incorporation, Weingarten had a hand in the rapid growth and development of the community outside the fence of Fort Ord.

"There, in 15 years, he amassed a fortune valued at $1,500,000. He earned more than $50,000 in some years from his public employment as both city attorney and legal counsel for the Redevelopment Agency of the City of Seaside. The redevelopment plum has paid more than $41,000 a year.

"After firing Weingarten last year, the city tried to hire a new attorney, but out of at least 40 applicants, not one was engaged. Legal advice in the interim has been furnished by several local attorneys.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                    Page 16
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

The city looks upon the job as requiring about half the time of a busy lawyer.

"Weingarten, at the same time he was guiding and advising the city with its problems, also engaged in a prolific real estate and legal practice. After leaving the Navy as an officer at the Postgraduate School in Monterey, he quickly gained a reputation for diligence and intelligence.

"Later, some found him difficult to follow in business transactions, particularly in his recollections of earlier verbal agreements.

                          "Backing
"Although enjoying solid backing from Seaside Mayor Louis N. Haddad, whom he serves as personal attorney, also, Weingarten encountered considerable opposition from some segments of the local populace. Black residents were disturbed by his appearances in behalf of a local landlord against whom a civil rights discrimination case was brought by a black couple.

"Minority groups equated Weingarten's public stance as a city attorney and as legal counsel to a federal housing program as requiring action in their behalf, instead of legal opposition.

"Weingarten also antagonized former associates of the Navy with whom he had banded together to form a land development group known as All-Nav, Inc. The group, put together about 1960 as a small-time and friendly operation, came upon hard times in the middle 1960s. *153

"Dissidents waged a proxy fight in the tiny corporation of about 130 members, who bought stock at $10 a share. The dissidents took over the corporation after a number of land deals made by Weingarten turned sour and landed in court. The dissidents discovered that Weingarten had been taking out as much as $30,000 a year in legal and consultant fees. This upset the naval people who thought they were part of a small, informal deal to make a little money in land, with no intention of paying big league salaries to officers. Weingarten shortly before his ouster was president, a member

of the board and legal counsel to All-Nav, Inc.

"As city attorney during Seaside's infancy, Weingarten is credited with helping direct the city's major accomplishments, in growing from a World War II boom town into an orderly residential and commercial city. He handled legal details for the capital improvement program, including the paving of streets, the $20 million urban renewal program, and construction of the city's gleaming offices at Harcourt avenue and Canyon Del Rey boulevard.

                          "Surgery
"The city council since it fired Weingarten has undergone radical surgery. Three of four members - Gerald McGrath, Oliver Murray and Pearl Carey - were retired in a recall movement. Only Councilman Stephen Ross of the group voting to oust Weingarten remains.

"The urban redevelopment agency, composed of members recommended by the mayor and approved by the council, acts autonomously in selecting its own agency staff and legal counsel. A friendly council, of course, is likely to approve the mayor's selections.

"A friendly city council, too, could go along with the mayor who was outvoted in his opposition to the ousting of Weingarten by last year's council.

"Weingarten's biggest problem with combined public and private practice came in a series of suits brought against him over the past five years. Of these, only one had previously been disclosed in the press. In the legal battles, two court decisions ruled against Weingarten, and one, brought against him for fraud and to set aside fraudulent conveyances, was settled in secret.

"And although Haddad says Weingarten never lost a case while serving as city attorney, in his private practice, Weingarten's court record shows three substantial setbacks.

"Actually, Seaside druggist Fred Mitchell says he bested Weingarten in a case involving the right of customers to park at the Fremont Pharmacy's curb-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129                                                     Page 17
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
**(Cite as: 102 Cal.App.3d 129)**

side. In the dispute, it developed that the State of California, and not the city of Seaside, as represented by Weingarten, controlled the regulation of parking on the busy thoroughfare.

"A 1965 suit brought by Mrs. Elizabeth L. Schacht of San Francisco against Weingarten probably set back the former Seaside city attorney as decisively as anything.

### "Secret Settlement

"Tried in 1969 before a jury in superior court, it was settled secretly after a day and a half of testimony. It was learned that Weingarten paid between $40,000 and $50,000 to close the case.

"He had been brought into court accused of helping John H. Schacht, formerly of Pebble Beach, skip town to avoid paying a $216,000 judgment to his former wife.

"In 1964, Schacht liquidated his Monterey County assets and moved to Canada in the interval between Judge Anthony Brazil's announcement of the judgment from the bench, and the formal recording of the ruling.

"In attempting to find Schacht, investigators ran into Weingarten serving as a lawyer for him. Weingarten was accused of assisting in the rapid liquidation by personally buying $60,000 worth of savings and loan association stock from Schacht. He was also **\*154** accused of getting All-Nav, Inc., the land development group, to purchase Schacht's two building lots in Carmel Valley.

"Schacht handed the keys to his Pebble Beach house to Weingarten, with orders to lease or sell. Weingarten's Seaside office, which sometimes served as a meeting place for rump sessions of city council, became the 'mail drop' for the vanished Schacht.

"Weingarten was implicated in the case because the California Code for attorneys prohibits advising and assisting clients to avoid court judgments. Weingarten in his defense said Schacht had told him of intentions to appeal the judgment with a

need for cash in case he had to comply with the court order.

### "Pleads 'Poor'

"The wealthy Weingarten, who also owns two houses in Pebble Beach, including one he rents to Seaside City Manager Milton Farrell, pleaded poverty in seeking to pay the secret settlement.

"After his first offer of $1,000 a month for 50 months was accepted, he returned with another offer of a flat $40,000, or a 20 per cent cut, for cash. This was also accepted.

"Mrs. Diane Charbonneau, who lived on Mingo street in Seaside in the early 1960s with her four children, also fought Weingarten successfully. She retained control of her property through litigation after the urban redevelopment lawyer, using insider information on land sales, sought to claim it as his own.

### "Barred

"A superior court judge cleared the way for Mrs. Charbonneau to sell her property to the redevelopment project, rejecting all claims of Weingarten to the property. The court barred Weingarten from interfering with the sale of her property.

"Years earlier, Weingarten had obtained a sheriff's deed to the property in a judgment against a former owner. He had not recorded the deed at the courthouse in Salinas, and a title search by Mrs. Charbonneau's attorney revealed that legal title had remained with a Southern California woman.

"Complicating the legal case was the fact that Weingarten had also taken a third deed of trust against the property after he had served as Mrs. Charbonneau's attorney in a divorce. His fee was $250, plus $25 costs.

### "Third Case

"The third losing case Weingarten encountered in his private practice involved charges of fraud, malpractice and negligence in his trusteeship of property on Casanova street, Monterey, on behalf of a widow.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

102 Cal.App.3d 129
102 Cal.App.3d 129, 162 Cal.Rptr. 701, 5 Media L. Rep. 2585
(Cite as: 102 Cal.App.3d 129)

Page 18

"Lawyers still argue whether the Seaside attorney was actually found guilty of fraud in the suit brought by Mrs. Marie Parker for the recovery of her property. The newspapers carried the story both ways.

"Weingarten appealed Judge Hugh Donovan's ruling in superior court in Monterey County to the California Supreme Court, but to no avail. The only modification in the original ruling was a reduction in damages paid to the widow who had been wiped out of her $21,000 equity by the transactions of her attorney, her son, and his real estate partner.

"The judge, horrified by the legal tangle, stated from the bench:

"'You see, there is the viciousness of the whole thing. He (Weingarten) was acting for both parties with adverse interests ... *155

"'And I reluctantly, I assure I reluctantly rendered this judgment because I thought there was a violation of the State Bar Act there.'

"In searching for a new city attorney, the Seaside City Council will not have the advice and assistance of the bar association. This advice is sought, for instance, by the U.S. Senate when it is asked to confirm presidential appointments to the federal bench.

"Formal complaints lodged with the bar association against the Seaside public official have been turned aside as inconsequential. In private conversations, local attorneys admit they are aghast at the problems created for them by the antics of their colleague in the bar.

"'Sure, he's giving us a bad name,' said one.

"'Where there's smoke, there may be fire,' one wise and judiciously-inclined older member observed.

"The city council, meantime, hopes to proceed with filling the attorneyship, and has not barred Weingarten from further consideration." *156

Cal.App.1.Dist.,1980.

Weingarten v. Block

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.